IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK
Buffalo Division

NEW YORK STATE RIFLE AND PISTOL :
ASSOCIATION, INC.; WESTCHESTER :
COUNTY FIREARMS OWNERS :
ASSOCIATION, INC.; SPORTSMEN'S :
ASSOCIATION FOR FIREARMS EDUCATION, :
INC.; NEW YORK STATE AMATEUR :
TRAPSHOOTING ASSOCIATION, INC.; :
BEDELL CUSTOM; BEIKIRCH AMMUNITION :
CORPORATION; BLUELINE TACTICAL & :
POLICE SUPPLY, LLC; WILLIAM NOJAY, :
THOMAS GALVIN; and ROGER HORVATH, :
 :
   Plaintiffs. :
 :
  v. :  Civil No.:_____
 :
ANDREW M. CUOMO, Governor of the State of :
New York; ERIC T. SCHNEIDERMAN, Attorney :
General of the State of New York; JOSEPH A. :
D'AMICO, Superintendent of the New York State :
Police; FRANK A. SEDITA, III, District :
Attorney for Erie County; and GERALD J. GILL, :
Chief of Police for the Town of Lancaster, :
New York, :
 :
   Defendants. :

## COMPLAINT

### (For Declaratory Judgment and Injunctive Relief)

  1.  This is an action to vindicate the right of the people of the State of New York to keep

and bear arms under the Second Amendment to the United States Constitution, which prohibits

infringement of the right of law-abiding citizens to keep commonly-possessed firearms in the home

for defense of self and family and for other lawful purposes.

2.     Plaintiff NEW YORK STATE RIFLE AND PISTOL ASSOCIATION, INC. ("NYSRPA", "association plaintiff"), is a New York not-for-profit corporation with approximately 45,000 members and with its principal place of business in Albany (Albany County), New York. The NYSRPA is New York state's largest and the nation's oldest firearms advocacy organization. Since 1871 the NYSRPA has been dedicated to the preservation of Second Amendment rights, promotion of firearm safety, education and training, and the shooting sports. Members of the NYSRPA participate in numerous rifle and pistol matches within and without the State of New York on an annual basis.  The NYSRPA brings this action on behalf of itself and its members ("members" or "member plaintiffs").

3.     Plaintiff WESTCHESTER COUNTY FIREARMS OWNERS ASSOCIATION, INC. ("WCFOA", "association plaintiff"), is a New York not-for-profit corporation with approximately 2,000 members and with its principal place of business in Rye Brook (Westchester County), New York.  WCFOA is a grassroots, all-volunteer organization. WCFOA's primary purpose is to protect and defend the right of lawful firearm owners to exercise their fundamental constitutional right to keep and bear arms.  The WCFOA brings this action on behalf of itself and its members ("members" or "member plaintiffs").

4.     Plaintiff SPORTSMEN'S ASSOCIATION FOR FIREARMS EDUCATION, INC. ("SAFE", "association plaintiff"), is a New York not-for-profit corporation with approximately 1,200 members and with its principal place of business in Commack (Suffolk County), New York. Since September 1994, SAFE has been dedicated to the preservation of Second Amendment rights, promotion of firearm safety, education and training, and the shooting sports. Members of SAFE participate in numerous rifle events each year and SAFE sponsors many outdoor shooting events.

For example, SAFE sponsors biannual women's only instructional classes to promote safety and gun education to women. SAFE  brings this action on behalf of itself and its members ("members" or "member plaintiffs").

5.      Plaintiff NEW YORK STATE AMATEUR TRAPSHOOTING ASSOCIATION, INC. ("NYSATA", "association plaintiff") is a New York not-for-profit corporation having its primary place of business at 7400 Bull Street, Bridgeport, New York. The NYSATA was founded in 1858. The object of the NYSATA is the encouragement of trapshooting, the protection and propagation of fish and game, the preservation of forests, and the promotion of good fellowship. The NYSATA has 50 affiliated clubs. On average, each affiliated club through the State has 100 members. The NYSATA hosts four major shoots throughout the year; the next shoot will be held on May 8 through May 12, 2013 in Cicero, New York.  The  NYSATA brings this action on behalf of itself and its members ("members" or "member plaintiffs").

6.      Plaintiff BEDELL CUSTOM ("Bedell", "business plaintiff") is a New York sole proprietorship with a principal place of business in Lancaster (Erie County), New York.  DANIEL BEDELL is the owner and operator of Bedell Custom, and engages in the business of manufacturing and selling firearms both within and without the State of New York.  Mr. Bedell is a resident of Lancaster, New York and a citizen of the United States.  Mr. Bedell holds a Federal Firearms License ("FFL") for the sale, re-sale and importation of firearms and ammunition, as well as Gunsmith and Dealer licenses issued by Erie County.

7.      Plaintiff BEIKIRCH AMMUNITION CORPORATION ("Beikirch", "business plaintiff") is a New York corporation with a principal place of business in East Rochester (Monroe County), New York.  HANS FARNUNG ("Farnung") is the President and Chief Executive Officer

of Beikirch.  Beikirch is in the business of selling firearms and ammunition both within and without

the State of New York.  Beikirch holds an FFL for the sale, re-sale and importation of firearms and

ammunition, as well as a handgun re-sale license issued by Monroe County.  Farnung holds a

Residence Carry license issued by Monroe County.

       8.      Plaintiff BLUELINE TACTICAL & POLICE SUPPLY LLC ("Blueline", "business

plaintiff") is a New York limited liability corporation with a principal place of business in Elmsford

(Westchester County), New York.   BENJAMIN ROSENSHINE ("Rosenshine") is the Chief

Executive Officer of Blue Line.  Blueline is in the business of selling firearms and ammunition both

within and without the State of New York.  Blueline holds an FFL for the sale, re-sale and

importation of firearms and ammunition, as well as a Dealer license issued by Westchester County.

Rosenshine holds a Residence Carry license issued by Westchester County.

       9.      Plaintiff WILLIAM NOJAY ("Nojay", "individual plaintiff") is a resident of

Pittsford (Monroe County), New York, and a citizen of the United States.  Mr. Nojay holds a

Residence Carry permit issued by Monroe County and is the owner of AR-type firearms.  Mr.

Nojay was elected to the New York State Assembly in November 2012 and currently serves as a

representative of  Assembly District 133.

       10.      Plaintiff THOMAS GALVIN ("Galvin", "individual plaintiff") is resident of

Rochester (Monroe County), New York, and a citizen of the United States.  Mr. Galvin holds a

Federal Firearms License ("FFL"), as well as Dealer and Carry Licenses issued by Monroe County.

Mr. Galvin is a Life Member of the National Rifle Association and a Life Member of The New

York State Rifle and Pistol Association. He has been a competitive marksman from 1970 to the

present. Mr. Galvin is a marksmanship instructor for junior and adult members of The Genesee Conservation League, Inc., and has been so for the past 25 years. Mr. Galvin is a left-hand amputee.

11.     Plaintiff ROGER HORVATH ("Horvath", "individual plaintiff") is a resident of Mahopac (Putnam County), New York, and a citizen of the United States.  Mr. Horvath holds a Federal Firearms License ("FFL"), as well as full carry license issued by Putnam County.   Mr. Horvath is paralyzed from the chest down, is wheelchair bound, and suffers from severe Carpal Tunnel Syndrome in his left hand.

12.     The individual plaintiffs, member plaintiffs, and business plaintiffs are eligible under the laws of the United States and of the State of New York to receive and possess firearms, including handguns, rifles, and shotguns, and ammunition.  Each of the above association plaintiffs brings suit on its own behalf and on behalf of its members.

13.     Defendant ANDREW M. CUOMO is the Governor of the State of New York  whose principal place of business is in Albany (Albany County), New York.

14.     Defendant ERIC T. SCHNEIDERMAN is the Attorney General of the State of New York whose principal place of business is in Albany (Albany County), New York.

15.     Defendant JOSEPH A. D'AMICO is Superintendent of the New York State Police whose principal place of business is in Albany (Albany County), New York.

16.     Defendant FRANK A. SEDITA, III is the District Attorney for Erie County, New York whose principal place of business is Buffalo (Erie County), New York.

17.     Defendant GERALD J. GILL is the Chief of Police for the Town of Lancaster, whose principal place of business is in Lancaster (Erie County), New York.

18.     All Defendants herein are being sued in their official capacities.

**Jurisdiction**

19.     Jurisdiction is founded on 28 U.S.C. § 1331 in that this action arises under the

Constitution and laws of the United States, and under 28 U.S.C. § 1343(a)(3) in that this action

seeks to redress the deprivation, under of color of the laws, statutes, ordinances, regulations,

customs and usages of the State of New York, of rights, privileges or immunities secured by the

United States Constitution.

