IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK
Buffalo Division

NEW YORK STATE RIFLE AND PISTOL )
ASSOCIATION, INC., et al, )
)
Plaintiffs, )
v. )        Case No.: 1:13-cv-00291-WMS
)
ANDREW M. CUOMO, et al, )
)
Defendants. )
_____)

## MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

COME NOW the Plaintiffs NEW YORK STATE RIFLE AND PISTOL ASSOCIATION,

INC.; WESTCHESTER COUNTY FIREARMS OWNERS ASSOCIATION, INC.;

SPORTSMEN'S ASSOCIATION FOR FIREARMS EDUCATION, INC.; NEW YORK STATE

AMATEUR TRAPSHOOTING ASSOCIATION; BEDELL CUSTOM; BEIKIRCH

AMMUNITION CORPORATION; BATAVIA MARINE & SPORTING SUPPLY; WILLIAM

NOJAY; THOMAS GALVIN; and ROGER HORVATH, by and through counsel, hereby set forth

the following facts, reasons, and authorities in support of their motion for a preliminary injunction.

Dated: April 15, 2013                    Respectfully Submitted,

LAW OFFICE OF STEPHEN HALBROOK          GOLDBERG SEGALLA, LLP

By: /s/   Stephen P. Halbrook           By: /s/   Brian T. Stapleton
Stephen P. Halbrook, Esq.               Brian T. Stapleton, Esq.
*Pro Hac Vice* (pending)                Matthew S. Lerner. Esq.
3925 Chain Bridge Road, Suite 403       11 Martine Avenue, Suite 750
Fairfax, VA 22030                       White Plains, New York 10606-1934
(703) 352-7276                          (914) 798-5400
protell@aol.com                         bstapleton@goldbergsegalla.com

                                        *Counsel For Plaintiffs*

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES.................................................................................iii

I.      INTRODUCTION...................................................................................1

II.     STATEMENT OF FACTS......................................................................2

    A.      Restrictions On Magazines and Rounds.............................................2

    B.      Restrictions On Stocks and Grips of Rifles and Shotguns.........................5

    C.      The Firearms Affected By The Act's Restriction..................................9

III.    STANDARD OF REVIEW......................................................................13

IV.     ARGUMENT.......................................................................................14

    A.      PLAINTIFFS ARE OVERWHELMINGLY LIKELY
         TO PREVAIL ON THE MERITS OF THEIR
         CONSTITUTIONAL CLAIM............................................................14

         i.      The Act Prohibits Commonly-Possessed Firearms and Magazines
             In The Home Where Second Amendment Guarantees
             Are At Their Zenith....................................................................14

         ii.     The Act's Restrictions Are Irrational and Violate Both the Second
             Amendment and the Equal Protection Clause.................................18

         iii.    Numerous Provisions Contained in the Act Are
             Unconstitutionally Vague............................................................24

    B.      PLAINTIFFS WILL SUFFER IRREPARABLE HARM
         IN THE ABSENCE OF PRELIMINARY INJUNCTIVE RELIEF..................27

         i.      The Act's Prohibitions on Loading More Than Seven Rounds, and
             on Possession of a Magazine with Capacity over Ten Rounds,
             including Those Manufactured Before September 13, 1994,
             Infringe On Plaintiffs' Core Second Amendment Rights.....................27

         ii.     The Act's Prohibitions and Restrictions on Large Capacity Magazines
             and Commonly-Possessed Firearms that it Redefines as
             "Assault Weapons" Violates the Second Amendment.........................32

GOLDBERG SEGALLA, LLP
11 Martine Ave., 7th Floor
White Plains, NY 10607
(914) 798-5400

# TABLE OF CONTENTS
(continued)

      C.     GRANTING PRELIMINARY INJUNCTIVE RELIEF
              IS IN THE PUBLIC INTEREST……………………………………………36

V.     CONCLUSION…………………………………………………………………...37

GOLDBERG SEGALLA, LLP
11 Martine Ave., 7th Floor
White Plains, NY 10607
(914) 798-5400

# TABLE OF AUTHORITIES

## Cases

*Abdul Wali v. Coughlin,*
754 F.2d 1015 (2d Cir. 1985) ................................................................ 14

*Bach v. Pataki,*
408 F.3d 75 (2d Cir. 2005) .................................................................... 1

*Carlson v. Medco Health Solutions, Inc.,*
2011 U.S. Dist. LEXIS 96705 (W.D.N.Y. 2011) ................................... 13

*Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.,*
598 F.3d 30 (2d Cir. 2010) .................................................................... 14

*Cox v. New Hampshire,*
312 U.S. 569, 576 (1941) ....................................................................... 34

*Dandamudi v. Tisch,*
686 F.3d 66 (2d Cir. 2012) .................................................................... 14

*District of Columbia v Heller,*
554 U.S. 570 (2008) ............................................................................... 1

*Ezell v. City of Chicago,*
651 F.3d 684 (7th Cir. 2011) ................................................................ 17

*Haitan Centers Council, Inc., v. McNary,*
969 F.2d 1326 (2d Cir. 1992) ............................................................... 36

*Hoffman Estates v. Flipside,*
455 U.S. 489 (1982) ............................................................................... 20

*Johnson v. Miles,*
355 F. App'x 444 (2d Cir. 2009) .......................................................... 23

*Jolly v. Coughlin,*
76 F.3d 468 (2d Cir.1996) ..................................................................... 32

*Kachalsky v. County of Westchester,*
701 F.3d 81 (2d Cir. 2012) .................................................................... 15

GOLDBERG SEGALLA, LLP
11 Martine Ave., 7th Floor
White Plains, NY 10607
(914) 798-5400

iii

*Kolender v. Lawson,*
461 U.S. 352 (1983)................................................................................. 20

*Lopez Torres v. New York State Bd. of Elections,*
462 F.3d 161, 207 (2d Cir. 2006)............................................................36

*Lawrence v. Texas,*
539 U.S. 558 (2003)................................................................................. 12

*Ligon v. City of New York,*
12 CIV. 2274 SAS, 2013 WL 628534 (S.D.N.Y. Feb. 14, 2013) ............ 32

*McDonald v. City of Chicago,*
130 S. Ct. 3020 (2010).............................................................................. 1

*Peoples Rights Organization, Inc. v. City of Columbus,*
152 F.3d 522 (6th Cir. 1998) ................................................................. 26

*Posters 'N' Things, Ltd. v. U.S.,*
511 U.S. 513 (1994)................................................................................. 21

*Red Earth LLC v. United States,*
657 F.3d 138 (2d Cir. 2011) ................................................................... 13

*Richmond Boro Gun Club, Inc. v. City of New York,*
F.3d 681 (2d Cir. 1996) .......................................................................... 18

*Stanley v. Georgia,*
394 U.S. 557 (1969)................................................................................. 16

*Statharos v. N.Y. City Taxi & Limousine Comm'n,*
198 F.3d 317 (2d Cir. 1999) ................................................................... 32

*Thomas v. Collins*
323 U.S. 516, 539-40 (1945)....................................................................34

*United States v. Decastro,*
682 F.3d 160 (2d Cir. 2012) ................................................................... 16

*United States v. Harriss,*
347 U.S. 612 (1954)................................................................................. 21

*United States v. Marzzarella,*
614 F.3d 85 (3d Cir. 2010) ..................................................................... 17

GOLDBERG SEGALLA, LLP
11 Martine Ave., 7th Floor
White Plains, NY 10607
(914) 798-5400

iv

*United States v. Toner*,
728 F.2d 115 (2d Cir. 1984) .................................................................................... 18

*United States v. Williams*,
553 U.S. 285 (2008).................................................................................................. 20

*Windsor v. United States*,
699 F.3d 169 (2d Cir. 2012). .................................................................................... 15

*Winter v. Natural Resources Defense Council, Inc.*,
555 U.S. 7, 24 (2008)................................................................................................13

**Statutes**

New York Penal Law ("PL") § 265.00(22)(a)(iv), (b)(iii), (c)(iii), (g)(iii) ...................................... 20

PL § 265.02(7). ............................................................................................................ 7

PL § 265.10(2), (3). ...................................................................................................... 7

PL § 265.02(8). ............................................................................................................ 3

PL § 265.00(22)(a) ...................................................................................................... 19

PL § 265.36.................................................................................................................. 4

PL § 265.37.................................................................................................................. 3

PL §§ 265.10(2), (3). .................................................................................................... 3

**Treatises**

11A Charles Alan Wright et al., Federal Practice & Procedure §2948.1 (2d ed. 1995).................... 21

GOLDBERG SEGALLA, LLP
11 Martine Ave., 7ᵗʰ Floor
White Plains, NY 10607
(914) 798-5400

## I.   INTRODUCTION

Plaintiffs seek predominantly to preserve the status quo ante pending this litigation. Provisions of prior firearms law were radically changed by the New York Secure Ammunition and Firearms Enforcement Act of 2013 ("the Act"), which was enacted on January 15, 2013.  The Act was amended on March 28, 2013, as part FF of S2607D-2013.

*District of Columbia v. Heller*, 554 U.S. 570, 595 (2008), held that the text, structure, and history of the Second Amendment confirm that it "confer[s] an individual right to keep and bear arms." *McDonald v. City of Chicago*, 130 S. Ct. 3020, 3026 (2010), further held that this individual right is a fundamental one that applies with full force through the Fourteenth Amendment to the States.

