# EXHIBIT C

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK
Buffalo Division

NEW YORK STATE RIFLE AND PISTOL :
ASSOCIATION, INC., *et al.*, :
 :
     Plaintiffs. :
  v. :  Civil No.: 1:13-cv-00291
 :
ANDREW M. CUOMO, *et al.*, :
 :
     Defendants. :

## DECLARATION OF GUY ROSSI

  I, Guy Rossi, do hereby swear or affirm:

  I offer this declaration in support of a motion made by the plaintiffs in the above-referenced action that seeks a preliminary injunction enjoining the enforcement of the New York Secure Ammunition and Firearms Enforcement Act ("the Act"). This declaration is based upon my review of the Act, the Complaint filed by the plaintiffs herein, and my review of the plaintiff's motion for preliminary injunction. It is also based upon my thirty (30) years of experience in instructing and training law enforcement recruits, instructors, and supervisors for Monroe County and the surrounding regions.

  I offer the following opinions under the penalties of perjury, and to a reasonable degree of firearms safety, firearms operations, and firearms training certainty.

## I. EXPERIENCE & TRAINING

  I am a retired Police Sergeant of the Rochester, New York Police Department. During my years on the force I specialized in patrol, recruit, field training and defensive tactics instruction. I have been a nationally recognized law enforcement trainer since 1982. My teachings in officer survival skills have been published in over two hundred (200) magazine articles and book chapters.

  I have developed and trained recruits, instructors, and supervisors in firearms, defensive tactics, and justified use of force. I have developed and instructed hundreds of cognitive and psychomotor skill related programs, including New York State Penal Law Article 35 – Defense of Justification, Liability Issues for Police Supervisors, Firearms and Defensive Tactic Instructor Courses, Multimedia for Law Enforcement Trainers, and, most recently, a web-based learning program in Community College Citizen Preparedness for FEMA. The curriculum and training which I developed and instructed have been recognized on a international basis, and are based upon my career employment as a police officer and my extensive knowledge of firearms (including those characterized as "assault weapons" by New York law).

  I have a Master's Degree in Adult Education – Instructional Design. I am a charter and advisory board member of the International Law Enforcement and Educators Trainers Association (ILEETA), as well as the (former) Editor of *The ILEETA Review*. Significant certifications/credentials of mine include NYS Division of Criminal Justice Services Master

Instructor in General Topics, Defensive Tactics, Firearms, Field Training and Aerosol Subject Restraint, Law Enforcement Accreditation Manager, Security Guard Instructor, Safariland Master Baton and Defensive Tactic Instructor, Taser Instructor, Force Science Analyst Certification and Independent Consultant/Trainer in Verbal Defense and Influence.

As a result of the aforementioned education, training and experience I have developed an extensive knowledge of firearms, their various features, their safe operation, and their use for self defense. I have been qualified as an expert witness on the use of force by law enforcement officers.

## II.    THE SAFE ACT'S RESTRICTIONS ON MAGAZINES & ROUNDS

Prior to the passage of the SAFE Act, New York law defined a "large capacity ammunition feedings device" (hereafter "LC magazine") as a magazine capable of holding more than ten rounds.  The prior law banned new LC magazines, and those LC magazines manufactured before the 1994 enactment date were grandfathered.  As amended, the Act changed the rules in two ways.  First, the Act prohibits loading more than seven rounds in any magazine, including those kept at home for self-protection, except that ten rounds may be loaded in a magazine at a shooting range or competition.  Second, the Act requires that grandfathered magazines manufactured before September 13, 1994, be converted so that they're incapable of being "readily restored or converted" to holding more than ten rounds. The State has not provided any guidance on the means, methods, or standards it will apply to determine whether a converted magazine is adequately "incapable" of ready restoration.

