# **<u>EXHIBIT F</u>**

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK
Buffalo Division

NEW YORK STATE RIFLE AND PISTOL                :
ASSOCIATION, INC., *et al.*,                            :
                                                       :
                              Plaintiffs.              :
                                                       :
              v.                                       :     Civil No.: 1:13-cv-00291
                                                       :
ANDREW M. CUOMO, *et al.*,                            :
                                                       :
                              Defendants.              :

### DECLARATION OF GARY KLECK

I, Gary Kleck, do hereby swear or affirm:

I offer this declaration in support of a motion made by plaintiffs in the above-referenced action that seeks a preliminary injunction enjoining the enforcement of the New York Secure Ammunition and Firearms Enforcement Act ("the SAFE Act," "the Act"). This declaration is based upon my review of the Act, the Complaint filed by plaintiffs herein, and my review of plaintiffs' motion for preliminary injunction. It is also based upon my years of study, training, research and teaching in Criminology and Criminal Justice; my education; and my experience.

I offer the following opinions under the penalties of perjury, and to a reasonable degree of certainty found in the fields of Criminology and Criminal Justice.

## I.    EXPERIENCE & TRAINING

I am a Professor of Criminology and Criminal Justice at Florida State University. During my years as a professor I have extensively researched and written about the subject of gun control, and am a nationally-recognized authority on violence and gun control. I have conducted numerous studies on the effects of guns on death and injury in crimes, and on suicides and gun accidents. I have also conducted numerous studies on the impact of gun control laws on rates of violence, the frequency and effectiveness of defensive gun use by crime victims, patterns of gun ownership, why people support gun control, and gun trafficking.

I have published and presented extensively on the issues of guns, violence, and gun control. In 1994, I conducted the National Self-Defense Survey, a nationwide survey designed to estimate the prevalence of defensive gun use (DGU). During the survey my team and I used standard random digit dial (RDD) procedures to select a representative sample of telephone-owning U.S. households (over 95% of all U.S. households) to call. We then conducted telephone interviews with nearly 5,000 adults, asking about DGU. If the respondent (R) claimed to have had a DGU experience, we asked an extended series of follow-up questions to assess whether the experience actually qualified as a DGU (i.e., whether a crime was being committed against the victim, if there was a direct confrontation between victim and offender, and if the victim used a gun to either threaten or attack the offender). We found that about 1.3% of the Rs had experienced a DGU in the preceding 12

months.  Multiplying the U.S. adult population size by 1.3% yielded an estimate that in 1993 there were approximately 2.5 million incidents in which victims used guns for self-protection.  As a point of comparison, there were about 0.5 million violent crimes committed that same year by offenders using guns, as estimated by the U.S. Census Bureau's National Crime Victimization Survey.

I have a Ph.D. in Sociology. I am the 1993 winner of the Michael J. Hindelang Award of the American Society of Criminology for my book POINT BLANK: GUNS AND VIOLENCE IN AMERICA, which made "the most outstanding contribution to criminology."  I am also an Editorial Consultant for numerous publications including (among others) *Criminology, Homicide Studies, Violence and Victims, Social Problems* and *Journal of Research in Crime and Delinquency.*

## II.     THE NEW YORK SAFE ACT'S RESTRICTIONS ON MAGAZINES & ROUNDS

Prior to the passage of the New York SAFE Act (the "Act"), New York law defined a "large capacity ammunition feedings device" (hereafter "LC magazine") as a magazine capable of holding more than ten rounds.  The prior law banned new LC magazines, and those LC magazines manufactured before the 1994 enactment date were grandfathered.  The Act broadened the definition of a "large capacity ammunition feeding device" to mean a "magazine, belt, drum, feed strip, or similar device, that has a capacity of, or that can be readily restored or converted to accept, more than ten rounds of ammunition."  Penal Law § 265.00(23).

As amended, the Act changed the rules in two ways.  First, the Act prohibits loading more than seven rounds in any magazine, including magazines kept at home for self-protection, except that ten rounds may be loaded in a magazine at a shooting range or competition.  Second, the Act requires that the above grandfathered magazines manufactured before September 13, 1994, be converted so that they not capable of being "readily restored or converted" to holding more than ten rounds.

