UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

NEW YORK STATE RIFLE AND
PISTOL ASSOCIATION, INC., et. al.,

                           Plaintiffs,

                                                 Case No.: 13-cv-00291-WMS

   v.

ANDREW M. CUOMO, et al.,

                           Defendants.
_____

## NATIONAL RIFLE ASSOCIATION OF AMERICA, INC.'S *AMICUS CURIAE* BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

Charles J. Cooper*
David H. Thompson*
COOPER & KIRK, PLLC
1523 New Hampshire Ave., N.W.
Washington, D.C. 20036
(202) 220-9600
ccooper@cooperkirk.com

*Pro hac vice* application forthcoming

John G. Schmidt Jr.
Nicolas J. Rotsko
Michael B. Powers, Esq.
PHILLIPS LYTLE LLP
3400 HSBC Center
Buffalo, N.Y. 14203
(716) 847-8400
jschmidt@phillipslytle.com

*Attorneys for National Rifle Association of America, Inc.*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................ ii

INTEREST OF AMICUS CURIAE .................................................................1

BACKGROUND AND SUMMARY OF THE ARGUMENT ...........................................1

ARGUMENT ...........................................................................................2

I.       Principles Established by *Heller* and *McDonald*. .....................................2

II.      The Second Amendment's Protection of Certain "Arms"
         Is Absolute. ................................................................................5

II.      The Act's "Assault Weapon" Ban Outlaws Firearms Commonly
         Used for Lawful Purposes and Is Therefore Unconstitutional...............................7

IV.      The Act Is Unconstitutional Under Any Level of Scrutiny Even
         If Such Balancing Tests Are Appropriate. ...........................................12

V.       The Ban on Magazines Containing More Than Seven Rounds
         Also Violates the Second Amendment. ...............................................16

VI.      *Heller II*....................................................................................20

CONCLUSION.........................................................................................25

## **TABLE OF AUTHORITIES**

**Cases**                                                                                          **Page**

*Barnes v. Glen Theatre, Inc.*, 501 U.S. 560 (1991) ..........................................................22

*Clark v. Jeter*, 486 U.S. 456 (1988).................................................................................12

*City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432 (1985).......................................16

*Department of Agric. v. Moreno*, 413 U.S. 528 (1973) ....................................................16

*District of Columbia v. Heller*, 554 U.S. 570 (2008)................................................ *passim*

*Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011) ......................................................5

*Heller v. District of Columbia*,
    670 F.3d 1244 (D.C. Cir. 2011).........................................4, 8, 9, 20, 21, 22, 23, 24, 25

*Houston v. City of New Orleans*, 675 F.3d 441 (5th Cir. 2012), *withdrawn and*
    *superseded on rehearing on other grounds*, 682 F.3d 361 (5th Cir. 2012) ..................4

*Kachalsky v. County of Westchester*, 701 F.3d 81 (2d Cir. 2012) .............................4, 5, 12

*McDonald v. City of Chicago*, 130 S. Ct. 3020 (2010)........................................2, 4, 5, 16

*Moore v. Madigan*, 702 F.3d 933 (7th Cir. 2012).............................................................5

*Nguyen v. I.N.S.*, 533 U.S. 53 (2001).........................................................................15, 16

*Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447 (1978)....................................................22

*Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37 (1983)........................12

*San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1 (1973) .......................................12

*Staples v. United States*, 511 U.S. 600 (1994)......................................................7, 8, 9, 24

*Stenberg v. Carhart*, 530 U.S. 914 (2000) ...............................................................10, 11

*Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180 (1997)......................................................3

*United States v. Miller*, 307 U.S. 174 (1939).....................................................................6

*United States v. Virginia*, 518 U.S. 515 (1996) .........................................................12, 16


**Statutes**

U.S. CONST. amend. II ........................................................................................................5

N.Y. PENAL LAW § 265.00.........................................................................8, 9, 11, 17, 18


**Other**

Allen Rostron, *Justice Breyer's Triumph in the Third Battle Over the*
    *Second Amendment*, 80 GEO. WASH. L. REV. 703 (2012) ............................................4

Christopher S. Koper et al., Report to the National Institute of Justice, United States
   Department of Justice, *An Updated Assessment of the Federal Assault Weapons Ban:
   Impacts on Gun Markets and Gun Violence, 1994-2003* (2004) .........14, 15, 16, 17, 19

Darrell A.H. Miller, *Text, History, and Tradition:  What the Seventh Amendment
   Can Teach Us About the Second*, 122 YALE L.J. 852 (2013) .......................................4

David B. Kopel, *Assault Weapons*, in GUNS: WHO SHOULD HAVE THEM? 159
   (David B. Kopel ed., 1995)......................................................................................9

David B. Kopel, *Rational Basis Analysis of "Assault Weapon" Prohibition*,
   20 J. CONTEMP. L. 381 (1994) .......................................................................7, 10, 15

Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense:
   An Analytical Framework and A Research Agenda*,
   56 UCLA L. REV. 1443 (2009) ...............................................................................15

GARY KLECK, TARGETING GUNS: FIREARMS AND THEIR
   CONTROL (1997).............................................................................13, 14, 15, 19, 20

GUN DIGEST 2013 (Jerry Lee ed., 67th ed. 2012) ............................................................17

1 HAWKINS, TREATISE OF THE PLEAS OF THE CROWN (1716) ...............................................6

Josh Sugarmann, *Assault Weapons and Accessories in America* (Violence
   Policy Center 1988), *available at* http://www.vpc.org/studies/awaconc.htm ............11

NATIONAL RESEARCH COUNCIL, FIREARMS AND VIOLENCE: A CRITICAL
   REVIEW (Charles F. Wellford et al. eds., 2005) .........................................................14

Nicholas J. Johnson, *Supply Restrictions at the Margins of* Heller *and the
   Abortion Analogue*, 60 HASTINGS L.J. 1285 (2009) ......................................8, 9, 11, 15

NYSAFE, RIFLES THAT ARE CLASSIFIED AS ASSAULT WEAPONS,
   http://www.governor.ny.gov/assets/documents/RiflesthatAREclassifiedasassaultweap
   ons.pdf..................................................................................................................9

Peter Reuter & Jenny Mouzos, *Australia: A Massive Buyback of Low-Risk Guns*, in
   EVALUATING GUN POLICY 121 (Jens Ludwig & Philip J. Cook eds., 2003) ..............14

Randy Barnett, *Gun Control Fails Rationality Test*, WASH. EXAMINER,
   Jan. 29, 2013, *available at* http://washingtonexaminer.com/gun-control-fails-
   rationality-test/article/2519971 ..............................................................................16

Thomas E. Romano, *Firing Back: Legislative Attempts to Combat Assault
   Weapons*, 19 SETON HALL LEGIS. J. 857 (1995) ...................................................14, 15

*What Should America Do About Gun Violence?:  Hearing Before the S. Comm. on the
   Judiciary*, 113th Cong. 8 (2013), *available at* http://www.judiciary.senate.gov/pdf/1-
   30-13KopelTestimony.pdf (written testimony of David B. Kopel) ...............10, 17, 19

## INTEREST OF AMICUS CURIAE

The National Rifle Association of America, Inc. ("NRA") is America's foremost and oldest defender of Second Amendment rights.  Founded in 1871, the NRA today has approximately five million members.  The NRA is America's leading provider of firearms marksmanship and safety training for civilians.  The NRA has a strong interest in this case because the law at issue here violates the Second Amendment rights of its many members residing in New York by prohibiting them from possessing commonly-owned firearms and magazines.

