## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NEW YORK
Buffalo Division

| | |
|---|---|
| NEW YORK STATE RIFLE AND PISTOL ASSOCIATION, INC., et al., | |
| Plaintiffs. | |
| v. | Case No.: 13-cv-00291-WMS |
| ANDREW M. CUOMO, et al., | |
| Defendants. | |

**[PROPOSED] AMICI CURIAE BRIEF OF NEW YORK STATE SHERIFFS' ASSOCIATION, TIMOTHY B. HOWARD, ERIE COUNTY SHERIFF, REUEL A. TODD, OSWEGO COUNTY SHERIFF, BARRY C. VIRTS, WAYNE COUNTY SHERIFF, DONALD B. SMITH, PUTNAM COUNTY SHERIFF, THOMAS J. LOREY, FULTON COUNTY SHERIFF, THE LAW ENFORCEMENT LEGAL DEFENSE FUND, LAW ENFORCEMENT ACTION NETWORK, AND THE INTERNATIONAL LAW ENFORCEMENT EDUCATORS AND TRAINERS ASSOCIATION**

*Counsel for Amici Curiae*

C. D. Michel*
Clinton B. Monfort
Michel & Associates, P.C.
180 E. Ocean Blvd., Ste. 200
Long Beach, CA 90802
(562) 216-4444/cmichel@michellawyers.com
* Pro hac vice application forthcoming

Sheldon W. Boyce, Jr.
William J. Brongo
Brenna, Brenna and Boyce, PLLC
31 East Main Street, Suite 2000
Rochester, NY 14614
(585) 454-2000 / boyce@brennalaw.com

Jeffrey Chamberlain
Chamberlain Kaufman and Jones
35 Fuller Road
Albany, NY 12205
(518) 435-9426 / jeffc@flsa.com

*Of Counsel*

Edwin Meese, III
1075 Spring Hill Road
McLean VA 22102
(202) 633-2001

Alfred S. Regnery
1611 North Kent St. #901
Arlington, VA 22209
(202) 258-7411

David Martin
Law Offices of David Henderson Martin
1611 North Kent Street, Suite 901
Arlington, VA 22209
(703) 807-1875

## <u>TABLE OF CONTENTS</u>

**PAGE(S)**

INTEREST OF AMICI CURIAE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

SUMMARY OF ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

I.      THE CHALLENGED PROVISIONS VIOLATE THE SECOND AMENDMENT. . . . . . . . . . . . . . . 3

        A.      The Challenged Laws Require Heightened Scrutiny Because They
                Prohibit Arms That Are Typically Used By Law-Abiding Citizens. . . . . . . . . . 3

        B.      The Challenged Laws Do Not Assist Law Enforcement In Combating
                Violent Crime, And Serve To Decrease Public Safety. . . . . . . . . . . . . . . . . . . 8

II.     THE CHALLENGED PROVISIONS ARE FATALLY VAGUE. . . . . . . . . . . . . . . . . . . . . . . . 15

        A.      Laws Imping Upon Fundamental Rights Must Provide The Highest
                Levels of Clarity To Ensure Equitable Enforcement. . . . . . . . . . . . . . . . . . . 16

        B.      The Court Should Apply a Heightened Vagueness Standard Because
                The Challenged Provisions Impose Criminal Sanctions And Lack a
                Scienter Requirement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

        C.      The Challenged Provisions Fail To Provide Sufficient Guidance To
                Law Enforcement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

## <u>TABLE OF AUTHORITIES</u>

<b>PAGE(S)</b>

### <u>FEDERAL CASES</u>

*Ashcroft v. Free Speech Coal.*,
    535 U.S. 234 (2002)..................................................... 4

*Bagget v. Bullitt*,
    377 U.S. 360 (1964)................................................... 16

*Brown v. Entm't Merchs. Ass'n*,
    131 S. Ct. 2729 (2011).................................................. 4

*Burdick v. Takushi*,
    504 U.S. 428 (1992)..................................................... 7

*Carey v. Population  Servs. Int'l*,
    431 U.S. 678 (1977)..................................................... 4

*Chicago v. Morales*,
    527 U.S. 41 (1999).................................................... 16

*City of Los Angeles v. Alameda Books, Inc.*,
    535 U.S. 425 (2002)..................................................... 9

*Clark v. Cmty. for Creative Non-Violence*,
    468 U.S. 288 (1984)..................................................... 7

*Clark v. Jeter*,
    486 U.S. 456 (1988)..................................................... 9

*District of Columbia v. Heller*,
    554 U.S. 570 (2008)......................................... 4, 5, 6, 17, 18

*Ezell v. City of Chicago*,
    651 F.3d 684 (7th Cir. 2011)............................................. 5

*Farrell v. Burke*,
    449 F.3d 470 (2d Cir. 2006)............................................ 17

## TABLE OF AUTHORITIES (CONT.)

PAGE(S)

### FEDERAL CASES (CONT.)

*GeorgiaCarry.org. v. Georgia*,
    687 F.3d 1244 (11th Cir. 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Gonzales v. Carhart*,
    550 U.S. 124 (2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Grayned v. City of Rockford*,
    408 U.S. 104 (1972). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 16, 19

*Griswold v. Connecticut*,
    381 U.S. 479 (1965). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Hayes v. N.Y. Atty. Grievance Comm. of the Eighth Judicial Dist.*,
    672 F.3d 158 (2d Cir. 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 17

*Heller v. District of Columbia*,
    670 F.3d 1244  (D.C. Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 5, 6

*Kachalsky v. County of Westchester*,
    701 F.3d 81 (2d Cir. 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 7

*Kolender v. Lawson*,
    461 U.S. 352 (1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 16, 17, 20

*McDonald v. City of Chicago*,
    130 S. Ct. 3020 (2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Nordyke v. King*,
    644 F.3d 776 (9th Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Papachristou v. City of Jacksonville*,
    405 U.S.156 (1972). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Planned Parenthood of Se. Pa. v. Casey*,
    505 U.S. 833 (1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

# TABLE OF AUTHORITIES (CONT.)

**PAGE(S)**

## FEDERAL CASES (CONT.)

*Peoples Rights Organization, Inc. v. City of Columbus*,
  152 F.3d 522 (6th Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*R.A.V. v. City of St. Paul*,
  505 U.S. 377 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Reliable Consultants, Inc. v. Earle*,
  517 F.3d 738 (5th Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Reno v. Flores*,
  507 U.S. 292 (1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Shaw v. Hunt*,
  517 U.S. 899 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Small v. Bud-K Worldwide, Inc.*,
  895 F. Supp. 2d 438 (E.D.N.Y. 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Turner Broad. Sys. v. FCC*,
  512 U.S. 622 (1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*United States v. Chester*,
  628 F.3d 673 (4th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 9

*United States v. Decastro*,
  682 F.3d 160 (2d Cir. 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7

*United States v. Marzzarella*,
  614 F.3d 85 (3d Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6

*United States v. Masciandaro*,
  638 F.3d 458 (4th Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

## TABLE OF AUTHORITIES (CONT.)

PAGE(S)

### FEDERAL CASES (CONT.)

*United States v. Reese*,
    627 F.3d 792 (10th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*United States v. Salerno*,
    481 U.S. 739 (1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 16

