UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
Buffalo Division

| | |
|---|---|
| NEW YORK STATE RIFLE AND PISTOL ASSOCIATION, INC., et al., | |
| Plaintiffs, | |
| v. | Case No.: 13-cv-00291-WMS |
| ANDREW M. CUOMO, et al., | |
| Defendants. | |

**BRIEF OF AMICI CURIAE BRADY CENTER TO PREVENT GUN VIOLENCE, THE POLICE FOUNDATION, AND MAJOR CITIES CHIEFS ASSOCIATION IN SUPPORT OF DEFENDANTS**

*Counsel for Amicus Curiae*

Kristin Graham Koehler
James E. Mendenhall*
Lisa E. Jones*
Sidley Austin LLP
1501 K. St., NW
Washington, DC 20005
(202) 736-8000
kkoehler@sidley.com
jmendenhall@sidley.com
lisa.jones@sidley.com
* *Pro hac vice application pending*

*Of Counsel*

Jonathan E. Lowy
Brady Center to Prevent Gun Violence
Legal Action Project
1225 Eye Street, NW, Suite 1100
Washington, DC 20005
(202) 898-0792
jlowy@bradymail.org

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................... ii

STATEMENT OF INTEREST ................................................................................... 1

SUMMARY .............................................................................................................. 2

I.   Overview ............................................................................................................ 3

II.  The Standard for Determining Whether the SAFE Act Is Consistent With the Second Amendment ................................................................................................. 3

III. The Weapons Regulated by the SAFE Act Are Not Protected by the Second Amendment ... 4

  A.  The Weapons Possessing the Regulated Characteristics Are Not Commonly Used ........... 5

  B.  The Weapons Possessing the Regulated Characteristics Are Not in Common Use at the Relevant Time ................................................................................. 7

  C.  The Characteristics Prohibited by the SAFE Act Are Not Related to Self-Defense in the Home ......................................................................................... 9

  D.  The Weapons Prohibited by the SAFE Act Are Dangerous and Unusual ......................... 12

IV. Even Assuming *Arguendo* That the SAFE Act Implicates the Second Amendment, New York's Legislation is Constitutional .......................................................... 15

  A.  Strict Scrutiny is Not Appropriate For Plaintiffs' Second Amendment Challenges .......... 15

    1.  Applying Strict Scrutiny is Inconsistent with *Heller, McDonald,* and Second Circuit Precedent ................................................................................ 15

    2.  Intermediate Scrutiny is the Accepted Standard ........................................... 17

    3.  The Requirements of the SAFE Act Are Reasonable and Satisfy Intermediate Scrutiny Review ............................................................................... 20

CONCLUSION ......................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

Cᴀꜱᴇꜱ

*Arnold v. Cleveland,*
  616 N.E. 2d 163 (Ohio 1993) ............................................................................21

*Burdick v. Takushi,*
  504 U.S. 428 (1992) ...............................................................................19, 22

*Clark v. Jeter,*
  486 U.S. 456 (1988) ...........................................................................................19

*District of Columbia v. Heller,*
  554 U.S. 570 (2008) ........................................................................... *passim*

*English v. State,*
  35 Tex. 473 (1871) ..........................................................................................13

*Heller v. District of Columbia,*
  670 F.3d 1244 (D.C. Cir. 2011) ("*Heller II*") ...................................................1, 23

*Kachalsky v. County of Westchester,*
  701 F.3d 81 (2d Cir. 2012) .........................................................................9, 17

*Lewis v. United States,*
  445 U.S. 55 (1980) ...........................................................................................18

*McDonald v. City of Chicago,*
  130 S. Ct. 3020 (2010) ..................................................................... *passim*

*Navegar, Inc. v. United States,*
  192 F.3d 1050 (D.C. Cir. 1999) .........................................................................21

*Nordyke v. King,*
  563 F.3d 439 (9th Cir. 2009) ...........................................................................10

*NRA v. ATF,*
  700 F.3d 185 (2012) .........................................................................................18

*Peterson v. Martinez,*
  707 F.3d 1197 (10th Cir. 2013) .........................................................................18

*United States v. Chester,*
  628 F.3d 673 (4th Cir. 2010) ............................................................................18

*United States v. Decastro,*
   682 F.3d 160 (2d Cir. 2012)...................................................................4, 10, 17

*United States v. Hayes,*
   555 U.S. 415 (2009)..........................................................................................1

*United States v. Marzzarella,*
   614 F.3d 85 (3d Cir. 2010)..................................................................... *passim*

*United States v. Miller,*
   307 U.S. 174 (1939)..........................................................................................7

*United States v. Skoien,*
   614 F.3d 638 (7th Cir. 2010) ...........................................................................1

*Yick Wo v. Hopkins,*
   118 U.S. 356 (1886).........................................................................................19

## STATUTES

18 U.S.C. § 922 ................................................................................................21

18 U.S.C. § 923 (2000 & Supp. V 2005).........................................................21

18 U.S.C. § 930 (2000 & Supp. V 2005).........................................................21

Albany City Code §§ 193-13 through 193-15 ...................................................6

Buffalo City Code § 180-1..................................................................................6

Env. Cons. Law § 11-0391 .................................................................................6

N.Y. City Admin. Code § 10-306........................................................................6

Rochester City Code § 47-5 ................................................................................6

## OTHER AUTHORITIES

Council of D.C., Comm. on Pub. Safety & The Judiciary, Report on Bill 17-843 (Nov.
   25, 2008) ........................................................................................................21

Cornell & DeDino, *A Well Regulated Right, The Early American Origins of Gun Control,*
   73 Fordham L. Rev. 487 (2005)......................................................................16

Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense:An
   Analytical Framework and a Research Agenda,*56 UCLA L. Rev. (2009)............................12

Gary Kleck & Marc Gertz, *Armed Resistance to Crime: The Prevalence and Nature of
   Self-Defense With a Gun,* 86 J. Crim. L. & Criminology 150 (1995) ....................................21

Lawrence Rosenthal & Joyce Lee Malcolm, *McDonald v. Chicago: Which Standard of Scrutiny Should Apply to Gun Control Laws?* 105 Nw. U. L. Rev. 437 (2011)....................16

*American Under the Gun: A Special Report on Gun Laws and the Rise of Mass Shootings*, Mother Jones (Dec. 2012), *available at* http://www.motherjones.com/special-reports/2012/12/guns-in-america-mass-shootings ...........................................................................................................................22, 23

Brady Center to Prevent Gun Violence, *Assault Weapons: "Mass Produced Mayhem"* (Oct. 2008), *available at* http://www.gs2ac.com/flyers/2008/200810_mass-produced-mayhem.pdf ..........................................................................................................11, 23

Bureau of Justice Statistics, *Crimes committed with firearms,* 1973-2007, *available at* http://bjs.ojp.usdoj.gov/content/glance/tables/guncrimetab.cfm .............................................25

