UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X
New York State Rifle and Pistol Association, Inc.;  :
Westchester County Firearms Owners Association, Inc.; :
Sportsmen's Association for Firearms Education, Inc.; : **Civil Action Number:**
New York State Amateur Trapshooting Association, Inc.; : **1:13-cv-00291 (WMS)**
Bedell Custom; Beikirch Ammunition Corporation;  :
Blueline Tactical & Police Supply, LLC; Batavia Marine & :
Sporting Supply, LLC; William Nojay; Thomas Galvin; :
and Roger Horvath,           :
        Plaintiffs,   :
               :
  -against-         :
               :
               :
Andrew M. Cuomo, Governor of the State of New York; :
Eric T. Schneiderman, Attorney General of the State of :
New York; Joseph A. D'Amico, Superintendent of the :
New York State Police; Lawrence Friedman, District :
Attorney for Genesee County; and Gerald J. Gill, Chief of :
Police for the Town of Lancaster, New York,   :
               :
        Defendants.  :
-----------------------------------------------------------------------X

## DECLARATION of KEVIN BRUEN

   Kevin P. Bruen, under penalty of perjury and in accordance with 28 U.S.C. §1746, states and declares as follows:

   1.  I am a sworn member of the New York State Police ("State Police"), assigned to Counsel's office as an Assistant Counsel. I have held this position for 13 years. Previously, I served as an Assistant District Attorney in Kings County and Warren County. I have over twenty years experience in prosecution and law enforcement.

   2.  As an Assistant Counsel for the State Police, I am fully familiar with the terms, implementation, and enforcement of the Secure Ammunition and Firearms Enforcement Act, 2013 N.Y. Laws, ch. 1 ("SAFE Act"), and I am thus able to make this declaration based upon

personal knowledge.  I submit this Declaration in support of the State Defendants' Cross-Motion

to Dismiss and for Summary Judgment and in Opposition to the Plaintiffs' Motion for a

Preliminary Injunction.

3.      The SAFE Act is intended to make New York safer by reducing gun violence

through common sense and balanced reforms.  The law respects the interests of hunters,

sportsmen, and other lawful gun owners while freezing the number of military-style firearms

(hereinafter "assault weapons") and reducing their presence in the state over time, by banning

future sales or transfers.  The law ensured that no lawfully owned gun was declared,

retrospectively, illegal, by permitting owners of assault weapons to continue to posses them as

long as they are registered in accordance with the Act. Moreover, the law did not ban the sale of

a vast majority of hunting, target or home defense weapons.  The law even permits the

possession and transfer of assault weapons if they are more than fifty years old.[1]

4.      The law also bans large-capacity magazines ("LCMs"), unless they are more than

fifty years old as stated above.  Lawful owners of LCMs will have until January 15, 2014, to

either sell them out of state, sell them to a New York State licensed dealer, transfer them to law

enforcement, discard them in accordance with state law, or permanently modify them (*see infra*

note 10) so that they can no longer hold more than ten (10) rounds.

**The SAFE Act**

**I.      Overview**

5.      Enacted in response to the mass shooting deaths of 20 schoolchildren and six

adults in Newtown, Connecticut on December 14, 2012, and the murder of two first responders

in Webster, New York on December 24, 2012, the SAFE Act is a comprehensive piece of

---

[1] This exemption allows collectors' and historians' interested in military weapons to continue to
collect and study historic weapons.

legislation designed to prevent gun violence.  The Act amends numerous statutes, including the

Penal Law, the Mental Hygiene Law, the Criminal Procedure Law, and the Family Court Act.

Including an array of reforms, the SAFE Act toughens regulations to limit access to firearms by

those with a disqualifying mental health condition; requires federal background checks for most

private sales of guns; advances a statewide database and greater uniformity in licensing firearms;

regulates the possession of firearms on school property and establishes a procedure to assist in

developing school safety plans; allows judges to temporarily remove firearms from those subject

to a protective order where the court finds a substantial risk of violence against the person

protected by the order; increases penalties for the murder of certain first responders; addresses

the threat posed by violent gangs and their illegal distribution of weapons in the course of their

criminal enterprise; and provides a variety of other protections and enhancements to gun

licensing.

