**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------X
New York State Rifle and Pistol Association, Inc.;                          :
Westchester County Firearms Owners Association, Inc.;          :
Sportsmen's Association for Firearms Education, Inc.;            :   **Civil Action Number:**
New York State Amateur Trapshooting Association, Inc.;        :   **1:13-cv-00291 (WMS)**
Bedell Custom; Beikirch Ammunition Corporation;                  :
Blueline Tactical & Police Supply, LLC; Batavia Marine &    :
Sporting Supply, LLC; William Nojay; Thomas Galvin;           :
and Roger Horvath,                                                                      :
                                                  Plaintiffs,                             :
                                                                                                 :
            -against-                                                                      :
                                                                                                 :
                                                                                                 :
                                                                                                 :
Andrew M. Cuomo, Governor of the State of New York;       :
Eric T. Schneiderman, Attorney General of the State of         :
New York; Joseph A. D'Amico, Superintendent of the           :
New York State Police; Lawrence Friedman, District            :
Attorney for Genesee County; and Gerald J. Gill, Chief of     :
Police for the Town of Lancaster, New York,                         :
                                                                                                 :
                                                  Defendants.                         :
-------------------------------------------------------------------X

## DECLARATION of CHRISTOPHER S. KOPER

Christopher S. Koper, Ph.D., declares and states, under penalty of perjury, as follows:

1.          I am an Associate Professor for the Department of Criminology, Law and Society at George Mason University, in Fairfax, Virginia and a senior fellow at George Mason's Center for Evidence-Based Crime Policy.  (Attached hereto as Exhibit A is a copy of my curriculum vitae.)

2.          In 1997, my colleague Jeffrey Roth and I conducted a study on the impact of Title XI, Subtitle A of the Violent Crime Control and Law Enforcement Act of 1994 (hereinafter the "federal assault weapons ban" or the "federal ban"), for the United States

Department of Justice and the United States Congress.[1]  I updated the original 1997 study

in 2004[2] and briefly revisited the issue again by re-examining my 2004 report in 2013.[3]

To my knowledge, these were the only published academic studies to have examined the

efficacy of the federal ban on assault weapons and ammunition feeding devices holding

more than ten rounds of ammunition (hereinafter referred to as "large-capacity

magazines" or "LCMs").[4]  By its own terms, the federal assault weapons ban expired in

2004.

       3.      This declaration will summarize some of the key findings of those studies

regarding the federal ban and its impact on crime prevention and public safety, and, based

upon my findings, provide some opinions on the potential impact and efficacy of

prohibitions and restrictions on assault weapons and large-capacity magazines, like those

contained in New York's recently enacted Secure Ammunition and Firearms

---

[1] Jeffrey A. Roth & Christopher S. Koper, *Impact Evaluation of the Public Safety and Recreational Firearms Use Protection Act of 1994: Final Report* (1997), attached hereto as Ex. B (hereinafter, "*Impact Evaluation*").

[2] Christopher S. Koper, *An Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets and Gun Violence, 1994-2003* (2004), attached hereto as Ex. C (hereinafter, "*Updated Assessment of the Federal Assault Weapons Ban*").

[3] Christopher S. Koper, *America's Experience with the Federal Assault Weapons Ban, 1994-2004: Key Findings and Implications*, ch. 12, pp. 157-171 in Reducing Gun Violence in America: Informing Policy with Evidence (Daniel S. Webster & Jon S. Vernick eds. 2013), attached hereto as Ex. D (hereinafter "*America's Experience with the Federal Assault Weapons Ban*").

[4] As discussed below, there have been some additional studies as to the impact and efficacy of the federal assault weapons ban conducted by non-academic institutions.  In 2011, for example, the *Washington Post* published the results of its own investigation into the federal ban's impact on the criminal use of LCMs in Virginia. *See infra* ¶ 49.  I am also aware of gun tracing analyses conducted by ATF (2003 Congressional Q&A memo provided to the author) and the Brady Center to Prevent Gun Violence (2004), both of which are consistent with the findings of my studies regarding the decline in assault weapons as a percentage of crime gun traces between the pre-ban and post-ban periods. *See infra* note 21.

Enforcement Act, 2013 N.Y. Laws, ch. 1 (hereinafter, the "SAFE Act").

4.      As discussed below, it is my considered opinion that New York's bans on assault weapons and large-capacity magazines, particularly its LCM ban, have the potential to prevent and limit shootings in the State, particularly those involving high numbers of shots and victims -- and thus are likely to advance New York's interests in protecting its populace from the dangers of such shootings.

## I.      Criminal Uses and Dangers of Assault Weapons and LCMs

5.      Assault weapons are usually defined as a subset of semiautomatic weapons.[5]  Although the precise definition used by various federal, state, and local statutes has varied, it generally includes semiautomatic pistols, rifles, and shotguns with military features conducive to military and potential criminal applications but unnecessary in shooting sports or for self-defense.

