UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

NEW YORK STATE RIFLE AND PISTOL
ASSOCIATION, INC.; WESTCHESTER
COUNTY FIREARMS OWNERS
ASSOCIATION, INC.; SPORTSMEN'S
ASSOCIATION FOR FIREARMS EDUCATION,
INC.; NEW YORK STATE AMATEUR
TRAPSHOOTING ASSOCIATION, INC.;
BEDELL CUSTOM; BEIKIRCH AMMUNITION
CORPORATION; BLUELINE TACTICAL &
POLICE SUPPLY, LLC; BATAVIA MARINE &
SPORTING SUPPLY; WILLIAM NOJAY,
THOMAS GALVIN, and ROGER HORVATH,

                    Plaintiffs,                          13-cv-00291-WMS

               -v.-

ANDREW M. CUOMO, Governor of the State of
New York; ERIC T. SCHNEIDERMAN, Attorney
General of the State of New York; JOSEPH A.
D'AMICO, Superintendent of the New York State
Police; LAWRENCE FRIEDMAN, District
Attorney for Genesee County; and GERALD J.
GILL, Chief of Police for the Town of Lancaster,
New York,

                    Defendants.

## MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION AND IN SUPPORT OF STATE DEFENDANTS' CROSS-MOTION TO DISMISS AND/OR FOR SUMMARY JUDGMENT

ERIC T. SCHNEIDERMAN
Attorney General of the State of New York
*Attorney for Defendants*
120 Broadway, 24th Floor
New York, New York 10271
(212) 416-8426
william.taylor@ag.ny.gov

WILLIAM J. TAYLOR, JR.
Assistant Attorney General
    *Of Counsel*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................ i

PRELIMINARY STATEMENT ........................................................................................ 1

STATEMENT OF FACTS ................................................................................................ 3

A.  The Relevant Law in New York Prior to the SAFE Act .......................................... 3

    1. 1994 Federal Assault Weapons Ban ................................................................ 3
    2. Federal Import Ban on Certain Assault Weapons ........................................... 6
    3. New York Enacts Its Own State Law Ban on
       Assault Weapons and Large-Capacity Magazines ......................................... 7

B.  The SAFE Act ......................................................................................................... 8

    1. New York's Enhanced Assault Weapons Ban ................................................. 8
    2. New York's Enhanced Ban on Large-Capacity
       Magazines and Ammunition Load Limits ..................................................... 10
    3. New York's Regulation of Ammunition Sales to Prevent
       the Purchase of Ammunition by Prohibited Persons ................................... 12

C.  The Present Action ............................................................................................... 13

LEGAL STANDARDS ................................................................................................... 14

ARGUMENT .................................................................................................................. 17

I.   PLAINTIFFS' SECOND AMENDMENT CHALLENGES
    TO THE SAFE ACT FAIL AS A MATTER OF LAW ................................................. 17

    A. *Heller* and *McDonald* .......................................................................................... 17
    B. The Post-*Heller* Framework for Assessing Plaintiffs'
       Second Amendment Claims ............................................................................. 19
    C. Since *Heller*, Federal and State Courts Have Upheld Prohibitions
       and Restrictions on Assault Weapons and Large-Capacity Magazines ..................... 21
    D. The SAFE Act's Prohibitions and Restrictions on Assault Weapons
       and Large-Capacity Magazines Regulate Conduct that Is Outside the
       Scope of -- and Thus Entirely Unprotected by -- the Second Amendment .............. 25

        1. New York's Assault Weapons Ban Does Not Implicate the
          Second Amendment .............................................................................. 25

       *a. Assault Weapons Are Unusually Dangerous Military-Style Firearms* ........... 25
       *b. Assault Weapons Are Not In "Common Use"* ................................................ 29
       *c. Assault Weapons Are Not "Typically Possessed by Law-Abiding*
          *Citizens for Lawful Purposes" Such as Self-Defense and Hunting* ................ 30

    2. Neither New York's Ban on Large-Capacity Magazines Nor Its
       Seven-Round Load Limit Implicates the Second Amendment ........................... 34

       *a. The Banned Ammunition Devices Are "Dangerous and Unusual"* ................ 34
       *b. The Banned Devices Are Not "Typically Used for Lawful Purposes"* ........... 36

  E. Counts One and Two Also Fail Because the Challenged Provisions
    of the SAFE Act Do Not "Substantially Burden the Second Amendment"
    and Plainly Satisfy Rational Basis Review ................................................................. 39

    1. New York's Assault Weapons Ban Does Not Substantially Burden the
       Second Amendment and Survives the Requisite Rational Basis Review ............ 40
    2. New York's Ban on Large-Capacity Magazines and Its Seven-Round
       Load Limit Do Not Substantially Burden the Second Amendment and
       Survive Rational Basis Review ........................................................................... 43

  F. Even If Heightened Scrutiny Applied Here, the Challenged Provisions
    of the SAFE Act Would Plainly Pass Constitutional Muster .................................... 46

    1. If Heightened Scrutiny Is Necessary, Intermediate --Not Strict –
       Scrutiny Would Be Appropriate ........................................................................ 46
    2. The Applicable Intermediate Scrutiny Standard ................................................ 49
    3. New York's Assault Weapons and Large-Capacity Magazine Bans
       and the Seven-Round Load Limit Satisfy Intermediate Scrutiny ....................... 50

II. PLAINTIFFS' EQUAL PROTECTION CLAIM FAILS AS A MATTER OF LAW ........... 56

  A. Plaintiffs' Equal Protection Claim Fails Because the SAFE
    Act Does Not  Treat Similarly Situated Persons Differently .................................... 57

  B. Plaintiffs' Equal Protection Claim Also Fails Because the
    Statutory Classification Here Survives Rational Basis Review ................................. 58

III. THE SAFE ACT IS NOT UNCONSTITUTIONALLY VAGUE ........................................ 60

  A. The Applicable Vague-In-All-Applications Standard ................................................ 61
  B. None of the Challenged SAFE Act Terms is Unconstitutionally Vague ................... 63

    1. The Ten-Round Capacity Provisions are Not Vague............................................ 64

     *i.  The Phrase "Can Be Readily Restored or Converted to Accept"*
        *is Not Vague* .................................................................. 64

     *ii.  The Definition of "Large Capacity Ammunition Feeding Device"*
        *is Not Vague With Respect to Tubular Magazines* ........................... 65

  2.  The Terms "Pistol Grip that Protrudes Conspicuously" and
     "Protruding Grip that Can be Held by the Non-Trigger Hand"
     are Not Vague ....................................................................... 67

  3.  The Exclusion for Semiautomatic Shotguns that Cannot Hold
     More than Five Rounds is Not Vague ............................................ 68

  4.  Section 265.36 is Not Vague .................................................... 68

  5.  The Term "Threaded Barrel Designed to Accommodate a Flash
     Suppressor, Muzzle Br[a]k[e] or Muzzle Compensator" is Not Vague ............ 70

  6.  The Term "Version" is Not Vague ............................................... 71

  7.  The Term "Manufactured Weight" is Not Vague ................................ 72

  8.  The Term "Commercial Transfer" is Not Vague ............................... 73

IV.  PLAINTIFFS' CLAIMS IN COUNT FOUR FAIL ON RIPENESS GROUNDS
    AND BECAUSE THEY FAIL TO STATE A VIABLE CAUSE OF ACTION ................. 73

  A.  Count Four Is Not Justiciable................................................... 74
  B.  Count Four Also Should Be Dismissed Because Plaintiffs Fail
     to State a Viable Claim on the Merits ......................................... 75

V.  OTHER GROUNDS FOR DISMISSAL OF THE ACTION ............................... 77

VI.  PLAINTIFFS HAVE FAILED TO ESTABLISH ENTITLEMENT TO A
    PRELIMINARY INJUNCTION ........................................................ 78

CONCLUSION................................................................................ 79

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Am. Trucking Ass'ns* v. *Mich. PSC*,
545 U.S. 429 (2005)..........................................................................................75

*Anderson* v. *Liberty Lobby, Inc.*,
477 U.S. 242 (1986)..........................................................................................15

*Armour* v. *City of Indianapolis*,
132 S. Ct. 2073 (2012).................................................................................58-59

*Arnold* v. *City of Cleveland*,
616 N.E.2d 163 (Ohio 1993)......................................................................24, 42

*Arnold's Wines, Inc.* v. *Boyle*,
571 F.3d 185 (2d Cir. 2009)......................................................................75-76

*Ashcroft* v. *Iqbal*,
556 U.S. 662 (2009)..........................................................................................15

*Benjamin* v. *Bailey*,
662 A.2d 1226 (Conn. 1995) ...............................................................24, 42, 57

*Brown & Williamson Tobacco Corp.* v. *Pataki*,
320 F.3d 200 (2d Cir. 2003).....................................................................,75-76

*Brown* v. *Eli Lilly & Co.*,
654 F.3d 347 (2d Cir. 2011)............................................................................15

*Bryant* v. *N.Y. State Educ. Dep't*,
692 F.3d 202 (2d Cir. 2012), *cert. denied*, 133 S. Ct. 2022 (2013) .......................58

*Butler* v. *City of Batavia*,
545 F. Supp. 2d 289 (W.D.N.Y. 2008), *aff'd*, 323 F. App'x 21 (2d Cir. 2009) ....................56

*Carvajal* v. *Artus*,
633 F.3d 95 (2d Cir. 2011)..............................................................................74

*Citizens for a Safer Cmty.* v. *City of Rochester*,
164 Misc. 2d 822 (Sup. Ct. Monroe Cnty. 1994) (Siragusa, J.) .......................24, 45

*City of Boerne* v. *Flores*,
521 U.S. 507 (1997)..........................................................................................49

*City of Cincinnati* v. *Langan*,
    640 N.E.2d 200 (Ohio Ct. App. 1994) ....................................................... 24, 45-46

*Coal. of N.J. Sportsmen, Inc.*, v. *Whitman*,
    44 F.Supp.2d 666 (D.N.J. 1999), *aff'd*, 263 F.3d 157 (3d Cir. 2001).........57, 59, 62-63, 65-67

*Danials-Kirisits v. N.Y. State Office of Court Admin.*,
    No. 05-CV-800S, 2013 U.S. Dist. LEXIS 58708 (W.D.N.Y. Apr. 14, 2013)........................15

*Del-Rain Corp.* v. *United States*,
    95-CV-938S, 1995 U.S. Dist. LEXIS 19619 (W.D.N.Y. Dec. 12, 1995) ..............................74

*District of Columbia* v. *Heller*,
    554 U.S. 570 (2008)........................................................................................... *passim*

*Ezell* v. *City of Chicago*,
    651 F.3d 684 (7th Cir. 2011) ...............................................................................47

*Gary D. Peake Excavating Inc.* v. *Town Bd. of the Town of Hancock*,
    93 F.3d 68 (2d Cir. 1996)...................................................................................75

*Grand River Enter. Six Nations, Ltd.* v. *Pryor*,
    481 F.3d 60 (2d Cir. 2007).............................................................................38, 78

*Granholm* v. *Heald*,
    544 U.S. 460 (2005)........................................................................................75-76

*Grayned* v. *City of Rockford*,
    408 U.S. 104 (1972)......................................................................................61, 67

*Gun Owners' Action League, Inc.* v. *Swift*,
    284 F.3d 198 (1st Cir. 2002).................................................................................59

*Hamilton* v. *Accu-Tek*,
    47 F. Supp.2d 330 (E.D.N.Y. 1999) ....................................................................77

*Heller* v. *District of Columbia*,
    670 F.3d 1244 (D.C. Cir. 2011) ("*Heller II*").................................................. *passim*

*Heller* v. *District of Columbia*,
    698 F. Supp. 2d 179 (D.D.C. 2010), *aff'd,* 670 F.3d 1244 (D.C. Cir. 2011)
    ("*Heller II*") ....................................................................................................... *passim*

*Heller* v. *Doe*,
    509 U.S. 312 (1993).............................................................................................58

*Hightower* v. *City of Boston*,
    693 F.3d 61 (1st Cir. 2012) ...................................................................34, 38, 58

*Hightower* v. *City of Boston*,
    822 F. Supp. 2d 38 (D. Mass. 2011), *aff'd*, 693 F.3d 61 (1st Cir. 2012)...............................57

*HOP Energy, L.L.C.* v. *Local 553 Pension Fund*,
    678 F.3d 158 (2d Cir. 2012).................................................................................................69

*Kachalsky* v. *County of Westchester*,
    701 F.3d 81 (2d Cir. 2012), *cert. denied*, 133 S. Ct. 1806 (2013) ................................... *passim*

*Kachalsky* v. *County of Westchester*,
    817 F. Supp. 2d 235 (S.D.N.Y. 2011), *aff'd*, 701 F.3d 81 (2d Cir. 2012) ........................ 56-57

*Kasler* v. *Lockyer*,
    2 P.3d 581 (Cal. 2000) ...................................................................................................43, 57

*Kasler* v. *Lungren*,
    72 Cal. Rptr. 2d 260 (Ct. App. 1998), *rev'd on other grounds*, 2 P.3d 581 (Cal. 2001) .........72

*Kolender* v. *Lawson*,
    461 U.S. 352 (1983).....................................................................................61, 69, 71, 72

*Kowalski* v. *Tesmer*,
    543 U.S. 125 (2004)...........................................................................................................78

*Kuck* v. *Danaher*,
    822 F. Supp. 2d 109 (D. Conn. 2011) ...............................................................................63

*Kwong* v. *Bloomberg*,
    876 F. Supp. 2d 246 (S.D.N.Y. 2012), *appeal pending*, No. 12-1578 (2d Cir., argued
    Feb. 1, 2013) .....................................................................................................................58

*Lopez Torres* v. *N.Y. State Bd. of Elections*,
    462 F.3d 161 (2d Cir. 2006), *rev'd on other grounds*, 552 U.S. 196 (2008)....................16, 78

*Maine* v. *Taylor*,
    477 U.S. 131 (1986)...........................................................................................................75

*Mary Jo C.* v. *N.Y. State & Local Ret. Sys.*,
    707 F.3d 144 (2d Cir. 2013)..............................................................................................70

*McDonald* v. *City of Chicago*,
    130 S. Ct. 3020 (2010)............................................................................................ 19, 24-25

*Mont. Shooting Sports Ass'n* v. *Holder*,
    No. CV-09-147, 2010 U.S. Dist. LEXIS 104301 (D. Mont. Aug. 31, 2010),
    *adopted by* 2010 U.S. Dist. LEXIS 110891 (D. Mont. Oct. 18, 2010)...................................78

*Nat'l Elec. Mfrs. Ass'n* v. *Sorrell*,
    272 F.3d 104 (2d Cir. 2001)........................................................................75

*Nat'l Rifle Ass'n of Am., Inc.* v. *Bureau of Alcohol, Tobacco, Firearms & Explosives*,
    700 F.3d 185 (5th Cir. 2012) ........................................................ 19-20, 50

*Nat'l Rifle Ass'n of Am., Inc.* v. *McCraw*,
    No. 12-10091, 2013 U.S. App. LEXIS 10128 (5th Cir. 2013) .................58

*Nnebe* v. *Daus*,
    644 F.3d 147 (2d Cir. 2011)........................................................................77

*Nordlinger* v. *Hahn*,
    505 U.S. 1 (1992).........................................................................................56

*Nordyke* v. *King*,
    681 F.3d 1041 (9th Cir. 2012) (en banc) .............................................58, 60

*Oltra, Inc.* v. *Pataki*,
    273 F. Supp. 2d 265 (W.D.N.Y. 2003) ................................................ 75-76

*Olympic Arms* v. *Buckles*,
    301 F.3d 384 (6th Cir. 2002) .....................................................................43

*Olympic Arms* v. *Magaw*,
    91 F. Supp. 2d 1061 (E.D. Mich. 2000), *aff'd*, 301 F.3d 384 (6th Cir. 2002) ........................27

*Osterweil* v. *Bartlett*,
    706 F.3d 139 (2d Cir. 2013).......................................................................31

*Pankos Diner Corp.* v. *Nassau Cnty. Legislature*,
    321 F. Supp. 2d 520 (S.D.N.Y. 2003).......................................................16

*People* v. *Arizmendi*,
    2011 Cal. App. Unpub. LEXIS 7284 (Ct. App.2011)...............................23

*People* v. *Ford*,
    66 N.Y.2d 428 (1985) ................................................................................61

*People* v. *James*,
    94 Cal. Rptr. 3d 576 (Ct. App. 2009) ..........................................23, 28, 34

*People* v. *Millon*,
    2011 Cal. App. Unpub. LEXIS 4501 (Ct. App. 2011)..............................23

*People* v. *Wood*,
    58 A.D.3d 242 (1st Dep't 2008) ................................................................62

*Peoples Rights Organization* v. *City of Columbus*,
 152 F.3d 522 (6th Cir. 1998) ......................................................................... 65-66

*Perez* v. *Hoblock*,
 368 F.3d 166 (2d Cir. 2004) ................................................................................66

*Pike* v. *Bruce Church, Inc.*,
 397 U.S. 137 (1970) .............................................................................................76

*Posters 'N' Things, Ltd.* v. *United States*,
 511 U.S. 513 (1994) .............................................................................................71

*Richmond Boro Gun Club, Inc.* v. *City of New York*,
 97 F.3d 681 (2d Cir. 1996) ........................................................................ *passim*

*Richmond Boro Gun Club* v. *City of New York*,
 896 F. Supp. 276 (E.D.N.Y. 1995), *aff'd*, 97 F.3d 681 (2d Cir. 1996) ........................... *passim*

*Rivera-Powell* v. *N.Y.C. Bd. of Elections*,
 06 Civ. 6843, 2006 U.S. Dist. LEXIS 72712 (S.D.N.Y. Oct. 4, 2006), *aff'd*, 470 F.3d
 458 (2d Cir. 2006) .........................................................................................16, 78

*Robertson* v. *City & County of Denver*,
 874 P.2d 325 (Colo. 1994) .............................................................................24, 42

*Sellan* v. *Kuhlman*,
 261 F.3d 303 (2d Cir. 2001) ................................................................................61

*Smolen v. Dildine*,
 No. 11-6434, 2011 U.S. Dist. LEXIS 139356 (W.D.N.Y. Dec. 5, 2011) ...............................38

*Staples* v. *United States*,
 511 U.S. 600 (1994) .........................................................................................30, 72

*State Ammunition Inc.* v. *Lindley*,
 No. 2:10-cv-01864, 2010 U.S. Dist. LEXIS 133491 (E.D. Cal. Dec. 2, 2010) .....................74

*Thibodeau* v. *Portuondo*,
 486 F.3d 61 (2d Cir. 2007) (Sotomayor, J.) .........................................................61

*Thomas* v. *City of New York*,
 143 F.3d 31 (2d Cir. 1998) ..................................................................................74

*Turner Broad. Sys., Inc.* v. *FCC*,
 512 U.S. 622 (1994) .............................................................................................49

*United States* v. *Carter*,
 465 F.3d 658 (6th Cir. 2006) ...............................................................................64

*United States* v. *Catanzaro*,
    368 F. Supp. 450 (D. Conn. 1973) .......................................................................65

*United States* v. *Chafin*,
    423 F. App'x 342 (4th Cir. 2011) ......................................................................78

*United States* v. *Conrad*,
    No. 1:11CR00042, 2013 U.S. Dist. LEXIS 19145 (W.D. Va. Feb. 13, 2013) .......................78

*United States* v. *Coppola*,
    671 F.3d 220 (2d Cir. 2012).....................................................................61,67, 71

*United States* v. *Decastro*,
    682 F.3d 160 (2d Cir. 2012)............................................................................ *passim*

*United States* v. *Drasen*,
    845 F.2d 731 (7th Cir. 1998) ...........................................................................64

*United States* v. *Farhane*,
    634 F.3d 127 (2d Cir. 2011).................................................................60, 61, 62, 73

*United States* v. *Huet*,
    No. 08-0215, 2010 U.S. Dist. LEXIS 123597 (W.D. Pa. Nov. 22, 2010), *rev'd on*
    *other grounds*, 665 F.3d 588 (3d Cir. 2012), *cert. denied*, 133 S. Ct. 422 (2012) .................28

*United States* v. *M-K Specialties Model M-14 Machinegun Serial No. 1447797*,
    424 F. Supp. 2d 862 (N.D. W. Va. 2006) ...............................................................64

*United States* v. *Marzzarella*,
    614 F.3d 85 (3d Cir. 2010)............................................................................42, 47

*United States* v. *Miller*,
    604 F. Supp. 2d 1162 (W.D. Tenn 2009)..............................................................47

*United States* v. *Petrillo*,
    332 U.S. 1 (1947)......................................................................................67

*United States* v. *Powell*,
    423 U.S. 87 (1975)....................................................................................66

*United States* v. *Skoien*,
    614 F.3d 638 (7th Cir. 2010) ...........................................................................47

*United States* v. *Walker*,
    709 F.Supp.2d 460 (E.D. Va. 2010) ...................................................................47

*United States* v. *Weaver*,
    No. 2:09-cr-00222, 2012 U.S. Dist. LEXIS 29613 (S.D. W. Va. Mar. 6, 2012)...................63

*United States* v. *Williams*,
    553 U.S. 285 (2008)....................................................................................61

*United States v. Wonschik*,
    353 F.3d 1192 (10th Cir. 2004) ................................................................72

*United States* v. *Zaleski*,
    489 F. App'x 474 (2d Cir. 2012), *cert. denied*, 133 S. Ct. 554 (2012)....................................20

*USA Baseball* v. *City of New York*,
    509 F. Supp. 2d 285 (S.D.N.Y. 2007).....................................................57, 60, 78

*Vill. of Hoffman Estates* v. *Flipside, Hoffman Estates*,
    455 U.S. 489 (1982).......................................................................62, 63, 71

*W.R. Huff Asset Mgmt. Co., LLC* v. *Deloitte & Touche LLP*,
    549 F.3d 100 (2d Cir. 2008)....................................................................78

*Warren* v. *United States*,
    859 F. Supp. 2d 522 (W.D.N.Y. 2012), *aff'd*, 2013 U.S. App. LEXIS 8283 (2d Cir.
    Apr. 24, 2013) ...........................................................................................15

*Warth v. Seldin*,
    422 U.S. 490 (1975).................................................................................73

*Weinstock* v. *Columbia Univ.*,
    224 F.3d 33 (2d Cir. 2000)......................................................................15

*Wilson* v. *Cnty. of Cook*,
    943 N.E.2d 768 (Ill. App. Ct. 2011), *aff'd in part and rev'd in part on other grounds*,
    968 N.E.2d 641 (Ill. 2012).......................................................................47

*Wilson* v. *Cnty. of Cook*,
    968 N.E.2d 641 (2012)...............................................................23, 62, 67, 68

## STATUTES AND LEGISLATIVE MATERIALS

2013 N.Y. Laws, ch. 1 ................................................................ *passim*

2013 N.Y. Laws, ch. 57, pt. FF.................................................... 10-12

2000 N.Y. Laws, ch. 189 § 10 ........................................................7

Penal Law
    § 15.15(2) ............................................................................................................61
    § 265.00(22) .....................................................................................................9, 68
    § 265.00(22)(a)(ii), (a)(iv), (b)(iii), and (c)(iii) ...............................................66
    § 265.00(22)(a)(vi) .............................................................................................70
    § 265.00(22)(c)(viii) ...........................................................................................71
    § 265.00(22)(g) .............................................................................................9, 40
    § 265.00(22)(g)(iii) .............................................................................................68
    § 265.00(22)(h ............................................................................................. 10-11
    § 265.00(23) ....................................................................................... 10-11, 63, 65
    § 265.02 ...............................................................................................................61
    § 265.20(7)-(7-b) .................................................................................................12
    § 265.20(a)(1) .....................................................................................................12
    § 265.20(a)(7)-(7-b) ............................................................................................59
    § 265.20(a)(7-f) .............................................................................................11, 55
    § 265.20(a)(10) ...................................................................................................12
    § 265.36 ......................................................................................................... 68-69
    § 265.37 ...............................................................................................................11
    § 400.00(16-a)(b) ...............................................................................................10
    § 400.03(2),(3) ....................................................................................................13
    § 400.03(7) ..........................................................................................................73
    § § 265.00(22)(c)(vii) .........................................................................................72

Envtl. Conserv. Law
    § 11-0931(1)(c) .............................................................................................12, 36

