**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**
Buffalo Division

| | |
|---|---|
| NEW YORK STATE RIFLE AND PISTOL ASSOCIATION, INC., et al.,<br>Plaintiffs.<br>v.<br>ANDREW M. CUOMO, et al.,<br>Defendants. | Case No. 13-cv-00291-WMS |

**BRIEF OF *AMICI CURIAE* LAW CENTER TO PREVENT GUN VIOLENCE, NEW YORKERS AGAINST GUN VIOLENCE, AND MOMS DEMAND ACTION FOR GUN SENSE IN AMERICA IN SUPPORT OF DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

TERRENCE M. CONNORS
CONNORS & VILARDO, LLP
1000 Liberty Building
Buffalo, New York 14202
Tel: (716) 852-5533

JONATHAN K. BAUM (*PRO HAC VICE*)
ALAN R. FRIEDMAN (*PRO HAC VICE)*
MARK T. CIANI*
KATTEN MUCHIN ROSENMAN LLP
575 Madison Avenue
New York, New York 10022-2585
Tel: (212) 940-8800
www.kattenlaw.com

*Counsel for Amici Curiae Law Center to Prevent Gun Violence, New Yorkers Against Gun Violence, and Moms Demand Action for Gun Sense in America*

**Pro hoc vice* application pending

## POINTS AND AUTHORITIES

INTEREST OF *AMICI CURIAE* ....1

INTRODUCTION AND SUMMARY OF ARGUMENT ....2

ARGUMENT....3

I. THE SAFE ACT FALLS OUTSIDE THE SCOPE OF THE SECOND AMENDMENT RIGHT RECOGNIZED IN *HELLER*....3

A. The SAFE Act....3

B. The Second Amendment Does Not Protect a Right to Possess Assault Weapons or Large Capacity Ammunition Magazines....6

1. The Second Amendment Does Not Protect Dangerous and Unusual Weapons. ....7

a) Assault Weapons Are Unusually Dangerous Military-Style Firearms....8

b) Assault Weapons and Large Capacity Magazines Are Unsuitable for Responsible Self-Defense in the Home....11

c) Assault Weapons and Large Capacity Magazines Are Used Overwhelmingly in Crimes with Multiple Victims and Assaults on Law Enforcement....13

2. Under the SAFE Act, Individuals May Still Possess a Wide Variety of Handguns and Magazines for the Purpose of Responsible Self-Defense in the Home. ....15

II. EVEN IF ASSAULT WEAPONS AND LARGE CAPACITY AMMUNITION MAGAZINES DO IMPLICATE THE SECOND AMENDMENT, NEW YORK'S STATUTE BANNING THESE WEAPONS REMAINS CONSTITUTIONAL. ....16

A. If Heightened Scrutiny Is Necessary In Evaluating This Challenge, Strict Scrutiny Is Not Appropriate. ....16

1. The Application of Strict Scrutiny to Firearm Regulations Is Generally Inappropriate. ....16

2. Strict Scrutiny is Inconsistent with *Heller* and *McDonald*....19

B. If Heightened Scrutiny Applies, Intermediate Scrutiny is the Appropriate Level of Review....21

C. The Assault Weapons and Large Capacity Ammunition Magazine Bans Satisfy Intermediate Scrutiny....22

1. Preservation of Public Safety and Prevention of Crime Are Paramount Government Interests....23

2. Assault Weapons and Large Capacity Ammunition Magazines Jeopardize Public Safety....23

3. The SAFE Act is Substantially Related to the Government's Significant Interests....24

CONCLUSION....25

## TABLE OF AUTHORITIES

### FEDERAL CASES

*Burdick v. Takushi*,
504 U.S. 428 (1992)....................18

*Dist. of Columbia v. Heller*,
554 U.S. 570 (2008).................... Passim

*Ezell v. City of Chicago*,
651 F.3d 684 (7th Cir. 2011) ....................16

*Gonzales v. Oregon*,
546 U.S. 243 (2006)....................23

*Heller v. Dist. of Columbia*
670 F.3d 1244 (D.C. Cir. 2011) .................... Passim

*Heller v. Dist. of Columbia*,
698 F. Supp. 2d 179 (D.D.C. 2010) ....................14, 17, 19

*Kachalsky v. Cnty of Westchester*,
701 F.3d 81 (2d Cir. 2012)....................17-18, 20-21

*Kelley v. Johnson*,
425 U.S. 238 (1976)....................17, 23

*Lorrilard Tobacco Co. v. Reilly*,
533 U.S. 525 (2001)....................22

*McDonald v. City of Chicago*,
130 S. Ct. 3020 (2010) ....................1, 7, 17, 19

*Osterweil v. Bartlett*,
706 F.3d 139 (2d Cir. 2013)....................17

*San Antonio Indep. Sch. Dist. v. Rodriguez*,
411 U.S. 1 (1973)....................19

*Schall v. Martin*,
467 U.S. 253 (1984)....................23

*Turner Broad. Sys., Inc. v. F.C.C.*,
512 U.S. 622 (1994)....................22, 25

*United States v. Decastro*,
682 F.3d 160 (2d Cir. 2012)....................8, 20

*United States v. Fincher*,
538 F.3d 868 (8th Cir. 2008) ....................8

*United States v. Marzzarella*,
595 F. Supp. 2d 596 (W.D. Pa. 2009)....................19

*United States v. Marzzarella*,
614 F.3d 85 (3d Cir. 2010).................... Passim

*United States v. Masciandaro*,
638 F.3d 458 (4th Cir. 2011) ....................16, 18

*United States v. Miller*,
307 U.S. 174 (1939)....................7

*United States v. Reese*,
627 F.3d 792 (10th Cir. 2010) .................... 17-18

*United States v. Salerno*,
481 U.S. 739 (1987)....................23

*United States v. Skoien*,
587 F.3d 803 (7th Cir. 2009) ....................19

*United States v. Skoien*,
614 F.3d 638 (7th Cir. 2010) ....................22

*United States v. Walker*,
709 F. Supp. 2d 460 (E.D. Va. 2010) ....................18

*United States v. Williams*,
616 F.3d 685 (7th Cir. 2010) .................... 17-18

*Ward v. Rock Against Racism*,
491 U.S. 781 (1989)....................18, 22

*Woollard v. Gallagher*,
712 F.3d 865 (4th Cir. 2013) ....................16

**STATE CASES**

*People v. James*,
94 Cal. Rptr. 3d 576, 09 Cal. Daily Op. Serv 6769 (Cal. Ct. App. 2009) ....................8

**STATE AND LOCAL STATUTES**

Cal. Penal Code §§ 12275-1290 (2013)....................3

Conn. Gen. Stat. § 53-202a *et seq.*....................3

Cook. Cnty. Code of Ordinances §§ 54-211 – 54-213....................3

D.C. Code Ann. §§ 7-2551.01 – 7-2551.03....................3

Haw. Rev. Stat. Ann. §§134-1, 134-4, 134-8 (2013)....................3

Mass. Gen. Laws ch. 140, §§ 121-123, 131, 131M (2013)....................3

Md. Code Ann., Crim. Law §§ 4-301-4-306 (2013)....................3

N.J. Stat. Ann. §§ 2C:39-1w, 2C:39-5, 2C:58-5, 2C:58-12, 2C:58-13 (2013)....................3

New York City Admin. Code § 10-301....................3

Penal Law § 265....................3-4

**OTHER AUTHORITIES**

ArmaLite, *A Historical Review of ArmaLite* 3, 12 (Jan. 4, 2010), http://www.armalite.com/images/Library/History.pdf....................8

Associated Press, *Killer of 2 NY firemen had semiautomatic rifle, available at* http://www.boston.com/news/local/connecticut/2012/12/25/killer-firemen-had-semiautomatic-rifle/nT8sAMWgiwhQMhiXo73yLP/story.html....................14

