IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK
Buffalo Division

NEW YORK STATE RIFLE AND PISTOL        )
ASSOCIATION, INC., et al,              )
                                       )
                   Plaintiffs,         )
          v.                           )        Case No.: 1:13-cv-00291-WMS
                                       )
ANDREW M. CUOMO, et al,                )
                                       )
                   Defendants.         )
_____)

**PLAINTIFFS' OMNIBUS MEMORANDUM OF LAW
IN SUPPORT OF PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT,
IN REPLY TO DEFENDANTS' OPPOSITION TO PRELIMINARY INJUNCTION,
AND IN OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

The Plaintiffs, by and through counsel, hereby set forth the following facts, reasons, and

authorities showing why the Defendants' Cross-Motions to Dismiss and/or For Summary Judgment

dated 06/21/13 (Doc. ## 64, 70) should be denied, and why the Plaintiffs' Cross-Motion For

Summary Judgment (Doc. # 113) and Motion for Preliminary Injunction dated 04/15/13 (Doc. #23)

should be granted.

Dated: August 19, 2013                 Respectfully Submitted,

LAW OFFICE OF STEPHEN HALBROOK         GOLDBERG SEGALLA, LLP

By:  /s/   Stephen P. Halbrook         By:   /s/   Brian T. Stapleton
Stephen P. Halbrook, Esq.              Brian T. Stapleton, Esq.
*Pro Hac Vice* (pending)               Matthew S. Lerner. Esq.
3925 Chain Bridge Road, Suite 403      11 Martine Avenue, Suite 750
Fairfax, VA 22030                      White Plains, New York 10606-1934
(703) 352-7276                         (914) 798-5400
protell@aol.com                        bstapleton@goldbergsegalla.com

                                       *Counsel For Plaintiffs*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................................iii

I.   INTRODUCTION.................................................................................1

II.  STATEMENT OF THE FACTS.................................................................2

III. STATEMENT OF THE LAW.....................................................................2

   A.   Motion to Dismiss Standards.............................................................2

   B.   Summary Judgment Standards...........................................................3

   C.   Relevant Law In New York Prior to the SAFE Act.....................................4

IV.  ARGUMENT.......................................................................................7

   I.   PLAINTIFFS STATE VALID SECOND AMENDMENT CLAIMS
        ON WHICH THEY HAVE A CLEAR LIKELIHOOD OF SUCCESS.................7

      A.   *Heller* and *McDonald*..............................................................7

      B.   Post-*Heller* Cases..................................................................10

      C.   The Commonly-Possessed Firearms Banned Here Are Within
           The Scope of the Second Amendment...........................................13

         1.   The Ban Implicates the Second Amendment...........................13

            a.   The Banned Firearms Are Not Unusually Dangerous
                 Military-Style Firearms............................................13

            b.   The Banned Firearms Are In Common Use.....................16

            c.   The Banned Firearms Are Typically Possessed
                 By Law-Abiding Citizens for Lawful Purposes,
                 Including Self-Defense, Target Shooting and Hunting........16

         2.   Standard Magazines and The Seven-Round Load Limit for
              Self-Defense In the Home Implicate the Second Amendment.......19

            a.   Standard Magazines Are Not "Dangerous and
                 Unusual".............................................................19

## TABLE OF CONTENTS
### (continued)

        b.    Standard Magazines Are Typically Used For Lawful Purposes....................................................................21

D.    The Gun Magazine Bans Substantially Burden Second Amendment Rights and Lack a Rational Basis...............................................23

        1.    The Ban On Common Firearms Substantially Burdens The Right and Has No Rational Basis...................................24

        2.    The Bans On Common Magazines and On Having More Than Seven Rounds In A Magazine Substantially Burden The Right and Have No Rational Basis..................................24

E.    The Bans Do Not Survive Heightened Scrutiny...............................27

        1.    As The Right Is Fundamental, Strict Scrutiny Must Be Applied, Not Intermediate Scrutiny or Some Other Interest-Balancing Approach................................................28

        2.    The Substantial-Relation Test of Intermediate Scrutiny Precludes Reliance On Unsupported Legislative Assertions..........30

        3.    The Bans Do Not Satisfy Intermediate Scrutiny.......................31

II.    THE EQUAL PROTECTION CLAIM IS VALID.......................................33

III.    THE ACT IS UNCONSTITUTIONALLY VAGUE...................................36

A.    A Law Permeated With Vagueness is Facially Vague..........................36

B.    The Specific Terms Are Vague....................................................39

        1.    Magazine Capacity Provisions...........................................39

        2.    "Pistol Grip That Protrudes Conspicuously" and "Protruding Grip".........................................................41

        3.    Shotguns That Cannot Hold More Than Five Rounds.................41

        4.    The Unintelligible "And If" Clause.....................................42

GOLDBERG SEGALLA, LLP
11 Martine Ave., 7th Floor
White Plains, NY 10607
(914) 798-5400

**TABLE OF CONTENTS**
(continued)

5. "Threaded Barrel Designed to Accommodate" and "Muzzle Break"..........................................................42

6. "Version"..................................................................43

7. "Manufactured Weight"..............................................44

8. "Commercial Transfer"..............................................44

IV. COUNT IV IS RIPE FOR PRE-ENFORCEMENT REVIEW AND STATES A VALID CLAIM FOR RELIEF....................................45

    A. Count IV Is Justiciable................................................45

    B. Count IV States a Sufficient Claim on the Merits...............................47

V. NEW YORK FAILS TO STATE OTHER GROUNDS FOR DISMISSAL....................................................................49

VI. PLAINTIFFS ARE ENTITLED TO AN INJUNCTION.....................................50

V. CONCLUSION...............................................................50

GOLDBERG SEGALLA, LLP
11 Martine Ave., 7th Floor
White Plains, NY 10607
(914) 798-5400

## **TABLE OF AUTHORITIES**

### **Cases**

Abbott Laboratories v. Gardner, 387 U.S. 136, 149 (1967) ............................................................... 47

Andrews v. State, 50 Tenn. 165, 179 (1871) ................................................................................... 10

Arnold v. City of Cleveland, 616 N.E.2d 163, 172 (Ohio 1993) ....................................................... 13

Arnold's Wines, Inc. v. Boyle, 571 F.3d 185, 191 (2d Cir. 2009), ................................................... 50

Benjamin v. Bailey, 234 Conn. 455, 465-66, 662 A.2d 1226 (Conn. 1995) ..................................... 13

Benjamin v. Bailey, 234 Conn. 455, 662 A.2d 1226, 1237 (1995) ................................................... 35

Brown & Williamson Tobacco Corp. v. Pataki, 320 F.3d 200 (2d Cir. 2003) ................................... 50

Burdick v. Takushi, 504 U.S. 428 (1992) ........................................................................................ 29

Christianson v. Colt Industries Operating Corp., 486 U.S. 800, 804 (1988) ...................................... 8

Cincinnati v. Discovery Network, Inc., 507 U. S. 410, 418 (1993) .................................................. 24

Cincinnati v. Langan, 94 Ohio App.3d 22, 29-30,  640 N.E.2d 200 (1994) ..................................... 14

Citizens for a Safer Community v. Rochester, 164 Misc.2d 822, 826, 627 N.Y.S.2d 193 (1994).... 35

City of Chicago v. Morales, 527 U.S. 41, 55 (1999) ........................................................................ 38

City of Lakewood v. Pillow, 180 Colo. 20, 501 P.2d 744, 745 (1972) ............................................. 13

Clark v. Jeter, 486 U.S. 456, 461 (1988) ........................................................................................ 28

Coalition of New Jersey Sportsmen, Inc. v. Whitman, 44 F. Supp. 2d 666, 686 (1999) ................. 37

Craig v. Boren, 429 U.S. 190, 195 (1976) ....................................................................................... 51

Descamps v. United States, 133 S.Ct. 2276, 2292 (2013) .............................................................. 40

GOLDBERG SEGALLA, LLP
11 Martine Ave., 7ᵗʰ Floor
White Plains, NY 10607
(914) 798-5400

## TABLE OF AUTHORITIES
### (continued)

District of Columbia v. Heller, 554 U.S. 570, 624-25 (2008)........................................2, 9

Ezell v. City of Chicago, 651 F.3d 684, 704 (7th Cir. 2011) ............................................. 36

Granholm v. Heald, 544 U.S. 460, 466 (2005)................................................................... 49

Gun Owners' Action League, Inc. v. Swift, 284 F.3d 198, 212 (1st Cir. 2002) ................ 37

Gun South, Inc. v. Brady, 877 F.2d 858, 866 (11th Cir. 1989) ........................................... 4

Harrold v. Collier, 107 Ohio St.3d 44, 836 N.E.2d 1165 (2005) ...................................... 14

Heller v. District of Columbia,
670 F.3d 1244 (D.C. Cir. 2011), aff'g, 698 F. Supp.2d 179 (D. D.C. 2010) ................... 11

Hetherton v. Sears, Roebuck & Co., 652 F.2d 1152, 1157-58 (3rd Cir. 1981) ................. 36

Hightower v. City of Boston, 693 F.3d 61, 66, 71 & n.7 (1st Cir. 2012)........................... 20

Hutchinson  v.  Rosetti , 24 Misc. 949, 951, 205 N.Y.S.2d 526 (1960)............................. 10

Kachalsky v. County of Westchester, 701 F.3d 81 (2nd Cir. 2012) ................................... 29

Kasler v. Lockyer, 23 Cal.4th 472, 479, 2 P.3d 581, 584 (2000) ...................................... 35

Kasler v. Lockyer, 23 Cal.4th 472, 507-08, 2 P.3d 581 (2000)......................................... 26

Kolender v. Lawson, 461 U.S. 352, 357-58 (1983)............................................................ 43

Landmark Communications, Inc. v. Virginia, 435 U.S. 829, 843 (1978) .......................... 13

Los Angeles v. Alameda Books, Inc., 535 U.S. 425, 438-39 (2002) ................................. 32

McDonald v. City of Chicago, 130 S.Ct. 3020, 3036 (2010)............................................. 28

Mont. Shooting Sports Ass'n v. Holder,  No. CV-09-147, 2010 WL 3926029
 (D. Mont. Aug. 31, 2010) ................................................................................................. 51

GOLDBERG SEGALLA, LLP
11 Martine Ave., 7th Floor
White Plains, NY 10607
(914) 798-5400

**TABLE OF AUTHORITIES**
(continued)

Moore v. Gallup, 267 A.D. 64, 68, 45 N.Y.S.2d 63 (3d Dept. 1943),
aff'd., 293 N.Y. 846, 59 N.E.2d 439 (1944).................................................................. 10

Nnebe v. Daus, 644 F.3d 147, 156 (2d Cir. 2011)......................................................... 50

Nordyke v. King, 681 F.3d 1041, 1043 n.2 (9th Cir. 2012) .......................................... 37

Oltra, Inc. v. Pataki, 273 F. Supp. 2d 265 (W.D. N.Y. 2003) ..................................... 50

O'Neill v. State, 16 Ala. 65, 67 (1849)........................................................................... 7

Olympic Arms v. Buckles, 301 F.3d 384, 389 (6th Cir. Mich. 2002)........................... 26

Panetti v. Quarterman, 551 U.S. 930, 957 (2007) ....................................................... 37

Parker v. District of Columbia, 478 F.3d 370, 398 (D.C. Cir. 2007) .......................... 10

People v. Alexander, 189 A.D.2d 189, 193, 595 N.Y.S.2d 279 (4th Dept. 1993) ........... 1

People v. Digaetano, 188 Misc.2d 771, 729 N.Y.S.2d 614 (2001) .............................. 39

People v. James, 174 Cal. App.4th 662, 94 Cal. Rptr.3d 576, 585 (2009).................... 10

People v. Raso, 9 Misc.2d 739, 742, 170 N.Y.S.2d 245 (Cnty. Ct. 1958) ................... 10

People v. Wood, 58 A.D.3d 242 (1st Dep't 2008) ........................................................ 39

Peoples Rights Organization, Inc. v. City of Columbus, 152 F.3d 522, 532 (6th Cir. 1998)............. 35

Peoples Rights Organization, Inc. v. City of Columbus, 152 F.3d 522, 538 (6th Cir. 1998),
aff'g in part & rev'g in part, 925 F. Supp. 1254, 1269 (S.D. Ohio 1996) ........................ 40

Rabbitt v. Leonard, 36 Conn. Supp. 108, 413 A.2d 489, 491 (Supr. Ct. 1979) ............... 13

Republican Party of Minnesota v. White, 536 U.S. 765, 774-75 (2002).......................... 28

Richmond Boro Gun Club, 97 F.3d at 684 .................................................................... 39

Rinzler v. Carson, 262 So. 2d 661, 666 (Fla. 1972) ...................................................... 9

GOLDBERG SEGALLA, LLP
11 Martine Ave., 7th Floor
White Plains, NY 10607
(914) 798-5400

**TABLE OF AUTHORITIES**
(continued)

Riss v. City of New York, 22 N.Y.2d 579, 581, 240 N.E.2d 860 (1968)..........................................22

Robertson v. Denver, 874 P.2d 325, 328 (Colo. 1994) ....................................................13

Robertson v. Denver, 874 P.2d 325, 334-35 (Colo. 1994) ....................................................45

Sable Commcns. of Cal., Inc. v. FCC, 492 U.S. 115, 129 (1989)......................................31

San Antonio Independent School District v. Rodriguez, 411 U.S. 1, 17, 33 (1973).........................28

Springfield Armory, Inc. v. City of Columbus, 29 F.3d 250 (6th Cir. 1994)....................................45

Staples v. United States, 511 U.S. 600, 603 (1994)..........................................................8

State Ammunition Inc. v. Lindley, No. 2:10–cv–01864,
2010 WL 4983286, *1 (E.D. Cal. Dec. 2, 2010) ....................................................48

State v. Kerner,181 N.C. 574, 107 S.E. 222, 224 (1921) ....................................................10

Stenberg v. Carhart, 530 U.S. 914, 1001 n.16 (2000) ....................................................1

Thomas v. City of New York, 143 F.3d 31, 34 (2d Cir. 1998) ....................................................47

Turner Broadcasting System, Inc. v. FCC, 520 U.S. 180, 189 (1997) ....................................31

TVA v. Hill, 437 U.S. 153, 173 n.18 (1978) ....................................................2

United States v. Aguilar-Espinosa, 57 F. Supp.2d 1359, 1362 (M.D. Fla. 1999) ....................................41