20.     This action seeks relief pursuant to 28 U.S.C. §§ 2201, 2202, and 42 U.S.C. § 1983.

21.     Venue lies in this district pursuant to 28 U.S.C. § 1391.

**The New York Secure Ammunition and Firearms Act**

22.     On January 15, 2013, Governor Cuomo signed into law the New York Secure

Ammunition and Firearms Act ("the Act"), which was passed as "emergency legislation" without

notice to the public or committee hearings.  The Act creates new offenses with severe criminal

penalties for previously-lawful activities involving the acquisition and possession of rifles,

handguns, shotguns, ammunition magazines, and ammunition.  As such, the Act severely and

adversely affects plaintiffs and millions of other law-abiding gun owners in New York.

**Prohibitions on Magazines**

23.     The Act bans "large capacity ammunition feeding devices," which are devices "that

have a capacity of, or can readily be restored or converted to accept," more than 7 or 10 rounds of

ammunition, depending on when they were acquired by the owner, and depending on different

effective dates.  Such devices are hereafter called "LC magazines."  It also prohibits possession of a

magazine loaded with more than 7 rounds, except that 10 rounds may be loaded at certain ranges or

competitions.

24.     Possession of an LC magazine is a felony. § 265.02(8).  Transportation and disposition of an LC magazine are felonies.  § 265.10(2), (3).

25.     Effective January 15, 2013, an LC magazine was redefined to include any such device with a capacity of more than 10 rounds.  Act § 38, amending New York Penal Law § 265.00(23)(a).[1]

26.     Effective March 15, 2013, for purposes of the magazine ban in § 265.02(8), an LC magazine does not include a magazine with a capacity of 8 to 10 rounds "lawfully possessed by such person before the effective date of the chapter of the [Act] which amended this subdivision [8]," and further does not include a magazine manufactured before September 13, 1994, with a capacity of more than 10 rounds.  Act § 41-b.

27.     Effective March 15, 2013, the above ban on possession of an LC magazine, § 265.02(8), does not apply to possession and use of a magazine containing 8 to 10 rounds at:

> an indoor or outdoor firing range located in or on premises owned or occupied by a duly incorporated organization organized for conservation purposes or to foster proficiency in arms; at an indoor or outdoor firing range for the purpose of firing a rifle or shotgun; at a collegiate, olympic or target shooting competition under the auspices of or approved by the national rifle association; or at an organized match sanctioned by the International Handgun Metallic Silhouette Association.

Act § 46, amending § 265.20(a)(7-f).

28.     Effective March 15, 2013, the Act created a new § 265.36 making it unlawful to possess an LC magazine manufactured before September 13, 1994, "and if such person lawfully possessed" such LC magazine before the effective date of the Act, "that has a capacity of, or that can be readily restored or converted to accept, more than ten rounds of ammunition."  Act § 46-a.

---

[1]  All statutory references hereafter are to New York Penal Law.

The "and if" clause does not complete a sentence, and the meaning of this provision is unintelligible.

29.     Effective March 15, 2013, the Act created a new § 265.37 making it unlawful to possess a magazine "that such person lawfully possessed" before the Act's effective date with a capacity of "more than seven but less than ten rounds of ammunition, where such device contains more than seven rounds of ammunition."  Act § 46-a.  Under this provision, one may not load a magazine with a capacity of 8 or 9 rounds with more than 7 rounds, but one may load a magazine with a capacity of 10 rounds with 10 rounds.

30.     The above new §§ 265.36 and 265.37 apply to everyone without any exemptions, including police officers and peace officers who are made exempt from other provisions by § 265.20(a)(1)(b) & (c).

31.     Effective April 15, 2013, § 265.00(23) is amended to state in part:

"Large capacity ammunition feeding device" means a magazine, belt, drum, feed strip, or similar device, that (a) has a capacity of, or that can be readily restored or converted to accept, more than ten rounds of ammunition, or (b) contains more than seven rounds of ammunition, or (c) is obtained after the effective date of the chapter of the laws of two thousand thirteen which amended this subdivision and has a capacity of, or that can be readily restored or converted to accept, more than seven rounds of ammunition . . . .

Act § 38.

32.     Section 265.00(22)(h) provides that an LC magazine legally possessed by an individual prior to the Act "may only be sold to, exchanged with or disposed of to a purchaser authorized to possess such weapons or to an individual or entity outside of the state," subject to reporting the transfer.  Transfer of an LC magazine to a person inside New York is a crime unless it is transferred within one year of the Act's effective date, i.e., by January 15, 2014.  Act § 37.

33.     The State of New York has published a "frequently asked" questions web page concerning the Act on its website.  Governor Cuomo's "N.Y. SAFE ACT FAQ" website ("the website") states:

> Q:     *What if I have a magazine that can contain more than ten rounds?*
>
> A:     *You can permanently modify the magazine so that it holds no more than ten rounds, responsibly discard it, or sell it to a dealer or an out of state purchaser by January 15, 2014.*

See:  http://www.governor.ny.gov/2013/gun-reforms-faq.

34.     The website does not define the term "permanent," does not provide any guidance on how to permanently modify magazines in a manner that the State of New York finds acceptable, nor does it refer gun or magazine owners to any other resource that can provide this information.

## Prohibitions on Rifles, Handguns, and Shotguns

35.     The Act defines as "assault weapons" commonly-possessed rifles, handguns, and shotguns that are semiautomatic, meaning that they fire only a single round with one pull of the trigger, just like other ordinary firearms.  They are not "machine guns," which are fully automatic and continue to fire until the trigger is released.

36.     The Act broadens the firearms defined as "assault weapons" by replacing the "two-features" test in found in prior law with a "one-feature" test.  The Act requires registration or forced divestiture of those already possessed, and "grandfathers" those that are registered, but only to the owner at the time the Act was passed.  It prohibits possession of any "assault weapons" not already possessed and registered.

37.     Possession of an assault weapon is a Class D felony. § 265.02(7).  Transportation and disposition of an assault weapon are Class D felonies.  § 265.10(2), (3).

38.     Effective on January 15, 2013, § 37 of the Act amended § 265.00(22) to redefine "assault weapon" as follows:

*Rifles*

(a)     a semiautomatic rifle that has an ability to accept a detachable magazine and has at least one of the following characteristics:

    (i)      a folding or telescoping stock;
    (ii)     a pistol grip that protrudes conspicuously beneath the action of the weapon;
    (iii)    a thumbhole stock;
    (iv)    a second handgrip or a protruding grip that can be held by the non-trigger hand;
    (v)     a bayonet mount;
    (vi)    a flash suppressor, muzzle break, muzzle compensator, or threaded barrel designed to accommodate a flash suppressor, muzzle break, or muzzle compensator;
    (vii)   a grenade launcher . . . .

*Shotguns*

(b)     a semiautomatic shotgun that has at least one of the following characteristics:

    (i)      a folding or telescoping stock;
    (ii)     a thumbhole stock;
    (iii)    a second handgrip or a protruding grip that can be held by the non-trigger hand;
    (iv)    a fixed magazine capacity in excess of seven rounds;
    (v)     an ability to accept a detachable magazine . . . .

*Pistols*

(c)     a semiautomatic pistol that has an ability to accept a detachable magazine and has at least one of the following characteristics:

    (i)      a folding or telescoping stock;
    (ii)     a thumbhole stock;

(iii)    a second handgrip or a protruding grip that can be held by the non-trigger hand;

(iv)    capacity to accept an ammunition magazine that attaches to the pistol outside of the pistol grip;

(v)    a threaded barrel capable of accepting a barrel extender, flash suppressor, forward handgrip, or silencer;

(vi)    a shroud that is attached to, or partially or completely encircles, the barrel and that permits the shooter to hold the firearm with the non-trigger hand without being burned;

(vii)    a manufactured weight of fifty ounces or more when the pistol is unloaded;

(viii)    a semiautomatic version of an automatic rifle, shotgun or firearm . . . .

39.    The term "assault weapon" further includes "(e) a semiautomatic rifle, a semiautomatic shotgun or a semiautomatic pistol or weapon defined in" § 265.00(22)(e)(v) as added by chapter 189 of the laws of 2000 "and otherwise lawfully possessed pursuant to such chapter" prior to September 14, 1994 (i.e., rifles, handguns, and shotguns grandfathered under prior law).

40.    The term "assault weapon" further includes "(f) a semiautomatic rifle, a semiautomatic shotgun or a semiautomatic pistol or weapon defined in" § 265.00(22)(a), (b) or (c) "possessed prior to" the date of this enactment, i.e., January 15, 2013.

41.    As provided by § 265.00(22)(g), "assault weapon" does not include, *inter alia*, "(ii) a semiautomatic rifle that cannot accept a detachable magazine that holds more than five rounds of ammunition; [and] (iii) a semiautomatic shotgun that cannot hold more than five rounds of ammunition in a fixed or detachable magazine . . . ."