Given that *Heller* and *McDonald* overruled Second Circuit precedent to the contrary, *see Bach v. Pataki*, 408 F.3d 75, 83-86 (2d Cir. 2005), one would have expected to see any post-*Heller/McDonald* state legislation comport with the fundamental individual right the Supreme Court recognized.  In hastily passing the Act as emergency legislation, New York did the exact opposite. Numerous provisions of the Act violate the Second Amendment rights of persons to possess ordinary firearms in their own homes for self protection.

Plaintiffs are law-abiding gun owners who will be irreparably injured by the provisions at issue.  While Plaintiffs are challenging various portions of the Act, some parts need not be addressed in this motion as they are not effective for some time.  The portions about which this preliminary injunction is sought pertain to (1) the capacity of ammunition magazines and the number of rounds that may be loaded therein; and (2) certain features on rifles and shotguns which under prior law

GOLDBERG SEGALLA, LLP
11 Martine Ave., 7ᵗʰ Floor
White Plains, NY 10607
(914) 798-5400

1

gave rise to no restriction, but under the Act are criminalized or severely regulated under the derogatory term "assault weapons."

For the reasons stated herein, this Court should enter a preliminary injunction enjoining the enforcement of those portions of the Act.  Because the challenged portions of the Act fail any standard of review applicable to constitutional rights and have no rational basis, there is a substantial likelihood that Plaintiffs will prevail on the merits of their constitutional claims.  The Act prohibits Plaintiffs from exercising their fundamental Second Amendment rights, and that constitutes irreparable harm for the purpose of a preliminary injunction.  Furthermore, the public interest will be served by the grant of a preliminary injunction.  Enjoining enforcement of the challenged provisions of the Act will largely preserve the status quo ante, and will mean that New Yorkers can by-and-large follow the requirements of established prior law regarding pistols, rifles, shotguns, magazines, and rounds while this challenge is pending.

## II.   STATEMENT OF FACTS

### A.   Restrictions On Magazines and Rounds

Prior law defined a "large capacity ammunition feeding device" (hereafter "LC magazine") as a magazine capable of holding more than ten rounds, excluding "grandfathered" magazines manufactured before September 13, 1994.  As amended, the Act radically changed the rules in two ways.

First, the Act prohibits loading more than 7 rounds in any magazine, including magazines kept at home for self protection, except that 10 rounds may be loaded in a magazine at a shooting range or competition.

Second, the Act requires that the above grandfathered magazines manufactured before September 13, 1994, be converted so that they are not capable of being "readily restored or converted" to hold more than ten rounds.  The State has not provided any guidance on the means, methods, or standards it will apply to determine whether a converted magazine is adequately "incapable" of ready restoration.

The Act prohibits possession of a magazine capable of holding more than ten rounds, with certain exceptions.  While the ten-round limit generally reflects prior law, that law was enacted before and is contrary to Second Amendment rights as set forth in *Heller* and *McDonald*. Nationwide, most pistols are manufactured with magazines holding 10 to 17 rounds.  *See* Declaration of Mark Overstreet (attached hereto as **"Exhibit A"**);  the National Shooting Sports Foundation ("NSSF") *2010 Modern Sporting Rifle Comprehensive Consumer Report*) (attached hereto as **"Exhibit B"**);  Declaration of Guy Rossi (attached hereto as **"Exhibit C"**) at p.2.  Many commonly possessed popular rifles are manufactured with magazines holding 10, 20, or 30 rounds. *Id.*

The penalties for violating these provisions are severe.  Possession of an LC magazine is a Class D felony. N.Y. Penal Law § 265.02(8).[1]  Transportation and disposition of an LC magazine are Class D felonies.  §§ 265.10(2), (3).  Possession of a magazine containing more than seven rounds is punishable by fines and/or imprisonment, depending on whether it occurs at one's home or any other location.  § 265.37.  Possession of certain ambiguously-defined LC magazines is a Class A misdemeanor.  § 265.36.

---

GOLDBERG SEGALLA, LLP
11 Martine Ave., 7th Floor
White Plains, NY 10607
(914) 798-5400

[1]  All statutory references hereafter are to New York Penal Law.

*Prohibition on Magazine Loaded with More than Seven Rounds*

New Yorkers who wish to keep a pistol or rifle in their homes or places of business for self

protection must do so under rules that severely impinge on their Second Amendment right.  Section

265.37 states in relevant part: "It shall be unlawful for a person to knowingly possess an ammunition

feeding device . . . where such device contains more than seven rounds of ammunition."

The prohibition in § 265.37 on possession of a magazine containing more than seven rounds

does not apply to possession and use of a magazine with a capacity of no more than ten rounds at:

> an indoor or outdoor firing range located in or on premises owned or occupied by a
> duly incorporated organization organized for conservation purposes or to foster
> proficiency in arms; at an indoor or outdoor firing range for the purpose of firing a
> rifle or shotgun; at a collegiate, olympic or target shooting competition under the
> auspices of or approved by the national rifle association; or at an organized match
> sanctioned by the International Handgun Metallic Silhouette Association.

Section 265.20(a)(7-f).

*Remanufacturing Grandfathered Magazines So They Cannot*
*Be Readily Restored or Converted to Accept More Than Ten Rounds*

The Act provides: "'Large capacity ammunition feeding device' means a magazine, belt,

drum, feed strip, or similar device, that has a capacity of, or that can be readily restored or converted

to accept, more than ten rounds of ammunition. . . ."  § 265.00(23).  While a similar definition

existed in prior law, it excluded from such definition any magazine manufactured before September

13, 1994.  By repealing that exclusion, the Act imposes the impossible duty on persons who wish to

keep their grandfathered magazines of somehow remanufacturing them so that they cannot be

readily restored or converted to hold more than ten rounds.

Such remanufacturing or conversion of magazines would require engineering know-how,

parts, and equipment that are beyond the capacity of most law-abiding gun owners.  Exhibit C at p. 2

*See also* Declaration of Roger Horvath (attached hereto as **"Exhibit D"**); Declaration of Thomas Galvin (attached hereto as **"Exhibit E"**).   No such products or services are, to Plaintiffs' knowledge, on the market. Exhibit C at p. 2.  Indeed, as with firearms, magazine model and design types number in the hundreds or the thousands. *Id.*

*Dangling "And If" Clause in Penal Law § 265.36*

The Act compounds the above problem involving grandfathered magazines with § 265.36, which provides in relevant part:

> It shall be unlawful for a person to knowingly possess a large capacity ammunition feeding device manufactured before September thirteenth, nineteen hundred ninety-four, *and if* such person lawfully possessed such large capacity feeding device before the effective date of the chapter of the laws of two thousand thirteen which added this section, that has a capacity of, or can be readily restored or converted to accept, more than ten rounds of ammunition. (Emphasis added.)

The above dangling "and if" clause does not complete a sentence and is unclear.  This part of the Act is wholly ineffective to give notice to New Yorkers as to what the provision proscribes.

**B.**    **Restrictions On Stocks and Grips of Rifles and Shotguns**

The rules as to rifles and shotguns similarly infringe on Plaintiffs' and fellow New Yorkers' Second Amendment right to possess ordinary firearms in their homes for self-protection.  In order to comply with the Act, they will have to forego common features in rifles and shotguns that promote firing accuracy and do not render the firearm more powerful, dangerous, or unsafe. Exhibit C at 3-5. The Act amended § 265.00(22)(a) drastically to redefine the term "assault weapon" in part as follows:

> *a semiautomatic rifle that has an ability to accept a detachable magazine and has at least one of the following characteristics:*
>
> *(i)*      *a folding or telescoping stock;*

GOLDBERG SEGALLA, LLP
11 Martine Ave., 7th Floor
White Plains, NY 10607
(914) 798-5400

5

> (ii)     *a pistol grip that protrudes conspicuously beneath the action of the weapon;*
>
> (iii)    *a thumbhole stock . . . .*

Curiously, § 265.00(22)(b), which concerns shotguns, deleted the feature under prior law of "a pistol grip that protrudes conspicuously beneath the action of the weapon," and now provides in part that "assault weapon" means:

> *a semiautomatic shotgun that has at least one of the following characteristics:*
>
> (i)     *a folding or telescoping stock;*
>
> (ii)    *a thumbhole stock . . . .*

As with restrictions on magazines, the penalties for possessing an assault weapon are severe. The possession of an assault weapon is a Class D felony.  § 265.02(7).  Transportation and disposition of an assault weapon are Class D felonies.  § 265.10(2), (3).  "Assault weapons" as defined by prior law that were lawfully possessed before January 15, 2013, must be registered. §§ 265.00(22)(e) & (f), § 400.00(16-a).

Restricting rifles and shotguns on the basis of the above features violates the Second Amendment and is irrational.  A brief explanation of these features illustrates the point.

### a. Telescoping Stock

A "telescoping stock" allows the length of the stock to be shortened or lengthened consistent with the length of the person's arms, so that the stock fits comfortably against the shoulder and the rear hand holds the grip and controls the trigger properly.  <u>Exhibit C</u> at 3-4.  It simply allows the gun to fit the person's physique correctly, in the same manner as one selects the right size of shoe to wear.  *Id.*  For example, a telescoping stock allows a hunter to change the length of the stock depending on the clothing appropriate for the weather encountered.  *Id.*  Shooting outdoors in fall

and winter require heavy clothing and a shooting vest, thus requiring shortening the stock so that the firearm can be fitted for proper access to the trigger. *Id.* The gun may be adjusted to fit the different sizes of several people in a family or home. *Id.* A telescoping stock does not make a firearm more powerful or more deadly. *Id.* The state has no interest in requiring that guns not be the correct fit for the user.