The Act prohibits possession of a magazine capable of holding more than ten rounds.  However, on a nationwide basis most pistols are manufactured with magazines holding ten to 17 rounds.  Many popular rifles are manufactured with magazines holding 10, twenty, or thirty rounds.  These pistols, rifles and shotguns are sold to civilians and are in common use for self defense, hunting, and nationally established sporting competitions. Some of these competitions are designed specifically for pistols, rifles and shotguns capable of holding a greater number of rounds than the Act permits.

The Act defines a "large capacity ammunition feeding device" as a "magazine, belt, drum, feed strip, or similar device, that has a capacity of, or that can be readily restored or converted to accept, more than ten rounds of ammunition."  § 265.00(23).  While a similar definition existed in prior New York law, any magazine manufactured before September 13, 1994, was excluded from the prior definition.  By repealing that exclusion, the Act requires those who wish to keep their grandfathered magazines to somehow remanufacture them so that they cannot be readily restored or converted to hold more than ten rounds.  However, such remanufacturing or conversion requires engineering knowhow, parts, and equipment that are beyond the capacity of an ordinary, law-abiding gun owner.  No such products or services are, to my knowledge, on the market.  Indeed, as with firearms, magazine model and design types number in the hundreds or thousands.

## III.   THE SAFE ACT'S RESTRICTIONS ON STOCKS & GRIPS OF RIFLES & SHOTGUNS

The Act redefines the term "assault weapon" in part as follows:

*a semiautomatic rifle that has an ability to accept a detachable magazine and has at least one of the following characteristics:*

*(i)      a folding or telescoping stock;*

*(ii)     a pistol grip that protrudes conspicuously beneath the action of the weapon;*

*(iii)    a thumbhole stock . . . .*

*See* PL § 265.00(22)(a).

The section of the Act that deals with shotguns (§ 265.00(22)(b)) deleted the feature under prior law of "a pistol grip that protrudes conspicuously beneath the action of the weapon," and now provides in part that "assault weapon" means in part:

*a semiautomatic shotgun that has at least one of the following characteristics:*

*(i)      a folding or telescoping stock;*

*(ii)     a thumbhole stock . . . .*

*See* PL § 265.00(22)(a).

Restricting rifles and shotguns on the basis of the above features is not rational. An explanation of these features illustrates the point.

**Telescoping Stocks**. A "telescoping stock" allows the length of the stock to be shortened or lengthened consistent with the length of the person's arms, so that the stock fits comfortably against the shoulder and the rear hand holds the grip and controls the trigger properly. It simply allows the gun to fit the person's physique correctly, literally in the same manner as one selects the right size of shoe to wear. For example, a telescoping stock allows a hunter to change the length of the stock depending on the clothing appropriate for the weather encountered. Shooting outdoors in fall and winter require heavy clothing and a shooting vest, thus requiring shortening of the stock so that the firearm can be fitted for proper access to the trigger. The gun may be adjusted to fit the different sizes of several people in a family or home. A telescoping stock does not make a firearm more powerful or more deadly.

The irrationality of the Act's restriction on telescoping stocks is underscored by the fact that the restriction has no regard to length. A stock could be three feet at its minimum

length and still be restricted. No justification would exist based on concealability. However, the length of a firearm impacts its concealability. Prohibitions on concealabilty are found in the Penal Law. For example, Penal Law § 265.00(3) defines a "firearm" as follows:

> "Firearm" means (a) any pistol or revolver; or (b) a shotgun having one or more barrels less than eighteen inches in length; or (c) a rifle having one or more barrels less than sixteen inches in length; or (d) any weapon made from a shotgun or rifle whether by alteration, modification, or otherwise if such weapon as altered, modified, or otherwise has an overall length of less than twenty-six inches . . . .

Possession of a "firearm" is prohibited by Penal Law § 265.01, except that a license entitles one to possess a pistol or revolver. § 265.20(a)(3). Thus, a rifle or shotgun must have an overall length of twenty-six inches or more. That is a rational, objective manner for the state to set a standard regarding concealability, and it clearly applies to rifles and shotguns with and without a telescoping stock, or a folding stock as well. No such basis exists to restricting a gun with a telescoping stock or folding stock without regard to overall length.