The Act's restriction on the number of rounds loaded in a magazine is unlikely to have any detectable effect on the number of homicides or violent acts committed with firearms.  Further, criminals will be even less likely to be affected by the LC magazine restriction than noncriminals.  It is the law-abiding citizens who will primarily be impacted by the restriction.

A.    **The Act's Seven-Round Restriction Will Have An Inconsequential Effect On Criminal Behavior, But Will Reduce Law-Abiding Citizens' Ability To Adequately Defend Themselves, Their Families, and Their Property.**

The Act's limitation of the number of rounds allowable for a firearm in the home impairs a homeowner's ability to successfully defend himself or herself during a criminal attack in the home.  For a variety of reasons, the seven-round restriction will leave some homeowners unable to adequately protect themselves, their families, and their property.

1.    **Having Only Seven Rounds to Fire in a Situation of Lawful Self-Defense Will Be Insufficient In a Large Share of Defensive Gun Use Situations.**

Limiting magazine loading to seven rounds will impair a crime victim's ability to lawfully defend himself and others because: (a) victims often face multiple criminal adversaries; and (b) people miss with most of the rounds they fire, even when trying to shoot their opponents.  In 2008, the National Crime Victimization survey indicated that 17.4% of violent crimes involved two or more offenders, and that nearly 800,000 violent crimes occurred in which the victim faced multiple offenders.[1]

A reasonable upper limit on the marksmanship of lawful defenders using guns can be inferred from a review of the many detailed studies that have been done of shootings by police officers in which the officers were trying to shoot criminal adversaries.  In many of these shootings, the officers fired large numbers of rounds.  Yet, in 63% of the incidents, the officers failed to hit even a single offender with even a single round.[2]  Police officers have the experience, training, and temperament to handle stressful, dangerous situations far better than the average civilian, so it is reasonable to assume marksmanship among civilians using guns far self-protection will be still lower than that of police.

Some law-abiding citizens, along with many criminals, might invest in multiple seven-round magazines in the absence of larger capacity magazines -- a development which obviously defeats the purpose of the magazine capacity limit.  Beyond that, however, some people will not be able to make effective use of additional magazines.  Under the intense emotional stress of a crime victimization, when the victim's hands are shaking, it will be impossible for some victims to eject the expended magazine and insert a new one quickly enough to make effective use of the second magazine.  Further, elderly or physically handicapped persons may find it physically impossible for them to quickly change magazines.

---

[1]  U.S. Bureau of Justice Statistics, 2013. BJS website at http://bjs.gov/content/pub/pdf/cvus08.pdf, Table 37.

[2]  William A. Geller and Michael S. Scott, *Deadly Force: What We Know*, WASHINGTON, D.C. POLICE EXECUTIVE RESEARCH FORUM (1993).

    2.    **The Restrictions on LC Magazines Will Have An Inconsequential Impact on Reducing Homicides and Violent Crimes.**

       Criminals rarely fire more than ten rounds in gun crimes. Indeed, they usually do not fire any at all – the gun is used only to threaten the victim, not attack him or her.[3] For the vast majority of gun crimes, the unavailability of LC magazines would therefore be inconsequential to deterring the criminal behavior. Among the very small share of offenders who anticipate firing more than ten rounds, many would simply substitute one of the many illegal LC magazines that will continue to circulate even after being prohibited.[4] Among those unwilling or unable to acquire such an unlawful LC magazine, the absence of an LC magazine would, as far as available evidence indicates, still make no difference, even in mass shooting incidents where offenders fire large numbers of rounds. This is because criminals can either (a) use multiple, smaller capacity magazines; or (b) simply bring multiple guns to the crime. Indeed, evidence on mass shootings indicates that these are precisely the adaptations adopted by <u>most</u> mass shooters.[5] Thus, either adaptation would allow a criminal to fire many rounds without using an LC magazine.