## BACKGROUND AND SUMMARY OF THE ARGUMENT

The New York Secure Ammunition and Firearms Enforcement Act of 2013 ("the Act") prohibits a gun owner from possessing a magazine capable of holding more than 10 rounds or from loading more than seven rounds in a magazine at any location other than a shooting range. The Act also expands the list of firearms that New York considers "assault weapons" to include semi-automatic firearms capable of accepting detachable magazines that also have one of a list of enumerated features.  The possession of such a firearm is prohibited unless it was owned prior to the effective date of the Act and registered with the State prior to April 15, 2014.  Because these provisions outlaw firearms and standard magazines that are "of the kind in common use . . . for lawful purposes," *District of Columbia v. Heller*, 554 U.S. 570, 624 (2008), they cannot be reconciled with the Second Amendment.

**ARGUMENT**

**I.      Principles Established by *Heller* and *McDonald*.**

The Supreme Court's recent decisions in *Heller* and *McDonald v. City of Chicago*, 130 S.

Ct. 3020 (2010), provide authoritative guidance for interpreting and applying the Second

Amendment.

*First*, the Second Amendment protects an "*individual right*" that "*belongs to all*

*Americans*."  *Heller*, 554 U.S. at 581, 595 (emphasis added).  And as the Court repeatedly

emphasized in both *Heller* and *McDonald*, the "inherent" and "pre-existing" right of self-defense

is the "core" and "the *central component* of the [Second-Amendment] right itself."  *Id*. at 592,

599, 628, 630; *accord McDonald*, 130 S.Ct. at 3036; *id*. at 3047 (controlling opinion of Alito, J.).

*Second*, the right to keep and bear arms is a *fundamental* right, implicit in our

constitutional scheme of ordered liberties and "deeply rooted in this Nation's history and

tradition."  *McDonald*, 130 S. Ct. at 3036.  This fundamental right is entitled to no less respect

than the other fundamental rights protected by our Constitution and may not to be "treat[ed] . . .

as a second-class right" or "singled out for special—and specially unfavorable—treatment."

*McDonald*, 130 S. Ct. at 3043, 3044.

*Third*, the Second Amendment is "enshrined with the scope [it was] understood to have

*when the people adopted [it]*, whether or not future legislatures or (yes) even future judges think

that scope too broad."  *Heller*, 554 U.S. at 634-35 (emphasis added).  Accordingly, the Second

Amendment's scope is determined through "historical analysis" and any limits on the right must

be supported by "historical justifications."  *Id*. at 627, 635.

*Fourth*, and relatedly, the line between permissible and impermissible arms regulations *is*

*not* to be established by balancing the individual right protected by the Second Amendment

2

against purportedly competing government interests.  This balance has already been struck, for the Second Amendment "is the very *product* of an interest-balancing by the people," and "[t]he very enumeration of the right takes out of the hands of government . . . the power to decide on a case-by-case basis whether the right is *really worth* insisting upon."  *Id.* at 634, 635.

Thus, while *Heller* made clear that the District of Columbia's handgun ban would fail "any of the standards of scrutiny that [the Court has] applied to enumerated constitutional rights," *id.* at 628, the Court pointedly did not apply any of those standards but rather flatly and categorically struck down the ban after finding it irreconcilable with the Second Amendment's text and history.  Likewise, the Court categorically invalidated the so-called "trigger-lock requirement"—the separate, independent provision of D.C. law requiring "that firearms in the home be rendered and kept inoperable at all times"—without subjecting it to any of the forms of scrutiny.  *Id.* at 630.

Further, the Court expressly rejected the "interest-balancing" approach proposed by Justice Breyer in dissent, *see id.* at 634-35, an approach that was in substance if not in name a form of intermediate scrutiny, *see, e.g.*, *Heller*, 554 U.S. at 704-05 (Breyer, J., dissenting) (finding "no cause here to depart from the standard set forth in *Turner* [*Broadcasting System, Inc. v. FCC*, 520 U.S. 180 (1997)]," a "First Amendment case[] applying intermediate scrutiny"). *McDonald* reiterated that *Heller* "expressly rejected the argument that the scope of the Second Amendment right should be determined by judicial interest balancing."  130 S. Ct. at 3047 (controlling opinion of Alito, J.).  *McDonald* emphasized that resolving Second Amendment cases *would not* "require judges to assess the costs and benefits of firearms restrictions and thus to make difficult empirical judgments in an area in which they lack expertise."  *Id.* at 3050.

Despite the Supreme Court's clear guidance, a number of lower courts in the wake of *Heller* have resolved Second Amendment claims by applying a levels-of-scrutiny analysis, often settling on an intermediate scrutiny approach that resembles Justice Breyer's rejected interest-balancing test.  These decisions, we respectfully submit, are not faithful to *Heller* and *McDonald*. *See, e.g.*, Allen Rostron, *Justice Breyer's Triumph in the Third Battle Over the Second Amendment*, 80 GEO. WASH. L. REV. 703, 706-07 (2012) ("The lower courts . . . have effectively embraced the sort of interest-balancing approach that Justice Scalia condemned . . . ."); Darrell A.H. Miller, *Text, History, and Tradition:  What the Seventh Amendment Can Teach Us About the Second*, 122 YALE L.J. 852, 855 (2013) ("Some judges . . . have simply ignored the Court's rejection of balancing tests."); *Heller v. District of Columbia*, 670 F.3d 1244, 1271 (D.C. Cir. 2011) ("*Heller II*") (Kavanaugh, J., dissenting) ("*Heller* and *McDonald* leave little doubt that courts are to assess gun bans and regulations based on text, history, and tradition, not by a balancing test . . . ."); *Houston v. City of New Orleans*, 675 F.3d 441, 448 (Elrod, J., dissenting) (5th Cir. 2012), *withdrawn and superseded on rehearing on other grounds*, 682 F.3d 361 (5th Cir. 2012) ("*Heller* and *McDonald* rule out scrutiny analysis.").