*United States v. Strauss*,
    999 F.2d 692 (2d Cir.1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*United States v. Virginia*,
    518 U.S. 515 (1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Vill. of Hoffman Estates v. Flipside*,
    455 U.S. 489 (1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 16, 17, 19

*VIP of Berlin, LLC v. Town of Berlin*,
    593 F.3d 179 (2d Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Ward v. Rock Against Racism*,
    491 U.S. 781 (1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Wash. State Grange v. Wash. State Republican Party*,
    552 U.S. 442 (2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Windsor v. United States*,
    699 F.3d 169 (2d Cir. 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

### STATE CASES

*Harrott v. County of Kings*,
    25 Cal.4th 1138 (2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 23

## TABLE OF AUTHORITIES (CONT.)

PAGE(S)

### STATUTES, RULES & REGULATIONS

Cal. Penal Code § 16460. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Cal. Penal Code § 30515. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Cal. Code Regs. tit. 11 § 5469. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

N.Y. Penal Law § 265.00. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

N.Y. Pen. Law § 265.02. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 19, 20

N.Y. Pen. Law § 265.10. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 19, 20

N.Y. Pen. Law §265.36. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

N.Y. Pen. Law §265.37. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 19, 20

N.Y. Const. art. 13, § 1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

H.R. 3355, 103rd Cong. § 110101 (1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

H.R. 3355, 103rd Cong. § 110102 (1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

H.R. 3355, 103rd Cong. § 110103 (1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

H.R. 3355, 103rd Cong. § 110104 (1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

H.R. 3355, 103rd Cong. § 110105 (1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

H.R. 3355, 103rd Cong. § 110106 (1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Sen. Bill No. 2444 (1989-1990 Reg. Sess.)  (Aug. 23, 1990). . . . . . . . . . . . . . . . . . . . . . 22, 23

### OTHER AUTHORITY

Christopher S. Koper, Daniel J. Woods & Jeffrey A. Roth,
      "An Updated Assessment of the Federal Assault Weapons Ban: Impacts on
      Gun Markets and Gun Violence, 1994-2003:Report to the National Institute
      of Justice, United States Department of Justice," University of Pennsylvania,
      June 2004. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 13

<u>**TABLE OF AUTHORITIES (CONT.)**</u>

<b>PAGE(S)</b>

<u>**OTHER AUTHORITY (CONT.)**</u>

David B. Kopel,
*Are So-Called "Assault Weapons" A Threat to Police Officers?*,
The Law Enforcement Trainer (Sept./Oct. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

David B. Kopel*,*
*What Should America Do About Gun Violence? Full Committee Hearing*
*Before United States Senate Judiciary Committee*, 113th Cong. (2013). . . . . . . . . . . . . 13

Eugene Volokh,
*Implementing the Right to Keep and Bear Arms for Self-Defense*,
56 UCLA L. Rev. 1443 (2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Gun Policy & Law Enforcement: Where Police Stand on America's Hottest Issue*,
Policeone.com, http://www.policeone.com/Gun-Legislation-Law- Enforcement/articles/
6183787-PoliceOnes-Gun-Control-Survey-11-key-lessons-from-officers-perspectives
(last accessed May 3, 2013). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

**INTEREST OF AMICI CURIAE**

Amici curiae New York State Sheriffs' Association (NYSSA), Erie County Sheriff Timothy B. Howard, Oswego County Sheriff Reuel A. Todd, Wayne County Sheriff Barry C. Virts, Putnam County Sheriff Donald B. Smith, Fulton County Sheriff Thomas J. Lorey, the Law Enforcement Legal Defense Fund (LELDF), the Law Enforcement Action Network (LEAN), and the International Law Enforcement Educators and Trainers Association (ILEETA) (collectively, "Amici"), are member organizations and individual law enforcement officials representing the interests of law enforcement officers throughout the country and in the state of New York.[1]  This amicus brief will provide the Court with the perspective of major law enforcement groups, experienced law enforcement officials, and organizations that aid law enforcement in legal matters and support law enforcement activities and issues in the courts, before the legislature, and among the public.

As amici sheriffs and many of the organizational amici's members are charged with the enforcement of state and federal firearms laws, Amici are well suited to provide insight about the lawful use of the arms at issue in this litigation, which may impact the Court's framework for reviewing Plaintiffs' Second Amendment claims.  And because law enforcement officers are the front-line responders to violent crimes, Amici are well positioned to shed light for the Court on the practical impact the challenged provisions will have on public safety.  Amici are also able to provide important insight regarding the negative impact the challenged provisions will have on the ability of law-abiding citizens to defend themselves.

Amici will also explain, based upon their collective knowledge and experience with

---

[1] Detailed individual descriptions of Amici's background in relation to this case are fully set forth in the accompanying Motion for Leave to File.

officers who are tasked with enforcing the law, that the challenged laws are unduly vague and fail to provide sufficient guidelines for officers to equitably administer the laws. Because Amici support officers who are not only responsible for enforcing the challenged provisions, but are also responsible for keeping the peace, Amici have a strong interest in ensuring that the laws officers are tasked with enforcing have sufficient guidelines, not only for the sake of the public, but also to protect officers and ensure against the diversion of limited resources from crucial law enforcement functions.

## SUMMARY OF ARGUMENT

The challenged laws restrict commonly-owned arms that are widely chosen by law-abiding citizens for self-defense within their homes. Law enforcement officers are no exception to this practice. Amici and many members of amici organizations regularly choose the restricted firearms and magazines for defense of themselves and their families, including times they are off duty and also upon retirement.  Because the challenged provisions impose a blanket ban on arms protected by the Second Amendment, they are unconstitutional per se, or at minimum, require heightened judicial scrutiny.  And as Amici are acutely aware, the challenged provisions cannot survive such review because they do not serve to increase the safety of New York residents. Instead, the laws operate to decrease the ability of law-abiding citizens to effectively protect themselves in their homes, thus jeopardizing the public's safety.

Further, the vagueness of the challenged provisions precludes fair enforcement. Inevitably, the lack of guidelines will require officers to rely on their subjective interpretations, thereby jeopardizing the freedom of law-abiding individuals attempting to comply with the laws. In other words, officers are put in the unenviable position of guessing whether individuals exercising their Second Amendment rights should be arrested under the new laws.  And while the

laws are difficult for citizens to comprehend, they are worse for law enforcement.  Officers are

not only expected to enforce the laws against those seeking to exercise fundamental rights, they

are likely to face suits for wrongful arrests and have prosecutions dismissed.

 Amici are entrusted with the critical responsibility of ensuring law and order.  In very

real and direct ways, the challenged laws increase disorder.  Law enforcement's work is made

more difficult attempting to enforce unclear laws that harm, rather than promote, public safety.

The laws appear willfully blind to legitimate safety interests, and instead are tailored to impact,

and negatively impact, law-abiding firearm owners.

Ultimately, the challenged provisions impose unnecessary, time-consuming, and costly

burdens on law enforcement. Law enforcement officers have enough to do already without being

asked to enforce a large, technical, controversial set of laws, the enforcement of which will

stretch already scarce law enforcement resources and reduce police support among the citizenry.

Because the laws are opaque and unclear, and are contrary to the United States Constitution and

Supreme Court precedent, Amici respectfully ask that they be enjoined by this Court.