Center for Disease Control National Center for Injury Prevention and Control, Web-based Injury Statistics Query and Reporting System ("WISQARS"), *available at* http://www.cdc.gov/injury/wisqars/index.html (last visited on June 20, 2013). ....................24

Christopher Koper, *American's Experience with the Federal Assault Weapons Ban, 1994-2004,* in *Reducing Gun Violence in America* 167 (Daniel W. Webster and Jon S. Vernick eds.) (2013) ............................................................................................................14

Christopher Koper, *An Updated Assessment of the Federal Assault Weapons Ban:Impacts on Gun Markets and Gun Violence, 1994-2003,* Report to the National Institute of Justice, U.S. Dep't of Justice (June 2004), *available at* https://www.ncjrs.gov/pdffiles1/nij/grants/204431.pdf.............................................................8

Gary Kleck, *Point Blank, Guns & Violence in America* (paperback ed., 2005)............................12

Kevin Ashton, *The Physics of Mass Killing,* the internet of things and other things (Jan. 24, 2013), *available at* http://kevinjashton.com/2013/01/24/the-physics-of-mass-killing/ ...................................................................................................................................15

Mark Follman, Gavin Aronsen and Jaeah Lee, *More than half of mass shooters used assault weapons and high-capacity magazine,* Mother Jones (Feb. 27, 2013), *available at* http://www.motherjones.com/politics/2013/02/assault-weapons-high-capacity-magazines-mass-shootings-feinstein.................................................................22, 23

Mayors Against Illegal Guns, *Mass Shootings Since January 20, 2009* (2013), *available at* http://www.minnpost.com/sites/default/files/attachments/mass_shootings_2009-13_-_jan_29_12pm.pdf.......................................................................................................15

National Shooting Sports Federation, *Modern Sporting Rifle (MSR) – Comprehensive Consumer Report 2010*, a*vailable at* http://nssf.org/share/PDF/MSRConsumerReport2010.pdf. .......................................................7

Zawitz, U.S. Dep't of Justice, Bureau of Justice Statistics, *Guns Used in Crime* (1995) ..............8

iv

**Statement of Interest**

The Brady Center to Prevent Gun Violence, the Police Foundation, and Major City Chiefs are filing this brief as *amici curiae* in support of Defendants.  This brief principally addresses the current legal standard for Second Amendment protection of restrictions on the possession for firearms and the standard of review of such restrictions.  This brief also elaborates on arguments presented by Defendants and other *amici*.

The Brady Center has a substantial interest in ensuring that the Second Amendment is not interpreted to inhibit strong government action to prevent gun violence and protecting families and communities.  Through its Legal Action Project, the Brady Center has filed numerous amicus curiae briefs in cases involving firearms regulations, including *McDonald v. City of Chicago*, 130 S. Ct. 3020 (2010), *United States v. Hayes*, 555 U.S. 415, 427 (2009) (citing Brady Center brief), *District of Columbia v. Heller*, 554 U.S. 570 (2008), *Heller v. District of Columbia*, 670 F.3d 1244 (D.C. Cir. 2011) ("*Heller II*"), and *United States v. Skoien*, 614 F.3d 638 (7th Cir. 2010) (en banc).

The Police Foundation is America's oldest national, nonpartisan, nonprofit police research organization.  Its mission is to advance policing through innovation and science.  The foundation has a long history of promoting public policies that enhance safety of law enforcement officers and the public they serve.

The Major Cities Chiefs Association is comprised of police executives heading the sixty-six largest police departments in the United States which protect approximately forty percent of America's population.

**Summary**

Assault weapons are enablers of violent crime and mass murder.  Plaintiffs argue that the number of crimes involving assault weapons is small compared to the total number of gun crimes.  In fact, assault weapons are used disproportionately in violent crime, but, regardless, Plaintiffs miss the broader point.  Mass slaughters terrorize society at large, undermine the public's sense of safety and security, and burden the community with latent fear and uncertainty.

After the expiration of the federal assault weapons ban in 2004, State and local governments have sought to fill the void.  The process has moved slowly, as legislatures have grappled with the difficult policy and legal issues involved.  The gun market, however, has been much more nimble.  Immediately after the expiration of the federal assault weapons ban, and before the New York State legislature acted, sales of assault weapons sharply increased.  Now, Plaintiffs argue, it is too late.  The legislature did not act quickly enough, they say, and now that the market is glutted with assault weapons, the sheer popularity of the weapons entitles the guns to Second Amendment protection.  Furthermore, Plaintiffs argue, such protection is so absolute that the legislature has no discretion to restrict the most dangerous assault weapons despite the overwhelming public policy interest in doing so.

Plaintiffs misconstrue the Second Amendment.  It does not protect dangerous and unusual weapons such as those restricted by the Secure Ammunition and Firearms Enforcement (SAFE) Act of 2013.  Nor does it protect secondary characteristics of guns that do not relate to the basic functionality of the weapon for purposes of self-defense.  It protects only weapons that are in common use for lawful purposes, and even then, legislatures have the authority to regulate such weapons to protect the public interest.  Under this standard, the SAFE Act is Constitutional.

## I.     Overview

The SAFE Act does not prohibit all guns, or even all semiautomatic weapons.  It prohibits only semiautomatic weapons that have particular secondary characteristics, such as certain pistol grips, and places limitations on the size of magazines and the number of rounds that may be loaded into a magazine.  None of these characteristics relates to the basic functionality of the weapon for self-defense.  Other semiautomatic weapons are permitted, and those weapons are equally suited (if not more so) for self-defense.  Plaintiffs, however, seek to extend Second Amendment protection to weapons that are, at their core, military-style weapons and large magazines, including those that enable firing 30 rounds or more, which have no meaningful use other than killing masses of people.

Plaintiffs' preliminary injunction motion addresses only two sections of the SAFE Act: (1) the ban on rifles and shotguns containing certain features that bring them within the definition of "assault weapons"; and (2) the prohibition against magazines with a capacity greater than ten rounds, and the requirement to load no more than seven rounds in a magazine.

As discussed below, these restrictions do not burden Plaintiffs' Second Amendment rights, and, therefore, this Court need not address the appropriate standard of review.  In any event, even if the restrictions did implicate the Second Amendment, the only appropriate standard for assessing the constitutionality of the SAFE Act is intermediate scrutiny, a standard which the Act patently meets.