6.      As is especially pertinent to this action, the SAFE Act also amended New York's

existing ban on assault weapons, enacted in 2000,[2] by broadening the definition of assault

weapons and strengthening the existing ban on large capacity ammunition feeding devices, or

LCMs. *See* Penal Law § 265.00(22) and (23).

7.      The vast majority of guns currently owned within New York State are not

affected by the SAFE Act.  To help gun owners determine whether they have a weapon requiring

registration, the State Police created the website, www.NYSAFEAct.com, which contains a

partial list of guns that are not affected.  The site additionally lists those military style features

---

[2] The 2000 ban was, in essence, New York's version of the 1994 federal assault weapons ban, and many of the terms being challenged as vague herein existed in both the 2000 New York ban and the 1994 federal ban.

that classify a gun as an assault weapon.  Questions can also be answered by calling 1-855-LAWGUNS (1-855-529-4867).

A.     <u>The Prohibition Against Assault Weapons</u>

8.     Assault weapons are defined as a sub-category of the larger group of all semiautomatic weapons. A semiautomatic weapon fires one round for each squeeze of the trigger.  After each shot, the gun automatically loads the next round in the chamber, and arms the firing pin for the next shot, thereby permitting a faster rate of fire compared to manually operated guns.  In contrast to semiautomatic weapons, fully automatic weapons, such as machine guns, fire continuously as long as their trigger is squeezed.  Fully automatic firearms have been illegal to own in the United States without a federal permit since 1934.

9.     As defined by the SAFE Act, assault weapons are military-style weapons that, by design, are equipped with features that enable shooters to engage multiple targets very rapidly in a combat setting.   Unlawful attacks with assault weapons, particularly equipped with LCMs, result in more rounds fired, potentially leading to more injuries to more people and injuries of greater severity.  The rate of fire and larger ammunition capacity afforded by these weapons permit offenders to fire more frequently and indiscriminately.  Moreover, a single offender can fire suppressing fire at law enforcement and effectively hold-off and overwhelm an initial law enforcement response.[3]

10.     In addition, assault weapons give criminals an opportunity to "over-match" police in any confrontation and are especially dangerous in the hands of members of organized crime and street gangs.  Perhaps the best known example of such a confrontation occurred in North

---

[3] *See*, http://www.saratogian.com/articles/2009/01/13/news/doc496c11bflb9e8058333547.txt, detailing a shoot-out that occurred during a routine traffic stop on I-90 where an assailant fired at least 28 bullets at responding officers and pinned them down for over 40 minutes.

Hollywood, California on February 28, 1997, when Larry Phillips, Jr. and Emil Matasareanu, in full body armor, fired approximately 1,100 rounds from illegally converted automatic and semiautomatic weapons, with LCMs, wounding 18 people. It required a law enforcement response of approximately 300 officers to finally end the shoot-out.

11.     Aside from assault weapons, the definition of which is discussed below, the SAFE Act leaves almost all other types of guns, including handguns, rifles and shotguns, available to the public to use for self-defense. Notably, it does not ban the sale, or require the registration of, semiautomatic rifles with detachable magazines that have no banned features. *See* Exhibit 45-47.

12.     The SAFE Act's ban on the further sales or transfer of assault weapons, while expanding the definition of assault weapon and freezing the number of assault weapons in New York, does not take away, or limit in any meaningful sense, a person's ability to defend himself or herself. Vast numbers of other home defense options are available. Going forward New Yorkers who did not already own an assault weapon at the time of the Act's passage will have to choose options other than banned assault weapons. However, the SAFE Act leaves a tremendous range of options open for defensive purposes. For example, some, but not all, of these options are listed on the SAFE Act's website, which sets out at least 145 pistols, 150 rifles, and 40 shotguns that are explicitly not banned as assault weapons.