6.      The ability to accept a detachable magazine, including a large-capacity magazine, is a common feature of guns typically defined as assault weapons.[6]  In addition, LCMs are frequently used with guns that fall outside of the definition of assault weapon.  (Thus, the universe of assault weapons and LCMs, considered together, is substantially larger than the universe of assault weapons alone.)

---

[5] A semiautomatic weapon is a gun that fires one bullet for each pull of the trigger and, after each round of ammunition is fired, automatically loads the next round and cocks itself for the next shot, thereby permitting a faster rate of fire relative to non-automatic firearms.  Semiautomatics are not to be confused with fully automatic weapons (*i.e.*, machine guns), which fire continuously so long as the trigger is depressed.  Fully automatic weapons have been illegal to own in the United States without a federal permit since 1934.  See *Updated Assessment of the Federal Assault Weapons Ban*, p. 4 n.1.

[6] This was true of the definition of "semiautomatic assault weapon" in the federal assault weapons ban (in which the ability to accept a detachable magazine was, in general, a necessary feature of all such weapons, except for certain shotguns).  See 18 U.S.C. § 921(a)(30) (repealed).  It is also true of the definition of "assault weapon" under the SAFE Act.  See N.Y. Penal Law § 265.00(22).

7.     One of the core rationales for legislative attempts to ban, or otherwise limit, the availability of both assault weapons and LCMs is that they are particularly dangerous because they facilitate the rapid firing of high numbers of rounds. This increased firing capacity thereby potentially increases injuries and deaths from gun violence. See *Updated Assessment of the Federal Assault Weapons Ban*, p. 97 (noting that "studies . . . suggest that attacks with semiautomatics – including [assault weapons] and other semiautomatics with LCMs – result in more shots fired, persons wounded, and wounds per victim than do other gun attacks").

8.     As such, assault weapons and LCMs have frequently been employed in highly publicized mass shootings, and are disproportionately used in the murders of law enforcement officers, crimes for which weapons with greater firepower would seem particularly useful. See *Updated Assessment of the Federal Assault Weapons Ban*, pp. 14-19, 87.

9.     During the 1980s and early 1990s, assault weapons and other semiautomatic firearms equipped with LCMs were involved in a number of highly publicized mass murder incidents that first raised public concerns and fears about the accessibility of high powered, military-style weaponry and other guns capable of discharging high numbers of rounds in a short period of time. For example:

- On July 18, 1984, James Huberty killed 21 persons and wounded 19 others in a San Ysidro, California McDonald's restaurant, using an Uzi carbine, a shotgun, and another semiautomatic handgun, and equipped with a 25-round LCM;

- On January 17, 1989, Patrick Purdy used a civilian version of the AK-47 military rifle and a 75-round LCM to open fire in a Stockton, California schoolyard, killing five children and wounding 29 other persons;

- On September 14, 1989, Joseph Wesbecker, armed with an AK-47 rifle, two MAC-11 handguns, a number of other firearms, and multiple 30-round magazines, killed seven and wounded 15 people at his former workplace in Louisville, Kentucky;

- On October 16, 1991, George Hennard, armed with two semiautomatic handguns with LCMs (and reportedly a supply of extra LCMs), killed 22 people and wounded another 23 in Killgren Texas; and

- On December 7, 1993, Colin Ferguson, armed with a handgun and multiple LCMs, opened fire on commuters on a Long Island Rail Road train, killing 6 and wounding 19.

See *Updated Assessment of the Federal Assault Weapons Ban*, p. 14.[7]

10.     More recently, in the years since the expiration of the federal ban in 2004, there has been another well-publicized series of mass shooting incidents involving

---

[7] Additional details regarding these incidents were obtained from: Violence Policy Center, *Mass Shootings in the United States Involving High-Capacity Ammunition Magazines* (Washington, DC 2012) (hereinafter, "Violence Policy Center 2012"); Mark Follman, Gavin Aronsen & Deanna Pan, *US Mass Shootings, 1982-2012: Data from Mother Jones' Investigation* (updated Feb. 27, 2013), *available at* http://www.motherjones.com/politics/2012/12/mass-shootings-mother-jones-full-data (hereinafter, "Follman, Aronsen & Pan 2013"); and Mark Follman, Gavin Aronsen & Jaeah Lee, *More Than Half of Mass Shooters Used Assault Weapons and High-Capacity Magazines* (Feb. 27, 2013), *available at* http://www.motherjones.com/politics/2013/02/assault-weapons-high-capacity-magazines-mass-shootings-feinstein (hereinafter, "Follman, Aronsen & Lee 2013").

previously banned assault weapons and/or LCMs.  Since 2007, for example, there have

been at least fifteen incidents in which offenders using assault-type weapons or other

semiautomatics with LCMs have wounded and/or killed eight or more people.[8]  Some of

the more notorious of these incidents, both nationally and in New York, include:

- Blacksburg, Virginia, April 16, 2007: Student Seung-Hui Cho killed 33 (including himself) and wounded 17 on the campus of Virginia Tech, armed with a handgun and multiple LCMs;