Albany City Code §§ 193-13 - 193-16 ......................................................................7

Buffalo City Code § 180-1 .........................................................................7, 12, 37

Albany City Code §§ 193-13 - 193-16 ......................................................................7

N.Y.C. Admin. Code §§ 10-301(16)-(17), 10-303.1 .................................................7

N.Y.C. Admin. Code § 10-306 ........................................................... 7, 12-14, 37

Rochester City Code § 47-5(B), (F) .........................................................7, 12, 37

18 U.S.C. §§ 921-925 ............................................................................... *passim*

Public Safety and Recreational Firearms Use Protection Act.  Pub. L. No. 103-322, tit.
    XI, subtit. A, 108 Stat. 1796, 1996-2010 (1994) (codified at subsections of 18 U.S.C.
    §§ 921-22) (repealed by Pub. L. 103-322, § 110105(2), effective Sept. 13, 2004) ......... *passim*

H.R. Rep. 103-489 (1994) ........................................................................... *passim*

Cal. Penal Code §§ 30510, 30515, 30600, 30605 ......................................................21

D.C. Code
  §§ 7-2501.01(3A), 7-2502.02(6)................................................................21
  §§ 7-2502.01, 7-2502.02(6) ....................................................................21
  §§ 7-2504.01, 7-2504.04 ........................................................................13

Mass. Gen. Laws ch. 140
  § 122B ....................................................................................................13

Wash. Rev. Code
  § 9.41.110(3) ..........................................................................................13

### OTHER AUTHORITIES

Philip Cook, Jens Ludwig & David Hemenway, *The Gun Debate's New Mythical
  Number: How Many Self-Defense Uses Per Year?*, 16 J. Pol'y Analysis & Mgmt.
  463, 463-69 (2007)................................................................................32

Michael G. Lenett, *Taking a Bite out of Violent Crime*
  20 Dayton L. Rev. 573 (1995) ............................................................6, 26

Lawrence E. Rosenthal & Adam Winkler, *The Scope of Regulatory Authority under the
  Second Amendment* 225 (Daniel W. Webster & Jon S. Vernick eds., 2013)....................25, 31

Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense: An
  Analytical Framework and a Research Agenda*,
  56 UCLA L. Rev. 1443, 1489 (2009) ................................................ 24, 40, 42-44

*What Should America Do About Gun Violence?: Hearing Before the S. Comm. on the
  Judiciary*, 113th Cong. (Jan. 30, 2013) (testimony of Baltimore County Police
  Department Chief James Johnson) *available at*
  http://www.senate.gov/isvp/?comm=judiciary&type=live&filename=judiciary013013 ........26

David Hemenway, *Private Guns, Public Health* (2004) ............................................32

Claude Werner, *Analysis of Five Years of Armed Encounters (with Data Tables),
  available at* http://gunssavelives.net/self-defense/analysis-of-five-years-of-armed-
  encounters-with-data-tables/ ................................................................37

*Field & Stream*, 2003 National Hunting Survey, *available at*
  http://www.fieldandstream.com/articles/hunting/2002/06/2003-national-hunting-
  survey ..............................................................................................34

Defendants Andrew Cuomo, Governor of the State of New York; Eric T. Schneiderman, Attorney General of the State of New York; and Joseph A. D'Amico, Superintendent of the New York State Police (collectively, the "State Defendants") respectfully submit this memorandum of law (i) in opposition to Plaintiffs' motion for a preliminary injunction, filed April 15, 2013, and (ii) in support of the State Defendants' cross-motion, brought pursuant to Rules 12(b)(1), 12(b)(6), and 56 of the Federal Rules of Civil Procedure, to dismiss plaintiffs' Amended Complaint in this action with prejudice and/or for summary judgment against plaintiffs.

## PRELIMINARY STATEMENT

Gun violence plagues this State and our nation. Every year, approximately 100,000 Americans are the victims of such violence. (Exs. 2-3).[1] And every day, 33 Americans are murdered with guns. (Exs. 2, 4).[2]

To combat this epidemic, on January 15, 2013, the State of New York enacted the Secure Ammunition and Firearms Enforcement Act, 2013 N.Y. Laws, ch. 1 (the "SAFE Act"). In a broad array of reforms, the SAFE Act "provides the toughest, most comprehensive and balanced answer in the nation to gun violence." (Ex. 5 (Gov. Memo) at 1; Ex. 6 (Assembly Memo) at 1; Ex. 7 (Senate Memo) at 1. The SAFE Act strengthened New York's existing bans on assault weapons and large-capacity ammunition magazines and established new statewide regulations to prevent unlawful and dangerous ammunition sales. It is these provisions, each well supported

---

[1] Citations are made herein to the Declarations of Kevin Bruen, dated June 20, 2013 ("Bruen Decl."); Christopher S. Koper, dated June 21, 2013 ("Koper Decl."); Franklin Zimring, dated June 20, 2013 ("Zimring Decl."); Kathleen M. Rice, dated June 18, 2013 ("Rice Decl."); James M. Sheppard, dated June 21, 2013 ("Sheppard Decl."); Lucy P. Allen, dated June 21, 2013 ("Allen Decl."); and William J. Taylor, Jr., dated June 21, 2013 ("Taylor Decl."), as well as exhibits ("Ex.") which have, for ease of reference, been consecutively numbered and organized into an Appendix annexed to the Taylor Declaration.

[2] *See* http://smartgunlaws.org/category/gun-studies-statistics/gun-violence-statistics/ (last visited June 21, 2013).

under the law, that Plaintiffs -- a collection of special-interest organizations, businesses, and individuals -- challenge in this action.  None of their claims has any merit.

*First*, Plaintiffs' Second Amendment challenges to New York's strengthened bans on assault weapons and large-capacity magazines fail, in their entirety, as a matter of law.  Case law since the Supreme Court's decision in *District of Columbia* v. *Heller*, 554 U.S. 570 (2008) -- including binding precedent from the Second Circuit -- makes this clear.

As demonstrated in detail below, New York's bans on assault weapons and large-capacity magazines do not even implicate Plaintiffs' Second Amendment rights, because such weapons are not within the scope of Second Amendment protection. *See infra* pp. 25-39. Furthermore, as Plaintiffs concede, they have access to a plethora of fully adequate alternatives to assault weapons and large-capacity magazines, and thus the bans at here issue do not substantially burden their Second Amendment rights.  *See infra* pp. 39-46; *United States* v. *Decastro*, 682 F.3d 160, 166-68 (2d Cir. 2012).  In any event, even if they did substantially burden Plaintiffs' rights, these provisions so clearly satisfy New York's interests in public safety and crime prevention that they easily survive constitutional scrutiny.  *See infra* pp. 46-56.

*Second*, Plaintiffs' equal protection claim also fails. The legislative classification challenged here -- which distinguishes between the number of rounds which may be loaded into a magazine at gun ranges and shooting competitions (where ten-round magazines may be loaded to full capacity) and everywhere else in New York (where magazines are limited to seven rounds) -- does not treat similarly situated individuals differently.  And, even if it did, the classification here plainly passes the applicable rational basis review.  *See infra* pp. 56-60.

*Third*, each of Plaintiffs' vagueness challenges to the statutory language in New York's assault weapons and large-capacity magazine bans is without merit.  Under settled precedent,

these provisions -- almost all of which have applied to conduct in this State for almost twenty years -- raise no constitutional concerns whatsoever.  *See infra* pp. 60-73.

**Fourth**, Plaintiffs claim challenging the SAFE Act's new provisions regulating ammunition sales, which have not yet gone into effect, is also without basis.  The Dormant Commerce Clause and due process arguments raised fail both on ripeness grounds and on the merits.  *See infra* pp. 73-77.

**Fifth**, dismissal of the action is also warranted, as to certain of the parties, for independent reasons.  *See infra* pp. 77-78.

Accordingly, for all these reasons, discussed in detail below, Plaintiffs' preliminary injunction motion should be denied, the State Defendants' motion should be granted, and each of Plaintiffs' claims should be dismissed with prejudice.

## STATEMENT OF FACTS

The facts and circumstances relevant to this proceeding are briefly summarized below.

### A.     The Relevant Law in New York Prior to the SAFE Act

Legal restrictions on assault weapons and large-capacity magazines have long existed in New York.  Since 1994, when the federal ban was enacted, the manufacture, transfer, and possession of both (i) certain semiautomatic firearms with military-style features designated as "assault weapons" and (ii) certain ammunition magazines or other feeding devices "ha[ving] a capacity of, or that can be readily restored or converted to accept, more than ten rounds of ammunition" have been continuously prohibited in New York.

#### 1.     1994 Federal Assault Weapons Ban

On September 13, 1994 -- in the wake of numerous mass shootings during the 1980s and early 1990s, involving assault weapons and other semiautomatic firearms equipped with large-

capacity magazines -- President Clinton signed into law, as part of the Violent Crime Control and Law Enforcement of 1994, the Public Safety and Recreational Firearms Use Protection Act. Pub. L. No. 103-322, tit. XI, subtit. A, 108 Stat. 1796, 1996-2010 (1994) (codified at subsections of 18 U.S.C. §§ 921-22) (repealed by Pub. L. 103-322, § 110105(2), effective Sept. 13, 2004); (*see* Koper Decl. ¶¶ 9, 27).  This legislation, known as the "federal assault weapons ban," established a ten-year prohibition on (i) semiautomatic rifles, pistols, and shotguns with military-style features, which were defined in the statute as "semiautomatic assault weapons," and (ii) certain "large capacity ammunition feeding devices" capable of holding more than ten rounds. (Ex. 8 (Pub. L. 103-322, 108 Stat. 1996-2010); (*see* Koper Decl. ¶¶ 27-37).

        The federal ban was not a prohibition on all semiautomatic firearms; rather, it prohibited those semiautomatic weapons having features that are useful in military and criminal applications but that are unnecessary in shooting sports or for self-defense.  (Koper Decl. ¶ 29); *see* H.R. Rep. 103-489, at 17-20 (1994) (Ex. 9).  Banned firearms were identified under the law in two ways.  18 U.S.C. § 921(a)(30) (repealed); (*see* Koper Decl. ¶ 30).  First, the federal ban specifically prohibited 18 models and variations of semiautomatic guns by name, as well as revolving cylinder shotguns. 18 U.S.C. § 921(a)(30)(A) (repealed); *id.* § 922(v)(1) (repealed); (*see* Koper Decl. ¶ 31.)  Second, the federal ban enumerated specific military-style features and banned those semiautomatic assault weapons having two or more of those features.  18 U.S.C. 921(a)(30)(B)-(D) (repealed); *id.* § 922(v)(1) (repealed); (*see* Koper Decl. ¶ 32)  For example, a semiautomatic rifle fell within the ban if it had the ability to accept a detachable magazine and possessed two or more of the following five features: "(i) a folding or telescoping stock; (ii) a pistol grip that protrudes conspicuously beneath the action of the weapon; (iii) a bayonet mount; (iv) a flash suppressor or threaded barrel designed to accommodate a flash suppressor; and (v) a

grenade launcher." 18 U.S.C. § 921(a)(30)(B) (repealed). There were similar definitions for semiautomatic pistols and shotguns. *Id.* § 921(a)(30)(C) and (D) (repealed).

The federal ban also prohibited magazines "ha[ving] a capacity of, or that can be readily restored or converted to accept, more than 10 rounds of ammunition." 18 U.S.C. § 921(a)(31)(A) (repealed); *id.* 18 U.S.C. § 922(w)(1) (repealed).

The federal ban contained several important exemptions and limitations which blunted its full impact and efficacy, especially in the short term. (*See* Koper Decl. ¶¶ 35-37). Assault weapons and large capacity magazines manufactured on or before the effective date of the law (*i.e.*, on or before September 13, 1994) were "grandfathered" in and thus remained legal to possess and transfer. 18 U.S.C. § 921(a)(31)(A) (repealed); *id.* § 922(v)(2) (repealed); *id.* § 922(w)(2) (repealed); *see* H.R. Rep. 103-489, at 20; (Koper Decl. ¶ 36). But because magazines are not required to be uniquely labeled or numbered, it was almost impossible to determine if a magazine was manufactured after 1994 and thus banned. (Bruen Decl. ¶ 29). Furthermore, the federal ban did not apply to weapons possessing only one military-style feature. Thus, many manufacturers were able to evade the law through the production of so-called "copycat" weapons, in which one banned feature was redesigned or the weapon simply renamed. (Koper Decl. ¶ 37.)[3]

The federal ban did not prohibit firearms which lacked the specified military features. Guns without semiautomatic actions, *i.e.*, bolt, slide, pump, and lever actions, were exempted. 18 U.S.C. § 922(v)(3)(B)(i) (repealed); *see* H.R. Rep. 103-489, at 20. The ban expressly exempted "by make and model 661 long guns most commonly used in hunting and recreational sports."

---

[3] Many foreign-made weapons with one military-style feature, however, were banned from importation into the country pursuant to the federal Gun Control Act of 1968. *See infra* p. 6; (Koper Decl. ¶ 37 n.17).

H.R. Rep. 103-489, at 20; 18 U.S.C. § 922(v)(3)(A) & App. A (repealed); (Ex. 8 at 108 Stat. 2000-2010). And it excluded "any semiautomatic rifle that cannot accept a detachable magazine that holds more than 5 rounds of ammunition" and "any semiautomatic shotgun that cannot hold more than 5 rounds of ammunition in a fixed or detachable magazine." 18 U.S.C. § 922(v)(3)(C)-(D) (repealed).

The federal assault weapons ban expired, by its own terms, on September 13, 2004. Pub. L. 103-322, § 110105(2); (Ex. 8 at 108 Stat. 2000).[4] As discussed below, however, parallel provisions have remained in effect under New York law, until strengthened by the SAFE Act just months ago.

### 2.  Federal Import Ban on Certain Assault Weapons

Even before Congress enacted the federal assault weapons ban in 1994, the federal Bureau of Alcohol, Tobacco, Firearms and Explosives (the "ATF") already prohibited the importation of certain foreign-made assault weapons, pursuant to the Gun Control Act of 1968, which generally bars the importation of firearms that are not "particularly suitable for or readily adaptable to sporting purposes." 18 U.S.C. § 925(d)(3); *id.* 922(l); (*see* Koper Decl. ¶ 37 n.17).

In 1984, the ATF blocked the importation of certain models of shotguns under this "sporting purposes test." (*See* Ex.10 (2011 ATF Study) at 3). Then, in 1989, the ATF determined that foreign semiautomatic rifles having one of a number of named military features (including those listed in the two-feature test 1994 federal assault weapons ban, *see* 18 U.S.C. § 921(a)(30)(B) (repealed)), fail the sporting purposes test and cannot be imported into the country. (Ex. 11 (1989 ATF Study) at 6-7; Ex. 12 (1998 ATF Study) at 1, 11). And, in 1998,

---

[4] For further details regarding the background and legislative history of the 1994 federal assault weapons ban. *see* Michael G. Lenett, *Taking a Bite out of Violent Crime*, 20 Dayton L. Rev. 573 (1995).

after the passage of the federal assault weapons ban, the ability to accept a large-capacity magazine made for a military rifle was added to the list of disqualifying features, as the ATF determined that semiautomatic rifles with this feature "are attractive to certain criminals" and "cannot fairly be characterized as sporting rifles." (Ex. 12 (1998 ATF Study) at 2-3, 36-38). These import bans remain in effect, even since the expiration of the federal assault weapons ban in 2004.  *See* http://www.atf.gov/firearms/faq/saws-and-lcafds.html#expiration-importation (last visited June 20, 2013).[5]

### 3. New York Enacts Its Own State Law Ban on Assault Weapons and Large-Capacity Magazines

In 2000, while the 1994 federal assault weapons ban was still in effect, New York enacted its own ban on assault weapons and large-capacity magazines which mirrored the federal ban. 2000 N.Y. Laws, ch. 189, § 10 (Ex. 13); (Ex. 14 (2000 Gov. Memo) at 3, 5-6; Ex. 15 (2000 Senate Memo) at 2-3, 5-6); *see also* Ex. 16 (6/23/00 Assembly Debate) at 161-65; Ex. 17 (6/22/00 Senate Debate) at 6139-40; Ex. 18 (2000 Gov. Press Release)).  Because it contained no sunset provision, New York's ban remained in effect even after the federal ban expired in 2004. (Ex. 16 (6/23/00 Assembly Debate) at 166).  Indeed, it remained the law of this State until it was recently supplemented by the SAFE Act.[6]

---

[5] In fact, the ATF, has recently proposed expanding the import ban to include shotguns possessing one or more of certain military-style features.  (Ex. 10 (2011 ATF Study); Ex. 19 (2012 ATF Report)).

[6] Several municipalities in New York have long had their own, stricter prohibitions on assault weapons and/or large-capacity magazines as well. *See* Buffalo City Code § 180-1 (B), (F) (Ex. 20); Rochester City Code § 47-5(B), (F) (Ex. 21); Albany City Code §§ 193-13 through 193-16 (Ex. 22); N.Y.C. Admin. Code §§ 10-301(16)-(17), 10-303.1, 10-306 (Ex. 23).

**B.**     **The SAFE Act**

On January 15, 2013, in the wake of another series of mass shootings and violence caused by persons armed with assault weapons or large-capacity magazines -- including the horrific shooting deaths of twenty schoolchildren and six adults in Newtown, Connecticut, on December 14, 2012, and the murder of two first responders in Webster, New York, on December 24, 2012 -- New York State enacted a comprehensive legislative package, the SAFE Act, including significant reforms to prevent gun crime and violence and increase public safety in New York.  2013 N.Y. Laws, ch.1 (Ex. 24).  The Act is designed to reduce the availability of unusually dangerous weapons and deter the criminal use of firearms while "ensuring that sportsmen and other legal gun owners have full enjoyment of the guns to which they are entitled," thereby "increasing the safety of New Yorkers while observing the protections of the Second Amendment." (Ex. 5 (Gov. Memo) at 1, 6; Ex. 6 (Assembly Memo) at 1, 5; Ex. 7 (Senate Memo) at 1, 5).  It contains a broad array of provisions, from measures to prevent access to firearms by criminals or those with a disqualifying mental condition, to those advancing school safety and increasing criminal penalties for those who misuse firearms.  (Bruen Decl. ¶ 5).  These, and most other provisions of the SAFE Act, are not at issue here.

The SAFE Act also strengthened New York's existing bans on assault weapons and large capacity magazines and established statewide regulations to prevent unlawful ammunition sales -- the provisions Plaintiffs  now challenge in this litigation.

**1.**     **New York's Enhanced Assault Weapons Ban**

In an effort to combat the many copycat assault weapons that had emerged after the 1994 federal assault weapons ban and New York's own 2000 ban -- including the Bushmaster AR-15 used in Newtown, which would have evaded the restrictions of New York's prior law -- the

SAFE Act's enhanced assault weapons ban replaced the State's previously existing list of banned firearms and two-feature test "with a clearer 'one-feature' test." (Ex. 5 (Gov. Memo) at 2; Ex. 6 (Assembly Memo) at 2; Ex. 7 (Senate Memo) at 2; Bruen Decl. ¶¶ 6, 14-15; Ex. 25 (2013 Gov. Press Release) at 2). This strengthened ban was adopted to establish "a more comprehensive means for addressing these dangerous weapons"; in effect, to cure some weaknesses in the prior federal ban. (Ex. 5 (Gov. Memo) at 6; Ex. 6 (Assembly Memo) at 5-6; Ex. 7 (Senate Memo) at 5-6).

Thus, under the SAFE Act, New York's assault weapons ban now applies to any gun that is semiautomatic, has the ability to accept a detachable magazine (in the case of rifles and pistols), and "possess[es] one feature commonly associated with military weapons." (Ex. 5 (Gov. Memo) at 2; Ex. 6 (Assembly Memo) at 2; Ex. 7 (Senate Memo) at 2); Penal Law § 265.00(22); *id.* § 265.02(7).[7] The SAFE Act retains the express exemptions from the ban of certain types, and makes and models, of firearms. *See supra* pp. 5-6. This includes the exemptions for all guns manually operated by bolt, pump, lever or slide action, as well as the exclusion of the over 660 rifles and shotguns "most commonly used in hunting and recreational sports" that were originally set forth in the federal assault weapons ban. Penal Law § 265.00(22)(g); H.R. Rep. 103-489, at 20; *see* 18 U.S.C. § 922 App. A (repealed).

The SAFE Act does not ban any guns that were lawfully possessed prior to its effective date of January 15, 2013. Penal Law §§ 265.00(22)(g)(v), 400.00(16-a). Those who lawfully possessed assault weapons at that time may continue do so; they need only register their firearms within fifteen months (*i.e.*, by April 15, 2004). *Id.*; (Bruen Decl. ¶ 27). The registration process

---

[7] Further discussion, and explication of, the banned military-style features included in the SAFE Act's enhanced assault weapons ban is also set forth in the accompanying Declaration of Kevin Bruen. (Bruen Decl. ¶¶ 17-26); *see also infra* pp. 26-27.

is free and simple, requiring completion of a basic, less than one-page form which can be submitted either online or by mail, to the State Police.   (Bruen Decl. ¶ 27 n.8; Ex. 26 (Registration Form)).[8]

Finally, in order to educate the public about its provisions, including providing information regarding which guns are illegal under the assault weapons ban, how to recognize the relevant features proscribed by the ban, and which make and model of weapons require registration, the SAFE Act provides that the State Police "shall create and maintain an internet website."   Penal Law § 400.00(16-a)(b); (Bruen Decl. ¶ 7). This website, which sets forth information regarding the SAFE Act and its enhanced assault weapons ban, as well as the large capacity magazine ban, is currently available at www.NYSAFEAct.com.  (Bruen Decl. ¶ 7).

### 2. New York's Enhanced Ban on Large-Capacity Magazines and Ammunition Load Limits

The SAFE Act strengthens the almost twenty-year old ban on large-capacity magazines, amending the Penal Law to ban all magazines "that have the capacity to hold more than ten rounds of ammunition including those that were grandfathered in under the original assault weapons ban." (Ex. 5 (Gov. Memo) at 2; Ex. 6 (Assembly Memo) at 2; Ex. 7 (Senate Memo) at 2)); Penal Law § 265.00(23); *id.* § 265.02(8); *id.* § 265.36; 2013 N.Y. Laws, ch. 57, pt. FF, § 4 (Ex. 69); (*see* Bruen Decl. ¶¶ 28-29).   As the Act's sponsors stated, the prior ban fell short, in part, "because it was impossible to tell the difference between" grandfathered large-capacity magazines (*i.e.*, those manufactured on or before September 13, 1994, the effective date of the federal assault weapons ban) and those that were not, thus undermining the impact and intent of the original ban.  (Ex. 5 (Gov. Memo) at 2; Ex. 6 (Assembly Memo) at 2; Ex. 7 (Senate Memo)

---

[8] Alternatively, assault weapons may be sold out of state or through an authorized in-state firearms dealer, transferred to law enforcement, or, as under prior law, permanently modified so as to no longer qualify as an assault weapon.  Penal Law § 265.00(22)(h); *see id.* § 265.20(a)(1), (10); (Bruen Decl. ¶ 27 & n.9).

at 2); (*see* Bruen Decl. ¶ 29).  Thus, the SAFE Act now "prohibits possession of all magazines with the capacity to contain more than ten rounds, regardless of the date of manufacture."  (Ex. 5 (Gov. Memo) at 7; Ex. 6 (Assembly Memo) at 6; Ex. 7 (Senate Memo) at 6; Penal Law § 265.00(23); *id.* § 265.02(8); *id.* § 265.36; 2013 N.Y. Laws, ch. 57, pt. FF, § 4.[9]

New Yorkers who currently own a magazine holding more than ten rounds have until January 15, 2014 to sell it out of state or through an authorized in-state firearms dealer, to transfer the magazine to law enforcement, or to discard it in accordance with state law.  Penal Law § 265.00(22)(h); *see id.* § 265.20(a)(1), (10); (Bruen Decl. ¶¶ 4, 32).  Alternatively, those who wish to keep their magazines may, by that same date, permanently modify them so that they no longer have a capacity of more than ten rounds.  Penal Law § 265.00(23); (Bruen Decl. ¶ 32 & n.10).[10]

In order to further strengthen New York's large-capacity magazine ban -- and, as one of the legislative sponsors put it, further "limit the amount of people [a perpetrator] could unlawfully kill" -- the SAFE Act also limits to seven the number of rounds of ammunition that a New Yorker may load into a magazine.  Penal Law § 265.37; (Ex. 27 (1/15/13 Assembly Debate) at 65; *see* Bruen Decl. ¶ 28).  To balance the interests of sportsmen and those who wish to train with their firearms, this seven-round load limit does not apply in the more controlled and secure environment of a firing range or shooting competition; there, individuals may load their ten-round magazines to full capacity.  Penal Law § 265.20(a)(7-f); (Bruen Decl. ¶ 28); *see also*

---

[9] "10-round magazines" are widely advertised, and available, as compliant with New York law for use in guns that would otherwise have a higher than ten-round (10) capacity.  (Bruen Decl. ¶ 31).