ATF, *Assault Weapons Profile* (1994)....................9, 15

Brian J. Siebel, Brady Ctr. To Prevent Gun Violence, *Assault Weapons: Mass Produced Mayhem* 16 (2008), http://www.gs2ac.com/flyers/2008/200810_mass-produced-mayhem.pdf....................11-12, 24

Christopher S. Koper, U.S. Dep't of Justice, *An Updated Assessment of the Federal Assault Weapons Ban* 4 n.1 (2004)....................9, 12-13

Citizens Crime Commission of New York City, Mass Shooting Incidents in America (1984-2012), *available at* http://www.nycrimecommission.org/mass-shooting-incidents-america.php....................5

Dan Frosch and Kirk Johnson, *Gunman Kills 12 in Colorado, Reviving Gun Debate*, N.Y. Times, July 21, 2012, at A1....................6

David Olinger, *Gun Dealer Surrenders Firearms License,* Denver Post, Oct. 14, 1999, at B07....................5

Dennis A. Henigan, *The Heller Paradox*, 56 UCLA L. Rev. 1171, 1197-98 (2009). ....................19

Dep't of Treasury, *Study on the Sporting Suitability of Modified Semiautomatic Assault Rifles* 34-35, 38 (1998). ....................10

District Attorney, Queen County Press Release dated July 25, 2012, *available at* http://www.queensda.org/newpressreleases/2012/july/williams_paul_07_25_2012_sen.pdf. ....................5

Editorial, *Arm the Troopers*, NY Post, Feb. 22, 2010, *available at* http://www.nypost.com/p/news/opinion/editorials/arm_the_troopers_yc3hgD49GnjNT8a4kDUkiI ....................14

*Full Auto Conversion*, Weapons Combat, http://www.weaponscombat.com/full-auto-conversion (last visited June 7, 2013). ....................10

Holly Yan, Kyung Lah and Dana Ford, Santa Monica Shooting Survivor: Thank God, I'm Alive, cnn.com, June 11, 2013, *available at* http://www.cnn.com/2013/06/10/justice/california-college-gunman/index.html?hpt=hp_t2. ....................6

*How a Lightning Link Works for All AR15 Calibers*, Guns Lot, http://www.gunslot.com/videos/how-lightning-link-works-all-ar15-calibers (last visited June 7, 2013) . ....................11

Jason T. Anderson, *Second Amendment Standards of Review: What the Supreme Court Left Unanswered in District of Columbia v. Heller*, 82 S. Cal. L. Rev. 547, 583 (2009). ....................15

Jim Stewart & Andrew Alexander, *Assault Guns Muscling in on Front Lines of Crime,* Atlanta Journal-Atlanta Constitution, May 21, 1989, at A1, A8. ....................10

Josh White & Maria Glod, *D.C. Sniper Executed by Lethal Injection*, Pittsburgh Post-Gazette, Nov. 11, 2009, at A1. ....................5

Karyn Hunt, *Gunman Said to Have List of 50 Names*, Charlotte Observer, July 3, 1993. ....................5

*Lightning Link*, The Home Gunsmith, http://thehomegunsmith.com/pdf/fast_bunny.pdf (last visited June 7, 2013). .................... 10-11

Lou Michel, *Dead girl was not target of shooting; Police say her brother may have been the one*, Oct. 2, 2010, *available at* http://www.buffalonews.com/apps/ pbcs.dll/article?AID=/20101002/CITYANDREGION/310029895 ....................12

Lou Michel, *The return of the assault rifle; High-powered weapons seem to be regaining their deadly role in WNY crime and violence*, Nov. 21, 2010, *available at* http://www.buffalonews.com/apps/pbcs.dll/article?AID=/20101121/CITYANDREGION/311219987 ............13

Marianne W. Zawitz, U.S. Dep't of Justice, *Guns Used in Crime* (1995) ............15

New York State Senate Introducer's Memorandum in Support, Bill No. S2230 ............23

Governor's Program Bill No. 1, Memorandum in Support, 2013 ............23

NRA-ILA, *Firearm Fact Card, 2011*, http://www.nraila.org/news-issues/fact-sheets/2011/firearm-fact-card-2011.aspx (last visited June 13, 2013) ............15

Recent Mass Shootings, http://libcloud.s3.amazonaws.com/9/56/4/1242/analysis-of-recent-mass-shootings.pdf ............13

Richard Esposito and Daniel Arkin, Santa Monica shooting spree suspect identified as death toll climbs, *available at* http://usnews.nbcnews.com/_news/2013/06/09/18865467-santa-monica-shooting-spree-suspect-identified-as-death-toll-climbs?lite ............6

Susan Candiotti, Greg Botelho and Tom Watkins, *Newtown shooting details revealed in newly released documents*, cnn.com, Mar. 29, 2013, *available at* http://www.cnn.com/2013/03/28/us/connecticut-shooting-documents. ............6

Violence Policy Ctr., *Bullet Hoses: Semiautomatic Assault Weapons – What Are They? What's So Bad About Them*? Sec. 2 (May 2003), *available at* http://www.vpc.org/studies/hosetwo.htm ............9

Violence Policy Ctr., *Mass Shootings in the United States Involving High Capacity Ammunition Magazines* (Jan. 2011), *available at* http://www.vpc.org/fact_sht/VPCshootinglist.pdf............ 5-6

Violence Policy Ctr., *"Officer Down" — Assault Weapons and the War on Law Enforcement, Section One: Assault Weapons, the Gun Industry, and Law Enforcement* (May 2003), *available at* http://www.vpc.org/studies/officeone.htm. ............13

Weapons Combat, http://www.weaponscombat.com/full-auto-conversion (last visited June 7, 2013) ............10

Wikipedia page, *available at* http://en.wikipedia.org/wiki/Colin_Ferguson_(mass_murderer). ............5

## INTEREST OF *AMICI CURIAE*

*Amicus curiae* Law Center to Prevent Gun Violence ("the Law Center") is a non-profit, national law center dedicated to reducing gun violence and the destructive impact it has on communities. The Law Center focuses on providing comprehensive legal expertise to promote smart gun laws. These efforts include tracking all Second Amendment litigation nationwide and providing support to jurisdictions facing legal challenges. As an *amicus*, the Law Center has provided informed analysis in a variety of firearm-related cases, including *District of Columbia v. Heller*, 554 U.S. 570 (2008), and *McDonald v. City of Chicago*, 130 S. Ct. 3020 (2010).

The Law Center has a particular interest in this litigation because it was formed in the wake of an assault weapon massacre at a San Francisco law firm in 1993. The shooter in that rampage was armed with two assault weapons and multiple large capacity ammunition magazines, some capable of holding up to 50 rounds of ammunition.

*Amicus curiae* New Yorkers Against Gun Violence (NYAGV), a non-profit, tax-exempt organization, is New York State's leading anti-gun violence organization. Established in 1993 by a group of Brooklyn, New York mothers galvanized by the shooting death of a teacher in Prospect Park, Brooklyn, NYAGV has grown to include members in 27 counties throughout New York. NYAGV partners with community groups, local officials, law enforcement and individual citizens across New York to advocate against gun violence. NYAGV's affiliated Education Fund, also a non-profit, tax-exempt organization, works to educate New York youth and community members about gun violence and gun safety laws.

*Amicus curiae* Moms Demand Action for Gun Sense in America ("Moms Demand Action"), formed in the aftermath of the mass shooting at Sandy Hook Elementary School in December 2012, is a nonpartisan grassroots organization with more than 100,000 members and nearly 100 chapters in 40 states, including six chapters in New York. A core purpose of Moms

Demand Action is to advocate for common sense federal and state gun laws in order to curtail the epidemic of gun violence in the United States. Moms Demand Action strongly supports laws that protect public safety by regulating assault weapons and large capacity ammunition magazines.