United States v. Carolene Products Co., 304 U.S. 144, 152 (1938) ....................................................1

United States v. Carter, 465 F.3d 658, 663-64 (6th Cir. 2006) ....................................................40

United States v. Chafin, 423 F. App'x 342, 344 (4th Cir. 2011)....................................................51

United States v. Chester, 628 F.3d 673, 682-83 (4th Cir. 2010) ....................................................30

GOLDBERG SEGALLA, LLP
11 Martine Ave., 7th Floor
White Plains, NY 10607
(914) 798-5400

**TABLE OF AUTHORITIES**
(continued)

United States v. Conrad, No. 1:11CR00042, 2013 WL 546373 (W.D. Va. Feb. 13, 2013)............. 51

United States v. Decastro, 682 F.3d 160, 168-69 (2d Cir. 2012) ...................................... 24

United States v. Drasen, 845 F.2d 731, 733 (7th Cir. 1988) ............................................ 40

United States v. Emerson, 270 F.3d 203, 216, 227 n.22 (5th Cir. 2001)............................... 7

United States v. Farhane, 634 F.3d 127, 139 (2d Cir. 2011) .......................................... 38

United States v. Huet, No. 08-0215, 2010 U.S. Dist. LEXIS 123597, at *13, *30
(W.D. Pa. Nov. 22, 2010), rev'd on other grounds, 665 F.3d 588, 597 n.7 (3d Cir. 2012),
cert. denied, 133 S. Ct. 422 (2012) ..................................................................... 16

United States v. Huff, 512 F.2d 66, 69 (5th Cir. 1975) ................................................. 44

United States v. Marzzarella, 614 F.3d 85, 92 n.8 (3rd Cir. 2010).................................25, 51

United States v. Miller, 307 U.S. 174, 178 (1939) ...................................................... 7

United States v. M-K Specialties Model M-14 Machinegun,
424 F. Supp.2d 862, 872 (N.D. W.Va. 2006) ............................................................ 41

United States v. Rybicki, 354 F.3d 124, 131 (2d Cir.2003) ............................................ 37

United States v. Salerno, 481 U.S. 739, 745 (1987) .................................................... 37

United States v. Skoien, 614 F.3d 638, 641-42 (7th Cir. 2010) ...................................... 30

United States v. Thompson/Center Arms Co., 924 F.2d 1041, 1948-49 (Fed. Cir. 1991),
aff'd, 504 U.S. 505 (1992)............................................................................... 41

United States v. Zaleski, 489 Fed. Appx. 474, 475 (2nd Cir. 2012)................................... 10

Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.,
454 U.S. 464, 484 (1982)................................................................................ 29

Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 494-95 (1982)......... 37

GOLDBERG SEGALLA, LLP
11 Martine Ave., 7th Floor
White Plains, NY 10607
(914) 798-5400

viii

## TABLE OF AUTHORITIES
### (continued)

Welsh v. United States, 398 U.S. 333, 354 (1970)................................................................ 1

Wilson v. Cnty. of Cook, 943 N.E.2d 768, 775-77 (Ill. App. Ct. 2011),
aff'd in part & rev'd in part, 968 N.E.2d 641 (Ill. 2012)..................................................... 30

Wilson v. County of Cook, 968 N.E.2d 641 (Ill. 2012) ....................................................... 12

**Statutes**

18 U.S.C. § 921(a)(30)(B) .................................................................................................... 32

18 U.S.C. § 922(t)................................................................................................................. 17

18 U.S.C. § 922(v)(2) ........................................................................................................... 32

26 U.S.C. § 5845(b)............................................................................................................... 17

36 U.S.C. § 40722(1) & (2) .................................................................................................. 19

42 U.S.C. § 1983.................................................................................................................... 50

Penal Law § 265.00(3)........................................................................................................... 15

Penal Law § 265.02 ............................................................................................................... 39

Penal Law § 265.20(7) through (7-c) .................................................................................... 19

Penal Law § 265.20(a)(7-f).................................................................................................... 34

Penal Law § 400.03(1)........................................................................................................... 47

**Other Authorities**

Bureau of Justice Statistics, Firearm Violence, 1993-2011, at 1 (May 2013)....................... 4

GOLDBERG SEGALLA, LLP
11 Martine Ave., 7th Floor
White Plains, NY 10607
(914) 798-5400

# TABLE OF AUTHORITIES
## (continued)

### Treatises

"The Right to Defensive Arms after District Of Columbia v. Heller," 111 W. Va. L. Rev. 349, 388
   (Winter 2009).................................................................................................................. 19

Harold E. Johnson, Small Arms Identification & Operation Guide – Eurasian Communist Countries
   (Defense Intelligence Agency 1980), p. 105 ................................................................. 1

### Constitutional Provisions

U.S. Const., Art. I, § 8, cl. 3 ............................................................................................... 48

## I.    **INTRODUCTION**

This is a classic case of "an Alice-in-Wonderland world where words have no meaning."

*Welsh v. United States*, 398 U.S. 333, 354 (1970) (Harlan, J., concurring). New York's fundamental

premise in defense of the SAFE Act is that any firearm it wishes to ban loses Second Amendment

protection as long as it is demeaned as an "assault weapon."  The term "assault weapon" normally

means a weapon used in an assault.[1]  But now it has become "a political term, developed by anti-gun

publicists" to ban firearms "on the basis of undefined 'evil' appearance."  *Stenberg v. Carhart*, 530

U.S. 914, 1001 n.16 (2000) (Thomas, J., dissenting) (citation omitted).

In 1994, Congress passed a law defining "assault weapon" to include a short list of named

firearms as well as certain firearms with two specified generic characteristics.[3]  Magazines holding

more than ten rounds were similarly grandfathered.  New York passed a nearly-identical law in

2000.  But with the passage of the SAFE Act in 2013, virtually overnight countless numbers of

ordinary firearms were declared to be "assault weapons" based on a single generic characteristic,

and, having been so labeled, are argued to have lost their Second Amendment protection.  Yet

nothing about these arms changed, other than how the term "assault weapon" was used.[4]

---

[1] See *People v. Alexander*, 189 A.D.2d 189, 193, 595 N.Y.S.2d 279 (4th Dept. 1993) ("a tire iron that was believed to be the assault weapon").
[3] Chapter XI, Subchapter A of the Violent Crime Control and Law Enforcement Act of 1994, P.L. 103-322, 108 Stat. 796 (1994), codified at 18 U.S.C. §§ 921(a)(30), 922(v) (expired 2004).
[4] As *TVA v. Hill*, 437 U.S. 153, 173 n.18 (1978) states:

This recalls Lewis Carroll's classic advice on the construction of language:
"When *I* use a word," Humpty Dumpty said, in rather a scornful tone, "it means just what *I* choose it to mean—neither more nor less." *Through the Looking Glass*, in *The Complete Works of Lewis Carroll* 196 (1939).

GOLDBERG SEGALLA, LLP
11 Martine Ave., 7th Floor
White Plains, NY 10607
(914) 798-5400

The test for Second Amendment protection is not based on what a legislature may call various arms, but on whether they are "in common use" and "typically possessed by law-abiding citizens for lawful purposes . . . ." *District of Columbia v. Heller*, 554 U.S. 570, 624-25 (2008).

There is no question of fact that the firearms and magazines banned by the SAFE Act are in common use by plaintiffs and millions of law-abiding citizens for self-defense, sport, and hunting. It is equally beyond dispute that SAFE Act violates the Equal Protection Clause and is unconstitutionally vague. For these reasons, the Defendants' Motion to Dismiss should be denied, summary judgment should be granted to the plaintiffs, the Court should issue declaratory judgment that the SAFE Act is unconstitutional, and a permanent injunction should issue.

## II.   STATEMENT OF THE FACTS

The relevant facts of this matter are contained in Plaintiffs' Counter-Statement of Undisputed Material Facts, as well as Plaintiffs' Response to the State Defendants' Statement of Undisputed Material Facts, that accompany this Memorandum, and in the affidavits and exhibits attached thereto.

## III.   STATEMENT OF THE LAW

### A.   Motion To Dismiss Standards

Fed.R.Civ.P. 12(b)(6) provides for dismissal of a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). *Mayo v. Conway*, 2013 U.S. Dist. LEXIS 116450, 7-10 (W.D.N.Y. Aug. 16, 2013). When determining whether a complaint states a claim, the court must construe the complaint liberally, accept all factual allegations as true, and draw all reasonable inferences in the plaintiff's favor. *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007); *Goldstein v. Pataki*, 516 F.3d 50, 56 (2d Cir. 2008). However, when presented

with a 12(b)(6) motion, the district court may not consider matters outside of the pleadings without converting the motion into a motion for summary judgment. *Friedl v. City of New York*, 210 F.3d 79, 83-84 (2d Cir. 2000).

### B.    Summary Judgment Standards

Summary judgment is only warranted upon a showing "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The burden is on the moving party to establish the absence of any material factual issues. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986). In determining whether there are genuine issues of material fact, the Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Stern v. Trustees of Columbia Univ. in City of New York*, 131 F.3d 305, 312 (2d Cir. 1997).

The Second Circuit will affirm the grant of summary judgment where the movant establishes a set of facts in support of his claim, which would entitle him to relief. *Legnani v. Alitalia Linee Aeree Italiane*, S.P.A., 274 F.3d 683, 685 (2d Cir. 2001). In the normal course, the trial court's responsibility is "limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue resolution." *B.F. Goodrich v. Betoski*, 99 F.3d 505, 522 (2d Cir. 1996) (quoting *Gallo v. Prudential Servs.*, L.P., 22 F.3d 1219, 1224 (2d Cir. 1994)). ). But here, the facts in dispute (to the extent any are material) are legislative facts, that is, facts that pertain to broader questions of public policy, and resolution of such facts is appropriate at the summary stage since any findings will be subject to de novo review on appeal. *See, e.g., Indiana Harbor Belt R. Co. v. Am. Cyanamid*

GOLDBERG SEGALLA, LLP
11 Martine Ave., 7th Floor
White Plains, NY 10607
(914) 798-5400

3

*Co.*, 916 F.2d 1174, 1182 (7th Cir. 1990); *see also Prentis v. Atlantic Coast Line Co.*, 211 U.S. 210, 227 (1908) (Holmes, J.).

**C.     Relevant Law in New York Prior to the SAFE Act**

New York suggests that restrictions on "assault weapons" and magazines are long-standing. Mem. 3.[5] They are not. The 1994 federal law defined that term very narrowly compared to the SAFE Act, and it grandfathered the affected guns and magazines. It supposedly restricted "military-style" features, Mem. 4, but that term has no meaningful application here. The only firearms restricted were semiautomatics, but military forces worldwide issue full automatic machine guns to their troops.[6] One could just as well say that having a barrel on a rifle is "military-style," as it is found on every military rifle, and it is far more significant than, e.g., the shape of a grip or stock.

As New York notes, the federal law defined an "assault weapon" as having two specified generic features. Mem. 5. A gun with "one military-style feature" did not meet the definition, and thus "many manufacturers were able to evade the law" by producing guns without that feature. Mem. 5. It is curious that compliance with the law was supposedly "evasion" thereof. Congress did not see fit to reenact the law when it expired in 2004. Had it done so, it would have no difference in the rate of gun crime: the federal assault weapons ban has produced no discernible reduction in the lethality and injuriousness of gun violence. *See e.g.,* Christopher Koper, Daniel Woods and Jeffrey Roth, *An Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets and Gun Violence, 1994-2003* (June 2004) ("Koper 2004") at 96. *See also* Christopher Koper and

---

[5] "Mem." herein refers to Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion for a Preliminary Injunction and in Support of State Defendants' Cross-motion to Dismiss and/or for Summary Judgment.

[6] "[T]he guns subject to this law are not military weapons, but merely look like military weapons, since they are identical in action to sporting guns and are not capable of full automatic fire." *Citizens for a Safer Community v. Rochester,* 164 Misc.2d 822, 826, 627 N.Y.S.2d 193 (1994).

GOLDBERG SEGALLA, LLP
11 Martine Ave., 7th Floor
White Plains, NY 10607
(914) 798-5400

4

Jeffrey Roth, *Impact Evaluation of the Public Safety and Recreational Firearms Use Protection Act of 1994 – Final Report* (March 1997) ("Koper 2007"); NATIONAL RESEARCH COUNCIL, FIREARMS AND VIOLENCE: A CRITICAL REVIEW 97 (Charles F. Wellford *et al.* eds., 2005); Centers for Disease Control, *Recommendations To Reduce Violence Through Early Childhood Home Visitation, Therapeutic Foster Care, and Firearms Laws*, 28 AM. J. PREV. MED. 6, 7 (2005); Robert A. Hahn *et al.*, *Firearms Laws and the Reduction of Violence: A Systematic Review*, 28 AM. J. PREV. MED. 40, 49 (2005).

Nor is there any need to renew the Ban: the homicide rate began falling two years before the enactment of the federal assault weapons ban, and the rates of gun homicide and other violent gun crimes are "strikingly lower" now than during their peak in the mid-1990s. *See* Pew Research Center, *Gun Homicide Rate Down 49% Since 1993 Peak; Public Unaware* (May 2013) ("Pew Report"), at 1. Pew Report at 1. *See also* U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Statistics, *Special Report – Firearm Violence, 1993-2011* (May 2013) ("BJS Report") at 1. The federal ban's lack of effect, and the strikingly low gun crime rates show that, in reality, there is no need for the SAFE Act's draconian restrictions.

Moreover, while the banned "assault weapons" are mostly rifles, they are used in disproportionately fewer crimes: approximately 90% of all non-fatal firearm crimes in the U.S. between 1993 and 2011 were committed with a handgun. BJS Report at 1, 3. Approximately 80% of all gun homicides in the U.S. between 1991 and 2001 were committed with a handgun. *See* U.S. Department of Justice, Federal Bureau of Investigation, *Crime in the United States – Uniform Crime Report* ("FBI UCRs"), 1995 to 2011. *See also* BJS Report at 1, 3. In contrast, only 6% of the gun homicides committed between 1991 and 2001 involved a shotgun, and even less (4.6%) involved a

rifle. FBI UCRs, 1995 to 2011.  In New York, 73% of the gun homicides between 1995 and 2010

were committed with a handgun.  *Id.*  Only 4% of these involved a shotgun, and a mere 3% involved

a rifle.  *Id.*  The remainder of the firearms could not be identified.  *Id.*

New York points out that, in 1989, the Bureau of Alcohol, Tobacco, Firearms and Explosives

(ATF) decided that it no longer considered certain firearms to be "particularly suitable for or readily

adaptable to sporting purposes" as required for import.  Mem. 6, citing 18 U.S.C. § 925(d)(3).  Left

unsaid is that ATF did consider such firearms to meet the sporting criteria since it was enacted in the

Gun Control Act of 1968.[8]  Yet the Second Amendment is not confined to firearms that a

government agency deems sporting, but extends to firearms "of the kind in common use," and

"popular weapon[s] chosen by Americans for self-defense."  *Heller*, 554 U.S. at 624, 629.