42.    Further, "assault weapon" does not include a weapon registered under § 400.00(16-a), but which is subject to § 265.00(22)(h).  § 265.00(22)(g)(v).  Section 265.00(22)(h) in turn provides that a weapon defined in § 265.00(22)(e) or (f) and a large capacity ammunition feeding device that was legally possessed by an individual prior to the enactment of this Act "may only be sold to, exchanged with or disposed of to a purchaser authorized to possess such weapons or to an

GOLDBERG SEGALLA, LLP
11 Martine Ave., 7th Floor
White Plains, NY 10607
(914) 798-5400

individual or entity outside of the state," provided that the transfer is reported to the entity where the weapon is registered.

### Registration Requirements

43.     Grandfathered "assault weapons" must be registered with the New York State Police by April 15, 2014, or sold to a dealer or out of state by January 15, 2014.  Governor Cuomo's website states: "If you have an assault weapon, you can register it with the State Police. You have until April 15, 2014 to register your weapon."  The website states that instead of registering the assault weapon: "You can sell it to a New York State dealer or anyone out of state by January 15, 2014."

44.     Effective on March 15, 2013, a new § 265.01-b(2) provides that a person who lawfully possesses a firearm (handgun) prior to the enactment of that section and fails to register it under § 400.00(16-a) commits a felony.  Act § 41-a.

45.     Also effective on March 15, 2013, § 265.20(a)(3) – which exempts a licensed handgun from prohibitions on handgun possession – is amended also to exempt possession of a weapon defined in § 265.00(22)(e) & (f)  (an "assault weapon" legally possessed prior to the Act) which is registered under § 400.00(16-a) or is included in an amended license under § 400.00.  Act § 46.

46.     Effective on April 15, 2013, § 400.00(16-a) provides that the owner of a weapon in § 265.00(22)(e) or (f) possessed before the effective date of the Act must apply to register it or amend a firearm license to include it within one year of the effective date of this subdivision, i.e., by April 15, 2014.  Act § 48.

## Prohibitions on Sale and Acquisition of Ammunition

47.     The Act requires that no ammunition may be commercially sold or transferred other than by a licensed firearm dealer or a seller of ammunition registered with the State Police.  The identities of all persons buying ammunition will be transferred electronically to the State Police.

48.     "Seller of ammunition" means a person or firm "who engages in the business of purchasing, selling or keeping ammunition."  Act § 39, enacting § 265.00(24).  "Dealer in firearms" means a person or firm "who engages in the business of purchasing, selling, keeping for sale, loaning, leasing, or in any manner disposing of, any assault weapon, large capacity ammunition feeding device, pistol or revolver."  § 265.00(9).

49.     Effective on January 1, 2014, § 50 of the Act created § 400.03, which provides that a seller of ammunition must register with the superintendent of state police, while a dealer in firearms need not do so if already registered.  § 400.03(1).  Such sellers and dealers must keep records of ammunition receipt and delivery, including the date, name, age, occupation, residence, amount, caliber, manufacturer, serial number or other identification.  They are subject to inspection by the police and peace officers "at all reasonable hours."  § 400.03(2).

50.     Once the superintendent of the state police certifies that the statewide license and record database is operational, no ammunition may be transferred unless: (a) the seller identifies the transferee and the ammunition information in the database, (b) the system provides a unique identification number, and (c) the transferee presents an identification document.  § 400.03(3).

51.     If the purchaser is eligible, the database provides the unique identification to the seller.  § 400.03(4).  The seller must create a record of the transaction which shall be accessible by the division of state police and maintained for no longer than one year.  § 400.03(5).  If available, a

background check under the National Instant Criminal Background Check System will satisfy these requirements.  § 400.03(6).

52.     "No commercial transfer of ammunition shall take place unless a licensed dealer in firearms or registered seller of ammunition acts as an intermediary between the transferor and the ultimate transferee of the ammunition for the purposes of contacting the statewide license and record database pursuant to this section. Such transfer between the dealer or seller, and transferee must occur in person."  § 400.03(7).  A seller of ammunition who fails to register and sells ammunition, or who fails to keep the required records, is subject to fines and imprisonment.  § 400.03(8).

53.     The Act's Statement in Support states that "this bill requires that any seller – whether located in New York or out of state – ship the ammunition to a dealer within New York for in-person pick-up."

### Facts and Impact

54.     Members of Plaintiffs NYSRPA, WCFOA, and SAFE ("members") possess and wish to acquire rifles, handguns, shotguns, ammunition feeding devices, and ammunition, and are subject to and adversely affected by each and every restriction articulated in this complaint on "assault weapons" (including each definition thereof), "large capacity ammunition feeding devices," and ammunition sales.  In addition, members of NYSATA are adversely affected by the restrictions on ammunition sales.

55.     Individual plaintiffs WILLIAM NOJAY and THOMAS GALVIN and ROGER HORVATH possess and wish to acquire rifles, handguns, shotguns, ammunition feeding devices, and ammunition, and are subject to and adversely affected by each and every restriction articulated

in this complaint on "assault weapons" (including each definition thereof), "large capacity ammunition feeding devices," and ammunition sales.

56.     Individual plaintiffs WILLIAM NOJAY and THOMAS GALVIN and ROGER HORVATH are adversely affected by the change in the definition of "large capacity feeding devices" and also by the restrictions on ammunition sales.

57.      Plaintiff BEDELL CUSTOM is in the business of manufacturing, buying and selling firearms and ammunition within and without the State of New York.  Bedell's business is subject to and adversely affected by each and every restriction articulated in this complaint on "assault weapons" (including each definition thereof), "large capacity ammunition feeding devices," and ammunition sales.  In addition, Bedell's business has been adversely affected by the change in the definition of "large capacity feeding devices" and also by the restrictions on ammunition sales.

58.     For example, prior to the enactment of the Act, a significant segment of Bedell's business involved the purchase of "AR"-type firearms from out-of-state distributors and the sale of these "AR"-type firearms to customers.  As a direct and proximate result of the Act's passage, Bedell's out-of-state distributors have significantly reduced and, in some cases, stopped altogether the shipment of "AR"-type firearms to Bedell due to concern and confusion over whether these types of arms can legally be shipped to, received by and/or sold by the holder of an FFL.  These reductions and stoppages have caused actual harm to Bedell's sales and overall business.

59.     By way of further example, another segment of Bedell's business involves modifying and customizing specific types of firearms that are used in United States Practical Shooting Association ("USPSA") competitions.  While the caliber and type of these USPSA firearms may vary, they share a common denominator in that they require the use of magazines that

can hold at least ten (10) rounds of ammunition. As a direct and proximate result of the passage of the Act, Bedell's orders for and shipments of USPSA firearms have been significantly reduced, and this segment of Bedell's business has suffered actual harm.

60.     Plaintiff BEIKIRCH AMMUNITION CORP. is in the business of buying, selling, and re-selling firearms and ammunition within and without the State of New York. Beirkirch's business is subject to and adversely affected by each and every restriction articulated in this complaint on "assault weapons" (including each definition thereof), "large capacity ammunition feeding devices," and ammunition sales. In addition, Beikirch's business has been adversely affected by the restrictions on ammunition sales.

61.     For example, one segment of Beikirch's business involves the purchase, sale and re-sale of long arms, "AR"- type firearms, and ammunition. As a direct result of the passage of the Act, Beikirch's suppliers of long arms, "AR"- type firearms and ammunition have refused to sell, ship or transport these items into the State of New York due to concern and confusion over whether these types of arms can legally be shipped to, received by and/or sold by the holder of an FFL. These refusals have caused actual harm to Beikirch's sales and overall business.

62.     The actual harm to Beikirch's business has been so great that Beikirch has recently purchased a firearms and ammunition business located in Pennsylvania, close to the New York border near its own current location. This purchase was made out of concern created by dwindling firearms and ammunition sales (and related business difficulties) that have been caused by the Act's passage. The Act has harmed Beikirch's business to the point that Beikirch is now contemplating either the imminent shutting down of its New York business and/or the imminent laying off of a large number of its current employees.

63.     Plaintiff BLUELINE TACTICAL & POLICE SUPPLY, LLC is in the business of buying, selling, and re-selling firearms and ammunition within and without the State of New York. Blueline's business is subject to and adversely affected by each and every restriction articulated in this complaint on "assault weapons" (including each definition thereof), "large capacity ammunition feeding devices," and ammunition sales.  In addition, Blueline's business has been adversely affected by the restrictions on ammunition sales.

64.     For example, one segment of Blueline's business involves the purchase, sale and re-sale of rifles, including "AR"- type firearms, and ammunition.  As a direct result of the passage of the Act, Blueline's sales of rifles, AR-type firearms and ammunition have been significantly reduced. These reductions have caused actual harm to Blueline's business.

65.     In addition, suppliers of long arms, "AR"- type firearms and ammunition have refused to sell, ship or transport these items into the State of New York due to concern and confusion over whether these types of arms can legally be shipped to, received by and/or sold by the holder of an FFL.  These refusals have caused actual harm to Blueline's sales and overall business.