It is noteworthy that the restriction is based solely on the existence of a telescoping stock without regard to length. *Id.* A stock could be three feet at its minimum length and still be restricted. No justification would exist based on concealability.

The State has expressed an interest in restricting guns based on concealability based on the following definitions in § 265.00(3):

> "Firearm" means (a) any pistol or revolver; or (b) a shotgun having one or more barrels less than eighteen inches in length; or (c) a rifle having one or more barrels less than sixteen inches in length; or (d) any weapon made from a shotgun or rifle whether by alteration, modification, or otherwise if such weapon as altered, modified, or otherwise has an overall length of less than twenty-six inches . . . ."

Possession of a "firearm" is prohibited, § 265.01, except that a license entitles one to possess a pistol or revolver. § 265.20(a)(3). Thus, a rifle or shotgun must have an overall length of twenty-six inches or more. That is a rational, objective manner for the State to set a standard regarding concealability, and it clearly applies to rifles and shotguns with and without a telescoping stock, or a folding stock as well. No such basis exists to restricting a gun with a telescoping stock or folding stock without regard to overall length.

### b. *Pistol Grip That Protrudes Conspicuously Beneath the Action*

A pistol grip allows a rifle to be held at the shoulder with more comfort and stability. <u>Exhibit</u> <u>C</u> at 4-5. Many rifles have pistol grips rather than straight grips. *Id.* The Act restricts a rifle, but not

GOLDBERG SEGALLA, LLP
11 Martine Ave., 7th Floor
White Plains, NY 10607
(914) 798-5400

7

a shotgun, with a "pistol grip that [1] protrudes conspicuously [2] beneath the action of the weapon." While failing to define "conspicuously" in inches or angles, it does not restrict a pistol grip that protrudes inconspicuously. But a pistol grip may protrude conspicuously if it is not beneath the action. None of these distinctions makes sense.

Having the above feature has no effect on the functionality of a semiautomatic rifle that has an ability to accept a detachable magazine. *Id.* A pistol grip ("conspicuous" or otherwise) does not make a firearm more powerful or deadly. *Id.* A "conspicuously protruding" pistol grip does not make a firearm more powerful or more deadly. *Id.* Pistol grips serve the function of assisting sight-aligned accurate fire. Exhibit C at 4. Positioning the rear of the stock into the pocket of the shoulder and maintaining it in that position is aided by the pistol grip, and is imperative for accurate sight alignment and thus accurate shooting with rifles of this design, due to the shoulder stock being in a straight line with the barrel. *Id.* The more consistent the shooter's eye is in relation to the line of the stock and barrel, the more accurate the shot placement. *Id.* This sight alignment between the eye and firearm is not conducive to spray or hip fire. *Id.* The second purpose for the pistol grip is weapon retention, imperative for example during a home invasion when assailant(s) may attempt to disarm a citizen in close quarters. *Id.* The State has no interest in restricting a rifle by compromising its accuracy or the ability to retain it when used for self defense. *Id.* With the forward hand holding the fore-end, the rearward hand holding the grip, and the butt securely against the shoulder, a rifle may be fired accurately. *Id.*

A pistol grip does *not* function to allow a rifle to be fired from the hip. *Id.* (emphasis added). Conversely, a rifle with a straight grip and no pistol grip would be more conducive to firing from the hip. *Id.* Firing from the hip would be highly inaccurate and is simply not a factor in crime.

### c. Thumbhole Stock

A thumbhole stock allows the rifle to be held with more comfort and stability, and, thus, fired more accurately. Exhibit C at 5. A thumbhole stock does not make a rifle more powerful or more deadly. *Id.* Typically found on hunting rifles, it is unclear why it would be designated as an "assault weapon" feature. *Id.* Whether one's thumb does or does not go through a hole in the stock is irrelevant to how a rifle functions. *Id.* The Dtate has no rational interest in restricting a thumbhole stock.

### C.    The Firearms Affected By The Act's Restriction

The Act's broadened definition of "assault weapon" impacts a wide range of firearms, all of which are regularly used for lawful and legitimate purposes like hunting, sporting competitions  and self defense.  Millions of law-abiding gun owners enjoy these firearms, and all citizens have a fundamental right to possess them. The pistols, rifles and shotguns criminalized by these restrictions are immensely popular and have widespread use throughout the United States.

One type of rifle that is directly impacted by the Act's restrictions is arguably the most popular: the AR-15 type of Modern Sporting Rifle ("MSR").  Colt introduced the AR-15 SP-1 rifle in 1963. *See*, Overstreet  Declaration (Exhibit A) at 2. Since that time, "AR-15" has become a generic term commonly used to describe the same or similar MSRs made by Colt and other manufacturers. *Id.*

AR-15 model MSRs (and all other rifles called "assault weapons" under the Act) are semiautomatic, meaning that they are designed to fire only once when the trigger is pulled. *Id.* They are not fully automatic machine guns, which continue to fire so long as the trigger is pressed.  AR-15 model MSRs  have the capacity to accept a detachable magazine. *Id.* (Standard magazines hold 20 or

GOLDBERG SEGALLA, LLP
11 Martine Ave., 7th Floor
White Plains, NY 10607
(914) 798-5400

9

30 rounds of ammunition, but magazines of other capacities are also available). *Id.* They also have a pistol grip typically 3 ¾ to 4 inches in length that protrudes at a rearward angle beneath the action of the rifle. *Id.*

U.S. Government data sources (such as Bureau of Alcohol Tobacco, Firearms and Explosives ("ATF" or "BATF") manufacturing and export statistics) and nationwide market and consumer surveys (such as the National Shooting Sports Foundation ("NSSF") *Modern Sporting Rifle Comprehensive Consumer Report*) indicate that the AR-15 MSR is one of the most widely and commonly possessed rifle in the United States:

- Between 1986-2011, over 3.3 million AR-15s were made and not exported by AR-15 manufacturers whose production can be identified from government data sources.

- In 2011, there were 6,244,998 firearms (excluding fully-automatic firearms, i.e., machine guns) made in the U.S. and not exported. Of these, 2,238,832 were rifles, including 408,139 AR-15s by manufacturers whose production figures could be discerned from the ATF reports. Thus, AR-15s accounted for at least seven percent of firearms, and 18 percent of rifles, made in the U.S. for the domestic market that year.

- From 1986 through 2011, U.S.-made firearms accounted for 69 percent of all new firearms available on the commercial market in the United States. Even with the inclusion of imported firearms into the above calculations, AR-15s would account for a significant percentage of new firearms available in the United States.

- 2012-2013 Estimates. The FBI reports that background checks processed through the National Instant Criminal Background Check System (NICS), most of which are conducted for retail purchases of firearms by consumers, increased 14.2 percent in 2011 as compared to 2010; 19.1 percent in 2012 as compared to 2011; and 44.5 percent during the first three months of 2013 as compared to the same period in 2012.

- If the 2011-2013 trend for AR-15 rifle production was identical to that for NICS checks, it would mean that nearly 660,000 AR-15s were made in the U.S. and not exported during 2012 and the first three months of 2013. That figure, added to the over 3.3 million noted earlier, implies a conservative estimate of 3.97 million AR-15s for the period 1986-March 2013, excluding production by Remington and Sturm, Ruger. See attached spreadsheet.

Exhibit A at 2-4.

Magazines that hold more than ten rounds are commonplace to the point of being a standard for pistols and rifles:

- Annual BATF manufacturing and export statistics indicate that semiautomatic pistols rose as a percentage of total handguns made in the United States and not exported, from 50 percent of 1.3 million handguns in 1986, to 82 percent of three million handguns in 2011.

- Standard magazines for very commonly owned semiautomatic pistols hold up to 17 rounds.  In 2011, about 61.5 percent of the 2.6 million pistols made in the U.S. were in calibers typically using magazines that hold over ten rounds.

- In recent decades, the trend in semiautomatic pistols has been away from those designed to hold 10 rounds or fewer, to those designed to hold more than ten rounds. This tracks with trends among law enforcement and military personnel.

- Today, police departments typically issue pistols the standard magazines for which hold more than ten rounds.  One such pistol is the Glock 17, the standard magazines for which hold 17 rounds.  The standard magazine for our military's Beretta M9 9mm service pistol holds 15 rounds. The M9 replaced the M1911 .45 caliber pistol, the standard magazine for which holds seven rounds.

Exhibit A at 4-6.

Beginning with the M1 Carbine, introduced in the 1940s, rifles equipped with detachable magazines holding more than ten rounds have been increasingly common:

- There are about two million privately owned M1 Carbines, the standard magazines for which hold 15 or 30 rounds.

- There are roughly 4 million AR-15 type rifles.  They are typically sold with between one and three 30-round magazines.

- Ruger Mini-14 series rifles, which may outnumber M1 Carbines and AR-15s combined, have the capacity to accept magazines that hold more than ten rounds, and many are equipped with such magazines.  Numerous other rifle designs use magazines holding more than 10 rounds.

Exhibit A at 6-7.