**Pistol Grip That Protrudes Conspicuously Beneath the Action.** A pistol grip allows a rifle to be held at the shoulder with more comfort and stability. Many rifles have straight stocks with no pistol grips. The Act restricts a rifle, but not a shotgun, with a "pistol grip that [1] protrudes conspicuously [2] beneath the action of the weapon." While failing to define "conspicuously" in inches or angles, it does not restrict a pistol grip that protrudes inconspicuously. But a pistol grip may protrude conspicuously if it is not beneath the action. None of these distinctions make sense.

Having the above feature has no effect on the functionality of a semiautomatic rifle that has an ability to accept a detachable magazine. A pistol grip ("conspicuous" or otherwise) does not make a firearm more powerful or deadly. A "conspicuously protruding" pistol grip does not make a firearm more powerful or more deadly. Pistol grips provide sight-aligned accurate fire, a factor about which I have instructed during training. Positioning the rear of the stock into pocket of the shoulder and maintaining it in that position is aided by the pistol grip, and is imperative for accurate sight alignment and thus accurate shooting with rifles of this design, due to the shoulder stock being in a straight line with the barrel. This is because the shooter's eye functions as the rear sight of the long gun. The more consistent the shooter's eye is in relation to the line of the stock and barrel, the more accurate the shot placement. This sight alignment between the eye and firearm is not conducive to spray or hip fire. Another purpose for the pistol grip is weapon retention. This is imperative, e.g., during a home invasion if assailant(s) attempt to disarm a citizen in close quarters. The state has no interest in restricting a rifle by compromising its retention or accuracy. With the forward hand holding the fore-end, the rearward hand holding the grip, and the butt securely against the shoulder, a rifle may be fired accurately.

A pistol grip does *not* function to allow a rifle to be fired from the hip. Conversely, a rifle with a straight grip and no pistol grip would be more conducive to firing from the hip. Firing from the hip would be highly inaccurate and is simply not a factor in crime.

**Thumbhole Stock**. A thumbhole stock allows the rifle to be held with more comfort and stability, and thus fired more accurately. A thumbhole stock does not make a rifle more powerful or more deadly. Typically found on hunting rifles, it is unclear why it would be designated as an "assault weapon" feature. Whether one's thumb does or does not go through a hole in the stock is irrelevant to how a rifle functions.

## IV. THE IMPACT OF THE SAFE ACT'S SEVEN-ROUND RESTRICTION ON THE ABILITY TO RE-LOAD UNDER THE DURESS OF A SUDDEN ATTACK.

The Act's limitation of the number of rounds allowable for a firearm in the home significantly impairs a homeowner's ability to successfully defend him- or herself while under a criminal attack in the home. The seven-round limitation unreasonably assumes that all homeowners possess more than one magazine and are able to load, fire and reload their firearm magazine under criminal attack (as described below). However, a homeowner under the extreme duress of an armed and advancing attacker is likely to fire at, but miss, his or her target. Nervousness and anxiety, lighting conditions, the presence of physical obstacles that obscure a "clean" line of sight to the target, and the mechanics of retreat are all factors which contribute to this likelihood. Under such expected conditions, it is of paramount importance that a homeowner have quick and ready access to ammunition in quantities sufficient to provide a meaningful opportunity to defend herself and/or her loved ones. It is equally important that the homeowner under attack have that capability quickly and efficiently to re-load a firearm after all of the rounds it holds are fired. However, many homeowners cannot re-load quickly or efficiently due to such factors as age, physical limitations, and the stress / anxiety produced by a potentially life-threatening situation.

In order to fully understand this point, an explanation of the mechanics of loading and re-loading a firearm, as well as the physiological response process of a person under the stress of an attack, are required.

### A. It May Be Difficult Or Impossible To Load and/or Re-Load The Firearm In Time To Save Oneself From A Sudden Attack.

This section of the Declaration explains the mechanics of loading handguns and using them for self defense.