    3.    **The Restrictions on LC Magazines Will Not Have A Dramatic Effect On The Number of Injured Victims or Deaths in a Mass Shooting.**

       A ban on LC magazines will have an inconsequential effect on reducing the number of killed or injured victims in mass shootings. The presumption is false that an offender lacking LC magazines would be forced to reload sooner or more often, thereby giving bystanders the opportunity to tackle the shooter and stop his attacks. The window of opportunity for such heroic intervention closes rapidly: it takes two to four seconds for a prepared and experienced shooter to eject an expended magazine from a semi-automatic gun, insert a loaded magazine, and make the gun ready to fire. Thus, it is not surprising that victims and bystanders in mass shootings do not in fact tackle the shooters while they are reloading. I am aware of only one such incident in U.S. history – the Colin Ferguson shootings on a Long Island commuter train in 1993.[6] Bystander intervention was feasible in that case only because of its unique location. Because train passengers could not exit the moving train car, they were forced to remain relatively close to the shooter, allowing them

---

[3] Gary Kleck and Karen McElrath, *The Effects of Weaponry On Human Violence*, SOCIAL FORCES, 69(3):669-92 (1991).

[4] Gary Kleck, *Targeting Guns* (NY: Aldine de Gruyter, 1997).

[5] Gary Kleck, *The Worst Possible Case For Gun Control: Mass Shootings in Schools*, AMERICAN BEHAVIORAL SCIENTIST, 52(10):1447-1464 (2009).

[6] Gary Kleck, *Targeting Guns* (NY: Aldine de Gruyter, 1997).

Page 5 of 9

to quickly close the short distance between them and the aggressive shooter when he tried to switch magazines.

Another reason the unavailability of LC magazines would not create opportunities for bystander intervention in mass shootings is because most mass shooters bring multiple guns to the crimes and, therefore, can continue firing without reloading even after any one gun's ammunition is expended.  A study of every large-scale mass shooting committed in the United States in the 10-year period from 1984 through 1993 found that the killers in 13 of the 15 incidents possessed multiple guns – the Ferguson shooting being one of the two exceptions.[7]

## III.   THE NEW SAFE ACT'S RESTRICTIONS ON STOCKS & GRIPS OF RIFLES & SHOTGUNS

The Act redefines the term "assault weapon" in part as follows:

*a semiautomatic rifle that has an ability to accept a detachable magazine and has at least one of the following characteristics:*

*(i)      a folding or telescoping stock;*

*(ii)     a pistol grip that protrudes conspicuously beneath the action of the weapon;*

*(iii)    a thumbhole stock . . . .*

*See* Penal Law § 265.00(22)(a).

The section of the Act that deals with shotguns -- Penal Law § 265.00(22)(b) -- deleted the feature under prior law of "a pistol grip that protrudes conspicuously beneath the action of the weapon," and now provides, in part, that "assault weapon" means, in part:

*a semiautomatic shotgun that has at least one of the following characteristics:*

*(i)      a folding or telescoping stock;*

*(ii)     a thumbhole stock . . . .*

*See* Penal Law § 265.00(22)(a).

Restricting rifles and shotguns on the basis of these features is not rationally related to reduce gun violence.  As explained in detail below, the restriction will make little difference in making the public safer from crimes committed with rifles and shotguns.

---

[7] Gary Kleck, *Targeting Guns*  (NY: Aldine de Gruyter, 1997).

A.      **The Act's "Assault Weapon" Ban Will Not Reduce Homicides Or Violent Crimes Or Improve Public Safety.**

The restriction of rifles and shotguns on the basis of the features discussed above has no rational relation to the interest of reducing homicides and violent crimes.  As with the ban on LC magazines, the "assault weapon" ban under the Act will not deter criminal behavior or mass shootings. The ban will, however, compromise law-abiding citizen's ability to protect themselves, their families, and the property against criminals using just as accurate and lethal non-banned semi-automatic firearms. Reducing gun availability among law-abiding citizens also reduces defensive gun uses that would otherwise save lives, prevent injuries, thwart rape attempts, drive off burglars, and help victims retain their property.