The Second Circuit, of course, applied intermediate scrutiny in *Kachalsky* to uphold New York's requirements for obtaining a license to carry a handgun in public.  *See Kachalsky v. Cnty. of Westchester*, 701 F.3d 81 (2d Cir. 2012).  But regardless of whether *Kachalsky* was correctly decided—and we submit that it was not, both in its application of intermediate scrutiny and in its ultimate result—its interest-balancing analysis does not control here.  For unlike the Act, the New York law under review in *Kachalsky* did not amount to a flat ban, *see id.* at 98 (New York did not categorically "forbid[] anyone from carrying a handgun in public"), and it did not extend

into the home, *see id.* at 94 ("New York's licensing scheme affects the ability to carry handguns only *in public.* . . .").

*Kachalsky* thus does not foreclose application of *Heller*'s categorical approach to a law that *does* amount to a flat ban and that *does* extend into the home.  Indeed, even the first distinction standing alone is sufficient:  The Seventh Circuit, for example, eschewed the levels-of-scrutiny analysis it had applied in other Second Amendment cases in striking down the State of Illinois's "flat ban on carrying ready-to-use guns outside the home."  *Moore v. Madigan*, 702 F.3d 933, 940 (7th Cir. 2012); *see also id.* at 941 (declining to rely "on degrees of scrutiny" in deciding case).  And the case is even stronger, of course, when, as here, both distinctions are present.  *See, e.g.*, *Ezell v. City of Chicago*, 651 F.3d 684, 703 (7th Cir. 2011) ("Both *Heller* and *McDonald* suggest that broadly prohibitory laws restricting the core Second Amendment right— like the handgun bans at issue in those cases, which prohibited handgun possession even in the home—are categorically unconstitutional.").

In sum, as even *Kachalsky* recognized, "where a state regulation is entirely inconsistent with the protections afforded by an enumerated right—as understood through that right's text, history, and tradition—it is an exercise in futility to apply means-end scrutiny."  701 F.3d at 89 n.9.  That is the case here, and the Act therefore can and should be struck down without resort to means-end scrutiny.

## II.     The Second Amendment's Protection of Certain "Arms" Is Absolute.

The text of the Second Amendment provides that "the right of the people to keep and bear *Arms*, shall not be infringed."  U.S. CONST. amend. II (emphasis added).  It follows that there are certain "instruments that constitute bearable arms," *Heller*, 554 U.S. at 582, that law-abiding, responsible, adult citizens have an inviolable right to acquire, possess, and use.  Indeed,

the Second Amendment's "core protection"—the right to armed self-defense, including, most

acutely, in the home—is no less absolute than the First Amendment's protection of the

expression of unpopular opinions:

> The First Amendment contains the freedom-of-speech guarantee that the people ratified, which included exceptions for obscenity, libel, and disclosure of state secrets, but not for the expression of extremely unpopular and wrongheaded views. The Second Amendment is no different. . . . And whatever else it leaves to future evaluation, it surely *elevates above all other interests* the right of law-abiding, responsible citizens to use arms in defense of hearth and home.

*Id.* at 634-35 (emphasis added).

As the Supreme Court has made clear, the arms protected by the Second Amendment are

those weapons "of the kind in common use . . . for lawful purposes like self-defense." *Heller*,

554 U.S. at 624.  Conversely, "the Second Amendment *does not* protect those weapons not

typically possessed by law-abiding citizens for lawful purposes, such as short-barreled

shotguns." *Id*. at 625 (emphasis added).[1]

According to *Heller*, then, the possession and use of short-barreled shotguns, like the

possession and use of modern-day "M-16 rifles" and other "sophisticated arms that are highly

unusual in society at large," can be restricted without constitutional concern.  *Id*. at 628.  But the

possession and use of firearms of the kind in common use for self-defense and other lawful

purposes is constitutionally protected.

---

[1] This distinction is "fairly supported by the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons,' " 554 U.S. at 627—a tradition that did not bar "Persons of Quality [from] wearing *common Weapons* . . . for their Ornament or Defence, in such places, and upon such Occasions, in which it is common Fashion to make use of them, without causing the least Suspicion of an Intention to commit any Act of Violence or Disturbance of the Peace."  1 Hawkins, Treatise of the Pleas of the Crown 136 (1716) (emphasis added).  And this distinction is rooted in founding-era militia practices: "Ordinarily when called for militia service able-bodied men were expected to appear bearing arms supplied by themselves and of the kind *in common use* at the time."  *Heller*, 554 U.S. at 625 (quoting *United States v. Miller*, 307 U.S. 174, 179 (1939)) (emphasis added, brackets omitted).

Applying this "common use" test, *Heller* flatly and categorically struck down the District of Columbia's handgun ban. As the Court explained, that ban "amount[ed] to a prohibition of an entire class of 'arms' that is overwhelmingly chosen by American society for [the] lawful purpose [of self-defense]." *Id.*; *see also id.* at 628-29 (Handguns are "the most preferred firearm in the nation to 'keep' and use for protection of one's home and family."); *id.* at 629 ("[T]he American people have considered the handgun to be the quintessential self-defense weapon."); *id.* ("[H]andguns are the most popular weapon chosen by Americans for self-defense in the home . . . .").

### III.    The Act's "Assault Weapon" Ban Outlaws Firearms Commonly Used for Lawful Purposes and Is Therefore Unconstitutional.

The constitutionality of the Act at issue here thus turns on whether the banned rifles, shotguns, and pistols are in common use for lawful purposes in this Nation. The answer to that question is plainly yes.

Indeed, the answer to that question should be apparent from the very definition the Act uses for the weapons it seeks to ban. It describes "assault weapons" as "semiautomatic" rifles, shotguns, and pistols with additional features that, as explained below, generally make those firearms easier and safer to use. And while, as also explained below, "assault weapon" is a term of opprobrium invented for political and public relations purposes, "semiautomatic" is a term that has a distinct meaning, and it is a weapon type that has been in existence for over a hundred years. *See* David B. Kopel, *Rational Basis Analysis of "Assault Weapon" Prohibition*, 20 J. CONTEMP. L. 381, 413 (1994) ("semiautomatics are more than a century old"). And unlike "machineguns, sawed-off shotguns, and artillery pieces," semiautomatic firearms "traditionally have been widely accepted as lawful possessions." *Staples v. United States*, 511 U.S. 600, 611-12 (1994). The "automatic" part of "semi-automatic" refers to the fact that the user need not

manipulate the firearm (via mechanisms such as a bolt or lever) to place another round in the chamber after each round is fired.  But unlike a fully automatic firearm, a semiautomatic firearm will *not* fire continuously on one pull of its trigger; rather, a semiautomatic firearm requires the user to pull the trigger each time he or she wants to discharge a round.  *See id*. at 602 n.1.; N.Y. PENAL LAW § 265.00(21).