## ARGUMENT

I.   THE CHALLENGED PROVISIONS VIOLATE THE SECOND AMENDMENT

### A.   The Challenged Laws Require Heightened Scrutiny Because They Prohibit Arms That Are Typically Used By Law-Abiding Citizens

The items prohibited by the challenged laws are "typically possessed by law-abiding

citizens for lawful purposes."[2] In addition to the items directly prohibited – certain semi-

---

[2] One of the firearms targeted by the challenged provisions is America's 'most popular semi-automatic rifle.' ") (*Heller v. District of Columbia*, 670 F.3d 1244, 1287 (D.C. Cir. 2011) ("*Heller II* ") (Kavanaugh J., dissenting)); NRA Amicus Br. at 16 ("Americans own tens of millions of magazines fitting [the] description [of those banned by the challenged provisions]."); *id.* at 17 ("Indeed, such magazines are standard equipment" on firearms owned by millions of Americans.")

automatic firearms and magazines with a capacity of more than ten rounds – the challenged

provisions also effectively ban countless handguns and long-guns that come equipped from the

factory with ammunition feeding devices capable of accepting more than ten rounds.  Due to the

popularity of each of the restricted firearms and magazines, and because of their effectiveness for

personal defense, these items are also widely used (and often preferred) by countless off-duty

officers, and countless more retired law enforcement officers, in their homes.  Accordingly, law-

abiding citizens, including members of the law enforcement community, are guaranteed the right

to acquire, possess, and use them for lawful purposes, including self-defense.  *District of

Columbia v. Heller*, 554 U.S. 570, 624.[3]

The Court need not go any further to rule on the challenged provisions. Without resort to

any means-end level of scrutiny, *Heller* categorically invalidated the D.C. handgun ban because it

prohibited a class of arms overwhelmingly chosen by Americans for lawful purposes. 554 U.S. at

628-29. Here too, the challenged laws serve as a flat prohibition on protected arms, and, in light

of *Heller*, they are necessarily unconstitutional. As the Second Circuit in *Kachalsky v. County of

Westchester*, 701 F.3d 81, 89 n.9 (2d Cir. 2012) recognized, "where a state regulation is entirely

inconsistent with the protections afforded by an enumerated right – as understood through that

right's text, history, and tradition – it is an exercise in futility to apply means-end scrutiny."

To the extent the Court is inclined to apply a means-end approach based (at least in part)

---

[3]  A ban on the acquisition, sale, transport, or manufacture of protected arms is the functional
equivalent of a ban on possession and requires equally exacting review. Fundamental rights protect
the purchase of items protected by that right, regardless of whether that corollary appears directly
in the text of the right itself. *See Richmond Newspapers v. Virginia*, 448 U.S. 555, 579-80 (1980).
It is well settled that individuals have an inherent right to access constitutionally protected items.
*See, e.g.*, *Carey v. Population  Servs. Int'l*, 431 U.S. 678, 687-89 (1977); *Griswold v. Connecticut*,
381 U.S. 479, 485-86 (1965); *Brown v. Entm't Merchs. Ass'n*, 131 S. Ct. 2729, 2738 (2011);
*Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 253 (2002).

on the severity of a given restriction, any test that would apply mere rational basis to laws that impose more than a de minimis or incidental burden on the right to arms directly conflicts with *Heller*. The explicit nature of the right to arms precludes application of rational basis review. *Heller*, 554 U.S. at 628 n.27. Whatever else *Heller* left for future courts to decide, it is clear on at least this point. *Id.* Accordingly, a law that directly restricts Second Amendment conduct necessarily burdens the right and *requires* heightened scrutiny. *See, e.g.*, *Ezell v. City of Chicago*, 651 F.3d 684, 701 (7th Cir. 2011); *United States v. Marzzarella*, 614 F.3d 85, 95-96 (3d Cir. 2010). Meaningful judicial review cannot be avoided simply by calling such a restriction not quite "substantial" enough.[4]

In light of *Heller*'s clear direction on this point, the majority of circuits that have decided the issue apply some form of heightened scrutiny to all regulations that impose more than a de minimis burden on Second Amendment activity. *See, e.g.*, *GeorgiaCarry.org. v. Georgia*, 687 F.3d 1244, 1260 n.34 (11th Cir. 2012); *Heller II*, 670 F.3d at 1252; *Ezell*, 651 F.3d at 706;

---

[4]   Justice Scalia, *Heller*'s author, has decried the contention that a law that directly regulates a fundamental right is valid unless it imposes an "undue" or "substantial" burden:

> [A] law of general applicability which places only an incidental burden on a fundamental right does not infringe that right, . . . but that principle does not establish the quite different (and quite dangerous) proposition that a law which *directly* regulates a fundamental right will not be found to violate the Constitution unless it imposes an "undue burden." It is that, of course, which is at issue here: Pennsylvania has *consciously and directly* regulated conduct that our cases have held is constitutionally protected. The appropriate analogy, therefore, is that of a state law requiring purchasers of religious books to endure a 24-hour waiting period, or to pay a nominal additional tax of 1¢. The joint opinion cannot possibly be correct in suggesting that we would uphold such legislation on the ground that it does not impose a "substantial obstacle" to the exercise of First Amendment rights.

*Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 987-88 (1992) (Scalia, J., dissenting) (citations omitted).

*United States v. Masciandaro*, 638 F.3d 458, 469, 471 (4th Cir. 2011); *United States v. Chester*, 628 F.3d 673, 680 (4th Cir. 2010); *United States v. Reese*, 627 F.3d 792, 800-01 (10th Cir. 2010); *Marzzarella*, 614 F.3d at 94-95.

Despite this developing consensus, the Second Circuit applied mere rational basis scrutiny in a case challenging restrictions on Second Amendment conduct, holding that "heightened scrutiny is appropriate only as to those regulations that substantially burden" the right. *United States v. Decastro*, 682 F.3d 160, 164 (2d Cir. 2012). *Decastro* is unclear as to what constitutes a "substantial burden," but to the extent the analysis excludes from heightened scrutiny all burdens falling somewhere between de minimis and substantial, it is improperly applied to the Second Amendment. *Compare Decastro*, 682 F.3d at 164 (applying mere rational basis review to all burdens on the Second Amendment until they are deemed "substantial"), *with Heller II*, 670 F.3d at 1255-56 (recognizing that, while a de minimis burden might not warrant heightened scrutiny, *Heller* "clearly does reject any kind of 'rational basis' " test for evaluating laws directly regulating Second Amendment conduct).

Because the challenged provisions impose a ban on arms that are, as Amici have observed on the front lines, overwhelmingly used by law-abiding citizens, the laws are per se invalid.

Should the Court nonetheless apply the *Decastro* substantial burden test, the challenged provisions still require heightened scrutiny because they impose a substantial burden on protected conduct. Indeed, it is difficult to imagine a greater burden on protected arms than an outright ban on their possession.[5]  Certainly, the Supreme Court could think of nothing. *Heller*, 554 U.S. at

---

[5]  New York's ban on the manufacture and transport of such firearms is equally burdensome. One would be hard pressed to find a more severe restriction on the right to purchase constitutionally protected goods than a law that prohibits the making of such goods and subsequent transport of those goods for sale. *See, e.g.*, *Reliable Consultants*, 517 F.3d at 741, 742 & n.16, 744 (restriction on sale of sex toys, although not a total ban, nevertheless "*heavily burden*[*ed*] a

629 ("Few laws in the history of our Nation have come close to the severe restriction of the

District's handgun ban"). And it is no answer to say the laws do not impose a substantial burden

simply because Plaintiffs have access to other arms sufficient for self-defense and other lawful

purposes. Under that logic, a flat ban on *all* firearms would be subject only to rational basis

review so long as swords were permitted. Such would certainly defy the Supreme Court's

instruction in *Heller*. *Id.* at 628 n.27; *see also id.* at 629 ("It is no answer to say, as petitioners do,

that it is permissible to ban the possession of handguns so long as the possession of other

firearms (i.e., long guns) is allowed.").