## II.    The Standard for Determining Whether the SAFE Act Is Consistent With the Second Amendment

In *District of Columbia v. Heller,* 554 U.S. 570 (2008), the Supreme Court assessed the constitutionality of a Washington, D.C. gun regulation.  The Court first examined whether the particular weapons being regulated fell within the scope of Second Amendment protection, and

3

then, after concluding that the weapons were protected, whether the restriction at issue violated the Second Amendment.  *See Heller,* 554 U.S. at 628-635.[1]

Several courts, including the Second Circuit, have refined the second step of the analysis and have examined the relative burden on the Second Amendment right in order to identify the appropriate level of scrutiny.  As stated in *Decastro*:

> Given *Heller*'s emphasis on the weight of the burden imposed by the D.C. gun laws, we do not read the case to mandate that any marginal, incremental or even appreciable restraint on the right to keep and bear arms be subject to heightened scrutiny.  Rather, heightened scrutiny is triggered only by those restrictions that (like the complete prohibition on handguns struck down in *Heller*) operate as a substantial burden on the ability of law-abiding citizens to possess and use a firearm for self-defense (or for other lawful purposes).

*United States v. Decastro,* 682 F.3d 160, 166 (2d Cir. 2012).  We follow that approach below.

### III.   The Weapons Regulated by the SAFE Act Are Not Protected by the Second Amendment

Under the first prong of the *Heller* test, a court must determine whether the weapons that are the subject of regulation fall within the scope of protection of the Second Amendment. *Heller* stands for the proposition that a weapon is only protected if it is (A) commonly used (B) "at the time" (C) for self-defense in the home and (D) is not dangerous and unusual.  The regulated weapons must meet each of these criteria in order to qualify for protection.  The weapons that are regulated by the SAFE Act do not meet any of these criteria and, therefore, are not protected by the Second Amendment.

---

[1] *See also United States v. Marzzarella,* 614 F.3d 85, 89 (3d Cir. 2010) (stating that *Heller* "suggests a two-pronged approach to Second Amendment challenges.  First, we ask whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's guarantee. . . . If it does not, our inquiry is complete.  If it does, we evaluate the law under some form of means-end scrutiny.  If the law passes muster under that standard, it is constitutional.  If it fails, it is invalid.").

## A.    The Weapons Possessing the Regulated Characteristics Are Not Commonly Used

In *Heller*, the Supreme Court held that "the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes . . . ." 554 U.S. at 625.  The Court noted that historically "the sorts of weapons protected were those 'in common use . . ..'"  *Id.* at 627.  According to *Heller*, possession in the home of all handguns could not be totally banned because they are "*overwhelmingly chosen* by American society" for self-defense. *Id.* at 629 (emphasis added).  Handguns are essentially in a class by themselves.  According to the Court, "the American people have considered the handgun to be the *quintessential self-defense weapon*," and "[w]hatever the reason, handguns are *the most popular weapon chosen by Americans* for self-defense in the home . . . ." *Id.* (emphasis added).  No other weapon has been shown to be as popular, and the Court did not explain whether any lower level of "use" could be deemed "common."  However, under any reasonable interpretation, the weapons regulated by the SAFE Act are not in common use for several reasons.

First, there is no evidence that the level of use of weapons regulated by the SAFE Act remotely approaches the level of handgun use.  The assault weapons that Plaintiffs focus upon – semiautomatic rifles and shotguns that possess the characteristics identified by the SAFE Act – are not the "quintessential self-defense weapon" or "the most popular weapon chosen by Americans for self-defense in the home."  Plaintiffs do not even attempt to argue otherwise.

Second, there is no evidence whatsoever that the weapons regulated by the SAFE Act are commonly used for lawful self-defense *in New York State*.  Plaintiffs present national production and sales figures, none of which provide an indication of how prevalent the weapons at issue are in New York.  Certainly, there is no evidence that New York gun owners typically use more than seven rounds at a time from a single magazine.  In fact, pre-existing New York laws impose a six

round hunting load limit.[2]  Several cities in New York also have gone further than either state or federal law in setting magazine capacity and limits on the number of rounds which can be loaded for certain firearms.[3]

Third, even if semiautomatic weapons are in common use, the SAFE Act does not prohibit such weapons.  Plaintiffs do not complain that the SAFE Act prohibits a particular class of weapons (such as semiautomatic rifles) – it clearly does not – but that the SAFE Act prohibits certain secondary characteristics (such as a hand grip) that are incorporated into certain of those weapons.  Plaintiffs cite no legal basis for asserting that the Second Amendment protects secondary characteristics that do not relate to the basic functionality of the weapon, in this case, the ability of the weapon to load and fire bullets semi-automatically for purposes of self-defense.  Nevertheless, if one were to accept the theory that secondary characteristics are protected, the relevant constitutional inquiry would not be whether semiautomatic weapons as a class are in common use but rather whether semiautomatic weapons *with the particular characteristics at issue* are commonly used.  There is no evidence that they are.

Plaintiffs assert (Mot. at 10) that "AR-15s accounted for at least seven percent of firearms . . . made in the U.S. for the domestic market" in 2011.  (As noted, they provide no evidence of the level of use in New York).  It is simply not credible to assert that this amounts to "common use."  In any case, not all AR-15s possess each of the characteristics the SAFE Act regulates.  For example, according to the National Shooting Sports Foundation, only 60% of "modern

---

[2] Env. Cons. Law § 11-0391.

[3] *See* Buffalo City Code § 180-1(B)(five round limit for rifles and shotguns); Rochester City Code § 47-5 (five round limit for rifles and shotguns).  *See also* Albany City Code §§ 193-13 through 193-15; N.Y. City Admin. Code § 10-306.

sporting rifles" (semiautomatic rifles) have a collapsible/folding stock.[4]  Extrapolating from this

data, this would mean that only 4.2% of all such firearms are AR-15s with collapsible stocks.

The NSSF study also indicates that only 20% of modern sporting rifles have a permanent or non-

permanent muzzle break, slightly more than half have a permanent or non-permanent flash-hider,

and 62% have a threaded barrel.  There is, therefore, no basis for concluding that weapons with

each of the individual characteristics regulated by the SAFE Act are commonly used.

**B.     The Weapons Possessing the Regulated Characteristics Are Not in Common Use at the Relevant Time**

According to *Heller*, "the sorts of weapons protected were those 'in common use at the

time.'"  554 U.S. at 627.  The Court did not elaborate on what it meant by "at the time."  The

phrase originated in *Miller*, where the Court stated:

> The signification attributed to the term Militia appears from the debates in the Convention, the history and legislation of Colonies and States, and the writings of approved commentators. These show plainly enough that the Militia comprised all males physically capable of acting in concert for the common defense. "A body of citizens enrolled for military discipline." And further, that ordinarily, when called for service these men were expected to appear bearing arms supplied by themselves and of the kind *in common use at the time*.

*United States v. Miller*, 307 U.S. 174, 179 (1939) (emphasis added).  From this statement, it

might be understood that the relevant time for assessing whether a weapon is in common use is

the time when the Constitution was drafted.  *Heller* held that this was not the appropriate

reference point, but it did not give any indication of what the relevant "time" should be.

554 U.S. at 582.

---

[4] National Shooting Sports Federation, *Modern Sporting Rifle (MSR) – Comprehensive Consumer Report 2010* at 7, a*vailable at* http://nssf.org/share/PDF/MSRConsumerReport2010.pdf.