13.     Furthermore, assault weapons are not necessary for home defense. In fact, assault rifles may be more of a liability than an asset in home defense. Given the size, speed and penetrating power of a center-fire round commonly fired by these weapons, any "miss" and even a direct hit on the intruder is very likely to pass through any drywall, and/or the intruder, and potentially injure an unintended target. Larger and more powerful bullets, like the 7.62mm round, with a steel core and a copper jacket, a round commonly fired by an AK-47 style gun, can

5

even pass through cinder block.  A more effective choice for home defense might be a shotgun loaded with buckshot.  While a shotgun loaded with buckshot has less secondary penetrating power it has just as much, if not more, stopping power on the primary target, i.e. the home intruder.  The accuracy needed for proper shot placement in a home invasion scenario is far more critical when using a semiautomatic rifle than a shotgun loaded with shot and such accuracy may be difficult in a high-stress situation.

14.     Although built on New York State's assault weapons ban, enacted in 2000, which itself was modeled after the federal assault weapons ban of  September 1994[4], the SAFE Act contains several notable changes from its predecessor to make its definition of an assault weapon more encompassing.  For example, the SAFE Act has a "one-feature" test, which means just one military style feature is enough for a semiautomatic weapon with the ability to accept a detachable magazine to be defined as an assault weapon.  The federal assault weapons ban, and New York State law, had previously required two military features for a weapon to be banned from future sale or transfer.  Moreover, both laws excluded any weapon lawfully possessed on September 13, 1994, the effective date of the federal ban, from the definition of assault weapon. These weapons could be lawfully sold and resold under New York's prior assault weapons ban.

15.     The "one-feature" test was adopted for the SAFE Act because, as learned from the experience with the 1994 federal assault weapons ban and the 2000 New York ban, a "two-feature" test permitted many military-style weapons to avoid regulation by having only one banned feature while still retaining its essence as a military-style weapon.  Thus, the SAFE Act ensures that semiautomatic weapons with detachable magazines, and with one of the listed

---

[4] *See*, Title XI, Subtitle A of the Violent Crime Control and Law Enforcement Act of 1994, which expired pursuant to its own provisions after ten years, in 2004.

characteristics, particularly those initially designed as infantry weapons, do not avoid registration or prohibition with just slight modifications.

16.     Specifically excluded from the definition of assault weapon is "any rifle, shotgun or pistol that is manually operated by bolt, pump, lever or slide action" or has been rendered permanently inoperable; or is an antique firearm as defined in 18 U.S.C. § 921(a)(16). *See* Penal Law § 265.00 (22)(g).  This in effect means a great deal of common guns could never be defined as assault weapons.

**1.     Rifles Which Qualify as Assault Weapons**

17.     Under the SAFE Act, a rifle is an assault weapon if it is semiautomatic, able to accept a detachable magazine, *and* has at least one of the following military characteristics: i) folding or telescoping stock; ii) pistol grip that protrudes conspicuously beneath the action of the weapon; iii) thumbhole stock; iv) second handgrip or protruding grip that can be held by non-trigger hand; v) bayonet mount; vi) flash suppressor; vii) muzzle brake; viii) muzzle compensator; (ix) a threaded barrel designed to accommodate (vi) - (viii) above; and x) a grenade launcher. *See* Penal Law § 265.00 (22)(a).  The SAFE Act website contains frequently asked questions, click-through questionnaires, and photographs to assist the public in understanding these banned features.  However, most of these features existed under the law previously and have been understood by gun owners and law enforcement for years.

18.     These particular banned features make a gun a defined assault weapon because of the associated military applications.[5]  For example, folding or telescoping stocks help make the weapon more compact for concealment.  From a military perspective, they also allow one weapon to be adjusted to fit different size shooters, so that one weapon can be distributed to

---

[5] The strictly military applications of bayonet mounts and grenade launchers are obvious and should require no explanation.

soldiers of different sizes.  In addition the folding stock adjusts to the same shooter to

accommodate body armor.  Photographs of folding and telescoping stocks, and other banned

features, from the SAFE Act website are annexed with the accompanying volume as Exhibit 61.[6]

19.   Protruding pistol grips, thumbhole stocks[7]and second handgrips for the non-

trigger hand are military features because they allow the weapon to held by the shooter in a

stronger hand position that allows shooters to hold the weapon steady and remain on target while

rapidly firing multiple rounds despite recoil or muzzle rise.  Pistol grips and thumbhole stocks, in

particular, aid a shooter in retaining control of a firearm while holding it at his or her hip,

facilitating the rapid and continuous fire of ammunition.  Second handgrips permit the shooter to

hold the firearm with two hands for greater control during rapid fire.  In addition, a weapon so

equipped can be very quickly re-sighted on successive targets with greater ease.  These features

are designed to be effective in an offensive or combat situation but are not necessary in a more

static home defense situation. *See* Exhibit 61 (Photographs of pistol grips, thumbhole stocks,

second handgrips, and other prohibited features, from the SAFE Act website).