- Binghamton, New York, April 3, 2009: Jiverly Wong killed 14 (including himself) and wounded 4 at the American Civic Association immigration center, armed with two handguns and a 30-round LCM;

- Tucson, Arizona, January 8, 2011:  Jared Loughner, armed with a handgun and multiple LCMs, killed 6 and wounded 13, including Congresswoman Gabrielle Giffords;

- Aurora, Colorado, July 20, 2012: James Holmes killed 12 and wounded 58 in a movie theater, armed with a Smith & Wesson M&P15 assault rifle, 100-round LCMs, and other firearms; and

- Newtown, Connecticut, December 14, 2012: Adam Lanza killed 26 (twenty of whom were young children) and wounded two at Sandy Hook Elementary School, armed with a Bushmaster AR-15-style assault rifle, two handguns,  and multiple LCMs.

See *America's Experience with the Federal Assault Weapons Ban*, p. 157-58.[9]

---

[8] See Violence Policy Center 2012; Follman, Aronsen & Pan 2013; Follman, Aronsen & Lee 2013.

[9] Additional details regarding these incidents were obtained from: Violence Policy Center

### A.    Assault Weapons

11.    As noted, assault weapons pose particular dangers by their large and disproportionate involvement in two aspects of crime and violence: mass shootings and murders of police. See *Updated Assessment of the Federal Assault Weapons Ban*, pp. 14-19, 87.

12.    With respect to mass shootings, the available evidence before the federal assault weapons ban was enacted in 1994 and after its expiration in 2004 both support this conclusion. Prior to the federal ban, assault weapons or other semiautomatics with LCMs were involved in 6, or 40%, of 15 mass shooting incidents occurring between 1984 and 1993 in which six or more persons were killed or a total of 12 or more were wounded. See *Updated Assessment of the Federal Assault Weapons Ban*, p. 14.[10]

13.    More recently, a media investigation and compilation of 62 lone-shooter[11], public mass shooting incidents that involved the death of four or more people, over the period 1982-2012, reports that more than half of all these mass shooters possessed assault weapons, LCMs, or both.[12]

14.    Assault weapons also appear to be used in a disproportionately high number of shootings of law enforcement officers. For example, although prior to the

---

2012; Follman, Aronsen & Pan 2013; and Follman, Aronsen & Lee 2013.

[10] These figures are based on tabulations that I and my research team did using data reported in Gary Kleck, *Targeting Guns: Firearms and Their Control* (1997), pp. 124-26.

[11] Two incidents included in this media analysis (including the school shooting in Columbine, Colorado) involved two shooters. The rest of incidents involved one shooter. *See infra* note 12.

[12] This investigation and compilation of data on mass shootings was done by reporters at *Mother Jones* magazine. See Follman, Aronsen & Pan 2013; Follman Aronsen & Lee 2013; Mark Follman, Gavin Aronsen & Deanna Pan, *A Guide to Mass Shootings in America* (updated Feb. 27, 2013), *available at* http://www.motherjones.com/politics/2012/07/mass-shootings-map.

federal ban they represented somewhere between 1 and 8% of guns used in crime, assault weapons accounted for as many as 16% of the gun murders of police in 1994.  See *Updated Assessment of the Federal Assault Weapons Ban*, p. 11, 14-15 & n.12; *Impact Evaluation*, pp. 98-100;  *America's Experience with the Federal Assault Weapons Ban*, pp. 160-61.

15.     In addition to their disproportionate use in mass shootings and police murders, there is also evidence to suggest that assault weapons are more attractive to criminals, than lawful users, due to the weapons' military-style features and their particularly large ammunition capacities.  See *Updated Assessment of the Federal Assault Weapons Ban*, pp. 17-18.

16.     For example, a study of young adult handgun buyers in California found that buyers with minor criminal histories, such as arrests or misdemeanor convictions that did not disqualify them from purchasing handguns, were more than twice as likely to purchase assault pistols than were buyers with no prior criminal history (4.6% to 2%, respectively). And those with more serious criminal histories were even more likely to purchase assault pistols:  6.6% of those charged with a prior gun offense bought assault pistols, as did 10% of those who had been charged with two or more serious violent offenses.  See *Updated Assessment of the Federal Assault Weapons Ban*, p. 17.

**B.     LCMs**

17.     LCMs, because they can be and are used both with assault weapons and guns that fall outside the definition of an assault weapon, appear to present even greater dangers to crime and violence than assault weapons alone.

18.     Prior to the federal assault weapons ban, for example, guns with LCMs were used in roughly 13-26% of most gun crimes (as opposed to somewhere between about 1% and 8% for assault weapons alone).   See *Updated Assessment of the Federal Assault Weapons Ban*, pp. 15, 18-19; *America's Experience with the Federal Assault Weapons Ban*, pp. 161-62.