[10] Large-capacity magazines that were manufactured at least fifty years ago qualify as "a curio or relic" and are exempted, provided owners register them using the same simple process, and same basic form, as is used for the registration of assault weapons.  Penal Law § 265.00(23).

Penal Law § 265.20(7)-(7-b), (7-d)-(7-e), (12)-(13) (other range and competition exemptions under New York firearms law).[11]

Just as they are exempted from the assault weapons ban, law enforcement officers are exempted from the large-capacity magazine ban and the seven-round load limit.  Penal Law § 265.20(a)(1); (Bruen Decl. ¶ 33).  And, similarly, authorized in-state firearms dealers in New York may continue to possess large-capacity magazines (as well as assault weapons) and transfer them to other dealers, those out of state, or to law enforcement.  Penal Law § 265.20(a)(10); (Bruen Decl. ¶ 33).

### 3.  New York's Regulation of Ammunition Sales to Prevent the Purchase of Ammunition by Prohibited Persons

In order to ensure that persons not legally entitled to possess ammunition are not able to purchase it[12] and to track high-volume ammunition buyers in New York State, the SAFE Act also reforms ammunition sales practices in New York.  Penal Law § 400.03; (Ex. 5 (Gov. Memo) at 3, 7; Ex. 6 (Assembly Memo) at 2, 6; Ex. 7 (Senate Memo) at 2, 6).

Beginning no earlier than January 15, 2014, all ammunition dealers must be registered with the State Police, and each ammunition sale will require both a state background check and

---

[11] Even stricter load limits already existed under state law as to the number of rounds hunters may load into certain of their guns.  *See* Envtl. Conserv. Law § 11-0931(1)(c) (prohibiting the use of most semiautomatic firearms "contain[ing] more than six shells in the magazine and chamber combined").  And, several cities in New York have also gone further than either state or federal law in setting magazine capacity and load limits for certain firearms.  N.Y.C. Admin. Code § 10-306 (five-round load limit for rifles and shotguns); Buffalo City Code § 180-1(B), (F)-(G) (five-round limit for certain semiautomatic rifles and shotguns); Rochester City Code § 47-5(B), (F)-(G) (same); *see infra* p. 37.  Despite the apparent confusion in Plaintiffs' papers on this question (*see* Galvin Aff. at 2; Horvath Aff. at 3), nothing in New York law restricts individuals to seven-round magazines.  Pursuant to a chapter amendment enacted by the Legislature months ago, ten-round magazines remain permissible in New York under the SAFE Act.  (Bruen Decl. ¶ 11); 2013 N.Y. Laws, ch. 57, pt. FF, § 4.

[12] Current federal law prohibits the sale of ammunition (and firearms) to juveniles, felons, fugitives from justice, drug addicts, certain mentally-ill persons, and those convicted of domestic violence crimes, among others.  *See* 18 U.S.C. § 922(b)(1) & (d).

12

the transmission of a record of sale to the State Police.  Penal Law § 400.03; 2013 N.Y. Laws, ch. 1, §§ 50, 57(e) (Ex. 24); (*see* Bruen Decl. ¶¶ 35-40).  The Act also includes a ban on direct internet sales of ammunition, by which the perpetrator of the recent mass shooting in Aurora, Colorado, for example, reportedly amassed over 6,000 rounds of ammunition.  (*See* Ex. 25 (2013 Gov. Press Release) at 2).  Once the new law goes into effect, those who wish to buy ammunition, including those who wish to do so online, must appear in-person before a registered ammunition dealer for a face-to-face sales transaction. Penal Law § 400.03; *see* Bruen Decl. ¶ 36).[13]

At the time of each ammunition sale, the purchaser must present a valid photo ID and the seller must record the date of sale, the name, age, occupation and residence of purchaser, as well as the amount, caliber, manufacturer and serial number of the ammunition.  Penal Law § 400.03(2),(3); (Bruen Decl. ¶ 39).  If the purchaser passes the background check, the sale is completed.  None of the resulting records is subject to inquiries under New York's Freedom of Information Law, and the records are purged within one year.  § 400.03(2), (5); (Bruen Decl. ¶ 39).[14]

## C.      **The Present Action**

On March 21, 2013, Plaintiffs commenced this action against Defendants.  Three weeks later, on April 11, 2013, Plaintiffs filed their Amended Complaint.  (Ex. 1 (Amended Complaint)

---

[13] The SAFE Act permits two types of ammunition dealers in New York: licensed dealers in firearms who are not required to take added steps to register for ammunition sales (*see* Penal Law 400.03(1)) and "seller[s] of ammunition," defined as a person or entity "who engages in the business of purchasing, selling or keeping ammunition" and must register with the State Police, *id.*; *id.* § 265.00(24).

[14] Other states, the District of Columbia, and cities such as New York City, also require a license to sell ammunition and/or mandate that a record of an ammunition sale be kept by the seller. *See, e.g.,* Mass. Gen. Laws ch. 140, § 122B; Wash. Rev. Code § 9.41.110(3); D.C. Code §§ 7-2504.01, 7-2504.04; N.Y. City Admin. Code § 10-306(e).

(hereinafter "Am. Cplt.").[15]  Plaintiffs challenge the constitutionality of various provisions of the SAFE Act.  In particular, Plaintiffs assert five causes of action against all Defendants: (i) a Second Amendment claim against New York's large-capacity magazine ban (Count One); (ii) a Second Amendment claim against the State's assault weapons ban (Count Two); (iii) an Equal Protection Clause claim against the seven-round load limit for magazines (Count Three); (iv) a Dormant Commerce Clause claim challenging the SAFE Act's ammunition sale provisions; and (v) a Due Process Clause claim, challenging provisions of the Act on vagueness grounds.  They seek both declaratory and injunctive relief.

On April 15, 2013 -- three months after the SAFE Act was enacted -- Plaintiffs filed a motion for a preliminary injunction as to some portions of Counts One, Two, Three, and Five. (ECF No. 23).  Since then, the National Rifle Association (the "NRA"), and a group including three local sheriffs together with the New York State Sheriffs Association (the "NYSSA"), have each filed *amicus curiae* briefs in support of Plaintiffs' motion.  (ECF Nos. 46, 56).

The State Defendants now oppose Plaintiffs' motion and cross-move to dismiss this action and/or for summary judgment for the reasons discussed below.

## LEGAL STANDARDS

The governing standards on the motions now before the Court -- both (i) the State Defendants' motion, under Rules 12(b)(1), 12(b)(6), and 56, to dismiss the Amended Complaint and/or for summary judgment against Plaintiffs; and (ii) Plaintiffs' preliminary injunction motion-- are well settled.

---

[15] Originally, there were only three business plaintiffs; Batavia Marine & Sporting Supply was added as a party in the Amended Complaint.  Also, the District Attorney for Erie County was named as a defendant in the original Complaint; he was dropped and replaced by defendant Lawrence Friedman, District Attorney for Genessee County, in the Amended Complaint.

To survive dismissal under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007)). This standard applies to the State Defendants' motion to dismiss Count Four of the Amended Complaint and to any claims the Court decides it can resolve without considering additional factual submissions.

Rule 12(b)(1) applies to the State Defendants' jurisdictional arguments, including those raised in Point IV, *infra*.   For such claims, the Court "must review the allegations in the complaint, the undisputed facts, if any, placed before it by the parties, and -- if the plaintiff comes forward with sufficient evidence to carry its burden of production on this issue -- resolve disputed issues of fact." *Warren* v. *United States*, 859 F. Supp. 2d 522, 528 (W.D.N.Y. 2012) (internal quotation marks omitted), *aff'd*, 2013 U.S. App. LEXIS 8283 (2d Cir. Apr. 24, 2013).

Summary judgment is appropriate where the evidence shows that "there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).   A party opposing summary judgment "may not rely on conclusory allegations or unsubstantiated speculation." *Brown* v. *Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011) (internal quotation marks omitted).   "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Weinstock* v. *Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000); *Danials-Kirisits v. N.Y. State Office of Court Admin.*, No. 05-CV-800S, 2013 U.S. Dist. LEXIS 58708, at *7 (W.D.N.Y. Apr. 14, 2013).

Plaintiffs have also moved for a preliminary injunction as to certain of their claims.   They have not, however, correctly stated in their motion papers the preliminary injunction standard that governs here.   (*See* Pl. Mem. at 13-14).   The Second Circuit has made clear that where, as

here, the preliminary relief sought would "stay[] governmental action taken in the public interest pursuant to a statutory scheme . . . , plaintiffs must establish a 'clear' or 'substantial' likelihood of success on the merits on their claim."  *Lopez Torres* v. *N.Y. State Bd. of Elections*, 462 F.3d 161, 183 (2d Cir. 2006), *rev'd on other grounds*, 552 U.S. 196 (2008); *accord Rivera-Powell* v. *N.Y.C. Bd. of Elections*, 06 Civ. 6843, 2006 U.S. Dist. LEXIS 72712, at *11 (S.D.N.Y. Oct. 4, 2006), *aff'd*, 470 F.3d 458 (2d Cir. 2006).  This "heightened standard" is also required here because Plaintiffs "seek to enjoin enforcement of and, ultimately, void a statute that was already in effect at the time the Complaint was filed."  *Pankos Diner Corp.* v. *Nassau Cnty. Legislature*, 321 F. Supp. 2d 520, 523 (S.D.N.Y. 2003); *see, e.g.*, *Lopez Torres*, 462 F.3d at 183.[16]

Moreover, as discussed further below, *see infra* p. 50, given the "general reticence to invalidate the acts of [our] elected leaders," to prevail on their own motion or defeat the motion for dispositive relief brought now by the State Defendants, Plaintiffs must "clearly demonstrate[]" that the statutory provisions they wish to strike down fail to pass constitutional muster.  *Kachalsky* v. *County of Westchester*, 701 F.3d 81, 100-01 (2d Cir. 2012), *cert. denied*, 133 S. Ct. 1806 (2013).

In the end, under all these standards, the ultimate question here is whether, on the record now before the Court, Plaintiffs' claims in this action have merit under the law.  As discussed below, they plainly do not.

---

[16] To prevail on their preliminary injunction motion, Plaintiffs must also make "a strong showing of irreparable harm." *Rivera-Powell*, 2006 U.S. Dist. LEXIS 72712, at *11.  As made clear in the discussion that follows, Plaintiffs do not come close to demonstrating irreparable harm.

**ARGUMENT**

**I.**

**PLAINTIFFS' SECOND AMENDMENT CHALLENGES
TO THE SAFE ACT FAIL AS A MATTER OF LAW**

Plaintiffs claim that the SAFE Act's prohibitions on assault weapons and large-capacity magazines infringe on their right to keep and bear arms. (Am. Cplt. ¶¶ 89-122). They seek declaratory and permanent injunctive relief, and, with respect to the bulk of their challenges, have moved for a preliminary injunction against enforcement of the statute. (Am. Cplt. at 44; Pl. Mem. at 37-38).

But, as demonstrated below, each of these challenges to the SAFE Act is wholly without merit. Under post-*Heller* Second Amendment doctrine, Plaintiffs' Second Amendment claims fail, in their entirety, as a matter of law. Accordingly, for the reasons that follow, Plaintiffs' preliminary injunction motion as to Counts One and Two should be denied, and summary judgment dismissing these Second Amendment claims with prejudice is fully warranted.

**A.      *Heller* and *McDonald***

In *District of Columbia* v. *Heller*, 554 U.S. 570 (2008), the Supreme Court held that the Second Amendment protects an individual right to keep and bear arms for lawful purposes, most notably for self-defense within the home. *Id.* at 595, 599-600, 635. Based on this interpretation, the *Heller* Court ruled that the District of Columbia's complete ban on the possession of handguns and any usable firearms in the home violates the Second Amendment, noting that handguns are the "quintessential self-defense weapon." 554 U.S. at 573, 628-29; *see Kachalsky*, 701 F.3d at 88. Indeed, the *Heller* Court found that the ban on home handgun possession squarely struck at the core of the Second Amendment right -- a rare feat, because "[f]ew laws in the history of our Nation have come close to the severe restriction of the District's handgun ban."

17

554 U.S. at 629; *see id.* at 628-30, 635.  The Court thus held that the challenged D.C. statutes would fail constitutional muster under "any of the standards of scrutiny" applicable to "enumerated constitutional rights."  *Id.* at 628-29.

Nevertheless, the Court emphasized in *Heller* that "the right secured by the Second Amendment is not unlimited."  *Id.* at 626.  It is "not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose."  *Id.*  On the contrary, "the Second Amendment right, whatever its nature, extends only to certain types of weapons."  *Id.* at 623 (citing *United States* v. *Miller*, 307 U.S. 174, 178-82 (1939)).  *Heller* makes clear that weapons "most useful in military service" may be banned, even if that would leave citizens with access only to "small arms."  *Id.* at 627-28; *see id.* at 624-25.  And, in particular, the Court stated, "the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns."  *Id.* at 625 (citing *Miller*, 307 U.S. at 178-82).  The Court made clear that this "important limitation" on the right to keep and bear arms -- one that is especially relevant in this case -- was "supported by the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'"  *Id.* at 627 (citing, *inter alia*, 4 Blackstone 148-149 (1769)).[17]

---

[17] The Court in *Heller* identified several other historical limitations on the scope of the right protected by the Second Amendment as well.  For example, it noted that "the majority of 19th-century courts to consider the question held that prohibitions on carrying concealed weapons were lawful under the Second Amendment or state analogues."  *Id.* at 626.  It also emphasized that "nothing in [its] opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms."  *Id.* at 626-27.  And the Court stressed that it had listed "these presumptively lawful regulatory measures only as examples"; the list was illustrative, "not . . . exhaustive."  *Id.* at 627 n.26.

Two years after *Heller*, in *McDonald* v. *City of Chicago*, 130 S. Ct. 3020, 3026 (2010), the Supreme Court held that the Second Amendment right recognized in *Heller* applies to the states through the Fourteenth Amendment.  In so doing, the Court reiterated its central holding in *Heller* "that the Second Amendment protects the right to possess a handgun in the home for self-defense."  *Id.* at 3050.  It also reaffirmed *Heller*'s assurances that Second Amendment rights are far from absolute, and the Court made clear that the doctrine of "incorporation does not imperil every law regulating firearms" and that "[s]tate and local experimentation with reasonable firearms regulations will continue under the Second Amendment."  *Id.* at 3046-47.

**B.     The Post-*Heller* Framework for Assessing
Plaintiffs' Second Amendment Claims**

Since *Heller* and *McDonald*, lower courts "have filled the analytical vacuum" left by the Supreme Court's failure to set forth a precise framework for assessing Second Amendment claims.  *Nat'l Rifle Ass'n of Am., Inc.* v. *Bureau of Alcohol, Tobacco, Firearms & Explosives*, 700 F.3d 185, 194 (5th Cir. 2012) (citing cases). The Second Circuit follows a three-step approach to analyze Second Amendment claims. *See Kachalsky*, 701 F.3d at 88-94; *United States* v. *Decastro*, 682 F.3d 160, 164-65 & n.3 (2d Cir. 2012).

*First*, just as in other circuits, the Second Circuit begins by inquiring into whether the conduct at issue falls within the scope of the Second Amendment right recognized in *Heller*. *Nat'l Rifle Ass'n*, 700 F.3d at 194; *see Kachalsky*, 701 F.3d at 89; *see also McDonald* 130 S. Ct. at 3050. *Heller* makes clear that the Second Amendment does not protect all weapons or all classes of weapons. 554 U.S. at 624-25, 627; *Decastro*, 682 F.3d at 165 n.4. Since *Heller*, the Second Circuit has held that the Second Amendment does not protect weapons not typically

19

possessed by law-abiding citizens for lawful purposes. *United States* v. *Zaleski*, 489 F. App'x 474, 475 (2d Cir. 2012) (citing *Heller*, 554 U.S. at 624-25), *cert. denied*, 133 S. Ct. 554 (2012).[18]

*Second*, if the law at issue implicates conduct that falls within the scope of the Second Amendment right, the court next determines whether it places a "substantial burden" on that right. *Decastro*, 682 F.3d at 166.  As the Second Circuit has held, "heightened scrutiny is triggered only by those restrictions that (like the complete prohibition on handguns struck down in *Heller*) operate as a substantial burden on the ability of law-abiding citizens to possess and use a firearm for self-defense (or for other lawful purposes)." *Id.*; *accord Kachalsky*, 701 F.3d at 93. If no showing of substantial burden is made, such as where adequate alternatives remain available, then the law is subject to no heightened scrutiny at all, and need survive only rational basis review to pass constitutional muster. *Decastro*, 682 F.3d at 166-68 & n.5.

*Finally*, if the challenged law is found to substantially burden the right to keep and bear arms, then "some form of heightened scrutiny" under the Second Amendment is appropriate. *Kachalsky*, 701 F.3d at 93; *Decastro*, 682 F.3d at 164-67.  Courts have, almost without exception, applied intermediate scrutiny -- under which courts assess whether a law is substantially related to an important governmental objective -- at this stage of the analysis. *See, e.g.*, *Kachalsky*, 701 F.3d at 96-97.  Indeed, as discussed below, the D.C. Circuit has held that if any heightened scrutiny is required, "intermediate rather than strict scrutiny is the appropriate standard of review" for Second Amendment challenges to assault weapons and large-capacity

---

[18] In undertaking this scope inquiry at the first step of the analysis, courts often "look to whether the [challenged] law harmonizes with the historical traditions associated with the Second Amendment guarantee." *Nat'l Rifle Ass'n*, 700 F.3d at 194; *see Decastro*, 682 F.3d at 165.  The Second Circuit has made clear, however, that whether a law is "longstanding" is not "a talismanic formula for determining whether a law regulating firearms is consistent with the Second Amendment." *Kachalsky*, 701 F.3d at 90 n.11.  And, even if it were, it is equally clear under *Heller* "that a regulation can be deemed 'longstanding' even if it cannot boast a precise founding-era analogue." *Nat'l Rifle Ass'n*, 700 F.3d at 196; *see Kachalsky*, 701 F.3d at 90 n.11.

magazines bans.  *Heller* v. *District of Columbia*, 670 F.3d 1244, 1262 (D.C. Cir. 2011) ("*Heller II*").

As set forth below, Plaintiffs' challenges to New York's bans on assault weapons and large-capacity magazines fail at each step of this analysis.  First, the bans do not even implicate Plaintiffs' constitutional rights because such weaponry is outside the ambit of Second Amendment protection.  *See infra* pp. 25-39.  Furthermore, as Plaintiffs concede, they "*could* substitute alternative weapons*" to effectuate self-defense in their homes (Pl. Mem. at 23), and so the bans do not substantially burden their rights.  *See infra* pp. 39-46.  And, in any event, even if the bans imposed a substantial burden, because these provisions so clearly advance New York's public safety goals, they easily withstand constitutional scrutiny.  *See infra* pp. 46-56.

**C.**   **Since *Heller*, Federal and State Courts Have Upheld Prohibitions and Restrictions on Assault Weapons and Large-Capacity Magazines**

Both the D.C. Circuit, in *Heller II,* and several California state appellate courts have, since *Heller*, upheld under the Second Amendment bans on assault weapons and large-capacity magazines nearly identical to those at issue in this action.[19]  Plaintiffs' preliminary injunction papers fail to mention these authorities.

*Heller II* is directly on point.  In that case, plaintiffs challenged the District of Columbia's new gun laws, passed in the wake of the Supreme Court's *Heller* decision, which prohibited assault weapons and the possession of magazines with a capacity of more than ten rounds of ammunition.  670 F.3d at 1247; *see id.* at 1249.  The *Heller II* plaintiffs, like Plaintiffs here,

---

[19] Notably, like New York law after the SAFE Act, both D.C.'s and California's assault weapons bans consist of a "one-feature test," which "ban[s] non-specified weapons that have any one of a list of military-style features."  *Heller II*, 698 F. Supp. 2d 179, 193 n.13 (D.D.C. 2010); *see* D.C. Code §§ 7-2501.01(3A), 7-2502.02(6); Cal. Penal Code §§ 30510, 30515, 30600, 30605.  The District's ban, in fact, is even stricter than New York's, as it prohibits *all* assault weapons, even those possessed prior to the law's enactment.  D.C. Code §§ 7-2502.01, 7-2502.02(6); *see Heller II*, 670 F.3d at 1249.

argued that the banned assault weapons and magazines "are commonly possessed for self-protection in the home as well as for sport," and that D.C.'s prohibitions on each of them impermissibly "burden[ed] the Second Amendment right."  *Id.* at 1260-61.  But both the district court and the D.C. Circuit disagreed, rejecting plaintiffs' challenges.  *Id.* at 1247-48, 1264; *see* 698 F. Supp. 2d 179, 193-95 (D.D.C. 2010) (district court decision).

The district court in *Heller II* concluded that "assault weapons and large capacity ammunition feeding devices fall outside the scope of the core Second Amendment right" -- *i.e.*, "the right of law-abiding responsible citizens to use arms in defense of hearth and home."  698 F. Supp. 2d at 193, 195 (quoting *Heller*, 554 U.S. at 635).  The court thus determined that it "need not assess whether these laws survive intermediate scrutiny," but noted that "even if [it] were to conduct the intermediate scrutiny analysis, the plaintiffs' claims would still fail" because "it is beyond dispute that public safety is an important -- indeed, a compelling -- governmental interest" and the record before the court on summary judgment, which included many of the same reports and studies that the State Defendants have submitted on this motion, *see infra* pp. 25-56, "amply demonstrate[d] that there is at least a substantial fit between that goal and the bans on assault weapons and large capacity ammunition feeding devices."  *Id.* at 195.

The D.C. Circuit affirmed.  The court held that it was not clear that "the prohibitions of certain semi-automatic rifles and magazines holding more than ten rounds" even implicated the plaintiffs' Second Amendment right.  670 F.3d at 1261-62 ("Although we cannot be confident the prohibitions impinge at all upon the core right protected by the Second Amendment, we are reasonably certain the prohibitions do not impose a substantial burden upon that right.").[20]

---

[20] As already noted, and discussed further below, *see infra* pp. 39, 41-42, under the Second Circuit's decision in *Decastro*, 682 F.3d at 169 & n.5, only rational basis review applies here where the bans at issue does not substantially burden Second Amendment rights.

Finding that these weapons were in "common use," the court held it was not evident whether they "are commonly used or are useful specifically for self-defense or hunting," as would be required for the District's bans to affect the right. *Id.* at 1260-61. Nevertheless, the court held that even assuming that the challenged laws "impinge[d] upon the right protected by the Second Amendment," they would survive. *Id.* at 1262. Concluding that the laws "do[] not effectively disarm individuals or substantially affect their ability to defend themselves," the court held that, if means-end constitutional analysis were performed, intermediate scrutiny would apply. *Id.* at 1261-62. It then concluded that the District's bans on assault weapons and large-capacity magazines were substantially related to its important interests in crime prevention and public safety -- and thus did not violate plaintiffs' rights under the Second Amendment. *Id.* at 1262-64.