## INTRODUCTION AND SUMMARY OF ARGUMENT

On December 14, 2012, a man walked into Sandy Hook Elementary School in Newtown, Connecticut, carrying an assault weapon with large capacity ammunition magazines and hundreds of rounds of ammunition. He shot 20 children and six adults before turning the gun on himself – all *within five minutes*. In that very short time, the gunman fired 155 bullets and shot each of his victims multiple times, including one six-year-old who was shot 11 times. In response to this horrific incident and the many others preceding it, New York strengthened its longstanding ban on assault weapons and large capacity ammunition magazines, enacting the New York Secure Ammunition and Firearms Enforcement Act ("SAFE Act") to prevent such tragedies from happening again.

This Court should grant Defendants' Cross-Motion for Summary Judgment and deny Plaintiffs' Motion for Preliminary Injunction, because the SAFE Act and, in particular, its prohibitions on assault weapons and large capacity ammunition magazines, are fully consistent with the Second Amendment.

In *District of Columbia v. Heller*, 554 U.S. 570 (2008), the Supreme Court held that the Second Amendment protects an individual right to possess an operable handgun in the home for self-defense. The SAFE Act does not conflict with this right, as residents may lawfully purchase and possess numerous handguns and ammunition magazines for use in domestic self-protection. Plaintiffs, however, are not satisfied. They demand that this Court extend *Heller* to protect the possession of assault weapons and large capacity ammunition magazines, devices of military

origin that are designed to kill large numbers of people quickly and efficiently. *Heller* does not support such an extension and, as courts elsewhere have ruled, the Second Amendment does not guarantee the right to possess these weapons, which are frequently employed in mass shootings and attacks on law enforcement and are not suitable for self-defense.

As discussed in Section I below, Plaintiffs' challenge to the SAFE Act fails because the SAFE Act places no burden on any Second Amendment right. Further, as shown in Section II, even if the SAFE Act were to implicate the Second Amendment, it clearly passes constitutional muster under the applicable standard of review.

## ARGUMENT

### I. THE SAFE ACT FALLS OUTSIDE THE SCOPE OF THE SECOND AMENDMENT RIGHT RECOGNIZED IN *HELLER*.

The State of New York, like many other state and local governments nationwide, prohibits assault weapons and large capacity ammunition feeding devices. Penal Law §§ 265.02(7)-(8), 265.37.[1]

#### A. The SAFE Act

Assault weapons have been banned in New York since 2000. The SAFE Act expands the definition of "assault weapon" under New York law. Under the SAFE Act, semiautomatic

[1] In the wake of the Newtown shooting, Colorado and Connecticut enacted laws prohibiting the sale and/or possession of assault weapons and/or large capacity magazines. *See* Conn. Gen. Stat. § 53-202a *et seq.*; H.B. 13-1224, 69th Gen. Assemb., Reg. Sess. (Colo. 2013). States that – like New York – already banned assault weapons and large capacity magazines include California, Massachusetts, Hawaii, Maryland, and New Jersey. Cal. Penal Code §§ 12275-1290 (2013); Haw. Rev. Stat. Ann. §§134-1, 134-4, 134-8 (2013); Md. Code Ann., Crim. Law §§ 4-301-4-306 (2013); Mass. Gen. Laws ch. 140, §§ 121-123, 131, 131M (2013); N.J. Stat. Ann. §§ 2C:39-1w, 2C:39-5, 2C:58-5, 2C:58-12, 2C:58-13 (2013). Similarly, several local governments also prohibit assault weapons and/or large capacity magazines including the District of Columbia, Cook County, Illinois, and New York City. *See* D.C. Code Ann. §§ 7-2551.01 – 7-2551.03; Cook Cnty. Code of Ordinances §§ 54-211 – 54-213; New York City Admin. Code § 10-301.

rifles, shotguns, and pistols qualify as prohibited assault weapons if they have any of a number of specifically enumerated characteristics that enable the firing of hundreds of bullets per minute, aid in the commission of mass murders and assaults, or facilitate the weapon's concealment, purposes that are all inconsistent with responsible self-defense in the home. Penal Law § 265.00(22). Plaintiffs' challenge to the SAFE Act focuses on three of these characteristics:

- A folding or telescoping stock. This feature promotes concealment and mobility.
- A pistol grip that protrudes conspicuously beneath the action of the weapon. This feature allows a shooter to hold the firearm with two hands for greater control during rapid fire (when the muzzle of the gun can quickly get too hot to hold).
- A thumbhole stock. This feature helps a shooter retain control of a firearm while holding the firearm at the hip, facilitating the spraying of rapidly-fired ammunition.

Clearly, these features have nothing to do with lawful self-defense in the home and everything to do with firing as many rounds as quickly as possible.

New York has prohibited any "magazine, belt, drum, feed strip, or similar device, . . . that . . . has a capacity of, or that can be readily restored or converted to accept, more than ten rounds of ammunition" since 2000. Penal Law § 265.00(23). The SAFE Act strengthened this prohibition by eliminating a "grandfather" provision in prior law that allowed individuals under certain circumstances to continue to possess these magazines if they were manufactured before September 14, 1994. The SAFE Act requires that persons possessing such magazines must either lawfully dispose of them or permanently alter them to limit the device's capacity to no more than ten rounds of ammunition. Penal Law § 265.36. The SAFE Act also prohibits possession of an ammunition feeding device if it contains more than seven rounds of ammunition, unless the device is possessed on a gun range or at a shooting competition. Penal Law §§ 265.20 (a)(7-f), 265.37.

State and local governments across the country have adopted laws restricting civilian access to assault weapons and large capacity ammunition feeding devices because of the devastating role they repeatedly play in mass shootings. For example:

- In July 1993, a shooter armed with assault weapons and large capacity magazines killed nine people, including himself, and injured six others (one of whom subsequently died) at a law firm in San Francisco.[2]

- In December 1993, a shooter armed with large capacity magazines killed six people and wounded 19 others, on a Long Island Rail Road train.[3]

- In April 1999, the gunmen in the Columbine High School massacre, which killed 15 people, including the shooters, and wounded 23 others, used assault weapons and large capacity magazines.[4]

- In October 2002, the assailants known as the "D.C. Snipers" killed ten innocent people using a Bushmaster .223-caliber sniper rifle, an assault weapon.[5]

- In April 2007, the shooter responsible for the Virginia Tech massacre armed himself with numerous 15-round magazines in an attack that left 33 dead, including himself, and 17 injured.[6]

- In April 2009, a shooter armed with two semiautomatic pistols, two 30-round large capacity ammunition magazines, and two 15-round large capacity magazines killed 13 people and wounded four others in Binghamton, New York.[7]

- In September 2009, a shooter, armed with an assault rifle fired 29 rounds into a crowd of people in Far Rockaway, New York killing one person and injuring another.[8]

---

[2] Karyn Hunt, *Gunman Said to Have List of 50 Names*, Charlotte Observer, July 3, 1993, at 2A. This tragedy led to the formation of *amicus* Law Center to Prevent Gun Violence.

[3] Wikipedia page, *available at* http://en.wikipedia.org/wiki/Colin_Ferguson_(mass_murderer).

[4] David Olinger, *Gun Dealer Surrenders Firearms License*, Denver Post, Oct. 14, 1999, at B07.

[5] Josh White & Maria Glod, *D.C. Sniper Executed by Lethal Injection*, Pittsburgh Post-Gazette, Nov. 11, 2009, at A1.

[6] Violence Policy Ctr., *Mass Shootings in the United States Involving High Capacity Ammunition Magazines* (Jan. 2011), http://www.vpc.org/fact_sht/VPCshootinglist.pdf.

[7] Citizens Crime Commission of New York City, Mass Shooting Incidents in America (1984-2012), http://www.nycrimecommission.org/mass-shooting-incidents-america.php.

[8] District Attorney, Queen County Press Release dated July 25, 2012, *available at* http://www.queensda.org/newpressreleases/2012/july/williams_paul_07_25_2012_sen.pdf.