New York cites recent ATF studies, Mem. 7 n.5, but they do not support the Act here.  ATF

has decided that semiautomatic shotguns with detachable box magazines,[9] thumbhole stocks, and

pistol grips[10] are indeed sporting.  See N.Y. Ex. 10, at 10, 12, & attached Ex. 1 (pictures).  It has also

decided about the forward pistol grip:

> [T]here is a convincing argument that this feature is generally recognized as
> particularly suitable for or readily adaptable to sporting purposes because it permits
> accuracy and maneuverability even for activities such as bird hunting or skeet
> shooting. The forward pistol grip permits a shooter to grip a shotgun at a more natural
> angle in that the shooter is not required to rotate the forward hand and cradle the
> firearm during firing. This ergonomic design provides for added comfort and more
> accurate engagement of fast-moving targets.

---

[8] ATF's 1989 change in policy was challenged, but no final decision on the merits was rendered.  *Gun South, Inc. v.
Brady*, 877 F.2d 858, 866 (11th Cir. 1989) (review limited to 90-day suspension of permits), *rev'g* 711 F. Supp. 1054
(N.D. Ala. 1989).  The district court found that the reinterpretation was sparked by politics rather than by ATF's experts,
who testified that the rifles at issue continued to be sporting.  711 F. Supp. at 1056-60.

[9] "The majority of shotguns on the market today contain an integral 'tube' magazine. However, certain shotguns utilize
removable box magazine like those commonly used for rifles.  In regard to sporting purposes, the working group found
no appreciable difference between integral tube magazines and removable box magazines." N.Y. Ex. 10, at 10.

[10] "[P]istol grips for the trigger hand are prevalent on shotguns and are therefore generally recognized as particularly
suitable for sporting purposes."  N.Y. Ex. 10, at 12.

GOLDBERG SEGALLA, LLP
11 Martine Ave., 7th Floor
White Plains, NY 10607
(914) 798-5400

N.Y. Ex. 19, at 3.[11]

The following are shotgun features that ATF considers sporting[12] but which Penal Law § 265.00(22)(b) bans as "assault weapon" features:

> a semiautomatic shotgun that has at least one of the following characteristics:
> (ii) a thumbhole stock;
> (iii) a second handgrip or a protruding grip that can be held by the non-trigger hand;
> (v) an ability to accept a detachable magazine . . . .

In 2000, New York enacted a law with similar provisions to the 1994 federal law.  The SAFE Act made radical changes to that law by encompassing countless more firearms into its restrictions. New York avers: "In order to further strengthen New York's large-capacity magazine ban -- and, as one of the legislative sponsors put it, further 'limit the amount of people [a perpetrator] could unlawfully kill' -- the SAFE Act also limits to seven the number of rounds of ammunition that a New Yorker may load into a magazine." Mem. 11 (citations omitted).  It cannot be seriously believed that a person who violates the laws against murder would obey a law limiting the rounds in a magazine to seven.

## IV.  **ARGUMENT**

### I.    **PLAINTIFFS STATE VALID SECOND AMENDMENT CLAIMS ON WHICH THEY HAVE A CLEAR LIKELIHOOD OF SUCCESS**

#### A.    *Heller* and *McDonald*

New York fundamentally misunderstands the Supreme Court decisions in *Heller* and *McDonald*. Mem. 17-19.  The guarantee of the Second Amendment simply does not allow a state to ban commonly-possessed firearms based on arbitrarily-defined features such as how they are held and the capacity of their magazines.

---

[11] "Several commenters argued that . . . the features allowed disabled sporting enthusiasts to use shotguns. Principally, the commenters noted that forward pistol grips are an essential feature for this group of sporting enthusiasts." *Id.* at 1.
[12] See N.Y. Ex. 19, at 4 (list of non-sporting features).

GOLDBERG SEGALLA, LLP
11 Martine Ave., 7th Floor
White Plains, NY 10607
(914) 798-5400

"[T]he Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Heller*, 554 U.S. at 582.

Indeed, the Second Amendment declares that the right to keep and bear arms promotes "a well regulated militia." That is why it protects "ordinary military equipment" if it is the type "supplied by [militiamen] themselves and of the kind in common use at the time." *Heller*, 554 U.S. at 624. At the founding, "weapons used by militiamen and weapons used in defense of person and home were one and the same." *Id.* at 625. Other than that, Heller refers to longstanding restrictions, but none involve a prohibition on firearm possession by law-abiding persons. *Id.* at 626-27.

New York avers: "*Heller* makes clear that weapons 'most useful in military service' may be banned, even if that would leave citizens with access only to 'small arms.'" Mem. 18, quoting *Heller* at 627-28. But that deletes the critical part of the quotation, which more fully states:

> It may be objected that if weapons that are most useful in military service – M-16 rifles and the like – may be banned, then the Second Amendment right is completely detached from the prefatory clause. But as we have said, the conception of the militia at the time of the Second Amendment's ratification was the body of all citizens capable of military service, who would bring the sorts of lawful weapons that they possessed at home to militia duty. It may well be true today that a militia, to be as effective as militias in the 18th century, would require sophisticated arms that are highly unusual in society at large. Indeed, it may be true that no amount of small arms could be useful against modern-day bombers and tanks.

Id. at 627.

Thus, *Heller* was referring to "M-16 rifles and the like," which are fully automatic machine guns. But Heller does not suggest that any "military" feature disqualifies a firearm from Second Amendment protection – the original militia would "bring the sorts of lawful weapons that they possessed at home to militia duty." *Id.* at 627.

Accordingly, *Heller* held: "The handgun ban amounts to a prohibition of an entire class of 'arms' that is overwhelmingly chosen by American society for that lawful purpose [self-defense]." Id. at 628. "It is no answer to say . . . that it is permissible to ban the possession of handguns so long as the possession of other firearms (i.e., long guns) is allowed." *Id.* at 629. The same reasoning applies here.

Well before *Heller*, the Supreme Court noted the fundamental difference between common semiautomatic rifles discharging one bullet per trigger pull and machine guns: "The AR-15 is the civilian version of the military's M-16 rifle, and is . . . a semiautomatic weapon. The M-16, in contrast, is a selective fire rifle that allows the operator, by rotating a selector switch, to choose semiautomatic or automatic fire*." Staples v. United States*, 511 U.S. 600, 603 (1994).[16] Acknowledging "a long tradition of widespread lawful gun ownership by private individuals in this country," *Staples* noted: "Even dangerous items can, in some cases, be so commonplace and generally available that we would not consider them to alert individuals to the likelihood of strict regulation. . . . [D]espite their potential for harm, guns generally can be owned in perfect innocence. " *Id.* at 610-11. Contrasting ordinary firearms, such as the AR-15 rifle involved in that case, with "machineguns, sawed-off shotguns, and artillery pieces," the Court noted that "guns falling outside those [latter] categories traditionally have been widely accepted as lawful possessions . . . ." *Id.* at 612.

New York's reading of the Second Amendment here as being devoid of any real protection parallels arguments it made in support of the District of Columbia in *Heller*. The Brief for New York *et al*. by then Attorney General Andrew M. Cuomo argued that "the Second Amendment has

---

[16] *See Christianson v. Colt Industries Operating Corp.*, 486 U.S. 800, 804 (1988) (describing the M-16 selective fire rifle as the "standard assault rifle").

GOLDBERG SEGALLA, LLP
11 Martine Ave., 7th Floor
White Plains, NY 10607
(914) 798-5400

no application to state laws." *District of Columbia v. Heller*, 2008 WL 157197, *1 (Brief of Amici

Curiae 2008).  It analyzed the Second Amendment as nothing more than a provision to protect "state

sovereignty over militias," *id.* at *4, which did not "explicitly guarantee an individual right to own a

gun . . . ." *Id.* at *9.  Since *Heller* and *McDonald* rejected those arguments, New York's fall-back

position is that it can ban any firearm it wishes by arguing that it is outside the scope of the Second

Amendment.

As noted, *Heller* drew the line between common handguns and long guns, which fire only

one shot per trigger pull, and fully automatic machine guns. Semiautomatic rifles, pistols, and

shotguns "are commonly kept and used by law-abiding people for hunting purposes or for the

protection of their persons and property . . . ." *Rinzler v. Carson*, 262 So. 2d 661, 666 (Fla. 1972).

Rifles in particular have been long held to be protected by the Second Amendment,[17] including in

New York precedents.[18]

### B.    Post-*Heller* Cases

As New York notes, the Second Circuit has repeated *Heller*'s holding that "the Second

Amendment does not protect weapons not typically possessed by law-abiding citizens for lawful

purposes." Mem. at 19-20, citing *United States v. Zaleski*, 489 Fed. Appx. 474, 475 (2nd Cir. 2012).

New York neglected to mention the holding in *Zaleski* that "the Second Amendment does not protect

---

[17] *State v. Kerner*, 181 N.C. 574, 107 S.E. 222, 224 (1921) (protected arms include "the rifle, the musket, the shotgun, and the pistol"); *Andrews v. State*, 50 Tenn. 165, 179 (1871) ("the rifle of all descriptions, the shotgun, the musket, and repeater, are such [protected] arms").

[18] *People v. Raso*, 9 Misc.2d 739, 742, 170 N.Y.S.2d 245 (Cnty. Ct. 1958) ([the Legislature] carefully avoided including rifles [for restrictions] because of the Federal constitutional provision"); *Hutchinson v. Rosetti*, 24 Misc. 949, 951, 205 N.Y.S.2d 526 (1960) (rifle used for defense against a prejudiced mob must be returned based on "the constitutional guarantee of the right of the individual to bear arms.  Amendments Art. II."); *Moore v. Gallup*, 267 A.D. 64, 68, 45 N.Y.S.2d 63 (3d Dept. 1943), *aff'd.*, 293 N.Y. 846, 59 N.E.2d 439 (1944) ("the arms to which the Second Amendment refers include weapons of warfare to be used by the militia, such as swords, guns, rifles and muskets").

GOLDBERG SEGALLA, LLP
11 Martine Ave., 7th Floor
White Plains, NY 10607
(914) 798-5400

*Zaleski's* personal possession of machine guns." Again, that is the type of firearm *Heller* said is

outside the scope of the Second Amendment, not the type of firearms involved here.

New York relies on *People v. James*, 174 Cal. App.4th 662, 94 Cal. Rptr.3d 576, 585 (2009)

(Mem. 23), which asserted that the Second Amendment "does not protect the right to possess assault

weapons . . . ." It relied solely on legislative statements that some of the banned guns had been used

in crime, something that could be said for any type of firearm. It concluded: "These are not the

types of weapons that are typically possessed by law-abiding citizens for lawful purposes such as

sport hunting or self-defense . . . ." *Id.* at 586. The court offered no actual evidence whatever for

that proposition.

New York relies, wrongly, on the majority opinion in *Heller v. District of Columbia*, 670

F.3d 1244 (D.C. Cir. 2011), *aff'g*, 698 F. Supp.2d 179 (D. D.C. 2010) ("*Heller II*"). Mem. 21-23.

New York was wrong to rely on the district court opinion, because it held that the Second

Amendment does not recognize a "fundamental right," and thus applied intermediate scrutiny, 698 F.

Supp.2d at 187, and it "defer[ed] to the Council's findings," *id.* at 194. *Heller* said the right is

fundamental, rejected Justice Breyer's "interest-balancing" approach which amounts to intermediate

scrutiny, and invalidated the ban categorically without any reference to the Council's findings.

*Heller*, 554 U.S. at 593-94, 634-35.

*McDonald* held the Second Amendment right to be "fundamental" and disregarded

legislative findings. *McDonald*, 130 S.Ct. at 3036-37, 3042-46. Yet the *Heller II* majority relied on

the Council's findings and applied intermediate scrutiny to uphold the District's ban on firearms it

calls "assault weapons" and magazines holding over ten rounds. 670 F.3d at 1261. It did so despite

its following acknowledgment that should have resolved the case based on the *Heller* test:

> We think it clear enough in the record that semi-automatic rifles and magazines holding more than ten rounds are indeed in "common use," as the plaintiffs contend. Approximately 1.6 million AR-15s alone have been manufactured since 1986 . . . . As for magazines, fully 18 percent of all firearms owned by civilians in 1994 were equipped with magazines holding more than ten rounds . . . .

*Id.* at 1261.

Based on the same evidence, Judge Kavanaugh noted in dissent that "[t]he AR–15 is the most popular semi-automatic rifle," and that "[s]emi-automatic rifles are commonly used for self-defense in the home, hunting, target shooting, and competitions." *Id.* at 1287-88 (Kavanaugh, J., dissenting). Judge Kavanaugh would have invalidated the District's prohibition based on any of the familiar tests: "Whether we apply the *Heller* history- and tradition-based approach or strict scrutiny or even intermediate scrutiny, D.C.'s ban on semi-automatic rifles fails to pass constitutional muster." *Id.* at 1285.

New York cites, but neglects to acknowledge the basis of, the decision in *Wilson v. County of Cook*, 968 N.E.2d 641 (Ill. 2012). Mem. 23 n.21. The Illinois Supreme Court in *Wilson* held that it could not say "at this early stage of the litigation that assault weapons as defined in this Ordinance categorically fall outside the scope of the rights protected by the second amendment." *Id.* at 655.

As to the suspect legislative declaration that the banned guns were "military" weapons and were most likely to be used in crime (*see id.* at 656), the court stated that "a legislative declaration does not preclude inquiry by the judiciary into the facts bearing on an issue of constitutional law." *Id.* at 657, citing *Landmark Communications, Inc. v. Virginia*, 435 U.S. 829, 843 (1978).