66.     Since the passage of the Act, Blueline's customers have demonstrated a decreased willingness to sell or buy long arms, including "AR"-type firearms due to concern and confusion over whether these types of arms can legally be possessed, purchased or sold in the State of New York.  In addition, since the passage of the Act,  a large segment of Blueline's customers have shown an increasing willingness to simply turn in their firearms (rather than sell them) as they are confused and concerned about whether continued possession of these arms constitutes a crime and will result in their (the customers') criminal prosecution.  As Rosenshine puts it, "the customers are tired of being made to feel like criminals."

GOLDBERG SEGALLA, LLP
11 Martine Ave., 7th Floor
White Plains, NY 10607
(914) 798-5400

17

67.     As a direct and proximate result of Blueline's customers' willingness to give up their firearms and/or buy other firerarms, Blueline's sales of firearms have suffered and Blueline's business has been actually harmed.

68.     Some members, individual plaintiffs, and business plaintiffs possess magazines manufactured before September 13, 1994, with a capacity of more than 10 rounds.  Other members, individual plaintiffs, and business plaintiffs possess magazines with a capacity of 8 to 10 rounds that they lawfully possessed before January 15, March 15, and April 15, 2013, respectively.  Still other members, individual plaintiffs, and business plaintiffs do not possess magazines with a capacity of more than seven rounds, but would acquire such magazines forthwith but for the Act.  Many members, individual plaintiffs, and business plaintiffs would load more than seven rounds in their magazines for use in firearms kept in the home for self-protection.  Members, individual plaintiffs, and business plaintiffs are unaware how to modify magazines so they cannot readily be restored or converted to accept more than 7 or 10 rounds.

69.     Some members, individual plaintiffs, and business plaintiffs possess "assault weapons" as previously defined that were lawfully possessed prior to September 14, 1994, and under the laws of 2000.  Other members possess "assault weapons" under each and every one of the Act's new definitions in § 265.00(22) that they lawfully possessed prior to January 15, 2013.  But for the Act, still other members, individual plaintiffs, and business plaintiffs would forthwith obtain and possess "assault weapons" under each and every one of the Act's new definitions in § 265.00(22).

70.     As examples, some members, individual plaintiffs, and business plaintiffs possess, and other members, individual plaintiffs, and business plaintiffs would possess but for the Act,

semiautomatic rifles that have an ability to accept a detachable magazine with a folding or telescoping stock, a pistol grip that protrudes conspicuously beneath the action of the weapon, or a thumbhole stock.  Other members, individual plaintiffs, and business plaintiffs possess or would possess such rifles with muzzle brakes, muzzle compensators, or threaded barrel designed to accommodate such attachments.

71.     By way of further illustration, some members, individual plaintiffs, and business plaintiffs possess Ruger 10/22 semiautomatic rifles with a detachable, rotary magazine that holds 10 rounds of .22 rimfire cartridges and with a thumbhole stock.  Such rifles are commonly used for hunting small game and for target shooting.  A thumbhole stock allows the rifle to be held more comfortably and fired more accurately, but it causes the rifle to be defined as an "assault weapon."

72.     But for the Act, other members, individual plaintiffs, and business plaintiffs would forthwith obtain and possess identical Ruger 10/22 rifles and magazines but may not do so in that they are considered respectively "assault weapons" and "large capacity ammunition feeding devices."

73.     Association plaintiff SAFE owns fourteen (14) Ruger 10/22 rifles.  These .22 caliber arms are sold with a ten-round rotary magazine.  The Act criminalizes these firearms and prohibits their use by SAFE members and students for training purposes and sport simply because they have a 10-round magazine.

74.     As a direct and proximate result of the Act, SAFE is unable to hold instructional classes using its own Ruger 10/22 rifles, including but not limited to classes for women who seek to learn how to use a firearm for their own protection.

75.     SAFE's members own numerous semi-automatic firearms and most semi-automatic firearms are not manufactured and equipped with magazines that hold 7 or fewer rounds.  All of those firearms will be rendered illegal or unusable due to the Act.

76.     Members, individual plaintiffs and business plaintiffs are unaware of how to convert "large capacity ammunition feeding devices" so that they will hold only 7 rounds.   Other members, individual plaintiffs and business plaintiffs might possess the technical ability to attempt such conversions, but are unaware of the definition of  "readily converted or restored" or "permanent" that the State of New York would apply to such conversions. The Governor's website contains no guidance in this regard, nor does it refer gun or magazine owners to other resources that can provide adequate guidance.

77.     Members, individual plaintiffs and business plaintiffs have sought guidance from the State of New York as to the scope of, application of, and exceptions to the SAFE Act, and have either received no response from the State or responses that are inaccurate and confusing.

78.     For example, on January 29th, 2013 Daniel Bedell attended a Safe Act "town meeting" held at the Clarence Public Library in Clarence, New York.  The meeting was attended by Mike Green (Executive Deputy Commissioner of the New York State Division of Criminal Justice Services) and  Steve Hogan (First Deputy Counsel, New York State Police).  During this meeting, Mr. Green and Mr. Hogan were asked numerous questions regarding, *inter alia,*  how the Act was to be applied and/or enforced, the types of firearms the Act implicated, the nature and scope of any exceptions to the Act's criminal provisions, and/or the timing of the Act's enforcement.  The responses of Green and Hogan were vague, ambiguous, confusing and non-responsive to the questions that were asked.   In several instances, Green and Hogan simply read from sections of the

GOLDBERG SEGALLA, LLP
11 Martine Ave., 7th Floor
White Plains, NY 10607
(914) 798-5400

Act, without bothering to explain their application. The response of Green and Hogan did not shed any further light on how the Act was to be applied and/or enforced, the nature and scope of any exceptions to the Act's criminal provisions, the types of firearms the Act implicated, and/or the timing of the Act's enforcement.

79.     During this same meeting Mr. Bedell asked Mr. Green and Mr. Hogan specific questions, such as whether he (Bedell) could sell stripped AR-15 lower receivers under the new law. Examination of the Act reveals that these items are not mentioned anywhere within its numerous provisions.  However, Mr. Green and Mr. Hogan classified these items as prohibited "assault weapons," even though they bear none of the characteristics attributed to "assault weapons" defined by the Act.  Mr. Green's and Mr. Hogan's insistence that these items are "assault weapons" that could not be sold has caused confusion and uncertainty as to how the Act is to be implemented and enforced.

80.     Some members of NYSRPA, WCFOA, and SAFE obtained M-1 carbines from the Civilian Marksmanship Program ("CMP"), either when it was administered by the U.S. Department of the Army or later when it became a private corporation established by federal law.  Other such members wish to obtain such carbines in the future.  M-1 carbines are semiautomatic, have the ability to accept a detachable magazine, have a bayonet mount, and use a 15 round or 30 round detachable magazine.

81.     Some members of NYSRPA, WCFOA and SAFE obtained M-1 rifles from the CMP.  The purpose of the CMP is to promote marksmanship in support of the national defense.  M-1 rifles are semiautomatic and  have the ability to accept an insertable, internal, detachable clip of 8

rounds.  The Act's prohibitions render such rifles and clips, depending on when acquired, either unusable or unlawful to possess.

82.     Being in possession of, or wishing to acquire, "assault weapons" in all pertinent definitions and "large capacity ammunition feeding devices," members of NYSRPA, WCFOA, and SAFE and other plaintiffs are subject to the Act's requirements regarding registration, transferring such items to persons outside of New York, and converting magazines, and to the Act's serious criminal penalties, including incarceration, fines, forfeitures, and cancellation of licenses.

83.     NYSRPA, WCFOA, SAFE, and NYSATA members purchase ammunition at competitive prices from out-of-state businesses.    Members of NYSATA purchase ammunition from out of state and sell such ammunition to other NYSATA members.  The Act's ban on out-of-state sales and creation of a monopoly on sales for New York businesses causes financial harm to such plaintiffs and their members and makes it more difficult to obtain ammunition for lawful self protection, hunting, target shooting, and trap shooting.

## Injury Threatened by Defendants

84.     As Governor of the State of New York, defendant ANDREW M. CUOMO "shall take care that the laws are faithfully executed."  N.Y. Const., Art. IV, §3.  As such, the Governor is responsible for the administration and enforcement of the Act, which he conducts through various officers, agents, and employees.

85.     As Attorney General for the State of New York, defendant ERIC T. SCHNEIDERMAN shall "prosecute and defend all actions and proceedings in which the state is interested . . . ."  Executive Law § 63(1).

86.     As Superintendent of the New York State Police, defendant JOSEPH A. D'AMICO is required to enforce the criminal and administrative provisions of the Act.  "It shall be the duty of the superintendent of the state police and of members of the state police to prevent and detect crime and apprehend criminals."  Executive Law § 223.  The Superintendent shall (a) register "assault weapons," and (b) decide what guns are "assault weapons" and "educate the public" thereon on a website.  Act, § 48, creating § 400.00(16-a).  The Superintendent has a duty to establish the ammunition registration system.  Act, § 50, creating § 400.03.