The actual number of magazines made or imported each year is not known, since the ATF does not require manufacturers to report magazine production. *Id.* at 6.   However, estimates are set forth in Christopher S. Koper, *An Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets and Gun Violence, 1994-2003* (Report to the National Institute of Justice, U.S. Dep't. of Justice 2004), available at http://www.sas.upenn.edu/jerrylee/research/aw_final2004.pdf. *Id.*  Koper reported that, as of 1994, 18%  percent of civilian-owned firearms, including 21% of civilian-owned handguns, were equipped with magazines holding over ten rounds, and that 25 million guns were equipped with such magazines. *Id.*  Some 4.7 million such magazines were imported during 1995-2000. *Id.*

Koper further reported that, as of 1994, 40% percent of the semiautomatic handgun models and a majority of the semiautomatic rifle models manufactured and advertised before the ban were sold with, or had a variation that was sold with, a magazine holding over ten rounds. *Id.*

The various features that the Act uses to qualify a firearm as an "assault weapon" are also in widespread and common use.  The NSSF *2010 Modern Sporting Rifle Comprehensive Consumer Report* ("Comprehensive Consumer Report") (Exhibit C) details the prevalence and popularity of the features characterized by the Act as defining an "assault weapon."  These include threaded barrels, flash suppressors, and collapsible/telescoping stocks.  The Comprehensive Consumer Reportillustrates the lawful and legitimate reasons supporting the MSR's popularity and common use as of 2010.

According to the Comprehensive Consumer Report:

- 60% of MSR owners that responded to the study owned multiple MSRs.

GOLDBERG SEGALLA, LLP
11 Martine Ave., 7th Floor
White Plains, NY 10607
(914) 798-5400

- Recreational target shooting and home defense were the top two reasons for owning an MSR. Beyond this, MSR owners consider accuracy and reliability to be the two most important things to consider when buying a MSR.

- Those who shoot often are much more likely to own multiple MSRs. 3 out of 4 who shoot twice a month or more own multiple MSRs.

- 84% of MSR owners have at least one accessory on their rifle or do not shoot "out of the box." 62% of owners accessorize their rifle after their purchase but within 12 months after purchasing it.

- 60% of MSR owners use a collapsible/folding stock.

- Of the most recent MSRs purchased, 62% had a threaded barrel, 64% had a flash hider, 54% had a 16" barrel.

- One-third of all MSR owners use a 30-round magazine the most in their MSR.

- Black is by far the most popular finish color with 83% of owners saying their most recent MSR is black.

Exhibit C at 7-8.

## III.   **STANDARD OF REVIEW**

A party seeking a preliminary injunction must demonstrate "(1) irreparable harm absent injunctive relief; (2) either a likelihood of success on the merits, or a serious question going to the merits to make them a fair ground for trial, with a balance of hardships tipping decidedly in the plaintiff's favor; and (3) that the public's interest weigh in favor of granting an injunction". *Red Earth LLC v. United States*, 657 F.3d 138, 143 (2d Cir. 2011); *Carlson v. Medco Health Solutions, Inc.*, 2011 U.S. Dist. LEXIS 96705, at *10 (W.D.N.Y. 2011). Notwithstanding that the United States Supreme Court stated the formulation of the test somewhat differently in *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 24 (2008), the Second Circuit maintains that "[it has] found no command from the Supreme Court that would foreclose the application of our established

GOLDBERG SEGALLA, LLP
11 Martine Ave., 7th Floor
White Plains, NY 10607
(914) 798-5400

13

'serious questions' standard as a means of assessing a movant's likelihood on the merits." *Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 38 (2d Cir. 2010).

Plaintiffs easily satisfy all three threshold requirements for obtaining preliminary injunctive relief, and the balance of interests weight heavily in their favor.

## IV.   ARGUMENT

### A.   PLAINTIFFS ARE OVERWHELMINGLY LIKELY TO PREVAIL ON THE MERITS OF THEIR CONSTITUTIONAL CLAIM.

To show likelihood of success on the merits, a movant "need not show that success is an absolute certainty.  He need only make a showing that the probability of his prevailing is better than fifty percent.  There may remain considerable room for doubt." *Abdul Wali v. Coughlin*, 754 F.2d 1015, 1025 (2d Cir. 1985).  Plaintiffs' probability of prevailing is decidedly better than fifty percent, if the first test is applied; they raise sufficiently serious questions going to the merits, if the second test is applied.  Also if the second test applies, the balance of hardship tips decidedly toward plaintiffs, while defendants will have no hardships of any kind if they refrain from enforcing the Act.

"Normally the purpose of a preliminary injunction is to maintain the status quo ante pending a full hearing on the merits." *Id.*  Plaintiffs seek to do just that here, with the exception that they also seek preliminarily to enjoin the prohibition on possession of a magazine capable of holding more than ten rounds, in that it is inconsistent with *Heller* and *McDonald*.

### i.   The Act Prohibits Commonly-Possessed Firearms and Magazines In The Home Where Second Amendment Guarantees Are At Their Zenith.

The laws of most states and federal law have no restrictions on magazine capacity or the number of rounds that may be loaded in a magazine, nor do they restrict guns that some choose to

GOLDBERG SEGALLA, LLP
11 Martine Ave., 7ᵗʰ Floor
White Plains, NY 10607
(914) 798-5400

14

call "assault weapons."  Magazines with a capacity of more than ten, cartridges, and rifles and shotguns with telescoping stocks, pistol grips, and thumbhole stocks, are commonly possessed in the millions by law-abiding citizens throughout the United States for lawful purposes.

The "Purpose" section of the Memorandum in Support of the Act states: "Through this legislation, New York is the first in the nation to completely ban all pre-1994 high capacity magazines. . . ."  New York is also the first state in American history to prohibit loading more than seven rounds in a magazine.  The Memorandum's "Statement of Purpose" states: "The proposed amendments replace the existing ban consisting of and a 'two-feature' test adopted from the now-expired federal assault weapons ban with a clearer 'one-feature' test."  New York thus bans certain firearms and magazines that are typically possessed in all or most of the other 49 states.

The Second Amendment protects arms "typically possessed by law-abiding citizens for lawful purposes," in contrast to arms such as the M-16 machine gun "that are highly unusual in society at large."  *District of Columbia v. Heller,* 554 U.S. 570, 625 (2008).  The Act's prohibitions on firearms and magazines, however, apply to mere possession of them in the home even though "Second Amendment guarantees are at their zenith within the home."  *Kachalsky v. County of Westchester,* 701 F.3d 81, 88 (2d Cir. 2012) (citing *Heller,* 554 U.S. at 628-29).  "Few laws in the history of our Nation have come close to the severe restriction of the District's handgun ban."  *Id.* at 88 (quoting *Heller,* at 629).  The same severe restrictions that the Supreme Court observed in *Heller* readily apply to the Act here.  Addressing the issue at hand, *Kachalsky* continued:

> New York's licensing scheme affects the ability to carry handguns only in public, while the District of Columbia ban applied in the home "where the need for defense of self, family, and property is most acute."  *Heller,* 554 U.S. at 628, 128 S. Ct. 2783. This is a critical difference.  The state's ability to regulate firearms and, for that matter, conduct, is qualitatively different in public than in the home.  *Heller*

GOLDBERG SEGALLA, LLP
11 Martine Ave., 7th Floor
White Plains, NY 10607
(914) 798-5400

15

reinforces this view. In striking D.C.'s handgun ban, the Court stressed that banning usable handguns in the home is a "policy choice" that is "off the table," *id.* at 636.

*Kachalsky* at 94.[4]

Regarding the standard of review, *Kachalsky* decided that, even outside the home, "some form of heightened scrutiny would be appropriate." *Id.* at 93. However, "*Heller* explains that the 'core' protection of the Second Amendment is the 'right of law-abiding, responsible citizens to use arms in defense of hearth and home.'" *Id.* (quoting *Heller* at 634-35). While not deciding the level of scrutiny for burdens on the core right, "applying less than strict scrutiny when the regulation does not burden the 'core' protection of self-defense in the home makes eminent sense . . . ." *Id.* at 93. Deciding that intermediate scrutiny is proper regarding restrictions on carrying firearms in public, *Kachalsky* explained:

> Unlike strict scrutiny review, we are not required to ensure that the legislature's chosen means is "narrowly tailored" or the least restrictive available means to serve the stated governmental interest. To survive intermediate scrutiny, the fit between the challenged regulation need only be substantial, "not perfect."

*Id.* at 97 (citations omitted).

Accordingly, a higher standard than intermediate scrutiny applies to prohibitions on possession of firearms and magazines in the home. To be sure, *Heller* "noted that the Second Amendment right does not encompass all weapons, but only those 'typically possessed by law-abiding citizens for lawful purposes' and thus does not include the right to possess 'dangerous and unusual weapons.'" *United States v. Decastro*, 682 F.3d 160, 165 n.4 (2d Cir. 2012) (quoting *Heller*

---

[4] "Treating the home as special and subject to limited state regulation is not unique to firearm regulation; it permeates individual rights jurisprudence." *Id.* at 94 (citing *Stanley v. Georgia*, 394 U.S. 557, 568 (1969)) (obscene materials); *Lawrence v. Texas*, 539 U.S. 558, 562, (2003) (private sexual conduct).

at 626, 627 n.26).  The firearms and magazines banned here are typically possessed nationwide by law-abiding citizens for lawful purposes, and are anything but "unusual."  Indeed, that was the case in New York before the Act.  Firearms with two features and magazines in any capacity manufactured before 1994, not to mention magazines loaded with more than seven rounds, were not even restricted under prior law.