Police have neither the legal obligation nor the practical ability to rescue all crime victims. Hence, it is essential that all law-abiding citizens be able to protect themselves. This ability to defend oneself is vital in all regards, but is perhaps most crucial in the home. Violent criminal attacks frequently occur suddenly and without warning, leaving the victim with less than a second to fire the handgun to save herself. Reaction time under stress is complicated and can be attributed to many physiological, psychological and environmental factors, but the three most basic are: the ability for an individual to perceive a threat

(Perceptual Processing), the ability to make a decision (Cognitive Processing), and the ability of the brain to send messages to the muscles to react (Motor Processing). This processing takes, minimally, several seconds without consideration of other factors such as distractions, noise, multiple assailants, lighting conditions, nervousness and fatigue. Ref: Management of Aggressive Behavior Instructor Manual, MOAB Training International.

In the well-known Tueller Drill for police training, it is emphasized that an attacker who is 21 feet away can close the entire distance between himself and the victim in a second-and-a half.[1] If the victim is ready for a potential attack, it may be possible to deploy a *loaded* handgun quickly enough for defense against a sudden attack. However, it is impossible to do so with an unloaded handgun. If the victim is not expecting an attack, the fastest reaction time, even for a trained officer with a loaded firearm, is about 3.5 seconds. Bob Irwin, *Rethinking the 21-Foot Rule: You can't react to a knife attack as fast as you think you can,* POLICE, Oct. 1, 2007, http://www.policemag.com/Channel/Patrol/Articles/2007/10/Rethinking-the-21-Foot-Rule.aspx. It is important to note that during the Tueller Study, the officers knew they were facing a man with a knife during optimum environmental conditions (thereby negating Perceptual Processor Time). Also, the assailant volunteers used in the study were veteran fellow officers that were not affected by intoxicants or were extremely fit or athletic.

1.    **The Mechanics of Loading / Re-loading a Semi-automatic Handgun**

The following is the procedure for loading or re-loading a semi-automatic firearm. We assume that the crime victim is a right-handed person, who has done everything lawfully possible to optimize the loading process: namely, she is carrying the handgun in her right hand, and has ready access to a nearby magazine (a rectangular or parallelogram box which holds the ammunition).

1.    Grasp the grip (the butt) of the gun with the right hand.

2.    Grasp the magazine with the left hand.

3.    Bring the gun and the magazine towards the center of one's body. Tilt the gun so that the butt is pointing towards one's left.

4.    Depress a magazine release button. (Only required for re-loading. When re-loading, this would be the first step).

5.    Use the left hand to insert the magazine into the magazine well of the gun. (In a semi-automatic, the grip is hollow, and contains a space to accommodate

---

[1] The Tueller Drill is performed by trained police with loaded guns. (Or, more precisely, guns which simulate being loaded, such as with special "ammunition" that "fires" a laser when the trigger is pulled). The Tueller reaction times are for officers who already know that the aggressor is encroaching with a knife. Hence, the cognitive deadly force decision-making has been virtually eliminated from the reaction time, and the officer's gun is already loaded. Even then, fewer than 50% of officers were able to draw and fire if the attacker started from within 15 feet away.

the magazine).

6.    Use the base of the left hand to push hard on the magazine, so that it clicks into place inside the handgun grip.

7.    Turn the handgun so that it is in front of the body, with the muzzle pointing to the left. (Alternatively, hold the handgun so that the muzzle points forward).

8.    Continue to hold the handgun grip with the right hand. With the left hand, grasp the top of the handgun.

9.    Move the top cartridge in the magazine into the handgun's firing chamber. (A "cartridge" is one unit of ammunition. A unit of ammunition is also called a "round").  Using the left hand, pull the slide of the handgun all the way to its maximum rear position. This requires moving the slide one or more inches against the force of a heavy spring. If the slide is moved even a fraction of an inch short of its maximum rear position, this step will fail, and the gun will not function. The slide is moved with the non-dominant hand. For people without strong upper bodies, including most women, pulling the slide all the way is not an easy maneuver.