1.      **Criminals Are Just As Likely to Use Non-Banned Firearms that Function The Same as The Banned Firearms Falling Within the "Assault Weapon" Definition Under The Act.**

Under the Act, though some semi-automatic firearms are banned, other semi-automatic firearms are left legally available, including (a) unbanned models; (b) currently banned models that are redesigned to remove military-style features (i.e., flash suppressor, bayonet lug, etc.) so as to render them non-Assault Weapons ("AWs"); and (c) firearms that would otherwise be banned as AWs but are grandfathered into lawful status because they were manufactured before September 13, 1994, or were lawfully possessed before January 15, 2013.  Thus, firearms will continue to be available that function in essentially identical ways as the banned firearms – i.e., they can accept detachable magazines (including LC magazines), can be fired just as fast, and can fire rounds that are, shot-for-shot, just as lethal as rounds fired from the banned firearms.  Consequently, criminals can substitute mechanically identical firearms for banned AWs, commit the same crimes they otherwise would have committed with the banned firearms, with the same number of wounded or killed victims.  Powerfully motivated would-be mass shooters would be especially likely to do whatever it takes to acquire the weaponry needed to carry out their crimes, though there would be no reason why less powerfully motivated killers and other criminals would not likewise acquire such substitute weapons.  Consequently, there is no sound a priori reason to believe the Act will reduce homicide or other violent crime, or to improve public safety.[8]

2.      **The Expanded Definition of "Assault Weapon" And Ban Of Them Under the Act Will Make Little Difference On Public Safety Concerning Crimes Committed With Firearms.**

---

[8]  Gary Kleck, *Targeting Guns*  (NY: Aldine de Gruyter, 1997).

Criminals who do not currently possess or use banned AWs have no need to acquire substitute weapons because they will presumably simply continue to use the firearms they currently possess. For these criminals, the unavailability of AWs will make no difference one way or the other because they would not have used these banned firearms anyway. This category apparently encompasses virtually all criminals, since only about 2% or less of gun crimes are committed with AWs, as defined under the federal AW ban or previous state AW bans.[9]

The Act extends the definition of AW, but only in ways that are, as far as available evidence can determine, inconsequential with regard to their utility for inflicting criminal harm -- i.e., extending the prohibited class to include semi-automatic firearms with "military-style" features such as flash suppressors, bayonet lugs, openings for magazines under the action rather than in the grip, etc. Gun makers who want to continue selling firearms to New York customers can easily convert semi-automatic firearms that are currently defined as AWs under the Act, due to their possession of these military-style features, into lawful weapons, redesigning them to remove the offending features, without affecting their utility for criminal purposes. Thus, this broadening of the definition of AWs is not likely to make much difference in the AW share of firearms used in crime -- i.e., it is negligible and thus restrictions on availability of such firearms is likely to have a correspondingly tiny effect on public safety.

> **3.    The Features Included In the New York SAFE Act's One-Feature Test Make Rifles And Shotguns With Those Features Preferable For Legitimate Self-Defense and Sporting Activity Purposes For The Same Reasons They Are Useful for Criminal Purposes.**

All attributes of AWs that *do* make them more useful for criminal purposes, such as their accuracy, lethality, rapid fire, or ability to fire many rounds without reloading, not only are also present in easily-substituted, unbanned, counterpart firearms, but also increase their utility for *lawful* self-defense or various sporting uses.

In self-defense situations where it is necessary for the crime victim to shoot the criminal in order to prevent harm to the defender or others, accuracy is obviously crucial to the victim's ability to avert harm.

In self-defense situations where it is necessary to shoot the aggressor and only lethal or incapacitating injury will stop him, the lethality of the defender's firearm is likewise crucial to the crime victim's ability to stop the aggressor's criminal attack and avert harm to the defender and other potential victims.

In situations where the victim faces multiple adversaries, the ability to fire many rounds without reloading is crucial for the ability of the victim to avert harm. It should be kept in mind that under the stressful circumstances of a crime, victims will not be able to hit

---

[9] Gary Kleck, *Targeting Guns* (NY: Aldine de Gruyter, 1997).

their adversaries with every shot (or even most of the shots) they fire, so multiple rounds would often need to be fired at each of the criminals the victim faced before they stopped their criminal attempts.