A large percentage of firearms in common civilian use in the United States are semiautomatic, including many handgun, rifle, and shotgun models that fall outside the Act's definition of "assault weapons."  Indeed, "it is just not credible to say that semiautomatic technology is unusual or uncommon," given that "sixty percent of gun owners [own] some type of semiautomatic firearm."  Nicholas J. Johnson, *Supply Restrictions at the Margins of* Heller *and the Abortion Analogue*, 60 HASTINGS L.J. 1285, 1293-95 (2009) (discussing 1994 survey). Further, "[t]he vast majority of handguns today are semi-automatic."  *Heller II*, 670 F.3d at 1286 (Kavanaugh, J., dissenting); *accord* Declaration of Mark Overstreet, Doc. No. 23-2 ("Overstreet Decl."), ¶ 13 ("Annual firearm manufacturing and export statistics released by the [ATF] indicate that semiautomatic pistols rose as a percentage of total handguns made in the United States and not exported, from 50 percent of 1.3 million handguns in 1986, to 82 percent of 3 million handguns in 2011.").  And given that handguns are generally regarded by the American people as "the quintessential self-defense weapon" and thus cannot be prohibited, *Heller*, 554 U.S. at 629, it follows that "semi-automatic handguns are constitutionally protected under the Supreme Court's decision in *Heller*," *Heller II*, 670 F.3d at 1289.

Again, all semiautomatic firearms—including the safety-enhanced firearms banned under the Act—discharge only a single shot per trigger pull.  They are thus fundamentally different

from fully automatic, military weapons.  But the firearms banned by the Act are *not* fundamentally different from some of the semiautomatic firearms that it permits.

Indeed, Americans own millions of the very semiautomatic firearms the Act bans.  The prohibited AR-15 rifle,[2] for example, is America's "most popular semi-automatic rifle."  *Heller II*, 670 F.3d at 1287 (Kavanaugh, J., dissenting).  Since 1986, nearly four million AR-15-type rifles have been manufactured for the U.S. commercial market.  Overstreet Decl. ¶ 5.  In 2011, AR-15s *alone* "accounted for at least seven percent of firearms, and 18 percent of rifles, made in the U.S. for the domestic market that year."  *Id.* ¶ 8; Johnson, 60 HASTINGS L.J. at 1296 ("the AR-15" is "now the best-selling rifle type in the United States").  Indeed, the AR-15 is the very firearm that the Supreme Court in *Staples* identified as being among those weapons that "traditionally have been widely accepted as lawful possessions."  511 U.S. at 611.

The Act outlaws many other commonly used firearms through its ban on semiautomatic rifles, handguns, and shotguns with certain features.  Semiautomatic rifles with the capacity to accept detachable magazines, for example, are banned if they have one additional enumerated feature, such as a pistol grip that protrudes conspicuously beneath the action of the weapon, a thumbhole stock, or a folding stock.  N.Y. PENAL LAW § 265.00(22)(a).  A detachable magazine does nothing to distinguish a semiautomatic firearm from other familiar, commonly-possessed firearms.  Indeed, most semiautomatic firearms in America have a detachable magazine.  *See* Johnson, 60 HASTINGS L.J. at 1298 n.100 (citing David B. Kopel, *Assault Weapons*, in GUNS: WHO SHOULD HAVE THEM? 159, 165 (David B. Kopel ed., 1995)).

To be sure, under  the Act a detachable magazine, standing alone, is not enough to transform an otherwise lawful pistol or rifle into an "assault weapon" (though a detachable

---

[2] *See* NYSAFE, RIFLES THAT ARE CLASSIFIED AS ASSAULT WEAPONS, http://www.governor.ny.gov/assets/documents/RiflesthatAREclassifiedasassaultweapons.pdf.

magazine standing alone would make a semiautomatic shotgun unlawful).  But to the extent the additional attributes that, when combined with a detachable magazine, push a firearm over the line from acceptable to contraband make a difference in the functionality of the firearm at all, they tend to *improve* the firearm's utility and safety for self-defense and other lawful purposes. A pistol grip, for example, makes it easier to hold and stabilize a rifle or shotgun when fired from the shoulder and therefore promotes accuracy.  *See* Kopel, 20 J. CONTEMP. L. at 396 ("The defensive application is obvious, as is the public safety advantage in preventing stray shots.").  A thumbhole stock also promotes better control by the user.  A telescoping or folding stock not only makes it easier to transport a firearm in a vehicle or to store it in the home, *id*. at 398-99, but, more importantly, also promotes accuracy by allowing the stock to be adjusted to fit the individual user's physique, thickness of clothing, and shooting position.  *What Should America Do About Gun Violence?:  Hearing Before the S. Comm. on the Judiciary*, 113th Cong. 8 (2013), *available at* http://www.judiciary.senate.gov/pdf/1-30-13KopelTestimony.pdf (written testimony of David B. Kopel) ("Kopel Testimony").  Features such as these are necessarily at least as useful for lawful self-defense as for criminal aggression.

What, then, can possibly explain why the Act singles out the firearms that it does?  A little history goes a long way towards providing an explanation.  The term "assault weapon" is a neologism—a recent invention that does not denote any pre-existing category of weapon recognized in the history of firearms:

> Prior to 1989, the term 'assault weapon' did not exist in the lexicon of firearms.  It is a political term, developed by anti-gun publicists to expand the category of 'assault rifles' so as to allow an attack on as many additional firearms as possible on the basis of undefined 'evil' appearance.

*Stenberg v. Carhart*, 530 U.S. 914, 1001 n.16 (2000) (Thomas, J., dissenting) (quotation marks omitted).  The leaders of this movement were not coy about the political agenda behind their invention of this term:

> Assault weapons . . . are a new topic.  The weapons' menacing looks, coupled with the public's confusion over fully automatic machine guns versus semi-automatic assault weapons—anything that looks like a machine gun is assumed to be a machine gun—can only increase the chance of public support for restrictions on these weapons.

Josh Sugarmann, *Assault Weapons and Accessories in America* (Violence Policy Center 1988), *available at* http://www.vpc.org/studies/awaconc.htm (emphasis omitted).  *See also* Johnson, 60 HASTINGS L.J. at 1289-90 ("Some people still believe the assault weapons debate is about machine guns.  This is not surprising given that proponents of the 1994 ban were counting on precisely that confusion.  The calculation was political.").

In accord with this pedigree, the Act's definition of "assault weapons" turns not on a firearm's value or appropriateness for self-defense or other lawful civilian purposes, nor on features that render a firearm unusually dangerous to the public or the police.  *See Heller*, 554 U.S. at 627.  Rather, firearms are classified (and banned) based primarily on whether they have features frequently found on military firearms (other than automatic action, of course, which has long been sharply restricted on civilian firearms) or are believed simply to have particularly "menacing looks."  Sugarmann, *Assault Weapons and Accessories in America*.  This is perhaps best exemplified by the Act's ban on semiautomatic pistols that both (a) have the capacity accept a detachable magazine and (b) are "[a] semiautomatic version of an automatic . . . firearm." N.Y. PENAL LAW § 265.00(22)(c)(viii).  The *only* thing that distinguishes these pistols from other, permissible semiautomatic pistols that accept a detachable magazine is that they *look like* (but in fact are not) automatic weapons.