   The only remaining question is which level of heightened scrutiny applies to laws that,

like those at issue here, substantially burden protected conduct. In *Decastro*, the Second Circuit

initially left that question unanswered, 682 F.3d at 164-65; but the court later clarified that

"applying less than strict scrutiny when the regulation does not burden the 'core' protection of

self-defense in the home" is appropriate, *Kachalsky*, 701 F.3d at 93-94. To the extent

intermediate scrutiny is *ever* appropriate when a law directly and substantially burdens Second

Amendment conduct,[6] *Kachalsky* suggests that it does not apply here, where the law strikes at the

very "core" of the right – i.e, the right of law-abiding adults to possess protected arms in their

---

constitutional right") (emphasis added).

   [6] Amici note that the substantial burden test, as applied in *Decastro* and *Kachalsky*, is greatly flawed. When the Ninth Circuit in *Nordyke v. King*, 644 F.3d 776, 782-88 (9th Cir. 2011), formulated the substantial burden test adopted by the Second Circuit in *Decastro*, it drew heavily from doctrines generated in other rights contexts – doctrines in which laws that substantially burden fundamental rights are *unconstitutional per se* or, at least, subject to strict scrutiny. *See, e.g.*, *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 451-52 (2008); *Gonzales v. Carhart*, 550 U.S. 124, 146 (2007); *Burdick v. Takushi*, 504 U.S. 428, 432 (1992); *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989); *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 (1984); *see also* Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense*, 56 UCLA L. Rev. 1443, 1454 n.39 (2009). Accordingly, if a substantial burden test is appropriate in the Second Amendment context, nothing less than strict scrutiny must apply.

homes for self-defense. Instead, strict scrutiny must apply.

Regardless, the challenged laws cannot survive any level of heightened scrutiny because, as Amici explain, they are not sufficiently linked to any purported public safety concerns.

### B.     The Challenged Laws Do Not Assist Law Enforcement In Combating Violent Crime, And Serve To Decrease Public Safety

Amici take their duties to protect the citizenry and defend American liberties very seriously.  New York Sheriffs have sworn an oath to uphold the United States Constitution, and thus cannot be expected to enforce unconstitutional laws.  N.Y. Const. art. 13, § 1.  To this end, Amici are compelled to express their concerns over the justification for the challenged provisions' curtailment of constitutional rights, and their observations should be afforded significant weight.

Of course, it is not just Amici who have taken exception with the challenged provisions. Local opposition to the new laws has been overwhelming.  Over 50 counties and 160 cities and towns formally expressed their opposition to the challenged provisions, as well as 13 sheriffs and 4 law enforcement organizations. In fact, a large majority of counties went so far as to adopt resolutions opposing the legislation, while not a single county passed a resolution supporting the measures. NY Safe Resolutions, www.nysaferesolutions.com (compiling resolutions and opposition letters against the Act from local government and law enforcement) (last visited May 8, 2013).

The widespread opposition to the laws stemmed largely from the failure of the Legislature to consider relevant testimony and evidence before adopting the challenged provisions – evidence that decisively shows the laws do not advance any public safety interests. It is for these reasons the challenged provisions cannot survive meaningful judicial review.

Under heightened scrutiny, whether intermediate or strict, the presumption of validity is reversed, with the challenged law presumed unconstitutional and the burden on the government to justify the law. *See R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992) (content-based speech regulations are presumptively invalid); *see also Chester*, 628 F.3d at 680 (explaining that "unless the conduct at issue is not protected by the Second Amendment at all, the Government bears the burden of justifying the constitutional validity of the law"). To prevail under strict scrutiny, Defendants must establish that the challenged provisions are "narrowly tailored to serve a compelling state interest." *Reno v. Flores*, 507 U.S. 292, 302 (1993). And intermediate scrutiny requires the government to prove the challenged provisions are "substantially related to an important governmental objective." *Clark v. Jeter*, 486 U.S. 456, 461 (1988). As Amici are uniquely positioned to inform the Court, the challenged provisions are unwarranted under either standard.

While the government has a compelling interest in preventing crime, *United States v. Salerno*, 481 U.S. 739, 749 (1987), the Legislature "must have had a strong basis *in evidence* to support that justification." *Shaw v. Hunt*, 517 U.S. 899, 908 n.4 (1996) (emphasis added). Even under intermediate scrutiny, the government "must demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way." *Turner Broad. Sys. v. FCC*, 512 U.S. 622, 664 (1994) (plurality opinion); *see also Windsor v. United States*, 699 F.3d 169, 185 (2d Cir. 2012) (quoting *United States v. Virginia*, 518 U.S. 515, 533 (1996) ("The justification must be genuine, not hypothesized or invented post hoc in response to litigation.")). The government cannot "get away with shoddy data or reasoning" in doing so; the "evidence must fairly support [its] rationale . . . ." *City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425, 438 (2002).

9

Here, the bills creating the challenged provisions were introduced into the New York Legislature on January 14, 2013, and by January 15 – the very next day – it had already unceremoniously voted on, passed, and delivered them to Governor Cuomo for signature as an "emergency measure." S. 2230, 2013 Reg. Sess. (N.Y. 2013). There is no legislative history suggesting the Legislature considered a scintilla of evidence as to whether limiting the capacity of ammunition feeding devices to ten rounds (loaded with seven rounds when kept for self-defense) or prohibiting firearms with features unrelated to their lethality actually furthers public safety.[7]

There was no discussion concerning the impact on law enforcement, e.g., whether law enforcement officers consider the prohibited items a significant threat, or whether they believe depriving law-abiding people of the prohibited items would promote or harm public safety.  Nor was there any discussion of whether the funding of this large expansion of firearms regulation would result in diverting resources from other more crucial law enforcement functions, thereby decreasing public safety. And, while the Legislature appears to suggest the costs of enforcing the challenged provisions will fall on the state and "will be paid out of the Division of State Police capital budget," *id.*, local agencies expect to nevertheless incur additional costs in enforcing the challenged provisions – at least indirect ones – as there is no explanation of what costs the state will cover.