It would be unreasonable to look only to the day on which the statute was enacted as the relevant reference point.  Suppose, for example, that a new, unregulated and highly lethal weapon were developed before the statute was enacted. When it is first offered for sale, the weapon would not be protected because it would not be in common use.  However, if sales of the weapon grew explosively over the next year, prior to any legislation, then the weapon would, within that short period, become constitutionally protected, even though a ban would have been permissible had the legislature acted just a few months earlier.  Such an approach makes little sense.  If "common use at the time" is a relevant criterion, then the reference period must at least include a reasonable period of time for the legislature to assess and respond to changes in the marketplace by amending the law.

While semiautomatic rifles have existed for a long time, they were not in common use for self-defense throughout their existence.  In fact, the Sheriffs' brief demonstrates that large sales of AR-15s are a relatively recent phenomenon.  554 U.S. at 627.  Between 1986 and 2004, on average fewer than 100,000 AR-15s were sold annually.[5]  The weapons clearly were not in common use at that time, in part, because their use was prohibited by the federal weapons ban.  Purchases spiked after the expiration of the weapons ban in 2004, peaking in 2009 at well over 500,000 units sold.  It cannot be that, in 2004, a ban on AR-15s was constitutional but not five years later.

_____

[5] *See also,* Zawitz, U.S. Dep't of Justice, Bureau of Justice Statistics, *Guns Used in Crime* 6 (1995) (stating that assault weapons constituted about 1% of guns in circulation prior to federal assault weapons ban); Christopher Koper, *An Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets and Gun Violence, 1994-2003,* Report to the National Institute of Justice, U.S. Dep't of Justice at 10 (June 2004) ("Around 1990, there were an estimated 1 million privately owned AWs in the U.S. (about 0.5% of the estimated civilian gun stock)[.]").

Plaintiff's analysis is particularly absurd with respect to regulations covering, not the basic weapon (*e.g.*, semiautomatic rifles), but particular characteristics of that weapon, such as particular grips, that are even more likely than entirely new classes of weapons to grow quickly in popularity.  If a major gun manufacturer devised a particularly appealing hand grip, which it then incorporated into all of its otherwise standard rifles, hundreds of thousands of guns with that particular hand grip could be manufactured and sold then within a very short period of time. Under Plaintiff's argument, Second Amendment protection would then adhere not just to the category of gun (semiautomatic rifles) but to guns with that particular *hand grip*.

If "common use at the time" is the criterion to be applied, then "the time" must at least be understood to cover a historically representative period of time during which the weapons exhibiting the particular characteristic were available and widely used for purposes of self-defense.  There is no evidence that the weapons regulated by the SAFE Act were in common use for such a period.

### C.      The Characteristics Prohibited by the SAFE Act Are Not Related to Self-Defense in the Home

Even if plaintiffs could demonstrate that the weapons regulated by the SAFE Act were in "common use at the time," that alone would not be sufficient to bring the weapons within the scope of Second Amendment protection.  Such common use must have been for a lawful purpose.  The primary "lawful purpose" identified by the Supreme Court is self-defense within the home.  According to *Heller*, self-defense "was the *central component* of the right itself."[6] 554 U.S. at 599.  As stated in *Kachalsky v. County of Westchester,* 701 F.3d 81, 89 (2d Cir.

---

[6] *See also*, *McDonald v. City of Chicago*, 130 S. Ct. 3020, 3044 (2010) (the Supreme Court reiterated its "central holding in *Heller*" that "the Second Amendment protects a personal right to keep and bear arms for lawful purposes, most notably for self-defense within the home").

2012), "[w]hat we know from these decisions is that Second Amendment guarantees are at their zenith within the home."

Therefore, a critical question in determining whether the SAFE Act oversteps constitutional bounds is whether the regulation impinges on the ability of the weapons to serve their basic function of self-defense in the home.  Indeed, the functionality of the weapon was at the heart of the *Heller* decision, which examined the constitutionality of D.C. gun law that required that handguns be disabled in the home.  According to the Court, that requirement "makes it impossible for citizens to use [the firearm] for the core lawful purpose of self-defense and is hence unconstitutional."[7]

In short, if the regulated characteristics meaningfully affect the utility of the weapon for self-defense, then it is more likely that the regulation at issue violates the Second Amendment. However, if regulating the underlying characteristics of the weapon does not undermine its utility for self-defense, then the regulation falls outside the scope of the Second Amendment.  As stated in *Mazarrella,* 614 F.3d at 94:

> *Heller* distinguished handguns from other classes of firearms, such as long guns, by looking to their functionality.  *Id*. at 2818 (citing handguns' ease in storage, access, and use in case of confrontation).  But unmarked firearms are functionally no different from marked firearms.  The mere fact that some firearms possess a nonfunctional characteristic should not create a categorically protected class of firearms on the basis of that characteristic.

---

[7] *See also Decastro,* 682 F.3d at 165 ("Throughout, *Heller* identifies the constitutional infirmity in the District of Columbia laws in terms of the burden on the ability of D.C. residents to possess firearms for self-defense.  The Court emphasized . . . that the mandate to disable all firearms 'makes it *impossible* for citizens to use them for the core lawful purpose of self-defense and is hence unconstitutional.'"); and *Nordyke v. King,* 563 F.3d 439, 458  (9th Cir. 2009) ("*Heller* tells us that the Second Amendment's guarantee revolves around armed self-defense.  If laws make such self-defense impossible in the most crucial place – the home – by rendering firearms useless, then they violate the Constitution.").

The SAFE Act's restrictions do not impact a semiautomatic weapon's utility for self-defense.  As noted, the SAFE Act does not prohibit all semiautomatic weapons, but only those that possess the enumerated characteristics.  The prohibited and permitted weapons serve equally well for purposes of self-defense in the home.  Indeed, the NRA itself admits that "the firearms banned by the Act are *not* fundamentally different from some of the semiautomatic firearms that it permits."  Brief of Amicus Curiae National Rifle Association of America at 8-9, ("NRA Amicus Brief").  For example, according to the NRA, "[a] detachable magazine does nothing to distinguish a semiautomatic firearm from other familiar, commonly-possessed firearms."  *Id.* at 9.  In fact, a semiautomatic weapon with, for example, a large magazine may be more dangerous (and therefore less suited for self-defense) given that the ability to fire a burst of bullets in a short period of time increases the risk of accidental shootings of innocent bystanders.

Given that the prohibited weapons are not of greater utility than permitted weapons for purposes of self-defense in the home, the regulation cannot implicate the Second Amendment.  As stated in *Mazarrella*, "it also would make little sense to categorically protect a class of weapons bearing a certain characteristic wholly unrelated to their utility." 614 F.3d at 94.