20.   A muzzle brake, or muzzle compensator, limits the amount of recoil by

channeling the gases that are released after the weapon is fired in such a fashion as to steady the

barrel and reduce recoil.  This allows a shooter to fire multiple rounds without the recoil of the

firing throwing them off target. This is particularly true the larger and more powerful the round

used. Furthermore, by significantly reducing recoil the weapon is significantly easier to shoot

when rapidly firing multiple rounds.  *See* Exhibit 61.

---

[6] Citation to exhibits are to those accompanying the declaration of William Taylor, Jr., dated June 21, 2013, which have been placed in a consecutively bound volume for the convenience of the Court.

[7] Thumbhole stocks were developed in an attempt to circumvent prior statutory prohibitions on protruding pistol grips under the "two-feature" test and they are the functional equivalent of pistol grips.

21.     Flash suppressors reduce the light given off when the gun fires (also known as its muzzle flash).  Reduced muzzle flash accommodates nighttime shooting, or firing in the dark, as the shooters' eyes more easily adjust to the dark after successive shoots. Just as important, flash suppressors mask the location of a shooter by reducing the light given off when the firearm is fired. This renders the shooter's position harder to determine by law enforcement.  Flash suppressors would give a tactical advantage to a criminal in any nighttime confrontation, or ambush, as it makes it much difficult for law enforcement to locate the direction of the firing weapon.

22.     In order to accommodate items such as flash suppressors, muzzle brakes and muzzle compensators, the "threaded" barrels on guns are a banned military feature because a threaded barrel (similar to the end of a garden hose) enables the weapon to accept and affix attachments referred to above, in addition to silencers.   Photographs from the SAFE Act website of flash suppressors, muzzle brakes, muzzle compensators, and threaded barrels, as well as other banned features and firearms, are gathered at Exhibit 61-63, 65-67.

23.     While semiautomatic weapons, equipped with some or all of the above-described banned features in the hands of a soldier have great offensive uses and battlefield capability, in the hands of a criminal they easily can be turned to horrific uses on unsuspecting citizens and police officers.  Further, the absence of banned features from semiautomatic firearms does not detract from that weapon's usefulness for self-defense, as generally, self-defense situations are usually resolved with one or two shots fired within a few seconds.

**2.     Shotguns and Pistols That Qualify as Assault Weapons**

24.     A shotgun is defined as an assault weapon, and thus regulated, if it is semiautomatic and has at least one of the following military characteristics: i) folding or

telescoping stock; ii) thumbhole stock; iii) second handgrip or protruding grip that can be held by non-trigger hand; iv) fixed magazine capacity in excess of seven rounds; or v) an ability to accept a detachable magazine. *See* Penal Law § 265.00 (22)(b).  Photographs of shotguns that are assault weapons are included in the accompanying volume as Exhibit 66.

25.     Pistols are defined as assault weapons, and thus regulated by the SAFE Act, only if they are semiautomatic and able to accept a detachable magazine, and have at least one of the following military characteristics: i) folding or telescoping stock; ii) thumbhole stock; iii) second handgrip or protruding grip that can be held by non-shooting hand; iv) capacity to accept an ammunition magazine that attaches to the pistol outside of the pistol grip; v) a threaded barrel capable of accepting a barrel extender, flash suppressor, forward hand grip or silencer; vi) a shroud that is attached to, or partially or completely encircles, the barrel and that permits the shooter to hold the firearm with the non-trigger hand without being burned; vii) a manufactured weight of 50 ounces or more when the pistol is unloaded[8]; or viii) a semiautomatic version of an automatic rifle, shotgun or firearm.   One example of a banned assault pistol is the infamous Intratec TEC-9, which was linked with drug and gang related crime. The TEC-9, which was used in at least two mass shootings, is light and concealable but is in fact a semi-automatic version of a military automatic weapon.  It is notoriously inaccurate, but capable of firing a large number of rounds quickly.  The TEC-9 is an example of an assault weapon that is  based upon a military design, with military features, designed more for offensive and combat uses but not necessary or appropriate for home self-defense. *See* Penal Law § 265.00 (22)(c). Sample photographs of banned pistols from the SAFE Act website are attached as Exhibit 63.