19.     And, in New York City, the New York State Division of Criminal Justice Services reported that, in 1993, at least 16%, and as many as 25%, of guns recovered in murder investigations were equipped with LCMs.  See *Updated Assessment of the Federal Assault Weapons Ban*, p. 18.[13]

20.     Like assault weapons, it also appears that guns with LCMs have been used disproportionately in murders of police.  Specifically, the available data, from prior to the federal ban, indicates that LCMs are used in somewhere between 31% to 41% of gun murders of police.  See *Updated Assessment of the Federal Assault Weapons Ban*, p. 18; *America's Experience with the Federal Assault Weapons Ban*, p. 162.

21.     Firearms with LCMs also tend to account for a higher share of guns used in mass public shootings.  As noted above, prior to the federal ban, semiautomatics with LCMs, including assault weapons, were involved in 6, or 40%, of 15 mass shooting incidents occurring between 1984 and 1993 in which six or more persons were killed or a total of 12 or more were wounded.  See *Updated Assessment of the Federal Assault Weapons Ban*, p. 14; *America's Experience with the Federal Assault Weapons Ban*, p. 161.  And a recent media investigation reports that, since 1982, half of all lone public

---

[13] The minimum estimate is based on cases in which discharged firearms were recovered, while the maximum estimate is based on cases in which recovered firearms were positively linked to the case with ballistic evidence.  See *Updated Assessment of the Federal Assault Weapons Ban*, p. 18 n.15.

mass shooters who killed 4 or more persons possessed LCMs when carrying out their attacks.[14]

22.     In addition, the available evidence suggests that gun attacks with semiautomatics -- including both assault weapons and guns equipped with LCMs -- tend to result in more shots fired, more persons wounded, and more wounds inflicted per victim than do attacks with other firearms. See *Updated Assessment of the Federal Assault Weapons Ban*, p. 97; *America's Experience with the Federal Assault Weapons Ban*, p. 166-67.

23.     For example, in mass shooting incidents that resulted in at least 6 deaths or at least 12 total gunshot victims from 1984 through 1993, offenders who clearly possessed assault weapons or other semiautomatics with LCMs wounded or killed an average of 29 victims in comparison to an average of 13 victims wounded or killed by other offenders. See *Updated Assessment of the Federal Assault Weapons Ban*, pp. 85-86; *America's Experience with the Federal Assault Weapons Ban*, p. 167.

24.     Similarly, a study of handguns attacks in Jersey City, New Jersey during the 1990s found that the average number of victims wounded in gunfire incidents involving semiautomatic pistols was 15% higher than in those involving revolvers. The study further found that attackers using semiautomatics to fire more than ten shots were responsible for nearly 5% of all gunshot victims. *Updated Assessment of the Federal Assault Weapons Ban*, p. 84-85, 90-91; *America's Experience with the Federal Assault Weapons Ban*, p. 167.

---

[14] See Follman, Aronsen & Lee 2013.

25.     And, in an analysis I conducted of guns recovered by police in Baltimore, I also found LCMs to be associated with gun crimes that resulted in more lethal and injurious outcomes.  For instance, I found, among other things, that guns used in shootings were 17% to 26% more likely to have LCMs than guns used in gunfire cases with no wounded victims, and guns linked to murders were 8% to 17% more likely to have LCMs than guns linked to non-fatal gunshot victimizations.  See *Updated Assessment of the Federal Assault Weapons Ban*, p. 87.

26.     In short, while tentative, the available evidence suggests more often than not that attacks with semiautomatics, particularly those equipped with LCMs, result in more shots fired, leading both to more injuries and injuries of greater severity.

## II.     <u>The 1994 Federal Assault Weapons Ban</u>

### A.     Provisions of the Federal Assault Weapons Ban

27.     Enacted on September 13, 1994 -- in the wake of many of the mass shootings described above -- the federal assault weapons ban imposed prohibitions and restrictions on the manufacture, transfer, and possession of both certain semiautomatic firearms designated as assault weapons and certain LCMs.  Pub. L. No. 103-322, tit. XI, subtit. A, 108 Stat. 1796, 1996-2010 (1994).

28.     The federal assault weapons ban was to expire after ten years, unless renewed by Congress.  *Id.* § 110105(2).  It was not renewed, and thus, by its own terms, the federal ban expired on September 13, 2004.[15]

---

[15] I understand that, in 2000, New York enacted a ban on assault weapons and LCMs that was identical in its terms to the federal ban.  This ban, as I understand it, remained the law in New York until the enactment of the SAFE Act in 2013.

*Banned assault weapons and features*

29.    As noted, the federal assault weapons ban imposed a ten-year ban on the manufacture, transfer, or possession of what the statute defined as "semiautomatic assault weapons." The federal ban was not a prohibition on all semiautomatic firearms; rather, it was directed against those semiautomatics having features that are useful in military and criminal applications but that are unnecessary in shooting sports or for self-defense.

30.    Banned firearms were identified under the federal law in two ways: (i) by specific make and model; and (ii) by enumerating certain military-style features and generally prohibiting those semiautomatic firearms having two or more of those features.