Post-*Heller* decisions by the California state appellate courts also support the constitutionality of the SAFE Act provisions at issue in this case. Less than a year after *Heller*, in *People* v. *James*, 94 Cal. Rptr. 3d 576 (Ct. App. 2009), the California Court of Appeal rejected a Second Amendment challenge to the state's assault weapons ban. *Id.* at 578-79, 584-86. The *James* court concluded that "*Heller* does not extend Second Amendment protection to assault weapons," noting that "assault weapons, like machine guns, are not in common use by law-abiding citizens for lawful purposes and likewise fall within the category of dangerous and unusual weapons that the government can prohibit for individual use." *Id.* at 585-86. This reasoning and result have been repeatedly reaffirmed by the California courts in the years since. *See, e.g.*, *People* v. *Arizmendi*, 2011 Cal. App. Unpub. LEXIS 7284, at *24-28 (Ct. App.2011); *People* v. *Millon*, 2011 Cal. App. Unpub. LEXIS 4501, at *10-14 (Ct. App. 2011).[21]

---

[21] The Illinois Supreme Court recently acknowledged the reasoning in both *Heller II* and *James* in considering a Second Amendment challenge to Cook County's assault weapons ban. *Wilson* v. *Cnty. of Cook*, 968 N.E.2d 641, 657 (2012). However, that case was commenced in 2007,

Even prior to *Heller*, numerous state court decisions, without exception, held that assault weapons and large-capacity magazines were not entitled to protection under a variety of state provisions protecting the right to bear arms.  *See, e.g.*, *Benjamin* v. *Bailey*, 662 A.2d 1226, 1230-35 (Conn. 1995) (Connecticut's assault weapons ban "does not infringe on the right to bear arms guaranteed by article first, § 15" of the state constitution); *Robertson* v. *City & County of Denver*, 874 P.2d 325, 331-33 (Colo. 1994) (Denver's ban on assault weapons "designed primarily for military or antipersonnel use" did not violate "the right to bear arms in self-defense" provided by the state constitution); *Arnold* v. *City of Cleveland*, 616 N.E.2d 163, 166-73 (Ohio 1993) (Cleveland's assault weapons ban did not violate "the fundamental right to bear arms" established by the Ohio constitution); *City of Cincinnati* v. *Langan*, 640 N.E.2d 200, 203 n.1, 205-06 (Ohio Ct. App. 1994) (upholding Cincinnati's ban on rifle magazines holding more than 10 rounds under right to bear arms provision of Ohio constitution).[22]

In sum, courts that have addressed bans on assault weapons and large capacity magazines have held that such bans do not implicate, and certainly do not burden or violate, the Second Amendment right.[23]  *Cf. McDonald*, 130 S. Ct. at 3047 (noting "the paucity of precedent

---

prior to *Heller* and *McDonald*.  The court thus remanded "given the procedural posture" of the case, noting that "unlike *Heller II*, the County has not had an opportunity to present evidence to justify the nexus between the Ordinance and the governmental interest it seeks to protect."  *Id.*  The matter is on remand to the trial court at the present time.

[22] *See also, e.g.*, *Richmond Boro Gun Club, Inc.* v. *City of New York*, 97 F.3d 681 (2d Cir. 1996) (pre-*Heller* decision rejecting constitutional challenges to New York City's ban on assault weapons and large-capacity magazines); 896 F. Supp. 2d 276 (E.D.N.Y. 1995) (district court decision) (same); *Citizens for a Safer Cmty.* v. *City of Rochester*, 164 Misc. 2d 822, 826 (Sup. Ct. Monroe Cnty. 1994) (Siragusa, J.) (pre-*Heller* decision upholding Rochester's law regulating the possession of assault weapons and banning certain semiautomatic rifles and shotguns "which [are] loaded or capable of being loaded with more than six (6) cartridges in the ammunition feeding device and chamber combined").

[23] This is the overwhelming consensus of constitutional scholars as well.  (Ex. 28 at 8-25 (Prof. Laurence H. Tribe); Ex. 70 at 2 (more than 50 constitutional law professors)); Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytical Framework and*

sustaining bans comparable to those at issue [t]here and in *Heller*”).   As set forth below, New York law similarly does not reach or burden conduct protected by the Second Amendment.

> **D.    The SAFE Act's Prohibitions and Restrictions on Assault Weapons and Large-Capacity Magazines Regulate Conduct that Is Outside <u>the Scope of -- and Thus Entirely Unprotected by -- the Second Amendment</u>**

> > **1.    New York's Assault Weapons Ban Does <u>Not Implicate the Second Amendment</u>**

The assault weapons restricted and prohibited by New York law are “dangerous and unusual” military-style weapons, the prohibition of which is fully consistent with the sorts of bans on dangerous weapons that have long existed and repeatedly been upheld against constitutional attack.

> > ***a.    Assault Weapons Are Unusually <u>Dangerous Military-Style Firearms</u>***

Assault weapons are not “ordinary firearms” (Pl. Mem. at 5), but instead are unusually dangerous military-style weapons that “are designed to enhance their capacity to shoot multiple human targets very rapidly.”  *Heller II*, 670 F.3d at 1262; (Ex. 29 (2008 Brady Center testimony before D.C. Council) at 1; *see* Ex. 5 (Gov. Memo in Support) at 6; Ex. 6 (Assembly Memo in Support) at 5-6; Ex. 7 (Senate Memo in Support) at 5-6; Bruen Decl. ¶ 9; Sheppard Decl. ¶¶ 9, 14; Ex. 30 at 2 (2010 statement from Buffalo Police Commissioner).)  They “are semiautomatic versions of fully automatic weapons designed for military use.”  (Ex. 29 (2008 Brady Center testimony before D.C. Council)); *see Heller II*, 670 F.3d at 1262-63; *Richmond Boro*, 896 F. Supp. at 282; (Bruen Decl. ¶¶ 9, 25; Koper Decl. ¶¶ 5-10, 29-32 ; Sheppard Decl. ¶¶ 9, 14); H.R. Rep. No. 103-489, at 17 (noting conclusion of ATF working group that “semiautomatic assault rifles . . . represent a distinctive type of rifle distinguished by certain general characteristics

---

*a Research Agenda*, 56 UCLA L. Rev. 1443, 1489 (2009); Lawrence E. Rosenthal & Adam Winkler, *The Scope of Regulatory Authority under the Second Amendment* 225, 231-34 (Daniel W. Webster & Jon S. Vernick eds., 2013).

which are common to the modern military assault rifle").  Indeed, although as semi-automatic firearms they "fire 'only one shot with each pull of the trigger,'" assault weapons "still fire almost as rapidly as automatics."  *Heller II*, 670 F.3d at 1263 (quoting *Staples* v. *United States*, 511 U.S. 600, 602 n.1 (1994)); (*see* Ex. 31 (2008 Brady Center report) at 1); Lenett, *supra*, at 575 n.6; *see also* H.R. Rep. No. 103-489, at 18 ("semiautomatic weapons can be fired at rates . . . making them virtually indistinguishable from machineguns")).

Plaintiffs' contention that the banned "military-style features" set forth in the SAFE Act are "common feature . . . that . . . do not render the firearm more powerful, dangerous, or unsafe" (Pl. Mem. at 5) is also without merit.  As explained in the accompanying declaration of Kevin Bruen, these specific features -- most of which have been part of the assault weapons ban applicable in New York for almost twenty years -- were included in the State's assault weapons law precisely because they are useful in military and criminal applications but unnecessary for self-defense or sporting purposes.  (Bruen Decl. ¶¶ 13-26; *see* Koper Decl.¶¶ 29, 32;  Ex. 10 (2011 ATF Study) at 9-12; Ex. 12 (1998 ATF Study) at ex. 5; Ex. 11 (1989 ATF Report) at 6-7; Ex. 32 (Koper 2004) at 4-8, 80 n.94; Ex. 33 (2004 Legal Cmty. Against Violence report) at 1; Ex. 31 (2008 Brady Center report) at 14-16); Lenett, *supra*, at 606-07; H.R. Rep. 103-489, at 18-20.[24]

---

[24] *See also What Should America Do About Gun Violence?: Hearing Before the S. Comm. on the Judiciary*, 113th Cong. (Jan. 30, 2013) (testimony of Baltimore County Police Department Chief James Johnson) (stating that the that these features give assault weapons enhanced "technical capability . . . [and] ability to cool down and handle round after round after round" and increase the guns' "offensive capability," and concluding that assault weapons and the features that define them are "meant for the battlefield and in a public safety environment only"), *available at* http://www.senate.gov/isvp/?comm=judiciary&type=live&filename=judiciary013013, at 3:19:15-3:21:55.

For example, pistol grips and thumbhole stocks aid a shooter in retaining control of a firearm while holding it at his or her hip, facilitating the rapid and continuous fire of ammunition without precise aiming.  (Bruen Decl. ¶ 19; Ex. 12 (1998 ATF Study) at ex. 5); *see Richmond Boro*, 97 F.3d at 685; *Heller II*, 670 F.3d at1262-63.  A folding or telescoping stock sacrifices accuracy for advantages such as concealability and mobility in close combat.  (Bruen Decl. ¶ 18; Ex. 10 (2011 ATF Study) at 9); *see Richmond Boro*, 97 F.3d at 684-85.  And a muzzle brake or muzzle compensator helps to reduce the recoil and muzzle movement caused by rapid fire.  (Bruen Decl. ¶ 20).   In short, these banned features, as well as the others contained in New York's assault weapons ban, have long been recognized as "serv[ing] specific, combat-functional ends" and their "net effect . . . is a capability for lethality -- more wounds, more serious, in more victims -- far beyond that of firearms in general, including other semiautomatic guns." H.R. Rep. 103-489, at 18-20; (*see* Bruen Decl. ¶¶ 13-26; Exs. 10-11, 31-33).[25]

Assault weapons also "are the weapons of choice among drug dealers, criminal gangs, hate groups, and mentally deranged persons bent on mass murder."  H.R. Rep. No. 103-489, at 13; *see Heller II*, 670 F.3d at 1263; *Richmond Boro*, 896 F. Supp. at 282-83 (citing evidence from Manhattan, Brooklyn, and Bronx District Attorneys regarding the use of assault weapons in crime); (Koper Decl. ¶¶ 11-16; Sheppard Decl. ¶¶ 9-16; Rice Decl. ¶¶ 6, 10; Bruen Decl. ¶ 10; Ex. 32 (Koper 2004) at 17-18, 87; Ex. 11 (1998 ATF Study) at 34-35, 38).  And, contrary to the

---

[25] And even if, as Plaintiffs and their *amici* argue, the "menacing looks" of assault weapons were part of the reason New York has prohibited and restricted their possession, that would not raise any constitutional concerns here.  (Ex. 28 (2013 Tribe Testimony) at 23).  As the Supreme Court made clear in *Heller*, regulating certain weapons because of their intimidating appearance is historically, and constitutionally, unproblematic.  *See Heller*, 554 U.S. at 627 (citing, *inter alia*, 4 Blackstone 148-49 (1769) ("the offence of riding or going armed, with dangerous or unusual weapons, is a crime against the public peace, by terrifying the good people of the land")); *see also, e.g.*, *Olympic Arms* v. *Magaw*, 91 F. Supp. 2d 1061, 1074 (E.D. Mich. 2000), *aff'd*, 301 F.3d 384 (6th Cir. 2002); H.R. Rep. 103-489, at 18; (Rice Decl. ¶ 8).

assertions of Plaintiffs' *amici* (*see* NYSSA Mem. at 11), they are used in a disproportionately high number of shootings of law enforcement officers.  (Koper Decl. ¶¶ 11, 14; Ex. 32 (Koper 2004) at 10, 15 & n.12; Ex. 34 (Koper 2013) at 160-61; Ex. 35 (Roth & Koper 1997) at 98-100); *see Heller II*, 670 F.3d at 1262.  In fact, a 2003 study analyzing FBI data found that 20% of law enforcement officers killed in the line of duty were killed with an assault weapon.  (Ex. 37 (2003 Violence Policy Ctr. Report) at 5.)

With respect to mass shootings, the numbers are even more stark.  One recent study has determined that, out of 62 mass shootings in the United States over the past three decades, more than half involved assault weapons and/or large-capacity magazines -- with the great majority of these weapons obtained legally.  (Koper Decl. ¶¶ 12; *see also* Ex. 39 (2013 Mayors Against Illegal Guns study) (finding that, in mass shootings over the past four years, shooters who used assault weapons and/or high-capacity magazines shot over twice as many people and killed 57 percent more people than shooters who did not use these weapons); Allen Decl. ¶¶ 16-22).

In sum, as the ATF has explained:

> Assault weapons were designed for rapid fire, close quarter shooting at human beings.  That is why they were put together the way they were.  You will not find these guns in a duck blind or at the Olympics.  They are mass produced mayhem.

(Ex. 40 (1994 ATF *Assault Weapons Profile*) at 19).  Accordingly, since *Heller*, courts have concluded that assault weapons are "dangerous and unusual" weapons outside the scope of the Second Amendment right.  *See, e.g.*, *Heller II*, 690 F. Supp. 2d at 193-95; *James*, 94 Cal. Rptr. 3d at 585-86; *see also, e.g.*, *United States* v. *Huet*, No. 08-0215, 2010 U.S. Dist. LEXIS 123597, at *13, *30 (W.D. Pa. Nov. 22, 2010) ("Although the semiautomatic assault weapons ban ended in 2004, Congress's determination of which weapons were, and which weapons were not, dangerous, bears upon the constitutional inquiry regarding whether defendant Huet's rifle

was 'dangerous' or 'unusual.'"), *rev'd on other grounds*, 665 F.3d 588, 597 n.7 (3d Cir. 2012), *cert. denied*, 133 S. Ct. 422 (2012).

### b.     *Assault Weapons Are Not In "Common Use"*

Assault weapons also are not in "common use," *see Heller*, 554 U.S. at 624-25, 628, and Plaintiffs' arguments to the contrary are just wrong.  They are a tiny percentage of the firearms available, both in New York and nationwide.

The best estimates are that, prior to the 1994 federal ban, there were approximately 1.5 million privately owned assault weapons in the United States, which was less than 1% of the total civilian gun stock.  (Koper Decl. ¶ 38; Ex. 34 (Koper 2013) at 160-161; Ex. 32 (Koper 2004) at 10; Ex. 68 (1995 Bureau of Justice Statistics findings) at 6).  And, while these numbers appear to have increased since the federal ban was lifted in 2004 (though, of course, presumably not nearly to the same extent in New York, where an assault weapons ban has remained in place continuously) assault weapons are still, based on the NRA's own estimates, only around 2% of all firearms owned nationwide.  (Ex. 28 (2013 Prof. Tribe Senate Testimony) at 24-25 ("Given that the Congressional Research service recently found that, as of 2009, Americans own about 310 million guns, the NRA's estimate would translate into approximately 7 million assault weapons owned today" -- which is just over 2%)).  That is "hardly enough to justify calling such weapons 'common' within the meaning of *Heller*."  (*Id.* at 25).[26]

---

[26] The "modern sporting rifle" production figures set forth in the declaration Plaintiffs submitted from the NRA's Research Coordinator, Mark Overstreet are not to the contrary.  The Overstreet Declaration estimates that approximately "3.97 million AR-15 type rifles" have been manufactured in the United States since 1986.  (Overstreet Decl. ¶ 11).  Even if all these weapons remain functional and are currently possessed by Americans, that would still mean that what Plaintiffs contend is the "most popular" assault weapon would amount to just over 1% of all firearms owned in this country.  (*See* Ex. 28 (2013 Prof. Tribe Senate Testimony) at 24).

c.    *Assault Weapons Are Not "Typically Possessed by Law-Abiding Citizens for Lawful* <u>*Purposes" Such as Self-Defense and Hunting*</u>

Even if Plaintiffs were correct about assault weapons being "commonly possessed" (which they are not), the scope of the Second Amendment right is not governed by industry marketing and sales figures.  The relevant "common use" question under *Heller* is not whether there are lots of these weapons, but rather whether they are "typically possessed by law-abiding citizens for lawful purposes" such as self-defense, in particular.  *Heller*, 554 U.S. at 625, 627; *see supra* pp. 18, 22-23.  Assault weapons are not, and, for this reason as well, they are entirely unprotected by the Second Amendment.

In *Heller II*, Plaintiffs' counsel submitted a nearly identical Overstreet Declaration with estimates of nationwide AR-15 production in an effort to prove that the estimated number of weapons sold indicate that they are subject to constitutional protection. (Ex. 41 (*Heller II* Overstreet Decl.)). The argument did not work there, and it does not work here.  The D.C. Circuit did not find that assault weapons were commonly used for self-defense.  *Heller II*, 670 F.3d at 1261.  Instead these were "offensive" weapons, and, as the court noted, it was "difficult to draw meaningful distinctions between the AR-15 and the M-16" -- the automatic military rifle that "*Heller* suggests….may be banned [as] dangerous and unusual."  *Id.* at 1263; *see Staples*, 511 U.S. at 603 ("Many M-16 parts are interchangeable with those in the AR-15 and can be used to convert the AR-15 into an automatic weapon."); (Koper Decl. ¶ 31; Ex. 32 (Koper 2004) at 4; Bruen Decl. ¶ 10).  Assault weapons are certainly not comparable to the handgun as the "quintessential" firearm for home defense identified by the Court in *Heller*.  554 U.S. at 629.

There is ample evidence that assault weapons are not suitable for home defense. The ammunition shot from some assault weapons is, in fact, powerful enough to penetrate walls, increasing the threat of stray bullets harming innocent family members, neighbors, and

passersby.  *See, e.g.*, *Richmond Boro*, 896 F. Supp. 2d at 283; (Bruen Decl. ¶¶ 13, 23; Sheppard Decl. ¶ 27); Rosenthal & Winkler, *supra*, at 232.  As the Executive Director of the Fraternal Order of Police put it, "[a]n AK-47 fires a military round.  In a conventional home with dry-wall walls, I wouldn't be surprised if [an AK-47 round] went through six of them."  (Ex. 31 (2008 Brady Center report) at 16).  The banned features of assault weapons are "conducive to military and potential criminal applications but unnecessary in shooting sports or for self-defense." (Koper Decl. ¶ 5; *see* Bruen Decl. ¶ 23; *see* Ex. 28 (Tribe Testimony) at 23-24 ("In fact, I have searched in vain for any reasoned arguments that pistol grips, forward grips, telescoping stocks, grenade or rocket launchers, and barrel shrouds are indispensable or even contribute to self-defense.")); *see supra* pp. 26-27.

With respect to self-defense, and in particular "the core . . . right to self-defense in the home," *Osterweil* v. *Bartlett*, 706 F.3d 139, 140 (2d Cir. 2013), the evidence here in no way supports Plaintiffs.  Notably, though two of the individual Plaintiffs (Galvin and Horvath) submitted affidavits in support of Plaintiffs' preliminary injunction motion in which they list the assault weapons they own  and claim that they own these weapons, in part, "[f]or self protection purposes," neither attests that he has ever actually used one of his assault weapons in self-defense.  (Galvin Aff. at 1-3; Horvath Aff. at 1-3).  Nor does the 168-paragraph Amended Complaint contain such allegations, as to any of the Plaintiffs.  Nor do Plaintiffs allege that these are the only weapons they use or could use for their defense.

Plaintiffs, in fact, offer no evidence at all that assault weapons are commonly used for self-defense in the home.  Instead, they offer only highly dubious information about the use of firearms in general for self-defense.  And, despite Plaintiffs' assertions, the use of guns, *of any sort*, for self-defense purposes is rare.  Thus, while Plaintiffs have submitted a declaration from

Gary Kleck, Professor of Criminology and Criminal Justice at Florida State University, asserting that "[i]n 1993 there were approximately 2.5 million incidents in which victims used guns for self-protection," (Kleck Decl. at 1-2), this figure, and the methodology used to derive it, have been repeatedly debunked.[27]   (Ex. 42 (2013 Violence Policy Ctr. Report) at 6; Ex. 43 (David Hemeway, *Private Guns, Public Health* (2004)) at 238-243; Ex. 44 (Philip Cook, Jens Ludwig & David Hemenway, *The Gun Debate's New Mythical Number: How Many Self-Defense Uses Per Year?*, 16 J. Pol'y Analysis & Mgmt. 463, 463-69 (2007)).   On the contrary, the most reliable, accurate data in this area, the National Crime Victimization Survey ("NCVS") conducted by the Bureau of Justice Statistics, shows that self-defense gun use in the United States is much smaller. (Ex. 42 (2013 Violence Policy Ctr. Report) at 7-10).   Specifically, under the most recent NCVS data, for the *five-year period from 2007 through 2011*, the total number of self-protective behaviors involving any type of firearm by victims of attempted or completed violent crimes or property crimes totaled only 338,700 -- a tiny fraction of the 12.5 million such incidents we would expect over this period if Kleck's estimate that firearms are used in self-defense 2.5 million times a year were correct.  (Ex. 42 (Violence Policy Ctr. Report) at 7-10).[28]

And justifiable homicides involving a gun are even rarer.  In 2010, there were just 230 justifiable homicides in the United States involving a gun, with none reported in New York.  (Ex. 42 (Violence Policy Ctr. Report) at 2, 13).  For the five-year period from 2006 through 2010,

---

[27] For example, as Dr. David Hemenway, Professor of Health Policy at the Harvard School of Public Health and director of the Harvard Injury Control Research Center has noted, "[t]his estimate is not plausible and has been nominated as the 'most outrageous number mentioned in a policy discussion".  (Ex. 43 (David Hemenway, *Private Guns, Public Health* (2004)) at 66); *see id.* at 68 ("It is clear that the claim of 2.5 million annual self-defense gun uses is a vast overestimate.")).

[28] Of this number, it is not known what type of firearm was used or whether it was fired or not. The number may also include off-duty law enforcement officers who use their firearms in self-defense.  (Ex. 42 (Violence Policy Ctr. Report) at 7).

there were only 1,031 justifiable homicides involving a gun nationwide, with only five total in New York and all of those occurring in 2006.  (Ex. 42 (Violence Policy Ctr.) at 2, 13).  The data does not reveal whether assault weapons were used in any of these justifiable homicides.  It does show, however, with respect to the national numbers, that in only 4.5% of cases was the firearm used a rifle -- which is, of course, the only type of assault weapon that any of the Plaintiffs here have specifically stated they possess (*i.e.*, Galvin's and Horvath's AR-15s (*see* Galvin Aff. at 1-2; Horvath Aff. at 1-2)).  (Ex. 42 (Violence Policy Ctr. Report) at 19).  In fact, even Plaintiffs' proffered expert, has concluded that "revolvers and semi-automatic pistols are together used almost 80% of the time in incidents of self-defense with a gun."  *Heller II*, 670 F.3d at 1262 (citing Gary Kleck & Marc Gertz, *Armed Resistance to Crime: The Prevalence and Nature of Self-Defense with a Gun*, 86 J. Crim. L. & Criminology 150, 185 (1995)).[29]

Nor, even assuming it mattered under the Second Amendment, do assault weapons serve any legitimate hunting or sporting purposes.  (Ex. 5 (Gov. Memo in Support) at 6 (noting that the assault weapons banned "have military-style features unnecessary for hunting and sporting purposes"); Ex. 6 (Assembly Memo in Support) at 5; Ex. 7 (Senate Memo in Support)).  The ATF has long banned the importation of certain assault weapons precisely because they "are not generally recognized as particularly suitable for or readily available to sporting purposes."  (Ex. 12 (1998 ATF Study); Ex. 11 (1989 ATF Report);  Koper Decl. ¶ 37 n.17); *see Heller II*, 670 F.3d at 1262; (Ex. 32 (Koper 2004) at 1, 10 n.7; Ex. 31 (2008 Brady Center report) at 14-16; Ex. 12 (2012 ATF Report); Ex. 10 (2011 ATF Report)); *supra* pp. 6-7.  Indeed, despite Plaintiffs'

---

[29] Any factual dispute about the extent to which firearms in general are used in self-defense is not material to the issue of the extent to which assault weapons are used in self-defense, and thus does not preclude summary judgment in favor of the State Defendants. In any event, Plaintiffs have clearly failed to establish that assault weapons are commonly used for self-defense in the home in New York or nationwide.

contention that SAFE Act's restrictions will affect "a wide range of firearms . . . which are regularly used for lawful and legitimate purposes like hunting [and] sporting competitions," when asked, even hunters and sportsman acknowledge that assault weapons are simply not "legitimate sporting guns." *Field & Stream*, 2003 National Hunting Survey, *available at* http://www.fieldandstream.com/articles/hunting/2002/06/2003-national-hunting-survey (last visited June 21, 2013); *see* Ex. 31 (2008 Brady Center report) at 17.

In sum, as courts have recognized and the record here makes clear, "[t]hese are not the types of weapons that are typically possessed by law-abiding citizens for lawful purposes such as sport hunting or self-defense; rather, these are weapons of war." *James*, 94 Cal. Rptr. 3d at 586.