- In January 2011, a shooter killed six people and wounded 13 others, including Congresswoman Gabrielle Giffords, in a Safeway parking lot in Tucson using a large capacity magazine holding 33 rounds of ammunition.[9]

- In July 2012, a gunman killed 12 people and wounded 58 others in a movie theater in Aurora, Colorado, armed with an AR-15 assault rifle and 100-round ammunition magazines.[10]

- In December 2012, a gunman killed 26 people and wounded two more at Sandy Hook Elementary School in Newtown, Connecticut. Twenty of the dead were young children. The gunman was armed with a Bushmaster XM-15 assault rifle, two handguns, multiple 30-round magazines, and hundreds of rounds of ammunition.[11]

- Earlier this month, another shooter killed five people in Santa Monica, California, armed with 1,300 rounds of ammunition and multiple firearms, including an AR-15 assault rifle with large capacity ammunition magazines.[12]

The foregoing litany of tragedies demonstrates that assault weapons and large capacity ammunition feeding devices are particularly attractive to and have been used again and again by criminals intending to inflict the maximum amount of destruction.

**B. The Second Amendment Does Not Protect a Right to Possess Assault Weapons or Large Capacity Ammunition Magazines.**

The United States Supreme Court held in *District of Columbia v. Heller* that the Second Amendment protects the right to possess a handgun in the home for the purpose of lawful self-

---

[9] Violence Policy Ctr., *Mass Shootings in the United States Involving High Capacity Ammunition Magazines*.

[10] Dan Frosch and Kirk Johnson, *Gunman Kills 12 in Colorado, Reviving Gun Debate*, N.Y. Times, July 21, 2012, at A1.

[11] Susan Candiotti, Greg Botelho and Tom Watkins, *Newtown shooting details revealed in newly released documents*, cnn.com, Mar. 29, 2013, *available at* http://www.cnn.com/2013/03/28/us/connecticut-shooting-documents.

[12] Holly Yan, Kyung Lah and Dana Ford, Santa Monica Shooting Survivor: Thank God, I'm Alive, cnn.com, June 11, 2013, *available at* http://www.cnn.com/2013/06/10/justice/california-college-gunman/index.html?hpt=hp_t2; Richard Esposito and Daniel Arkin, Santa Monica shooting spree suspect identified as death toll climbs, *available at* http://usnews.nbcnews.com/_news/2013/06/09/18865467-santa-monica-shooting-spree-suspect-identified-as-death-toll-climbs?lite.

defense. 554 U.S. at 635. The Court in *Heller* found the D.C. statute at issue invalid because it banned handguns of *any type*, even within the home. *Id* at 628, 636.

**1. The Second Amendment Does Not Protect Dangerous and Unusual Weapons.**

*Heller* emphasized that the right protected by the Second Amendment is not "unlimited," and does not include the "right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Heller,* 554 U.S. at 626. The *Heller* Court also explicitly excluded certain classes of weapons from the scope of the Second Amendment, specifically endorsing the "historical tradition of prohibiting the carrying of dangerous and unusual weapons." *Id*. at 627, *aff'g United States v. Miller*, 307 U.S. 174, 178 (1939) (holding that short-barreled shotguns are not protected by the Second Amendment, because they are dangerous and unusual) (internal quotation omitted).[13] Consistent with *Heller's* rule circumscribing the reach of the Second Amendment, in *McDonald v. City of Chicago*, the Supreme Court emphasized that "incorporation [of the Second Amendment into the Due Process Clause of the Fourteenth Amendment] does not imperil every law regulating firearms," and agreed that "reasonable firearms regulation will continue under the Second Amendment." *McDonald*, 130 S. Ct. 3020, 3046 (2010) (internal citations omitted).

The Second Circuit has confirmed the limited nature of the Second Amendment right recognized in *Heller*: "[T]he Second Amendment right does not encompass all weapons, but only those 'typically possessed by law-abiding citizens for lawful purposes' and thus does not

[13] The Supreme Court also identified a non-exhaustive list of "presumptively lawful regulatory measures" (*Heller*, 554 U.S. at 627 n.26), including "longstanding prohibitions" on firearm possession by felons and the mentally ill, as well as laws forbidding firearm possession in sensitive places such as schools and government buildings, and imposing conditions on the commercial sale of firearms. *Id*. at 626-27. In addition, the Court declared that its analysis should not be read to suggest "the invalidity of laws regulating the storage of firearms to prevent accidents." *Id*. at 632.

include the right to possess 'dangerous and unusual weapons.'" *United States v. Decastro,* 682 F.3d 160, 165 n.4 (2d Cir. 2012) (quoting *Heller*, 544 U.S. at 625, 627). Courts outside the Second Circuit have also upheld other prohibitions that restrict the possession of "dangerous and unusual" weapons after *Heller*. *See, e.g.*, *Heller v. Dist. of Columbia* ("*Heller II*"), 670 F.3d 1244, 1263-64 (D.C. Cir. 2011) (acknowledging *Heller*'s exception for "dangerous and unusual" weapons, and upholding the D.C. assault weapons and large capacity magazine bans against a Second Amendment challenge); *United States v. Fincher,* 538 F.3d 868, 874 (8th Cir. 2008) (defendant's possession of machine gun not protected by Second Amendment as those firearms fall "within the category of dangerous and unusual weapons"); *People v. James*, 94 Cal. Rptr. 3d 576, 586, 09 Cal. Daily Op. Serv. 6769 (Cal. Ct. App. 2009) (upholding California's assault weapon prohibition because assault weapons fall within category of "dangerous and unusual" weapons).

**a) Assault Weapons Are Unusually Dangerous Military-Style Firearms.**

Assault weapons are categorically different from the handguns at issue in *Heller*. Assault weapons are semiautomatic versions of fully automatic weapons designed for combat. For example, the AR-15 rifle, some versions of which are prohibited by the SAFE Act, was originally designed as a military weapon and issued primarily to combat troops, Special Forces and other military units. *See* ArmaLite, *A Historical Review of ArmaLite* 3, 12 (Jan. 4, 2010), http://www.armalite.com/images/Library/History.pdf. The AR-15 was eventually reclassified as the M-16 and "became the military's basic service rifle." *Id.* at 12.

The only significant difference between civilian and military assault rifles is the manner in which they fire multiple bullets (i.e., whether they are "semiautomatic" or fully "automatic"). "A semiautomatic weapon fires one bullet for each squeeze of the trigger. After each shot, the

gun automatically loads the next bullet and cocks itself for the next shot, thereby permitting a somewhat faster rate of fire relative to non-automatic firearms." Christopher S. Koper, U.S. Dep't of Justice, *An Updated Assessment of the Federal Assault Weapons Ban* 4 n.1 (2004). In contrast, a fully automatic assault weapon "fires continuously as long as the trigger is held back - until it runs out of ammunition." *See* Violence Policy Ctr., *Bullet Hoses: Semiautomatic Assault Weapons – What Are They? What's So Bad About Them*? Sec. 2 (May 2003), *available at* http://www.vpc.org/studies/hosetwo.htm.

In reality, the differences between firing a semiautomatic assault weapon and a fully automatic one are minimal, and both are dangerous and unusual weapons. Most notably, both can fire hundreds of bullets in a single minute. In a police department test, a fully automatic UZI with a 30-round magazine "emptied in slightly less than two seconds. . . while the same magazine was emptied in just five seconds on semiautomatic" mode. *Heller II*, 670 F.3d at 1262-63 (quoting *Firearms Registration Amendment Act of 2008: Hearing on Bill 17-0843 Before the Comm. on Public Safety and the Judiciary of the Council of the District of Columbia* (Oct. 1, 2008) (statement of Brian J. Siebel, Brady Ctr. To Prevent Gun Violence) ("Siebel Statement")).