New York next cites pre-*Heller* state court decisions upholding gun and magazine bans under state arms guarantees. Mem. 24. But these decisions do not meet the standard of review required for the Second Amendment by *Heller* and *McDonald*, not to mention that they conflict with prior

GOLDBERG SEGALLA, LLP
11 Martine Ave., 7th Floor
White Plains, NY 10607
(914) 798-5400

12

decisions in those same states.  *E.g.*, *Benjamin v. Bailey*, 234 Conn. 455, 465-66, 662 A.2d 1226 (Conn. 1995) (adopting "reasonable regulation" test and holding that if "some types of weapons" are available, "the state may proscribe the possession of other weapons");[20] *Robertson v. Denver*, 874 P.2d 325, 328 (Colo. 1994) ("this case does not require us to determine whether that right is fundamental");[21] *Arnold v. City of Cleveland*, 616 N.E.2d 163, 172 (Ohio 1993) ("reasonableness test" applies to the "fundamental right" to have arms);[22] *Cincinnati v. Langan*, 94 Ohio App.3d 22, 29-30,  640 N.E.2d 200 (1994) (despite "evidence that the weapons had a legitimate use for target-shooting competition and defensive purposes," ban upheld).

In sum, New York has cited nothing to overcome the *Heller* test that the Second Amendment protects possession of firearms that are commonly possessed by law-abiding persons for lawful purposes.  This is an objective standard that cannot be negated by mere use of a pejorative term.

### C. The Commonly-Possessed Firearms Banned Here Are Within the Scope of the Second Amendment

#### 1. The Ban Implicates the Second Amendment

New York asserts that the banned firearms "are 'dangerous and unusual' military-style weapons," Mem. 25, even though they are very usual and common among civilians.

##### a. The Banned Firearms are not Unusually Dangerous Military-Style Firearms"

Rhetoric aside, the actual features New York specifies to be so unusual and dangerous are quite ordinary.  First is the claim that they "fire almost as rapidly as automatics."  Mem. 26 (citation

---

[20] *But see Rabbitt v. Leonard*, 36 Conn. Supp. 108, 413 A.2d 489, 491 (Supr. Ct. 1979) ("a Connecticut citizen, under the language of the Connecticut constitution, has a fundamental right to bear arms").
[21] *But see City of Lakewood v. Pillow*, 180 Colo. 20, 501 P.2d 744, 745 (1972) (gun ban void because governmental "purpose cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved").
[22] *But see Harrold v. Collier*, 107 Ohio St.3d 44, 836 N.E.2d 1165 (2005) (strict scrutiny applies to fundamental rights).

GOLDBERG SEGALLA, LLP
11 Martine Ave., 7th Floor
White Plains, NY 10607
(914) 798-5400

13

omitted).  This is flatly incorrect. Semiautomatic firearms are designed to fire only once when the trigger is pulled. *See* Declaration of Mark Overstreet ("Overstreet Decl.") [attached to Plaintiffs' Memorandum of Law in Support of Motion for Preliminary Injunction as Exhibit A) (Doc. #23-2)]. *See also*, Plaintiffs' Counter-Statement of Material Facts, ¶ 122.   Semiautomatic firearms are not fully automatic machine guns, which continue to fire so long as the trigger is pressed. *Id.* As such, a semiautomatic firearm can only fire as fast as the finger that pulls its trigger. *Id.*  None of the firearms that New York bans fires any faster than any other semiautomatic firearm, whether used for hunting, defense, or target shooting.

Second, New York claims that "pistol grips and thumbhole stocks aid a shooter in retaining control of a firearm while holding it at his or her hip, facilitating the rapid and continuous fire of ammunition without precise aiming." Mem. 27.  Not so.  A pistol grip or thumbhole stock makes it more difficult to hold a rifle at the hip because the wrist is twisted in an awkward, downward position. *See* Rossi Decl. at 3-4.   A rifle with a straight stock may be held more comfortably at the hip. *Id.*  Any such firing "without precise aiming" is unlikely to hit the target. *Id.*

Third, New York asserts: "A folding or telescoping stock sacrifices accuracy for advantages such as concealability and mobility in close combat." Mem. 27.  Again, not so.  Rossi Decl. at 2-5. A folding stock makes a gun easier to transport such as in an ATV. *Id.*  A telescoping stock allows adjustments to fit the persons size so the gun can be held more comfortably. *Id.* No accuracy is sacrificed. *Id.*  Concealability is not relevant, as New York elsewhere restricts the overall length of long guns with or without such stocks.  Penal Law § 265.00(3) ("firearm" includes weapon made from shotgun or rifle with overall length under 26"), § 265.01 (possession of firearm prohibited).

GOLDBERG SEGALLA, LLP
11 Martine Ave., 7th Floor
White Plains, NY 10607
(914) 798-5400

New York next asserts that the banned firearms are the "weapons of choice" of all manner of bad people. Mem. 27-28.  This is simply not true.  The overwhelming weight of evidence produced by studies of the federal assault weapons ban indicates "assault weapons" and "large capacity magazines" are not used disproportionately in crimes. Koper 2004 at 17; Koper 2007 at 65, 70, 96. Koper characterizes the inclusion of assault weapons among crime guns as "rare" (Koper 2007 at 69): according to most studies, AWs are used in approximately 2% of all gun crimes, Koper 2004 at 2, 14, 19.  As Judge Kavanaugh wrote, "semi-automatic handguns are used in connection with violent crimes far more than semi-automatic rifles are."  *Heller II*, 670 F.3d at 1269-70.  Rhetorical, politically-charged statements by lobbying groups or in the cited 1994 ATF publication, Mem. 28,[24] are no substitute for actual facts.  Lobbyists and government agencies do not define the limits of constitutional rights.

New York claims that "since Heller, courts have concluded that assault weapons are 'dangerous and unusual' weapons outside the scope of the Second Amendment right."  Memo 28-29, citing *United States v. Huet*, No. 08-0215, 2010 U.S. Dist. LEXIS 123597, at *13, *30 (W.D. Pa. Nov. 22, 2010), *rev'd on other grounds*, 665 F.3d 588, 597 n.7 (3d Cir. 2012), cert. denied, 133 S. Ct. 422 (2012).  That case illustrates the use of "assault weapon" as sleight-of-hand terminology. The prosecution had alleged that the rifle in that case was an "assault weapon," but the district court found that that was not the case under the expired federal law, commenting that "the SKS (or M59/66) is a legal, common semi-automatic rifle that is used as a hunting rifle," and "is owned by American gun owners in the hundreds of thousands." 2010 WL 4853847, *4, *11.

---

[24] Saying that the banned guns are designed for "shooting at human beings" and are "mass produced mayhem," as did the ATF publication, blatantly ignores that such guns are predominantly owned by law-abiding citizens who bought them after passing background checks, who use them for target shooting, and who would never use them to shoot at a human being other than in lawful self defense.

GOLDBERG SEGALLA, LLP
11 Martine Ave., 7th Floor
White Plains, NY 10607
(914) 798-5400

  **b.**  **The Banned Firearms are in Common Use**

New York argues that "assault weapons" are not in common use.  Mem. 29.  It seeks to rely

on a pre-1994 estimate apparently based on what would become the federal definition of "assault

weapon," but that definition was far more narrow than New York's newly-minted, extremely broad

definition.  A two-decades old narrow definition bears no relation to the current broad definition.

Even the majority in *Heller II* readily conceded that "semi-automatic rifles and magazines holding

more than ten rounds are indeed in 'common use,' as the plaintiffs contend."  670 F.3d at 1261

(citing Mark Overstreet declaration).

  **c.**  **The Banned Firearms are Typically Possessed by Law-Abiding**
      **Citizens for Lawful Purposes, Including Self-Defense, Target**
      **Shooting, and Hunting**

The firearms that New York bans are lawfully manufactured or imported and are lawfully

purchased by millions of Americans after passing the National Instant Criminal Background Check,

see 18 U.S.C. § 922(t), as well as any state-required checks.  *See* Overstreet Decl at 4-7; the National

Shooting Sports Foundation *2010 Modern Sporting Rifle Comprehensive Consumer Report*) ("NSSF

2010 MSR Report") [attached to Plaintiffs' Memorandum of Law in Support of Motion for

Preliminary Injunction as Exhibit B (Doc. ## 23-3, 23-4, and 23-5)] at 27; Rossi Decl. at 2.  Yet

New York alleges that these firearms do not meet the test of being "typically possessed by law-

abiding citizens for lawful purposes . . . ."  Mem. 30, quoting *Heller*, 554 U.S. at 625.  If New York

seriously contends that these citizens, which include plaintiffs herein, actually possess (or wish to

possess) these firearms for unlawful purposes, it fails to articulate what those purposes might be.

  Instead of denying the "lawful purposes" plaintiffs and other citizens have, New York

irrelevantly asserts that it is "difficult to draw meaningful distinctions between the AR-15 and the

M-16," i.e., a semiautomatic rifle and a machinegun. Mem. 30, quoting *Heller II*, 670 F.3d at 1263. If that panel majority found it difficult, the United States and every state has found the distinction obvious. Possession of an unregistered machinegun is a serious crime under federal law and the laws of most states, including New York. *E.g.,* 26 U.S.C. §§ 5845(b), 5861. The military forces of the world find the distinction quite meaningful. The difference between a gun that requires a separate trigger pull for each shot, and one that fires continuously with a single trigger pull is, to put it mildly, rather obvious and fundamental. *Staples*, 511 U.S. at 602 n.1.[25]

Again disregarding the "lawful purposes" for which persons possess the banned guns, New York asserts that some of the banned guns are "not suitable for home defense" because the bullets may "penetrate walls." Mem. 30. This is a gross over-simplification: the firepower of a particular firearm is dependent on caliber, ballistics, and other variables, not on whether the firearm is a rifle or a handgun, and certainly not on whether a rifle has a pistol grip.[26] *See* Declaration of Gary Roberts ("Roberts Decl.") [attached to as Plaintiffs Counter-Statement of Undisputed Material Facts as **"Exhibit O"**]. The State's claim that banned weapons are not useful for home defense is, likewise, extremely inaccurate: it is widely accepted that the AR-15 chambered in a .223/5.56 mm caliber is the firearm best suited for home defense use. Roberts Decl. at 14-15. *See also* J. Guthrie, *Versatile Defender: An Argument for Advanced AR Carbines in the Home*, in BOOK OF THE AR-15 134 (Eric R. Poole, ed. 2013); Eric Poole, *Ready To Arm: It's Time to Rethink Home Security*, in GUNS & AMMO, BOOK OF THE AR-15 15-22 (Eric R. Poole, ed. 2013); Mark Kayser, *AR-15 for Home & the Hunt,* In PERSONAL & HOME DEFENSE 28-29, 30-31 (2013).

---

[25] New York suggests that a semiautomatic can be converted into an automatic, Mem. 30, but a shotgun barrel can be sawed off to an illegal length. Such capability is not relevant to the purposes for which law-abiding citizens possess such firearms.

[26] Nor does the assertion apply to shotguns which discharge pellets.

GOLDBERG SEGALLA, LLP
11 Marine Ave., 7th Floor
White Plains, NY 10607
(914) 798-5400

17

In *Heller*, the District and its amici (including New York's authorities here) argued that handguns may be banned because persons could defend themselves with rifles and shotguns, which were argued to be superior for self defense.[27] *Heller* responded: "It is no answer to say . . . that it is permissible to ban the possession of handguns so long as the possession of other firearms (i.e., long guns) is allowed. . . . There are many reasons that a citizen may prefer a handgun for home defense . . . ." *Heller*, 554 U.S. at 630. Reasons also exist why a citizen may prefer a rifle.

Yet again ignoring that *Heller* refers to the "lawful purposes" for which citizens may possess firearms, New York argues that plaintiffs do not allege that they "have ever actually used" a banned gun (or any gun) in self defense, that use of guns in self defense is rare, and that "justifiable homicides involving a gun are even rarer." Mem. 31-32. Indeed, mere possession of a firearm is often a deterrent. But *Heller* and *McDonald*, did not condition exercise of the constitutional right on having previously used a particular firearm in self defense.

While New York cannot deny that plaintiffs and millions of Americans possess the banned guns for hunting and target shooting, and that those are "lawful purposes," it asserts that the banned guns have no "legitimate hunting or sporting purposes." Mem. 33. AR-15 type rifles are lawfully and widely used for hunting and competitions. *E.g.*, Rossi Decl. at 2; NSSF 2010 MSR Report at 7-8; Roberts Decl. at 10-15. The firearms characterized as "assault weapons" under the SAFE Act have been widely and legally used for sporting purposes (as well as for self-defense and hunting) throughout New York and the United States for decades. *See* King Aff. at ¶¶ 16-18; Somavilla Aff.

---

[27] Brief for Respondent, No. 07-290, *District of Columbia v. Heller*, at 54 (2008) (the District "adopted a focused statute that continues to allow private home possession of shotguns and rifles, which some gun rights' proponents contend are actually the weapons of choice for home"); Brief of Violence Policy Center, *id.*, at 30 ("shotguns and rifles are much more effective in stopping" a criminal; "handguns – compared with larger shotguns and rifles that are designed to be held with two hands – require a greater degree of dexterity").

GOLDBERG SEGALLA, LLP
11 Martine Ave., 7th Floor
White Plains, NY 10607
(914) 798-5400

at ¶¶ 16-18. There are numerous shooting competitions for non-military personnel that have taken place throughout the State of New York for years that regularly and legally used the firearms now classified as "assault weapons" to compete. King Aff. at ¶¶ 16-18; Sommavilla Aff. at ¶¶ 16-18. These matches legally used the rifles, pistols and shotguns now classified as "assault weapons," were and are extremely popular, and have been attended throughout the years by hundreds (and likely thousands) of individual and member plaintiffs. *Id.* AR-15 type rifles are the leading type of firearm used in the National Matches and in other matches sponsored by the Civilian Marksmanship Program (CMP), which Congress established "to instruct citizens of the United States in marksmanship" and "to promote practice and safety in the use of firearms . . . ." 36 U.S.C. § 40722(1) & (2). Competitions with such rifles are sponsored by the National Rifle Association, which has long been recognized in New York law as associated with legitimate use of firearms. *E.g.,* Penal Law § 265.20(7) through (7-c) (NRA training and competitions).

That the banned firearms are "typically possessed by law-abiding citizens for lawful purposes," *Heller,* 554 U.S. at 625, is a demonstrable and indisputable fact. It is not dependent on what a government agency such as ATF deems to be "particularly suitable for sporting purposes" at any given time, or on opinions expressed in limited surveys, as New York suggests. Mem. 33-34. Rifles such as AR-15 are "widely owned by private citizens today for legitimate purposes," including "for self-defense, hunting, and target shooting . . . ." Michael P. O'Shea, *The Right to Defensive Arms after District Of Columbia v. Heller,* 111 W. VA. L. REV. 349, 388 (Winter 2009).