87.     As District Attorney for Erie County, defendant FRANK A. SEDITA, III, has a duty "to conduct all prosecutions for crimes and offenses cognizable by the courts" of Erie County, including all crimes under the Act.  County Law § 700(1).

88.     As Chief of Police for the Town of Lancaster, New York, defendant GERALD J. GILL has a duty to enforce the criminal laws of the State, including the Act, and "to commit any person charged with a criminal offense until an examination shall be had before the proper magistrate . . . ."  Second Class Cities Law § 141.

89.     As a proximate cause of the administration and enforcement of above provisions of the Act by defendants as aforesaid, Plaintiffs have been, and will continue to be, subjected to irreparable harm.

## COUNT ONE

**(Prohibition on Commonly-Possessed Magazines Violative of the Second Amendment)**

90.     Paragraphs 1 through 89 are re-alleged and incorporated herein by reference.

91.     Magazines that have a capacity of more than 7 or 10 rounds of ammunition are commonly possessed by law-abiding citizens throughout the United States for self defense, target shooting, hunting, and other lawful purposes.  Such magazines are useful for militia purposes. Many firearms are designed for and sold with magazines that hold more than 7 or 10 rounds.

92.     The need for and usefulness of magazines holding more than 7 or 10 rounds for lawful defense of self and others is demonstrated by the fact that they are issued to law enforcement officers.  Criminals have and use magazines without any limitation in capacity.  The Act's provisions on magazines put law-abiding citizens at a grave disadvantage to criminals, who will not comply with the seven-round limit.

93.     The Act's limitation of magazine capacity to 7 rounds or 10 rounds, depending on when they were obtained, and the Act's prohibition on loading more than 7 rounds in any magazine, facially and as applied, infringe on the right of the people, including plaintiffs, to keep and bear arms as guaranteed by the Second Amendment, and as made applicable to the States by the Fourteenth Amendment, of the United States Constitution.

94.     It is not a viable option to say that persons may obtain multiple magazines and change magazines if confronted with a sudden home invasion, robbery, or other attack.  There are members of association plaintiffs NYSRPA, WCFOA, and SAFE who: only have one magazine for their firearm; own obsolete models of firearms for which extra magazines no longer available; do not keep extra loaded magazines with their firearms; could not change magazines while under the

GOLDBERG SEGALLA, LLP
11 Martine Ave., 7th Floor
White Plains, NY 10607
(914) 798-5400

24

extreme stress of a criminal attack; and could not change magazines due to old age, major disability, arthritis, and other physical conditions.

95.     By way of illustration, changing magazines during a marksmanship competition or if confronted with a sudden home invasion, robbery, or other attack is not a viable option for plaintiff Thomas Galvin. Mr. Galvin is a left-hand amputee. For self protection and competition purposes Mr. Galvin owns several Glock pistols and M1A and AR15 rifles, all of which have magazines with capacities over 7 or 10 rounds. If confronted with a sudden home invasion, robbery, or other attack, Mr. Galvin would have to pinch the pistol or rifle under his left arm and against his body without dropping the firearm in order to change the magazine. He would have to do the same during competitions. The necessity of changing magazines under such circumstances because of the Act's requirements presents Mr. Galvin with no viable option to use his pistols or rifles to protect himself in an adequate fashion.

96.     The same illustration applies with equal force to plaintiff Roger Horvath.  Mr. Horvath is a paraplegic, wheelchair-bound, and lives alone on approximately two acres of land with a large area of woods behind his house.  The nearest police precinct is approximately five miles away. Mr. Horvath has an adopted son, Roger Horvath Junior, aged nine (9), whom he takes care of several days and nights per week.  As a wheelchair-bound resident living in a remote area, Mr. Horvath is particularly vulnerable to being targeted by robbers, home invaders, and other predators.

97.     Given his ambulatory disability, Mr. Horvath has limited ability to retreat effectively or safely during a home invasion. Given his advanced Carpal Tunnel Syndrome, Mr. Horvath has extreme difficulty manipulating objects such as ammunition magazines.  This difficulty is compounded by stressful situations where the need to move with speed is paramount.

98.     Mr. Horvath's physical limitations significantly compromise his ability to quickly or effectively reload a firearm.  The extended time Mr. Horvath currently requires to switch out ammunition magazines represents a prolonged exposure to capture, injury and/or death at the hands of a home invader, robber, or other predator advancing upon him during the switch out.  Under such conditions, Mr. Horvath's safety - and the well-being of those who depend upon him for defense – rest upon his ability to use a magazine that holds more than ten (10) rounds of ammunition.  Yet, the Act's criminalization of such magazines deprives him of this ability, and irrationally increases his vulnerability to attack.

99.     Most pistols are not designed to operate with magazines holding only 7 rounds, and come from the factory with magazines with a capacity greater than 7 rounds.  For most pistols, no such magazines are manufactured, and plaintiffs have no knowledge of where to obtain such magazines.  Nor do plaintiffs know how to convert magazines in higher capacities to magazines in lower capacities , and if they could, have no way of knowing whether such magazines would be considered to be ones that could be "readily restored or converted" to accept a higher capacity.   By limiting new magazines to those with a capacity of 7 rounds, the handguns, rifles, and shotguns owned, possessed, sold and/or transferred by plaintiffs are functionally inoperable.

100.     As described above, but for the criminal penalties in the Act forbidding them to do so, member plaintiffs, individual plaintiffs and business plaintiffs would continue to possess, or would forthwith acquire, magazines with a capacity over 7 or 10 rounds for handguns, rifles, and shotguns for protection of themselves and their families in their homes and for other lawful purposes.

101.    Accordingly, the Act's prohibitions on "large capacity ammunition feeding devices" set forth in Penal Law §§ 265.00(22) & (23)(a), 265.02(8), 265.10(2), (3), 265.36, 265.37, and 265.00(22)(h) violate the right of the people, including plaintiffs and members of plaintiff associations, to keep and bear arms, in violation of the Second and Fourteenth Amendments to the United States Constitution.

## COUNT TWO

**(Prohibition on Commonly-Possessed Firearms Violative of the Second Amendment)**

102.    Paragraphs 1 through 101 are re-alleged and incorporated herein by reference.

103.    Prior to the Act, New York law used the pejorative term "assault weapon" to describe commonly-possessed rifles, handguns, and shotguns and to prohibit the acquisition and possession of any such firearms not lawfully possessed prior to its effective date in 1994, as amended in 2000.  Such grandfathered firearms were not required to be registered.

104.    For example, the Act's prohibitions and restrictions on the ordinary rifles, pistols, and shotguns it mischaracterizes as "assault weapons" have already caused a decrease in the number of out-of-state entrants for the NYSATA's next major shoot on May 8 through May 12, 2013 in Cicero, New York. Many of the out-of-state competitors who would have entered competition at this shoot, and would enter NYSATA shoots in the future but for the Act, have expressed their reluctance to NYSATA officers about traveling to New York and attending NYSATA shoots because of the Act's prohibitions and restrictions on ordinary rifles, pistols, and shotguns. Those out-of-state competitors have expressed that the ambiguities of the Act and how it applies to them are the main deterrents to attending NYSATA's upcoming shoot in May 2013 and future NYSATA shoots.

105.    The four major shoots that the NYSATA hosted last year (2012) had a total of 2, 289

entrants. 825 of those entrants, or 36% of the total number of entrants, were from out-of-state. The

decrease in out-of-state entrants to NYSATA shoots due to the Act's prohibitions and restrictions

on the ordinary rifles, pistols, and shotguns will directly injure the NYSATA and its members by

lost profits (through lost entrant fees and a decrease in ammunition sales by the NYSATA at those

shoots) and by decreasing the diversity and skill-level of entrants at NYSATA-sponsored events in

New York State.

106.    The Act radically broadened the meaning of "assault weapon" to describe countless

numbers of rifles, handguns, and shotguns that were commonly-possessed under prior law, to

prohibit the acquisition and possession of any such firearms not lawfully possessed prior to January

15, 2013, and to require the registration of any such firearms lawfully possessed prior to that date.

Any such registered firearms may not be transferred to any person in New York, including to

descendants by inheritance, except a licensed dealer.

107.    Under the Act, a semiautomatic rifle that simply has an ability to accept a detachable

magazine is not an "assault weapon."   Under the Act's "single feature" test, this ordinary rifle

becomes an "assault weapon" merely by reason of having a feature related to how it is held,

transported, or fired comfortably.  § 265.00(22)(a).

108.    A "telescoping stock" allows the length of the stock to be shortened or lengthened

consistent with the length of the person's arms, so as to fit the individual's physique and to enable

more accurate fire.  Those are precisely the same reasons military-issue and police-issue  rifles

usually come with adjustable stocks.  The following features allow a rifle to be held at the shoulder

with more comfort and stability and therefore to be fired with greater accuracy (so as to hit the

GOLDBERG SEGALLA, LLP
11 Martine Ave., 7th Floor
White Plains, NY 10607
(914) 798-5400

intended target, rather than an innocent bystander): "a pistol grip that protrudes conspicuously beneath the action of the weapon," "a thumbhole stock," and "a second handgrip or a protruding grip that can be held by the non-trigger hand." A "folding stock" allows a rifle to be transported more compactly such as in a backpack, ATV, or boat.