*Decastro* noted that "heightened scrutiny is triggered only by those restrictions that (like the complete prohibition on handguns struck down in *Heller*) operate as a substantial burden on the ability of law-abiding citizens to possess and use a firearm for self-defense (or for other lawful purposes)."  *Id.* at 166 (citing, *inter alia*, *Ezell v. City of Chicago*, 651 F.3d 684, 708 (7th Cir. 2011)) ("a severe burden on the core Second Amendment right of armed self-defense will require an extremely strong public-interest justification and a close fit between the government's means and its end"); *United States v. Marzzarella*, 614 F.3d 85, 94–95 (3d Cir. 2010) ("de minimis" burden on the right might not warrant heightened scrutiny), *cert. denied*, 131 S.Ct. 958 (2011).  *Marzzarella* is instructive here in that it upheld a ban on firearms with obliterated serial numbers because that did not ban a class of firearms: "Because unmarked weapons are functionally no different from marked weapons, [the prohibition] does not limit the possession of any class of firearms."  *Id.* at 94.

*Decastro* further noted: "Reserving heightened scrutiny for regulations that burden the Second Amendment right substantially is not inconsistent with the classification of that right as fundamental to our scheme of ordered liberty in *McDonald v. City of Chicago*, 130 S.Ct. [3020, 3036 (2010)]."[5]  682 F.3d at 166-67.  *Decastro* concluded that a prohibition on transportation into

GOLDBERG SEGALLA, LLP
11 Martine Ave., 7ᵗʰ Floor
White Plains, NY 10607
(914) 798-5400

---

[5] Using reasoning that does not survive *Heller* and *McDonald*, the Second Circuit rejected a vagueness challenge to an assault weapon and magazine ban on the basis that "the local law does not infringe upon a fundamental constitutional right. Courts rarely invalidate a statute on its face because

17

one's state of residence of a firearm acquired outside the state "does not substantially burden his right to keep and bear arms" because "it does nothing to keep someone from purchasing a firearm in her home state . . . ." *Id.* at 168. By contrast, the Act here violates the fundamental right at issue because it bans mere possession of firearms and magazines in one's own home.

### ii.    The Act's Restrictions Are Irrational and Violate Both the Second Amendment and the Equal Protection Clause.

The restrictions at issue fail to pass muster under any standard of review for equal protection purposes. The fundamental right to possess arms for self defense in one's own home gives rise to strict scrutiny. But the restrictions here fail to pass even rational basis review.

"Under the Fourteenth Amendment, a law that 'impermissibly interferes with the exercise of a fundamental right . . .' is reviewed under the strict scrutiny standard." *Dandamudi v. Tisch*, 686 F.3d 66, 72 (2d Cir. 2012) (citation omitted). "Where no . . . fundamental right [is] infringed upon by government conduct, the constitutional guarantee of equal protection is satisfied where a classification bears a rational relationship to an appropriate governmental interest." *Windsor v. United States*, 699 F.3d 169, 196 (2d Cir. 2012). "Having a conceivable legitimate governmental interest is, alone, not sufficient for rational basis review. To survive rational basis review, a law must also have a rational relationship to the asserted legitimate governmental interest." *Id.* at 197.

The Act distinguishes between shooters at ranges and competitions (who are permitted to possess ten rounds in a magazine) and private citizens who wish to protect their lives, homes and

---

of alleged vagueness if the statute does not relate to a fundamental constitutional right . . . and if the statute provides 'minimally fair notice' of what the statute prohibits." *Richmond Boro Gun Club, Inc. v. City of New York*, 97 F.3d 681, 684 (2d Cir. 1996). *See also United States v. Toner*, 728 F.2d 115, 128 (2d Cir. 1984) ("the statute passes constitutional muster if it rests on a rational basis, . . . since the right to possess a gun is clearly not a fundamental right").

GOLDBERG SEGALLA, LLP
11 Martine Ave., 7th Floor
White Plains, NY 10607
(914) 798-5400

18

property (who can only possess seven rounds).   Limiting a victim to loading only seven rounds into a magazine within one's home is not just irrational, it is absurd:  no criminal who might intrude into one's home would obey this law.  But ten rounds may be loaded at a shooting range or competition. The State has no interest in preventing citizens from defending themselves, and certainly does not value shooting at a practice range or target competition more than the right of self-defense.  This makes no sense. Yet, under the Act, recreation trumps protection of life.

Applying any test from strict scrutiny to rational basis, the restrictions here fail, as there is no nexus between the Act's restrictions and either a reduction in violent crime or an improvement in public safety.  Indeed, the Act's focus on certain physical characteristics of firearms has no rational relationship to any legitimate, important or compelling governmental interests.

Restricting the presence of a telescoping stock does not further any governmental interest in concealability.  Instead, it eliminates a rifle's ability to properly fit the shooter.  A semiautomatic rifle that has an ability to accept a detachable magazine and a semiautomatic shotgun may not have a telescoping stock, regardless of the overall length of the gun.  The overall length when the stock is retracted to its shortest position may be far longer than the overall length of a rifle or shotgun without a telescoping stock, so the restriction does not relate to concealability.  The only effect of the restriction is that the shoulder stock cannot be adjusted to fit a person's size correctly.

A semiautomatic rifle that has an ability to accept a detachable magazine may not have a pistol grip that protrudes conspicuously beneath the action of the weapon, even though that is just a design to enable holding the rifle comfortably against the shoulder in a stable manner.  Where the rear hand holds the rifle is irrelevant to its function and firepower.  By contrast, a semiautomatic shotgun may have a pistol grip that protrudes conspicuously beneath the action of the weapon.

Finally, a semiautomatic rifle that has an ability to accept a detachable magazine and a semiautomatic shotgun may not have a thumbhole stock, which is popular for hunting.  Again, how the rear hand holds the stock has no relation to how the gun functions.

The Act's restriction on the number of rounds loaded in a magazine is also irrational, as it is unlikely to have any detectable effect on the number of homicides or violent acts committed with firearms.  *See* Declaration of Gary Kleck (attached hereto as **"Exhibit F"**) at  p.3.  Criminals will be even less likely to be affected by the LC magazine restriction than noncriminals.  *Id.*  It is the law-abiding citizens who will primarily be impacted by the restriction.  *Id.*

The Act's limitation of the number of rounds allowable for a firearm in the home impairs a homeowner's ability to successfully defend himself or herself during a criminal attack in the home because: (a) victims often face multiple criminal adversaries; and (b) people miss with most of the rounds they fire, even when trying to shoot their opponents.  *Id.*  This includes police officers: numerous studies have been done of shootings by police officers in which the officers were trying to shoot criminal adversaries.  *Id.*  In many of these shootings, the officers fired large numbers of rounds.  *Id.*  Yet, in 63% of the incidents, the officers failed to hit even a single offender with even a single round.  *Id.*  Police officers have the experience, training, and temperament to handle stressful, dangerous situations far better than the average civilian, so it is reasonable to assume marksmanship among civilians using guns for self-protection will be still lower than that of police.  *Id.*

Some law-abiding citizens, along with many criminals, might invest in multiple ten-round magazines in the absence of larger capacity magazines – a development which obviously defeats the purpose of the magazine capacity limit.  *Id.*  Beyond that, however, some people will not be able to make effective use of additional magazines.  *Id.* at 3.

The restrictions on LC magazines will have an inconsequential impact on reducing homicides and violent crimes. *Id.* at 4. Criminals rarely fire more than ten rounds in gun crimes. *Id.* Indeed, they usually do not fire any at all – the gun is used only to threaten the victim, not attack him or her. *Id.* For the vast majority of gun crimes, the unavailability of LC magazines would therefore be inconsequential to deterring the criminal behavior. *Id.*

A ban on LC magazines will have an inconsequential effect on reducing the number of killed or injured victims in mass shootings. *Id.* at 4. The presumption is false that an offender lacking LC magazines would be forced to reload sooner or more often, thereby giving bystanders the opportunity to tackle him and stop his attacks. *Id.* Analysis of mass shootings in the United States shows it is exceedingly rare that victims and bystanders in mass shootings have tackled shooters while they are reloading. *Id.* This is particularly true because most mass shooters bring multiple guns to the crimes and, therefore, can continue firing without reloading even after any one gun's ammunition is expended. *Id.* at 5. A study of every large-scale mass shooting committed in the United States in the 10-year period from 1984 through 1993 found that the killers in 13 of these 15 incidents possessed multiple guns. *Id.*

The Act's restrictions on rifles and shotguns that contain so-called "Assault Weapon" characteristics is, likewise, not rationally related to the goals of reducing homicides or violent crimes or improving public safety. *Id.* at 6.

Criminals are just as likely to use non-banned firearms that function the same as firearms falling within the "assault weapon" ("AW") definition under the Act. *Id.* Under the Act, though some semi-automatic firearms are banned, other semi-automatic firearms are left legally available, including (a) unbanned models; (b) currently banned models that are redesigned to remove the

features that make them AWs; and (c) firearms that would otherwise be banned as AWs but are grandfathered into lawful status because they were manufactured before September 13, 1994, or were lawfully possessed before January 15, 2013. *Id.* Thus, firearms will continue to be available that function in essentially identical ways as the banned firearms – i.e., they can accept detachable magazines (including LC magazines), can be fired just as fast, and can fire rounds that are, shot-for-shot, just as lethal as rounds fired from the banned firearms. *Id.* Consequently, criminals can substitute mechanically identical firearms for banned AWs, commit the same crimes they otherwise would have committed with the banned firearms, with the same number of wounded or killed victims. *Id.*

The Act's expanded definition and ban of "assault weapons" will make little difference on public safety by reducing crimes committed with firearms. *Id.* at 6-7. Criminals who do not currently possess or use banned AWs have no need to acquire substitute weapons because they will presumably continue to use the firearms they currently possess. *Id.*

All attributes of AWs that *do* make them more useful for criminal purposes (i.e., accuracy, lethality, rapid fire, ability to fire many rounds without reloading) are present in easily-substituted, unbanned, counterpart firearms. More importantly, these same attributes increase the utility of AWs for *lawful* self-defense or various sporting uses. *Id.* at 7.