10.    Now release the slide. The compressed spring pushes the slide forward. As the slide moves forward, it pushes the first cartridge from the magazine into the firing chamber.

11.    Now move the left hand to the grip of the gun so that is supports the right hand. Although one-handed shooting is possible, accuracy is substantially improved by a two-handed grip.

12.    Finally, bring the handgun up to eye level, and point it at the target.[2] If the aggressor is within 15 feet, there will not be time to bring the gun to eye level, so the victim simply points the gun at the center of the aggressor's mass.

As the above makes clear, loading a firearm requires two hands.  Loading is far more difficult when someone is physically handicapped, or one hand is wounded during an attack. During my extensive experience with force-on-force simulation training, it was a very common occurrence (30-40% occurrence rate) for police officers engaged in a gunfight to be struck in the hand by the attacker.  The reason is simple: we shoot at the muzzle flash that draws our attention, and at the opposite end of that flash are hands holding a gun.  Having

---

[2]  Pointing the handgun at the target may be all that time allows, if it allows that much. If there is time to use the handgun's sights, acquire a sight picture by aligning the front sight (which is a small vertical rectangle) within the rear sight (shaped like a "U", but angular), with the same amount of light showing on either side of the front sight, right and left. The top of the front sight should appear flush with top of the rear sight.

more rounds in a magazine allows the victim to better protect themselves without the need to reload, especially if the victim is handicapped, disabled or injured.

It is known fact that under the "stress flood" of a life or death encounter the blood within one's body is re-routed to the larger muscles so as to allow a "flee or fight" response. This physiological reaction to extreme stress causes significant reloading difficulty during an attack due to loss of fine motor control in the fingers. Trying to push a magazine release or align a magazine with the magazine well with fingers that are shaking and weakened due to blood loss is very difficult for a seasoned veteran soldier or police officer who expects this phenomena. These crucial tasks are far more difficult for a civilian who has never been trained that such changes will occur, or trained during realistic scenario-based training, or who is experiencing a life-threatening attack for the first time.

The legitimate and compelling need for an LC magazine for self-defense is underscored by the fact that police officers are exempt from the restrictions on magazine capacity and on loading more than 7 rounds in a magazine. § 265.20(1)(b). The 2010 New York City Police Department's *Annual Firearms Discharge Report* [3] ("NYPD AFDR") provides detailed information on all incidents in which NYPD officers discharged their weapons in 2010. In that year there were thirty three (33) incidents of the police intentionally discharging firearms in encounters of adversarial conflict. NYPD AFDR at p.8, Figure A.10. 65% of these incidents took place at a distance of less than ten (10) feet. NYPD AFDR at p.9, Figure A.11. In 33% of these incidents, the NYPD officer(s) involved fired more than 7 rounds. NYPD AFDR at p.8, Figure A.10. In 21% of these incidents, the NYPD officer(s) fired more than 10 rounds. Id. If highly trained and experienced NYC police officers required the use of at least 8 rounds in 1/3rd of their close-range encounters to subdue an aggressive assailant, it stands to reason that a "green" civilian gun owner under duress (and certainly far less experienced and trained than a NYC police officer) would need at least that many rounds to subdue an armed assailant within his or her home.

## 2. The Effect of Time Delay Caused by Loading

Police and civilians who train in defensive handgun use learn to draw a loaded handgun, quickly acquire a sight picture, and place two shots on the attacker's upper center of mass. Optimally, all this can be accomplished in a little over two seconds. Bill Lewinski, *Biomechanics of Lethal Forces Encounters-Officer Movements,* THE POLICE MARKSMAN, Nov./Dec. 2002, at 19 (during a test of 68 Los Angeles Police Dept. officers using already-loaded guns, they took an average of 1.71 seconds to draw a firearm from an unsnapped holster and fire one shot, with the hand already very near the holster; .38 seconds to fire second shot).