Likewise, the ability to fire the weapon rapidly may be essential to either deter offenders from attacking, or failing that, to shoot those who cannot be deterred from attacking. This is so both because some of the defender's shots will miss, and because the offender(s) may not allow the victim much time to shoot before incapacitating the victim. This means that, regardless of how an AW is defined, restricting firearms with the attributes that make them useful for criminal purposes will necessarily also restrict firearms possessing the attributes that make them more effective for purposes of lawful self-defense. Indeed, it is hard to even imagine an attribute of a firearm that makes it more useful for criminal purposes but does not also make it more useful for some lawful purpose, especially self-defense. Criminal acts of violence are different from lawful defensive acts of violence only with regard to the presence or absence of legal justification for the act, not with regard to the physical actions taken by the participants.

4.   **The New York SAFE Act's Ban on Firearms Defined as an "Assault Weapon" Will Not Deter Criminals From Possessing and Using Them In Crimes or Finding Substitute Firearms With The Same Feature, And Will Simultaneously Deny Law-Abiding Citizens Access to Those Weapons to Defend Themselves.**

While either criminals or prospective crime victims *could* substitute alternative weapons for banned "AWs," criminals are more likely to actually do so because they are more powerfully motivated to have deadly weapons. This would be especially true of the extremely rare mass shooters, who typically plan their crimes in advance and thus are in a position to take whatever time and effort is needed to acquire substitute weapons.[10]

Further, even ordinary criminals are strongly motivated to acquire firearms both for purposes of committing crimes and for purposes of self-defense. Because criminals are victimized at a rate higher than noncriminals,[11] this means that they have even stronger self-defense motivations to acquire and retain guns than noncriminals. In contrast, many prospective crime victims do not face an imminent threat at the time they consider acquiring a gun for self-protection, have a weaker motivation to do whatever it takes to acquire their preferred type of firearm, and are therefore less likely to do so.

Further, it is virtually a tautology that criminals will disobey the AW ban at a higher rate than noncriminals. This means that noncriminals who desire either a firearm banned under the SAFE Act or a substitute gun will be less likely to acquire one than criminals.

---

[10]   Gary Kleck, *The Worst Possible Case For Gun Control: Mass Shootings in Schools*, AMERICAN BEHAVIORAL SCIENTIST, 52(10):1447-1464 (2009).

[11]   Gary Kleck, *Targeting Guns* (NY: Aldine de Gruyter, 1997).

Consequently, the additional defensive value conferred by the attributes characteristic of the banned firearms will be denied to noncriminals at a higher rate than the crime-increasing effects of those attributes will be denied to criminals.

## V.    **CONCLUSION**

The Act's restrictions on LC magazines and broadening of the definition of banned AWs will have little or no impact on the number of homicides and violent acts committed with firearms. Law-abiding citizens will bear the brunt of the restriction on LC magazines and the broadened definition of "banned" AWs.  The LC magazines restriction will not deter criminal behavior. Criminals rarely need large numbers of rounds to commit their crimes and, on the rare occasions when they do, will accomplish the same goal as using a LC magazine by using multiple, smaller capacity magazines or bringing multiple firearms to the crime.  The seven-round restriction does, however, leave homeowners unable to adequately protect themselves, their families, and their property.

Criminals will similarly use rifles and shotgun that have the same function as those that the Act bans.  Furthermore, the "unavailability" of AWs due to the Act will not deter criminals from committing crimes they intend to commit with equally lethal and accurate non-banned rifles and guns.

The Act's broadened definition of AWs is based on features that benefit criminals and law-abiding citizens equally. The same attributes that make rifles and shotguns with those features effective for criminal behavior also make them effective for self defense and sporting activities.  Criminals will obey the Act at a lower rate than noncriminals, so, by banning rifles and shotguns with those features, the Act will impact law-abiding citizens' ability to defend themselves more than it will deter criminals from possessing and using those banned AWs.

I have reviewed the foregoing statements, and I hereby declare under the penalties of perjury that they are true, correct, complete and accurate according to the best of my knowledge, information, and belief.

Dr. _Gary Kleck_
Dr. Gary Kleck

Dated: April __15__, 2013