**IV.    The Act Is Unconstitutional Under Any Level of Scrutiny Even If Such Balancing Tests Are Appropriate.**

As an initial matter, the only balancing test that possibly could be appropriate is strict scrutiny, which requires that a restriction on a fundamental constitutional right be narrowly tailored to serve a compelling governmental interest.  As explained above, the Supreme Court held in *McDonald* that the Second Amendment right to keep and bear arms is *fundamental*.  And when a law interferes with "fundamental constitutional rights," it generally is subject to "strict judicial scrutiny."  *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 16 (1973).  *See also, e.g.*, *Clark v. Jeter*, 486 U.S. 456, 461 (1988) ("[C]lassifications affecting fundamental rights . . . are given the most exacting scrutiny."); *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 54 (1983) ("[S]trict scrutiny [is] applied when government action impinges upon a fundamental right protected by the Constitution.").  Because the Act strikes directly at the fundamental, enumerated right to keep and bear arms, nothing less than strict scrutiny would be appropriate.[3]

At any rate, the Act could not pass even intermediate scrutiny, for it is not even "substantially related to the achievement" of the government's objective of advancing public safety.  *United States v. Virginia*, 518 U.S. 515, 533 (1996).  As an initial matter, to the extent that some of the forbidden features singled out by the Act actually serve to *enhance* a firearm's utility and safety for self-defense, the Act's ban on certain types of semiautomatic firearms not

---

[3] Although it ultimately left the question open, *see Kachalsky*, 701 F.3d at 93, *Kachalsky* supports application of strict scrutiny to laws that limit the right to keep and bear arms in the home.  *See, e.g.*, *id.* at 89 ("Second Amendment guarantees are at their zenith within the home."); *id.* at 93-94 ("[A]pplying less than strict scrutiny when the regulation *does not* burden the 'core' protection of self-defense in the home . . . is . . . consistent with jurisprudential experience analyzing other enumerated rights.  For instance, when analyzing First Amendment claims, content-based restrictions on noncommercial speech are subject to strict scrutiny, while laws regulating commercial speech are subject to intermediate scrutiny." (emphasis added, citations omitted)).

only does not *substantially serve* its goal of advancing public safety, it is affirmatively at war with it.

In addition, it is wholly implausible that criminals bent on committing murder or other acts of deadly violence would give serious thought to whether their weapon of choice would be legal for them to possess.  And even if this were not the case, a criminal could simply substitute for a banned safety-enhanced firearm another equally powerful—or even more powerful— semiautomatic weapon.  *See* GARY KLECK, TARGETING GUNS: FIREARMS AND THEIR CONTROL 128 (1997) (Assault rifles "are generally less lethal than ordinary hunting rifles, while ['assault weapon'] pistols are no more lethal than [non-'assault weapon'] handguns.").  Again, the term "assault weapon" does not denote any mechanically distinct category of semiautomatic firearms but rather bans certain semiautomatic firearms because of certain user-friendly features or simply because of the way they look, while leaving other functionally indistinguishable and equally (or more) lethal firearms untouched.  *See id.* at 121 (noting that "[t]he few dozen models of semiautomatic guns that ha[d] been banned as ['assault weapons' by the 1994 federal ban and similar State laws] are, as a group, mechanically identical to the hundreds of models not banned" in relevant respects, and "[t]herefore, there is no basis for expecting that the outcomes of *any* shootings would be different . . . if unbanned semiautomatic guns capable of accepting detachable magazines were used instead of mechanically identical, though cosmetically different, banned ['assault weapons']").

Not surprisingly, empirical evidence from the now-expired 1994 federal ban on semiautomatic "assault weapons" supports the commonsense proposition that the Act will not materially advance public safety.  To begin, this evidence indicates that criminals use "assault weapons" so infrequently that it cannot reasonably be expected that banning them will have a

significant impact on crime or homicide rates.  "Assault weapons" "were used in only a small fraction of gun crimes prior to the [1994] ban:  about 2% according to most studies and no more than 8%."  Christopher S. Koper et al., Report to the National Institute of Justice, United States Department of Justice, *An Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets and Gun Violence, 1994-2003* 2 (2004); *see also* KLECK, TARGETING GUNS at 41-42, 112.  These results are consistent with studies conducted in prisons indicating that "criminals not only did not 'prefer' military-style guns, they were strongly *dis*inclined to carry them during commission of their crimes, even when they owned one."  KLECK, TARGETING GUNS at 117.  Police officers also report that criminals prefer not to use "the sophisticated and expensive assault weapons as commonly thought."  Thomas E. Romano, *Firing Back: Legislative Attempts to Combat Assault Weapons*, 19 SETON HALL LEGIS. J. 857, 890 & n.171 (1995) (citing George R. Wilson, chief of the firearms division for the Washington, D.C. police department).

It is thus not surprising that the effects on homicide of the national "assault weapons" ban were "statistically insignificant."  Peter Reuter & Jenny Mouzos, *Australia: A Massive Buyback of Low-Risk Guns*, *in* EVALUATING GUN POLICY 121, 141 (Jens Ludwig & Philip J. Cook eds., 2003); NATIONAL RESEARCH COUNCIL, FIREARMS AND VIOLENCE: A CRITICAL REVIEW 97 (Charles F. Wellford et al. eds., 2005) ("[G]iven the nature of the [1994 assault weapons ban], the maximum potential effect of the ban on gun violence outcomes would be very small and, if there were any observable effects, very difficult to disentangle from chance yearly variation and other state and local gun violence initiatives that took place simultaneously.").  Indeed, before the 1994 ban expired in 2004, a study sponsored by the National Institute of Justice reported that, if the ban were continued, "effects on gun violence

14

[were] likely to be small at best and perhaps too small for reliable measurement."  Koper, Report

to the National Institute of Justice at 3.  *See also* Johnson, 60 HASTINGS L.J. at 1290, 1302;

Kopel, 20 J. CONTEMP. L. at 404-13.

 To be sure, the Act's definition of prohibited weapons is broader than that contained in

the 1994 ban.  But a definition of assault weapons that sweeps in a broader range of guns used by

criminals simply means that more criminals will either ignore the law or use different

semiautomatic firearms that are equally effective for their criminal purposes.  Thus, at most,

"violent criminals will simply resort to more easily attainable, equally lethal weapons."

Romano, 19 SETON HALL LEGIS. J. at 892; Eugene Volokh, *Implementing the Right to Keep and*

*Bear Arms for Self-Defense: An Analytical Framework and A Research Agenda*, 56 UCLA L.