Had the Legislature considered the relevant evidence, it would have found that

---

[7] The challenged provisions do not define "assault weapon" based on a firearm's operation (e.g., rate of fire, velocity, etc.) concealability or, for the most part, any other measure of lethality or safety concern. Rather, the definition bans firearms based on characteristics that are either cosmetic or are intended to make a firearm more ergonomic to handle. There are a few exceptions, such as a bayonet mount and a grenade launcher. But either feature can be restricted itself, apart from the type of firearm it is attached to, which is already the case with grenade launchers under the laws of some states. See, e.g., Cal. Penal Code § 16460(a)(2).

prohibiting magazine capacity and so-called "assault weapons" is not even significantly, let alone

*substantially*, related to furthering either public or officer safety. As a former firearms examiner

for the Los Angeles County Sheriff's Department, Dwight Van Horn, once stated:

> [T]he claim that AK-47s or something called an "assault weapon" – which is
> simply a fabricated political and media term meant to vilify firearms that look like
> military arms but actually means whatever someone wants it to mean – is widely
> used by criminals, isn't true and never has been true.[8]

The evidence vindicates Mr. Horn's assessment. In fact, so-called "assault weapons"

"were used in only a small fraction of gun crimes prior to the [1994 Assault Weapon] ban: about

2% according to most studies and no more than 8%."[9]  From 1975 through 1992, only about one

percent of law enforcement officers murdered in the United States were killed with what could be

described as an "assault weapon." Kopel, *Threat to Police Officers* (citing March 1997 report

from the Urban Institute, under contract from the U.S. Department of Justice, concluding that

"police officers are rarely murdered with 'assault weapons' "). Those numbers remain essentially

unchanged today. According to the Federal Bureau of Investigation, *all* types of rifles combined

comprised only two percent of *all* homicide weapons in 2011, for civilians and law enforcement

officers. Uniform Crime Reports, Murder Victims by Weapon, 2007-2011, *available at*

http://www.fbi.gov/about-us/cjis/ucr/crime-in-the.u.s/2011/crime-in-the.u.s.-2011/tables/expand

ed-homicide-data-table-8. Thus, those rifles considered "assault weapons" under the challenged

---

[8]  David B. Kopel, *Are So-Called "Assault Weapons" A Threat to Police Officers?*, The Law
Enforcement Trainer (Sept./Oct. 1997), *available at* http://davekopel.org/2A/OpEds
/Are_Assault_Weapons_a_Threat_to_Police.htm [hereinafter Kopel, *Threat to Police Officers*].

[9]  Christopher S. Koper, Daniel J. Woods & Jeffrey A. Roth, "An Updated Assessment of the
Federal Assault Weapons Ban: Impacts on Gun Markets and Gun Violence, 1994-2003: Report to
the National Institute of Justice, United States Department of Justice," University of Pennsylvania,
June 2004, at 2, *available at* http://www.ncjrs.gov/pdffiles1/nij/grants/204431.pdf  [hereinafter
Koper, et al., "Impacts on Gun Markets and Gun Violence"].

provisions or that have magazine capacities over ten rounds account for, at most, two percent of deaths by *any* weapon, but likely only a fraction of that.

Moreover, a report funded by the U.S. Department of Justice explains that the data on shots fired in attacks involving firearms suggest that relatively few such attacks involve more than 10 shots fired. Koper, et al., "Impacts on Gun Markets and Gun Violence" at 3. This supports Amici's observation that such limits on magazine capacity are generally not a concern of law enforcement officers – unless, of course, it is their own magazines that are being limited. It is hard to imagine that any officer would intentionally limit himself or herself to magazines loaded with seven rounds in a self-defense situation, whether in the field or at home, where an officer's self-defense needs are equal to that of law-abiding citizens. It is likewise doubtful that any officer would suggest that a law-abiding person do so, and Amici certainly would not suggest it.  For, while firearm *attacks* generally consist of few shots fired (since the attacker has the element of surprise on his side), *self-defense* shootings are more likely to require more rounds, due to the surprise and stress of a sudden criminal attack or the presence of multiple assailants.

Accordingly, prohibitions on certain semi-automatic firearms and magazines containing more than 7 rounds do not further any public safety interests, and these restrictions may actually be detrimental to the safety of law-abiding citizens.  And it is not merely Amici's belief that these restrictions will fail to increase public safety. History has confirmed it.

In 1994, the federal government implemented laws similar to the challenged provisions. H.R. 3355, 103rd Cong. §§ 110101-110106 (1994). They were so ineffective in promoting public safety that they were allowed to expire in 2004. *See* H.R. 3355, 103rd Cong. § 110106. "There was no evidence that lives were saved, no evidence that criminals fired fewer shots during gun fights, no evidence of any good accomplished. Given the evidence from the researchers selected

by the Clinton-Reno Department of Justice, it was not surprising that Congress chose not to renew the 1994 ban."[10]

This is generally the prevailing view among law enforcement officers. In March of this year, PoliceOne[11] conducted a comprehensive survey of American law enforcement officers' attitudes on the topic of gun control. *Gun Policy & Law Enforcement: Where Police Stand on America's Hottest Issue*, Policeone.com, http://www.policeone.com/Gun-Legislation-Law-Enforcement/articles/6183787-PoliceOnes-Gun-Control-Survey-11-key-lessons-from-officers-perspectives (last accessed May 3, 2013).  More than 15,000 verified law enforcement professionals took part in the survey. *Id.* "Virtually all respondents (95 percent) say that a federal ban on the manufacture and sale of ammunition magazines that hold more than 10 rounds would not reduce violent crime." *Id.*  Likewise, 71 percent acknowledged that a federal ban on the manufacture and sale of some semi-automatic firearms, i.e., "assault weapons" would have no effect on reducing violent crime. *Id.*

New York law enforcement officers are no exception to this prevailing view. The Albany Police Officers Union, not given the opportunity to weigh in *before* the law's passage, wrote a scathing letter to Governor Cuomo and the Legislature demanding the repeal of the challenged provisions, specifically because they have observed that limitations on magazine capacity and so-

---

[10]  *What Should America Do About Gun Violence? Full Committee Hearing Before United States Senate Judiciary Committee*, 113th Cong. at 11 (2013) (written testimony of David B. Kopel, Research Director, Independence Institute) [hereinafter Senate Judiciary Committee Testimony of David Kopel]; *see also* Koper, et al., Impacts on Gun Markets and Gun Violence at 96.

[11]  PoliceOne is an organization whose mission "is to provide officers with information and resources that make them better able to protect their communities and stay safer on the streets. . . . With more than 1.5 million unique visitors [to its website] per month and more than 450,000 registered members, PoliceOne is becoming the leading destination for Law Enforcement professionals." PoliceOne.com, www.policeone.com/about (last visited May 2, 2013).

called "assault weapons" do nothing to further public safety. Letter from Thomas Maher,

President, Albany Police Officers Union (Apr. 15, 2013), *available at*

http://www.nysrpa.org/files/SAFE/ AlbanyPoliceUnionLetter.pdf.

Amicus New York State Sheriffs' Association similarly criticized the challenged

provisions, releasing a statement that:

> Classifying firearms as assault weapons because of one arbitrary feature
> effectively deprives people the right to possess firearms which have never before
> been designated as assault weapons. We are convinced that only law abiding gun
> owners will be affected by these new provisions, while criminals will still have
> and use whatever weapons they want. . . . It bears repeating that it is our belief
> that the reduction of magazine capacity will not make New Yorkers or our
> communities safer.

Sheriffs' Response to NYSAFE Act, http://www.nysheriffs.org/articles/sheriffs%E2%80

%99-response-ny-safe-act (last accessed May 3, 2013).