The NRA contests this point and argues that, "to the extent the additional attributes that, when combined with a detachable magazine, push a firearm over the line from acceptable to contraband make a difference in the functionality of the firearm at all, they tend to *improve* the firearm's utility and safety for self-defense and other lawful purposes."  NRA Amicus Brief at 10.  That claim is unsubstantiated.  For example, according to former Baltimore County Police Department Colonel Leonard J. Supenski: "The typical self-defense scenario in a home does not require more ammunition than is available in a standard 6-shot revolver or 6-10 round semiautomatic pistol."  Brady Center to Prevent Gun Violence, *Assault Weapons: "Mass*

*Produced Mayhem"* at 16 (Oct. 2008).[8]  According to the NRA's own data, out of 482

incidences, the average and median number of shots fired by a defender was two.  *See* Claude

Werner, Director of Firearms Training, LLC, analysis of *The NRA Armed Citizen – A Five Year*

*Analysis.*[9]

The prohibited and permitted weapons do, however, differ with respect to one very

important function; namely, the prohibited weapons are particularly suited for criminal activity

and mass slaughter.  Stated differently, the characteristics that are regulated by the SAFE Act

turn a semiautomatic weapon into a dangerous and unusual weapon that falls outside the scope of

the Second Amendment.

### D.     The Weapons Prohibited by the SAFE Act Are Dangerous and Unusual

The Supreme Court found that "dangerous and unusual weapons" are not protected by the

Second Amendment, *Heller,* 554 U.S. at 571,[10] a holding it supported with reference to a series

of older treatises and state court decisions.  Two general themes emerge from these sources.

---

[8] While the NRA asserts that folding/telescoping stocks increase accuracy, the ATF concludes that "[t]hese stocks allow the firearm to be fired from the folded position, yet it cannot be fired nearly as accurately as with an open stock."  Department of Treasury, *Studying the Sporting Suitability of Modified Semi-Automatic Assault Rifles* at Exh. 5 (1998).

[9] In practice, "nearly all shootings, including criminal ones, use many fewer rounds" than ten, and "until recently even police officers would routinely carry revolvers, which tended to hold only six rounds." Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense:An Analytical Framework and a Research Agenda,* 56 UCLA L. Rev. 1443, 1489 (2009).  *See also* Gary Kleck, *Point Blank, Guns & Violence in America* (paperback ed., 2005) at p. 79 (explaining that only a tiny fraction of gun homicides involve more than ten shots fired).

[10] As explained in *Marzzarella*: "By equating the list of presumptively lawful regulations with restrictions on dangerous and unusual weapons, we believe the Court intended to treat them equivalently – as exceptions to the Second Amendment guarantee." 614 F.3d at 91.

First, a regulation does not infringe the right of the people to bear arms if it prohibits the possession of arms that terrify the population.  The Court cited, for example, Blackstone, which states that "[t]he offence of *riding* or *going armed*, with dangerous or unusual weapons, is a crime against the public peace, by terrifying the good people of the land, . . . ."  4 Blackstone 148 (1769).[11]  Second, the Supreme Court cited *English v. State*, 35 Tex. 473 (1871), which held that the Second Amendment did not protect certain types of weapons that are used for criminal purposes.  Among the "wicked devices of modern craft" prohibited by the statute at issue in that case were pistols.  According to *English*:

> To refer the deadly devices and instruments called in the statute 'deadly weapons,' to the proper or necessary arms of a 'well-regulated militia,' is simply ridiculous.  No kind of travesty, however subtle or ingenious, could so misconstrue this provision of the constitution of the United States, as to make it cover and protect that pernicious vice, from which so many murders, assassinations, and deadly assaults have sprung, and which it was doubtless the intention of the legislature to punish and prohibit.

> 35 Tex. at 476.

---

[11] The Court cited a number of other sources, including the following:  3 B. Wilson, Works of the Honourable James Wilson 79 (1804) ("Affrays are crimes against the personal safety of the citizens; for in their personal safety, their personal security and peace and undoubtedly comprehended . . . . In some cases, there may be an affray, where there is no actual violence; as where  a man arms himself with dangerous and unusual weapons, in such manner, as will naturally diffuse a terrour among the people."); 1 W. Russell, A Treatise on Crimes and Indictable Misdemeanors 271 (1831) ("where persons arm themselves with dangerous and unusual weapons, in such a manner as will naturally cause a terror to the people; which is said to have been always an offence at common law, and it is strictly prohibited by several statutes"); Russel at 272 ("it has been holden, that no wearing of arms is [prohibited within the meaning of the relevant statute], unless it be accompanied with such circumstances as are apt to terrify the people; from whence it seems clearly to follow, that persons of quality are in no danger of offending against the statute by wearing common weapons, or having their usual number of attendants with them for their ornament or defence, in such places, and upon such occasions, in which it is the common fashion to make use of them, without causing the least suspicion of an intention to commit any act of violence, or disturbance of the peace.").

Assault weapons clearly have the ability to terrify the population and are disproportionately used in crime. The SAFE Act covers certain characteristics that do not relate to the utility of the weapons for self-defense (or even sporting) but to improving the utility of the guns for mass slaughter. For example, according to the ATF, pistol grips that protrude conspicuously beneath the action of the weapon "were designed to assist in controlling machineguns during automatic fire." *See* Department of Treasury, *Studying the Sporting Suitability of Modified Semi-Automatic Assault Rifles,* Exh. 5 (1998). The ATF also found that a flash suppressor "disperses the muzzle flash when the firearm is fired to help conceal the shooter's position, especially at night. . . [and] assist[s] in controlling the 'muzzle climb' of the rifle, particularly when fired as a fully automatic weapon. From the standpoint of a traditional sporting firearm, there is no particular benefit in suppressing muzzle flash. Flash suppressors that also serve to dampen muzzle climb have a limited benefit in sporting uses by allowing the shooter to reacquire the target for a second shot." *Id.*

Research supports that assault weapons are particularly dangerous. Academic research has found that the average number of people killed or wounded in mass shootings doubled when assault weapons or semiautomatic guns combined with high capacity magazines were used in the shooting. *See* Christopher Koper, *American's Experience with the Federal Assault Weapons Ban, 1994-2004*, in *Reducing Gun Violence in America* 167 (Daniel W. Webster and Jon S. Vernick eds., (2013)). Other analyses have found a similar pattern. For mass shootings from January 2009 to January 2013, shootings with assault weapons or high capacity magazines resulted in more than double the number of people shot and more than 50 percent more killed. [12]

_____

[12] Mayors Against Illegal Guns did a study of mass shootings between January 2009 and January 2013. A mass shooting was defined as four or more people murdered with a gun. Their analysis found: "Assault weapons or high-capacity magazines were used in at least 12 of the incidents

Likewise, an analysis of a database of mass shootings from 1984 to 2012 found positive correlations between rounds fired per minute and the number of people hit and killed.  Kevin Ashton, *The Physics of Mass Killing,* the internet of things and other things (Jan. 24, 2013), *available at* http://kevinjashton.com/2013/01/24/the-physics-of-mass-killing/.  Reducing access to assault weapons and to high capacity ammunition magazines reduces criminals' ability to spray-fire a continuous stream of hundreds of bullets into crowds.