---

[8] The manufactured weight of a pistol or other firearm may be ascertained from the manufacturer through its website, product catalogues, product packaging, or inquiries to the manufacturer's customer service division.

26.     The rationale behind prohibiting the listed military features for shotguns and pistols is the same as set forth in paragraphs 18-22, *supra*.  In addition, the shroud on an semiautomatic pistol, which allows the non-trigger hand to hold the barrel without being burned, is a military feature because it allows the shooter to hold and steady the weapon when firing multiple shots in rapid succession.  The magazine outside the handgrip allows the weapon to accept very large magazines, much larger than could be placed inside the confine of the space available inside the traditional grip. In addition, this style of magazine placement, when used with a large capacity magazine, can also function as a forward hand grip for the non-trigger hand.

27.     In regard to assault weapons, the SAFE Act immediately banned the sale or transfer of assault weapons within the State but permits people who lawfully owned assault weapons prior to the SAFE Act's enactment to keep the weapons so long as they are registered by April 15, 2014[9]. Owners of such "grandfathered" assault weapons are authorized to sell them out of state or to a New York State licensed dealer.  If they do so by January 15, 2014, they need not  register the weapon. Owners also have the option, as they did under the ban of 2000, of permanently modifying[10] the gun so it no longer qualifies as an assault weapon.

---

[9] The registration form, *see* Exhibit 26, can be completed in a matter of minutes and submitted to the State Police electronically on the SAFE Act website, or by mail. The registration process is confidential and the information contained therein will not be disclosed except for law enforcement purposes.

[10]  Permanent modification is discussed on the SAFE Act website. *See* www.NYSAFEAct.com, which provides the following illustrative example:

Q: If I modify my gun by removing all design characteristics that makes it an assault weapon, do I have to register it?

A: No. If you modify your gun so that it is not an assault weapon, you do not have to register it. The modification must be permanent however. This includes, for example, removing

B.      **Large-Capacity Magazines**

28.      The SAFE Act also prohibits "large capacity ammunition feeding devices", which means magazines, belts, drums, feed strips, or similar devices that have a capacity of, or that can be readily restored[11] or converted to accept more than ten (10) rounds of ammunition (hereinafter "LCMs").  *See* Penal Law § 265.00(23).  Owners of eight (8)- to ten (10)-round magazines may keep them but cannot load them with more than seven (7) rounds, except at an incorporated firing range or during a recognized shooting competition.  *See* Penal Law §§ 265.37 and 265.20(a).[12]

29.      The 2000 state ban in New York, like the federal assault weapons ban, previously exempted, or "grandfathered-in," LCMs manufactured on or before September 13, 1994, but that exemption has been removed and the ban strengthened.   The exemption, in practical application, made the ban on large-capacity magazines manufactured after September 13, 1994 very difficult, if not impossible, to enforce, as in most cases magazines have no serial numbers.

30.      The term "rounds," as it relates to the SAFE Act provisions regarding capacity and load limits on ammunition feeding devices, means the standard rounds that the manufacturer

---

the bayonet lug by cutting or grinding, grinding off the threads on the barrel, removing the foregrip so that it cannot be readily reattached, or any change that cannot be reversed through reasonable means.

[11] The term "readily restored" as it relates to modifications of firearms or ammunition devices means work that can be performed by a gun owner of average abilities without gunsmith level knowledge or skill.  The term was used in the same way, in the definition of "large capacity ammunition feeding device," in both the 1994 federal assault weapons ban as well as the New York assault weapons ban of 2000.