31.    First, the federal ban specifically prohibited 18 models and variations of semiautomatic guns by name (*e.g.*, the Intratec TEC-9 pistol and the Colt AR-15 rifle), as well as revolving cylinder shotguns.  This list also included a number of foreign rifles that the federal government had banned from importation into the country beginning in 1989 (*e.g.*, the Avtomat Kalashnikov models).  And, indeed, several of the guns banned by name were civilian copies of military weapons and accepted ammunition magazines made for those military weapons.   (A list of the weapons banned by name in the 1994 law is set forth in Table 2-1 of the *Updated Assessment of the Federal Assault Weapons Ban*, p. 5.)

32.    Second, the federal assault weapons ban contained a "features test" provision that generally prohibited other semiautomatic guns having two or more military-style features.  Examples of such features include pistol grips on rifles, flash suppressors, folding rifle stocks, threaded barrels for attaching silencers, and the ability to accept detachable magazines.  (This "features test" of the federal assault is described

more fully in Table 2-2 of the *Updated Assessment of the Federal Assault Weapons Ban*, p. 6, and in Table 12-1 of *America's Experience with the Federal Assault Weapons Ban*, p. 160.)

### Banned LCMs

33.    The federal ban also prohibited most ammunition feeding devices holding more than ten rounds of ammunition (which I have referred to herein as "large-capacity magazines" or "LCMs").

34.    Like New York law both before and after the SAFE Act, the federal ban on LCMs extended to LCMs or similar devices that had the capacity to accept more than ten rounds of ammunition, or that could be "readily restored or converted or to accept" more than ten rounds of ammunition.[16]

### Exemptions and limitations to the federal ban

35.    The 1994 federal assault weapons ban contained several important exemptions that limited its potential impact, especially in the short-term.  See *Updated Assessment of the Federal Assault Weapons Ban*, pp. 10-11.

36.    First, assault weapons and LCMs manufactured before the effective date of the ban were "grandfathered" in and thus legal to own and transfer.  Estimates suggest that there may have been upward of 1.5 million assault weapons and 25-50 million LCMs thus exempted from the federal ban.  Moreover, an additional 4.8 million pre-ban LCMs were imported into the country from 1994 through 2000 under the grandfathering

---

[16] Technically, the ban prohibited any magazine, belt, drum, feed strip, or similar device that had the capacity to accept more than 10 rounds of ammunition, or which could be readily converted or restored to accept more than 10 rounds of ammunition.  The ban exempted attached tubular devices capable of operating only with .22 caliber rimfire (*i.e.*, low velocity) ammunition.

exemption.  Importers were also authorized to import another 42 million pre-ban LCMs, which may have arrived after 2000.  See *Updated Assessment of the Federal Assault Weapons Ban*, p. 10; *America's Experience with the Federal Assault Weapons Ban*, pp. 160-61.

      37.     Furthermore, although the 1994 law banned "copies or duplicates" of the named firearms banned by make and model, federal authorities emphasized exact copies in enforcing this provision.  Similarly, the federal ban did not apply to a semiautomatic weapon possessing only one military-style feature listed in the ban's features test provision.[17]  Thus, many civilian rifles patterned after military weapons were legal under the ban with only slight modifications.  See *Updated Assessment of the Federal Assault Weapons Ban*, pp. 10-11.[18]

---

[17] It should be noted, however, that any firearms imported into the country must still meet the "sporting purposes test" established under the federal Gun Control Act of 1968.  In 1989, ATF determined that foreign semiautomatic rifles having any one of a number of named military features (including those listed in the features test of the 1994 federal assault weapons ban) fail the sporting purposes test and cannot be imported into the country.  In 1998, the ability to accept an LCM made for a military rifle was added to the list of disqualifying features.  Consequently, it was possible for foreign rifles to pass the features test of the federal assault weapons ban but not meet the sporting purposes test for imports.  See *Updated Assessment of the Federal Assault Weapons Ban*, p. 10 n.7.

[18] Examples of some of these modified, legal versions of banned guns that manufacturers produced in an effort to evade the ban are listed in Table 2-1 of the *Updated Assessment of the Federal Assault Weapons Ban*, p. 5.

B.            Impact of the Federal Assault Weapons Ban

*Assault weapons*

38.    Prior to the federal ban, the best estimates are that there were approximately 1.5 million privately owned assault weapons in the United States (less than 1% of the total civilian gun stock).  See *America's Experience with the Federal Assault Weapons Ban*, pp. 160-61; *Updated Assessment of the Federal Assault Weapons Ban*, p. 10.

39.    Although there was a surge in production of assault weapon-type firearms as Congress debated the ban in 1994, the federal ban's restriction of new assault weapon supply helped drive up the prices for many assault weapons (notably assault pistols) and appeared to make them less accessible and affordable to criminal users.  See *America's Experience with the Federal Assault Weapons Ban*, pp. 162-63; *Updated Assessment of the Federal Assault Weapons Ban*, pp. 25-38.

40.    Analyses that my research team and I conducted of several national and local databases on guns recovered by law enforcement indicated that crimes with assault weapons declined after the federal assault weapons ban was enacted in 1994.