### 2. Neither New York's Ban on Large-Capacity Magazines Nor Its Seven-Round Load Limit Implicates the Second Amendment

#### a. The Banned Ammunition Devices Are "Dangerous and Unusual"

Large-capacity magazines are unnecessary for self-defense but are instead components of dangerous and unusual weapons.  (Ex. 5 (Gov. Mem. in Support) at 6 (finding that "some ammunition devices are so lethal that we simply cannot afford to continue selling them in our state"); Ex. 6 (Assembly Memo in Support) at 5; Ex. 7 (Senate Memo in Support) at 5); *see Hightower* v. *City of Boston*, 693 F.3d 61, 66, 71 & n.7 (1st Cir. 2012) (noting that "large capacity weapons" -- in that case, those able to carry "more than ten rounds" -- are not "of the type characteristically used to protect the home"); *Heller II*, 698 F. Supp. 2d at 193-95; (Ex. 10 (2011 ATF Study) at 10-11 (determining that "magazines capable of holding large amounts of ammunition, regardless of type, are particularly designed and most suitable for military and law enforcement applications," and that five-round magazines in shotguns "are particularly suitable for the military or law enforcement"); Ex. 12 (1998 ATF report) at 3, 38 ("firearms with the ability to expel large amounts of ammunition quickly . . . have military purposes and are a crime

problem"); *see also Heller II*, 670 F.3d at 1263-64 (rejecting Second Amendment challenge to D.C.'s ban on large-capacity magazines).

Large-capacity magazines pose a particular public health risk. Like assault weapons, large-capacity magazines appear to be disproportionately involved in murders of police and used to facilitate increased gun violence and deadly mass shootings. (Koper Decl. ¶¶ 17-26; Ex. 34 (Koper 2013) at 161-62; Ex. 32 (Koper 2004) at 14-15, 18-19; Ex. 38 (*Mother Jones* study)[30]; *see Heller II*, 670 F.3d at 1263-64 (concluding that "the evidence demonstrates that large-capacity magazines tend to pose a danger to innocent people and particularly to police officers"); (Sheppard Decl. ¶ 9-16; Rice Decl. ¶¶ 9-10; Zimring Decl. ¶¶ 15-22; Allen Decl. ¶¶ 16-22). Large-capacity magazines "are used in somewhere between 31% to 41% of gun murders of police." (Koper Decl. ¶ 20; Ex. 32 (Koper 2004) at 18; Ex. 34 (Koper 2013) at 162.) Guns with large-capacity magazines are disproportionately used in shootings with wounded victims and are linked with increased injuries and fatalities. *Heller II*, 670 F.3d at 1263 (citing analysis of gunshot victimizations in Baltimore conducted by one of the State Defendants' declarants, Dr. Christopher S. Koper) (quoting Ex. 32 (Koper 2004) at 87); (Koper Decl. ¶¶ 7, 22-26); *see* H.R. Rep. 103-489, at 19 (noting the "greater enhanced lethality" of "ammunition magazines which hold more than ten rounds"). As the D.C. Circuit also noted, "studies . . . suggest that attacks with semiautomatics -- including [assault weapons] or other semiautomatics with [magazines holding more than ten rounds] -- result in more shots fired, persons wounded, and wounds per victim than do other gun attacks." *Heller II*, 670 F.3d at 1263; (*see* Koper Decl. ¶ 22; Ex. 32 (Koper 2004) at 97; Ex. 34 (Koper 2013) at 166-67).

---

[30] http://www.motherjones.com/politics/2013/01/high-capacity-magazines-mass-shootings (last visited June 21, 2013); *see also* http://www.motherjones.com/politics/2012/12/mass-shootings-mother-jones-full-data (last visited June 21, 2013).

Perhaps most notably, as discussed above, a recent study has determined that, since 1982, at least half of all mass shooters used large-capacity magazines in carrying out their attacks, including, of course, in the horrific attacks at Newtown that in part prompted the legislature's actions here.  (Ex. 38 (*Mother Jone*s); *see* Koper Decl. ¶ 21; *see also* (Ex. 39 (Mayors Against Illegal Guns study); Zimring Decl. ¶¶ 15-22; Allen Decl. ¶¶ 16-22); *Heller II*, 670 F.3d at 1263 (citing evidence that "'[t]he threat posed by military-style assault weapons is increased significantly if they can be equipped with high-capacity ammunition magazines' because, '[b]y permitting a shooter to fire more than ten rounds without reloading, the greatly increase the firepower of mass shooters'").  This directly rebuts Professor Kleck's assertion based upon stale data that although large-capacity magazines are used in mass shootings, "most mass shooters" in this country "use multiple, smaller capacity magazines." (Kleck Decl. at 4;  *see* Pls.' PI Mem. at 21). [31]  In short, large-capacity magazines tend to be associated with more serious crimes with more serious outcomes. (Koper Decl. ¶ 7, 17-26).

<b>b.    The Banned Devices Are Not<br><u><i>"Typically Used for Lawful Purposes"</i></u></b>

While "magazines holding more than ten rounds" may well be in common use nationally, *Heller II*, 670 F.3d at 1261, as with assault weapons, that does not appear to be the case in New York.  Even before the passage of the SAFE Act, for almost twenty years, federal and New York law banned such large-capacity magazines in this State, excepting only those devices manufactured on or before the effective date of the federal assault weapons ban in 1994.  *See supra* pp. 5, 7.  The State also sets strict limits on the number of rounds hunters may load into

---

[31] Moreover, even Kleck's own data belies his conclusion here.  As Dr. Koper has demonstrated, under Kleck's own reported figures, "semiautomatics with [large-capacity magazines], including assault weapons, were involved in 6, or 40%, of 15 mass shooting incidents occurring between 1984 and 1993 in which six or more persons were killed or a total of 12 or more were wounded." (Koper Decl. ¶ 9; Ex. 32 (Koper 2004) at 14; Ex. 34 (Koper 2013) at 161).

36

their firearms.  Envtl. Convserv. Law § 11-0931(1)(c) (five-round magazine load limit for most semiautomatics); (*see* Ex. 27 (1/15/03 Assembly Debate) at 54; *see also* Ex. 10 (2011 ATF Study) at 10-11; Ex. 12 (1998 ATF Study) at 37); H.R. Rep. 103-489, at 19.  And several cities have long gone even further than the state and federal governments in setting ammunition capacity and load limits for firearms. *See* N.Y.C. Admin. Code § 10-306 (five-round load limit for rifles and shotguns); Buffalo City Code § 180-1(B), (F)-(G) (five-round limit for certain semiautomatic rifles and shotguns); Rochester City Code § 47-5(B), (F)-(G) (same).

More importantly, the evidence simply does not support Plaintiffs' claims that more than seven rounds, or a larger than ten-round magazine, is common or necessary for self-defense or that these provisions "impair[] a homeowner's ability to successfully defend himself or herself during a criminal attack in the home."  (*See also* Ex. 28 (2013 Tribe Testimony) at 14 (noting that, "in the case of high-capacity magazines, significant market presence does not necessarily translate into heavy reliance by American gun owners on those magazines for self-defense"). Instead, an analysis of the NRA's own reports "over a five-year period" of firearm use in self-defense, both within the home and elsewhere, "demonstrated that in 50% of all cases, two or fewer shots were fired, and the average number of shots fired across the entire data sample was also about two."  (*Id.* at 16-17;  http://gunssavelives.net/self-defense/analysis-of-five-years-of-armed-encounters-with-data-tables/ (last visited June 21, 2013)).[32]  And although Plaintiffs posit fantastical scenarios involving multiple home invaders who can be stopped only by a homeowner's immediate access to firearms containing more than seven rounds of ammunition

---

[32] An updated analysis of these NRA reports, for the period June 2010 to May 2013, likewise indicates that, contrary to Plaintiffs' assertions here, it is extremely rare for a person to fire more than seven shots when using a firearm in self-defense.  This analysis shows, individuals fired on average only 2.1 bullets when using a firearm in self-defense.  And in only 1 out of these 298 incidents -- much less than 1% -- was the defender reported to have fired more than seven bullets.  (Allen Decl. ¶¶ 12-15.)

(*see* Pl. Mem. at 27-32; Horvath Aff.), the evidence does not provide any reasonable grounds for these sorts of fears.  (*See* Allen Decl. ¶¶ 5-11; Ex. 28 (2013 Tribe Testimony) at 16-18)); *see supra* pp. 31-33.[33]

None of this means, of course, that Plaintiffs' fears of "a sudden home invasion, robbery, or other attack" (Am. Cplt. ¶ 93) are not genuine.  But their desire for large-capacity magazines (or more than seven rounds in that magazine) does not create a Second Amendment right.  (Ex. 28 (2013 Prof. Tribe Senate Testimony) at 16 ("I might want a magazine with twice as many bullets as any possible home intruder.  I might want a machine gun too.  But in the end that can't be the measure of what the Second Amendment says I have a *right* to own and deploy.")); *see Hightower*, 693 F.3d at 71 & n.7; *Heller II*, 670 F.3d at 1262 (rejecting Second Amendment challenge to D.C.'s large-capacity magazine ban where "plaintiffs present hardly any evidence that . . . magazines holding more than ten rounds are well-suited to or preferred for the purpose of self-defense or sport").[34]

---

[33] Plaintiffs rely upon this speculation of potential crimes in an effort to establish irreparable injury for the purposes of their preliminary injunction application. (*See* Pl. Mem. at 27-32).  But a party seeking to show irreparable harm must show that "absent a preliminary injunction [it] will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *Grand River Enter. Six Nations, Ltd.* v. *Pryor*, 481 F.3d 60, 66 (2d Cir. 2007) (internal quotation marks omitted).  The alleged harm must be likely, as opposed to merely possible. *Winter*, 555 U.S. at 22.  Although alleging a constitutional harm, Plaintiffs must still show that the alleged harm is actual and imminent, and not remote and speculative. *Smolen* v. *Dildine*, No. 11-6434, 2011 U.S. Dist. LEXIS 139356 , at *5 (W.D.N.Y. Dec. 5, 2011).  Plaintiffs have not come close to making such a showing here.  (*See also* Allen Decl. ¶¶ 5-11).

[34] Plaintiffs' cite the New York City Police Department's *Annual Firearms Discharge Report* for 2010 in support of their argument that they need large-capacity magazines and more than seven rounds in a single magazine to defend themselves in their homes. (*See* Pl. Mem. at 31-32).  But even assuming for argument that the situations faced by police officers exercising their duties and civilians in their homes were comparable, the data does not help Plaintiffs.  In 2010, New York City's population was more than 8,000,000 people and the New York Police Department employed more than 34,000 people. But there were only 33 incidents of intentional firearms discharge by police in an adversarial conflict.  Plaintiffs point to the reports of total shots fired

In short, like assault weapons, large-capacity magazines and guns with more than seven live rounds are neither necessary, nor particularly suitable, for self-defense. Plaintiffs argue that they need such devices to protect themselves because "people miss with most of the rounds they fire, even when trying to shoot their opponents." (Pl. Mem. at 20). But this risk only aggravates the danger here. As the D.C. Circuit recognized in upholding the District's large-capacity magazine ban against a Second Amendment challenge, the evidence shows that "high-capacity magazines are dangerous in self-defense situations because 'the tendency is for defenders to keep firing until all bullets have been expended, which poses grave risks to others in the household, passersby, and bystanders." *Heller II*, 670 F.3d at 1263-64; (*see* Ex. 28 (2013 Tribe Testimony) at 16-18; Ex. 31 (2008 Brady Center report) at 16; *see also* Bruen Decl. ¶ 13; Sheppard Decl. ¶ 27; Rice Decl. ¶15).

For all these reasons, the facts and law here make clear that, like the State's assault weapons ban, New York's large-capacity magazine ban and its prohibition on more than seven rounds in an ammunition magazine  regulate conduct that is not within the scope of the Second Amendment right. Thus, Plaintiffs' claims challenging these restrictions fail as a matter of  law.

> **E.    Counts One and Two Also Fail Because the Challenged
> Provisions of the SAFE Act Do Not "Substantially Burden the
> Second Amendment" and Plainly Satisfy Rational Basis Review**

Even if the Court were to find that the challenged provisions of the SAFE Act implicate conduct that falls within the scope of the Second Amendment right, Plaintiffs' claims still fail because the provisions do not substantially burden the right and would pass rational basis review.

---

per incident, *by all officers involved*, but the most striking totals here are how few shots were fired: in 27% of all incidents, the total number of shots fired *by all officers involved* was one, and in 60% five or fewer shots were fired. Even more notably, on the very same pages as the per-incident data (pp. 7-8 of the 2010 report), "shots fired per officer" is listed. Here, the results are even starker; 77% of officers fired five or fewer times, a quarter of all officers discharging their weapon in such a situation fired only once, and the mode number of shots fired was one. *See* http://www.nyc.gov/html/nypd/downloads/pdf/analysis_and_planning/afdr_20111116.pdf.

In *United States* v. *Decastro*, 682 F.3d 160 (2d Cir. 2012), the Second Circuit held that "heightened scrutiny is triggered only by those restrictions that (like the complete prohibition on handguns struck down in *Heller*) operate as a substantial burden on the ability of law-abiding citizens to possess and use a firearm for self-defense (or other lawful purposes)." *Id.* at 166. Laws regulating the availability of firearms will not be deemed a substantial burden on the right to keep and bear arms, and will be subject to only rational basis scrutiny, "if adequate alternatives remain for law-abiding citizens to acquire a firearm for self-defense." *Id.* at 168-69 That is precisely the situation here.

### 1.  New York's Assault Weapons Ban Does Not Substantially Burden the Second Amendment and Survives the Requisite Rational Basis Review

The SAFE Act does not substantially burden Plaintiffs Second Amendment rights because it prohibits a small, but dangerous, sub-class of weapons but leaves ample self-defense alternatives available to Plaintiffs.  (*See* Bruen Decl. ¶¶ 3, 7, 12-13, 41; Rice Decl. ¶ 14).  Under the NRA's own estimates, *see supra* p. 29, assault weapons comprise at most about 2% of the total civilian gun stock nationally (and likely much less than that in New York).  And, as the record here makes clear, *supra* pp. 30-34, assault weapons are not commonly used, or even suitable, for self-defense or sporting purposes.

Further, as discussed below, Plaintiffs concede that there are numerous "adequate alternatives" to assault weapons for those New Yorkers seeking "to acquire a firearm for self-defense" or other lawful purposes.  *Decastro*, 682 F.3d at 168; *see* Volokh, *supra*, at 1485-86, 1489 (noting "the availability of close substitutes for assault weapons"); (Pl. Mem at 22-23). Semiautomatic firearms without a banned military-style feature, firearms with manual actions (*i.e.*, bolt, pump, lever or slide action), and those hundreds of makes and models specifically exempted in "Appendix A" to the federal assault weapons ban are all permissible.  Penal Law §

265.00(22)(g); *see* H.R. Rep. 103-489, at 20.  And, on the website created and maintained by the New York State Police pursuant to the SAFE Act, the State also has made clear that at least 145 specified pistols, more than 150 specified rifles, and at least 40 specified shotguns are explicitly not banned as assault weapons under New York law.  (Bruen Decl. ¶¶ 12-13; Ex. 45 (rifles); Ex. 46 (pistols); Ex. 47 (shotguns)).[35]

Plaintiffs themselves assert that these, and other, guns still legal in this State include "firearms . . . that function in essentially identical ways as the banned firearms -- *i.e.*, they can accept detachable magazines . . . , can be fired just as fast, and can fire rounds that are, shot-for-shot, just as lethal as rounds fired from banned firearms."  (Pl. Mem. at 22; Kleck Decl. at 6). Plaintiffs further assert that the attributes of assault weapons that "increase their utility for *lawful* self-defense or various sporting purposes," "such as their accuracy, lethality, rapid fire, or ability to fire many rounds without reloading," "are also present in easily-substituted, unbanned counterpart firearms."  (Kleck Decl. at 7; *see* Pl. Mem. at 22).  Plaintiffs, in fact, concede that "prospective crime victims *could* substitute alternative weapons for banned [assault weapons]." (Pl. Mem. at 23; Kleck Decl. at 8).

*Heller II* is squarely on point.  There, as noted above, *see supra* pp. 21-23, the D.C. Circuit found that the District of Columbia's even more restrictive assault weapons ban, along with its ban on large-capacity magazines, "d[id] not impose a substantial burden" on the Second Amendment right, as it did not "prevent a person from keeping a suitable and commonly used weapon for protection in the home or for hunting, whether a handgun or a non-automatic long

---

[35] The State Police website also makes clear that its lists of pistols, rifles, and shotguns that do not qualify as assault weapons are "not exhaustive and only include some of the most common models."  (Exs. 45-47.)  And, under the SAFE Act's registration provisions, those who lawfully possessed assault weapons prior to the passage of the enhanced ban -- including apparently Plaintiffs Galvin and Horvath -- may continue to do so.

gun." *Heller II*, 670 F.3d at 1262.  That same reasoning applies equally to this case;[36] *see also United States* v. *Marzzarella*, 614 F.3d 85, 94 (3d Cir. 2010).

Moreover, state courts have consistently upheld, under state right to bear arms provisions, both state and local assault weapons bans on the grounds that, just as here, there remained "literally hundreds of alternative ways in which citizens may exercise their right to bear arms in self-defense" and thus the challenged laws did not significantly interfere with the right. *Robertson*, 874 P.2d at 333; *see also, e.g.*, *Benjamin*, 662 A.2d at 1232-35; *Arnold*, 616 N.E.2d at 173.  Simply put, assault weapons bans "don't substantially burden the right to keep and bear arms for self-defense, precisely because equally useful guns remain available."  Volokh, *supra*, at 1489.[37]

In light of the foregoing, New York's assault weapons ban plainly does not impose a substantial burden on Plaintiffs' Second Amendment rights."  *Decastro*, 682 F.3d at 168.  Certainly Plaintiffs have not come close to establishing, as they must, any such burden here on their right to keep and bear arms.  *See id.* at 169 n.7.

Accordingly, under *Decastro*, 682 F.3d at 166-68 & n.5, New York's assault weapons ban need only survive rational basis review in order to pass constitutional scrutiny under the Second Amendment.  It easily does so here, as it advances the governmental interests in crime

---

[36] The only relevant difference here is that, in *Heller II*, the D.C. Circuit still applied intermediate scrutiny to assess the District's assault weapons ban and its large-capacity magazine ban, even though it found that neither substantially burdened the Second Amendment.  *Id.* at 1261-62.  Here, by contrast, under the Second Circuit's decision in *Decastro*, 682 F.3d at 169 & n.5, only rational basis review applies.  (*See also* NYSSA Mem. at 6 (noting this holding in *Decastro*)).

[37] In their separate briefs, Plaintiffs' *amici* appear to contend that any such examination into whether "adequate alternatives remain for law-abiding citizens to acquire a firearm for self-defense," *Decastro*, 682 F.3d at 168, is not a permissible part of the Second Amendment inquiry and "cannot be squared with *Heller*."  (NRA Mem. at 21-22; *see* NYSSA Mem. at 6-7.)  But, under *Decastro* -- which, tellingly, the NRA does not cite and the NYSSA *amici* argue the Court should not apply -- this is unquestionably not the law in the Second Circuit.  682 F.3d at 168.

prevention and public safety.  *See, e.g.*, *Richmond Boro*, 97 F.3d at 688 (holding that New York City's assault weapons ban "is a rational legislative response to increased assault weapon violence in the city of New York"); *Richmond Boro*, 896 F. Supp. 2d at 282 ("The rational link between public safety and a law proscribing possession of semiautomatic rifles and shotguns is so obvious that it would seem to merit little serious discussion.");  *Kasler* v. *Lockyer*, 2 P.3d 581, 585-92 (Cal. 2000) (upholding California's assault weapons ban under the rational basis test); *Olympic Arms* v. *Buckles*, 301 F.3d 384, 389-90 (6th Cir. 2002) (holding that 1994 federal assault weapons ban survived rational basis review); *see also Heller*, 554 U.S. at 628-29 n.27. Indeed, as discussed in detail below, on the record submitted on this motion, the law demonstrably passes heightened constitutional scrutiny as well.  *See infra* pp. 46-56.

### 2.    New York's Ban on Large-Capacity Magazines and Its Seven-Round Load Limit Do Not Substantially Burden the Second Amendment and Survive Rational Basis Review

Like the assault weapons ban, both New York's ban on all large-capacity magazines and its prohibition on loading more than seven rounds of ammunition into a magazine also do not substantially burden the ability of law-abiding citizens to possess and use firearms "for self-defense (or other lawful purposes)."  *Decastro*, 682 F.3d at 166.  As noted above, *see supra* pp. 30-34, the record here makes clear that neither is typically used, or suitable, for such purposes. And, despite Plaintiffs' assertions to the contrary, there are "adequate alternatives," *Decastro*, 682 F.3d at 168, if more than seven rounds are ever needed for self-defense or other lawful purposes.

Plaintiffs could, of course, switch magazines or load more bullets -- an option they concede is freely available to both criminals and "law-abiding citizens."  (Pls.' PI Mem. at 20; Kleck Decl. at 3); *see, e.g.*, Volokh, *supra*, at 1489 (noting that "the ability to switch magazines in seconds, which nearly all semiautomatic weapons possess, should suffice for the extremely

rare instances when more rounds were needed").  They could also, if ever in such an unlikely scenario, continue to make use of a second (or even more than one additional) loaded firearm, especially given that Plaintiffs admit in their papers that at least some of them already possess multiple firearms.  (*See* Pls.' PI Mem. at 28-29; *see also, e.g.*, Ex. 48 (3/28/13 Assembly Debate) at 282-84, 342; Kleck Decl. at 4-5 (asserting that criminals can, and most mass shooters do, "bring multiple guns to the crimes and, therefore, can continue firing without reloading even after any one gun's ammunition is expended")).  This is more than sufficient under *Decastro* to defeat Plaintiffs' Second Amendment claims.  682 F.3d at 166-69.

Plaintiffs, it should be noted, seek not simply to return New York to the ten-round limit of pre-SAFE Act law (which would itself be an unwarranted rejection of a legislative judgment), but rather to eliminate *all* of the State's longstanding ammunition load and magazine capacity limits.  (Am. Cplt. ¶¶ 89-100; Pls. Mem. at 3, 37).  They claim that "magazines holding 10, 20, or 30 rounds" -- or even, it would seem, 100 rounds or more -- are all apparently within the core of the Second Amendment right and thus entitled to constitutional protection.  (Pls. Mem. at 3; *see id.* at 37; Am. Cplt. ¶¶ 89-100).

This argument is plainly without merit.  In *Heller II*, both the district court and the D.C. Circuit held that D.C.'s ban on "magazines holding more than ten rounds" fully comported with the Second Amendment.   670 F.3d at 1264; 698 F. Supp. 2d at 195.   As the D.C. Circuit reasoned, the prohibition on ammunition capacity at issue there "d[id] not impose a substantial burden" on the Second Amendment right, because it "d[id] not effectively disarm individuals or substantially affect their ability to defend themselves."  670 F.3d at 1262; *see also, e.g.*, Volokh, *supra*, at 1489 (noting that "until recently even police officers would routinely carry revolvers, which tended to hold only six rounds," and that "[t]hose revolvers were generally seen as

adequate for officers' defensive needs, though of course there are times when more rounds are needed"); (Ex. 28 (2013 Tribe Testimony) at 17 (noting the same)).[38]   State courts also have found similar restrictions on ammunition capacity lawful under state right to bear arms provisions.  *See, e.g.*, *Langan*, 640 N.E.2d at 203 n.1, 205-06; *see also, e.g.*, *Citizens for a Safer Cmty.*, 164 Misc. 2d at 835 (upholding a Rochester city ordinance which prohibited semiautomatic long guns, when possessed with ammunition feeding devices permitting them to be loaded with more than six rounds in the feeding device and chamber, finding that "[n]o serious argument can be made that th[is] limitation on the kinds of guns or the number of rounds available in a single magazine . . . is an important component of self-defense").