Just like fully automatic weapons, semiautomatic assault weapons are "designed to enhance [the] capacity to shoot multiple human targets very rapidly." *Id.* The Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") confirms that "[a]ssault weapons were designed for rapid fire, close quarter shooting at human beings. That is why they were put together the way they were." ATF, *Assault Weapons Profile* 19 (1994). "You will not find these guns in a duck blind or at the Olympics. They are mass produced mayhem." *Id.*

For these reasons, weapons like the AR-15, AK-47, and UZI models that are prohibited by the SAFE Act are frequently chosen by criminals for assaults and homicides. *See Heller II*, 670 F.3d at 1263 (citing Dep't of Treasury, *Study on the Sporting Suitability of Modified Semiautomatic Assault Rifles* 34-35, 38 (1998)) ("assault weapons are preferred by criminals . . . because of their high firepower."). "'[T]he military features of semiautomatic assault weapons are designed to enhance their capacity to shoot multiple human targets very rapidly' and '[p]istol grips on assault rifles . . . help stabilize the weapon during rapid fire and allow the shooter to spray-fire from the hip position.'" *See Heller II*, 670 F.3d at 1262-63 (quoting Siebel Statement). Indeed, assault weapons are 20 times more likely to be used in the commission of a crime than other kinds of weapons. *See* Jim Stewart & Andrew Alexander, *Assault Guns Muscling in on Front Lines of Crime*, Atlanta Journal-Atlanta Constitution, May 21, 1989, at A1, A8. Unlike the handguns at issue in *Heller*, these weapons do not have a tradition of use for lawful self-defense.

Any suggestion that the SAFE Act arbitrarily prohibits assault weapons merely because they *resemble* military-style fully automatic assault weapons is disingenuous. As discussed above, semi-automatic assault weapons and fully-automatic weapons are virtually the same.

Indeed, their characteristics are so similar that a semi-automatic assault weapon can readily be converted into a fully automatic weapon. *See, e.g.*, *Full Auto Conversion*, Weapons Combat, http://www.weaponscombat.com/full-auto-conversion (last visited June 7, 2013) (providing for purchase, instructions, blueprints, and schematics detailing the conversion of numerous semiautomatic weapons into fully automatic weapons). For example, a device called the "Lightning Link" easily converts an AR-15 into a fully automatic weapon and can be installed in a matter of ten seconds. *See, e.g.*, *Lightning Link*, The Home Gunsmith,

http://thehomegunsmith.com/pdf/fast_bunny.pdf (last visited June 7, 2013); *see also How a Lightning Link Works for All AR15 Calibers*, Guns Lot, http://www.gunslot.com/videos/how-lightning-link-works-all-ar15-calibers (last visited June 7, 2013) (instructional video demonstrating how Lightning Link works). The ease of modification of semi-automatic assault weapons to fully automatic weapons underscores the dangerous and unusual nature of these weapons that excludes them from Second Amendment protection.

**b) Assault Weapons and Large Capacity Magazines Are Unsuitable for Responsible Self-Defense in the Home.**

In *Heller*, the Supreme Court held that the Second Amendment protects the right of individuals to possess a handgun in the home for self-defense. As discussed above, however, the Court also held that the Second Amendment does not include the "right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Heller*, 554 U.S. at 626. Indeed, the exceedingly dangerous nature of assault weapons makes them an inappropriate choice for self-defense purposes. Ammunition shot from some assault weapons is powerful enough to penetrate walls, increasing the already significant threat of stray bullets harming innocent family members, neighbors, and passersby. The Executive Director of the Fraternal Order of Police explained that "[a]n AK-47 fires a military round. In a conventional home with dry-wall walls, I wouldn't be surprised if [an AK-47 round] went through six of them." *See* Brian J. Siebel, Brady Ctr. To Prevent Gun Violence, *Assault Weapons: Mass Produced Mayhem* 16 (2008), http://www.gs2ac.com/flyers/2008/200810_mass-produced-mayhem.pdf (quoting *Police Fear a Future of Armored Enemies*, USA Today, Mar. 3, 1997, at 02A).

Large capacity magazines are also inappropriate for responsible self-defense in the home. A former Baltimore Police Colonel stated that "[t]he typical self-defense scenario in a home does not require more ammunition than is available in a standard 6-shot revolver or 6-10 round

semiautomatic pistol. In fact, because of potential harm to others in the household, passerby, and bystanders, too much firepower is a hazard." *Id*. Large capacity magazines exacerbate concerns about stray bullets, because "the tendency for defenders [is] to keep firing until all bullets have been expended."[14] *Id*. Indeed, Plaintiffs themselves confirm the additional danger that large capacity magazines create, and their inappropriateness for responsible self-defense in the home, by acknowledging that "people miss with most of the rounds they fire," that "a homeowner under the extreme duress of an armed and advancing attacker is likely to fire at, but miss, his or her target." (Plaintiffs' Br. at 20, 27.) Responsible self-defense does not mean the capacity to spray dozens[15] of additional bullets in the home when the first seven have not been fired accurately.

The risk of errant bullets striking innocent household members or bystanders is magnified when one considers the possibility of an assault weapon or a large capacity magazine being used in a home located within any of the many densely populated urban areas in the State of New York. This risk is not hypothetical. In September 2010, a 15-year-old girl was killed in Buffalo by stray bullets from an AK-47 assault rifle while she was in her house typing on her computer. Lou Michel, *Dead girl was not target of shooting; Police say her brother may have been the one*, Oct. 2, 2010, *available at* http://www.buffalonews.com/apps/ pbcs.dll/article?AID=/20101002/ CITYANDREGION/310029895. Police recovered 19 shell casings from the scene of the crime, but the intended target – the victim's brother – was not killed. *Id.*

---

[14] "The threat posed by military-assault weapons is increased significantly if they can be equipped with high-capacity ammunition magazines" because, "[b]y permitting a shooter to fire more than ten rounds without reloading, they greatly increase the firepower of mass shooters." *See id.* at *16; *see also* Koper, *supra*, at 87 ("guns used in shootings are 17% to 26% more likely to have [magazines holding more than ten rounds] than guns used in gunfire cases resulting in no wounded victims").

[15] Indeed, some large capacity magazines readily available on the consumer market can hold up to 100 rounds of ammunition. *See, e.g.*, The Beta Company, *C-Mag Products Catalogue*, http://www.betaco.com/cmag_product_details.asp?product=1& product_category=accessories (last visited June 11, 2013).

**c) Assault Weapons and Large Capacity Magazines Are Used Overwhelmingly in Crimes with Multiple Victims and Assaults on Law Enforcement.**

Criminals disproportionately use assault weapons and large capacity magazines in two categories of crimes: those with multiple victims and those that target law enforcement. Assault weapons "account for a larger share of guns used in mass murders and murders of police, crimes for which weapons with greater firepower would seem particularly useful." Koper, *supra*, at 87. As described above, assault weapons and/or large capacity magazines have played a devastating role in numerous mass shootings nationwide, including those that occurred just within the last 12 months in Santa Monica, California, Newtown, Connecticut, and Aurora, Colorado. On average, shooters who use assault weapons and/or large capacity magazines in mass shootings shoot 135% more people, and kill 57% more people than shooters who do not use assault weapons and large capacity magazines. Mayors Against Illegal Guns, Analysis of Recent Mass Shootings, http://libcloud.s3.amazonaws.com/9/56/4/1242/analysis-of-recent-mass-shootings.pdf.

Criminals also overwhelmingly choose assault weapons and large capacity magazines for attacks against law enforcement. A study analyzing FBI data found that 20% of the law enforcement officers killed in the line of duty were killed with an assault weapon. *See* Violence Policy Ctr., *"Officer Down" — Assault Weapons and the War on Law Enforcement*, *Section One: Assault Weapons, the Gun Industry, and Law Enforcement* (May 2003), *available at* http://www.vpc.org/studies/officeone.htm. Speaking from his own experience, Buffalo's Police Commissioner Daniel Derenda has observed that: "[i]n my opinion, they [assault rifles] exist for one purpose and one purpose only and that is to kill." Lou Michel, *The return of the assault rifle; High-powered weapons seem to be regaining their deadly role in WNY crime and violence*, Nov. 21, 2010, *available at* http://www.buffalonews.com/apps/pbcs.dll/article?AID=/20101121/CITYANDREGION/311219987.