       **2.**      **The Ban on Standard Magazines and the Seven-Round Load Limit for Self Defense in the Home Implicate the Second Amendment**

       **a.**      **Standard Magazines are Not "Dangerous and Unusual"**

It is beyond dispute that standard magazines holding more than ten rounds and loaded with more than seven rounds are the norm nationwide. Overstreet Decl. at 4-7; Rossi Decl. at 2; NSSF 2010 MSR Report at 27. A large proportion, perhaps a majority, of pistols are manufactured with magazines holding more than ten rounds. *Id.* None of the other forty-nine states limit rounds in a magazine to seven, and not one shred of evidence suggests that it is common to do so anywhere.

New York's argument that such magazines are "dangerous and unusual" (Mem. 34) is belied by the Purpose clause of the SAFE Act itself: "Through this legislation, New York is the first in the nation to completely ban all pre-1994 high capacity magazines; to ban any magazine that holds more than seven rounds (rather than a limit of ten) . . . ." This law, not the magazines, is "unusual." As for being "dangerous," a magazine in itself is not even a weapon.

To say that magazines holding more than ten rounds are not "of the type characteristically used to protect the home," Mem. 34,[28] robs the term "characteristically" of any meaning, since only a tiny handful of states have any such requirement, and citizens of most states may have standard magazines for home defense. As the D.C. Circuit fully conceded: "We think it clear enough in the record that . . . magazines holding more than ten rounds are indeed in 'common use,' as the plaintiffs contend." *Heller II*, 670 F.3d at 1261. That should have ended the discussion.

New York argues that standard magazines are used "disproportionately" in murder. Mem. 35. First, this fails to distinguish rifle from pistol magazines. While 80% of all gun homicides in the U.S. between 1991 and 2001 were committed with a handgun (FBI UCRs, 1995 to 201; BJS Report

---

[28] *Hightower v. City of Boston*, 693 F.3d 61, 66, 71 & n.7 (1st Cir. 2012), made no such holding. Licenses for such magazines were available, but that case involved a license to carry a five-round revolver. *Id.* at 68, 71-72.

GOLDBERG SEGALLA, LLP
11 Martine Ave., 7th Floor
White Plains, NY 10607
(914) 798-5400

at 1, 3) only 4.6% involved a rifle. *Id.* In New York, 73% of the gun homicides between 1995 and 2010 were committed with a handgun, but a mere 3% involved a rifle. *Id.*

Second, while handguns are used in most firearm homicides, "the American people have considered the handgun to be the quintessential self-defense weapon." *Heller*, 554 U.S. at 629. And if standard magazines are used in 31-41% of gun murders of police, Mem. 35, that means that magazines holding ten or less rounds are used in 59-69% of such murders.[29] And if "attacks" with semiautomatics using magazines holding more than ten rounds result in "more shots fired," Mem. 35, surely persons defending themselves from such attacks are entitled to have parity.

### b.     Standard Magazines are Typically Used for Lawful Purposes

New York concedes that "'magazines holding more than ten rounds' may well be in common use nationally," but suggests that such is not the case in New York, which banned standard magazines made after 1994 but grandfathered those made by that date. Mem. 36. But *Heller* set a national standard for common use – lack of common use of handguns in D.C., which banned them, was irrelevant. "The handgun ban amounts to a prohibition of an entire class of 'arms' that is overwhelmingly chosen by American society for that lawful purpose." *Heller*, 554 U.S. at 628 (emphasis added). Moreover, magazines manufactured by the 1994 deadline remain in common use in New York.[30]

New York asserts that there is no evidence "that more than seven rounds, or a larger than ten-round magazine, is common or necessary for self-defense," Mem. 37, despite the overwhelming

---

[29] Similarly, even if "half of all mass shooters used large-capacity magazines," Mem. 36, that means that half did not.

[30] While a hunting regulation limits some auto-loading firearms to six rounds, it places no such limit for .22 rimfire firearms and for pistols with a barrel less than eight inches in length. Envtl. Convserv. Law § 11-0931(c).

GOLDBERG SEGALLA, LLP
11 Martine Ave., 7th Floor
White Plains, NY 10607
(914) 798-5400

21

choices made by Americans for that lawful purpose. Indeed, but for the criminal sanctions of the Act here, those would be the choices of the law-abiding citizens of New York.

New York next argues that the chances are low that citizens would ever "need" standard magazines or magazines loaded with more than seven rounds for self defense in the home, or that multiple shots may need to be fired for self defense. Mem. 37-38. Hopefully plaintiffs will never have to use a firearm for protection at all, but that does not extinguish their constitutional right to be ready to do so. *Heller* invalidated the District's ban on having a firearm operable for self defense without any showing that a specific plaintiff was likely to be attacked, or that shots would need to be fired: "This makes it impossible for citizens to use them for the core lawful purpose of self-defense and is hence unconstitutional." 554 U.S. at 630. The issue is whether it is possible for a citizen to exercise the right, not the likelihood that she may need to do so.

It bears recalling that there is no municipal liability "for failure to provide special protection to a member of the public who was repeatedly threatened with personal harm and eventually suffered dire personal injuries for lack of such protection." *Riss v. City of New York*, 22 N.Y.2d 579, 581, 240 N.E.2d 860 (1968). As the dissent pointed out, "in conformity, to the dictates of the law, Linda did not carry any weapon for self-defense . . . . Thus, by a rather bitter irony she was required to rely for protection on the City of New York which now denies all responsibility to her." Id. at 584-85 (Keating, J., dissenting). Here too, New York's assurances that no one "needs" what they deem necessary for protection are worthless.

Evidence is allegedly lacking that "magazines holding more than ten rounds are well-suited to or preferred for the purpose of self-defense or sport," Mem. 38. That they are well-suited and

preferred for self-defense is demonstrated by the fact that they are issued to law enforcement[31] and are bought by law-abiding citizens, who also use them for target shooting, competitions, and other sporting activities. E.g., Rossi Decl. at 2; NSSF 2010 MSR Report at 7-8; Roberts Decl. at --.

New York's claim that "guns with more than seven live rounds are neither necessary, nor particularly suitable, for self-defense," Mem. 39, is particularly disingenuous given that this is the first such law passed with that restriction in American history, or for all we know, in world history. D.C. made the same argument about its handgun ban, but the test is what is "overwhelmingly chosen by American society for that lawful purpose." *Heller*, 554 U.S. at 628.  The suggestion that citizens cannot be trusted to have available more than the arbitrarily-dictated seven rounds because a bystander may be injured wholly neglects self-defense against an aggressor, who will be quite glad for the victim to run out of ammunition.

In sum, the banned guns and magazines are "arms" that the people commonly "keep and bear," and their right to do so "shall not be infringed."  To say that these ordinary arms are "outside the scope" of the Second Amendment simply disregards the constitutional text and the choices made by the law-abiding citizens who exercise this right.

### D.    The Gun and Magazine Bans Substantially Burden Second Amendment Rights and Lack a Rational Basis

New York argues that even if Second Amendment rights are implicated, the right is not substantially burdened and the law has a rational basis. Mem. 39-40.  While the bans are substantial burdens and the law has no rational basis, the textual test is whether the right is "infringed," not whether it is substantially infringed.  And *Heller* explicitly held that rational basis "could not be used

GOLDBERG SEGALLA, LLP
11 Martine Ave., 7th Floor
White Plains, NY 10607
(914) 798-5400

---

[31] The Act recognizes this by exempting law enforcement from its prohibitions.

23

to evaluate the extent to which a legislature may regulate a specific, enumerated right," adding: "If all that was required to overcome the right to keep and bear arms was a rational basis, the Second Amendment would be redundant with the separate constitutional prohibitions on irrational laws, and would have no effect." *Heller*, 554 U.S. at 628 n.27.

*United States v. Decastro*, 682 F.3d 160, 168-69 (2d Cir. 2012), upheld a restriction on transport into one's state of a firearm acquired outside the state, because "it does nothing to keep someone from purchasing a firearm in her home state," and thus a person had "adequate alternatives" to obtain the very same firearm. By contrast, "heightened scrutiny is triggered" for restrictions "like the complete prohibition on handguns struck down in Heller," which it characterized as a "substantial burden" on the right. *Id.* at 166. This case too involves complete prohibitions on common firearms and magazines.

### 1. The Ban on Common Firearms Substantially Burdens the Right and Has No Rational Basis

New York has banned countless semiautomatic firearms with features that the American public has chosen as most appropriate for self defense and sport. New York argues that other firearms that are not semiautomatic and do not have these features are available. Mem. 40-41. But newspapers may not be banned because many magazines are available,[32] and *Heller* rejected the argument that handguns can be banned because long guns are available.

While semiautomatic firearms without the banned features are indeed available, banning those features, when looked at individually, is irrational. It is irrational to ban a shoulder stock because it may be adjusted to fit the user's physique. It is irrational to ban a rifle because it has a

---

[32] *See Cincinnati v. Discovery Network, Inc.*, 507 U. S. 410, 418 (1993) (applying heightened scrutiny to and invalidating "a categorical prohibition on the use of newsracks to disseminate commercial messages").

GOLDBERG SEGALLA, LLP
11 Martine Ave., 7th Floor
White Plains, NY 10607
(914) 798-5400

stock with a hole to place one's thumb, or has a piece of plastic or wood that is a pistol grip.  All of these features are designed to make long guns fit better, to make holding them more comfortable, and to make them more accurate.  New York's dramatic characterization of these innocuous but desirable features as "military-style, assault-weapon" features fails to obscure that they are normal, everyday civilian designs nationwide.

None of the cases New York cites conducts any searching analysis of the particular features at issue. Mem. 42. *Heller II* ignored the contrary evidence actually in the record about the function of a pistol grip on a rifle and instead relied on the testimony of Brady Center lobbyist Brian Siebel at a committee hearing that the purpose of a pistol grip is "to spray-fire from the hip position."  670 F.3d at 1262-63.  In fact, a pistol grip makes it more difficult to fire from the hip position, which in any event would be highly inaccurate. Rossi Decl. at  5.  Plaintiffs are entitled to have their factual claims decided on the basis of actual evidence in the record and not on the basis of bare allegations punctuated with a constant barrage of linguistic defamation.  Using the term "assault weapon" in every other sentence proves nothing.

*United States v. Marzzarella*, 614 F.3d 85, 94 (3d Cir. 2010), cert. denied, 131 S.Ct. 958 (2011), upheld a ban on firearms with obliterated serial numbers only because it did not ban any type of firearm at all: "Because unmarked weapons are functionally no different from marked weapons, [the prohibition] does not limit the possession of any class of firearms."  The Act here does just that. And *Marzzarella* was cited as authority in support of the holding in *United States v. Decastro*, 682 F.3d 160, 166 (2d Cir. 2012), upholding yet another law that did not ban any type of firearm whatever.  The reference to "adequate alternatives" concerned the ability to purchase the same firearm in New York as outside of New York, *id.* at 168, not to a ban on one type of firearm under

the guise that another was available.  The holding in *Decastro* provides no support for New York's argument here.

New York argues that its ban on countless ordinary firearms chosen by Americans, enforced with serious felony penalties, is not a "substantial burden" on the right to keep and bear arms.  From that incredible premise, it argues that only rational basis applies.  Mem. 42-43.  It then relies on pre-*Heller* cases from courts that believed that the Second Amendment did not even protect an individual right.[33]  And while those cases may have said that a ban on "assault weapons" was "rational," they failed to articulate any rational basis for banning the specific features at issue.  A ban on a specific feature cannot be justified just because the legislature put it in a list under the word "assault weapon."

## 2. The Bans on Magazines and on Having More Than Seven Rounds in a Magazine Substantially Burden the Right and Have no Rational Basis

New York is the only state nationwide that bans possession of all magazines capable of holding more than ten rounds and that prohibits loading more than seven rounds in a magazine.  To suggest "that neither is typically used, or suitable, for" self defense or other lawful purposes, Mem. 43, is to ignore the reality of practices in the 49 other states and in New York before this law passed.  No more than seven rounds in a magazine that holds no more than ten is neither typical nor suitable, which is why that was unheard of until this law passed.

---

[33] *See Richmond Boro Gun Club*, 97 F.3d 681, 684 (2d Cir. 1996) ("the statute does not relate to a fundamental constitutional right"); *United States v. Toner*, 728 F.2d 115, 128 (2d Cir. 1984) ("the right to possess a gun is clearly not a fundamental right"); *Kasler v. Lockyer*, 23 Cal.4th 472, 507-08, 2 P.3d 581 (2000) (no mention of Second Amendment or discussion of specific features); *Olympic Arms v. Buckles*, 301 F.3d 384, 389 (6th Cir. Mich. 2002) ("Second Amendment does not create an individual right to bear arms"; no discussion of specific features).

GOLDBERG SEGALLA, LLP
11 Martine Ave., 7th Floor
White Plains, NY 10607
(914) 798-5400

26

New York suggests that "Plaintiffs could, of course, switch magazines or load more bullets," Memo 43, although loading more bullets would be a crime.  The "let them eat cake" alternative of switching magazines ignores the effects of stress, not to mention of being handicapped, and it ignores that not everyone has a second magazine, or keeps one loaded.  New York's additional suggestion that a person being attacked could also "make use of a second (or even more than one additional) loaded firearm," Mem. 44, is utterly unrealistic.

For the proposition that no citizen ever "needs" more than seven rounds in a ten round magazine, New York relies on Professor Lawrence Tribe and others who have no qualifications whatever on training and preparation for self defense with firearms.  Mem. 45.  The argument is belied by the reality that law enforcement officers defend themselves with pistols typically holding up to 17 rounds and rifles typically holding 20 to 30 rounds, and that criminals simply do not obey laws limiting magazines at all.

The test is what guns and magazines are "in common use," are "typically possessed by law-abiding citizens for lawful purposes," are  "popular weapon[s] chosen by Americans for self-defense," are "chosen by American society for that lawful purpose [self-defense]," and are what "a citizen may prefer . . . for home defense . . . ." *Heller*, 554 U.S. at 624-25, 628-30.  The newly-minted ban on magazines and the arbitrarily-chosen number of rounds loaded therein that are chosen nationwide by Americans is a substantial burden on Second Amendment rights and has no rational basis.