109. A "muzzle brake, muzzle compensator, or threaded barrel designed to accommodate" such items reduces the "kick" or recoil in discharging a rifle and thereby enhances accurate fire (in particular for individuals of smaller stature, including, of course, most women). This is precisely why military-issue and police-issue rifles routinely come with muzzle compensators and muzzle brakes.

110. Under the Act, a semiautomatic shotgun is not an "assault weapon." Under the Act's "single feature" test, this ordinary shotgun becomes an "assault weapon" merely by reason of having a feature related to how it is held, transported, or loaded and unloaded. § 265.00(22)(b).

111. A "telescoping stock" allows the length of the stock to be shortened or lengthened consistent with the length of the person's arms. The following features allow a shotgun to be held at the shoulder with more comfort and stability: "a thumbhole stock"and "a second handgrip or a protruding grip that can be held by the non-trigger hand." A "folding stock" allows a shotgun to be transported more compactly.

112. A "fixed magazine capacity in excess of seven rounds" affords a shotgun more utility for self-defense in the home and, in rural areas, predator control. The "ability to accept a detachable magazine" makes a shotgun safer to unload, as all of the shells in a loaded magazine may be removed at once, while many shotguns with fixed magazines are unloaded by repeatedly cycling the action and running each shell through the firing chamber.

113.    Under the Act, a semiautomatic pistol that has an ability to accept a detachable magazine is not an "assault weapon."   Under the Act's "single feature" test, this ordinary pistol becomes an "assault weapon" merely by reason of having a feature related to how it is held, transported, or fired comfortably and accurately.  § 265.00(22)(c).

114.    A "thumbhole stock" allows a pistol to be fired more accurately at targets.  A "capacity to accept an ammunition magazine that attaches to the pistol outside of the pistol grip" is a design allowing a more intricate, accurate trigger mechanism.  A "threaded barrel capable of accepting a barrel extender" may enhance a pistol's balance, and thereby increase its accuracy.  All three of these features may be found on Olympic-style sporting pistols.

115.    A pistol with "a manufactured weight of fifty ounces or more when the pistol is unloaded" would be a matter of personal preference based on a person's strength and wish to reduce recoil.  A pistol that is "a semiautomatic version of an automatic rifle, shotgun or firearm" fails to describe anything inherently adverse about a given pistol other than that it is a "version" of something else.  And the phrase itself is devoid of meaning: what, precisely is a "pistol version" of a "rifle"?  Although they both shoot bullets, those are two different categories of weapons and equating them begs more questions than it answers.

116.    None of the above "assault weapon" features makes a rifle, shotgun, or pistol more powerful or dangerous.  Prohibiting guns with more comfortable furniture that allows them to fit one's hands and to be held better, and thereby to be fired with less discomfort and more accuracy, infringes on Second Amendment rights and is not even rational.

117.    The term "assault weapon" further includes "a semiautomatic rifle, a semiautomatic shotgun or a semiautomatic pistol or weapon defined in" § 265.00(22)(e)(v) as added by chapter

GOLDBERG SEGALLA, LLP
11 Martine Ave., 7th Floor
White Plains, NY 10607
(914) 798-5400

30

189 of the laws of 2000 "and otherwise lawfully possessed pursuant to such chapter" prior to September 14, 1994. § 265.00(22)(e). The term "assault weapon" further includes "(f) a semiautomatic rifle, a semiautomatic shotgun or a semiautomatic pistol or weapon defined in" § 265.00(22)(a), (b) or (c) "possessed prior to" the date of this enactment, i.e., January 15, 2013. No basis exists to restrict such guns, which fire only once per trigger pull.

118.    But for the criminal penalties in the Act forbidding them to do so, member plaintiffs, business plaintiffs and individual plaintiffs would continue to possess and would forthwith acquire rifles with the above features for protection of themselves and their families, for target shooting, and for hunting.

119.    The Act's prohibitions and restrictions on the ordinary rifles, pistols, and shotguns it mischaracterizes as "assault weapons" appear at Penal Law § 265.00(22) (defining "assault weapon"), § 265.01-b(2) (felony not to register firearm possessed prior to January 15, 2013), § 265.02(7) (possession of assault weapon a felony), § 265.10(2), (3) (transportation and disposition of assault weapon), and § 400.00(16-a) (owner of weapon in 265.00(22)(e) or (f) possessed before January 15, 2013, must apply to register it or amend a firearm license to include it by April 15, 2014).

120.    The aforesaid prohibitions and restrictions on rifles, pistols, and shotguns, which are commonly-possessed throughout the United States by law-abiding persons for lawful purposes, facially and as applied, infringe on the right of the people, including plaintiffs and members of plaintiff associations, to keep and bear arms as guaranteed by the Second Amendment, and as made applicable to the States by the Fourteenth Amendment, of the United States Constitution.

## COUNT THREE

**(Limit of 7 rounds in magazine for home protection and allowance for 10 rounds**

**in magazine at range or in competitions denies equal protection of the laws)**

121.    Paragraphs 1 through 120 are realleged and incorporated herein by reference.

122.    The Act prohibits loading more than 7 rounds in a magazine in one's own home for protection of self and family.  Act § 38, amending § 265.00(23) (7 round limit); § 265.02(8) (crime to possess).  That restriction exists even if the homeowner suspects or knows that an intruder has broken into the home and intends to commit a felony within, or to kill, or do harm to the occupants. However, the Act allows 10 rounds to be loaded in a magazine while at a range of an incorporated organization for conservation or proficiency in arms; at a range to fire a rifle or shotgun; at a competition under the auspices of or approved by the national rifle association; or at a match sanctioned by the International Handgun Metallic Silhouette Association.  Act § 46, amending § 265.20(a)(7-f).

123.    Governor Cuomo's website states:

Q:    *How many rounds can I put in my magazine today?*

A:    *Ten. Starting on April 15, 2013, you are limited to putting in seven rounds, unless you are at an incorporated firing range or competition recognized by the National Rifle Association or International Handgun Metallic Silhouette Association, in which case the limit is ten.*

*See*:  http://www.governor.ny.gov/2013/gun-reforms-faq.

124.    The aforesaid discrimination against homeowners who wish to protect themselves and their families from violence, and in favor of persons involved in mere sporting activities, is utterly irrational and denies to plaintiffs and members of plaintiff associations the equal protection

of the laws, contrary to the Fourteenth Amendment of the United States Constitution. It also, of course, infringes on the core right of self-defense guaranteed by the Second Amendment.

125.     In addition, it is unlawful to load more than 7 rounds in a magazine with a capacity of 8 or 9 rounds, if the magazine was lawfully possessed before January 15, 2013. Act § 46-a, creating new § 265.37. No exemptions exist. This would not prohibit loading 10 rounds in a magazine with a capacity of 10 rounds that was lawfully possessed before January 15, 2013. That discrimination against persons with magazines holding 8 or 9 rounds, and in favor of persons with magazines holding 10 rounds, is patently irrational and denies to plaintiffs and members of plaintiff associations the equal protection of the laws, contrary to the Fourteenth Amendment of the United States Constitution.

### COUNT FOUR

**(Granting monopoly of ammunition sales to New York**

**businesses violates the Dormant Commerce Clause and the Due Process Clause)**

126.     Paragraphs 1 through 125 are re-alleged and incorporated herein by reference.

127.     The Act's restriction of ammunition sales to New York businesses authorized by the State Police violates the Dormant Commerce Clause, which is inherent in the power of Congress "to regulate commerce . . . among the several States," as provided by Article I, § 8, cl. 3, of the United States Constitution.

128.     Prior to the Act, ammunition could be lawfully purchased from entities in New York and outside New York. It was not required that ammunition be purchased from a seller of ammunition registered with the State Police or from a licensed dealer in firearms.

129.    Section 50 of the Act created Penal Law § 400.03, which is effective on January 1, 2014, and which provides that ammunition may only be sold by a seller of ammunition registered with the State Police or a licensed dealer in firearms under § 400.00.  A dealer in firearms must "maintain a place of business in the city or county where the license is issued." § 400.00(1).  An application for a license as a dealer in firearms must be submitted "to the licensing officer where such place of business is located." § 400.00(3)(a).

130.    The effect of § 400.03 is to grant a monopoly on ammunition sales to sellers of ammunition and dealers in firearms which are based only in New York.   By allowing in-state businesses to sell ammunition directly to consumers in New York but prohibiting out-of-state businesses from doing so, the Act discriminates against interstate commerce, in violation of the Commerce Clause.