In self-defense situations where it is necessary for the crime victim to shoot the criminal in order to prevent harm to the defender or others, accuracy is crucial for the victim. *Id.* at 7. Where it is necessary for a crime victim to shoot the aggressor, and only lethal or incapacitating injury will stop him, the lethality of the defender's firearm is a precondition to her ability to end the criminal attack, and prevent harm to herself and other potential victims. *Id.*

Where a crime victim faces multiple adversaries, the ability and need to fire many rounds without reloading is obvious. *Id.* The ability to fire rapidly may be essential to either deter offenders from attacking, or failing that, to shoot those aggressors who cannot be deterred. *Id.* at 8. This is because some of the defender's shots will miss, and because the offender(s) may not allow the victim much time to shoot before incapacitating the victim. *Id.* Regardless of how an AW is defined, restricting firearms with the attributes that make them useful for criminal purposes necessarily restricts firearms possessing attributes that make them more effective for lawful self-defense. *Id.*

The Act's ban on firearms defined as "assault weapons" will not deter criminals from using them to commit crimes or from finding substitute firearms with the same features, and will simultaneously deny law-abiding citizens access to those weapons to defend themselves. *Id.* at 9.

While either criminals or prospective crime victims *could* substitute alternative weapons for banned "AWs," criminals are more likely to actually do so because they are more powerfully motivated to have deadly weapons. *Id.* This would be especially true of the extremely rare mass shooters, who typically plan their crimes in advance and thus are in a position to take whatever time and effort is needed to acquire substitute weapons. *Id.* Further, even ordinary criminals are strongly motivated to acquire firearms both for purposes of committing crimes and for purposes of self-defense. *Id.* Because criminals are victimized at a rate higher than noncriminals, this means that they have even stronger self-defense motivations to acquire and retain guns than noncriminals. *Id.* In contrast, many prospective crime victims do not face an imminent threat at the time they consider acquiring a gun for self-protection, have a weaker motivation to do whatever it takes to acquire their

23

preferred type of firearm, and are therefore less likely to do so. *Id.* Further, it is virtually a tautology that criminals will disobey the AW ban at a higher rate than noncriminals. *Id.*

In sum, the above provisions violate fundamental Second Amendment rights, but even if they did not, no rational relationship exists between them and a legitimate governmental interest.

### iii.   Numerous Provisions Contained in the Act Are Unconstitutionally Vague.

Significant portions of the Act do not provide any guidance, let alone relatively clear guidelines, as to prohibited conduct related to certain "feeding devices" and "assault weapons." Generally, "the void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender v. Lawson*, 461 U.S. 352, 357 (1983). The Supreme Court has distinguished between statutes that are void for vagueness under the Due Process Clause and the problematic hypotheticals that can be imagined under virtually any statute:

> What renders a statute vague is not the possibility that it will sometimes be difficult to determine whether the incriminating fact it establishes has been proved; but rather the indeterminacy of precisely what that fact is. Thus, [the Supreme Court has] struck down statutes that tied criminal culpability to whether the defendant's conduct was "annoying" or "indecent"-wholly subjective judgments without statutory definitions, narrowing context, or settled legal meanings. *Id.* at 1846. To survive a vagueness challenge, a statute must give "relatively clear guidelines as to prohibited conduct."

*Posters 'N' Things, Ltd. v. U.S.*, 511 U.S. 513, 525 (1994). Such "objective criteria" will "minimize the possibility of arbitrary enforcement and assist in defining the sphere of prohibited conduct under the statute." *Id.* at 526. "The underlying principle is that no man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed." *United States v. Harriss*, 347 U.S. 612, 617 (1954).

GOLDBERG SEGALLA, LLP
11 Martine Ave., 7th Floor
White Plains, NY 10607
(914) 798-5400

The Act criminalizes an ammunition feeding device that "has a capacity of, or that can be readily restored or converted to accept, more than" ten rounds of ammunition (*see* §§ 265.00(23), 265.02(8), 265.36 & 265.37).  However, the "capacity" of tubular magazines for rifles and shotguns varies with the length of the cartridges or shells inserted therein.  They may hold no more than ten of one length, but more than ten of another length.  As explained in *Peoples Rights Organization, Inc. v. City of Columbus*, 152 F.3d 522, 536 (6th Cir. 1998), invalidating a ban on "any semiautomatic shotgun with a magazine capacity of more than six rounds":

> Shotgun rounds are available in different lengths.[1] Rounds of a short length may cause a shotgun's magazine capacity to exceed six rounds. Conversely, rounds of a longer length (which may be all the owner possesses or is aware of) will result in a capacity that is less than six rounds. This provision is a trap for the unwary. It imposes criminal liability regardless of whether a shotgun owner knows of the existence of shorter length rounds. Hence, we find this definition unconstitutionally vague.

Further, Plaintiffs are left to guess at the amount of time that constitutes "readily," which varies with a person's knowledge, skill, access to tools, and availability of parts.  The provisions also fail to provide any guidelines on how an ordinary person can know whether such ammunition feeding device can be modified to accept more rounds, let alone one that "can be readily restored or converted to accept, more than" ten rounds of ammunition.  The subjective criteria contained in these provisions can be enforced *only* under arbitrary and subjective policies.  As explained in *Peoples Rights Organization, id.* at 538, an analogous term "is unduly vague in its own right inasmuch as the phrase 'may be readily assembled' does not provide sufficient information to enable a person of average intelligence to determine whether a particular combination of parts is within the

---

[1]"For instance, the record indicates that 12 gauge shotgun shells are available in the following lengths: 2", 2 1/2 ", 2 3/4", 3", and 3 1/2 "." *Id.* n.15.

GOLDBERG SEGALLA, LLP
11 Martine Ave., 7th Floor
White Plains, NY 10607
(914) 798-5400

25

ordinance's coverage."  The court agreed with the district court, which in turn relied on expert

testimony that:

> An ordinary person has no way to know whether a specific part or parts was [sic] so
> designed, how much time is included in "readily," by who [sic] parts "may be readily
> assembled," or what is an assault weapon.  Once again, no standard is provided for
> what "may be readily assembled," such as may be readily assembled by the person in
> possession, or may be readily assembled by a master gunsmith using the facilities of a
> fully-equipped machine shop.

*Peoples Rights Organization v. City of Columbus*, 925 F. Supp. 1254, 1269 (S.D. Ohio 1996).

The Act similarly leaves Plaintiffs guessing as to whether the rifles, pistols, and shotguns

they already own constitute an "assault weapon" under § 265.00(22), as amended.  It is also unclear

to Plaintiffs whether the rifles, pistols, and shotguns they intended to purchase but for the Act qualify

as an "assault weapon".   For example, the definition of "assault weapon" includes certain rifles with

"a pistol grip that protrudes conspicuously beneath the action of the weapon," § 265.00(22)(a)(ii),

and certain rifles, shotguns, and pistols with "a protruding grip that can be held by the non-trigger

hand."  § 265.00(22)(a)(iv), (b)(iii), (c)(iii).  Those terms are subjective and lack any definite

guidelines by way of measurement or other information.

Similarly, an "assault weapon" includes a semiautomatic shotgun with "(iv) a fixed magazine

capacity in excess of seven rounds; [or] (v) an ability to accept a detachable magazine . . . ."

§ 265.00(22)(b).  The definition does not include, among other things, "a semiautomatic shotgun that

cannot hold more than five rounds of ammunition in a fixed or detachable magazine . . . ."

§ 265.00(22)(g)(iii).  That exclusion fails to inform one whether a shotgun "that cannot hold more

than five rounds" refers (a) to the shotgun and magazine with shells of a given length possessed by a

specific person, or more broadly (b) to the same shotgun with shorter shells not possessed by that

person which would allow the magazine to hold more than five shells, or to a shotgun with a

detachable magazine that would hold more rounds in a different magazine not possessed.

**B.      PLAINTIFFS WILL SUFFER IRREPARABLE HARM
         IN THE ABSENCE OF PRELIMINARY INJUNCTIVE RELIEF.**

**i.      The Act's Prohibitions on Loading More Than Seven Rounds, and on Possession
         of a Magazine with Capacity over Ten Rounds, including Those Manufactured
         Before September 13, 1994, Infringe On Plaintiffs' Core Second Amendment
         Rights.**

William Nojay, Thomas Galvin, Roger Horvath, and members and supporters of the

NYSRPA, theWCFOA, the SAFE, and the NYSATA enjoy a fundamental right to keep and bear

arms. *McDonald*, 130 S. Ct. at 3042. "[T]he inherent right of self-defense has been central to the

Second Amendment right." *Heller*, 554 U.S. at 628.  However, if magazines may not contain more

than seven rounds for firearms in the home, the ability of these plaintiffs to defend themselves, their

families, and their property is severely compromised.