Quite obviously, the process of loading the handgun will take at least a few extra seconds. Extensive practice can reduce how long it takes a person to load a firearm under stress, but that time cannot be reduced to zero. Accordingly, the simple time delay of loading a spent firearm may result in the success of a violent attacker who otherwise could have

---

[3] http://www.nyc.gov/html/nypd/downloads/pdf/analysis_and_planning/afdr_20111116.pdf

been thwarted.

Carrying an unloaded firearm will often not provide a viable means of self-defense and would frequently result in a situation where the assailant has closed the distance on the victim so that the assailant is on the person of the victim. The victim is left with a firearm she needs to retain so that she is not shot with her own gun. At best then, the firearm becomes a bludgeoning tool.

### 3. The Efffect of the Loss of Defensive Use of the Non-dominant Arm and Hand.

The delay in loading a firearm has additional deadly implications. While the left arm and hand are being used to load the handgun, they cannot be used for anything else. The victim is more vulnerable because both hands are occupied. The non-gun hand becomes useless to fend off the attacker or to deflect the attacker's knife, stick, or other weapon.

Further, if the victim were to be grabbed during the loading of the firearm, the sympathetic nervous system reaction of clenching one hand to retain the magazine, or simply tightening muscles under stress would further limit the victim's ability to complete the loading of the firearm.

### 4. The Effects of Attention Distraction Caused by Loading

The unloaded firearm forces the victim to focus her attention on the firearm in order to load and chamber the ammunition. As a result, the victim is impeded from focusing attention on the assailant and her surroundings. Specifically, the need to load while under imminent threat:

- compromises and complicates decision making;

- limits perception of surroundings, increasing the likelihood that a fired shot will miss the intended target and strike an unintended target;

- limits ability to determine if retreat to safety is possible;

- limits ability to determine if there is another assailant; and

- limits ability to assess the level and nature of threat (i.e., has the aggressor drawn another weapon? Engaged someone as an accomplice? Given other pre-fight indicators, such as changing stance, glancing at the potential target?).

Brain-wave research of Olympic shooters shows that the greater a shooter's distraction, the greater the possibility of a miss. Bill Lewinski, *Stress Reactions of Lethal Forces Encounters,* THE POLICE MARKSMAN, May/June 2002, at 27; N. Konttinen, D.M. Landers, & H. Lyytinen, *Aiming Routines and Their Electrocortical Concomitants*

*Among Competitive Rifle Shooters,* 10 SCANDANAVIAN J. MED. & SCI. IN SPORT 169 (2000).

## V.   **CONCLUSION**

The SAFE Act's criminalization of magazines that hold more than 10 rounds outlaws the most commonly used pistols and rifles not just within the State of New York, but in the USA.  This is because on a nationwide basis most pistols are manufactured with magazines holding 10 to 17 rounds, and many popular rifles are manufactured with magazines holding 10, 20, or 30 rounds.

The SAFE Act's criminalization of LC magazines manufactured before September 13, 1994, requires law-abiding gun owners who wish to maintain such LC magazines to convert them, but provides no guidance on the means, methods, or standards it will apply to determine whether a converted magazine is adequately "incapable" of ready restoration. In addition, undertaking such a conversion requires engineering knowhow, parts, and equipment that are beyond the capacity of an ordinary, law-abiding gun owner.  In my experience, competent alterations to magazines is beyond the scope of ethical gunsmiths who would be willing to bet someone's life on a ad hoc conversion.

The SAFE Act's restrictions on stocks and grips of rifles and shotguns are irrational, and do not reflect characteristics that make a rifle or shotgun more powerful, dangerous or deadly.

The SAFE Act's limitation of the number of rounds allowable for a firearm in the home significantly impairs a homeowner's ability to successfully defend him- or herself while under a criminal attack in the home.

I have reviewed the foregoing statements, and hereby declare under the penalties of perjury that they are true, correct, complete and accurate according to the best of my knowledge, information, and belief.

_____
GUY ROSSI

Dated: April 15 , 2013