REV. 1443, 1468 (2009) ("[A]nyone who is denied an 'assault weapon' will almost certainly

substitute another gun that is equally lethal. It's therefore hard to see how assault weapons bans

will do much to reduce danger of crime or injury."); KLECK, TARGETING GUNS at 106

("[R]estrictions on one subtype of firearms encourage criminals to substitute other gun types, and

in some cases the most likely substitutes are even more dangerous than the targeted weapons.").

 In sum, given the Act's arbitrary classification of firearms on the basis of largely

cosmetic differences and the ready ability of criminals to substitute functionally

indistinguishable lawful weapons for the weapons it would ban, the Act's ban on certain

semiautomatic firearms plainly will not improve public safety.  This dooms the Act under

intermediate scrutiny, for a legislative restriction on a constitutional right is presumed invalid

unless the state can carry its burden of proof to show that the restriction serves an important

government interest in a direct and substantial way.  *See, e.g.*, *Nguyen v. I.N.S.*, 533 U.S. 53, 73

(2001) (upholding sex classification because it was based on "basic biological differences"

between men and woman, not "misconceptions and prejudices"); *Virginia*, 518 U.S. at 533

(striking down sex classification that the Court deemed relied on "overbroad generalizations"

rather than "enduring" or "inherent" differences between men and women).  Indeed, prohibitions

on certain semiautomatic firearms such as the Act are, as Professor Randy Barnett has recently

noted, "simply irrational and therefore unconstitutional" under any standard of review.  Professor

Randy Barnett, *Gun Control Fails Rationality Test*, WASH. EXAMINER, Jan. 29, 2013, *available

at* http://washingtonexaminer.com/gun-control-fails-rationality-test/article/2519971; *see also,

e.g.*, *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 448 (1985) (requiring a special use

permit for a home for the mentally disabled failed rational basis review when there was no

"rational basis for believing" that the "home and those who would occupy it would threaten

legitimate interests of the city in a way that other permitted uses such as boarding houses and

hospitals would not"); *Dep't of Agric. v. Moreno*, 413 U.S. 528, 537 (1973) (a limitation on food

stamp eligibility failed rational basis review when "[m]ost people in th[e] category" targeted by

Congress "can and will alter their living arrangements in order to remain eligible for food

stamps").

**V.      The Ban on Magazines Containing More Than Seven Rounds Also Violates the
          Second Amendment.**

1.      The principles established by *Heller* and *McDonald* likewise demonstrate that the

Act's prohibition on magazines capable of holding more than ten rounds or actually loaded with

more than seven rounds of ammunition is unconstitutional.  Again, the key question is whether

firearms equipped with such magazines are of a kind that are in common use for lawful purposes.

Clearly they are.

Americans own tens of millions of magazines fitting this description.  *See* Koper, Report

to the National Institute of Justice at 65 ("[G]un industry sources estimated that there were 25

million [such magazines] available as of 1995 . . . .  [N]early 4.8 million . . . were imported for

commercial sale . . . from 1994 through 2000 . . . .  During this period, furthermore, importers

received permission to import a total of 47.2 million [such magazines]; consequently, an

additional 42 million . . . may have arrived after 2000 or still be on their way, based on just those

approved through 2000.").  Indeed, such magazines are standard equipment on many popular

firearms owned by many millions of Americans for self-defense, hunting, and target shooting.

*See* Overstreet Decl. ¶ 14 ("Standard magazines for very commonly owned semiautomatic

pistols hold up to 17 rounds of ammunition.  In 2011, about 61.5 percent of the 2.6 million

pistols made in the U.S. were in calibers typically using magazines that hold over 10 rounds.");

*id.* ¶ 17 (there are millions of "rifles equipped with detachable magazines holding more than 10

rounds" privately owned in the United States); Kopel Testimony at 15-17.[4]  In addition, many

commonly possessed lever action rifles, which have been manufactured and owned by the

millions in this country since the time of the Civil War, have fixed tubular magazines that may in

some calibers hold more than ten rounds.  Although the definition of "large capacity ammunition

feeding device" excludes tubular magazines "designed to accept, and capable of operating only

with, .22 caliber rimfire ammunition," and certain curios or relics, N.Y. PENAL LAW §

---

[4] A review of the 2013 edition of Gun Digest, a standard reference work that includes specifications of currently available firearms, indicates that about two-thirds of the distinct models of semiautomatic centerfire rifles listed are normally sold with detachable magazines that hold more than ten rounds of ammunition. (Even many rifles normally sold with magazines of smaller capacity are also capable of accepting standard magazines without modification.) GUN DIGEST 2013 455-64, 497-99 (Jerry Lee ed., 67th ed. 2012).  The same book indicates that about one-third of distinct models of semiautomatic handguns listed—even allowing for versions sold in different calibers, which often have different ammunition capacities—are normally sold with magazines that hold more than ten rounds of ammunition.  *Id.* at 407-39.  In both cases, but especially for handguns, these figures underestimate the ubiquity of magazines capable of holding more than ten rounds of ammunition, because they include many minor variations of lower-capacity firearms offered by low-volume manufacturers.

265.00(23), many common lever action rifles (including most such rifles used for hunting or organized sport shooting) are centerfire rifles in other calibers, not rimfire .22s.[5]

2.      Because firearms equipped with magazines capable of holding more than ten rounds of ammunition or actually loaded with seven rounds are in "common use" for "lawful purposes," the Constitution guarantees the right of law-abiding, responsible citizens to acquire, possess, and use them.  *Heller*, 554 U.S. at 624.  But even if a levels-of-scrutiny analysis were to apply, and even if, contrary to *Heller*, intermediate scrutiny was the applicable standard of review, the Act's magazine ban could not stand.

To the extent the time it takes to change magazines could, in some situations, make a difference in the outcome of a confrontation, it is clear that, on balance, restricting citizens to magazines loaded with seven rounds will work to the advantage of criminals, not law-abiding citizens.  First, there are many millions of higher capacity magazines already in circulation, and while most law-abiding citizens will obey any new law restricting the purchase or transfer of such magazines, most criminals will not.  And even if one indulges the notion that such a ban will operate equally on law-abiding citizens and criminals alike, it is criminals, not their victims, that generally choose the time and place of an armed confrontation.  A criminal can thus plan in advance for the possibility that he will need more than a single magazine loaded with seven rounds and equip himself accordingly.

---

[5] Fixed tubular magazines consist of a tube that is integral to the rifle and that runs underneath and parallel to the barrel.  They cannot be replaced with a magazine of a different capacity, except (perhaps) with the services of a gunsmith.  Thus, under the Act, many common lever action hunting rifles that are not semi-automatics and cannot accept detachable magazines are defined as large capacity ammunition feeding devices, and must be registered, cannot be transferred except to a dealer, and ultimately must be disposed of out of state.  Because lever action rifles are themselves excluded from the definition of "assault weapon," the prohibition of tubular magazines capable of holding more than ten centerfire rounds, even when attached to lever action rifles, is plainly a trap for the unwary.