The Police Benevolent Association of the New York State Troopers, Inc. went so far as to

contend that the challenged provisions may in fact *decrease* officer safety, stating that they

"believe that actual enforcement of these new regulations will significantly increase the hazards

of an already dangerous job." Press Release, New York State Troopers PBA (Apr. 15, 2013),

*available at* http://www.syracuse.com/ news/ index.ssf/2013/04/ nys_troopers_have_widel

y_share.html. This is a valid concern, for demonizing the items being prohibited by the

challenged provisions as useful solely for evil is "a mean-spirited insult to the many police

officers who have chosen these very same guns and magazines as the best tools for the most

noble purpose of all: the defense of innocent life." Senate Judiciary Committee Testimony of

David Kopel at 3. It causes those officers to lose esteem among the otherwise supportive law-

abiding citizens, for it engenders hostility and mistrust toward officers among those who own

firearms and fear among those who do not. So not only is the essential resource of community

14

cooperation with law enforcement squandered, but the ranks of "criminals" – who were not such before – have effectively been increased at the expense of the numbers of the law-abiding.

For some reason, this wealth of evidence and perspective was ignored by the Legislature in passing the challenged provisions. But the Legislature's reasons for ignoring the evidence surrounding these provisions are ultimately irrelevant. For, the mere fact that it did so precludes the provisions from surviving *any* heightened standard of review. Regardless, as shown by Amici, the evidence strongly contradicts the value of the challenged provisions as public safety measures. As such, the challenged provisions are void under the Second Amendment and should be enjoined by this Court.

## II.    THE CHALLENGED PROVISIONS ARE FATALLY VAGUE

Amici strongly object to the State's passage of laws, like the challenged provisions, that law enforcement officers are inherently unable to fairly and uniformly enforce, in violation of essential due process guarantees.

Under the due process clause, a law must fail for vagueness unless it "give[s] the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972); *United States v. Strauss*, 999 F.2d 692, 697 (2d Cir.1993). Additionally, the law must provide "explicit standards" for the application of the law to prevent "arbitrary and discriminatory enforcement." *Grayned*, 408 U.S. at 108. The Supreme Court has recognized that "the requirement that a legislature establish minimal guidelines to govern law enforcement" is the "more important aspect of [the] vagueness doctrine." *Kolender v. Lawson*, 461 U.S. 352, 357-58 (1983).

Further, the rigor with which the vagueness standard is applied must increase if the challenged law limits the exercise of fundamental rights or imposes criminal sanctions. *Vill. of*

*Hoffman Estates v. Flipside*, 455 U.S. 489, 499 (1982). Because the laws at issue here restrict the fundamental right to keep and bear arms *and* levy criminal penalties, they trigger an elevated standard of vagueness review.[12]

Under any standard, Amici are unable to objectively determine which items are prohibited, and law enforcement resources will inevitably be wasted on the enforcement and prosecution of violations of the laws that will ultimately be dismissed or overturned.

**A.    Laws Impinging Upon Fundamental Rights Must Provide The Highest Levels of Clarity To Ensure Equitable Enforcement**

Because law enforcement officers are tasked with enforcing the challenged laws against individuals attempting to exercise their constitutional rights, it is imperative that the laws provide clear standards to guide law enforcement to protect against arbitrary enforcement.

It has long been held that laws entrenching upon constitutionally protected freedoms demand the greatest clarity. "[T]he vice of unconstitutional vagueness is further aggravated where . . . the statute in question operates to inhibit the exercise of individual freedoms affirmatively protected by the Constitution." *Bagget v. Bullitt*, 377 U.S. 360, 372 (1964). And the Second Circuit has confirmed that regulations limiting the exercise of constitutionally protected rights are subject to an "enhanced vagueness test," requiring more rigorous review than cases not touching upon constitutional rights. *Hayes v. N.Y. Atty. Grievance Comm. of the Eighth Judicial*

---

[12]    There is some tension as to whether the courts will apply the *Salerno* "void in all applications" test often referenced in general facial challenges, in the specific context of a facial *vagueness* claim. While courts often simply review a law for vagueness under the tests outlined in *Grayned*, in some instances, courts require vagueness in "all applications." *Vill. of Hoffman Estates*, 455 U.S. at 494 n.5. In others, courts have found laws unconstitutionally vague even in the face of clearly valid applications or when vagueness was found to "permeate" the challenged law. *Chicago v. Morales*, 527 U.S. 41, 55 (1999); *Kolender*, 461 U.S. at 358 n.8. Regardless of whether the Court applies one of these tests, the challenged laws must provide the heightened level of clarity required of laws that restrict constitutionally protected freedoms and are criminal in nature.

*Dist.*, 672 F.3d 158, 168 (2d Cir. 2012) (citing *Vill. of Hoffman Estates*, 455 U.S. at 499).

Although the courts have not yet had occasion to apply stricter vagueness standards to restrictions on Second Amendment freedoms, application of heightened vagueness review is consistent with Supreme Court precedent. While vagueness challenges implicating fundamental rights often arise in the First Amendment context, the Supreme Court has instructed that laws restricting constitutional freedoms demand greater clarity – absent any qualification that such freedoms must be enshrined by the First Amendment. *See Vill. of Hoffman Estates*, 455 U.S. at 499; *Kolender*, 461 U.S. at 358-62. Indeed, the Court in *Kolender v. Lawson* applied heightened vagueness review to a law restricting the "constitutional right to freedom of movement" and potentially raising First Amendment concerns. 461 U.S. at 358. But the Court did not limit its application of heightened review according to the law's impact on First Amendment liberties.

That heightened vagueness review has not yet been mandated in cases involving the right to keep and bear arms is not surprising.  For the Second Amendment has only recently been confirmed as protecting individual rights – freedoms that are indeed fundamental to our system of ordered liberty, and deserving of protections similar to the First Amendment. *Heller*, 554 U.S. at 595, 634-35; *McDonald v. City of Chicago*, 130 S. Ct. 3020, 3042 (2010).

In 2006, the Second Circuit took note of the potential application of the "sternest application" of vagueness review whenever fundamental rights are at stake, not merely those involving First Amendment conduct. *Farrell v. Burke*, 449 F.3d 470, 495 n.12 (2d Cir. 2006). Ultimately, however, the court declined to resolve the issue because, it found, the petitioner had not shown that the challenged law implicated other fundamental rights. *Id.* (citing *Vill. of Hoffman Estates*, 455 U.S. at 499).

More recently, the Eastern District of New York considered the application of heightened

17

vagueness review to a weapons possession prohibition the plaintiff argued implicated the Second

Amendment. *Small v. Bud-K Worldwide, Inc.*, 895 F. Supp. 2d 438 (E.D.N.Y. 2012). In

dismissing the plaintiff's vagueness challenge, the court noted that the statute was not void for

vagueness even under a stricter vagueness analysis, implying that such strict review may

rightfully be applied in cases implicating Second Amendment freedoms. *Id.* at 445 & n.7.

 Amici respectfully urge this court to apply a stricter vagueness analysis in the present

case to ensure greater clarity of laws that will inevitably require enforcement, via confiscation,

incarceration, or both, against otherwise law-abiding individuals attempting to exercise

fundamental rights.  Although the challenged provisions run afoul of Second Amendment

protections in their own right, the Second Amendment of course need not be violated in order to

trigger heightened vagueness review. Such an approach would defeat the purpose of  heightened

vagueness review, as challengers would simply bring suit under the violated right.