The weapons regulated by the SAFE Act are clearly dangerous and unusual, and, therefore, fall outside the scope of Second Amendment protection.

**IV.   Even Assuming *Arguendo* That the SAFE Act Implicates the Second Amendment, New York's Legislation is Constitutional.**

As explained above, the weapons regulated by the SAFE Act do not fall within the scope of protection of the Second Amendment.  However, even if they did, the restrictions in the SAFE Act should be subject to intermediate scrutiny, a standard that the legislation clearly meets.

**A.    Strict Scrutiny is Not Appropriate For Plaintiffs' Second Amendment Challenges**

**1.    Applying Strict Scrutiny is Inconsistent with *Heller, McDonald,* and Second Circuit Precedent**

*Heller* held – and two years later, *McDonald v. City of Chicago,* 130 S. Ct. 3020 (2010) confirmed – that the Second Amendment protects "the right of law-abiding, responsible citizens to use arms in defense of hearth and home." *Heller*, 554 U.S. at 635.  As *Heller* and *McDonald*

---

(28%).  These incidents resulted in an average of 15.6 total people shot – 123% more people shot than in other incidents (7.0) and 8.3 deaths – 54 percent more deaths than in other incidents (5.4). Mayors Against Illegal Guns, *Mass Shootings Since January 20, 2009* (2013), *available at* http://www.minnpost.com/sites/default/files/attachments/mass_shootings_2009-13_-_jan_29_12pm.pdf

also made clear, however, "like most rights, the right secured by the Second Amendment is not unlimited" in scope and does not amount to "a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Heller,* 554 U.S. at 626 (*citations omitted*)*; see McDonald*, 130 S. Ct. at 3047.

The Court in *Heller* and *McDonald* did not mandate or even articulate a standard of review for Second Amendment challenges.[13]  The Court, however, made clear that an individual right to keep and bear arms for self-defense *is* subject to reasonable regulation by the legislature. As the Court in *Heller* explained, the Constitution provides legislatures with "a variety of tools for combating" the "problem of handgun violence."  In *McDonald,* the Court reaffirmed the limited nature of the Second Amendment right explaining that "reasonable firearms regulation will continue under the Second Amendment."  130 S. Ct. at 3046.  The Court in *Heller* also set forth a non-exclusive list of a number of gun control regulations that the Court found to be "presumptively lawful" such as banning firearm possessions by felons and laws imposing conditions and qualifications on the commercial sale of arms.  554 U.S. at 626-627, n.26.  Thus, under *Heller* and *McDonald,* any suggestion that firearms regulations are somehow subject to the strong presumption against constitutionality (that accompanies a strict scrutiny review) is simply wrong.[14]

---

[13] *See also* Lawrence Rosenthal & Joyce Lee Malcolm, *McDonald v. Chicago:  Which Standard of Scrutiny Should Apply to Gun Control Laws?* 105 Nw. U. L. Rev. 437, 438-39 (2011).

[14]  States have long implemented wide-ranging restrictions on procuring, possessing, or using firearms not linked to any core purpose since the beginning of the Republic.  *See* Cornell & DeDino, *A Well Regulated Right, The Early American Origins of Gun Control,* 73 Fordham L. Rev. 487, 502-505 (2005).  This history of the Second Amendment and restrictions on this amendment is set out in greater detail by other *amici* that participated in the *Heller* litigation, *e.g.,* Br. for Professional Historians and Law Professors Saul Cornell, Paul Finkelman, Stanley N. Katz, and David T. Konig as *Amici Curiae* in Support of Appellees (D.C. Cir. No. 10-7036).

## 2.      Intermediate Scrutiny is the Accepted Standard

Although the Supreme Court did not specify a standard of review, it did provide some guidance to lower courts. *Id.* at 626-27. First, given the Second Amendment's status as a specific enumerated right, the Court reasoned that if a rational basis was all that was necessary to overcome the right to bear arms, the right would be meaningless. Second, as noted, the Court listed a number of presumptively lawful firearm regulations. Thus, signaling that intermediate scrutiny would be the correct standard of review.

The Second Circuit has also provided guidance. In *United States v. Decastro,* 682 F.3d 160 (2d Cir. 2012)*,* the Second Circuit set forth a construct under which courts must determine, in the first instance, whether a challenged regulation substantially burdens an individual's Second Amendment rights and, only *after* discerning that the challenged regulation imposes a substantial burden, will a Court apply some heightened level of scrutiny. *See Decastro*, 682 F.3d at 166-167.[15] The Second Circuit explained that statutes that do not impose a substantial burden on the Second Amendment would call for a less restrictive standard. *See id.* at 166. *Decastro* did not explicitly apply rational basis review but ultimately found that the law at issue did not substantially burden Second Amendment rights because it regulated rather than restricted gun use and, therefore, did not place a substantive burden on the right to possess a gun for self-defense. 682 F.3d at 167, n.5; *see Heller,* 554 U.S. at 626-627.

In *Kachalsky v. County of Westchester,* 701 F.3d 81, 93-101 (2d Cir. 2012), the Second Circuit addressed the constitutionality of a New York law requiring applicants to demonstrate "proper cause" to obtain a license to carry a concealed weapon in public. The Second Circuit

---

[15] The *Decastro* Court found that the substantial burden test is consistent with *Heller,* 682 F.3d at 165-66.

17

found that where a substantial burden is found to impact "non-core" Second Amendment rights, intermediate scrutiny should apply. *Id.* at 93. The Court determined that possession of a concealed weapon in public is not a core Second Amendment right and also found that the "proper cause" requirement was substantially related to the State's important interest in public safety and crime prevention. *Id.* at 98.

Lower court decisions almost uniformly have analyzed challenges such as those under review here under intermediate scrutiny. The Fourth, Third, Fifth and Tenth Circuits have applied intermediate scrutiny in the context of the Second Amendment.[16] Indeed, the standard used most often by state courts in analogous situations is intermediate scrutiny within a "reasonable regulation" framework – meaning that the applicable standard is whether the New York legislature is reasonable in enacting prophylactic measures directed at saving lives or reducing serious crime. *See, e.g., Lewis v. United States,* 445 U.S. 55, 66- 67 (1980).