[12] As originally enacted, the SAFE Act would have restricted individuals to seven-round magazines.  *See* § 265.00(23)(b) and (c).  Because few such magazines are made by manufacturers, however, this provision was permanently suspended and made not effective by a subsequent chapter amendment.  2013 N.Y. Laws, ch. 57, pt. FF.  Thus, New York law still permits individuals to possess ten-round magazines; outside of a gun range or shooting competition, however, they may not load them with more than seven rounds.

designed the weapon to accommodate. While it is possible, especially in the cases of shotguns, to use smaller shells than the weapon is designed to accommodate, or to otherwise use unusual or particularly small ammunition, such use is not within the contemplated meaning of this section.

31.     The 2000 ban on LCMs similarly limited magazine size to 10 rounds, as did the federal assault weapons ban. These laws have been understood and enforced for years and did not result in mass confusion or vagueness.  In fact, "10 round magazines" are widely advertised, and available, as compliant with New York law for use in guns that would otherwise have higher than ten (10) capacity.  Moreover, gunsmiths and gun manufacturers are continually adjusting to states' new laws and regulations, and are already doing so for the New York market.

32.     As noted, lawful owners of LCMs will have until January 15, 2014 to either sell them out of state, or sell to a New York State licensed dealer; transfer them to law enforcement; discard them in accordance with state law; or permanently modify them (*see supra* note 10) so that they can no longer hold more than ten (10) rounds.  *See* Penal Law § 265.00(22)(h).

33.     Just as they are exempted from the assault weapons ban, law enforcement officers are exempted from the LCM ban and the seven-round load limit for magazines.  *See* Penal Law § 265.20(a)(1).  New York State licensed dealers may also continue to possess LCMs (as well as assault weapons) and may transfer them to other dealers, individuals out of state, or to authorized law enforcement.  *See* Penal Law § 265.20(a)(10).

34.     LCMs are not necessary for sporting or self-defense purposes.  The New York State Legislature considered, and found, that even if some individuals desire higher capacity magazine rounds, the danger they pose to the public and law enforcement in the hands of a criminal far outweighs any possible potential benefit from such greater round capacity.  A large-

capacity magazines are any semiautomatic weapon's most dangerous feature, as it is the LCM

that allows a dangerous person or a criminal to fire high numbers of rounds without reloading.

**C.      The Ammunition Sales Provisions of the SAFE Act**

35.      Federal law prohibits the sale of ammunition to certain prohibited persons, like

felons, fugitives from justice, drug addicts, certain mentally-ill persons, and those convicted of

domestic violence crimes, among others.  *See* 18 U.S.C. § 922(d).  In provisions that will go into

effect on January 15, 2014, the SAFE Act takes reasonable steps to ensure that these prohibited

persons cannot get ammunition and to track ammunition sales in real time, where a law

enforcement need is implicated, such as repeated denials of the same person to buy ammunition.

*See* Penal Law § 400.03.

36.      The law also includes a ban on direct internet sales of ammunition.  Beginning no

earlier than January 15, 2014, individuals who wish to buy ammunition, including those who

wish to do so online, must appear in-person before an authorized ammunition dealer for a face-

to-face sales transaction.  *See* Penal Law § 400.03(7).  This will permit the seller to perform the

background check and comply with the sale-reporting requirement.  As mentioned above, *see*

*supra* ¶ 5, the SAFE Act was enacted, in part, as a response to mass shootings, like the tragic

events that occurred in Newtown and the shooting in a movie theater in Aurora, Colorado on

July 20, 2012.  The Aurora shooter is reported to have amassed over 6,000 rounds of ammunition

through direct internet purchases prior to his rampage without having to interact with a seller in-

person.[13]

---

[13] In my experience, licensed New York State gun dealers or dealers with a federal firearms
license ("FFL"), are largely careful and responsible.  They will likely refuse to sell to individuals
acting in an outrageously bizarre or threatening manner and when faced with such individuals,
they are likely to call law enforcement.  So, in addition to screening out sales to prohibited
persons, requiring face-to-face transactions adds another layer of protection in terms of the care

37.     Once these new ammunition sales provisions go into effect, the SAFE Act will permit two types of ammunition dealers in New York: i) licensed dealers in firearms, who are not required to take added steps to register for ammunition sales (*see* Penal Law § 400.03(1)); and ii) a new category called "seller[s] of ammunition," who must register with the State Police. *Id*.  As concerns this second category, a "seller of ammunition" is defined as "any person, firm, partnership, corporation or company who engages in the business of purchasing, selling or keeping ammunition."  *See* Penal Law § 265.00(24).