41.    In particular, across six major cities (Baltimore, Miami, Milwaukee, Boston, St. Louis, and Anchorage), the share of gun crimes involving assault weapons declined by 17% to 72%, based on data covering all or portions of the 1995-2003 post-ban period.  See *Updated Assessment of the Federal Assault Weapons Ban*, pp. 2, 46-60; *America's Experience with the Federal Assault Weapons Ban*, p. 163.

42.    This analysis of local data is consistent with patterns found in the national data on guns recovered by law enforcement agencies around the country and reported to

the federal Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") for investigative gun tracing.[19]  Specifically, although the interpretation is complicated by changes in tracing practices that occurred during this time, the national gun tracing data suggests that use of assault weapons in crime declined with the onset of the 1994 federal assault weapons ban, as the percentage of gun traces for assault weapons fell 70% between 1992-93 and 2001-02 (from 5.4% to 1.6%).  And, notably, this downward trend did not begin until 1994, the year the federal ban was enacted.  See *Updated Assessment of the Federal Assault Weapons Ban*, pp. 2, 39-46, 51-52; *America's Experience with the Federal Assault Weapons Ban*, p. 163.[20]

43.    In short, the analysis that my research team and I conducted indicates that the criminal use of assault weapons declined after the federal assault weapons ban was enacted in 1994, independently of trends in gun crime.  See *Updated Assessment of the Federal Assault Weapons Ban*, pp. 51-52; *America's Experience with the Federal Assault Weapons Ban*, p. 163.

44.    This decline in crimes with assault weapons was due primarily to a reduction in the use of assault pistols.  Assessment of trends in the use of assault rifles was complicated by the rarity of crimes with such rifles and by the substitution in some cases of post-ban rifles that were very similar to the banned models.  In general, however,

---

[19] A gun trace is an investigation that typically tracks a gun from its manufacture to its first point of sale by a licensed dealer. It is undertaken by the ATF, upon request by a law enforcement agency.  The trace is generally initiated when the requesting law enforcement agency provides ATF with a trace request including identifying information about the firearm, such as make, model and serial number.  For the full discussion of the use of ATF gun tracing data, see section 6.2 of *Updated Assessment of the Federal Assault Weapons Ban* , pp. 40-46.

[20] These findings are consistent with other tracing analyses conducted by ATF and the Brady Center to Prevent Gun Violence.  See *Updated Assessment of the Federal Assault Weapons Ban*, p. 44 n.43.

the decline in assault weapon use was only partially offset by substitution of post-ban assault weapon-type models. Even counting the post-ban models as assault weapons, the share of crime guns that were assault weapons fell 24% to 60% across most of the local jurisdictions studied. Patterns in the local data sources also suggested that crimes with assault weapons were becoming increasingly rare as the years passed. See *Updated Assessment of the Federal Assault Weapons Ban*, pp. 46-52; *America's Experience with the Federal Assault Weapons Ban*, pp. 163-64.

45.     Thus, while developing a national estimate of the number of assault weapons crimes prevented by the federal ban is complicated by the range of estimates of assault weapon use and changes therein derived from different data sources, tentatively, it appears that the federal ban prevented a few thousand crimes with assault weapons annually. For example, using 2% as the best estimate of the share of gun crimes involving assault weapons prior to the ban, and 40% as a reasonable estimate of the post-ban drop in this figure, implies that almost 2,900 murders, robberies, and assaults with assault weapons were prevented in 2002. See *Updated Assessment of the Federal Assault Weapons Ban*, p. 52 n.61.[21]

*LCMs*

46.     Assessing trends in LCM use is much more difficult because there was, and is, no national data source on crimes with LCMs, and few local jurisdictions maintain this sort of information.

---

[21] While it seems likely that some or all of these crimes happened regardless, as perpetrators merely substituted some other gun for the assault weapon, it also seems likely that the number of victims per shooting incident, and the number of wounds inflicted per victim was diminished in some of those instances.

47.     It was possible, nonetheless, to examine trends in the use of guns with LCMs in four jurisdictions: Baltimore, Milwaukee, Anchorage, and Louisville. In all four jurisdictions, the overall share of crime guns equipped with LCMs rose or remained steady through at least the late 1990s. This failure to reduce overall LCM use for at least several years after the federal ban was likely due to the immense stock of exempted pre-ban magazines, which, as noted, was enhanced by post-ban imports. See *Updated Assessment of the Federal Assault Weapons Ban*, p. 68-79; *America's Experience with the Federal Assault Weapons Ban*, pp. 164.

48.     My studies did show that the trend in crimes with LCMs may have been changing by the early 2000s, but the available data in the four cities I investigated were too limited and inconsistent to draw any clear overall conclusions in this regard. See *America's Experience with the Federal Assault Weapons Ban*, p. 164; *Updated Assessment of the Federal Assault Weapons Ban*, pp. 68-79.