In a final effort to save their Second Amendment challenge, Plaintiffs conjure up various scenarios in which, they assert, quickly "chang[ing] magazines" in their firearms "is not a viable option," pointing specifically to the physical disabilities of Plaintiff Galvin and Plaintiff Horvath. (Am. Cplt. ¶¶ 93-97; Pls. Mem. at 27-30).  But these sorts of fact-specific arguments provide no basis for Plaintiffs' facial challenge.  *See Decastro*, 682 F.3d at 168-69 & n.7 (noting stringent "no set of circumstances" standard for facial challenges); (Ex. 28 (2013 Tribe Testimony) at 18-19).  And the record here likewise does not support the as-applied claims of Plaintiffs Galvin or Horvath.  *See Decastro*, 682 F.3d at 169 n.7; *supra* pp. 37-38.

With respect to Galvin, far from making any particularized showing as to why he must be able to fire more than seven rounds from a gun without reloading or changing a magazine to effectively defend himself, his own affidavit states that he is an expert marksman and currently

---

[38] *See also* (Ex. 49 (Raymond W. Kelly, *NY Times* Op-Ed, 2/15/99) (noting that even when NYPD switched to semiautomatic pistols, the Commissioner "directed that the guns' magazines be reconfigured to limit capacity to 10 rounds" rather than their standard 16-round capacity); Ex. 48 (3/28/13 Assembly Debate) at 297).

owns at least eight separate firearms.  (*See* Galvin Aff. at 1-2).  Similarly, nothing in Horvath's affidavit shows that he is particularly vulnerable to an attack that could only be repelled through immediate access to more than seven rounds of live ammunition in the magazine of a single firearm, and certainly nothing comes close to sustaining the heavy burden required for the preliminary and permanent injunctive relief sought here.  (*See* Horvath Aff. at 1-3); *see supra* pp. 14-16.

In sum, neither New York's ban on large-capacity magazines nor its seven-round load limit for firearms substantially burdens the Second Amendment, on its face or as applied. *Decastro*, 682 F.3d at 164. Under *Decastro*, then, the only question left for the Court is whether these provisions survive rational basis review.  *See id.* at 166-68 & n.5.  Just like New York's assault weapons ban, they plainly do, *see supra* pp. 42-43; *see also, e.g.*, *Heller II*, 670 F.3d at 1264; *Langan*, 640 N.E.2d at 203 n.1, 205-06, and thus, for this reason, too, should be dismissed as a matter of law.

### F.    Even If Heightened Scrutiny Applied Here, the Challenged Provisions of the SAFE Act Would Plainly Pass Constitutional Muster

Even if the Court were to find that the conduct at issue here substantially burdens Plaintiffs' Second Amendment rights, Counts One and Two of the Amended Complaint should still be dismissed, because intermediate scrutiny, at best, is appropriate and  the challenged provisions each withstand such scrutiny.

### 1.    If Heightened Scrutiny Is Necessary, Intermediate --Not Strict --Scrutiny Would Be Appropriate

Where a law substantially burdens the Second Amendment right, courts assess how severely the challenged provisions burden the Second Amendment right, particularly the core right to self-defense in the home, in order to determine the level of scrutiny applicable.  *See Kachalsky*, 701 F.3d at 93-94;  *Heller II*, 670 F.3d at 1261-1262.

In reviewing the District of Columbia's assault weapons and large-capacity magazine bans -- which, like the SAFE Act provisions challenged by Plaintiffs here, are applicable both within the home and elsewhere -- the D.C. Circuit in *Heller II* found that if heightened scrutiny were even appropriate, because the laws were not severe burdens, intermediate scrutiny applied. 670 F.3d at 1261-64; *see also Wilson* v. *Cnty. of Cook*, 943 N.E.2d 768, 775-77 (Ill. App. Ct. 2011) (finding that intermediate scrutiny would apply to Cook County's assault weapons and large-capacity magazine bans), *aff'd in part and rev'd in part on other grounds*, 968 N.E.2d 641 (Ill. 2012).   In *Kachalsky,* the Second Circuit cited as "in line with [its] approach" not only *Heller II*, but several other recent court of appeals cases applying intermediate scrutiny to evaluate the constitutionality under the Second Amendment of laws that regulated, restricted, and even prohibited certain home firearm possession.   701 F.3d at 94, n.17.   In fact, following *Heller*, courts have almost unanimously held intermediate scrutiny applies, even as to laws reaching the "core" right of possession of firearms in the home.[39]

The arguments by Plaintiffs and their *amici* for the application of strict, or seemingly even a higher, form of scrutiny (*see* Pls. Mem. at 14-18; NRA Mem. at 12; NYSSA Mem. at 7-8) are without merit.   *Kachalsky* does not mandate the application of strict scrutiny here.   In *Kachalsky*, the Second Circuit rejected the application of strict scrutiny even where it held that plaintiffs' Second Amendment rights were substantially burdened by New York's requirement

---

[39] *See, e.g.*, *United States* v. *Marzzarella*, 614 F.3d 85, 96 (3d Cir. 2010) (applying intermediate scrutiny, at best, and rejecting Second Amendment challenge to conviction for possession of handgun with obliterated serial number in home); *United States* v. *Skoien*, 614 F.3d 638, 641-42 (7th Cir. 2010) (intermediate scrutiny applied to possession of shotgun in the home by a domestic violence misdemeanant); *United States* v. *Walker*, 709 F.Supp.2d 460 (E.D. Va. 2010) (same); *United States* v. *Miller*, 604 F. Supp. 2d 1162 (W.D. Tenn 2009) (intermediate scrutiny applied to uphold penal statute relating to possession in the home by a felon)*; see also Ezell* v. *City of Chicago*, 651 F.3d 684, 689, 708 (7th Cir. 2011)(applying less than strict scrutiny to law which "severely" burdened Second Amendment right by requiring citizens to obtain range training before possessing a gun in the home but banned gun ranges).

that a law abiding citizen show the "proper cause" to obtain a carry license, despite the fact that there was no alternative means to legally carry a handgun in public in New York. 701 F.3d at 93. The *Kachalsky* court did not hold or even suggest that every law affecting firearm possession in the home would be subject to strict scrutiny review.  *See id.*  Such a rule would be irreconcilable with the Second Circuit's prior decision in *Decastro*, in which the court applied no heightened scrutiny at all to a law that affected the possession of certain guns (*i.e.*, "firearms acquired outside the state") in the home.  682 F.3d  at 166-68.  The *amici*'s assertion that this Court should look only to "text, history, and tradition" in conducting its Second Amendment analysis (*see* NRA Mem. at 3-5; NYSSA Mem. at 4) has already been expressly rejected by the Second Circuit.[40]  *Kachalsky*, 701 F.3d at 89 n.9.  Nor is there any merit to the NRA's contention that strict scrutiny must be applied here because the Second Amendment right is fundamental.  (NRA Mem. at 12).  That argument is precluded by binding circuit precedent.  *Decastro*, 682 F.3d at 166-67.

The SAFE Act does not prohibit possession of handguns in the home, as did the laws in *Heller*, or prevent law-abiding citizens from keeping handguns, rifles and shotguns in their homes, or elsewhere, for self-defense.  Accordingly, even were the SAFE Act found to burden Plaintiffs' Second Amendment right, that burden is not severe and intermediate scrutiny applies.

---

[40] As noted by the court in *Kachalsky*, New York has regulated firearms since before the Constitution and has long-standing provisions banning weapons deemed particularly dangerous. 701 F.3d at 96 ("state regulation of the use of firearms in public was 'enshrined with[in] the scope' of the Second Amendment when it was adopted") (internal quotations and citations omitted).  In *Heller*, the Court referred to the long history of banning weapons deemed "dangerous and unusual."  554 U.S. at 627.  And, as historians have explained, the particular weapons regulated or banned change with the times, depending on community views in that jurisdiction.  (Ex. 50 (*Heller II* Historians' Brief ) at 12-17; Zimring Decl. ¶¶ 6-13). As *Heller* itself indicated, military-style weapons can appropriately be banned.  554 U.S. at 628. Accordingly, even if a historical analysis were applicable here, and it is not, the SAFE Act would survive.

## 2.    The Applicable Intermediate Scrutiny Standard

Under intermediate scrutiny, the Court's task is to assess whether a law "is substantially related to the achievement of an important governmental objective." *Kachalsky*, 701 F.3d at 96-97. Public safety and crime prevention are compelling governmental objectives. *Id.* at 97. Accordingly, here, the Court need only assess whether the challenged provisions of New York law are "substantially related to these interests." *Kachalsky*, 701 F.3d at 97.

Courts defer to legislative efforts to design solutions to address public safety and well-being. *Id.* ("substantial deference to the predictive judgments of [the legislature]' is warranted") (quoting *Turner Broad. Sys., Inc.* v. *FCC*, 520 U.S. 180 (1997)). This is especially true in the area of firearms regulation. *Id.* Indeed, "[i]n the context of firearm regulation, the legislature is 'far better equipped than the judiciary' to make sensitive policy judgments (within constitutional limits) concerning the dangers in carrying firearms and the manner to combat those risks." *Id.* (quoting *Turner Broad. Sys., Inc.* v. *FCC*, 512 U.S. 622, 665 (1994)). As the Second Circuit did in *Kachalsky*, the Court should properly look to both the legislative record and available empirical data to assess whether there is sufficient reason to credit the legislature's judgment in this context. *Id.* at 97-99 (relying on both "the legislative record" and "studies and data" submitted by the State in support of its motion for summary judgment).[41]

To survive intermediate scrutiny, the fit between the governmental objective and the challenged regulation need only be substantial, not perfect. *Id.* at 97. In addition, "it is well-

---

[41] Any argument that the challenged SAFE Act provisions should be struck down because there is an insufficient legislative history (*see* NYSSA Mem. at 9-10) is thus entirely without merit. *See also, e.g.*, *City of Boerne* v. *Flores*, 521 U.S. 507, 531 (1997) ("Judicial deference, in most cases, is not based on the state of the legislative record . . . compile[d] but 'on due regard for the body constitutionally appointed to decide.'") (quoting *Oregon* v. *Mitchell*, 400 U.S. 112, 207 (1970) (opinion of Harlan, J.)); *Turner Broad. Sys., Inc.*, 512 U.S. at 666 (noting that "Congress is not obligated, when enacting its statutes, to make a record of the type that an administrative agency or a court does to accommodate judicial review").

settled that 'a statute is not invalid under the Constitution because it might have gone farther than it did, that a legislature need not strike at all evils at the same time, and that reform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind.'" *Nat'l Rifle Ass'n*, 700 F.3d at 211 (quoting *Buckley* v. *Valeo*, 424 U.S. 1, 105 (1976)); *see Kachalsky*, 701 F.3d at 98-99. And, as the Second Circuit has made clear, where, as here, the State has "submitted studies and data" in support of firearms legislation, "the existence of studies and data challenging" that legislative judgment is not nearly enough to invalidate the challenged statutory provision under the Second Amendment. *Kachalsky*, 701 F.3d at 99-100.

Given the "general reticence to invalidate the acts of [our] elected leaders," firearms legislation of the sort at issue here should be struck down under the Second Amendment "only if 'the lack of constitutional authority to pass [the] act in question is clearly demonstrated.'" *Id.* at 100-01 (quoting *Nat'l Fed'n of Indep. Bus.* v. *Sebelius*, 132 S. Ct. 2566, 2579 (2012)) (internal quotation marks omitted) (alterations in *Kachalsky*). And, where, as here, Plaintiffs bring not only an as-applied, but a facial challenge to the provisions of a statute, that facial challenge can succeed only if Plaintiffs "show that 'no set of circumstances exists under which the [statute] would be valid, *i.e.*, that the law is unconstitutional in all of its applications,' or at least that it lacks a 'plainly legitimate sweep.'" *Decastro*, 682 F.3d at 168 (quoting *Wash. State Grange* v. *Wash. State Republican Party*, 552 U.S. 442, 449 (2008)) (alteration in *Decastro*).

For the reasons set forth below, the challenged SAFE Act provisions easily satisfy this intermediate scrutiny standard.

### 3. New York's Assault Weapons and Large-Capacity Magazine Bans and the Seven-Round Load Limit Satisfy Intermediate Scrutiny

The challenged SAFE Act provisions reasonably fit the governmental interests in public safety and crime prevention because, *inter alia*, the banned assault weapons and large-capacity

magazines (i) are unusually dangerous and intimidating military-style firearms that are designed for "combat-functional ends," H.R. Rep. 103-489, at 18; (*see* Bruen Decl. ¶¶ 9, 13-26; Koper Decl. ¶¶ 5-10, 29-32); *supra* pp. 25-29, 34-36; (ii) are preferred by criminals because of their high firepower (Ex. 12 (1998 ATF Study) at 34-35, 38; *see* Ex. 32 (Koper 2004) at 17-18; Koper Decl. ¶¶ 15-16, 17-26); *supra* pp. 27-29, 35-36; and (iii) are disproportionately used in both murders of law enforcement officers and mass shootings (Koper Decl. ¶¶ 11-14, 20-21; Ex. 37 (2003 Violence Policy Ctr. Report) at 5; *see* Zimring Decl. ¶¶ 15-22 ; Allen Decl. ¶¶ 16-22); *supra* pp. 27-29, 35-36.

Studies on the impact of the 1994 federal ban also provide substantial evidence that the SAFE Act's enhanced assault weapons ban will be effective in furthering public safety and crime prevention.  As explained in the accompanying Declaration of Christopher S. Koper, "criminal use of [assault weapons] declined after the federal assault weapons ban was enacted in 1994, independently of trends in gun crime."  (Koper Decl. ¶ 43; Ex. 32 (Koper 2004) at 51; Ex. 34 (Koper 2013) at 163); *see Heller II*, 670 F.3d at 1263.  In particular, across six major cities examined by Dr. Koper and his colleagues, assault weapon crimes declined between 17% and 72% over the post-ban period.  (Koper Decl. ¶ 41; Ex. 32 (Koper 2004) at 2, 46-60; Ex. 34 (Koper 2013) at 163).  These local findings are consistent with patterns found in national data, which show that assault weapons, as a percentage of total crime gun traces, fell 70% from 1992-93 to 2001-02 -- and that this downward trend did not begin until 1994, the year the federal ban was enacted.  (Koper Decl. ¶ 42; Ex. 32 (Koper 2004) at 2, 39-60; Ex. 34 (Koper 2013) at 163). In short, the analysis by Dr. Koper and his colleagues suggests that the federal ban prevented a

few thousand assault weapon crimes annually. (Koper Decl. ¶ 45; Ex. 32 (Koper 2004) at 52 n.61).[42]

Prior to the SAFE Act, New York's assault weapons ban, as well as its large-capacity magazine ban, was identical in its terms to the federal ban studied by Dr. Koper. *See supra* p. 7. With the SAFE Act's passage, however, New York has now strengthened its restrictions on assault weapons, replacing the previously existing "two-feature" test "with a clearer 'one-feature' test," and "also add[ing] to the list of 'features' that characterize a banned weapon." (Ex. 5 (Gov. Memo) at 2; Ex. 6 (Assembly Memo) at 2; Ex. 7 (Senate Memo) at 2). These enhancements -- which have long been advocated for by those who have studied the issue, including members of the New York legislature, as a means to combat so-called "copycat" assault weapons, in which one banned feature is redesigned or the weapon is simply renamed in a deliberate effort to evade the ban -- were made in order to establish "a more comprehensive means for addressing these dangerous weapons." (Ex. 5 (Gov. Memo) at 6; Ex. 6 (Assembly Memo) at 6; Ex. 7 (Senate Memo) at 6; *see* Bruen Decl. ¶ 15; Ex. 52 (5/24/05 Assembly Debate) at 13-14, 18-19; Ex. 53 (1/9/06 Assembly Debate) at 63-64; Ex. 33 (2004 Legal Cmty. Against Violence report) at 3-5; Ex. 31 (2008 Brady Center report) at 20; Ex. 54 (July 2004 Violence Policy Ctr. Report) at 1-6) (Ex. 51 (2004 Brady Center report) at 10-12.); *see also* (Ex. 55 (April 2004 Violence Policy Ctr. report) at 6). The SAFE Act, by remedying some of the weaknesses of the federal ban, is likely to be even more efficacious. (*See* Koper Decl. ¶¶ 4, 63-65; Bruen Decl. ¶¶ 41-42; Zimring Decl. ¶ 22; Rice Decl. ¶¶ 7, 12, 17.)

---

[42] The findings of Dr. Koper's study are also consistent with a gun tracing study conducted by the Brady Center to Prevent Gun Violence (which found a 66% decline in assault weapons traces between the pre-ban and post-ban periods evaluated (Ex. 31 (2004 Brady Center Report)), as well as with the ATF's own analysis. (Koper Decl. ¶ 42 n.20; Ex. 32 (Koper 2004) at 44 n.43).

Studies similarly support  the SAFE Act's restrictions on large-capacity magazines. (Koper Decl. ¶¶ 46-51).  While the overall data on the federal large-capacity magazine provision was too limited and inconsistent to draw any clear conclusions in this regard, perhaps due to the large number of grandfathered magazines, Dr. Koper's studies showed that the trend in crimes with large-capacity magazines may have been changing by the early 2000s.  (Koper Decl. ¶ 48). And, notably, a subsequent investigation by the *Washington Post* found that the percentage of recovered crime guns with large-capacity magazines declined significantly after the federal ban was enacted, and then abruptly increased once the ban expired, suggesting that the restrictions on large capacity magazines may well have had a substantial impact on their use in crime.  (Ex. 56 (2011 *Washington Post* report[43]); Ex. 39 (2013 *Washington Post* update[44]); *see* Koper Decl. ¶ 49-50; Ex. 34 (Koper 2013) at 165; Ex. 28 (2013 Tribe Testimony) at 20-21).

The federal and State bans before the SAFE Act did not restrict magazines manufactured before the federal ban's effective date, but the SAFE Act removed this exemption.  *See supra* pp. 10-11.  The available data indicates that such grandfathering of pre-ban magazines reduced the effectiveness of the original federal law -- and that the elimination of this grandfathering provision in the SAFE Act should now increase the likely effectiveness of New York's large-capacity magazine ban.  (*See* Koper Decl. ¶¶ 4, 59-60, 65; Sheppard Decl. ¶¶ 21-24, 29; Bruen Decl. ¶¶ 41-42; Rice Decl. ¶¶ 7, 9-10, 17).  The SAFE Act has also moved New York law beyond the federal ban by imposing a seven-round load limit for firearms, in order to further diminish the possibilities for unlawful gun violence.  (*See* Ex. 27 (1/15/13 Assembly Debate) at 65; Ex. 5 (Gov. Memo) at 6 ("mass shootings shatter or sense of safety in public places"); Ex. 6

---

[43] http://www.washingtonpost.com/wp-dyn/content/article/2011/01/22/AR2011012203452.html (last visited June 21, 2013).

[44] http://articles.washingtonpost.com/2013-01-10/news/36272948_1_magazines-and-assault-weapons-33-round-magazine-high-capacity-magazines  (last visited June 21, 2013).

(Assembly Memo) at 5; Ex. 7 (Senate Memo) at 5).  This additional limit to the large-capacity magazine ban is also likely to enhance its potential impact.  (Koper Decl. ¶¶ 61-62; Ex. 34 (Koper 2013) at 168; Ex. 32 (Koper 2004) at 83-91, 100 n.18).

The Plaintiffs' *amici* raise the point that assault weapons were used in only a fraction of gun crimes prior to the 1994 ban (*see* NRA Mem. at 13-15; NYSSA Mem. at 11-13), but ignore the disproportionate use of such firearms in murders of police and mass shootings.  They further ignore that the challenged provisions are only one part of New York's comprehensive legislative effort to combat firearm crime and violence.  The NRA also stresses the statement in Dr. Koper's study that the effects of continuing ban on assault weapons were "'likely to be small at best and perhaps too small for reliable measurement.'"  (NRA Mem. at 14-15).  This selective quotation, however, discounts the entirety of Dr. Koper's findings, which make clear that extension (or renewal) of the federal ban could yield "significant societal benefits," primarily by "prevent[ing] hundreds of gunshot victimizations annually and produc[ing] notable cost savings in medical care alone."  (Ex. 34 (Koper 2013) at 167; Ex. 32 (Koper 2004) at 100 & n. 118); Koper Decl. ¶¶ 51; *see also id.* ¶¶ 43-45, 49-50).   And, perhaps most significantly, both Plaintiffs and *amici* ignore that many of the flaws in the federal ban that limited its full effectiveness -- particularly, the two-feature test for assault weapons and the grandfathering of large capacity magazines -- have now been corrected in the SAFE Act.  (Koper Decl. ¶¶ 4, 58-65; Bruen Decl. ¶¶ 41-42; Rice Decl. ¶ 12; Zimring ¶ 14-22; Sheppard Decl. ¶¶ 2-3, 12, 17-18, 21-24, 28-29); *see supra* pp. 10-11.

In their preliminary injunction motion, Plaintiffs put forward evidence and arguments similar to those rejected in *Heller II.*[45]  That showing should similarly be rejected here. *See, e.g.*, *Heller II*, 670 F.3d at 1261-64 (upholding D.C.'s large-capacity magazine ban under intermediate scrutiny, after considering evidence similar to that submitted here).  And, in any event, as the Second Circuit has made clear, even if it were valid, the submission of such "conflicting evidence" by Plaintiffs is nowhere near sufficient to sustain their challenges under intermediate scrutiny.  *See Kachalsky*, 701 F.3d at 99-100; *supra* pp. 49-50.

None of this means, of course, that the SAFE Act's assault weapons and large capacity magazine bans are a panacea. They are not.  Rather, they are a considered legislative effort to prohibit and restrict the availability of particularly dangerous weaponry that is used disproportionately to kill police officers and in deadly mass shootings, and which is not necessary or suitable for self-defense.  Just like the D.C. Circuit found in upholding the assault weapons ban in *Heller II*, considering much of the same evidence before the Court on this

---

[45] Plaintiffs claim that the magazine capacity and load limits will not effect mass shootings.  One of the primary supposed pieces of evidence Plaintiffs point to is Gary Kleck's assertion that he is "aware of only one such incident in U.S. history -- the Colin Ferguson shootings on a Long Island commuter train in 1993" -- where bystanders in a mass shooting "tackle[d] the shooters while they [we]re reloading."  (Kleck Decl. at 4-5; *see* Pl. Mem. at 21; *see also* NRA Mem. at 19-20).  Kleck asserts that such "[b]ystander intervention" was possible in the Ferguson case "only because of its unique location" in the confined space of a moving train.  (Kleck Decl. at 4-5).  But, even if that assertion were material here, recent evidence belies Kleck's conclusions. There is ample evidence that pausing to reload during public shooting rampages has allowed bystanders to end the violence. In the mass shooting two years ago in Arizona, which killed 6 and wounded 13 including Congresswoman Gabriel Giffords, the shooter was only stopped when bystanders intervened, tackled, and disarmed him as he was attempting to reload.   And there have been other such incidents, none of them restricted to the "unique location" of a moving train.  (Zimring Decl. ¶ 19; Ex. 58 (collected articles); Ex. 28 (2013 Tribe Testimony) at 15; Ex. 59 (Baltimore Police Chief Testimony before U.S. Senate) at 2).  In addition, as the D.C. Circuit recognized in *Heller II*, this "'2 or 3 second pause' during which a criminal reloads his firearm 'can be of critical benefit to law enforcement.'"  *Heller II*, 670 F.3d at 1264; (Ex. 28 (2013 Tribe Testimony) at 15; *see* Sheppard Decl. ¶¶ 15-16; Rice Decl. ¶ 9).

motion, that is more than sufficient to survive intermediate scrutiny.  *Heller II*, 670 F.3d at 1262-64; *see, e.g.*, *Kachalsky*, 701 F. 3d at 96-99; *supra* pp. 49-50.

In conclusion, the SAFE Act is a public safety measure carefully tailored to limit the availability of particularly dangerous military-style weapons used in a particularly troubling subset of crimes, while continuing to allow law-abiding citizens to possess handguns and other firearms for self-defense in their homes. Plaintiffs have not and cannot establish that the SAFE Act implicates, much less violates, their Second Amendment rights and, accordingly, Counts One and Two should be dismissed.