For example, in December 2012, William Spengler, armed with the same make and caliber semi-automatic rifle used in the Newtown massacre, lured first responders to his home in Webster, NY by starting a fire, and then killed two firefighters and wounded two others. Associated Press, *Killer of 2 NY firemen had semiautomatic rifle*, *available at* http://www.boston.com/news/local/connecticut/2012/12/25/killer-firemen-had-semiautomatic-rifle/nT8sAMWgiwhQMhiXo73yLP/story.html. In January 2010, a carjacking suspect held New York State troopers at bay for nearly an hour because he was armed with a semi-automatic AK-47, while the state troopers were armed with ordinary .45 caliber handguns. Editorial, *Arm the Troopers*, NY Post, Feb. 22, 2010, *available at* http:// www.nypost.com/p/news/opinion/editorials/arm_the_troopers_yc3hgD49GnjNT8a4kDUkiI.

The prohibition on large capacity magazines serves as further protection for law enforcement officers, because gun users limited to ten-round magazines loaded with no more than seven rounds of ammunition must reload more frequently. For law enforcement confronting dangerous shootouts, "the 2 or 3 second pause to reload [ammunition] can be of critical benefit." *Heller v. Dist. of Columbia*, 698 F. Supp. 2d 179, 194 (D.D.C. 2010). Thus, for example, in January 2011, Jared Lee Loughner was only subdued in the midst of the mass shooting in Tucson that left six people dead and a dozen more injured after he was forced to interrupt his shooting spree in order to reload. Similarly, after killing six people and injuring 19 more on December 7, 1993, Colin Ferguson was only prevented from continuing his rampage on the Long Island Rail Road because he was subdued while attempting to reload.

For the reasons discussed above, the assault weapons prohibited by the SAFE Act constitute "dangerous and unusual" weapons that are not protected by the Second Amendment.

### 2. Under the SAFE Act, Individuals May Still Possess a Wide Variety of Handguns and Magazines for the Purpose of Responsible Self-Defense in the Home.

The SAFE Act prohibits a tiny fraction of available firearms – those that are military-style weapons capable of rapid fire-fueled devastation. *See* ATF, *supra*, at 19. The SAFE Act leaves common handguns, the weapons "overwhelmingly chosen" by the American people for self-defense in the home, untouched. *See Heller*, 554 U.S. at 628. As a result, the law does not interfere with public access to a wide array of firearms for responsible self-defense in the home.

Assault weapons are not commonly used or purchased by the public. These weapons have historically only comprised a small percentage of the total amount of firearms in circulation. *See* Marianne W. Zawitz, U.S. Dep't of Justice, *Guns Used in Crime* 6 (1995) (assault weapons constituted about 1% of guns in circulation prior to the federal assault weapons ban).[16] Unlike the right to own a handgun in *Heller*, any alleged "right to possess assault weapons" is "not at all rooted in the conscience of the American public." Jason T. Anderson, *Second Amendment Standards of Review: What the Supreme Court Left Unanswered in District of Columbia v. Heller*, 82 S. Cal. L. Rev. 547, 583 (2009).

Individuals are also free under the SAFE Act to possess numerous magazines that are capable of holding up to ten rounds of ammunition as long as they are not loaded with more than seven rounds. The SAFE Act only prohibits the possession of large capacity magazines, which

[16] While Plaintiffs and their *amici* offer a lot of bluster about how supposedly common these weapons are, the numbers they offer tell a different story. The website of the National Rifle Association estimates that there are nearly 300 million privately owned firearms in the United States. *See* NRA-ILA, *Firearm Fact Card, 2011*, http://www.nraila.org/news-issues/fact-sheets/2011/firearm-fact-card-2011.aspx (last visited June 13, 2013). According to the NRA's brief, less than four million AR-15's (which the NRA alleges is the "most popular" assault weapon) have been manufactured for sale on the US domestic market *in the entire period from 1986 to the present*. *See* Brief of the National Rifle Association, at 9. In other words, even if every single one of these AR-15s was still in circulation, they would account for just slightly more than 1% of all privately owned weapons in the United States.

have been used in every major recent mass shooting. Because the prohibition on assault weapons and large capacity magazines does not affect an individual's ability to possess an operable handgun for in-home self-defense, the SAFE Act imposes no burden on an individual's ability to exercise his or her Second Amendment right.

## II. EVEN IF ASSAULT WEAPONS AND LARGE CAPACITY AMMUNITION MAGAZINES DO IMPLICATE THE SECOND AMENDMENT, NEW YORK'S STATUTE BANNING THESE WEAPONS REMAINS CONSTITUTIONAL.

Appellants' failure to establish a Second Amendment right to possess assault weapons and large capacity magazines should end this Court's inquiry. *See, e.g.*, *Heller II*, 670 F.3d at 1252; *Ezell v. City of Chicago*, 651 F.3d 684, 702-04 (7th Cir. 2011); *United States v. Marzzarella*, 614 F.3d 85, 89 (3d Cir. 2010). But even if this Court were to radically expand the limited holdings of *Heller* and *McDonald* and conclude that the SAFE Act implicates the Second Amendment right to possess a handgun in the home for self-defense, the SAFE Act would still pass constitutional muster. Intermediate scrutiny is the most appropriate level of Second Amendment review and the SAFE Act more than meets this standard.

### A. If Heightened Scrutiny Is Necessary In Evaluating This Challenge, Strict Scrutiny Is Not Appropriate.

#### 1. The Application of Strict Scrutiny to Firearm Regulations Is Generally Inappropriate.

Plaintiffs and their *amici* argue the SAFE Act must be subject to a strict scrutiny standard because the enumerated right the Second Amendment protects is fundamental. In fact, Plaintiffs' *amicus*, the National Rifle Association, goes even further, arguing for a "categorical" approach that rejects virtually any regulation of guns whatsoever without applying any level of scrutiny. (NRA Amicus Brief at 3-5.) No court anywhere in the nation has embraced this radical approach and this court should not become the first. *See, e.g.*, *Woollard v. Gallagher*, 712 F.3d 865 (4th Cir. 2013); *United States v. Masciandaro*, 638 F.3d 458 (4th Cir. 2011); *Marzzarella*, 614 F.3d

85 (3d Cir. 2010); *United States v. Williams*, 616 F.3d 685 (7th Cir. 2010) *United States v. Reese*, 627 F.3d 792 (10th Cir. 2010); *Heller v. Dist. of Columbia*, 698 F. Supp. 2d 179 (D.D.C. 2010), *aff'd in part and vacated in part*, 670 F.3d 1244 (D.C. Cir. 2011).

Moreover, not all constitutionally enumerated rights—even those that are fundamental—trigger strict scrutiny. *See Marzzarella*, 614 F.3d at 96-97 (noting that even the right to free speech, an enumerated fundamental right essential to democratic governance, "is susceptible to several standards of scrutiny, depending upon the type of law challenged and the type of speech at issue," and finding that there is "no reason why the Second Amendment would be any different") (internal citations omitted). Indeed, binding Second Circuit authority has already rejected uniform application of strict scrutiny in Second Amendment cases. *See Kachalsky v. Cnty. of Westchester*, 701 F.3d 81, 96 (2d Cir. 2012) ("Because our tradition so clearly indicates a substantial role for state regulation of the carrying of firearms in public, we conclude that intermediate scrutiny is appropriate in this case.").