**E.     The Bans Do Not Survive Heightened Scrutiny**

The ban on guns and magazines here "amounts to a prohibition of an entire class of 'arms' that is overwhelmingly chosen by American society for that lawful purpose" of self defense, and

GOLDBERG SEGALLA, LLP
11 Martine Ave., 7th Floor
White Plains, NY 10607
(914) 798-5400

categorically fails constitutional muster "[u]nder any of the standards of scrutiny that we have applied to enumerated constitutional rights . . . ." *Heller*, 554 U.S. at 628. If a standard of review must be applied, it would be strict scrutiny. But the Act does not even pass intermediate scrutiny.

> **1.** **As the Right is Fundamental, Strict Scrutiny Must Be Applied, Not Intermediate Scrutiny or Some Other Interest-Balancing Approach**

"[T]he right to keep and bear arms is fundamental to our scheme of ordered liberty," and is "deeply rooted in this Nation's history and tradition . . . ." *McDonald v. City of Chicago*, 130 S.Ct. 3020, 3036 (2010). A right is "fundamental" if it is "explicitly or implicitly protected by the Constitution, thereby requiring strict judicial scrutiny." *San Antonio Independent School District v. Rodriguez*, 411 U.S. 1, 17, 33 (1973). "[C]lassifications affecting fundamental rights . . . are given the most exacting scrutiny." *Clark v. Jeter*, 486 U.S. 456, 461 (1988). "Under the strict-scrutiny test," the government has the burden to prove that a restriction "is (1) narrowly tailored, to serve (2) a compelling state interest." *Republican Party of Minnesota v. White*, 536 U.S. 765, 774-75 (2002).

*Heller* rejected Justice Breyer's "judge-empowering 'interest-balancing inquiry' that 'asks whether the statute burdens a protected interest in a way or to an extent that is out of proportion to the statute's salutary effects upon other important governmental interests.'" *Id.* at 634. Such a test would allow "arguments for and against gun control" and the upholding of a handgun ban "because handgun violence is a problem . . . ." *Id.*

*McDonald* rejected the view "that the Second Amendment should be singled out for special – and specially unfavorable – treatment." 130 S.Ct. at 3043. It refused "to treat the right recognized

in Heller as a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees . . . ."[34]  *Id.* at 3044.

New York's reliance on *Kachalsky v. County of Westchester*, 701 F.3d 81 (2nd Cir. 2012), is misplaced.  Mem. 46-47.  *Kachalsky* applied intermediate scrutiny to restrictions on carrying handguns outside the home, thus "applying less than strict scrutiny when the regulation does not burden the 'core' protection of self-defense in the home . . . ."  *Id.* at 93.  That implies that strict scrutiny would apply to gun bans in the home, given that "Second Amendment guarantees are at their zenith within the home."  *Id.* at 88.

New York cites other cases applying intermediate scrutiny that do not involve bans on possession of guns by law-abiding citizens in the home.  Mem. 47 n.39.  For instance, intermediate scrutiny applies to restrictions on possession of firearms by certain convicted criminals.  *United States v. Skoien*, 614 F.3d 638, 641-42 (7th Cir. 2010) (en banc).[35]  But where a regulation involves law-abiding persons, "a more rigorous showing than that applied in *Skoien* should be required, if not quite 'strict scrutiny.'"  *Ezell v. City of Chicago*, 651 F.3d 684, 708 (7th Cir. 2011) (gun range case not involving ban in the home).

New York relies on the part of a decision that was reversed on appeal.  Mem. 47, citing *Wilson v. Cnty. of Cook*, 943 N.E.2d 768, 775-77 (Ill. App. Ct. 2011), *aff'd in part & rev'd in part*, 968 N.E.2d 641 (Ill. 2012).  The lower court applied intermediate scrutiny to a ban on guns and magazines based on precedents applicable to violent criminals.  943 N.E.2d at 776, citing *Skoien*,

---

[34] No constitutional right is "less 'fundamental' than" others, and "we know of no principled basis on which to create a hierarchy of constitutional values . . . ."  *Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 484 (1982).

[35] See also *United States v. Chester*, 628 F.3d 673, 682-83 (4th Cir. 2010) ("intermediate scrutiny is more appropriate than strict scrutiny for" persons with a criminal history).

GOLDBERG SEGALLA, LLP
11 Martine Ave., 7th Floor
White Plains, NY 10607
(914) 798-5400

614 F.3d 638.  But the Illinois Supreme Court reversed the lower court's decision on the Second

Amendment.  Referring to the deference to legislative findings in *James* and the use of intermediate

scrutiny in *Heller II*, the Supreme Court stated that "we need not choose either of these approaches

at this time."  968 N.E.2d at 657.

### 2.    The Substantial-Relation Test of Intermediate Scrutiny Precludes Reliance on Unsupported Legislative Assertions

New York sets forth a watered-down, overly-deferential version of intermediate scrutiny that

sounds like Justice Breyer's "interest-balancing" approach.  Mem. 49-50.  True intermediate scrutiny

has teeth – it requires that a law be "substantially related to the achievement of an important

governmental objective." *Kachalsky*, 701 F.3d at 96-97 (emphasis added).  The Act here comes

nowhere near that standard.

Moreover, "it is [the Court's] task in the end to decide whether [the legislature] has violated

the Constitution," and thus "whatever deference is due legislative findings would not foreclose our

independent judgment of the facts bearing on an issue of constitutional law . . . ." *Sable Commcns.*

*of Cal., Inc. v. FCC*, 492 U.S. 115, 129 (1989).  New York assumes that assertions by bill sponsors

or the governor can override a constitutional right.[36]

*Heller* made no mention of legislative findings.  *McDonald*, which rejected the power "to

allow state and local governments to enact any gun control law that they deem to be reasonable,"

130 S.Ct. at 3046, barely mentioned Chicago's legislative finding about handgun deaths and

accorded it no discussion.  *Id.* at 3026.  Instead, *McDonald* noted that "the Second Amendment right

---

[36] New York cites *Turner Broadcasting System, Inc. v. FCC*, 520 U.S. 180, 189 (1997), but that case applied intermediate scrutiny to a content-neutral regulation, and held that the regulation must not burden more speech than necessary.  Moreover, its predecessor case, *Turner Broadcasting System, Inc. v. FCC*, 512 U.S. 622, 666 (1997), reiterated the above holding of *Sable Commcns*.

protects the rights of minorities and other residents of high-crime areas whose needs are not being met by elected public officials." *Id.* at 3049.

But even if a lesser standard is applied, such as that applied to adult bookstores under the First Amendment, a legislature cannot "get away with shoddy data or reasoning. The municipality's evidence must fairly support the municipality's rationale for its ordinance." *Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425, 438-39 (2002). If plaintiffs "cast direct doubt on this rationale, either by demonstrating that the municipality's evidence does not support its rationale or by furnishing evidence that disputes the municipality's factual findings," then "the burden shifts back to the municipality to supplement the record with evidence renewing support for a theory that justifies its ordinance." *Id.*

### 3.    The Bans at Issue Do Not Satisfy Intermediate Scrutiny

New York repeats factual allegations that are plainly wrong. Mem. 50-51. The banned guns are not unusual and are not designed for combat. The banned guns are primarily rifles that are not "preferred by criminals," who prefer handguns instead: the vast majority (90%) of all non-fatal firearm crimes in the U.S. between 1993 and 2011 were committed with a handgun. BJS Report at 1, 3. The banned guns are not "disproportionately used" in murders of any kind, and in fact are rarely used in crime at all. Koper 2004 at 17; Koper 2007 at 65, 70, 96.

If certain gun crimes fell after 1994, it could not possibly be attributed to the federal law. *See* Mem. 51-52. The federal law exempted all "assault weapons" that were possessed as of the effective date, and thus the millions of guns already in existence continued to be possessed. 18 U.S.C. § 922(v)(2) (1994-2004). Moreover, a semiautomatic rifle with a detachable magazine was not defined as an "assault weapon" unless it had two particular features, such as a pistol grip and a

GOLDBERG SEGALLA, LLP
11 Martine Ave., 7th Floor
White Plains, NY 10607
(914) 798-5400

31

bayonet mount.  § 921(a)(30)(B).  Manufacturers complied by removing one feature, such as the bayonet mount, and Americans continued to buy essentially the same rifles.  It would be ludicrous to suggest that crime fell because bayonet mounts were removed from the newly-made rifles that were otherwise identical.

The government must do more than offer "plausible reasons why" a gun restriction is substantially related to an important government goal, it must also "offer sufficient evidence to establish a substantial relationship between" the restriction and that goal to determine whether the restriction "violated the Second Amendment by application of the intermediate scrutiny test." *United States v. Chester*, 628 F.3d 673, 683 (4th Cir. 2010) (emphasis in original).  Here, New York's "reason" of "after that, therefore because of that" fizzles completely.

The Act's replacement of the two-feature test with a one-feature test will also be ineffectual. *See* Mem. 52.  The predominately law-abiding citizens who would otherwise acquire the banned guns would not have committed any crimes with them, and those who would otherwise commit crimes will continue to do so.

New York's suggestion that the expired federal law on magazines reduced crime fares no better.  Mem. 53.  The millions of magazines possessed by the effective date were grandfathered and continued to be possessed.  18 U.S.C. §§ 921(a)(31)(A), 922(w)(2) Unlimited numbers of magazines made abroad by the deadline could continue to be imported.

Since 2004, no pertinent federal restrictions have existed, and the previously-restricted guns and magazines have been made and acquired by Americans in unprecedented numbers. Overstreet Decl. at 2-7; Rossi Decl. at 2; Roberts Decl. at --; NSSF 2010 MSR Report at 27.  Over that same period, crime has continued at all-time lows.  Firearm Violence, 1993-2011, *supra*, at 1.  New

GOLDBERG SEGALLA, LLP
11 Martine Ave., 7ᵗʰ Floor
White Plains, NY 10607
(914) 798-5400

York's suggestion that the Act's restrictions will reduce crime is belied by the failed federal experiment, and Congress' refusal to reenact it, and the low crime rate that has persisted after the Act's expiration.

New York fails to suggest how the Act's "seven-round load limit for firearms" will "further diminish the possibilities for unlawful gun violence." Mem. 53.  Mere assertion without any evidence comes nowhere near showing that a law is "substantially related to the achievement of an important governmental objective." *Kachalsky*, 701 F.3d at 96-97.  Since only law-abiding citizens will obey this law and criminals will not, it only gives the advantage to the criminals.

New York concludes that the Act is "carefully tailored to limit the availability of particularly dangerous military-style weapons," Mem. 56, when in fact it is not tailored at all and it restricts common firearms with no remote connection to the military.  Pejorative name-calling aside, it has completely failed to show how the specific features it bans have any relation to crime whatever.  Has a rifle with a thumbhole stock even been used in a crime?  Is a stock that is adjustable so that it fits one's size really a danger to public safety?  Is a piece of plastic or wood constituting a pistol grip really unacceptably dangerous if it protrudes conspicuously beneath the action?  These are wholly innocuous features which Americans nationwide prefer, and which New York has no basis to criminalize.

## II.     THE EQUAL PROTECTION CLAIM IS VALID

It is a crime to load more than seven rounds in a magazine for protection of life at one's home, but ten rounds may be loaded at a firing range of a corporation organized for conservation or to foster proficiency in arms, at a firing range to fire a rifle or shotgun, at an NRA-approved target shooting competition, or at a match sanctioned by the International Handgun Metallic Silhouette

GOLDBERG SEGALLA, LLP
11 Martine Ave., 7th Floor
White Plains, NY 10607
(914) 798-5400

Association (IHMSA).[37]  Penal Law § 265.20(a)(7-f).  By trumping defense of life in one's home in favor of recreation, the prohibition on having more than seven rounds in a magazine denies plaintiffs the equal protection of the laws.

New York argues that everyone is treated alike, depending on whether they are at home or at the range. Mem. 57.  Not so.  It irrationally discriminates against persons who keep firearms for self defense in their homes, and in favor of persons who participate in recreational shooting.

New York misquotes a decision as stating that "[g]uns are things, not persons. Therefore, equal protection principles do not protect guns from unequal treatment."  Mem. 57, quoting *Kasler v. Lockyer*, 23 Cal.4th 472, 479, 2 P.3d 581, 584 (2000).  *Kasler* only said that "the Attorney General contends" that, and went on to refute the argument:

> [T]he argument made by the Attorney General "overlooks the fact that it is the persons who make and own guns who are penalized." . . . Courts not uncommonly refer to issues of equal protection as involving discrimination among things when they mean discrimination among persons having interests in those things.

*Id.* at 479-80 (citation omitted).[38]

*Citizens for a Safer Community v. Rochester*, 164 Misc.2d 822, 826, 627 N.Y.S.2d 193 (1994), held that Rochester's "assault weapon" ban denied equal protection "insofar as it attempts to make criminal the sale or the possession of certain guns of some manufacturers while allowing the possession of essentially identical guns made by others."  Under the ordinance, "two citizens could potentially be treated in a wholly unequal fashion if they possessed identical AR-15's made by

---

[37] IHMSA was formed  "to have some fun. . . . The object of the competition is to knock down metallic silhouettes (chickens, pigs, turkeys and rams) at various ranges . . . ." http://www.ihmsa.org/history-of-ihmsa.html.

[38] Even *Benjamin v. Bailey*, 234 Conn. 455, 662 A.2d 1226, 1237 (1995), which New York also cites, considered the allegation that "*people* who possess a listed firearm are treated differently from *people* who possess an unlisted firearm, and that this disparate treatment violates principles of equal protection . . . ."

GOLDBERG SEGALLA, LLP
11 Martine Ave., 7th Floor
White Plains, NY 10607
(914) 798-5400

34

different manufacturers. One would be subject to imprisonment, fine and loss of property; and the other would not be breaking the law." *Id.* at 838.[39]

New York would imprison a homeowner who inserted eight rounds in her magazine, but a person competing in a match by the International Handgun Metallic Silhouette Association is free to do so. Arbitrary laws like that violate equal protection. *Hetherton v. Sears, Roebuck & Co.*, 652 F.2d 1152, 1157-58 (3rd Cir. 1981), invalidated a requirement that two freeholders identify a firearm purchaser, because a state cannot "arbitrarily establish categories of persons who can or cannot buy the weapons." *Id.* at 1157-58. Such a requirement "is not more constitutionally permissible than a requirement that only Catholics or Blacks or Indians can identify purchasers of handguns." *Id.* at 1160.