131.    The Act's Statement in Support states that "this bill requires that any seller – whether located in New York or out of state – ship the ammunition to a dealer within New York for in-person pick-up."  The above provisions will thus be enforced extraterritorially on out-of-state sellers through civil and/or criminal actions – a violation of the Due Process Clause.  An out-of-state person or firm that sells any ammunition to a person in New York would be subject to civil and criminal penalties, fines, and potential incarceration.

132.    Plaintiff New York State Amateur Trap Association ("NYSATA") has members (including club members) who purchase shotgun ammunition from out-of-state and sell it to trap shooters, who are also NYSATA members, for practice and competitions.  Section 400.00, when effective, will prohibit such purchase and sale of ammunition by said members, who will be injured by lost profits, higher prices, and lack of availability of ammunition.

133.     Plaintiff NYSATA sells shotgun ammunition to its members and to trap shooters at NYSATA shoots. It sells shotgun shells by the case (250 shells per case) or by the box (25 shells per box). For example, NYSATA's sales of individual boxes to its members for practice or to try out a new gun are common. The NYSATA had approximately $24,742.00 (not including sales tax) in ammunition sales in 2012. The dollar-amount of 2012 sales equates to approximately 106,250 rounds of ammunition. The NYSATA sells the ammunition to its members for a prince below retail prices.

134.     Section 400.00, when effective, will dramatically increase the cost of selling ammunition by NYSATA based on the Act's recording requirements of ammunition receipt and delivery. The Act's recording requirements will drastically reduce, if not eliminate, NYSATA's sales of ammunition by the box to its members because of the time, inconvenience, and privacy concerns implicated by the Act. The increase in cost to the NYSATA will concomitantly increase the cost of ammunition to NYSATA members who have purchased boxes and cases of ammunition from NYSATA in the past and who intend to purchase boxes and cases of ammunition from the NYSATA in the future.

135.     Accordingly, the aforesaid restriction of ammunition sales to New York businesses authorized by the State Police violates the Dormant Commerce Clause as provided by Article I, § 8, cl. 3, of the United States Constitution, to the injury of plaintiffs and members of plaintiff associations, and is void.

## COUNT FIVE

### (Portions of the Act are vague, fail to give notice, and violate due process)

136.     Paragraphs 1 through 135 are realleged and incorporated herein by reference.

137.     Significant portions of the Act fail to provide adequate notice and are vague, in violation of the Due Process Clause of the Fourteenth Amendment.  The following sets forth vague portions of the Act involving "feeding devices" and "assault weapons."  NYSRPA, WCFOA, and SAFE members and other plaintiffs possess certain items, and other NYSRPA, WCFOA, and SAFE members and other plaintiffs wish forthwith to obtain such items, but they cannot determine whether such items constitute restricted "feeding devices" or "assault weapons."

### "Feeding Devices"

*"Magazines acquired between January 15 and April 15, 2013"*

138.     Effective April 15, 2013, the definition of "large capacity ammunition feeding device" in § 265.00(23) is amended to include in part a magazine with a capacity of "more than ten rounds of ammunition," and also a magazine that "is obtained after the effective date of the chapter of the laws of two thousand thirteen which amended this subdivision and has a capacity of . . . more than seven rounds of ammunition . . . ."  Act § 38.  Based on the April 15 effective date, one would think that a ten-round magazine may be obtained until that date and may be possessed thereafter.  However, the clause "obtained after the effective date" suggests that only a seven-round magazine obtained after January 15, may be possessed beginning on April 15, 2013.

139.     The provision making possession of an LC magazine unlawful, § 265.02(8), effective March 15, 2013, excludes a magazine with a capacity of 8 to 10 rounds "lawfully possessed by such person before the effective date of the chapter of the laws of two thousand

thirteen which amended this subdivision [8]," and further does not include a magazine manufactured before September 13, 1994, with a capacity of more than 10 rounds.  Act § 41b.  In addition to the same ambiguity set forth in the previous paragraph, this could be read in such manner as to permit possession of a ten-round magazine only if possessed by January 15, but not if obtained thereafter (such as by April 15), while permitting possession of a magazine with over-ten round capacity if manufactured by the 1994 deadline.

140.    Governor Cuomo's website begins: "Below are FAQ intended to help gun owners in New York understand and comply with the NY SAFE Act enacted on January 15, 2013."  It explains about the above amendment to  § 265.00(23):

> Q:      *Going forward, what magazines can I buy?*
>
> A:      *As of April 15, 2013, only magazines that can contain 7 rounds or less will be sold in New York, including permanently modified magazines.*

See:  http://www.governor.ny.gov/2013/gun-reforms-faq.

141.    The premise of the Governor's reading of the above provisions is that magazines that can contain more than 7 rounds can be sold until April 14, 2013, and thus may be lawfully possessed thereafter.

142.    The vagueness is compounded by § 265.00(22)(h), which makes it a crime to transfer a magazine made unlawful by the Act "to an individual inside New York state" only beginning a year after the effective date, i.e., January 15, 2014.

143.    Accordingly, the following clause in § 265.00(23) is unconstitutionally vague and is thus void: "or (c) is obtained after the effective date of the chapter of the laws of two thousand thirteen which amended this subdivision and has a capacity of, or that can be readily restored or converted to accept, more than seven rounds of ammunition . . . ."

*"Can be readily restored or converted to accept"*

144.   Several provisions refer an ammunition feeding device that "has a capacity of, or that can be readily restored or converted to accept, more than" either seven or ten rounds of ammunition. §§ 265.00(23), 265.02(8), 265.36, & 265.37.  These terms fail to inform a reasonable person as to *who* can readily restore or convert such devices, whether lay persons or trained experts with the requisite knowledge and skill, and with what equipment, ranging from common household tools to machine shops.  Nor do these provisions inform a reasonable person as to how much time is encompassed in "readily."

145.   An ordinary person may be able to ascertain the capacity of a magazine by counting the number of rounds that may be inserted into the magazine.  However, such person would not know by outward examination of a magazine if it "can be readily restored or converted to accept, more than" a certain number of rounds.  Just to begin the inquiry, one would be required to disassemble every magazine in one's possession, if one has the knowledge and skill to do so, and if the magazine is capable of being disassembled without destroying it.

146.   If the magazine is disassembled, the resultant pile of parts would not inform one whether it "can be readily restored or converted to accept, more than" a certain number of rounds, and if so, how many.  The average person may not be able to reassemble the magazine, and to do so in a manner that would decrease the number of rounds it will hold.  That would likely require the alteration, cutting, filing, or other manipulation of parts, matters about which the ordinary person would have no information.

147.   Governor Cuomo's website states in part:

Q:     *What if I have a magazine that can contain more than ten rounds?*

> A:      *You can permanently modify the magazine so that it holds no more than ten rounds . . . .*

See: http://www.governor.ny.gov/2013/gun-reforms-faq.

148.    The Governor gives no instructions about how "[y]ou can permanently modify the magazine" in such manner, although his Act threatens severe criminal penalties for not doing so.

149.    Accordingly, the terms "that can be readily restored or converted to accept," in each place they appear, are unconstitutionally vague.

### *"Similar device"*

150.    "'Large capacity ammunition feeding device' means a magazine, belt, drum, feed strip, or similar device, that, *inter alia*, "contains more than seven rounds of ammunition" or "has a capacity of . . . more than seven rounds of ammunition . . . ."  § 265.00(23).

151.    Many revolvers hold eight or more rounds.  The rounds are contained in the chambers of a cylinder that is not detachable from the frame of the revolver.  A revolver cylinder is not a magazine, belt, drum, or feed strip.  Plaintiffs do not believe that it is a "similar device," but that term is vague and law enforcement authorities may believe that it is a "similar device."

152.    The term "similar device" is unconstitutionally vague as applied to a revolver cylinder.  A revolver cylinder that holds more than seven rounds is not a "large capacity ammunition feeding device."

### *"'Magazine' for rifles with tubular magazines"*

153.    A "large capacity ammunition feeding device" includes any "magazine" that has a capacity of more than 7 or 10 rounds of ammunition, depending on when it was acquired, with an exception for "an attached tubular device designed to accept, and capable of operating only with,

.22 caliber rimfire ammunition." § 265.00(23).  An "assault weapon" excludes any "rifle, shotgun or pistol that . . . is manually operated by bolt, pump, lever, or slide action . . . ." § 265.00(22).

154.    Many pump, lever, and slide action rifles have an attached tubular magazine or device that accepts a different number of rounds depending on the length of the rounds.  An example would be the Model 1894 Winchester, a lever action rifle dating from the 19th century, of which millions have been made.  Such magazines or devices may accept no more than 7 or 10 rounds of one length of cartridge, but will accept more than 7 or 10 rounds of a shorter cartridge, which the owner may not possess and of which the owner may not even be aware.

155.    Since the number of rounds a tubular magazine holds various with the length of the rounds, insufficient notice is provided of whether such device "has a capacity of, or that can be readily restored or converted to accept, more than" any specified number of rounds.   Accordingly, the terms "magazine" and "large capacity ammunition feeding device" are unconstitutionally vague as applied to rifles with tubular magazines.