The Act's arbitrary limitation of the number of rounds allowable for a firearm in the home

causes a profound loss of sense of security and, more important, irreparable harm from a successful

criminal attack in the home.  Declaration of Guy Rossi (Exhibit C) at 5-9.   The seven-round

limitation unreasonably assumes that all homeowners possess more than one magazine and are able

to switch out their firearms' magazines while under criminal attack. *Id.* at 8. However, a homeowner

under the extreme duress of an armed and advancing attacker is likely to fire at, but miss, his or her

target. *Id.*  Nervousness and anxiety, lighting conditions, the presence of physical obstacles that

obscure a "clean" line of sight to the target, and the mechanics of retreat are all factors which

contribute to this likelihood.  Exhibit C at 5.  Under such expected conditions, it is of paramount

importance that a homeowner have quick and ready access to ammunition in quantities sufficient to

GOLDBERG SEGALLA, LLP
11 Martine Ave., 7th Floor
White Plains, NY 10607
(914) 798-5400

27

provide a meaningful opportunity to defend herself and/or her loved ones. *Id.* It is equally important that the homeowner under attack have that capability quickly and efficiently to re-load a firearm after all of the rounds it holds are fired. *Id.* However, many homeowners cannot re-load quickly or efficiently due to such factors as age, physical limitations, and the stress/anxiety produced by a potentially life-threatening situation. *Id.*

Violent criminal attacks frequently occur suddenly and without warning, leaving the victim with less than a second to fire the handgun to save herself. *Id.* Reaction time under stress is complicated and can be attributed to many physiological, psychological and environmental factors. *Id.* The most basic premise breaks down into three factors: the ability for an individual to perceive a threat (Perceptual Processing), the ability to make a decision (Cognitive Processing), and lastly the ability of the brain to send messages to the muscles to react (Motor Processing). *Id.* This processing takes, minimally, several seconds without consideration to other factors such as distractions, noise, multiple assailants, lighting conditions, nervousness and fatigue. *Id.*

Loading a firearm requires two hands, and is a far more difficult task when someone is physically handicapped, or one hand is wounded during an attack. Exhibit C at 5-7. Having more rounds in a magazine allows the victim to better protect himself or herself without the need to reload especially if handicapped, disabled or injured. *Id.* at 7.

Plaintiff Thomas Galvin and Plaintiff Roger Horvath are but two examples.

Mr. Galvin is a left-hand amputee. Exhibit E at 1. He owns several pistols and rifles with magazines having capacities over ten rounds that were manufactured before September 13, 1994. *Id.*

In order to change a magazine in one of his pistols or rifles, Mr. Galvin has to pinch the pistol or rifle under his left arm and against his body without dropping the firearm or magazine. *Id.*

at 2.  The seven-round limitation will require Mr. Galvin to switch out the magazines of his pistols and rifles more frequently if confronted with a sudden home invasion, robbery, or other attack.  *Id.*  Therefore, Mr. Galvin's ability to defend himself, his family and property with these pistols and rifles is substantially compromised by the seven-round limitation.  *Id.*

Plaintiff Roger Horvath is similarly impacted by the limitation.  *See* Exhibit D.  Mr. Horvath is a paraplegic and wheelchair bound.  *Id.* at 1.  He suffers from advanced Carpal Tunnel Syndrome and, as such, has extreme difficulty manipulating objects such as ammunition magazines.  *Id.*  Because of his physical limitations, Mr. Horvath has a limited ability to retreat effectively and safely if faced with a home invasion.  *Id.*  Mr. Horvath owns several firearms, all with magazine capacities of over ten rounds that were manufactured before September 13, 1994.  *Id.*

Mr. Horvath is particularly vulnerable to a home invasion.  He lives alone on approximately two acres of land with a large, wooded area behind his house.  *Id.* at 2.  The nearest police precinct to his house is five miles away.  *Id.*  Mr. Horvath has an adopted nine-year-old son whom he cares for several days and nights during the week.  *Id.*  In light of Mr. Horvath's physical limitations, the seven-round limitation deprives him of adequately protecting himself, his son, and his property and increases his vulnerability during a home invasion.  *Id.*

Mr. Horvath's physical limitations significantly compromise his ability to quickly or effectively reload a firearm.  *Id.* at 2.  The extended time Mr. Horvath currently requires to switch out ammunition magazines represents a prolonged exposure to capture, injury and/or death at the hands of a home invader, robber, or other predator advancing upon him during the switch out.  *Id.*  Under such conditions, Mr. Horvath's safety -- and the well-being of those who depend upon him for defense – rest upon his ability to use a magazine that holds more than ten (10) rounds of

GOLDBERG SEGALLA, LLP
11 Martine Ave., 7th Floor
White Plains, NY 10607
(914) 798-5400

29

ammunition.  Yet, the Act's criminalization of such magazines deprives him of this ability and irrationally increases his vulnerability to attack.

To be sure, physical handicaps are not the only factors that illustrate the legitimate need for LC magazines for lawful self-defense.  The physiological reaction to the "stress flood" produced by an armed attack, the time delay caused by loading/re-loading a firearm,  the loss of defensive  use of the non-dominant arm and hand during loading/re-loading, and the attention distraction caused by loading/re-loading a firearm are factors that effect able-bodied gun owners as well as those who are handicapped.

It is known fact that under the "stress flood" of a life or death encounter the blood within one's body is re-routed to the larger muscles so as to allow a "flee or fight" response.  Exhibit C at 8. This physiological reaction to extreme stress causes significant reloading difficulty during an attack due to loss of fine motor control in the fingers.  *Id.*  Trying to push a magazine release or align a magazine with the magazine well with fingers that are shaking and weakened due to blood loss is very difficult for a seasoned veteran soldier or police officer who expects this phenomena.  *Id.*  It is far more difficult for a civilian who has never been trained that such changes will occur, or trained during realistic scenario-based training, or who is experiencing a life-threatening attack for the first time.  *Id.*

Police and civilians who train in defensive handgun use learn to draw a loaded handgun, quickly acquire a sight picture, and place two shots on the attacker's upper center of mass.  Exhibit C at 8.  Optimally, all this can be accomplished in a little over two seconds.  *Id.*  Quite obviously, the process of loading the handgun will take at least a few extra seconds.  *Id.*  Extensive practice can reduce how long it takes a person to load a firearm under stress, but that time cannot be reduced to

zero. *Id.* Accordingly, the simple time delay of loading a spent firearm may result in the success of a violent attacker who otherwise could have been thwarted. *Id.*

Carrying an unloaded firearm will often not provide a viable means of self-defense and would frequently result in a situation where the assailant has closed the distance on the victim so that the assailant is on the person of the victim. Exhibit C at 9. The victim is left with a firearm she needs to retain so that she is not shot with her own gun. At best then, the firearm becomes a bludgeoning tool. *Id.*

The delay in loading a firearm has additional deadly implications. Exhibit C at 9. While the left arm and hand are being used to load the handgun, they cannot be used for anything else. The victim is more vulnerable because both hands are occupied. *Id.* The non-gun hand becomes useless to fend off the attacker or to deflect the attacker's knife, stick, or other weapon. *Id.* Further, if the victim were to be grabbed during the loading of the firearm, the sympathetic nervous system reaction of clenching one hand to retain the magazine, or simply tightening muscles under stress would further limit the victim's ability to complete the loading of the firearm. *Id.*

The unloaded firearm mandate forces the victim to focus her attention on the firearm in order to load and chamber the ammunition. Exhibit C at 9. As a result, the victim is impeded from focusing attention on the assailant and on the surroundings. *Id.*

As noted, the burden is on the State to justify any encroachment on the right to armed self-defense recognized by the Second Amendment. It is not the burden of the citizen to show that he or she has a need. Even so, the legitimate and compelling need for an LC magazine for self-defense is underscored by the fact that police officers are exempt from the restrictions on magazine capacity and on loading more than seven rounds in a magazine. § 265.20(1)(b). The 2010 New York City

GOLDBERG SEGALLA, LLP
11 Martine Ave., 7th Floor
White Plains, NY 10607
(914) 798-5400

31

Police Department's *Annual Firearms Discharge Report* ("NYPD AFDR") (available at

http://www.nyc.gov/html/nypd/downloads/pdf/analysis_and_planning/afdr_20111116.pdf) provides

detailed information on all incidents in which NYPD officers discharged their weapons in 2010.

Exhibit C at 8.  In that year there were thirty-three (33) incidents of the police intentionally

discharging firearms in encounters of adversarial conflict.  *Id.*, NYPD AFDR at p.8, Figure A.10.

65% of these incidents took place at a distance of less than ten (10) feet.  *Id.*, NYPD AFDR at p.9,

Figure A.11.  In 33% of these incidents, the NYPD officer(s) involved fired more than seven (7)

rounds.  *Id.*, NYPD AFDR at p.8, Figure A.10.   In 21% of these incidents, the NYPD officer(s) fired

more than ten (10) rounds.  *Id.*  If highly trained and experienced NYC  police officers required the

use of at least eight rounds in 1/3rd of their close-range encounters to subdue an aggressive assailant,

it stands to reason that a "green" civilian gun owner under duress (and certainly far less experienced

and trained than a NYC police officer) would need at least that many rounds to subdue an armed

assailant with his or her home.  *Id.*

> **ii.** **The Act's Prohibitions and Restrictions on Large Capacity Magazines and Commonly-Possessed Firearms that it Redefines as "Assault Weapons" Violate the Second Amendment**

It is well settled that "[t]he violation of a constitutional right . . . constitutes irreparable harm

for the purpose of a preliminary injunction."  *Ligon*, 2013 WL 628534, *39; *see Johnson v. Miles*,

355 F. App'x 444, 446 (2d Cir. 2009) ("an alleged violation of a constitutional right triggers a

finding of irreparable harm"); *Statharos v. N.Y. City Taxi & Limousine Comm'n*, 198 F.3d 317, 322

(2d Cir. 1999) ("Because plaintiffs allege deprivation of a constitutional right, no separate showing

of irreparable harm is necessary."); *Jolly v. Coughlin*, 76 F.3d 468, 482 (2d Cir.1996) ("The district

court . . . properly relied on the presumption of irreparable injury that flows from a violation of

constitutional rights."); 11A Charles Alan Wright et al., Federal Practice & Procedure §2948.1 (2d ed. 1995) ("When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary.").