18

Nor does available empirical evidence support a substantial connection between limiting citizens to seven rounds per magazine and public safety.  As an initial matter, such a limit will be simply irrelevant to the vast majority of gun crimes.  *See* KLECK, TARGETING GUNS at 123 ("It is unlikely that large-capacity magazines are currently relevant to the outcome of a large number of violent incidents, since few cases involve large numbers of shots fired.").  "[A]vailable studies on shots fired show that assailants fire less than four shots on average . . . ."  Koper, Report to the National Institute of Justice at 90.  Further, it is unlikely that such a limit would have much of an impact even in those rare instances in which criminals fire more than seven shots.  A study of "mass shootings"—*i.e.*, incidents in which "six or more victims were shot dead with a gun, or twelve or more total were wounded"—from 1984 to 1993 found that "[f]or those incidents where the number of rounds fired and the duration of the shooting were both reported, the rate of fire never was faster than about one round every two seconds, and was usually much slower than that."  KLECK, TARGETING GUNS at 124-25.  Thus, "[n]one of the mass killers maintained a sustained rate of fire that could not also have been maintained—even taking reloading time into account—with either multiple guns or with an ordinary six-shot revolver and the common loading devices known as 'speedloaders.' "  *Id.* at 125.  Furthermore, as more recent incidents demonstrate, a mass shooter may simply change magazines each time one is spent.  *See* Kopel Testimony at 19 ("At Newtown, the murderer changed magazines many times, firing only a portion of the rounds in each magazine. . . .  In the Virginia Tech murders, the perpetrator changed magazines 17 times.").  Finally, a criminal with multiple guns can avoid the need to reload by merely changing guns when the first gun runs out of ammunition. The perpetrators of the majority of mass shootings between 1984 and 1993 carried multiple firearms.  KLECK,

TARGETING GUNS at 125, 144 (table 4.2).  The same is true for similar incidents taking place since that time period.

By contrast, the defensive utility of having a magazine capable of holding more than ten—and actually loaded with more than seven—rounds of ammunition is obvious. A law-abiding person who runs out of ammunition before her attacker does is very likely to become a crime victim.  And a person faced with one or more armed assailants could well need to fire more than seven shots to defend herself and may not be able to change magazines immediately. Because criminals rarely announce their intentions in advance, victims will rarely have more than a single magazine immediately available, and a law-abiding person who is suddenly confronted by an armed assailant may take longer to change magazines under such stress than when calmly shooting at the firing range.  If she is elderly or disabled, changing magazines may prove to be no easy task.

## VI.    *Heller II.*

1.      To be sure, in *Heller II*, a divided panel of the D.C. Circuit held that the District of Columbia's ban on semiautomatic "assault rifles" did not violate the Second Amendment. Judge Kavanaugh's dissent forcefully and compellingly explains why *Heller* and *McDonald* mandate a textual and historical inquiry, not an intermediate scrutiny analysis, and why D.C.'s "assault rifle" ban—and thus the Act's "assault weapon" ban—is unconstitutional under either of these approaches.  Indeed, the majority opinion in *Heller II* was deeply flawed for a variety of reasons pertinent to the constitutionality of the Act.

*First*, the panel majority acknowledged that semi-automatic rifles are in "common use" (without identifying the purposes for which they are commonly used) and that there is no "longstanding" tradition of prohibiting their use.  *See Heller II*, 670 F.3d at 1260-61.  Under

*Heller*, that should have been the end of the case, and the District of Columbia's ban should have been struck down.  But the panel majority instead proceeded to apply a levels-of-scrutiny analysis, with the level of scrutiny turning on the Court's view of "how severely the prohibitions burden the Second Amendment right."  *Id*. at 1261.  Under the panel majority's analysis, in other words, the level of scrutiny to be applied in Second Amendment cases turns on the very type of balancing of interests assessment that *Heller* forbids.

*Second*, the panel majority erred by deeming intermediate scrutiny the proper standard.  As explained above, the *Heller* majority rejected the test Justice Breyer advanced in his dissent, which essentially was a form of intermediate scrutiny.  Indeed, it is telling that in explicating the intermediate scrutiny standard it was applying, the panel majority in *Heller II* repeatedly invoked *Turner*, the very case that Justice Breyer held up as exemplary of the interest-balancing approach he was advocating, and indeed the panel majority *quoted much of the same language from* Turner *quoted by Justice Breyer*.  *Compare Heller II*, 670 F.3d at 1259, *with Heller*, 554 U.S. at 704-05 (Breyer, J., dissenting).  *Heller* prohibits application of this standard to a ban on possessing arms protected by the Second Amendment.

*Third*, the panel majority's rationale for applying intermediate scrutiny cannot be squared with *Heller*.  In particular, the panel majority reasoned that "the laws at issue here do not prohibit the possession of 'the quintessential self-defense weapon,' to wit, the handgun," *Heller II*, 670 F.3d at 1261-62 (quoting *Heller*, 554 U.S. at 629), and thus that "the ban on certain semi-automatic rifles [does not] prevent a person from keeping a suitable and commonly used weapon for protection in the home or for hunting," *id.* at 1262.  Leaving aside the fact that the Act *does* prohibit many common handguns, the *Heller II* panel majority's reasoning is unpersuasive.  Indeed, its argument is "a bit like saying books can be banned because people can always read

newspapers.  That is not a persuasive or legitimate way to analyze a law that directly infringes an enumerated constitutional right."  *Id.* at 1289 (Kavanaugh, J., dissenting).  And under *Heller*, it is not the government's prerogative to pick and choose which constitutionally protected arms may be used for lawful purposes; rather, that right is reserved to the law-abiding citizens of this Nation.  Thus, in *Heller*, "[i]t [was] no answer to say . . . that it is permissible to ban the possession of handguns so long as the possession of other firearms . . . is allowed."  554 U.S. at 629.  And in *Heller II*, it likewise should have been no answer to say that it is permissible to ban some semiautomatic rifles so long as the possession of other firearms is allowed.