 Here, New York Penal Law sections 265.02(7) and 265.10(2) effectively ban the

purchase, transportation, and possession of the most popular rifle in the United States. *See supra*

Part I.A.; Pls.' Mot. Prelim. Inj. at 9-13; NRA Amicus Br. at 7-11. And sections 265.02(8) and

265.37 operate to limit the number of rounds law-abiding citizens may have at their ready for

self-defense. The Supreme Court has confirmed that the Second Amendment protects arms

typically possessed by law-abiding citizens, and identified that the right of self-defense is "core"

protected conduct that is at its zenith in the home. *Heller*, 554 U.S. at 635. At a minimum, laws

that criminalize the most common rifle in America today – a rifle that is often selected precisely

for its self-defense capabilities – impinge upon that core right. The same is true of laws banning

standard-capacity magazines that dictate to law-abiding citizens they may only use seven rounds

at a time to defend themselves within the sanctity of their own homes.  Moreover, the confusion

fomented by the challenged provisions will inevitably lead citizens to "steer far wider of the unlawful zone" of conduct "than if the boundaries of the forbidden areas were clearly marked," *Grayned*, 408 U.S. at 109, thus further inhibiting Second Amendment rights

In sum, because the challenged provisions restrict constitutionally protected freedoms, the highest levels of clarity are required to guide law enforcement.

**B.    The Court Should Apply a Heightened Vagueness Standard Because the Challenged Provisions Impose Criminal Sanctions and Lack a Scienter Requirement**

Regardless of whether fundamental rights are at issue, a strict vagueness test is warranted. As the Second Circuit has confirmed, the degree of vagueness tolerated in a statute also varies according to the nature of its penalties. Economic regulations are subject to a relaxed vagueness test, while laws with criminal penalties are subject to more stringent review. *VIP of Berlin, LLC v. Town of Berlin*, 593 F.3d 179, 186 (2d Cir. 2010) (internal citation omitted); *see also Vill. of Hoffman Estates*, 455 U.S. at 498-99. In accord with this notion, a scienter requirement may mitigate a law's vagueness. *Vill. of Hoffman*, 455 U.S. at 498-99.

Here, law enforcement officers are asked to enforce laws that impose felony and misdemeanor criminal sanctions.  N.Y. Pen. Law §§ 265.02(7),(8), 265.10(2),(3), 265.37.  And nothing in the law requires one to know that he or she is in possession of a magazine or a rifle that falls within the proscriptions of the challenged provisions. Because the laws levy criminal penalties and lack a scienter requirement, the Court should uphold them only if they meet appropriately strict standards of clarity, regardless of any impact on Second Amendment rights.[13]

---

[13] In *Peoples Rights Organization, Inc. v. City of Columbus*, 152 F.3d 522, 534 (6th Cir. 1998), the Sixth Circuit applied a "relatively stringent review" of an "assault weapons" ban. It did so without reference to the Second Amendment, which was not yet confirmed as an individual right.

C.    **The Challenged Provisions Fail To Provide Sufficient Guidance To Law Enforcement**

The challenged laws are brimming with vague terms that prevent equitable administration by law enforcement, as each provision incorporates confusing, undefined terms. Examples of particularly problematic provisions include: N.Y. Penal Law §§ 265.00(23), 265.02(8), 265.36 (criminalizing magazines having a capacity of more than ten rounds of ammunition); §§ 265.36, 265.37 (criminalizing possession of magazines that can be "readily restored or converted" to accept additional rounds of ammunition); §§ 265.00(22)(a) - (c), 265.02(7), 265.10(2), (3) (criminalizing certain firearms according to whether they have a "detachable" rather than a "fixed" magazine); and §§ 265.00(c)(viii), 265.02(7), 265.10(2), (3) (criminalizing semi-automatic "versions" of firearms restricted under federal law).

The vagueness doctrine primarily requires that these provisions "establish minimal guidelines to govern law enforcement." *Kolender*, 461 U.S. at 357-58. The challenged provisions cannot "entrust lawmaking to the moment-to-moment judgment of the policeman on his beat." *Chicago v. Morales*, 527 U.S. at 60.

Here, numerous provisions fail to establish minimal guidelines to govern law enforcement.  And further guidelines are essential, because officers do not have specialized knowledge concerning the firearms, magazine modifications and features the challenged provisions attempt to proscribe.

As an initial matter, some firearms have magazines that hold ten rounds if loaded with .357 magnum, but eleven rounds if loaded with .38 special.[14]  Amici Sheriffs and members of amici organizations are left to guess as to whether liability should be triggered where the capacity

---

[14] One such example is the popular model 1873 lever action rifle, a firearm so common it was a candidate for "the gun that won the west."

of tubular magazines for rifles and shotguns varies with the length of the cartridges used. Pls.'

Mot. Prelim. Inj. at 25 (citing *Peoples Rights Org. v. City of Columbus*, 152 F.3d 522, 536 (6th

Cir. 1998).  If an officer encounters one of these firearms, is the officer to seize the firearm and

arrest the individual, pursuant to sections 265.00(23), 265.02(8), and 265.36, because it is

capable of holding more than ten rounds of one type of ammunition? What if it is loaded with the

ammunition that only holds ten rounds? What if the firearm is unloaded, or if the individual is

unaware it can hold eleven rounds of a different type of ammunition?  Inevitably, officers will be

forced to decide on a case by case which firearms trigger confiscation and arrest, according to

their own interpretation of the laws, and according to their varying knowledge of firearms and

ammunition.

Of particular concern is the prohibition of magazines that "can be readily restored or

converted" to accept additional rounds of ammunition. N.Y. Penal Law §§ 265.36, 265.37.  As

suggested in Plaintiffs' Motion, the time it takes to modify a firearm or a magazine differs greatly

with an individual's knowledge, skill, access to tools, and the availability of parts.  This language

already created problems for law enforcement officers attempting to enforce former Penal Law

section 265.02.  Under that statute, retailers were investigated, arrested, and had licenses

suspended after modifying magazines pursuant to suggestions by law enforcement, who later

interpreted the statute differently due to the vagueness of the "readily restored or converted"

standard incorporated by that section.  Here too, Amici are at a loss as to what factory magazines

or modifications will prevent the magazine from being "*readily* restored or converted" to accept

additional rounds of ammunition. *See People Rights Org*., 152 F.3d at 538 (phrase "may be

*readily* assembled" in a firearms restriction is "unduly vague") (emphasis added).

Similarly, the challenged provisions provide no guidance to law enforcement officials

tasked with determining whether a firearm has a "fixed" versus a "detachable" magazine. N.Y. Penal Law §§ 265.00(22)(a) - (c), 265.02(7), 265.10(2), (3).  If tools are required to remove the magazine, is the magazine fixed or detachable? If the firearm must be disassembled (in part or entirely) to remove the magazine, will that trigger liability? Tellingly, California's "assault weapon" law (after which the challenged provisions were modeled in part) included clarifying regulations instructing that if a tool is required to remove the magazine, it is not considered detachable. Cal. Penal Code § 30515; Cal. Code Regs. tit. 11 § 5469(a). Without similar clarifying guidelines, law enforcement officers, including members of Amici organizations, are left to guess as to the meaning of the challenged provisions.