Plaintiffs wrongly suggest that the SAFE Act must be subject to a "higher standard than intermediate scrutiny" because it "violates the fundamental right at issue because it bans mere possession of firearms and magazines in one's own home." Mot. at 16,18. The SAFE Act does not violate any fundamental Second Amendment right, but, in any case, it is well-settled that laws that affect "fundamental rights" are not necessarily subject to strict scrutiny review. In fact,

---

[16] *See United States v. Chester*, 628 F.3d 673, 683 (4th Cir. 2010) (applying intermediate scrutiny to a ban on firearm possession by domestic violence misdemeanants); *Marzzarella*, 614 F.3d at 97 (applying intermediate scrutiny to a law criminalizing possession of guns with obliterating serial numbers); *Peterson v. Martinez,* 707 F.3d 1197 (10th Cir. 2013) (Slip. Op., separate concurrence of Judge Lucero) (explaining that, for Colorado's ban on carrying concealed weapons in public, if Second Amendment protection were available, the appropriate constitutional test is intermediate scrutiny);  *see also NRA v. ATF,* 700 F.3d 185, 205 (2012) (assuming that the challenged federal laws (prohibiting persons under 18 from possessing handguns) burdened conduct in the scope of the Second Amendment, finding that such laws "trigger nothing more than 'intermediate' scrutiny.").

18

the Supreme Court has expressly rejected the argument that any "burden upon the right to vote,"

which is clearly a fundamental right as discussed in *Yick Wo v. Hopkins,* 118 U.S. 356, 370

(1886), "must be subject to strict scrutiny." *Burdick v. Takushi,* 504 U.S. 428, 432 (1992).

Furthermore, while *Heller* rejected rational basis review for regulations that effectively

eviscerate the individual right to self-defense in the home, such as a *complete ban* on handgun

possession in the home 554 U.S. at 628, n. 27, the Court nowhere suggested that reasonable

regulations addressing firearms possession that did not prevent home self-defense would be

invalid.   The intermediate standard of review pays due heed to the Supreme Court's decisions in

*Heller* and *McDonald*, and makes the most sense in analyzing individual and state interests.

Intermediate scrutiny is also the appropriate standard to apply because of the interest at

stake with respect to the Second Amendment.  This Court is not faced, for example, with a

question whether speech (which harms no one physically) is protected or not.  The stakes under

the Second Amendment are much higher, where the question quite literally may be one of life or

death.  Under these circumstances, the state interests and objectives (to protect its citizenry from

maiming and death) are at their strongest.  Given that the SAFE Act does not impact core Second

Amendment rights, the appropriate constitutional test is intermediate scrutiny.[17]

To pass muster under intermediate scrutiny, New York must show that the requirements

of the legislation are "substantially related to an important government objective."  *Clark v.

Jeter,* 486 U.S. 456, 461 (1988).   As shown below, that standard has been met.

---

[17] Because the State's interest in this arena is abundantly clear and extremely important, it would
be fair to argue that a less stringent standard than intermediate scrutiny could be applied.

### 3.   The Requirements of the SAFE Act Are Reasonable and Satisfy Intermediate Scrutiny Review

New York passed the SAFE Act to protect New Yorkers by, among other things, "reducing the availability of assault weapons and deterring criminal use of firearms while promoting a fair, consistent and efficient method of ensuring that sportsmen and other legal gun owners have full enjoyment of the guns to which they are entitled" and through limiting the loading of more than seven rounds.  S2230 Sponsor's Memorandum at 1.  As the State legislature explained, "[i]n the wrong hands, guns are weapons of untold destruction and heart-break:  family and community members are taken from us in an instant; mass shootings shatter our sense of safety in public spaces; street crimes plague our neighborhood.  Nationwide, gun violence claims over 30,000 lives annually."  *Id*. at 5.

The New York legislation – in line with *Heller* – also recognizes that there is a "'historical tradition of prohibiting the carrying of dangerous and unusual' weapons" such as the assault-style weapons addressed in the Act.  *Id*. at 6.  The State explained that "[s]ome weapons are so dangerous and some ammunition devices so lethal that we simply cannot afford to continue selling them in our state.  Assault weapons that have military-style features unnecessary for hunting and sporting purposes are this kind of weapon" and "the test adopted [in the SAFE Act] is intended to" simplify the assault-weapon definition by focusing on the lethality of the weapon, "amplified by the particular features."  *Id*. at 6.  And the State acknowledged that regulating assault weapons and high capacity magazines (by requiring loading of no more than seven rounds) increases the safety of New Yorkers "while observing the protections of the Second Amendment."  *Id.*[18]

---

[18] *See generally* Testimony of Brian J. Siebel, Brady Center to Prevent Gun Violence (Oct. 1, 2008) (The Committee on Public Safety concluded that "assault weapons have no legitimate use

As discussed below, even if the bans on assault weapons and on loading more than seven bullets in a magazine somehow implicate the Second Amendment, because of the important government interest at stake and the slight burden they impose on any Second Amendment right, they survive review.  In fact, similar types of bans have been upheld. *See e.g., Arnold v. Cleveland,* 616 N.E. 2d 163, 173 (Ohio 1993); *compare McDonald,* 130 S. Ct. at 3047 (noting the "paucity of precedent sustaining bans comparable to" the Chicago handgun ban invalidated in that case); *cf Navegar, Inc. v. United States,* 192 F.3d 1050, 1053 (D.C. Cir. 1999) (upholding federal assault weapons ban against challenges not involving the Second Amendment).

Under intermediate scrutiny, the rigorousness of the inquiry depends in part upon the degree of the burden on protected conduct.  The SAFE Act does not impose any meaningful burden on Second Amendment rights.  As explained above, the firearms New York seeks to ban are not the quintessential self-defense weapons.  Rather, these firearms are dangerous and unusual outliers. [19]  They are not the type of firearms that are typically used for self-defense in the home.[20]  Furthermore, a seven-round magazine limit is simply not a burden on gun

---

as self-defense weapons, and would in fact increase the danger to law abiding users and innocent bystanders if kept in the home or used in self-defense situations.")  Council of D.C., Comm. on Pub. Safety & The Judiciary, Report on Bill 17-843 at 7 (Nov. 25, 2008).

[19] It is important to note that Congress has historically prohibited private possession of particularly dangerous types of firearms.  For example, possession of machine guns is categorically prohibited (*see* 18 U.S.C. § 922(o), and a similar restriction as to "semi-automatic assault weapons" was in effect until 2004 pursuant to a pre-existing sunset provision.  *See*  18 U.S.C. § 922(v)(1).  Congress has also restricted possession of firearms by various categories of individuals deemed unfit to possess such weapons (18 U.S.C. § 922(g)(1)) and prohibited possession of firearms at specific locations (18 U.S.C. § 930 (2000 & Supp. V 2005).  Further, federal law also regulates the manufacturing, sale and importation of firearms.  *See* 18 U.S.C. § 923 (2000 & Supp. V 2005); 18 U.S.C. § 922(a).

[20] *See* Gary Kleck & Marc Gertz, *Armed Resistance to Crime:  The Prevalence and Nature of Self-Defense With a Gun,* 86 J. Crim. L. & Criminology 150, 185 (1995) (revolvers and semi-

ownership or the ability to possess guns for self-defense of the home.[21]  As noted above, the

reasonableness of determining that a seven-round loading limit was the correct line to draw is

supported by the NRA's own data which shows that the average number of shots fired by an

armed citizen in self-defense is two bullets.