38.     The SAFE Act requires that at the time of each purchase[14] from either a licensed firearms dealer or a registered seller of ammunition, the purchaser of the ammunition must present a valid photo ID and the seller must record the date of sale, the name, age, occupation and residence of purchaser, as well as the amount, caliber, manufacturer and serial number, if any, of the ammunition.  *See* Penal Law § 400.03(2) and (3).

39.     This information will then be used to perform an instant background check of the purchaser.  *Id*.  If the purchaser passes the background check, the ammunition sale is completed. None of the resulting records generated by the sale are subject to inquiries under New York's Freedom of Information Law and they are purged within one year of submission to the State Police.  *See* Penal Law § 400.03(2) and (5).

40.     New York has a compelling interest in regulating ammunition sales to prevent criminals and the dangerously mentally ill from purchasing ammunition.  In particular, even if a criminal already illegally possesses a gun, he or she will have to obtain ammunition for the gun

---

these dealers can take in not selling to an obviously impaired or dangerous person.

[14] The term "commercial transfer" of ammunition, *see* Penal Law § 400.03(7), means transfers involving one who is engaged in the business of selling ammunition, whether or not such business is that person's primary livelihood.  The term "commercial transfers" does not encompass the occasional sale between individuals.

and the SAFE Act is designed to make that more difficult for criminals.   The background check

and face-to-face sale requirements of the SAFE Act are sensible measures that will help to

protect the people of New York, while respecting the rights of its citizens.   As noted above,

federal law wisely prohibits the sale of ammunition to felons, fugitives from justice, drug

addicts, certain mentally-ill persons, and those convicted of domestic violence crimes, *see* 18

U.S.C. § 922(d), but without a background check (and without confirmation of any such check

by a face-to-face transfer), there is currently no national means to prevent ammunition from

being sold to these prohibited persons.   Under the SAFE Act, New York will soon have the

means to close that loophole in the law.

## Conclusion

41.     The SAFE Act is a balanced and well-reasoned approach to further the

compelling state interests in crime prevention and public safety, while placing no practical

impediment on an individual's ability to defend himself or herself, or his or her home.   Among

other things, the SAFE Act furthers the State of New York's vital interests in protecting its

citizenry from the offensive capabilities of weapons designed to function as military firearms by

banning further purchases or transfers of these weapons and requiring registration of those

weapons that continue to be owned.   This freezes the number of assault weapons within the state

and prevents them from falling into the wrong hands.   By eliminating the "grandfathered" 1994

LCMs, that were exempted from the 2000 ban, the SAFE Act makes the 10 round capacity limit

enforceable.   It dramatically reduces the chances that criminals and other dangerous persons can

obtain LCMs and randomly fire large numbers of rounds into crowded areas and to outgun law

enforcement.   While the SAFE Act enhanced and broadened the definition of "assault weapon"

to more fully capture all the offensive and military features that can make a semiautomatic

firearm so dangerous in the hands of the criminally-minded, it has grand-fathered or excepted

from its reach all those assault weapons that were lawfully owned as of January 15, 2013.

Moreover, the SAFE Act recognizes the need of individuals to be armed, for self-defense or

other lawful purposes such as hunting , shooting sports,  and recreational shooting by exempting

from its provisions the overwhelming number and types of handguns, rifles and shotguns

currently owned within New York State.

      42.     While no law can be a cure-all to the obvious gun violence problem in the United

States, the SAFE Act is an important measure that will, among other things, limit the number of

military style weapons and reduce the chances they come into the possession of a dangerously

mentally ill person or criminal thus making New York State safer.

      I declare under penalty of perjury that the foregoing is true and correct.

Dated: Albany, New York
       June 20, 2011

                                    Kevin P. Bruen

17