49.     However, a later investigation by the *Washington Post* of LCM use in Virginia, analyzing data maintained by the Virginia State Police as to guns recovered in crimes by local law enforcement officers across the state, suggests that the ban may have had a more substantial impact on the supply of LCMs to criminal users by the time it expired in 2004. In Virginia, the share of recovered guns with LCMs generally varied between 13% and 16% from 1994 through 2000 but fell to 9% by 2004. Following expiration of the federal ban in 2004, the share of Virginia crime guns with an LCM rose to 20% by 2010. See *America's Experience with the Federal Assault Weapons Ban*, p. 165.[22]

---

[22] The results of the *Washington Post*'s original investigation (which are what are

*Results of the Federal Assault Weapons Ban*

50.   The federal ban's exemption of millions of pre-ban assault weapons and LCMs meant that the effects of the law would occur only gradually -- and that those effects were still unfolding when the ban expired in 2004.  Nevertheless, while the ban did not appear to have a measurable effect on overall gun crime during the limited time it was in effect, as just discussed, my studies and others do appear to show a significant impact on the number of gun crimes involving assault weapons and a possibly significant impact (based on the *Washington Post*'s analysis of Virginia data) on those crimes involving LCMs.[23]

51.   Moreover, as set forth in my 2013 book chapter, there is evidence that, had the federal ban remained in effect longer (or were it renewed), it could conceivably have yielded significant additional societal benefits as well, potentially preventing hundreds of

---

conveyed in *America's Experience with the Federal Assault Weapons Ban*, p. 165) are reported in David S. Fallis & James V. Grimaldi, *Va. Data Show Drop in Criminal Firepower During Assault Gun Ban*. Wash. Post, Jan. 23, 2011, *available at* http://www.washingtonpost.com/wp-dyn/content/article/2011/01/22/AR2011012203452.html.  Earlier this year, the *Post* updated this analysis, and slightly revised the figures it reported by identifying and excluding from its counts more than 1,000 .22-caliber rifles with large-capacity tubular magazines, which were not subject to the federal ban (and which are similarly not subject to New York's ban on large-capacity magazines).  See David S. Fallis, *Data Indicate Drop in High-Capacity Magazines During Federal Gun Ban*, Wash. Post, Jan. 10, 2013, *available at* http://www.washingtonpost.com/investigations/data-point-to-drop-in-high-capacity-magazines-during-federal-gun-ban/2013/01/10/d56d3bb6-4b91-11e2-a6a6-aabac85e8036_story.html.  This updated data, is reported above.

[23] In our initial 1997 study on the impact of the federal assault weapons ban, Jeffrey Roth and I also estimated that gun murders were about 7% lower than expected in 1995 (the first year after the ban), adjusting for pre-existing trends.  See *Impact Evaluation*, p. 6, 79-85.  However, the very limited post-ban data available for that study precluded a definitive judgment as to whether this drop was statistically meaningful.  Our later findings on LCM use made it difficult to credit the ban with this effect, however, and we did not update it for our 2004 report.  See *Updated Assessment of the Federal Assault Weapons Ban*, p. 92 n.109.

gunshot victimizations annually and producing millions of dollars of cost savings per year in medical care alone.  Indeed, reducing shootings by even a very small margin could produce substantial long-term savings for society, especially as the shootings prevented accrue over many years  See *America's Experience with the Federal Assault Weapons Ban*, pp. 166-67; see also *Updated Assessment of the Federal Assault Weapons Ban*, p. 100 n.118.

### III.    THE SAFE ACT

52.     As noted above, on January 15, 2013, the State of New York enacted the SAFE Act.  Among other things, the SAFE Act strengthened New York's existing bans on assault weapons and large-capacity magazines (which had previously mirrored the standards set forth in the 1994 federal assault weapons ban, *see supra* ¶¶ 27-37).  I examine these prohibitions and restrictions on assault weapons and large-capacity magazines, and opine as to their potential impact and likely efficacy, below.[24]

#### A.    New York's Assault Weapons Ban

53.     In the SAFE Act, New York strengthened its existing assault weapons ban -- which, like the 1994 federal ban, consisted of a list of specifically prohibited firearms and a "features test" provision that generally prohibited other semiautomatic guns having two or more military-style features -- with  a "one-feature" test.  In short, under the SAFE Act, New York's assault weapons ban now applies to any gun that is semiautomatic, has

---

[24] I note that the SAFE Act is a comprehensive law, containing many other provisions -- including a new requirement for background checks on private sales of guns, strengthened regulations to limit access to firearms by those with a disqualifying mental condition, new regulations intended to prevent the purchase of ammunition by prohibited persons, and increased penalties for illegal gun use --  designed to combat gun crime and violence and increase public safety.  I limit my analysis here to New York's bans on assault weapons and large-capacity magazines.

the ability to accept a detachable magazine (in the case of rifles and pistols), and possesses at least *one* military-style feature.  N.Y. Penal Law § 265.00(22).[25]

54.     The SAFE Act also added to and refined the list of military-style features that make a semiautomatic firearm an assault weapon.  *Id.*

55.     The SAFE Act does not ban any guns that were lawfully possessed prior to its effective date of January 15, 2013.  Those who lawfully possessed assault weapons at that time may continue to do so; they need only register their firearm within fifteen months (*i.e.*, by April 15, 2004) with the State Police.  N.Y. Penal Law § 265.00(g)(v).