## II.

## PLAINTIFFS' EQUAL PROTECTION CLAIM FAILS AS A MATTER OF LAW

Plaintiffs claim, in Count Three of the Amended Complaint, that, by permitting ten live rounds of ammunition in a magazine at shooting ranges and competitions but limiting that number to seven at all other places, *see* Penal Law § 265.20(a)(7-f), the SAFE Act denies Plaintiffs the equal protection of the laws.  (Am. Cmplt. ¶¶ 123-26; *see* Pls. Mem. at 18-19). Plaintiffs' equal protection claim is entirely without merit.  *First*, the challenged provisions of SAFE Act "do[] not treat similarly situated individuals differently," *Kachalsky* v. *County of Westchester*, 817 F. Supp. 2d 235, 273 (S.D.N.Y. 2011), *aff'd*, 701 F.3d 81 (2d Cir. 2012), as is required for any viable equal protection claim.  *Second*, even if they did, the relevant classification here, between the "controlled environment" (Ex. 27 (1/15/13 Assembly Debate) at 127) of an incorporated firing range or at a recognized shooting competition (where ten-round magazines may be loaded to full capacity) and everywhere else in New York (where magazines are limited to seven rounds), easily satisfies the applicable rational basis review.

A.      **Plaintiffs' Equal Protection Claim Fails Because the SAFE
Act Does Not Treat Similarly Situated Persons Differently**

The equal protection guarantee of the Fourteenth Amendment "does not forbid

classifications. It simply keeps governmental decisionmakers from treating differently persons

who are in all relevant respects alike." *Nordlinger* v. *Hahn*, 505 U.S. 1, 10 (1992); *see also, e.g.*,

*Butler* v. *City of Batavia*, 545 F. Supp. 2d 289, 292 (W.D.N.Y. 2008) (noting that the Equal

Protection Clause "is 'essentially a direction that all persons similarly situated should be treated

alike'"), *aff'd*, 323 F. App'x 21 (2d Cir. 2009).  Here, Plaintiffs do not allege, and cannot

establish, that the challenged provisions of the SAFE Act treat similarly situated persons

differently.  On the contrary, the distinction between the amount of ammunition that may be

loaded in a magazine at shooting ranges or competitions and the amount that may be loaded at

other locations "applies uniformly" to all individuals.  *Kachalsky*, 817 F. Supp. 2d at 273; *see

also Hightower* v. *City of Boston*, 822 F. Supp. 2d 38, 60 (D. Mass. 2011) (noting that "the equal

protection clause protects against unequal treatment, not against the equal application of a statute

that a plaintiff finds uncongenial or arbitrary"), *aff'd*, 693 F.3d 61, 83 (1st Cir. 2012).

At most, what the statute treats differently are guns (and, more particularly, their

ammunition magazines) depending on whether or not they are, at the time, located at a range or

shooting competition.  But "[g]uns are things, not persons. Therefore, equal protection principles

do not protect guns from unequal treatment." *Kasler* v. *Lockyer*, 2 P.3d 581, 584 (Cal. 2000);

*see, e.g.*, *Coal. of N.J. Sportsmen, Inc.*, v. *Whitman*, 44 F.Supp.2d 666, 686 (D.N.J. 1999), *aff'd*,

263 F.3d 157 (3d Cir. 2001); *Benjamin* v. *Bailey*, 662 A.2d 1226, 1235-37 (Conn. 1995); *see

also USA Baseball* v. *City of New York*, 509 F.Supp. 2d 285, 293 & n.2 (S.D.N.Y. 2007)

("[P]laintiffs must show some discriminatory effect on a person or entity the Constitution was

intended to protect, rather than an inanimate sporting good, in order to invoke the Equal

Protection Clause."). Because the SAFE Act does not treat similarly situated individuals differently, Plaintiffs' equal protection claim necessarily fails.

### B.    Plaintiffs' Equal Protection Claim Also Fails Because the Statutory Classification Here Survives Rational Basis Review

Even if scrutiny under the Equal Protection Clause were appropriate here, Count Three still fails. The SAFE Act's provisions permitting ten-round magazines to be loaded to full capacity at shooting ranges or competitions, but limiting magazines to seven rounds everywhere else, easily survives constitutional review.

As the Supreme Court has long held, "a classification neither involving fundamental rights nor proceeding along suspect lines . . . cannot run afoul of the Equal Protection Clause if there is a rational relationship between the disparity of treatment and some legitimate governmental purpose." *Heller* v. *Doe*, 509 U.S. 312, 319-20 (1993); *see Armour* v. *City of Indianapolis*, 132 S. Ct. 2073, 2080 (2012). Here, as demonstrated above, the SAFE Act's load limits do not impermissibly interfere with Second Amendment rights. Nor do Plaintiffs assert a claim based upon membership in any suspect class.[46] Thus, at most, the classification at issue need only survive rational basis review. *See, e.g.*, *Hightower*, 693 F.3d at 83 ("Given that the Second Amendment challenge fails, the equal protection claim is subject to rational basis review."); *Nat'l Rifle Ass'n of Am., Inc.* v. *McCraw*, No. 12-10091, 2013 U.S. App. LEXIS 10128, at *25-26 (5th Cir. 2013); *Nordyke* v. *King*, 681 F.3d 1041, 1043 n.2 (9th Cir. 2012) (en

---

[46] While Plaintiffs do not expressly assert such a claim, to the extent that plaintiffs Galvin and Horvath contend that they suffer from disabilities and, as a result, the SAFE Act's load limit violates equal protection guarantees as applied to them, it must be noted that the disabled are not a suspect class; any classifications affecting the disabled are subject to only rational basis review. *Bryant* v. *N.Y. State Educ. Dep't*, 692 F.3d 202, 219 (2d Cir. 2012), *cert. denied*, 133 S. Ct. 2022 (2013); *see also supra* Point I (demonstrating that as-applied Second Amendment claims are without merit).

banc); *Kwong* v. *Bloomberg*, 876 F. Supp. 2d 246, 260-61 & n.13 (S.D.N.Y. 2012), *appeal pending*, No. 12-1578 (2d Cir., argued Feb. 1, 2013).  It plainly does so.

Under the rational basis test, a legislative classification "is accorded a strong presumption of validity" and "must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification."  *Heller* v. *Doe*, 509 U.S. at 319-20; *see Armour*, 132 S. Ct. at 2080.  Because there is a presumption of constitutionality, Plaintiffs bear the burden to show that there is no conceivable rational basis for the legislation.  *Armour*, 132 S. Ct. at 2080-81.

The statutory classification here unquestionably survives such rational basis review.  As the legislative record reflects, ranges and competition sites are a "controlled environment," where gun safety and security are paramount.  (Ex. 27 (1/15/13 Assembly Debate) at 127).[47]  Thus, permitting more rounds at these locations for sporting and training purposes but only seven rounds elsewhere rationally furthers the State's interests in public safety.  (Ex. 5 (Gov. Memo) at 1-2; Ex. 6 (Assembly Memo) at 1; Ex. 7 (Senate Memo) at 1).

Further, exemptions for activities at ranges and competitions have been familiar to New York firearms law, since well before the SAFE Act, *see* Penal Law § 265.20(a)(7)-(7-b), (7-d)-(7-e), (12)-(13) -- a fact that, the Supreme Court has held, supports the rationality of that same distinction here.  *See Armour*, 132 S. Ct. at 2082.  Thus courts considering similar exemptions have universally upheld them on equal protection challenges.  *See, e.g., Coal. of N.J. Sportsmen*,

---

[47] Indeed, in a suit it recently filed against the City of New York, the lead plaintiff here has asserted that "shooting sports . . . are rated among the safest forms of recreation."  (Ex. 60 ¶ 30); *see also*, *e.g.*, http://www.nssf.org/ranges/rangeresources/video.cfm (last visited June 21, 2013) (National Shooting Sports Foundation video on general rules of range safety and etiquette); http://nssf.org/ranges/RangeResources/library/detail.cfm?filename=facility_mngmnt/safety/shooting_range_safety.htm&CAT=Facility%20Management (last visited June 21, 2013) (NSSF article on shooting range safety).

44 F. Supp. 2d at 685-86 (rejecting equal protection challenge to ban on large-capacity magazines that exempted their use "in competitive shooting matches," and holding that "participation in sanctioned shooting competitions is rationally related to maintaining large capacity magazines"); *Gun Owners' Action League, Inc.* v. *Swift*, 284 F.3d 198, 212-15 (1st Cir. 2002) (rejecting equal protection challenge to large-capacity magazine ban that provided exceptions for their use at "licensed gun clubs").[48]

Plaintiffs may be unhappy with the statutory line the Legislature drew in the SAFE Act, but that is no basis for a statute to fail rational basis review. *See, e.g.*, *USA Baseball*, 509 F. Supp. 2d at 293 ("Where the legislature engages in line drawing, 'the precise coordinates of the resulting legislative judgment [are] virtually unreviewable, since the legislature must be allowed leeway to approach a perceived problem incrementally.'") (quoting *FCC* v. *Beach Commc'ns*, 508 U.S. 307, 316 (1993)).   Just like their Second Amendment claims, Plaintiffs' equal protection challenge fails as a matter of law.

### III.

### THE SAFE ACT IS
### NOT UNCONSTITUTIONALLY VAGUE

Outside of the First Amendment context, a plaintiff asserting a pre-enforcement vagueness challenge must show that the statutory language at issue is vague in all of its applications. *See United States* v. *Farhane*, 634 F.3d 127, 138-39 (2d Cir. 2011).  Plaintiffs do not come close to meeting that standard here.  Their pre-enforcement, facial void-for-vagueness challenges to various provisions in the SAFE Act -- both those on which they have moved for

---

[48] *See also, e.g.*, *Nordyke*, 681 F.3d at 1043 n.2 (holding that allowing exception to county's ban on possession of firearms on its property for military reenactments but not for gun shows survived equal protection challenge "because Alameda County could reasonably conclude that gun shows are more dangerous than military reenactments").

preliminary injunctive relief (*see* Pls. Mem. at 24-27; Am. Cplt. ¶¶ 139-56) and those on which

they have not (*see* Am. Cplt. ¶¶ 157-68) -- fail as a matter of law.

A.       **The Applicable Vague-In-All-Applications Standard**

As a general matter, the void-for-vagueness doctrine "requires that a penal statute define

the criminal offense with sufficient definiteness that ordinary people can understand what

conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory

enforcement." *Kolender* v. *Lawson*, 461 U.S. 352, 357 (1983).[49]

Regardless of the context, the test for unconstitutional vagueness "does not demand

meticulous specificity in the identification of proscribed conduct.  Rather, it requires only that

the statutory language conveys sufficiently definite warning as to the proscribed conduct when

measured by common understanding and practices." *United States* v. *Coppola,* 671 F.3d 220,

235 (2d Cir. 2012) (internal quotation marks omitted).  Words in statutes must be interpreted

according to their commonly understood meanings.  *Sellan* v. *Kuhlman*, 261 F.3d 303, 311 (2d

Cir. 2001).  "[P]erfect clarity and precise guidance have never been required." *United States* v.

*Williams*, 553 U.S. 285, 304 (2008) (internal quotation marks omitted).

And, critically, because Plaintiffs' vagueness challenges are pre-enforcement and "do[]

not reach conduct protected by the First Amendment," to prevail here, they must show that the

challenged statutory provisions are impermissibly vague (under the standards just described) in

all possible applications.  *Farhane*, 634 F.3d at 138-39.  Second Circuit precedent is clear:

---

[49] Of these two criteria, the second (i.e., arbitrary enforcement) has been recognized as the more
important. *Id.* at 358.  However, the exercise of some degree of judgment on the part of law
enforcement is expected, and constitutionally unproblematic. *Grayned* v. *City of Rockford*, 408
U.S. 104, 114 (1972); see *Thibodeau* v. *Portuondo*, 486 F.3d 61, 69 (2d Cir. 2007) (Sotomayor,
J.) ("[T]he Constitution does not ban all discretion on the part of police officers or prosecutors as
'[e]ffective law enforcement often requires the exercise of some degree of police judgment.'").

> [t]o the extent the Supreme Court has suggested that a facial challenge may be maintained against a statute that does not reach conduct protected by the First Amendment, the identified test is, in fact, only a variation on as-applied analysis, requiring the defendant to show "that the law is impermissibly vague in all of its applications."

*Id.* (quoting *Vill. of Hoffman Estates* v. *Flipside, Hoffman Estates*, 455 U.S. 489, 497 (1982)); *cf. Decastro*, 682 F.3d at 163 (explaining that proponent of facial Second Amendment challenge must "establish that no set of circumstances exists under which the statute would be valid").

The burden here for Plaintiffs is an extremely high one.[50]  Courts applying the vague-in-all-applications test have rejected vagueness challenges where the statutory terms at issue covered any identifiable "core" of conduct.  *See, e.g.*, *Richmond Boro*, 896 F. Supp. at 289, *aff'd*, 97 F.3d 681, 684-86 (rejecting vagueness challenge to New York City's similar ban on assault weapons and large-capacity magazines);[51] *Coal. of N.J. Sportsmen, Inc.* v. *Whitman*, 44 F. Supp. 2d 666, 681 (D.N.J. 1999), *aff'd*, 263 F.3d 157 (3d Cir. 2001) (rejecting vagueness challenge to New Jersey's assault weapons ban).  As these courts have held, "[a]s long as the law clearly encompasses at least some core of conduct in which plaintiffs engage, a court will not entertain a

---

[50] In addition, because each of the criminal statutes at issue contains, either expressly or through state court construction, a *mens rea* requirement, *see, e.g.*, *People* v. *Ford*, 66 N.Y.2d 428, 440 (1985) ("Possession third [pursuant to Penal Law § 265.02] requires . . . that defendant's possession be knowing."); *People* v. *Wood*, 58 A.D.3d 242, 243-53 (1st Dep't 2008) (rejecting strict liability for "weapon possession offenses" in New York); *see also* Penal Law § 15.15(2), Plaintiffs' vagueness challenges must meet an even higher burden.  *See Hoffman Estates*, 455 U.S. at 499.  The NYSSA *amici* concede as much, stating that "a scienter requirement may mitigate a law's vagueness."  (NYSSA Mem. at 19).  And while they then go on to assert that the challenged statutes are not subject to any such *mens rea* requirement, that argument is clearly incorrect under both Penal Law article 15 and the governing New York case law.  *See, e.g.*, *Wood*, 58 A.D.3d at 243-53.

[51] Contrary to Plaintiffs' assertion (*see* Pls. Mem. at 17 n.5), nothing in *Heller* or *McDonald* negates the Second Circuit's finding in *Richmond Boro* that certain terms in New York City's assault weapons law, many of which are identical to the terms Plaintiffs now challenge in this action, are not unconstitutionally vague.  *See, e.g.*, *Wilson* v. *Cnty. of Cook*, 968 N.E.2d 641, 652 (Ill. 2012) (post-*Heller/McDonald* decision relying on *Richmond Boro* in dismissing vagueness challenges to law banning assault weapons); *see also infra* note 52.

facial vagueness challenge to other conduct, whether real or hypothetical, by plaintiffs or others." *Richmond Boro*, 896 F. Supp. at 289, *aff'd*, 97 F.3d at 684-86 (adopting district court's analysis of plaintiffs' facial vagueness challenge); *see also, e.g.*, *Coal. of N.J. Sportsmen*, 44 F. Supp. at 681 ("The issue then is whether the statute completely lacks a core, which plaintiffs have failed in this challenge to demonstrate.").

Plaintiffs cannot meet this heavy burden.  Thus, Plaintiffs' vagueness claims -- each of which boils down to an argument that the challenged terms do not meet the standards of "meticulous specificity," "perfect clarity," and "precise guidance" that have been expressly rejected by the Supreme Court and the Second Circuit -- should be dismissed by the Court as a matter of law.[52]

### B.   None of the Challenged SAFE Act Terms is Unconstitutionally Vague

As set forth below, all of the challenged SAFE Act terms are readily comprehensible and address core conduct that Plaintiffs admittedly engage in or wish to engage in.  Plaintiffs thus cannot, as they must to survive dismissal here, establish that any of the challenged terms "is impermissibly vague in all of its applications."  *Hoffman Estates*, 489 U.S. at 497.

---

[52] Plaintiffs make no argument at all as to what standard this Court should apply to its review of their vagueness claims.  (*See* Pl. Mem. at 24-26).  The NYSSA *amici* assert that the Court should apply a "heightened" vagueness standard, but do not specify what that standard is.  (*See* NYSSA Mem. at 16-19).  To the extent that this is a suggestion that the standard of vagueness review applicable in First Amendment cases should apply here, it is a meritless one.  *See, e.g.*, *Farhane*, 634 F.3d at 138-39 (holding that the void-in-all-applications test applies where "a statute does not reach conduct protected by the First Amendment").  Courts to consider similar arguments have properly rejected them.  *See, e.g.*, *Kuck* v. *Danaher*, 822 F. Supp. 2d 109, 131-32 (D. Conn. 2011) (rejecting argument that heightened standard applied "in the context of a facial vagueness challenge under the Second Amendment"); *United States* v. *Weaver*, No. 2:09-cr-00222, 2012 U.S. Dist. LEXIS 29613, at *28-32 (S.D. W. Va. Mar. 6, 2012) (rejecting argument that First Amendment vagueness standards apply "to the Second Amendment context").  Moreover, as demonstrated above, New York's restrictions on assault weapons and large-capacity magazines do not infringe upon Plaintiffs' Second Amendment rights here in any event.  And, as set forth below, it is also clear that Plaintiffs' vagueness challenges in this case would fail as a matter of law under any standard.

1.   **The Ten-Round Capacity Provisions are Not Vague**

Penal Law § 265.00(23) has for well over a decade defined "large capacity ammunition feeding device" to include a magazine that "has a capacity of, or that can be readily restored or converted to accept, more than ten rounds of ammunition."  Penal Law § 265.00(23).  Plaintiffs claim that this definition is unconstitutionally vague because (i) they cannot understand what is meant by "can be readily restored or converted to accept," and (ii) they cannot know if a tubular device fits within the definition of a large capacity ammunition feeding device because a tubular magazine for a rifle or a shotgun may accept more than ten rounds of a hypothetically shorter length.  (Am. Cplt. ¶¶139-147, 154-156; PI Mem. at 25-26.)  Neither argument has any merit.

i.   *The Phrase "Can Be Readily Restored*
*or Converted to Accept" is Not Vague*

Since its inclusion in the federal assault weapons ban almost twenty years ago, the phrase "can be readily restored or converted to accept" means, with respect to any modification of a magazine, work that can be performed by a gun owner of average intelligence and abilities without engaging the services of a gunsmith.  (Bruen Decl. ¶ 28 n.10).  Plaintiffs themselves acknowledge such an understanding of the term.  (Pl. Mem. at 4-5).  This is plainly more than sufficient to meet the constitutional standard.

Furthermore, the phrase "can be readily restored" appears in numerous gun-related statutes, and courts have repeatedly rejected vagueness challenges to it.  *See, e.g.*, *United States* v. *Carter*, 465 F.3d 658, 663-64 (6th Cir. 2006) (finding no vagueness in federal definition of machine gun, which includes "any weapon which . . . can be readily restored to shoot, automatically more than one shot"); *United States* v. *Drasen*, 845 F.2d 731, 737-38 (7th Cir. 1998) (rejecting a vagueness challenge to the phrase "readily restored" in 26 U.S.C. § 5845(c)); *United States* v. *M-K Specialties Model M-14 Machinegun Serial No. 1447797*, 424 F. Supp. 2d

862, 872 (N.D. W. Va. 2006) (rejecting vagueness challenge to the term "can be readily restored"); *United States* v. *Catanzaro*, 368 F. Supp. 450, 452-54 (D. Conn. 1973) (rejecting a vagueness challenge to the phrase "may be readily restored to fire" in § 5845(d)). In fact, in rejecting a vagueness challenge to a similar provision in that state's assault weapons ban, the federal district court in New Jersey, in a decision affirmed by the Third Circuit, explained:

> That plaintiffs can posit ambiguous applications is again, not the issue. Surely the Legislature, intent on reaching assault weapons which could be altered in minor ways or disassembled to avoid the purview of the other assault weapon definitions, did not have to specify in hours and minutes and with reference to specific tools and degrees of knowledge the parameters of what "readily assembled" means. The precision in drafting which plaintiffs demand is neither constitutionally required nor perhaps even possible or advisable given the confines of language in which we all operate.

*Coal. of N.J. Sportsmen*, 44 F. Supp. 2d at 681, *aff'd*, 263 F.3d 157.[53]  Accordingly, Plaintiffs' vagueness challenge to the phrase "can be readily restored or converted to accept" fails.

### ii.  The Definition of "Large Capacity Ammunition Feeding Device" is Not Vague With Respect to Tubular Magazines

Plaintiffs also argue that Penal Law § 265.00(23) is vague with respect to fixed tubular magazines because a tubular magazine may accept rounds of different lengths and, therefore, may be said to have the capacity to hold more than ten rounds of a purported shorter-length round.  (Am. Compl. ¶¶ 145-147, 154-156; PI Mem. at 25).  This argument, too, lacks merit.

First, this language has existed in the Penal Law since 2000 and, prior to that, was in the 1994 federal assault weapon ban. Thus, the challenged language has been in effect in New York for almost two decades, during which time it has resulted in no apparent confusion and certainly no arbitrary enforcement.  (Bruen Decl. ¶ 30; *see* Rice Decl. ¶ 13; Sheppard Decl. ¶¶ 19-20).

---

[53] Plaintiffs' attempted reliance here on *Peoples Rights Organization* v. *City of Columbus*, 152 F.3d 522 (6th Cir. 1998), (*see* Pl. Mem. at 25-26) is, as the district court in New Jersey found, "not . . . persuasive." *Coal. of N.J. Sportsmen*, 44 F. Supp. 2d at 681; *see infra* pp. 66-67.

Further, Plaintiffs assert only that the definition of a large capacity ammunition feeding device is vague in one limited, patently marginal application, namely if non-standard, shorter-length rounds could be obtained and loaded into a tubular magazine.[54]  By its terms, this argument concedes that the definition of large capacity magazine is not vague in all, or even in the majority, of its applications.  *See Coal. of N.J. Sportsmen*, 44 F. Supp. 2d at 680 n.21 (rejecting similar argument regarding shorter ammunition that may be loaded into tubular magazines as "of no consequence in light of the standard applied in this facial vagueness challenge").  In any event, "a statute or regulation is not required to specify every prohibited act."  *Perez* v. *Hoblock*, 368 F.3d 166, 175 (2d Cir. 2004).  The allegation that someone could fit more than ten rounds of an undersized round in their shotgun does not render that shotgun a prohibited large capacity magazine because "straining to inject doubt as to the meaning of words where no doubt would be felt by the normal reader is not required by the 'void for vagueness' doctrine."  *United States* v. *Powell*, 423 U.S. 87, 93 (1975).

Plaintiffs rely on the inapposite decision in *Peoples Rights Organization, Inc.* v. *City of Columbus* -- an out-of-circuit case that involved a statute that differs significantly from New York law -- which held that a six-round capacity limit on tubular magazines was a "trap for the unwary"  because it could impose liability on one who lacked knowledge that shorter-length rounds existed.  *See* 152 F.3d at 536. But their reliance is misplaced.  *Peoples Rights Organization* was premised on the fact that the statute at issue there "impos[ed] strict liability." 152 F.3d at 534, 536.  By contrast, the weapons possession statutes at issue here have a *mens rea* requirement.  *See supra* note 50.  Moreover, the correct vagueness standard, which was not

---

[54]  In fact, manufacturers design firearms and ammunition devices to accept a standard-length round, and the commonly understood meaning of rounds of ammunition in this context, among law enforcement and private citizens, is the standard, manufacturer-recommended round for the product.  (Bruen Decl. ¶ 30).

applied in that case, asks only whether the language of the statute "conveys sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices." *United States* v. *Petrillo*, 332 U.S. 1, 8 (1947); *see Coppola*, 671 F.3d at 235; *see also Coal. of N.J. Sportsmen*, 44 F. Supp. 2d at 680-81 (rejecting "heightened standard" applied in *Peoples Rights Organization*).  A standard easily satisfied here.

Accordingly, New York's statutory definition of "large capacity ammunition feeding device" is not unconstitutionally vague.

> **2.   The Terms "Pistol Grip that Protrudes Conspicuously" and "Protruding Grip that Can be Held by the Non-Trigger Hand" are Not Vague**

Plaintiffs also challenge the terms "pistol grip that protrudes conspicuously beneath the action of the weapon" and "protruding grip that can be held by the non-trigger hand."  Penal Law § 265.00(22)(a)(ii), (a)(iv), (b)(iii), and (c)(iii). (Am. Compl. ¶¶ 149-51; Pl. Mem. at 26.)  But the first of these terms has been the law in New York since 1994, and neither is vague.