The application of strict scrutiny is inappropriate in the evaluation of firearm regulations. Protecting public safety is the bedrock function of government, and guns have a "unique potential to facilitate death and destruction and thereby to destabilize ordered liberty." *McDonald*, 130 S. Ct. at 3108 (Stevens, J., dissenting). Accordingly, state and local governments have a profound interest in safeguarding the public and law enforcement personnel from gun violence. *See Kelley v. Johnson*, 425 U.S. 238, 247 (1976) ("promotion of safety of persons and property is unquestionably at the core of the State's police power"); *Osterweil v. Bartlett*, 706 F.3d 139, 143 (2d Cir. 2013), *certified question accepted*, 20 N.Y.3d 1058 (2013) (O'Connor, Sup. Ct. Justice (Ret.) sitting by designation) ("[t]he regulation of firearms is a paramount issue of public safety, and recent events in this circuit are a sad reminder that firearms

are dangerous in the wrong hands"); *Kachalsky*, 701 F.3d at 96 ("As Plaintiffs admitted at oral argument, the state 'enjoys a fair degree of latitude' to regulate the use and possession of firearms in public."). The level of scrutiny applied to firearms regulations must not deprive legislatures of the flexibility to safeguard the populace. *See Heller*, 554 U.S. at 636 (Constitution permits legislatures "a variety of tools for combating that problem").

Indeed, most courts that have chosen a level of scrutiny for evaluating Second Amendment claims have rejected strict scrutiny. *See, e.g.*, *Kachalsky*, 701 F.3d at 96; *Heller II*, 670 F.3d at 1257; *Masciandaro*, 638 F.3d at 471; *Reese*, 627 F.3d at 802; *Williams*, 616 F.3d at 691-93; *Marzzarella*, 614 F.3d at 96-97; *United States v. Walker*, 709 F. Supp. 2d 460, 466 (E.D. Va. 2010).

Even for rights that may sometimes warrant strict scrutiny, that standard is not applied to reasonable regulations of that right. For example, content-neutral regulations on the time, place, and manner of even core political speech are not subject to strict scrutiny. *See Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) (upholding content-neutral regulations on the time, place, and manner of speech, aimed at limiting the volume of amplified music and speeches); *see also Burdick v. Takushi*, 504 U.S. 428, 432 (1992) (although voting is a fundamental political right, it is erroneous to assume that any burden upon the right to vote must be subject to strict scrutiny). If a limit on the amplification of speech is not subject to strict scrutiny (*see Ward*, 491 U.S. at 791), then surely a limit on the amplification of lethal firepower is not subject to such scrutiny. Moreover, narrow impositions that permit citizens to exercise their rights in alternative ways are frequently subject to less rigorous standards of review. *Id.* at 791. Logic dictates that the Second Amendment does not require strict scrutiny of narrow regulations – like those at issue here – that leave a citizen with ample alternative types of firearms for self-defense in the home.

### 2. Strict Scrutiny is Inconsistent with *Heller* and *McDonald*.

Although *Heller* did not articulate a level of review, the decision implicitly rejected the use of strict scrutiny in the Second Amendment context. As "numerous other courts and legal scholars have pointed out, a strict scrutiny standard of review" does "not square with the majority's references to 'presumptively lawful regulatory measures.'" *Heller v. Dist. of Columbia*, 698 F. Supp. 2d at 187 (citing *United States v. Skoien*, 587 F.3d 803, 812 (7th Cir. 2009) (noting that the court did "not see how the listed laws could be 'presumptively' constitutional if they were subject to strict scrutiny"); *United States v. Marzzarella*, 595 F. Supp. 2d 596, 604 (W.D. Pa. 2009) (observing that "the Court's willingness to presume the validity of several types of gun regulations is arguably inconsistent with the adoption of a strict scrutiny standard of review"); Dennis A. Henigan, *The Heller Paradox*, 56 UCLA L. Rev. 1171, 1197-98 (2009) (stating "the *Heller* majority . . . implicitly rejected strict scrutiny")).

Additional cautionary remarks about the boundaries of the Second Amendment in *Heller* and *McDonald* further evidence the inappropriateness of employing a strict scrutiny review of firearms regulations. *See, e.g.*, *Heller*, 554 U.S. at 626 (noting that the Second Amendment's right to bear arms is "not unlimited," and that legislatures must be allowed to employ "a variety of tools for combating" the problem of gun violence.); *McDonald*, 130 S. Ct. at 3047 ("incorporation does not imperil every law regulating firearms."). These unambiguous statements by the Supreme Court are incompatible with the presumption of unconstitutionality that accompanies strict scrutiny. *See San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 16-17 (1973).

Indeed, the Second Circuit has expressly rejected the indiscriminate application of strict scrutiny to regulations that touch on Second Amendment rights. To the contrary, that Court has held: "[r]eserving heightened scrutiny for regulations that burden the Second Amendment right

substantially is not inconsistent with the classification of that right as fundamental to our scheme of ordered liberty in *McDonald* . . ." *United States v. Decastro*, 682 F.3d 160, 166-67 (2d Cir. 2012). "In deciding whether a law substantially burdens Second Amendment rights," the *Decastro* Court explained, "it is . . . appropriate to consult principles from other areas of constitutional law, including the First Amendment":

> In evaluating the reasonableness of content-neutral time, place or manner regulations under the First Amendment, we ask whether the challenged regulation "leave[s] open ample alternative channels for communication of the information." . . . Regulation may "reduce to some degree the potential audience for [one's] speech' so long as "the remaining avenues of communication are [ ]adequate." . . . By analogy, law that regulates the availability of firearms is not a substantial burden on the right to keep and bear arms if adequate alternatives remain for law-abiding citizens to acquire a firearm for self-defense.

*Id.* at 167-168 (citations omitted). As demonstrated above, the SAFE Act's prohibition on a limited class of firearms that are particularly dangerous and unusual, and that are not well-suited for self-defense in the home, leaves citizens free to employ any of a vast array of alternative firearms to defend themselves in their homes. Accordingly, strict scrutiny of the SAFE Act's bans on assault weapons and large capacity magazines is wholly unwarranted.

Plaintiffs' *amicus* National Rifle Association of America concedes that in its most recent decision in this area, *Kachalsky v. Cnty. of Westchester*, 701 F.3d 81 (2d Cir. 2012), the Second Circuit "left the question open" of "what level of scrutiny should apply to laws that burden the 'core' Second Amendment protection identified in *Heller*." (NRA Brief at 12 n.3.) But they claim that "*Kachalsky* supports application of strict scrutiny to laws that limit the right to keep and bear arms in the home." (NRA Brief at 12 n.3.) *Kachalsky* does no such thing. First, *Kachalsky* correctly identifies the limited scope of the "'core' protection of the Second Amendment" as defined in *Heller*: "the 'right of law-abiding, responsible citizens to use arms in defense of hearth and home.'" *Kachalsky*, 701 F.3d at 93 (quoting *Heller*, 554 U.S. at 634-35).

The "core" right is the right to use *some* arms for self-defense in the home – not *any* arms. Moreover, *Kachalsky* expressly reaffirms *Decastro*'s holding that "heightened scrutiny is triggered only by those restrictions that (like the complete prohibition on *all* handguns struck down in *Heller*) operate as a *substantial burden* on the ability of law-abiding citizens to possess and use a firearm for self-defense (or for other lawful purposes)." *Kachalsky*, 701 F.3d at 93, (quoting *Decastro*, 682 F.3d at 166) (emphasis added). The SAFE Act's limited prohibitions impose no such burden on citizens.

### B. If Heightened Scrutiny Applies, Intermediate Scrutiny is the Appropriate Level of Review.

Because the SAFE Act does not interfere with the right to possess a handgun in the home for self-defense, intermediate scrutiny is the highest possible level of appropriate review (although no means-end scrutiny review is necessary for the reasons explained above). Courts have reached similar conclusions in cases involving prohibitions on certain classes of weapons.