New York argues that "ranges and competition sites are a 'controlled environment,' where gun safety and security are paramount." Mem. 59. That has no relation to the number of rounds in a magazine. An unintentional discharge of a single round could endanger human life, and all the rules of gun safety focus on avoiding that possibility. No basis exists to suggest that persons do not practice gun safety in their homes, where a firearm would be discharged only in a dire emergency, but do so only at ranges.

To be sure, the ability to shoot at ranges promotes important interests. New York law previously exempted such activity from other restrictions, Mem. 59, but never anything like this. "The right to possess firearms for protection implies a corresponding right to . . . maintain proficiency in their use; the core right wouldn't mean much without the training and practice that

---

[39] *See also Peoples Rights Organization, Inc. v. City of Columbus*, 152 F.3d 522, 532 (6th Cir. 1998) (finding "no rational distinction" between persons who registered "on the basis of little more than a hunch that their firearms might constitute 'assault weapons'" and those who did not).

GOLDBERG SEGALLA, LLP
11 Martine Ave., 7th Floor
White Plains, NY 10607
(914) 798-5400

make it effective." *Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011).  But the core right is

not less important than what makes its exercise possible.

New York cites pre-*Heller* decisions as upholding certain exemptions for shooting ranges,

but they do not support the law here.  Mem. 59-60.  New Jersey banned certain magazines but

allowed some persons to register and use them in competitions.  The court upheld the ban with the

curious assertion that "participation in sanctioned shooting competitions is rationally related to

maintaining large capacity ammunition magazines." *Coalition of New Jersey Sportsmen, Inc. v.*

*Whitman*, 44 F. Supp. 2d 666, 686 (1999).

Another cited case involved a law allowing individuals and gun clubs to obtain licenses to

possess large-capacity weapons and magazines, but restricting licensed clubs from shooting at

targets with certain images.  *Gun Owners' Action League, Inc. v. Swift*, 284 F.3d 198, 212 (1st Cir.

2002).  This is not remotely relevant here.[40]

In sum, there is a "fundamental right to life," *Panetti v. Quarterman*, 551 U.S. 930, 957

(2007) (citation omitted), which New York may not diminish in favor of recreational activities.

### III.    THE ACT IS UNCONSTITUTIONALLY VAGUE

#### A.    A Law Permeated With Vagueness is Facially Vague

New York argues that facial vagueness may be shown only if a law is vague in all

applications.  Mem. 60-62.  It disregards the controlling en banc decision in *United States v. Rybicki*,

354 F.3d 124, 131 (2d Cir.2003) (en banc), which instructs that facial vagueness may also be shown

if "the law is 'permeated' with vagueness . . . ."

---

[40] Nor is the holding that a county could "could reasonably conclude that gun shows are more dangerous than military reenactments" and thus could regulate gun shows on county property more strictly.  *Nordyke v. King*, 681 F.3d 1041, 1043 n.2 (9th Cir. 2012) (*en banc*).  Again, none of these cases involve the issue of self-defense in the home.

GOLDBERG SEGALLA, LLP
11 Martine Ave., 7th Floor
White Plains, NY 10607
(914) 798-5400

*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 494-95 (1982), favored the "as-applied" approach where "the enactment implicates no constitutionally protected conduct," particularly where it is just an economic regulation with only civil, and not criminal penalties, and a scienter requirement. *Id.* at 498-99.  Some courts followed dicta in *United States v. Salerno*, 481 U.S. 739, 745 (1987), and narrowed constitutionally protected conduct to the First Amendment, restricting other vagueness challenges to an as-applied approach. *Rybicki*, 354 F.3d at 130-31.

That was questioned in *City of Chicago v. Morales*, 527 U.S. 41, 55 (1999) (plurality op.), which held about "a criminal law that contains no mens rea requirement, . . . and infringes on constitutionally protected rights": "When vagueness permeates the text of such a law, it is subject to facial attack." *Rybicki* summarized the *Morales* approach as follows:

> [T]o invalidate as unconstitutionally vague on its face a statute that does not implicate First Amendment rights and might be valid under some set of circumstances, a court would have to conclude that the law is "permeated" with vagueness, and, perhaps, that it infringes on a constitutional right and has no mens rea requirement . . . ."

*Rybicki*, 354 F.3d at 131.

The *en banc* court in *Rybicki* concluded about the two approaches: "We therefore need not adopt, and do not mean to suggest our preference for, either." *Id.* at 132.  It proceeded to consider the law at issue under both the vague in all applications and the permeated with vagueness standards. *Id.*  This court should do the same.

New York (Mem. 61-62) relies on *United States v. Farhane*, 634 F.3d 127, 139 (2d Cir. 2011), which stated: "In practice, the *Hoffman Estates/Salerno* rule warrants hypothetical analysis of 'all applications' only in cases of pre-enforcement facial vagueness challenges." *Id.*, citing *Richmond Boro Gun Club, Inc. v. City of New York*, 97 F.3d 681, 684–86 (2d Cir.1996). This was

dicta, because *Farhane* was a criminal case, not a pre-enforcement civil case.  The en banc *Rybicki* decision allows a "permeated with vagueness" analysis, and in any event *Farhane* distinguished *Morales*.  634 F.3d at 139 n.10.

New York suggests that *Richmond Boro Gun Club* survived *Heller* and *McDonald*, Mem. 61 n.51, but disregards the statement that "the local law does not infringe upon a fundamental constitutional right.  Courts rarely invalidate a statute on its face because of alleged vagueness if the statute does not relate to a fundamental constitutional right . . . ."  *Richmond Boro Gun Club*, 97 F.3d at 684.  *Heller* and *McDonald* held the Second Amendment right to be fundamental.

Contrary to New York, no scienter element appears in the following: "A person is guilty of criminal possession of a weapon in the third degree when: . . . (7) Such person possesses an assault weapon; or (8) Such person possesses a large capacity ammunition feeding device."  Penal Law § 265.02.[41]  See Mem. 62 n.5, citing *People v. Wood*, 58 A.D.3d 242 (1st Dep't 2008) (offenses under Penal Law §§ 265.01(1) & 265.02(1)).  *Wood* held that it must be proven that a person knowingly possesses a weapon (there, a knife), but knowledge of its characteristics need not be proven (that it "opens automatically by hand pressure applied to a button," the definition of a switchblade).  *Id.* at 252-53 & n.5.  The court contrasted *Staples*, 511 U.S. at 602, 615, which "goes one step further . . . by requiring that the defendant know that the rifle in his possession was capable of firing automatically . . . ."  58 A.D.3d at 252 n.4.

By requiring proof of knowledge that an item is a firearm, but not that it has the characteristics that make it an "assault weapon," the Act lacks any adequate scienter.  With

---

[41] The only decision to mention the elements of the offense of possession of an "assault weapon" does not mention mens rea. *People v. Digaetano*, 188 Misc.2d 771, 729 N.Y.S.2d 614 (2001).

GOLDBERG SEGALLA, LLP
11 Martine Ave., 7th Floor
White Plains, NY 10607
(914) 798-5400

definitions like the "conspicuously" protruding pistol grip, no objective standard would exist even if mens rea was required.

In sum, the Act implicates constitutional rights, is a criminal law with severe penalties, and has no element of scienter. Plaintiffs are entitled to challenge it both facially and as applied.

### B.   The Specific Terms are Vague

The Act's definitions fail to give sufficient guidance to the citizens or to the law enforcement officials who enforce it. "All is in the eye of the beholder, and prone to endless manipulation." *Descamps v. United States*, 133 S.Ct. 2276, 2292 (2013).

#### 1.   Magazine Capacity Provisions

#### i.   "Can Be Readily Restored or Converted to Accept"

New York asserts that "the phrase 'can be readily restored or converted to accept' means, with respect to any modification of a magazine, work that can be performed by a gun owner of average intelligence and abilities without engaging the services of a gunsmith." Mem. 64. This litigation assurance with no basis in the statutory text gives no guidance to the ordinary person. How would a real person know what a fictitious average gun owner would know or could do? In the real world, a person has no way to know that. *See Peoples Rights Organization, Inc. v. City of Columbus*, 152 F.3d 522, 538 (6th Cir. 1998), *aff'g in part & rev'g in part*, 925 F. Supp. 1254, 1269 (S.D. Ohio 1996).

New York cites cases on definitions in the National Firearms Act. Mem. 64-65. *United States v. Carter*, 465 F.3d 658, 663-64 (6th Cir. 2006), held certain definitions not to be vague, but "readily restored" was not even at issue. *United States v. Drasen*, 845 F.2d 731, 733 (7th Cir. 1988), concerned whether "the Act reaches a previously unassembled weapon that can be readily

GOLDBERG SEGALLA, LLP
11 Martine Ave., 7th Floor
White Plains, NY 10607
(914) 798-5400

assembled," not whether "readily restored" is itself vague.  Even that decision was rejected in *United States v. Thompson/Center Arms Co.*, 924 F.2d 1041, 1948-49 (Fed. Cir. 1991), *aff'd*, 504 U.S. 505 (1992).[42]  The courts are otherwise in disarray.  One court said that "readily restorable" could mean eight hours in "a properly equipped machine shop," *United States v. Smith*, 477 F.2d 399, 400 (8th Cir. 1973), which another court said "presses the notion of 'ready restoration' near or beyond its distal boundary."  *United States v. Aguilar-Espinosa*, 57 F. Supp.2d 1359, 1362 (M.D. Fla. 1999).

Most importantly, plaintiffs explained in factual detail why "can be readily restored or converted to accept" is vague as applied to magazines. See, Plaintiffs' Memorandum of Law In Support of Motion for Preliminary Injunction (Doc. # 23-1) at 24-26.  New York does not even try to explain when it comes to the countless magazine designs.

### ii.    Capacity of Tubular Magazines

The capacity of a tubular magazine varies with the length of the cartridges, meaning that the same magazine will hold ten or fewer, or more than ten, rounds depending on such length.  That renders the definition of "large capacity magazine" vague as applied to tubular magazines. *See* Pl. Mem. 25; *Peoples Rights Organization*, 152 F.3d at 536.

New York responds that magazines are made "to accept a standard-length round," which it also refers to as "the standard, manufacturer-recommended round for the product."  Mem. 66 n.54.  That is simply inaccurate.  For instance, .38 Special cartridges are available as "wadcutters," in which the bullet does not even protrude from the cartridge case, as well as with bullets extending

---

[42] The district court cases cited by New York make no attempt to define "readily."  *E.g.*, *United States v. M-K Specialties Model M-14 Machinegun*, 424 F. Supp.2d 862, 872 (N.D. W.Va. 2006).

GOLDBERG SEGALLA, LLP
11 Martine Ave., 7th Floor
White Plains, NY 10607
(914) 798-5400

well beyond the cartridge case.  Rifles with tubular magazines that will hold those cartridges will also hold .357 Magnum cartridges, which are even longer.

**2.**   **"Pistol Grip That Protrudes Conspicuously"**
**and "Protruding Grip"**

The terms "pistol grip that protrudes conspicuously beneath the action of the weapon," and "a protruding grip that can be held by the non-trigger hand," are subjective and vague.  The legislature could have easily defined what it meant in inches and angles, as it does with barrel length.  For instance, "firearm" is defined to include a shotgun with a barrel less than eighteen inches in length, Penal Law § 265.00(3), not a barrel that "protrudes inconspicuously."

Contrary to New York, "mathematical certainty" is possible and necessary here.  Mem. 67. *Richmond Boro Gun Club*, 97 F.3d at 685, upheld the term based on "photographs submitted by the parties," but that was a summary judgment case, and plaintiffs here are entitled to submit new evidence.[43]  Moreover, that court's belief that no fundamental right was involved, *id.* at 684, has been superceded by *Heller* and *McDonald*, thereby requiring a stricter vagueness test.

That plaintiffs have or desire rifles that they fear New York authorities consider, or may consider, restricted does not save the terms from vagueness.  Mem. 68.  Their wish to avoid arrest and incarceration for violation of a law that is vague only means that the law chills exercise of their rights.  By not using exact measurements where it is quite possible to do so, the law appears intent on doing just that.

**3.**   **Shotgun that Cannot Hold More than Five Rounds**

---

GOLDBERG SEGALLA, LLP
11 Martine Ave., 7th Floor
White Plains, NY 10607
(914) 798-5400

[43] That includes challenging whether such grips are for "'one-handed firing' at hip level," *id.*

The terms "semiautomatic shotgun that cannot hold more than five rounds of ammunition" is vague as applied to shotguns with tubular magazines due to shotgun shells being in different lengths, for the reasons stated above. New York's belief that the law assumes "standard rounds" of a given length, Mem. 68, is contrary to the fact that 12 gauge shotgun shells come in lengths from 2 inches to 3½ inches. Peoples Rights Organization, 152 F.3d at 536 n.15.

### 4.      The Unintelligible "And If" Clause

Penal Law § 265.36 is clear in making it unlawful "to knowingly possess a large capacity ammunition feeding device manufactured before" September 13, 1994. However, the remainder of the sentence fails to complete a sentence, is unintelligible, and should be stricken: "and if such person lawfully possessed such large capacity feeding device before the effective date of the chapter of the laws of two thousand thirteen which added this section, that has a capacity of, or can be readily restored or converted to accept, more than ten rounds of ammunition."

New York says this "grammatical error" is of no consequence because law enforcement must give notice of the violation for there to be a conviction. Mem. 69. But how would law enforcement know what it means? "[T]he more important aspect of vagueness doctrine . . . is not actual notice, but . . . the requirement that a legislature establish minimal guidelines to govern law enforcement." *Kolender v. Lawson*, 461 U.S. 352, 357-58 (1983) (citation omitted).

While the Act was rushed to passage without adequate proofreading, New York was informed of this unintelligible provision in the original Complaint, ¶ 28 (filed Mar. 21, 2013). No effort was made to clarify the provision when the Act was amended by S2607D-2013, Part FF (Mar. 28, 2013). It should not now be allowed essentially to rewrite the provision in a brief.

### 5.      "Threaded Barrel Designed to Accommodate" and "Muzzle Break"

GOLDBERG SEGALLA, LLP
11 Martine Ave., 7th Floor
White Plains, NY 10607
(914) 798-5400

42

Instead of referring to a "threaded barrel," the Act refers to a "threaded barrel designed to accommodate" a flash suppressor, "muzzle break," or muzzle compensator. Penal Law § 265.00(22)(a)(vi). All one can tell about threading is that it is course or fine, which provides no information on what it may or may not have been designed to accommodate. New York spends two pages on this provision without so much as suggesting how one would know the answer. Mem. 70-71. *Richmond Boro Gun Club*, 97 F.3d at 685, found no vagueness "when the statute is applied to firearms advertised to include parts identified as . . . flash suppressors," but did not suggest how bare threading would inform a person of what it was designed to accommodate.