*"and if such person lawfully possessed"*

156.    New § 256.36 appears to prohibit some type of possession of large capacity ammunition feeding devices.  Because the language of § 256.36 does not constitute an intelligible sentence, it does not provide notice of the conduct ostensibly prohibited and is unconstitutionally vague.

**"Assault Weapon"**

*"Protruding and conspicuously protruding grips"*

157.    "Assault weapon" includes certain rifles with "a pistol grip that protrudes conspicuously beneath the action of the weapon," § 265.00(22)(a)(ii), as well as certain rifles,

GOLDBERG SEGALLA, LLP
11 Martine Ave., 7th Floor
White Plains, NY 10607
(914) 798-5400

40

shotguns, and pistols with "a protruding grip that can be held by the non-trigger hand," § 265.00(22)(a)(iv), (b)(iii), (c)(iii). No measurements in inches, angles in degrees, or other information define these terms.

158. A reasonable person has no way to know the difference between a protruding grip and a grip that does not protrude but can be held by the non-trigger hand, or between a grip that protrudes conspicuously and a grip that does not protrude conspicuously. In the absence of standards, such matters are in the eye of the beholder.

159. Accordingly the following terms are subjective and unconstitutionally vague: "a pistol grip that protrudes conspicuously beneath the action of the weapon," and "a protruding grip that can be held by the non-trigger hand . . . ."

*"Ability to accept a five-round detachable magazine"*

160. "Assault weapon" is defined to include "a semiautomatic shotgun that has at least one of the following characteristics: . . . (iv) a fixed magazine capacity in excess of seven rounds; [and] (v) an ability to accept a detachable magazine . . . ." § 265.00(22)(b). However, "assault weapon" does not include, *inter alia*, "a semiautomatic shotgun that cannot hold more than five rounds of ammunition in a fixed or detachable magazine . . . ." § 265.00(22)(g)(iii).

161. This fails to inform whether "assault weapon" includes or excludes a semiautomatic shotgun that has "an ability to accept a detachable magazine," but is equipped only with a detachable magazine that cannot hold more than five rounds of ammunition. A reasonable person is thus at a loss to know whether such shotgun is "a semiautomatic shotgun that cannot hold more than five rounds of ammunition in a . . . detachable magazine . . . ."

*"Rounds" for shotguns with tubular magazines*

162.    The term "assault weapon" includes a semiautomatic shotgun with "a fixed magazine capacity in excess of seven rounds," § 265.00(22)(b)(iv), but excludes "a semiautomatic shotgun that cannot hold more than five rounds of ammunition in a fixed or detachable magazine . . . ." § 265.00(22)(g)(iii).

163.    Almost all semiautomatic shotguns have a fixed, tubular magazine in which the rounds are loaded one behind another.  Shotgun "rounds" or shells come in varying lengths.  The most popular shotguns are 12 gauge, and 12 gauge rounds are made in 3 ½", 3", 2 3/4", 2 ½", and 2" lengths.  The number of rounds a tubular magazine holds various with the length of the rounds.  Thus, the same magazine will or will not hold "in excess of seven rounds" or "more than five rounds" depending on the length of the rounds that are inserted into the magazine.  These terms fail to inform a person: rounds of what lengths?

164.    Accordingly, as applied to shotguns with tubular magazines, the terms "a fixed magazine capacity in excess of seven rounds" and "a semiautomatic shotgun that cannot hold more than five rounds of ammunition in a fixed or detachable magazine" are unconstitutionally vague.

*"Threaded barrel designed to accommodate" and "muzzle break"*

165.    "Assault weapon" includes certain rifles with a "threaded barrel designed to accommodate a flash suppressor, muzzle break, or muzzle compensator . . . ." § 265.00(22)(a)(vi).  By contrast, "assault weapon" includes certain pistols with "a threaded barrel capable of accepting a barrel extender, flash suppressor, forward handgrip, or silencer . . . ." § 265.00(22)(c)(v).

166.     A reasonable person has no way to know whether a rifle with a threaded barrel but with none of the above attachments is an "assault weapon."  Such person has no way to know what it was originally "designed to accommodate," and it may be fitted with some other attachment or no attachment.  No reference is made to it merely being "capable of accepting" such items as with the definition in relation to pistols.

167.     In addition, the term "muzzle break" has no known meaning.  A "muzzle brake" is a device that serves as a "brake" to reduce recoil or "kick," but does not "break" anything.  Yet use of a muzzle brake would subject plaintiffs to criminal prosecution merely because the words rhyme.

168.     Accordingly, the terms "threaded barrel designed to accommodate a flash suppressor, muzzle break, or muzzle compensator" are unconstitutionally vague.

### *"A 'version' of something else"*

169.     "Assault weapon" is defined to include "a semiautomatic pistol that has an ability to accept a detachable magazine and has at least one of the following characteristics: . . . a semiautomatic version of an automatic rifle, shotgun or firearm . . . ."  § 265.00(22)(c)(viii).  No law enforcement officer and no reasonable gun owner has any way to know that a pistol one possesses is a "version" of some other type of weapon that one neither possesses nor is even aware of.

170.     Accordingly, the terms "a semiautomatic version of an automatic rifle, shotgun or firearm" are unconstitutionally vague.

### *"Manufactured weight"*

171.     "Assault weapon" is defined to include certain pistols with "a manufactured weight of fifty ounces or more when the pistol is unloaded . . . ."  § 265.00(22)(c)(vii).  A reasonable

GOLDBERG SEGALLA, LLP
11 Martine Ave., 7th Floor
White Plains, NY 10607
(914) 798-5400

person has no way to know the weight of a pistol when it was manufactured.  Slides, barrels, grips, and other components of a pistol may easily be changed that would alter its weight.

172.    Accordingly, the terms "a manufactured weight of fifty ounces or more when the pistol is unloaded" are unconstitutionally vague.

"*Commercial transfer of ammunition*"

173.    "No commercial transfer of ammunition shall take place unless a licensed dealer in firearms or registered seller of ammunition acts as an intermediary between the transferor and the ultimate transferee of the ammunition for the purposes of contacting the statewide license and record database pursuant to this section."  § 400.03(7).

174.    The term "commercial transfer" is undefined and fails to give notice of whether it is limited to persons who are engaged in the business of dealing in ammunition for livelihood and profit, or also includes sales on a non-regular basis such as at trap shooting events, or even a single transfer, such as the sale of a box of cartridges by a hunter to another hunter.

175.    Accordingly, the terms "commercial transfer of ammunition" are unconstitutionally vague.

176.    In sum, all of the aforesaid terms and definitions fail to give notice of the conduct proscribed, are unconstitutionally vague, and violate the right of plaintiffs and members of plaintiff associations not to be deprived of life, liberty, and property without due process of law, contrary to the Fourteenth Amendment to the United States Constitution, and are thus void.

GOLDBERG SEGALLA, LLP
11 Martine Ave., 7th Floor
White Plains, NY 10607
(914) 798-5400

**WHEREFORE**, Plaintiffs pray that the Court:

A.      Enter a declaratory judgment that the provisions of the Penal Law specified herein infringe on the right of the people to keep and bear arms, in violation of the Second and Fourteenth Amendments to the United States Constitution and are void.

B.      Enter a declaratory judgment that the provisions of the Penal Law specified herein deny to Plaintiffs the equal protection of the laws, contrary to the Fourteenth Amendment to the United States Constitution.

C.      Enter a declaratory judgment that the the provisions of the Penal Law specified herein violate the Dormant Commerce Clause, Article I, § 8, of the United States Constitution.

D.      Enter a declaratory judgment that the provisions of the Penal Law specified herein are vague, fail to give notice, and violate the right of Plaintiffs to Due Process of Law, contrary to the Fourteenth Amendment to the United States Constitution.

E.      Issue preliminary and permanent injunctions enjoining defendants ANDREW M. CUOMO, ERIC T. SCHNEIDERMAN, JOSEPH A. D'AMICO, FRANK A. SEDITA III, and GERALD J. GILL, and their officers, agents, and employees from administration and enforcement of the provisions alleged herein to violate the United States Constitution.

F.      Award Plaintiffs attorneys' fees and costs; and

G.      Grant such other and further relief as may be proper.

Dated: March 21, 2013
          White Plains, NY

Respectfully submitted,

New York State Rifle and Pistol Association, Inc., *et al.*

By Counsel

/s/ Stephen P. Halbrook
Stephen P. Halbrook, *Pro Hac Vice* (pending)
3925 Chain Bridge Road, Suite 403
Fairfax, VA 22030
(703) 352-7276
protell@aol.com

/s/ Brian T. Stapleton
Brian T. Stapleton, Esq.
GOLDBERG SEGALLA LLP
11 Martine Avenue, Suite 750
White Plains, New York 10606-1934
(914) 798-5400
bstapleton@goldbergsegalla.com

***Attorneys for Plaintiffs***