As has been demonstrated at greater length above, the Act's restrictions on large capacity magazines and "assault weapons" violate the Second Amendment.  By subjecting firearms possessed before January 15, 2013, to onerous registration requirements, and prohibiting any additional such firearms to be obtained, the amendment violates law-abiding gun owners' Second Amendment rights to possess ordinary firearms in their own homes for self protection.

The broadened definition of "assault weapon" now describes countless numbers of rifles, handguns, and shotguns that are commonly-possessed under prior law.  This provision violates the Second Amendment in two ways.  First, it flatly prohibits any future acquisition of these commonly owned firearms.  For those who did not possess such a firearm passage of the Act, the law amounts to a flat ban on possession of these firearms for self-defense in their home.  And the ban on future acquisition also violates the rights of those who possessed such a firearm since the Second Amendment does not impose a limit on the number of firearms a person can own.  Second, for those who owned a banned firearm at the time of passage, they must now either (1) register those firearms, or (2) sell to, exchange with, or dispose of those firearms in manner set forth in the provision. *See* Penal Law § 265.00(22)(h).  The amendment forces Plaintiffs to choose between abandoning their firearms that were "legal" up until January 15, 2013, or providing detailed and sensitive personal information to the New York State Police in order to exercise their Second Amendment rights. Moreover, other plaintiffs who did not possess firearms under the newly-minted "assault weapon" definition by that deadline are absolutely prohibited from ever doing so.

GOLDBERG SEGALLA, LLP
11 Martine Ave., 7th Floor
White Plains, NY 10607
(914) 798-5400

33

The State may not simply ban possession of a constitutionally-protected object to those who did not possess it by a certain deadline, nor may it require that those who did so must register to exercise a core constitutional right.   And for those who had not yet turned 21 at the time of the passage of the Act, they never had an opportunity to meet this deadline.   The holding in *Heller* treats the Second Amendment on par with other constitutional rights.   *Heller*, 128 S. Ct. at 2797 ("[T]he Second Amendment, like the First and Fourth Amendments, codified a pre-existing right."). A person could not be banned from speaking or assembling just because he or she had not done so previously by an arbitrary deadline.   Further, just as a person may not be required to register to exercise the fundamental rights to freedom of religion, speech and press, and freedom from unreasonable search and seizure, a person may not be required to register merely to possess a firearm in his or her home.   *Thomas v. Collins*, 323 U.S. 516, 539-40 (1945) ("If the exercise of the rights of free speech and free assembly cannot be made a crime, we do not think this can be accomplished by the device of requiring previous registration as a condition for exercising them . . . .").

A license may be required to hold a parade on a public street.   *Cox v. New Hampshire*, 312 U.S. 569, 576 (1941).   However, a law which prohibited the distribution of literature "at any time, at any place, and in any manner without a permit," would "strik[e] at the very foundation of the freedom of the press by subjecting it to a license . . . ." *Id.* at 577 (citation omitted).   The Act at issue here prohibits certain firearms it now deems "assault weapons" at any time, at any place, and in any manner to persons who did not possess them on January 15, 2013, and prohibits those who did so to possess them without registration which entails disclosure of personal information to the State Police.

GOLDBERG SEGALLA, LLP
11 Martine Ave., 7th Floor
White Plains, NY 10807
(914) 798-5400

34

But for the Act, some Plaintiffs would acquire such firearms in order to protect themselves and their families, for target shooting, and for hunting. The expanded "assault weapon" ban relies on a "one-feature test" which has nothing to do with increasing a firearm's power or danger. Those features are found on rifles, pistols, and shotguns that are commonly-possessed throughout this country by law-abiding persons for lawful purposes. However, under the Act, a firearm becomes a prohibited "assault weapon" merely because it has a feature related to how the firearm is held, transported, or loaded and unloaded.

Whether grandfathered firearms or once commonly-possessed firearms under prior law that now constitute "assault weapons" under § 265.00(22), the amended definition of "assault weapon" deprives Plaintiffs of Second Amendment rights. That alone demonstrates Plaintiffs will suffer irreparable harm unless this Court grants this motion. *Ligon v. City of New York*, 12 CIV. 2274 SAS, 2013 WL 628534, *39 (S.D. N.Y. Feb. 14, 2013) ("[t]he violation of a constitutional right . . . constitutes irreparable harm for the purpose of a preliminary injunction.").

Prohibiting the exercise of constitutional rights like those at issue here is a classic irreparable injury. *Ligon*, 2013 WL 628534, *39 (S.D. N.Y. Feb. 14, 2013) ("[t]he violation of a constitutional right . . . constitutes irreparable harm for the purpose of a preliminary injunction."). Plaintiffs face arrest, prosecution, incarceration, legal disabilities, and confiscation of their firearms and magazines; or they face loss of their Second Amendment right to have arms for self defense in their own homes, for hunting, and for other lawful purposes. *See Peoples Rights Organization*, 152 F.3d at 529 ("Plaintiffs . . . face a clear Hobson's choice. They can either possess their firearms in Columbus and risk prosecution under the City's law, or, alternatively, they can store their weapons outside the City,

depriving themselves of the use and possession of the weapons."). The only way to provide

plaintiffs relief is to enjoin the enforcement of the Act.

### C.   GRANTING PRELIMINARY INJUNCTIVE RELIEF  IS IN THE PUBLIC INTEREST.

Granting Plaintiffs the relief they seek will serve the public interest. It is beyond cavil that

the public interest is served when each law-abiding citizen has the ability to defend himself, his

family, and his property in a manner that will be the most effective. As already discussed, the

Supreme Court in *Heller* and *McDonald* recognized that the Second Amendment conferred a right of

law-abiding citizens to possess ordinary firearms in their own homes for self protection. Even in

light of the clear holdings on this fundamental constitutional right in *Heller* and *McDonald*, the

hastily-passed New York legislation severely infringes on the right. The public interest is not served

by allowing enforcement, pending judicial review, of an Act which on its face severely restricts New

Yorkers' ability to possess a firearm in the home for self-protection and the protection of the

citizen's family and property.

Furthermore, the public interest is always served when constitutional rights are vindicated.

"In the absence of legitimate, countervailing concerns, the public interest clearly favors the

protection of constitutional rights . . . ." *Lopez Torres v. New York State Bd. of Elections*, 462 F.3d

161, 207 (2d Cir. 2006) (citation omitted). See *Haitian Centers Council, Inc. v. McNary*, 969 F.2d

1326, 1347 n.18 (2nd Cir. 1992) ("The public interest in having United States personnel comply with

the Constitution . . . .").

## V.   CONCLUSION

This Court should issue a preliminary injunction against enforcement of and/or prosecution of citizens under the following sections of the N.Y. Penal Law (as amended or created by corresponding sections of the Act):

1.    Section 265.37, which makes it unlawful to possess an ammunition feeding device containing more than seven rounds of ammunition.

2.    Sections 265.02(8) and 265.36, which make it unlawful to possess, and § 265.10(2) & (3), which make it unlawful to transport, ship, or dispose of, a large capacity ammunition feeding device.  In the alternative, to enjoin § 265.10(2) & (3) as applied to any such device manufactured before September 13, 1994.

3.    Section 265.36, if not wholly enjoined, to enjoin everything beginning with the unintelligible "and if" clause.

4.    Sections 265.00(23) and 265.36 in referring to any device "that can be readily restored or converted to accept" more than ten rounds of ammunition.

5.    Sections 265.00(23) and 265.36 in referring to any device that "has a capacity of, or that can be readily restored or converted to accept, more than" ten rounds of ammunition, as applied to tubular magazines.

"Assault Weapons"

6.    Section 265.00(22)(a)(i), (ii), and (iii) and (b)(i) and (ii), defining "assault weapon" in part as certain rifles and shotguns as having "a folding or telescoping stock," "a pistol grip that protrudes conspicuously beneath the action of the weapon," or "a thumbhole stock."

7.      Section 265.00(22)(b)(iv) and (v), which defines "assault weapon" as a

semiautomatic shotgun with "(iv) a fixed magazine capacity in excess of seven rounds; [or] (v) an

ability to accept a detachable magazine . . . ."

Dated: April 15, 2013                              Respectfully Submitted,

LAW OFFICE OF STEPHEN HALBROOK          GOLDBERG SEGALLA, LLP

By:  /s/    Stephen P. Halbrook              By:   /s/    Brian T. Stapleton
Stephen P. Halbrook, Esq.                     Brian T. Stapleton, Esq.
*Pro Hac Vice* (Pending)                         Matthew S. Lerner, Esq.
3925 Chain Bridge Road, Suite 403             11 Martine Avenue, Suite 750
Fairfax, VA 22030                             White Plains, New York 10606-1934
(703) 352-7276                                (914) 798-5400
protell@aol.com                               bstapleton@goldbergsegalla.com

                                              *Counsel For Plaintiffs*

## CERTIFICATION

I hereby certify that on April 15, 2013, a copy of the foregoing MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION was filed electronically and served by mail upon anyone unable to accept electronic filing. Notice of this filing was will be sent by e-mail to all parties by operation of the Court's electronic filing system  or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.

GOLDBERG SEGALLA, LLP


By:   __/s/   Brian T. Stapleton_____
        Brian T. Stapleton, Esq.