*Fourth*, the panel majority's application of intermediate scrutiny cannot be reconciled with *Heller*.  *Heller* concluded, as noted earlier, that the District of Columbia's handgun ban would "fail constitutional muster" under "any of the standards of scrutiny the Court has applied to enumerated constitutional rights," 554 U.S. at 571, including intermediate scrutiny, which is applied in some situations in which an enumerated right is burdened in an incidental or marginal way.  *See, e.g.*, *Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 566 (1991) ("expressive conduct within the outer perimeters of the First Amendment, though . . . only marginally so"); *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 456 (1978) (commercial speech, which has a "subordinate position in the scale of First Amendment values").  If the District of Columbia's ban on handguns could not pass intermediate scrutiny (*i.e.*, was not substantially related to public safety), it follows that its ban on certain semiautomatic firearms likewise could not pass this level of heightened scrutiny.  For while the panel majority attempted to build a case that criminals could misuse "assault weapons," *see Heller II*, 670 F.3d at 1262-63, the same was certainly true of the handguns at issue in *Heller*.  *See, e.g.*, *Heller*, 554 U.S. at 697-99 (Breyer, J., dissenting) ("From 1993 to 1997, 81% of firearm-homicide victims were killed by handgun.  . . .  Handguns

also appear to be a very popular weapon among criminals. . . .  [T]he linkage of handguns to firearms deaths and injuries appears to be much stronger in urban than in rural areas.").

Indeed, this point illustrates what is perhaps the most fundamental flaw in the panel majority's reasoning: its focus on ways in which certain firearms may be misused by criminals, rather than on ways in which they may be put to lawful defensive use by law-abiding citizens. Unlike the *Heller* dissenters, the Supreme Court's majority opinion focused on the latter, not the former, explaining that a handgun

> is easier to store in a location that is readily accessible in an emergency; it cannot easily be redirected or wrestled away by an attacker; it is easier to use for those without the upper-body strength to lift and aim a long gun; it can be pointed at a burglar with one hand while the other hand dials the police.

554 U.S. at 629.  Many of these attributes, of course, likely also explain why criminals prefer to use handguns, but that is not what the *Heller* majority deemed relevant.  Conversely, many of the attributes of "assault weapons" that the *Heller II* panel majority deemed pernicious enhance their fitness as defensive, *anti-assault* weapons when in the hands of law-abiding citizens.  *See Heller II*, 670 F.3d at 1262-63.

The Supreme Court's approach is authoritative, of course, but it also makes more sense. Criminals are by definition much less likely than law-abiding citizens to abide by restrictions on the types of guns that may be owned.  Thus, to the extent a certain weapon gives one party to a confrontation an advantage, banning that weapon will on the whole work to the benefit of the criminals, not the law-abiding.

At any rate, the panel majority's intermediate scrutiny analysis ultimately is at war with itself.  For recall the panel majority's reasoning for applying intermediate scrutiny in the first place:  that the ban would not "prevent a person from keeping a suitable and commonly used weapon for protection in the home or for hunting."  *Id*. at 1262.  Of course, it is also true that the

ban would not prevent a criminal from simply substituting for a banned semiautomatic "assault rifle" another equally lethal semiautomatic firearm just as "suitable and commonly used" for criminal purposes.  As explained above, it is therefore simply irrational to expect that dubbing a subcategory of semiautomatic weapons "assault weapons" and banning their possession will improve public safety.

*Fifth*, and finally, the panel majority erred by likening semiautomatic "assault weapons" to fully automatic firearms.  According to the panel majority, "*Heller* suggests 'M-16 rifles and the like' may be banned because they are 'dangerous and unusual.' "  *Heller II*, 670 F.3d at 1263 (quoting *Heller*, 554 U.S. at 627).  Citing the *Staples* decision, the panel majority then concluded that the two firearms are essentially equivalent:  "The Court had previously described the 'AR-15' as 'the civilian version of the military's M-16 rifle.' "  *Id.* (quoting *Staples*, 511 U.S. at 603).  But *Staples* was not *equating* the AR-15 with the M-16; to the contrary, it held that the AR-15, *unlike* the M-16, is among weapons that "traditionally have been widely accepted as lawful possessions."  *Staples*, 511 U.S. at 612.  The key distinction between these two firearms, of course, is that the AR-15 is semiautomatic, while the M-16 is fully automatic and thus has long been effectively restricted to military use.  The *Heller II* panel majority acknowledged this difference, but instead of recognizing its importance, sought to diminish it:  "Although semi-automatic firearms, unlike automatic M-16s, fire only one shot with each pull of the trigger, semi-automatics still fire almost as rapidly as automatics."  670 F.3d at 1263 (quotation marks and citation omitted).  There are two problems with this argument.  Not only does "the majority opinion's data indicate that semi-automatics actually fire two-and-a-half times slower than automatics," *id.* at 1289 (Kavanaugh, J., dissenting), but, taken to its logical conclusion, the majority opinion's reasoning would justify a ban on *all* semiautomatic weapons.  This cannot

possibly be right under *Heller*, given that semiautomatic firearms are ubiquitous and used by tens of millions of Americans for self-defense and other lawful purposes.

2.      The plaintiffs in *Heller II* also challenged the District of Columbia's ban on magazines capable of holding more than ten rounds of ammunition.  The *Heller II* panel majority also rejected this challenge.  (Judge Kavanaugh would have remanded for further proceedings on this issue.)  Given that the panel majority addressed both bans together, the panel majority's ruling on the magazine ban is subject to many of the same criticisms as its ruling on the semiautomatic "assault rifle" ban.  For example, like "assault rifles," the panel majority found it "clear enough" that "magazines holding more than ten rounds are indeed in 'common use.' " *Heller II*, 670 F.3d at 1261.  That should have been the end of the matter, yet rather than striking down the law, the panel majority proceeded to apply intermediate scrutiny.  And in applying intermediate scrutiny, the panel majority invoked testimony that "the '2 or 3 second pause' during which a criminal reloads his firearm 'can be of critical benefit to law enforcement' " without acknowledging the fact that a 2 or 3 second pause during which a victim reloads a firearm can be of equally critical benefit to a criminal.  *Heller II*, 570 F.3d at 1264.  And the panel majority did not address the evidence discussed above showing that banning magazines capable of holding more than ten rounds of ammunition is unlikely to promote public safety.

## CONCLUSION

In sum, the principles established by the Supreme Court's decisions in *Heller* and *McDonald*  make it clear that the Act's ban on safety-enhanced firearms and on magazines holding more than seven  rounds of ammunition violates the Second Amendment by prohibiting the use of arms that are in common use by ordinary Americans for self-defense and other lawful purposes.

Dated:  April 22, 2013
         Buffalo, New York

                                        Respectfully submitted,

Charles J. Cooper*
David H. Thompson*                          s/John G. Schmidt Jr.
Attorneys for National Rifle Association of  John G. Schmidt, Jr.
        America, Inc.                        Attorney for National Rifle Association of
COOPER & KIRK, PLLC                                  America, Inc.
1523 New Hampshire Ave., N.W.                Nicolas J. Rotsko
Washington, D.C. 20036                       Michael B. Powers, Esq.
(202) 220-9600                               PHILLIPS LYTLE LLP
ccooper@cooperkirk.com                       3400 HSBC Center
                                             Buffalo, N.Y. 14203
*Pro hac vice application forthcoming        (716) 847-8400
                                             jscmidt@phillipslytle.com

26