Finally, the Legislature's attempts to sweep in "*versions*," of firearms restricted under federal law fail to provide adequate guidelines to assist law enforcement.  N.Y. Penal Law §§ 265.00(c)(viii), 265.02(7), 265.10(2), (3) These provisions purport to ban firearms according to their similarity to firearms that are already prohibited.  This is extremely problematic for law enforcement officers, who are forced to exercise their own judgment as to whether a firearm is "similar enough" to a prohibited firearm to warrant confiscation and arrest.

A California Supreme Court case, although not controlling, is particularly instructive on this issue. In *Harrott v. County of Kings*, 25 Cal.4th 1138, 1143-44, 25 P.3d 649 (2001), the court considered a challenge to a provision of California's "assault weapon" ban, under which certain semi-automatic firearms could be added to the list of banned firearms if they were of the same "series" as models already prohibited under California law. In its opinion, the court quoted a letter from Senator Don Rogers to the Governor requesting the Governor's signature on Senate Bill No. 2444, a bill which required the Attorney General to produce an "Identification Guide" for firearms that were to be prohibited "assault weapons." *Id*. at 1162 n.4 (quoting Letter to

22

Governor Deukmejian Re: Sen. Bill No. 2444 (1989-1990 Reg. Sess.) Aug. 23, 1990). In that letter, Sen. Rogers stated:

> [A] great many law enforcement officers who deal directly with the public are not experts in specific firearms identification . . . . [¶] There are numerous makes and models of civilian military-looking semi-automatic firearms which are not listed by California as "assault weapons" but which are very similar in external appearance. This situation sets the stage for honest law-enforcement mistakes resulting in unjustified confiscations of non-assault weapon firearms.

*Id.*

Such mistakes, although innocently made, often result in unnecessary, time-consuming, and costly legal actions, both for law enforcement and for the lawful firearms owners affected. *Id.* Senator Rogers thus saw it as necessary to "assur[e] that law enforcement officers are assisted in the proper performance of their duties through having at their disposal a reliable means of accurately identifying each listed 'assault weapon.' " *Id.* Without the "Identification Guide," it was too likely that law enforcement officers would interpret and apply the law in an arbitrary and discriminatory manner because each officer's understanding of what constitutes an "assault weapon" could too easily differ from the next officer's understanding.

The court agreed, stating that "[n]ot only would ordinary citizens find it difficult, without the benefit of the Identification Guide, to determine whether a semiautomatic firearm should be considered an assault weapon, ordinary law enforcement officers in the field would have similar difficulty." *Id.* The same danger exists here. Just as the *Harrott* court observed that law enforcement officers could not be expected to be experts in the identification of "assault weapons" that are a "series" of a prohibited firearm, neither can law enforcement officers be expected to be experts in the identification of "assault weapons" that are a "version" of a firearm prohibited under federal law.

Ultimately, law enforcement are left to guess as to which items the challenged provisions were meant to prohibit. The lack of guidelines in these provisions will inevitably lead to "erratic arrests and convictions" that the due process clause was meant to prevent. *Papachristou v. City of Jacksonville*, 405 U.S. 156, 162 (1972).

Even if portions of the challenged provisions provided some standards, these statutes can, and should, provide greater clarity.  Law enforcement officers are assigned the daunting task of enforcing the laws, pursuant to their own interpretations, against individuals attempting to exercise their fundamental rights to keep and bear arms, with the very real possibility that their interpretations will result in the arrest and incarceration of otherwise law-abiding citizens.  Law enforcement should not be left to divert limited resources from crucial public safety functions attempting to enforce these provisions, only to have cases dismissed and convictions overturned.

## CONCLUSION

The challenged provisions criminalize the possession of protected arms – absent any nexus to a reduction in violence or criminal activity – in derogation of fundamental Second Amendment rights. Further, the laws fail to provide sufficient clarity to promote equitable enforcement, in violation of due process guarantees.  For these reasons, Amici respectfully request this Court issue an injunction enjoining enforcement of the challenged provisions.

Date:  May 14, 2013

| MICHEL & ASSOCIATES, P.C. | BRENNA, BRENNA AND BOYCE, PLLC |
|---|---|
| /s/ C. D. Michel | /s/ Sheldon W. Boyce, Jr. |
| C. D. Michel* | Sheldon W. Boyce, Jr. |
| Attorney for Amici Curiae | Attorney for Amici Curiae |
| Michel & Associates, P.C. | Brenna, Brenna and Boyce, PLLC |
| 180 E. Ocean Blvd., Ste. 200 | 31 East Main Street, Suite 2000 |
| Long Beach, CA 90802 | Rochester, NY 14614 |
| (562) 216-4444 | (585) 454-2000 |
| *Pro hac vice application forthcoming* | |

24

**CHAMBERLAIN, KAUFMAN AND JONES**
Jeffrey Chamberlain
Attorney for Amici Curiae
Chamberlain Kaufman and Jones
35 Fuller Road
Albany, NY 12205
(518) 435-9426
jeffc@flsa.com

## CERTIFICATE OF SERVICE

I hereby certify that on May 14, 2013, an electronic PDF of this [Proposed] Amici Curiae Brief of New York State Sheriffs' Association, Timothy B. Howard, Erie County Sheriff, Reuel A. Todd, Oswego County Sheriff, Barry C. Virts, Wayne County Sheriff, Donald B. Smith, Putnam County Sheriff, Thomas J. Lorey, Fulton County Sheriff, the Law Enforcement Legal Defense Fund, Law Enforcement Action Network, and the International Law Enforcement Educators and Trainers Association was uploaded to the Court's CM/ECF system, which will automatically generate and send by electronic mail a Notice of Docket Activity to all registered attorneys participating in the case. Such notice constitutes service on the following registered attorneys.

Brian T. Stapleton
GOLDBERG SEGALLA LLP
11 Martine Avenue, Suite 750
White Plains, New York 10606-1934

Stephen P. Halbrook, Esq.
3925 Chain Bridge Road, Suite 403
Fairfax, Virginia

Benjamin K. Ahlstrom
NEW YORK STATE ATTORNEY GENERAL'S OFFICE
Main Place Tower
Suite 300A
350 Main Street
Buffalo, NY 1420

Kevin M. Kearney
Hodgson Russ LLP
The Guaranty Building, Suite 100
140 Pearl Street
Buffalo, NY 14202

And I hereby certify that I have mailed the foregoing, by the United Sates Postal Service, to te following Defendant, whose counsel has yet to enter an appearance in the case:

Lawrence Friedman
District Attorney for Genesee County
Genesee County District Attorney's Office
One West Main Street
Batavia, NY 14020

**MICHEL & ASSOCIATES, P.C.**

/s/ C. D. Michel
C. D. Michel*
Attorney for Amici Curiae
Michel & Associates, P.C.
180 E. Ocean Blvd., Ste. 200
Long Beach, CA 90802
(562) 216-4444

*\* Pro hac vice application forthcoming*


**CHAMBERLAIN KAUFMAN AND JONES**
Jeffrey Chamberlain
Attorney for Amici Curiae
Chamberlain Kaufman and Jones
35 Fuller Road
Albany, NY 12205
(518) 435-9426
jeffc@flsa.com

**BRENNA, BRENNA AND BOYCE, PLLC**

/s/ Sheldon W. Boyce, Jr.
Sheldon W. Boyce, Jr.
Attorney for Amici Curiae
Brenna, Brenna and Boyce, PLLC
31 East Main Street, Suite 2000
Rochester, NY 14614
(585) 454-2000