Plaintiffs fail to show that the SAFE Act imposes any meaningful burden on their rights

to possess firearms in the home for self-defense.  In New York, it is clear that individuals who

are not otherwise disqualified by operation of law can maintain a wide variety of handguns,

rifles, or shotguns to protect themselves in their homes.  There is no ban on firearms that

facilitate self-defense; only a ban on dangerous and unusual assault weapons that are not

typically used for self-defense.  And restricting the size of magazines does not "ban" any sort of

firearm.

Furthermore, in applying the intermediate scrutiny standard, important regulatory

interests are typically sufficient to justify reasonable restrictions.  *Cf Burdick v. Takusi*, 504 U.S.

428, 434 (1992).  It is well-settled that regulation of gun ownership is not a modern invention – it

is a practice that was accepted by the founders.  Firearms have always been subject to police-

power regulation in the states.

Of course protecting the lives of citizens is an important regulatory interest and the

decision to ban a specific class of firearms such as assault-weapons is eminently reasonable in

---

automatic pistols are together used almost 80% of the time in incidents of self-defense); *see also*
Department of Treasury, *Studying the Sporting Suitability of Modified Semi-Automatic Assault
Rifles* 38 (1998) (finding semi-automatic assault rifles are "not generally recognized as
particularly suitable or readily adaptable to sporting purposes.").

[21] *See* http://www.motherjones.com/politics/2013/02/assault-weapons-high-capacity-magazines-mass-shootings-feinstein; *see also* http://www.motherjones.com/special-reports/2012/12/guns-in-america-mass-shootings .

light of the clear data demonstrating that assault-weapons are much more likely than other firearms to be used in acts of violence and in mass shootings.  Indeed, the subset of guns that New York is focusing on is one which is "preferred by criminals over law abiding citizens eight to one."  *See Assault Weapons "Mass Produced Mayhem"* at 10.  While we acknowledge that only a small percentage of firearms are "assault weapons" (perhaps only 1-2% of all firearms qualify as "assault weapons"), these types of firearms continue to be responsible for a disproportionately high number of mass shootings.[22]

Likewise, the restriction to seven or fewer bullets in a magazine is reasonable and constitutional because the use of large-capacity magazines (including detachable ammunition magazines which require infrequent reloading) have facilitated mass shootings.[23]  The D.C. Circuit already has found that limiting magazines to ten rounds is permissible.[24] While the difference between ten bullets and seven bullets is not large, the legislature had legitimate reasons to prohibit loading of more than seven bullets, given that large-capacity magazines that do not require frequent re-loading have contributed to extreme carnage in mass shooting

---

[22] From the mass shootings in Aurora, through Newtown, and to date, 42 guns with high capacity magazines were used across 31 mass shooting cases.  Twenty assault weapons were used across 14 mass shooting cases, and 33 cases involving assault weapons, or high capacity magazines, or both.  In 2012 alone, there were seven mass shootings and a record number of casualties stemming from gunfire (140 annual mass shooting casualties).  Furthermore, not one out of 62 mass shootings in the U.S. in the past 30 years has been stopped by a civilian with a gun. http://www.motherjones.com/politics/2013/02/assault-weapons-high-capacity-magazines-mass-shootings-feinstein.

[23] *See* http://www.motherjones.com/politics/2013/02/assault-weapons-high-capacity-magazines-mass-shootings-feinstein; *see also* http://www.motherjones.com/special-reports/2012/12/guns-in-america-mass-shootings.

[24] In *Heller v. District of Columbia*, 670 F.3d 1244, 1264 (D.C. Cir. 2011), in upholding the District of Columbia's ban on assault weapons, the Court applied intermediate scrutiny and found that the ten-round limit on magazine capacities passed constitutional muster.

situations.  It is reasonable for the legislature to balance the difference between ten and seven

bullets against the impact to the victims of mass shootings.  If a ten-round magazine limit is

constitutional, the seven-round loading limit is simply a matter of degree.  Where the Colt 45

handgun – the most common handgun which has been in use since 1911 – has a *standard* seven-

round ammunition magazine, it is hard to understand the Plaintiffs' belief that requiring a seven-

round loading limit does not pass muster under the Constitution.[25]

Furthermore, if Plaintiffs are correct in asserting that criminals rarely fire any rounds at

all but, instead, typically only brandish guns to threaten victims, there is no real difference

between allowing ten bullet magazines and requiring that only seven bullets be loaded at any

particular time. *See* Mot. at 21.  The seven bullet loading restriction is reasonable and protects

the health and safety of New York citizens by disallowing the use of large-scale magazines that

do not require frequent reloading.

Plaintiffs' suggestions that there is "no nexus between the Act's restrictions and either a

reduction in violent crime or an improvement in public safety" and that the legislature's focus on

"certain characteristics" that indisputably allow shooters to shoot (and kill) more people at a

faster pace has "no rational relationship to any legitimate, important, or compelling

governmental interests" are absurd.  Mot. at 19.  Guns in America kill more than 30,000 people

annually and injure 70,000 more.[26]  In 2007, firearms were used in more than 385,000 serious

---

[25]  Plaintiffs do not object to the six bullet load limit for the lawful purpose of hunting.  Thus, for
the lawful purpose of self-defense, the distinction between six and seven, and even between
seven and ten is one without a difference.

[26] *See* Center for Disease Control National Center for Injury Prevention and Control, Web-based
Injury Statistics Query and Reporting System ("WISQARS"), *available at*
http://www.cdc.gov/injury/wisqars/index.html (last visited on June 20, 2013).

crimes including approximately 12,000 murders, 191,000 robberies, and 181,000 aggravated assaults.[27]

In sum, New York's ban on assault weapons and its requirement of a seven-round or fewer loading limit are entirely reasonable measures that survive intermediate scrutiny, and they are, therefore, consistent with the scope of the Second Amendment right identified in *Heller*.

## CONCLUSION

For the reasons set forth above, this Court should deny Plaintiffs' request to enjoin provisions of the SAFE Act.

Respectfully submitted,

/s/ Jonathan E. Lowy
Jonathan E. Lowy
Brady Center to Prevent Gun Violence
Legal Action Project
1225 Eye Street, NW, Suite 1100
Washington, DC 20005
(202) 898-0792
jlowy@bradymail.org

*Of Counsel*

Kristin Graham Koehler
James E. Mendenhall*
Lisa E. Jones*
Sidley Austin LLP
1501 K. St., NW
Washington, DC 20005
(202) 736-8000
kkoehler@sidley.com
jmendenhall@sidley.com
lisa.jones@sidley.com
* *Pro hac vice application pending*

*Counsel for Amicus Curiae*

---

[27] Bureau of Justice Statistics, *Crimes committed with firearms,* 1973-2007, *available at* http://bjs.ojp.usdoj.gov/content/glance/tables/guncrimetab.cfm.