**B.   New York's LCM Ban**

56.     The SAFE Act also amended New York's existing ban on LCMs -- which, as noted, was identical to the 1994 federal ban -- so as to ban all LCMs that have the capacity to hold more than ten rounds of ammunition, including those that were grandfathered in under the original assault weapons ban.  *Id.* § 265.00(23).  My understanding is that those who currently own a magazine holding more than ten rounds have until January 15, 2014, to sell it out of state or through an authorized in-state firearms dealer, to transfer the magazine to law enforcement, or to discard it in accordance with state law.

57.     In addition, the SAFE Act limits to seven the number of rounds of ammunition that one may load into a magazine (unless at a gun range or recognized shooting competition, where ten-round magazines may be loaded to full capacity).  *Id.* § 265.37; *id.* § 265.20(a)(7-f).

---

[25] Revolving cylinder shotguns, which were included as part of the federal ban and New York's own prior ban, also remain banned under the SAFE Act.  *Id.* § 265.00(22)(d).

## C.      The Potential Impact and Efficacy of New York's Bans

58.     The SAFE Act was recently enacted and I have not undertaken any study or analysis of its effects.  But the SAFE Act does address some weaknesses that were present in the federal ban.

59.     In particular, while the LCM ban was arguably the most important feature of the 1994 federal ban (given that LCMs are the key feature contributing to an assault weapon's firepower, and that the reach of the LCM was much greater than the assault weapons ban as many semiautomatic guns that were not banned could still accept LCMs), my studies as to the effects of the federal ban indicated that the LCM ban was likely not as efficacious in reducing the use of these magazines in crime as it otherwise might have been because of the large number of pre-ban LCMs which were exempted from the ban. The *Washington Post*'s investigation of recovered guns with LCMs in Virginia, which showed an increasing decline in the number of recovered guns with LCMs the longer the ban was in effect, similarly suggests that the grandfathering of pre-ban LCMs delayed the full impact of the federal ban.

60.     As noted, through the SAFE Act, New York has attempted to address the limitations that the grandfathering provision placed on the efficacy of the federal ban by eliminating this exemption for pre-ban LCMs.  Under the SAFE Act, New York now prohibits the possession of all magazines with the capacity to contain more than ten rounds, regardless of the date of manufacture.  Accordingly, by eliminating the grandfathering of pre-ban LCMs, the SAFE Act's LCM ban appears to have even greater potential for reducing gun deaths and injuries, and doing so more immediately, than did the federal ban on LCMs.

61.     Furthermore, as also noted, the SAFE Act has generally limited to seven the number of rounds of ammunition that may be loaded into a magazine.  Based on my studies of the effects of LCMs and of the federal ban, my view is that this limitation, too, has the potential for favorable reduction effects on shootings in New York.  See Updated Assessment of the Federal Assault Weapons Ban, pp. 83-91.

62.     More specifically, as discussed above, see supra ¶¶ 17-26, 51, the available evidence suggests that attacks with semiautomatics, particularly those equipped with LCMs, result in more shots being fired, leading to both more injuries and injuries of greater severity.  By reducing to seven the number of shots that may be fired without reloading, New York's ban increases the chances of reducing the number of shots that are fired and thus reducing such gunshot victimizations, as well as the high medical care costs resulting from such potential gunshot victimizations.  See Updated Assessment of the Federal Assault Weapons Ban, pp. 83-91, 100 n.118.

63.     In addition, as noted, the SAFE Act also has amended New York's assault weapons ban, moving it to a "one-feature" test rather than the "two-feature" test that had existed under the federal ban (as well as prior New York law).  As a result, it appears that the simple cosmetic changes that made banned guns into legal substitutes under the federal assault weapons ban have now been made much more difficult in New York.  And this provision will thus further limit the availability of weapons with military-style characteristics considered conducive to criminal applications.  See supra ¶¶ 11-26, 38-45.

64.     While the SAFE Act's provisions prohibiting and restricting assault weapons and large-capacity magazines will certainly not be a panacea for the gun violence epidemic, they appear to be reasonable and well-constructed measures, like

federal restrictions on fully automatic weapons and armor-piercing ammunition, that will help prevent the spread of particularly dangerous weaponry.

65.     In sum, it is my considered opinion that New York's bans on assault weapons and large-capacity magazines, particularly its LCM ban, have the potential to prevent and limit shootings in the State, particularly those involving high numbers of shots and victims -- and thus are likely to advance New York's interests in protecting its populace from the dangers of such shootings.

Pursuant to 28 U.S.C. § 1746 I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.  Executed on June ___, 2013

Christopher S. Koper, Ph.D.