Plaintiffs' argument that the statute provides no guidance on what constitutes "protruding," in inches or centimeters, should be dismissed at the outset because, as the Supreme Court has explained, "we can never expect mathematical certainty from our language." *Grayned*, 408 U.S. at 110.  Indeed, such arguments have been held by the Second Circuit to be "disingenuous." *Richmond Boro*, 97 F.3d at 685.  In *Richmond Boro*, the Second Circuit rejected a vagueness challenge to the very same "pistol grip that protrudes conspicuously" language that Plaintiffs challenge here, finding that the term clearly identified military-style weapons which are designed to make "spray firing from the hip particularly easy," and further explained that even a cursory review of photographic examples of the banned feature made it clear the term is not vague.  *Id.*  And, relying on *Richmond Boro*, the Illinois Supreme Court recently rejected a vagueness challenge to the "protruding grip that can be held by the non-trigger hand" language

that Plaintiffs assert violates due process.  *Wilson*, 968 N.E.2d at 652 (finding that these are "specific and readily discernible characteristics").[55]

Moreover, Plaintiffs themselves admittedly can define these features, as they claim to possess or desire to possess rifles that have these grips. (Am. Cplt. ¶ 72).  Their vagueness challenge is simply without merit.

### 3.  The Exclusion for Semiautomatic Shotguns that Cannot Hold More than Five Rounds is Not Vague

Plaintiffs' vagueness challenge to the exception to the definition of assault weapon for "a semiautomatic shotgun that cannot hold more than five rounds of ammunition in a fixed or detachable magazine," Penal Law § 265.00(22)(g)(iii), is meritless.  (Am. Cpltl. ¶¶ 152-53; Pl. Mem. at 26-27.)  This provision, which has been the law in New York since 1994, easily passes constitutional review.

Plaintiffs again argue that the availability of shorter length shells, of which more than five could allegedly fit into a fixed or detached magazine, creates vagueness in the statute.  But that is not so.  The commonly understood meaning of rounds of ammunition is the standard, manufacturer-recommended round for the product.  (Bruen Decl. ¶ 30.)  Any shotgun that cannot hold more than five of such standard rounds plainly falls within the exception to the definition of assault weapon.

### 4.  Section 265.36 is Not Vague

Contrary to Plaintiffs' assertions (*see* Am. Cplt. ¶ 148; *see* Pl. Mem. at 5, 37), Penal Law § 265.36 is not unconstitutionally vague.  Section 265.36 provides:

---

[55] Even a cursory review of the photographs submitted with this motion (Exs. 61-63, 65-66), and those available on the SAFE Act website, make clear that pistol grips and conspicuously protruding grips are just as easy to identify today as they were in 1996, when the Second Circuit decided *Richmond Boro*, 97 F.3d at 685.

> It shall be unlawful for a person to knowingly possess a large capacity ammunition feeding device manufactured before September thirteenth, nineteen hundred ninety-four, and if such person lawfully possessed such large capacity feeding device before the effective date of the chapter of the laws of two thousand thirteen which added this section, that has a capacity of, or that can be readily restored or converted to accept, more than ten rounds of ammunition.
>
> An individual who has a reasonable belief that such device is of such a character that it may lawfully be possessed and who surrenders or lawfully disposes of such device within thirty days of being notified by law enforcement or county licensing officials that such possession is unlawful shall not be guilty of this offense.  It shall be a rebuttable presumption that such person knows that such large capacity ammunition feeding device may not be lawfully possessed if he or she has been contacted by law enforcement or county licensing officials and informed that such device may not be lawfully possessed.

Penal Law § 265.36.  Plaintiffs complain that the second half of the first paragraph is unintelligible and vague.  But their vagueness claim fails because the statute must be read as a whole.  *See HOP Energy, L.L.C.* v. *Local 553 Pension Fund*, 678 F.3d 158, 162 (2d Cir. 2012).

Although it contains a grammatical error, the section, read in its entirety, as it must be, makes clear that a person who had lawfully possessed a large-capacity magazine manufactured before September 13, 1994 (which had previously been legal to possess under a grandfather provision in the prior ban), may be convicted of illegal possession of the same only if he or she fails to dispose of such device within thirty days *after* being notified by law enforcement that the possessed device is unlawful.  Accordingly, any concerns regarding notice can be readily dismissed because not only does § 265.36 contain an express *mens rea* requirement, but it also provides for individualized notice by law enforcement.

In short, Plaintiffs have not shown, and cannot, that the statute fails to provide adequate notice of what conduct is prohibited or encourages arbitrary enforcement.  *See Kolender*, 461 U.S. at 357.  Their vagueness challenge to § 265.36 fails as a matter of law.

**5.   The Term "Threaded Barrel Designed to Accommodate a Flash
Suppressor, Muzzle Br[a]k[e] or Muzzle Compensator" is Not Vague**

The term "threaded barrel designed to accommodate a flash suppressor, muzzle break or

muzzle compensator," Penal Law § 265.00(22)(a)(vi), contains no vagueness whatsoever, and

Plaintiffs' claims to the contrary should be rejected.  (*See* Am. Cplt. ¶¶ 157-60).[56]

Plaintiffs make the unsupportable claim that a person who owns a rifle with a threaded

barrel, but who does not actually own a flash suppressor, a muzzle brake, or a muzzle

compensator, cannot know whether he or she owns a weapon that may fit within the definition of

assault weapon.  (*Id.* ¶ 158).   But they ignore the plain, unambiguous definition of assault

weapon, which includes a "semiautomatic rifle that has an ability to accept a detachable

magazine" and has "a flash suppressor, muzzle break, muzzle compensator, *or* threaded barrel

designed to accommodate a flash suppressor, muzzle break, or muzzle compensator."  Penal Law

§ 265.00(22)(a)(vi) (emphasis added).

Thus, subsection (vi) makes plain that one way to satisfy its criteria is to own a

semiautomatic rifle that is capable of accepting a detachable magazine and has a threaded barrel

which is designed to accommodate a flash suppressor, muzzle brake, or muzzle compensator.

Even if interpreting subsection (vi) to require a threaded barrel owner to also actually own a flash

suppressor, muzzle brake, or muzzle compensator were not contrary to its plain language, such

an interpretation would be rejected because it would read a redundancy into the statute.  *See*

*Mary Jo C.* v. *N.Y. State & Local Ret. Sys.*, 707 F.3d 144, 171 (2d Cir. 2013).

---

[56] Plaintiffs allege that the term "muzzle break" used in the statute is unconstitutionally vague
because the correct spelling of the device is "muzzle brake," and the term used in the statute,
therefore, has "no known meaning," and Plaintiffs could be wrongfully prosecuted merely
because the two words are "homophones."  (*Id.* ¶ 159).   This frivolous assertion is belied by
Plaintiffs' own claim that they and others would possess firearms with "muzzle brakes" but for
the SAFE Act.  (*Id.* ¶ 72; *see also* Bruen Decl. ¶¶ 17, 20; Ex. 61).

Plaintiffs further profess to be unable to ascertain what a threaded barrel is "originally 'designed to accommodate.'" (Am. Cplt. ¶ 158). Plaintiffs insert the word "originally," which does not appear in the statute, in support of their purported confusion but they cannot succeed on a vagueness claim by altering the text of the statute. In any event, this specific challenge to the threaded barrel provision has been expressly rejected by the Second Circuit. *See Richmond Boro*, 97 F.3d at 685. Further, as the Second Circuit noted in *Richmond Boro*, 97 F.3d at 685-86, the Supreme Court has rejected similar arguments because the question of what a product was designed for can be easily ascertained from the item's objective features. *See Posters 'N' Things, Ltd.* v. *United States*, 511 U.S. 513, 518 (1994); *Hoffman Estates*, 455 U.S. at 501.

Moreover, it is commonly understood that the objective purpose of threaded barrels is to accommodate flash suppressors, muzzle brakes, and muzzle compensators. (Bruen Decl. ¶ 20). The term "threaded barrel" has been used in federal and New York law since 1994, and Plaintiffs themselves clearly understand the term. They claim to own or desire to own guns with "threaded barrels designed to accommodate" muzzle brakes or muzzle compensators (Am. Cplt. ¶ 72), and further explain that a "'muzzle brake, muzzle compensator, or threaded barrel designed to accommodate such items reduces the 'kick' or recoil in discharging a rifle . . . ," (*id.* ¶ 106). Plaintiffs offer no reason to suspect that any other reasonably intelligent person would not have a similar understanding. *See Kolender*, 461 U.S. at 357; *Coppola*, 671 F.3d at 235.

### 6. The Term "Version" is Not Vague

Plaintiffs' baseless claim that they are unable to understand the term "version," contained within the phrase "a semiautomatic version of an automatic rifle, shotgun or firearm," Penal Law § 265.00(22)(c)(viii), should be rejected. (*See* Am. Compl. ¶¶ 161-62). Numerous courts have described various assault weapons as the "semiautomatic version" of military-style automatic

weapons. *See, e.g., Staples v. United States*, 511 U.S. 600, 614 (1994) ("The AR-15 is the civilian version of the military's M-16 rifle, and is, unless modified, a semiautomatic weapon."); *see also, e.g.*, *United States v. Wonschik*, 353 F.3d 1192, 1194 (10th Cir. 2004) (referring to a "Colt AR-15 rifle, which is the civilian, semiautomatic version of the military's M-16 automatic rifle"); *Richmond Boro*, 896 F. Supp. at 282 (noting that "certain semiautomatic rifles are 'versions of true selective fire military assault rifles'"); *Kasler* v. *Lungren*, 72 Cal. Rptr. 2d 260, 265 (Ct. App. 1998) ("For example, the Israeli 'Uzi' was designed as selective fire machine gun. But there is a semiautomatic version for consumption in the United States."), *rev'd on other grounds*, 2 P.3d 581 (Cal. 2001); (Ex. 11 (1989 ATF Report) at 7 (noting that manufacturers of machine guns "have developed semiautomatic versions of these firearms"); Bruen Decl. ¶ 25). Accordingly, the phrase "a semiautomatic version of an automatic rifle, shotgun or firearm," which has been a part of New York's assault weapons ban for well over a decade, is not vague. *See Kolender*, 461 U.S. at 357.

### 7.  The Term "Manufactured Weight" is Not Vague

Plaintiffs' patently baseless claim that they are unable to understand the term "manufactured weight," Penal Law § § 265.00(22)(c)(vii), should be dismissed.  (*See* Am. Cplt.¶¶ 163-64.)  Plaintiffs acknowledge that they understand what the term manufactured weight means when they claim that ownership of such a gun would be "a matter of personal preference based on a person's strength and wish to reduce recoil." (*Id.* ¶ 112).  That they then claim to be unable to understand the meaning of the term "manufactured weight," which has been a part of the law applicable in this State for almost twenty years, is puzzling.  Their own statements make clear that they more than sufficiently understand the term, and they offer no

72

reasoned argument as to why or how a person of reasonable intelligence could not similarly understand the meaning. (*See* Bruen Decl. ¶ 25 n.7).

**8.   The Term "Commercial Transfer" is Not Vague**

Finally, Plaintiffs' claim that they do not understand the term "commercial transfer," Penal Law § 400.03(7), should also be dismissed.  (*See* Am. Comp. ¶¶ 165-167).

The term "commercial transfer" of ammunition means transfers involving one who is engaged in the business of selling ammunition, whether or not such business is that person's primarily livelihood.  (Bruen Decl. ¶ 38 n.13).  Although Plaintiffs profess not to understand whether a "commercial transfer" includes transfers other than those involving persons engaged in the business of selling ammunition, this argument itself concedes that the statute is not vague in its application to the core conduct of transfers by those engaged in the business of ammunition sales, and thus is not vague in all, or even a majority, of its applications, as is required to sustain such a challenge.  *See, e.g.*, *Farhane*, 634 F.3d at 138-39; *Richmond Boro*, 97 F.3d at 685-86.

Accordingly, each of Plaintiffs' vagueness challenges to the SAFE Act fails as a matter of law.  Count Five should be dismissed with prejudice.

**IV.**

**PLAINTIFFS' CLAIMS IN COUNT FOUR FAIL
ON RIPENESS GROUNDS AND BECAUSE THEY
FAIL TO STATE A VIABLE CAUSE OF ACTION**

In Count Four of the Amended Complaint, Plaintiffs challenge the SAFE Act's regulation of ammunition sales, alleging that it violates both the Dormant Commerce Clause and the Due Process Clause by granting a "monopoly" on ammunition sales to New York businesses.[57]  (Am.

---

[57]  To the extent Plaintiffs are attempting to assert due process claims on behalf of "out-of-state sellers," on whom, they allege, the law will be "enforced extraterritorially," (Am. Cplt. ¶ 132), they lack the standing to do so. *See, e.g.*, *Warth v. Seldin*, 422 U.S. 490, 498-99 (1975).  As

Cplt. ¶¶ 127-36).   This claim, on which Plaintiffs have not moved for preliminary injunctive relief, fails on jurisdictional grounds and on the merits.

### A.      Count Four Is Not Justiciable

Because the SAFE Act's ammunition provisions do not go into effect until January 15, 2014, and thus have not applied to Plaintiffs in any way, Count Four plainly fails on ripeness grounds.  *See, e.g.*, *Thomas* v. *City of New York*, 143 F.3d 31, 34 (2d Cir. 1998) (holding that claims are not ripe where it is not clear whether and how the challenged laws will be applied and will affect plaintiffs); *Del-Rain Corp.* v. *United States*, 95-CV-938S, 1995 U.S. Dist. LEXIS 19619, at *7-11 (W.D.N.Y. Dec. 12, 1995) (dismissing action on ripeness grounds where it depended on "unknown factual contingencies" and "uncertain future events").

 A recent federal district court decision in California is directly on point.   *State Ammunition Inc.* v. *Lindley*, No. 2:10-cv-01864, 2010 U.S. Dist. LEXIS 133491 (E.D. Cal. Dec. 2, 2010).   There, plaintiffs brought a pre-enforcement Dormant Commerce Clause and Due Process challenge to a state statute, which had not yet gone into effect, making it a misdemeanor "to sell, deliver, or transfer handgun ammunition in any manner that is not a face-to-face transaction."  *Id.* at *1.   The court rejected the challenge as "not ripe for review" holding that because plaintiffs "cannot demonstrate any current harm or a sufficiently immediate concern," and because "[n]o one can yet anticipate how California's bill will affect [p]laintiffs and/or their business," "[n]o case or controversy exists at this time."  *Id.* at *3.   So too here. [58]

---

discussed below, such claims would also fail on ripeness grounds, as well as on the merits.  *See, e.g.*, *Carvajal* v. *Artus*, 633 F.3d 95, 103, 110 (2d Cir. 2011).

[58]  Contrary to Plaintiffs' assertions (Am. Cplt. ¶ 133), they will not be prohibited under the SAFE Act from engaging in the sale of ammunition.  To sell ammunition, Plaintiffs need only register as "seller[s] of ammunition" with the State Police.  Penal Law §§ 265.00 and 400.03(1). Plaintiffs' argument that the Act may make selling ammunition more expensive (Am. Cplt. ¶

**B.      Count Four Also Should Be Dismissed Because
          <u>Plaintiffs Fail to State a Viable Claim on the Merits</u>**

Plaintiffs' Dormant Commerce Clause claim also fails because they have simply failed to

state a viable cause of action.  *See, e.g.*, *Granholm* v. *Heald*, 544 U.S. 460, 481 (2005); *Arnold's*

*Wines, Inc.* v. *Boyle*, 571 F.3d 185 (2d Cir. 2009); *Brown & Williamson Tobacco Corp.* v.

*Pataki*, 320 F.3d 200 (2d Cir. 2003).   The Act's provisions, designed to prevent the sale of

ammunition to those legally prohibited from purchasing it, are constitutional.

Under the Commerce Clause, the Constitution "grants Congress the power 'to regulate

Commerce . . . among the several States.'"   *Oltra, Inc.* v. *Pataki*, 273 F. Supp. 2d 265, 271

(W.D.N.Y. 2003) (quoting U.S. Const., art. I, § 8, cl. 3).   Courts have held that the Commerce

Clause also contains a "negative" or "dormant" aspect "that denies the States the power

unjustifiably to discriminate against or burden the flow of articles of commerce.'"   *Id.* (quoting

*Brown & Williamson*, 320 F.3d at 208).

The Supreme Court has repeatedly affirmed, however, that the Commerce Clause in no

way "displaces States' authority to shelter [their] people from menaces to their health or safety".

*Am. Trucking Ass'ns* v. *Mich. PSC*, 545 U.S. 429, 434 (2005).   States retain their "broad

regulatory authority to protect the health and safety of [their] citizens," as long as they do not

"needlessly obstruct interstate trade."   *Maine* v. *Taylor*, 477 U.S. 131, 151 (1986); *see also, e.g.*,

*Gary D. Peake Excavating Inc.* v. *Town Bd. of the Town of Hancock*, 93 F.3d 68, 76 (2d Cir.

1996).

Most notably, both the Supreme Court and the Second Circuit have made clear that states

may require the in-state, face-to-face distribution of consumer products, where the distribution

---

135), simply fails to state a Dormant Commerce Clause claim. *See, e.g.*, *Brown & Williamson*,
320 F.3d at 212-13;  *Nat'l Elec. Mfrs. Ass'n* v. *Sorrell*, 272 F.3d 104, 110-11 (2d Cir. 2001).

requirements are evenly applied and intended to forward the public health or welfare.   The

decisions in *Granholm* v. *Heald*, 544 U.S. 460 (2005), and *Arnold's Wines, Inc.* v. *Boyle*, 571

F.3d 185 (2d Cir. 2009), for example, held that, in regulating the sales of wine, states may use a

"three tier" distribution system and forbid direct-to-consumer shipments of wine -- and, so long

as the "States treated in-state and out-of-state liquor on the same terms," such regulations were

fully in accord with the Commerce Clause.  *Granholm*, 544 U.S. at 481; *Arnold Wines*, 571 F.3d

at 190.

      Second Circuit law is clear that requiring face-to-face sales, where public health and

safety are advanced, comports with the Dormant Commerce Clause and does not "convey a

competitive advantage to in-state 'brick-and-mortar' retailers at the expense of out-of-state direct

retailers."  *Oltra*, 273 F. Supp. 2d at 273 (citing *Brown & Williamson*, 320 F.3d at 212-14, 219).

As the Second Circuit held in *Brown & Williamson*, even if the only way that an out-of-state

shipper could sell retail cigarettes to New Yorkers was to establish a brick-and-mortar outlet in

New York, in-state shippers suffered the same burden and, thus, the statute did not discriminate

against out-of-state shippers and did not violate the Dormant Commerce Clause. 320 F.3d at 212-

14, 219.  Furthermore, the Court held that the law easily passed whatever scrutiny was required

under the balancing test established in *Pike* v. *Bruce Church, Inc.*, 397 U.S. 137 (1970), where

the burdens on interstate commerce are outweighed by the "putative local benefits" of the

challenged law. 320 F.3d at 216-17, 219; *see id.* at 221 (Cabranes, J., concurring in the

judgment).

      The SAFE Act's face-to-face, in-person sale requirement for ammunition, which applies

equally to in-state and out-of-state sellers, clearly passes constitutional muster under *Brown &*

*Williamson*.  This is particularly so where, as here, the regulation's significant public purpose outweighs any possible incidental effect on interstate commerce.[59]

The SAFE Act's mandatory face-to-face requirement for the retail sale of ammunition enables the State to rationally prevent prohibited persons -- such as juveniles, felons and the mentally ill -- from purchasing ammunition, especially in mass quantities, online.  Indeed, just as "[t]he danger of criminal misuse of guns loose within a state arguably gives rise to an *intense state interest*," *Hamilton* v. *Accu-Tek*, 47 F. Supp.2d 330, 342 (E.D.N.Y. 1999) (emphasis added), the prevention of the purchase of ammunition by prohibited persons plainly addresses a public health danger.  Accordingly, dismissal of Count Four, with prejudice, is fully warranted.

## V.

## <u>OTHER GROUNDS FOR DISMISSAL OF THE ACTION</u>

In addition to all the above grounds for granting the State Defendants' motion here in its entirety, there are also two additional reasons why, as to certain of the parties, dismissal of the action is independently appropriate.

*First*, under settled Second Circuit precedent, the four organizational Plaintiffs lack standing to sue on behalf of their members under 42 U.S.C. § 1983.  *See, e.g.*, *Nnebe* v. *Daus*, 644 F.3d 147, 156 (2d Cir. 2011); (Am. Cplt. ¶¶ 2-5, 54; *id.* ¶ 21 (noting that Plaintiffs bring their claims, *inter alia*, "pursuant to . . . 42 U.S.C. § 1983").

---

[59] Although the crime-fighting logic contained in this new provision would seem self-evident, a study entitled "The Criminal Purchase of Firearm Ammunition," published in 2006 by the National Institutes of Health, demonstrates the need for this measure.  The study analyzed ammunition purchases in the City of Los Angeles over a two-month period in 2004.  The study found that, because the City did not have a point-of-purchase instant background check in place, persons whose criminal history made it illegal for them to buy ammunition actually purchased *over 10,000 rounds* of ammunition in the stores studied in Los Angeles within that short 60-day period, causing the researchers to conclude that "[a] background check would eliminate illegal ammunition transactions at retail outlets."  (Ex. 64).

*Second*, as those courts since *Heller* to consider the question have held, there is no Second Amendment right to sell firearms. *See, e.g.*, *United States* v. *Chafin*, 423 F. App'x 342, 344 (4th Cir. 2011); *United States* v. *Conrad*, No. 1:11CR00042, 2013 U.S. Dist. LEXIS 19145, at *21-22 (W.D. Va. Feb. 13, 2013); *Mont. Shooting Sports Ass'n* v. *Holder*, No. CV-09-147, 2010 U.S. Dist. LEXIS 104301, at *67-69 (D. Mont. Aug. 31, 2010), *adopted by* 2010 U.S. Dist. LEXIS 110891 (D. Mont. Oct. 18, 2010). Thus, the four business Plaintiffs (*see* Am. Cplt. ¶¶ 6-9) have no Second Amendment claims here. Nor do they have third-party standing to assert such claims on behalf of their customers. *See, e.g.*, *Kowalski* v. *Tesmer*, 543 U.S. 125 (2004) (rejecting third-party standing on behalf of prospective customers); *W.R. Huff Asset Mgmt. Co., LLC* v. *Deloitte & Touche LLP*, 549 F.3d 100 (2d Cir. 2008) (rejecting attempts by business to litigate claims on behalf of customers).

## VI.

## PLAINTIFFS HAVE FAILED TO ESTABLISH ENTITLEMENT TO A PRELIMINARY INJUNCTION

Plaintiffs have failed in their heavy burden of showing a clear likelihood of success on the merits, as they must, in order to obtain preliminary injunctive relief. *Lopez Torres*, 462 F.3d at 183. In fact, as set forth above, the State Defendants are entitled to dismissal of all of Plaintiffs' claims. Plaintiffs' motion for a preliminary injunction is thus moot. *USA Baseball*, 509 F. Supp. 2d at 303. Further, because all of their claims of potential injuries stemming from the SAFE Act are remote and speculative, Plaintiffs' have failed to establish irreparable harm and are not entitled to any preliminary injunctive relief. . *Grand River Enter. Six Nations, Ltd.*, 481 F.3d at 66; *Rivera-Powell*, 2006 U.S. Dist. LEXIS 72712, at *11.

## CONCLUSION

The State Defendants respectfully request that the Court issue an order: (i) denying

Plaintiffs' motion for a preliminary injunction; (ii) granting judgment to State Defendants

dismissing all of Plaintiffs' claims with prejudice; (iii) declaring that the challenged SAFE Act

provisions are constitutional; and (iv) granting such other and further relief as the Court deems

just, proper, and appropriate.

Dated:  New York, New York
       June 21, 2013

ERIC T. SCHNEIDERMAN
Attorney General of the State of New York
*Attorney for State Defendants*
By:
**/s/ *William J. Taylor, Jr.***
William J. Taylor, Jr.
Assistant Attorney General
120 Broadway, 24th Floor
New York, New York 10271
(212) 416-8426
william.taylor@ag.ny.gov