The U.S. Court of Appeals for the D.C. Circuit applied intermediate scrutiny to uphold the constitutionality of the District of Columbia's ban on assault weapons and large capacity magazines substantially similar to the SAFE Act. *Heller II*, 670 F.3d at 1261. The court stated that the prohibition of assault weapons and large capacity magazines was "more accurately characterized as a regulation of the manner in which persons may lawfully exercise their Second Amendment rights," since the prohibition did not "prevent a person from keeping a suitable and commonly used weapon for protection in the home." *Id*. at 1262. The court also aptly summarized a fundamental distinction between the absolute handgun ban in *Heller* and bans on assault weapons and large capacity magazines: "Unlike the law held unconstitutional in *Heller*, [bans on assault weapons and large capacity magazines] do not prohibit the possession of the

'quintessential self-defense weapon,' to wit, the handgun." *Id.* at 1261-62 (quoting *Heller*, 544 U.S. at 629).

In *Marzzarella*, the Third Circuit analyzed the federal prohibition on unmarked firearms under the intermediate scrutiny standard because the law did not severely limit the possession of firearms. 614 F.3d at 97. The Court explained that the prohibition left a person "free to possess any otherwise lawful firearm," so it was "more accurately characterized as a regulation of the manner in which persons may lawfully exercise their Second Amendment rights." *Id*.

If this Court decides to apply some form of heightened scrutiny, it should similarly apply intermediate scrutiny to New York's ban on assault weapons and large capacity magazines. Like the laws at issue in *Heller II* and *Marzzarella*, the SAFE Act does not impose a substantial burden on an individual's ability to exercise his or her Second Amendment right since it does not "prevent a person from keeping a suitable and commonly used weapon for protection in the home." *Heller II*, 670 F.3d at 1262. The SAFE Act imposes no regulations upon ordinary handguns "overwhelmingly chosen" for self-defense. *See Heller*, 554 U.S. at 628.

**C. The Assault Weapons and Large Capacity Ammunition Magazine Bans Satisfy Intermediate Scrutiny.**

Intermediate scrutiny requires a showing that the asserted governmental end is "significant," "substantial," or "important." *See, e.g., Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 662 (1994); *Ward*, 491 U.S. at 791; *United States v. Skoien*, 614 F.3d 638, 641-42 (7th Cir. 2010). It requires that the fit between the challenged regulation and the stated objective be reasonable, not perfect, and does not require that the regulation be the least restrictive means of serving the interest. *See, e.g., Lorrilard Tobacco Co. v. Reilly*, 533 U.S. 525, 556 (2001); *Marzzarella*, 614 F.3d at 98. The SAFE ACT easily satisfies intermediate scrutiny.

**1. Preservation of Public Safety and Prevention of Crime Are Paramount Government Interests.**

In enacting the SAFE Act, the New York Legislature was concerned by the threat to public safety posed by assault weapons and large capacity magazines, as well as the high level of violent crime in New York. *See* Governor's Program Bill No. 1, Memorandum in Support, 2013 ("This legislation will protect New Yorkers by reducing the availability of assault weapons and deterring the criminal use of firearms"); New York State Senate Introducer's Memorandum in Support, Bill No. S2230, Sen. Klein (same). It is beyond dispute that public safety and the prevention of crime are substantial and compelling governmental interests. *See, e.g.*, *United States v. Salerno*, 481 U.S. 739, 748-50 (1987) (noting that "the Government's regulatory interest in community safety can, in appropriate circumstances, outweigh an individual's liberty interest" and holding that the government's interest in preventing crime is compelling); *Schall v. Martin*, 467 U.S. 253, 264 (1984) ("The legitimate and compelling state interest in protecting the community from crime cannot be doubted"); *Kelley v. Johnson*, 425 U.S. 238, 247 (1976) ("promotion of safety of persons and property is unquestionably at the core of the State's police power"); *see also Gonzales v. Oregon*, 546 U.S. 243, 270 (2006) (States are generally afforded "great latitude" in exercising "police powers to legislate as to the protection of the lives, limbs, health, comfort, and quiet of all persons. . . ." (internal quotations and citation omitted)).

**2. Assault Weapons and Large Capacity Ammunition Magazines Jeopardize Public Safety.**

As demonstrated above (*see supra* Sections I.B.1.), assault weapons are particularly dangerous, military-style weapons designed for combat use, making them a significant threat to public safety. New York has an interest in preventing devastating attacks committed with assault weapons, such as the mass shootings at a college campus in Santa Monica, California, at Sandy Hook Elementary School in Newtown, Connecticut, at a movie theater in Aurora, Colorado, and

at a supermarket in Tucson, Arizona. As also demonstrated above, large capacity ammunition magazines also pose special dangers to public safety, especially when used with assault weapons. New York has a further interest in protecting from harm the law enforcement officers who serve and protect its citizens. As illustrated by the numerous tragic deaths of first responders and ordinary citizens killed by criminals armed with assault weapons (*see supra* at 4-6, 10, 13-15), the arms race among criminals – who, in the absence of the SAFE Act, would enjoy increased access to dangerous weapons – jeopardizes the safety of law enforcement officers, and the public, by turning the streets and other public venues into a shooting gallery.

**3. The SAFE Act is Substantially Related to the Government's Significant Interests.**

Given the real and immediate threats to the safety of the public and law enforcement personnel caused by assault weapons and large capacity ammunition magazines, New York has made the reasonable choice to reduce these threats by prohibiting access to these dangerous instruments of mass mayhem, while preserving access to handguns and other firearms. Since the most effective way to eliminate the danger and destruction caused by assault weapons and large capacity magazines is to prohibit their use, possession, and sale, a substantial relationship clearly exists between the SAFE Act and the government's significant interests.

Contrary to Plaintiffs' assertions, the SAFE Act narrowly restricts only firearms designed for rapid firing and magazines capable of holding high volumes of ammunition. These guns and magazines have been prohibited because of their demonstrated ability to cause a level of damage well beyond anything required for self-defense in the home. *See* Siebel, *supra*, at 14-16.

While the governmental interest in limiting access to assault weapons and large capacity magazines is significant, the SAFE Act places no burden on an individual's ability to possess a firearm for self-defense in the home. The ban covers only a tiny fraction of available firearms,

and those covered were chosen based on New York's determination that they possessed especially dangerous capabilities. As a result, the SAFE Act is a sufficiently narrowly-tailored means of serving vital government interests that is neither overly broad nor arbitrary. *See, e.g., Turner Broad. Sys.*, 512 U.S. at 662; *Heller II*, 670 F.3d at 1262; *Marzzarella*, 614 F.3d at 98. Under intermediate scrutiny, the fit between the government regulation and the asserted interest need not be perfect, nor must the regulation be the least restrictive means of serving the interest. *See, e.g., Turner Broad. Sys.*, 512 U.S. at 662. Instead, the regulation must be substantially related to the governmental interest, and the SAFE Act more than meets this standard.[17]

**CONCLUSION**

For all of the reasons set forth above, this Court should grant Defendants' Cross-Motion for Summary Judgment, deny Plaintiffs' Motion for Preliminary Injunction, and uphold the SAFE Act because it is fully consistent with the Second Amendment.

[17] Although strict scrutiny review should not be applied, the SAFE Act would also satisfy that level of review as a regulation necessary to achieving the State's compelling interests in protecting the safety of the public and members of law enforcement.

Dated: June 28, 2013
Buffalo, New York

Respectfully submitted,

By: s/Terrence M. Connors______
Terrence M. Connors

TERRENCE M. CONNORS
CONNORS &VILARDO, LLP
1000 Liberty Building
Buffalo, New York 14202
Tel: (716) 852-5533

JONATHAN K. BAUM (*PRO HAC VICE)*
ALAN R. FRIEDMAN (*PRO HAC VICE)*
MARK T. CIANI*
KATTEN MUCHIN ROSENMAN LLP
575 Madison Avenue
New York, New York 10022-2585
Tel: (212) 940-8800
www.kattenlaw.com

*Counsel for Amici Curiae Law Center to Prevent Gun Violence, New Yorkers Against Gun Violence, and Moms Demand Action for Gun Sense in America*

**Pro hac vice* application pending

84722817