The suggestion that "the objective purpose of threaded barrels is to accommodate" the three listed devices, Mem. 71, conflicts with the statutory text. A "threaded barrel designed to accommodate" the three specific devices implies the existence of a threaded barrel designed to accommodate other devices, and not these.

New York argues that it can imprison a citizen by outlawing something it describes as a "muzzle break" if the citizen has a "muzzle brake," because the words are homophones. Mem. 70 n.56. The meaning of "break" is entirely different from "brake." That plaintiffs, out of caution to avoid the penitentiary, anticipate the possibility that the authorities might enforce this vague provision in a manner not warranted by its wording does not constitute adequate notice. New York's haste in passing this enactment does not excuse what it considers to be just spelling errors.[44]

### 6.   "Version"

---

[44] *See United States v. Huff*, 512 F.2d 66, 69 (5th Cir. 1975) (ignoring a "a typographical error" in the name of a drug would not "sufficiently appris[e] [defendant] of the charge"; "we cannot regard this defect as a mere technicality").

GOLDBERG SEGALLA, LLP
11 Martine Ave., 7th Floor
White Plains, NY 10607
(914) 798-5400

New York fails to suggest how an ordinary person would know that a given firearm is "a semiautomatic version of an automatic rifle, shotgun or firearm." Mem. 71-72. First, New York bans automatic guns, which are machine guns, Penal Law § 265.02(2), making it impossible to compare any of the countless models of machine guns with a specific semiautomatic gun. None of the cases it cites involved a law banning possession of one gun that was a "version" of another.

Second, no notice is given of what features would make one gun a "version" of another gun. An analogous law defining an "assault weapon" as a list of firearms and other models with "slight modifications or enhancements" was declared unconstitutionally vague on its face in *Springfield Armory, Inc. v. City of Columbus*, 29 F.3d 250 (6th Cir. 1994). "Slight modifications" (like "version" here) raised unanswerable questions: "How is the ordinary consumer to determine which changes may be considered slight? A weapon's accuracy, magazine capacity, velocity, size and shape and the caliber of ammunition it takes can all be altered." *Id.* at 253.

Third, given that design features are technical and complex, it is unclear how an ordinary person would be able to make any necessary determination. A similar provision defining "assault weapon" as "semiautomatic pistols that are . . . modifications of automatic weapons" was declared vague. *Robertson v. Denver*, 874 P.2d 325, 334-35 (Colo. 1994). "[A]scertaining the design history and action design of a pistol is not something that can be expected of a person of common intelligence." *Id.* at 335.

### 7.    "Manufactured Weight"

New York fails to suggest how any person would know the "manufactured weight" of a firearm. Mem. 72-73. One could weigh a firearm in its present condition, but parts could have been interchanged since its manufacture. Plaintiffs' statement that weight is a matter of personal

preference is hardly an admission that ordinary persons know the weight of a firearm when actually manufactured.

### 8.    "Commercial Transfer"

New York suggests that "commercial transfer" of ammunition means "transfers involving one who is engaged in the business of selling ammunition," Mem. 73, although the statutory text does not say that, and instead simply provides: "No commercial transfer of ammunition shall take place unless a licensed dealer in firearms or registered seller of ammunition acts as an intermediary . . . ." Penal Law § 400.03(7).

For all plaintiffs know, selling a box of shotgun shells to a buddy who ran out in a duck blind is a "commercial transfer" that would subject a hunter to criminal penalties. As with the other vague provisions, New York considers plaintiffs' concerns insignificant, but plaintiffs and other law-abiding citizens are the ones who are threatened with incarceration for any perceived misstep. This and the other vague terms should be declared void.

### IV.    COUNT IV IS RIPE FOR PRE-ENFORCEMENT REVIEW AND STATES A VALID CLAIM FOR RELIEF

#### A.    Count IV is Justiciable

Since the ammunition provisions are effective on January 15, 2014, New York argues that Count IV is not ripe. Mem. 74. But that date will come soon, and it is the deadline for sellers of ammunition to register with the state police. Penal Law § 400.03(1). It is also the deadline for sellers of ammunition and gun dealers to be set up to conduct electronic background checks, keep records, and to comply with all other relevant provisions. § 400.03(2)-(6).

Plaintiff New York State Amateur Trap Association (NYSATA) sells shotgun ammunition to its members at below retail prices, and many of its members also order ammunition directly from out-of-state companies. Section 400.03 will dramatically increase prices, and it may eliminate NYSATA's ability even to sell ammunition. First Amended Complaint ¶s 133-35. NYSATA must plan well in advance if it decides to operate as a seller of ammunition, and both NYSATA and its members must take care not to order ammunition that would be delivered beginning on January 15, 2014.

Preenforcement review requires the court "to evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Abbott Laboratories v. Gardner*, 387 U.S. 136, 149 (1967). The issue is fit for judicial decision if, as here, "the issue tendered is a purely legal one . . . ." *Id.* "This is also a case in which the impact of the regulations upon the petitioners is sufficiently direct and immediate as to render the issue appropriate for judicial review at this stage." *Id.* at 152. While the criminal sanctions do not apply yet, plaintiffs are burdened now with what is required to be in compliance by the deadline.

New York cites *Thomas v. City of New York*, 143 F.3d 31, 34 (2d Cir. 1998), for its "holding that claims are not ripe where it is not clear whether and how the challenged laws will be applied and will affect plaintiffs," Mem. 74, but here it is clear that the law will be applied to injure plaintiffs. New York also relies on *State Ammunition Inc. v. Lindley*, No. 2:10–cv–01864, 2010 WL 4983286, *1 (E.D. Cal. Dec. 2, 2010), which includes virtually no analysis and the bare-bones conclusion about a similar law that plaintiffs had not shown "sufficiently immediate concern," and that "[n]o one can yet anticipate" how the law would affect their business. How the Act here will adversely affect plaintiffs is obvious.

GOLDBERG SEGALLA, LLP
11 Martine Ave., 7th Floor
White Plains, NY 10607
(914) 798-5400

**B.     Count IV States a Sufficient Claim on the Merits**

The Act's restriction of ammunition sales to New York businesses authorized by the State Police violates the Dormant Commerce Clause, which is inherent in the power of Congress "to regulate commerce . . . among the several States," U.S. Const., Art. I, § 8, cl. 3.  Prior to the Act, ammunition could be lawfully purchased from entities in or outside New York.  It was not required that ammunition be purchased from a seller of ammunition registered with the State Police or from a licensed dealer in firearms.

Ammunition may only be sold by a seller of ammunition registered with the State Police or a licensed dealer in firearms under § 400.00.  Penal Law § 400.03.  A dealer in firearms must "maintain a place of business in the city or county where the license is issued."  § 400.00(1).  An application for a license as a dealer in firearms must be submitted "to the licensing officer where such place of business is located." § 400.00(3)(a).

The effect of § 400.03 is to grant a monopoly on ammunition sales to sellers of ammunition and dealers in firearms which are based only in New York.   By allowing in-state businesses to sell ammunition directly to consumers but to prohibiting out-of-state businesses from doing so, the Act discriminates against interstate commerce, in violation of the Commerce Clause.

The Act's Statement in Support states that "this bill requires that any seller – whether located in New York or out of state – ship the ammunition to a dealer within New York for in-person pick-up."  That makes it similar to the laws at issue in *Granholm v. Heald*, 544 U.S. 460, 466 (2005), the object of which was "to allow in-state wineries to sell wine directly to consumers in that State but to prohibit out-of-state wineries from doing so . . . . It is evident that the object and design of the

GOLDBERG SEGALLA, LLP
11 Martine Ave., 7th Floor
White Plains, NY 10607
(914) 798-5400

47

Michigan and New York statutes is to grant in-state wineries a competitive advantage over wineries located beyond the States' borders."[46]

Just as only in-state businesses can sell ammunition, in *Granholm* only "[i]n-state wineries . . . can obtain a license for direct sales to consumers. The differential treatment between in-state and out-of-state wineries constitutes explicit discrimination against interstate commerce." *Id.* at 467. That discrimination violated the Commerce Clause. *Id.* at 466.

New York presented little evidence that the purchase of wine over the internet by minors was a problem, and indeed "minors who decide to disobey the law have more direct means of doing so." *Id.* at 490. Moreover, "the States can take less restrictive steps to minimize the risk that minors will order wine by mail," such as "an adult signature on delivery and a label so instructing on each package." *Id.* at 490-91. Ammunition sellers follow that practice now.

Out-of-state firms could even conduct background checks, as "[b]ackground checks can be done electronically." *Id.* at 492. The only procedure an internet seller could not follow would be a face-to-face sale in New York. But that requirement can be avoided under New York's scheme by simply having someone else make the purchase. "Under our precedents, which require the 'clearest showing' to justify discriminatory state regulation, . . . this is not enough." *Id.* at 490.[47]

New York relies on the pre-*Granholm* case of *Brown & Williamson Tobacco Corp. v. Pataki*, 320 F.3d 200 (2d Cir. 2003), which upheld a distinguishable statute prohibiting sellers from shipping

---

[46]The Second Circuit "recognize[d] that the physical presence requirement could create substantial dormant Commerce Clause problems if this licensing scheme regulated a commodity other than alcohol." *Id.* at 471, quoting 358 F.3d 223, 238 (2nd Cir. 2004).

[47]At one time, federal law required that ammunition be sold only in person and that records be kept. This was repealed after the ATF Director verified: "The Bureau [of ATF] and the Department [of the Treasury] have recognized that current recordkeeping requirements for ammunition have no substantial law enforcement value." House Report 99-495, 99th Cong., 2d.Sess., 17 (1986).

GOLDBERG SEGALLA, LLP
11 Martine Ave., 7th Floor
White Plains, NY 10607
(914) 798-5400

cigarettes directly to New York consumers.[48]  The statute here involves conducting an electronic background check that an out-of-state vendor could perform as well as a New York business, but only the latter may register to do so.  While the face-to-face requirement parallels *Brown & Williamson*, New York has not made the "clearest showing" as required by *Granholm* that the discriminatory state regulation – which can be easily circumvented – is justified.[49]

### V.  NEW YORK FAILS TO STATE OTHER GROUNDS FOR DISMISSAL

New York correctly states that, under Second Circuit precedent, an organization lacks standing to sue on behalf of its members under 42 U.S.C. § 1983.  Mem. 77, citing *Nnebe v. Daus*, 644 F.3d 147, 156 (2d Cir. 2011).  That has no effect here because it may sue in its own right, *id.,* as may its members.

New York asserts that "there is no Second Amendment right to sell firearms," and that the business plaintiffs have neither a Second Amendment claim nor standing to sue on behalf of their customers.  Mem. 78.[50]  To the contrary, regulations on gun sales "do not fall outside the scope of the Second Amendment," and a prohibition on the commercial sale of firearms "would be untenable under Heller."  *United States v. Marzzarella*, 614 F.3d 85, 92 n.8 (3rd Cir. 2010). *Heller* "did not purport to exempt those [firearm sale] laws from constitutional scrutiny." *Kole v. Village of Norridge*, No. 11 C 3871, 2013 WL 1707951, *6 (N.D. Ill. April 19, 2013). *See Powers v. Ohio*, 499

---

[48] *Oltra, Inc. v. Pataki*, 273 F. Supp. 2d 265 (W.D. N.Y. 2003), which involved the same tobacco restriction, is distinguishable for the same reasons.

[49] *Arnold's Wines, Inc. v. Boyle*, 571 F.3d 185, 191 (2d Cir. 2009), is not pertinent here because it upheld New York's alcohol regulatory scheme under the Twenty-first Amendment.

[50] None of the cases New York cites so held. *United States v. Chafin*, 423 F. App'x 342, 344 (4th Cir. 2011) (firearm sale to drug user); *United States v. Conrad*, No. 1:11CR00042, 2013 WL 546373 (W.D. Va. Feb. 13, 2013) (defendant not charged with selling firearm); *Mont. Shooting Sports Ass'n v. Holder*, No. CV-09-147, 2010 WL 3926029, *22 (D. Mont. Aug. 31, 2010) (Second Amendment claim not pled).

U.S. 400, 410-411 (1991) ("We have recognized the right of litigants to bring actions on behalf of third parties"); *Craig v. Boren*, 429 U.S. 190, 195 (1976) ("vendors . . . have been uniformly permitted to resist efforts at restricting their operations by acting as advocates of the rights of third parties who seek access to their market").

## VI.   **PLAINTIFFS ARE ENTITLED TO AN INJUNCTION**

Contrary to New York, Mem. 78, plaintiffs have shown a clear likelihood of success on the merits as well as irreparable harm, and are entitled to permanent injunctive relief.  New York is not entitled to dismissal of any of the claims.

## VII.   **CONCLUSION**

**WHEREFORE,** for the reasons set forth herein, the Court should grant the Plaintiffs' Motion for Summary Judgment for Declaratory Judgment that the SAFE Act is unconstitutional, grant a Permanent Injunction, and deny the Defendants' Motions for Summary Judgment.

Dated: August 19, 2013                           Respectfully Submitted,

LAW OFFICE OF STEPHEN HALBROOK          GOLDBERG SEGALLA, LLP

By: /s/   Stephen P. Halbrook_____          By: /s/   Brian T. Stapleton_____
Stephen P. Halbrook, Esq.                         Brian T. Stapleton, Esq.
Pro Hac Vice (Pending)                            Matthew S. Lerner, Esq.
3925 Chain Bridge Road, Suite 403                 11 Martine Avenue, Suite 750
Fairfax, VA 22030                                 White Plains, New York 10606-1934
(703) 352-7276                                    (914) 798-5400
protell@aol.com                                   bstapleton@goldbergsegalla.com

                                                  Counsel For Plaintiffs

<u>CERTIFICATION</u>

I hereby certify that on August 19, 2013 a copy of the foregoing OMNIBUS MEMORANDUM OF LAW was filed electronically and served by mail upon anyone unable to accept electronic filing. Notice of this filing was will be sent by e-mail to all parties by operation of the Court's electronic filing system  or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.

GOLDBERG SEGALLA, LLP

By:   /s/   Brian T. Stapleton
      Brian T. Stapleton, Esq.