IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| NEW YORK STATE RIFLE AND PISTOL ASSOCIATION, INC., et al., | ) ) ) | |
| Plaintiffs, | ) ) | Case No.: 13-cv-00291-WMS |
| v. | ) ) | |
| ANDREW M. CUOMO, et al., | ) ) | |
| Defendants. | ) | |

**PINK PISTOLS' AMICUS CURIAE BRIEF IN SUPPORT OF PLAINTIFFS' MOTION
FOR SUMMARY JUDGMENT**

Richard A. Grimm, III
Counsel for Pink Pistols
MAGAVERN MAGAVERN GRIMM LLP
1100 Rand Building
Buffalo, NY 14203
Tel: (716) 856-3500
Fax: (716) 856-3390
Email: rgrimm@magavern.com


*Attorney for Pink Pistols*

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................ ii

INTEREST OF AMICUS CURIAE ............................................................. 1

INTRODUCTION ...................................................................................... 1

ARGUMENT .............................................................................................. 1

I.  The Second Amendment Protects Civilian Ownership of Firearms that Are of the Kind in Common Use for Lawful Purposes. .......................................................... 1

    A.  *Heller* Forbids Any Form of Interest-Balancing in This Case. ............................... 1

    B.  The Second Amendment Protects the Individual Right to Possess Firearms that are Commonly Used by Law-Abiding Citizens for Lawful Purposes. .................... 3

II.  The Act's Ban on "Large Capacity Magazines" Outlaws a Nearly Universal Feature of Firearms Commonly Used for Lawful Purposes. ............................................. 4

III.  The Act's Ban on So-Called "Assault Weapons" Outlaws an Enormous Class of Firearms Commonly Used for Lawful Purposes. .............................................. 11

IV.  Banning So-Called "Assault Weapons" and "Large Capacity Magazines" Will Do Nothing To Reduce Violent Crime. .................................................................... 17

V.  The Sad Truth Is that the Statute Challenged Here Would Not Have Prevented the Atrocity that Spawned It—the Horrifying Massacre at the Newtown School. ................. 23

CONCLUSION .......................................................................................... 25

## TABLE OF AUTHORITIES

**Cases**                                                                  **Page**

*DeShaney v. Winnebago Cnty.*, 489 U.S. 189 (1989) ...................................................8

*District of Columbia v. Heller*, 554 U.S. 570 (2008)........................................... *passim*

*Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011) ..........................................18

*Heller v. District of Columbia*, 670 F.3d 1244 (D.C. Cir. 2011) ...........................2, 4, 11

*Kachalsky v. Cnty. of Westchester*, 701 F.3d 81 (2d Cir. 2012) ...............................2, 3

*McDonald v. City of Chicago*, 130 S. Ct. 3020 (2010)...............................................2

*Moore v. Madigan*, 702 F.3d 933 (7th Cir. 2012)..............................................2, 18

*Robb v. Hungerbeeler*, 370 F.3d 735 (8th Cir. 2004) ..............................................23

*Staples v. United States*, 511 U.S. 600 (1994) ........................................................12

*Stenberg v. Carhart*, 530 U.S. 914 (2000) ...........................................................15

*Town of Castle Rock v. Gonzalez*, 545 U.S. 748 (2005) .............................................8

*United States v. Skoien*, 614 F.3d 638 (7th Cir. 2010)...........................................18

**Statutes**

36 U.S.C. § 40701 ...............................................................................................10

Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No.
   103-322, 108 Stat. 1796, Title XI (1994).............................................................9

**Other**

1 HAWKINS, TREATISE OF THE PLEAS OF THE CROWN (1716) .......................................3

Anthony J. Pinizzotto, Edward F. Davis and Charles E. Miller III, VIOLENT ENCOUNTERS:
   A STUDY OF FELONIOUS ASSAULTS ON OUR NATION'S LAW ENFORCEMENT OFFICERS
   (FBI Criminal Justice Inform. Serv. Div. 2006) .................................................22

*Assault Weapons: A View from the Front Lines: Hearing on S. 639 and S. 653 Before
   the S. Comm. on the Judiciary*, 103d Cong. (1993) (statement of Joseph Constance,
   Deputy Chief, Trenton, New Jersey Police Department). ...................................21, 22

Brian McCombie, *Up Close with The FBI: The Bureau Emphasizes Close Quarters in
   New Gun Training*, in GUNS & AMMO, HANDGUNS (Aug./Sept. 2013)........................6, 7

BUREAU OF JUSTICE STATISTICS: CENSUS OF STATE AND LOCAL LAW ENFORCEMENT
   AGENCIES (2008), *available at* www.bjs.gov (July 2011 Report) ..............................6

Centers for Disease Control, *Recommendations To Reduce Violence Through Early
   Childhood Home Visitation, Therapeutic Foster Care, and Firearms Laws*,
   28 AM. J. PREV. MED. 6 (2005) .........................................................................20

CHAD ADAMS, COMPLETE GUIDE TO 3-GUN COMPETITION (2012)............................9, 10

Charles Krauthammer, Column, *Disarm the Citizenry*, THE WASHINGTON POST,

Apr. 5, 1996, at A19...................................................................................................16

CHRISTOPHER R. BARTOCCI, BLACK RIFLE II: THE M16 INTO THE
  21ST CENTURY (2004) ......................................................................................... *passim*

Christopher S. Koper, *America's Experience with the Federal Assault Weapons Ban,
  1994-2004*, in REDUCING GUN VIOLENCE IN AMERICA: INFORMING POLICY WITH
  EVIDENCE AND ANALYSIS (Daniel W. Webster & Jon S. Vernick eds., 2013) ..........................20

Christopher S. Koper *et al.*, *An Updated Assessment of the Federal Assault Weapons
  Ban: Impacts on Gun Markets and Gun Violence, 1994-2003* (2004), Rep. to the
  Nat'l Inst. of Justice, U.S. Dep't of Justice.................................................................4, 12, 20

CMP website, http://odcmp.com.........................................................................................10

CMP website, http://odcmp.com/Comm/About_Us.htm........................................................10

CMP website, http://www.odcmp.org/0904/M-16Match.asp.................................................11

CMP website, http://odcmp.com/NM/Pistol.htm.................................................................11

CMP website, http://www.odcmp.com/NM/SAFS.htm ........................................................11

CMP website, www.TheCMP.org .......................................................................................10

2012 CMP Sales Catalog .............................................................................................10, 11

Dan Haar, *America's Rifle: Rise of the AR-15*, HARTFORD COURANT (Mar. 9, 2013),
  http://articles.courant.com/2013-03-09/business/hc-haar-ar-15-it-gun-20130308_1_new-rifle-
  colt-firearms-military-rifle ............................................................................................12

David B. Kopel, *"Assault Weapons,"* in GUNS: WHO SHOULD HAVE THEM
  (David B. Kopel ed., 1995) ........................................................................................ *passim*

David B. Kopel, *Rational Basis Analysis of "Assault Weapon" Prohibition*,
  20 J. CONTEMP. L. 381 (1994) ......................................................................................11

Dep't of Justice, GUNS USED IN CRIME (1995) .................................................................12

Dick Metcalf, *The Big Boys*, in GUNS & AMMO (Jan. 2013) ...........................................9, 13

Doug Wyllie, *PoliceOne's Gun Control Survey: 11 Key Lessons From Officers'
  Perspectives* (Apr. 8, 2013), http://www.policeone.com/Gun-Legislation-Law-
  Enforcement/articles/6183787-PoliceOnes-Gun-Control-Survey-11-key-lessons-from-
  officers-perspectives/ ..................................................................................................21

Eric Poole, *Ready to Arm: It's Time To Rethink Home Security*, in GUNS & AMMO,
  BOOK OF THE AR-15 (Eric R. Poole ed., 2013)...............................................................13

FBI, *Crime in the U.S. 2010*, *cited in* PERSONAL & HOME DEFENSE,
  2013 BUYER'S GUIDE (2013) .........................................................................................8

GARY PAUL JOHNSTON & THOMAS B. NELSON,
  THE WORLD'S ASSAULT RIFLES (2010) .......................................................................13, 15

GUN: A VISUAL HISTORY (Chris Stone ed., 2012).........................................................4, 24

GUNS & AMMO, BOOK OF THE AR-15 (Eric R. Poole ed., 2013) .....................................5, 12

HANDGUNS: 2013 BUYER'S GUIDE (2013) ................................................................5

http://www.governor.ny.gov/assets/documents/RiflesthatAREclassifiedasassaultweapons.pdf.....9

J. Guthrie, *The 300 Blackout Story*, in GUNS & AMMO, BOOK OF THE AR-15: 300 BLACKOUT
EDITION (Eric R. Poole ed., 2013) ...................................................................9, 13

J. Guthrie, *Versatile Defender: An Argument for Advanced AR Carbines in the Home*,
in GUNS & AMMO, BOOK OF THE AR-15 (Eric R. Poole ed., 2013) ............................13

Jeffrey A. Roth & Christopher S. Koper, *Impact Evaluation of the Public Safety and
Recreational Firearms Use Protection Act of 1994 (Final Report)* (Mar. 13, 1997),
*available at* www.urban.org/UploadedPDF/aw_final.pdf ...............................18, 19

Joseph von Benedikt, *Double Down: Get Your DA Revolver Skills Up to Snuff with These
Pro Tips*, in GUNS & AMMO, HANDGUNS (Aug./Sept. 2013) ....................................25

Josh Sugarmann, *Assault Weapons and Accessories in America* (Violence Policy
Center 1988), http://www.vpc.org/studies/awaconc.htm ...................................15, 16

JOYCE LEE MALCOLM, GUNS AND VIOLENCE: THE ENGLISH EXPERIENCE (2002)...........................9

K.D. KIRKLAND, AMERICA'S PREMIER GUNMAKERS: BROWNING (2013) ............................4, 5, 11

K.D. KIRKLAND, AMERICA'S PREMIER GUNMAKERS: WINCHESTER (2013) ...............................24

Mark Kayser, *AR-15 for Home & the Hunt*, in PERSONAL & HOME DEFENSE (2013)..................13

MARK OWEN & KEVIN MAURER, NO EASY DAY: THE FIRSTHAND ACCOUNT OF THE MISSION
THAT KILLED OSAMA BIN LADEN (2012) ..............................................................14

MASSAD AYOOB, THE COMPLETE BOOK OF HANDGUNS (2013) ...........................................6

MAXIM POPENKER & ANTHONY G. WILLIAMS, ASSAULT RIFLE (2004) ..................................15

Michael Remez, *A Civilian Version of an M-16: Bushmaster Rifle a Common Choice*, HARTFORD
COURANT (Oct. 25, 2002), http://articles.courant.com/2002-10-25/news/0210252068_1_
bushmaster-firearms-john-allen-williams-distributor-in-washington-state ...............................14

MILITARY SMALL ARMS 146-47 (Graham Smith ed., 1994)..................................4, 5, 24

N.R. Kleinfield, *et al.*, *Newton Killer's Obsessions, in Chilling Detail*, N.Y. TIMES,
Mar. 28, 2013 .....................................................................................23

NATIONAL RESEARCH COUNCIL, FIREARMS AND VIOLENCE: A CRITICAL REVIEW 97
(Charles F. Wellford *et al.* eds., 2005).........................................................20

Robert A. Hahn, *et al.*, *Firearms Laws and the Reduction of Violence: A Systematic
Review*, 28 AM. J. PREV. MED. 40 (2005) ..........................................................20

THE AMERICAN RIFLEMAN GUIDE TO BLACK RIFLES (2006) ....................................13, 16, 17

THE COMPLETE BOOK OF AUTOPISTOLS: 2013 BUYER'S GUIDE (2013) ..................................5

THE PUBLIC INQUIRY INTO THE SHOOTINGS AT DUNBLANE PRIMARY SCHOOL ON 13 MARCH
1996, https://www.ssaa.org.au/research/1996/1996-10-16_public-inquiry-dunblane-lord-
cullen.pdf .........................................................................................25

WILL FOWLER AND PATRICK SWEENEY, WORLD ENCYCLOPEDIA OF RIFLES AND MACHINE
GUNS (2012)..................................................................................................4, 5. 24

www.ipsc.org ...........................................................................................................9

## INTEREST OF AMICUS CURIAE

Pink Pistols is a shooting society that honors diversity and that is open to all. It advocates the responsible use of lawfully owned and lawfully carried firearms for self defense, whether by sexual minorities (a group that FBI statistics identify as particularly subject to violence based on discriminatory animus) or by any other individuals, all of whom have a Second Amendment right to armed self-defense. Pink Pistols has twenty-two chapters across the United States, including one in New York City, and the organization is experiencing rapid growth, with requests to form new local chapters coming in all the time.

## INTRODUCTION

New York's SAFE Act ("the Act"), prohibits a gun owner (1) from possessing a magazine capable of holding more than ten rounds of ammunition and from loading more than seven rounds into a magazine or (2) from possessing a semiautomatic rifle, pistol, or shotgun that the Act deems an "assault weapon." These bans will respectively be referred to hereafter as the Act's "Large Capacity Magazine" ("LCM") ban and its "Assault Weapons" ("AW") ban. Because the Act categorically outlaws common firearms and standard magazines that are "of the kind in common use . . . for lawful purposes," *District of Columbia v. Heller*, 554 U.S. 570, 624 (2008), the Act cannot be reconciled with the Second Amendment and should be struck down.

## ARGUMENT

I.    **The Second Amendment Protects Civilian Ownership of Firearms that Are of the Kind in Common Use for Lawful Purposes.**

A.    *Heller* **Forbids Any Form of Interest-Balancing in This Case.**

In *Heller* the Supreme Court emphatically ruled that the line between permissible regulations and impermissible bans on firearms *is not* to be established by balancing the individual right protected by the Second Amendment against asserted competing government

interests (such as public safety), *because that balance has already been struck*: the Second Amendment itself "is the very *product* of an interest-balancing by the people," and "[t]he very enumeration of the right takes out of the hands of government . . . the power to decide on a case-by-case basis whether the right is *really worth* insisting upon." 554 U.S. at 634, 635.

Although *Heller* stated that D.C.'s handgun ban would fail "any of the standards of scrutiny that [the courts have] applied to enumerated constitutional rights," *id.* at 628, the Supreme Court made a point of *not* applying any of those standards. Instead, the Court categorically struck down the ban after finding it irreconcilable with the Second Amendment's text and history. Indeed, the Court *expressly disavowed* the "interest-balancing" and intermediate scrutiny proposed by Justice Breyer in dissent as wholly inappropriate when dealing with a categorical ban on a class of firearms. *See id.* at 634-35 (opinion of the Court); *id.* at 704-05 (Breyer, J., dissenting). In *McDonald v. City of Chicago*, 130 S. Ct. 3020 (2010), the Supreme Court reiterated that *Heller* "expressly rejected the argument that the scope of the Second Amendment right should be determined by judicial interest balancing." 130 S. Ct. at 3047 (controlling opinion of Alito, J.). As Judge Posner has written for the Seventh Circuit, "the Supreme Court made clear in *Heller* that it wasn't going to make the right to bear arms depend on casualty counts." *Moore v. Madigan*, 702 F.3d 933, 939 (7th Cir. 2012). *See also Heller v. District of Columbia*, 670 F.3d 1244, 1271 (D.C. Cir. 2011) ("*Heller II*") (Kavanaugh, J., dissenting) ("*Heller* and *McDonald* leave little doubt that courts are to assess gun bans and regulations based on text, history, and tradition, not by a balancing test . . . .").

Although the Second Circuit applied intermediate scrutiny in *Kachalsky v. County of Westchester*, 701 F.3d 81 (2d Cir. 2012), even on *Kachalsky*'s own terms its interest-balancing analysis does not control in this case, which involves a flat ban on certain categories of firearms.

The New York law under review in *Kachalsky* did not amount to a flat ban, *see id.* at 98 (New York did not categorically "forbid[] anyone from carrying a handgun in public"), and it did not extend into the home, *see id.* at 94 ("New York's licensing scheme affects the ability to carry handguns only *in public* . . . ."). Neither of those distinctions exists here, and therefore interest-balancing cases such as *Kachalsky* are inapposite and do not foreclose application of *Heller*'s categorical approach to a law that *does amount to a flat ban and that does extend into the home*.

In sum, "where a state regulation is entirely inconsistent with the protections afforded by an enumerated right—as understood through that right's text, history, and tradition—it is an exercise in futility to apply means-end scrutiny." *Id.* at 89 n.9. That is the case here.

**B.      The Second Amendment Protects the Individual Right to Possess Firearms that Are Commonly Used by Law-Abiding Citizens for Lawful Purposes.**

The firearms protected by the Second Amendment are those "arms 'in common use at the time' for lawful purposes like self-defense." *Heller*, 554 U.S. at 624. Conversely, "the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes," such as sawed-off shotguns. *Id.* at 625. *Heller* ruled that this distinction is "fairly supported by the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons,' " *id.* at 627—a tradition that did not bar "Persons of Quality [from] wearing *common Weapons* . . . for their Ornament or Defence, in such places, and upon such Occasions, in which it is common Fashion to make use of them . . . ." 1 HAWKINS, TREATISE OF THE PLEAS OF THE CROWN 136 (1716) (emphasis added).

Applying this "common use" test, *Heller* struck down the D.C. ban on handguns: "The handgun ban amounts to a prohibition of an entire class of 'arms' that is overwhelmingly chosen by American society for [the] lawful purpose [of self-defense]." 554 U.S. at 628.

II.     **The Act's Ban on "Large Capacity Magazines" Outlaws a Nearly Universal Feature of Firearms Commonly Used for Lawful Purposes.**

The principles established by *Heller* compel the conclusion that the Act's prohibition on LCMs is unconstitutional.  Indeed, the panel majority in *Heller II*, the only federal Court of Appeals to consider the constitutionality of a ban on LCMs, concluded that "[w]e think it clear enough in the record that . . . magazines holding more than ten rounds are indeed in 'common use,' as the plaintiffs contend."  670 F.3d at 1261.[1]

Americans own tens of millions of magazines fitting the Act's description of LCMs— therefore, such magazines are "in common use" by any conceivable standard.  *See* Christopher S. Koper *et al.*, *An Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets and Gun Violence, 1994-2003*, Rep. to the Nat'l Inst. of Justice, U. S. Dept. of Justice at 65 (2004) (hereafter "Koper NIJ Rep. 2004") (there are at least 72 million such magazines in the U.S., not counting the millions that have been imported or manufactured in the nine years since the federal ban on magazines in excess of ten rounds expired in 2004).[2]

---

[1] This is where the *Heller II* panel should have stopped, because the determination that a weapon is in common use for lawful purposes *is the decisive issue under Heller, see* 554 U.S. at 624-25, 627, not merely a threshold to the application of intermediate scrutiny. *See Heller II*, 670 F.3d at 1269, 1271-72, 1273, 1276-77 & n.8 (Kavanaugh, J., dissenting).

[2] Many "large" magazines date from the era of ratification of the 14th Amendment.  The 1849 Jennings rifle had a twenty-round magazine, the Volcanic rifle of the 1850s had a thirty-round magazine, both the 1866 Winchester carbine and the 1860 Henry rifle had fifteen-round magazines, the 1892 Winchester could hold seventeen rounds, the Schmidt-Rubin Model 1889 used a detachable twelve-round magazine, the 1898 Mauser Gewehr could accept a detachable box magazine of twenty rounds, and the 1903 Springfield rifle could accept a detachable box magazine of twenty-five rounds. *See* GUN: A VISUAL HISTORY 170-71, 174-75, 180-81, 196-97 (Chris Stone ed., 2012); MILITARY SMALL ARMS 146-47, 149 (Graham Smith ed., 1994); WILL FOWLER AND PATRICK SWEENEY, WORLD ENCYCLOPEDIA OF RIFLES AND MACHINE GUNS 135 (2012); K.D. KIRKLAND, AMERICA'S PREMIER GUNMAKERS: BROWNING 39 (2013).
    The same is true for semiautomatic handguns: the 1896 Mauser C/96 could accept a twenty-round box magazine; the 1908 Luger could accept a detachable thirty-two-round drum magazine; and the 1935 Browning Hi-Power pistol came standard with a thirteen-round magazine. *See* GUN: A VISUAL HISTORY 68-69; WORLD ENCYCLOPEDIA OF RIFLES AND

Indeed, the tendentious label "Large Capacity Magazine" is a misnomer because magazines that will hold more than ten rounds are *standard equipment* on: (1) the predominant brands of semiautomatic rifles used for both self-defense and recreational purposes, such as the AR-15, and (2) most semiautomatic pistols sold in America, whether to law enforcement officers or the general public, with limited exceptions such as diminutive pocket pistols or certain pistols designed for large cartridges such as the .45 ACP. On these commonly owned weapons, the standard-issue magazines for semiautomatic pistols have capacities ranging from eleven to nineteen rounds, with most being around fifteen to seventeen;[3] the standard-issue magazines for AR-15 semiautomatic rifles (and their numerous clones) hold thirty rounds.[4] These are the *standard*-capacity magazines that are for firearms of this size; it is the semiautomatic firearms (particularly handguns) that can hold only magazines of ten or fewer rounds that are unusual.

The nation's nearly one million law enforcement agents at the federal, state and local levels[5] are virtually all armed with semiautomatic handguns with magazines holding more than ten, and as many as twenty, rounds of ammunition.[6] Such firepower has proved to be essential in police encounters with armed criminals. The FBI has just made a major change in its firearms training protocol based on its discovery (analyzing seventeen years of data) that 75% of FBI

---

MACHINE GUNS 138, 141; AMERICA'S PREMIER GUNMAKERS: BROWNING 83.
    [3] *See* HANDGUNS: 2013 BUYER'S GUIDE 11-13, 50-55, 86-123 (2013); THE COMPLETE BOOK OF AUTOPISTOLS: 2013 BUYER'S GUIDE 73-97 (2013).
    [4] *See* GUNS & AMMO, BOOK OF THE AR-15 18, 32-33, 40, 42, 52, 70, 82, 146 (Eric R. Poole ed., 2013).
    [5] *See* BUREAU OF JUSTICE STATISTICS: CENSUS OF STATE AND LOCAL LAW ENFORCEMENT AGENCIES (2008), *available at* www.bjs.gov (July 2011 Report).
    [6] *See* MASSAD AYOOB, THE COMPLETE BOOK OF HANDGUNS 87 (2013) ("Known as the Glock 22, this pistol is believed to be in use by more American police departments than any other. Its standard magazine capacity is 15 rounds."); *id.* at 89 ("On the NYPD, where officers have a choice of three different 16-shot 9mm pistols for uniform carry, an estimated 20,000 of the city's estimated 35,000 sworn personnel carry the Glock 19."); *id.* at 90 ("The most popular police handgun in America, the Glock is also hugely popular for action pistol competition and home and personal defense.").

agent shoot-outs involved criminals who were within nine feet of the agent.[7] This tracks the experience of police officers nationwide: in the period from 2002 through 2011, 65% of law enforcement officers who were murdered in the line of duty were killed by assailants who were within ten feet of them.[8] Even at such close ranges, police officers who fire their handguns miss their target far more often than they hit it. A study of a decade's worth of data from the Metro-Dade police in Florida revealed that officers who shot at suspects, even at these close ranges, missed 85% of the time.[9] The New York City Police Department did slightly better: its officers only missed 83% of the time when the assailant was nine to twenty-one feet away, and when the assailant was within just six feet of the officer the police still missed 62% of the time.[10]

Even for experienced police officers, confrontations with armed criminals generate adrenalin that aids the big muscle groups that are involved in running away, but that impairs the fine motor control needed to operate a handgun, and the acute stress of being terrified for one's life only makes matters worse.[11] It is little wonder then that police officers deem high-capacity magazines essential for their encounters with armed criminals. Ordinary civilians, who lack the police officer's level of training and practice, need those extra rounds even more. The question is not "When is it an advantage to have a high-capacity magazine?" The proper question is "When is it an advantage to run out of ammunition when you are assaulted by an armed criminal?" And the answer to that is "never"—whether one is a police officer or a civilian.

The virtually universal use of semiautomatic pistols with LCMs by the nation's nearly one million law-enforcement officers is sufficient by itself to confirm that pistols with LCMs are

---

[7] *See* Brian McCombie, *Up Close With the FBI: The Bureau Emphasizes Close Quarters in New Gun Training*, in GUNS & AMMO, HANDGUNS (Aug./Sept. 2013) at 10.

[8] *Id.*

[9] *Id.*

[10] *Id.*

[11] *Id.* at 11.

"in common use" for "lawful purposes like self-defense." *Heller*, 554 U.S. at 624.[12]  It also

indicates that, if even *police officers* need that much firepower to defend themselves against

armed criminals, *a fortiori* law-abiding citizens need the same firepower, if not more.[13]  Police

officers have many advantages over civilians when it comes to self-defense, in addition to the

training and practice advantages discussed above: (1) they wear bullet-proof vests; (2) they carry

two extra magazines for their handguns on their utility belts; (3) they often have a smaller, back-

up gun hidden in their vests or in ankle holsters; (4) they have additional firepower available in

their patrol cars, such as a 12-gauge shotgun or a patrol rifle (and the latter is usually the

semiautomatic AR-15 that the Act outlaws as an "assault weapon"); (5) they typically have

additional weapons on their belts, including Tasers, police batons and chemical weapons such as

Mace or pepper spray; (6) they usually have a partner in the car with them, who is similarly

armed; and finally (7) back-up police reinforcements are only a radio call away.  Regular

civilians do not have all of those resources, so their need for standard pistol magazines that hold

as many rounds as possible is both acute and undeniable.

It is no answer to say that because the police are so well-armed, citizens need not be.  Not

only is that proposition wrong as a matter of law—because the Second Amendment's right to

bear arms is conferred on private citizens—it is also tragically false as a matter of fact.  No

citizen enjoys a constitutional right to police protection from assailants[14] and the police are,

unfortunately, rarely around when a citizen is being assaulted.  Consider the crime statistics for

2010: in that year the police were unable to prevent 14,748 murders, 84,767 rapes, and 367,832

---

[12] *See* David B. Kopel, "*Assault Weapons*," in GUNS: WHO SHOULD HAVE THEM 176, 202
(David B. Kopel, ed. 1995) (if "assault weapons" are "only made for slaughtering the innocent,"
then "such killing machines have no place in the hands of domestic law enforcement.")
[13] *Id.* at 202.
[14] *See DeShaney v. Winnebago Cnty.*, 489 U.S. 189, 197 (1989); *Town of Castle Rock v. Gonzalez*, 545 U.S.  748, 768 (2005).

robberies.[15]  Indeed, in 1989, the Justice Department found that there were 168,881 crimes of

violence where it took the police over an hour to respond.[16]

 Nor can the Act be redeemed by pointing out the many firearms that it does *not* ban.  *See*

*Heller*, 554 U.S. at 629 ("It is no answer to say, as petitioners do, that it is permissible to ban the

possession of handguns so long as the possession of other firearms (*i.e.*, long guns) is allowed.").

 Finally, the Act cannot justify denying civilians the semiautomatic, high-capacity

firearms that are issued to the police on grounds that civilians, unlike trained law enforcement

officers, cannot be trusted to identify when it is proper to use a firearm in self-defense and they

therefore constitute an unacceptable risk to public safety.  Armed civilians—even though they

outnumber police by several orders of magnitude—make far fewer mistakes with their firearms.

Each year there are approximately thirty instances in which a civilian mistakenly shoots and kills

an innocent individual who was not actually a burglar, mugger or similar threat—but "[o]ver the

same period the police erroneously kill *five to eleven times* more innocent people."[17]  Armed

civilians are also an asset to public safety:  "Regardless of which counts of homicides by police

are used, the results indicate that civilians legally kill far more felons than police officers do."[18]

 The undeniable reality is that civilians are often left to defend themselves.

Semiautomatic pistols and rifles with large magazine capacities are among "the most preferred

firearm[s] in the nation to 'keep' and use for protection of one's home and family."  *Heller*, 554

U.S. at 628-29.  As in *Heller*, the State has outlawed a class of arms "overwhelmingly chosen by

---

[15] FBI, *Crime in the U.S. 2010*, *cited in* PERSONAL & HOME DEFENSE, 2013 BUYER'S
GUIDE 11 (2013).
 [16] *Id.*
 [17] *See* MALCOLM, GUNS AND VIOLENCE, 239 & n.71 (emphasis added).
 [18] *See* Gary Kleck, *Keeping, Carrying, and Shooting Guns for Self-Protection*, in DON B.
KATES, JR. AND GARY KLECK, THE GREAT AMERICAN GUN DEBATE: ESSAYS ON FIREARMS AND
VIOLENCE 199 (1997).

American society for [the] lawful purpose [of self-defense]," *id.* at 628, and therefore the result here should be the same as in *Heller*: the Act should be struck down.

Magazines holding more than ten rounds are just as standard and common on rifles such as the semiautomatic, civilian versions of the AR-15—rifles that the Act denounces and bans as "assault weapons."[19] It is a common occurrence for a hunter to need quick, multiple shots to take down small, fleet-footed game.[20] The need for multiple, follow-up shots is even more vital when using a semiautomatic rifle to take down bigger, more dangerous game.[21]

LCMs are also essential in the most popular competitive shooting sports in America. Large ammunition capacity is essential when proceeding through multi-target stages of competitions sponsored by the highly popular International Practical Shooting Confederation (which has tens of thousands of members).[22] This is even more true for "3-Gun Competition," the fastest-growing shooting sport in America,[23] where participants compete in (and therefore require multiple high-capacity magazines in) all three categories of (i) rifle (typically using an AR-15 with 30- or 60-round magazines),[24] (ii) shotgun (typically using  23-round magazines)[25]

---

[19] *See* http://www.governor.ny.gov/assets/documents/RiflesthatAREclassifiedasassaultweapons.pdf.

[20] *See* Kopel, GUNS: WHO SHOULD HAVE THEM 171 (hunters often need to take multiple shots).

[21] *See* Dick Metcalf, *The Big Boys*, in GUNS & AMMO 51 (Jan. 2013); *see also* J. Guthrie, *The 300 Blackout Story*, in GUNS & AMMO, BOOK OF THE AR-15: 300 BLACKOUT EDITION 18 (Eric R. Poole ed., 2013).

[22] *See* www.ipsc.org.

[23] *See* CHAD ADAMS, COMPLETE GUIDE TO 3-GUN COMPETITION 89 (2012)

[24] *See id.* at 31, 33, 161.

[25] *See id.* at 75, 92-94.

and (iii) handgun (typically using 17- or 33-round magazines).[26]  3-Gun competition is not merely recreational.  From the outset it was viewed "first and foremost as a law enforcement training event, and participating officers received a certificate of competition towards training credits."[27]  One of the major 3-Gun matches is hosted at Fort Benning, Georgia by the U.S. Army Marksmanship Unit,[28] and military units, including the U.S. Army 5th Special Forces Group and the Oregon National Guard, have recognized the value of 3-Gun competition to refresh their firearm skills prior to deployment in Iraq or Afghanistan.[29]

Finally, LCMs are the standard for the National Match Competitions sponsored by the federal government's Civilian Marksmanship Program ("CMP"), which was established more than a century ago to improve the shooting skills of the nation's young men in case they were called to active military service.[30]  The CMP and its five thousand affiliated local clubs provide safety and marksmanship training to over one million citizens a year.[31]  Under the auspices of the Army Marksmanship Unit, thousands of participants—both adolescents and adults, and civilians as well as active-duty military members and law enforcement officers—compete using standard, rack-grade, military-issue M9 Beretta handguns (issued with 15-round magazines) and M-16 rifles (issued with 30-round magazines); these weapons are drawn directly from the arsenal of

---

[26] *See id.* at 75, 130, 132.

[27] *See id.* at 30.

[28] *See id.* at 43.

[29] *See id.* at 53-54.

[30] *See* the CMP website, http://odcmp.com.  For 80 years, the CMP was administered by the U.S. Army.  Now it is run by a non-profit 501(c)(3) organization chartered by Congress and known as the Corporation for the Promotion of Rifle Practice & Firearms Safety, Inc.  *See* 36 U.S.C. § 40701 *et seq.*

[31] *See* the CMP website, http://odcmp.com/Comm/About_Us.htm; *see also* www.TheCMP.org; 2012 CMP Sales Catalog at 1-3, 13 (noting thousands of affiliated organizations, including the Boy Scouts, 4-H Clubs, the American Legion and Junior ROTC, and the one million youth who "are now reached annually by CMP marksmanship training and education initiatives).

the Army's Small Arms School.[32]  To finance its operations, the CMP for many decades has been selling surplus military rifles to civilians, including the semiautomatic M-1 Carbine.[33]

In sum, what the Act demonizes and bans as "LCMs" are nothing more than millions of ordinary, standard-issue magazines that are "typically possessed" by law-abiding citizens and that are " 'in common use' . . . for lawful purposes like self-defense," hunting and recreational shooting. *Heller*, 554 US at 625, 624.  That requires that the Act be struck down.

**III.    The Act's Ban on So-Called "Assault Weapons" Outlaws an Enormous Class of Firearms Commonly Used for Lawful Purposes.**

Once again, the dispositive constitutional question posed by the Supreme Court in *Heller* has already been conceded with respect to semiautomatic rifles by the only federal Court of Appeals to reach the issue.  As the D.C. Circuit's panel majority wrote, "We think it clear enough in the record that semiautomatic rifles . . . are indeed in 'common use,' as the plaintiffs contend." *Heller II*, 670 F.3d at 1261.  Again, this is where the Court of Appeals' analysis should have stopped, because "common use for lawful purposes" is the test under the Supreme Court's decision in *Heller. See* 554 U.S. at 624-25, 627, 628-29.  And it is undeniable that semiautomatic rifles, shotguns and handguns are common in modern America; indeed, they have been commercially available and widely popular for more than a century.[34]  Semiautomatic

---

[32] *See* the CMP website, http://www.odcmp.org/0904/M-16Match.asp, and http://odcmp.com/NM/Pistol.htm.  The minimum age for participating in the Army's Small Arms Firing Schools, sponsored by the CMP and conducted by the Army's Marksmanship Unit, is fourteen for pistol students and twelve for rifle students. *See* http://www.odcmp.com/NM/SAFS.htm.

[33] *See* the 2012 CMP Sales Catalog 5 (selling semiautomatic M-1 carbines with fifteen-round magazines).

[34] *See Heller II*, 670 F.3d at 1287 (Kavanaugh, J., dissenting); *see also* David B. Kopel, *Rational Basis Analysis of "Assault Weapon" Prohibition*, 20 J. CONTEMP. L. 381, 413 (1994) ("semiautomatics are more than a century old"); K.D. KIRKLAND, AMERICA'S PREMIER GUNMAKERS: BROWNING 44 (2013) (Remington was making semiautomatic rifles in .25, .30, .32 or .35 caliber in 1900, leading to the 1906 Remington Model 8 Autoloading Center Fire Rifle).

pistols have dominated the handgun market and pushed revolvers aside for two decades now.[35]

And, as the Supreme Court has noted, unlike "machineguns, sawed-off shotguns, and artillery

pieces," semiautomatic firearms "traditionally have been widely accepted as lawful possessions."

*Staples v. United States*, 511 U.S. 600, 611-12 (1994).

The Act outlaws many semiautomatic guns, but its unconstitutionality can be

demonstrated by considering just one of the hundreds of examples: the semiautomatic American

AR-15. The AR-15-style rifle was the very firearm that was at issue in the Supreme Court's

decision in *Staples*, which described the "AR-15 [a]s the civilian version of the military's M-16

rifle." 511 U.S. at 603. The Court noted that the AR-15 was "a semiautomatic weapon," *id.*, and

therefore a firearm that "traditionally ha[s] been widely accepted as [a] lawful possession[]." *Id.*

at 612. The Court contrasted the routine civilian ownership of a semiautomatic AR-15 with the

potentially felonious possession of the military's *fully automatic* M-16 assault rifle. *Id.*

Just considering the AR-15 alone, there are approximately five million such rifles in this

country and it accounts for 60% of all civilian rifles sold each year in the United States.[36] That

undoubtedly qualifies them as being "in common use" and "typically possessed by law-abiding

citizens for lawful purposes." *Heller*, 554 U.S. at 624, 625. Dozens of companies manufacture

their own versions of the AR-15 for civilian use,[37] and the popularity of the weapon has spawned

an entire industry devoted to accessorizing and customizing this semiautomatic rifle.[38]

---

[35] *See* Koper NIJ Rep. 2004 at 81 (80% of handguns produced in 1993 were semiautomatic); Department of Justice, Guns Used in Crime 3 (1995) ("Most new handguns are pistols rather than revolvers.").

[36] *See* Dan Haar, *America's Rifle: Rise of the AR-15*, Hartford Courant (Mar. 9, 2013), http://articles.courant.com/2013-03-09/business/hc-haar-ar-15-it-gun-20130308_1_new-rifle-colt-firearms-military-rifle.

[37] *See generally* Guns & Ammo, Book of the AR-15 134 (Eric R. Poole ed., 2013).

[38] *See, e.g., id.* at i-ii, 9, 24-27, 30-32, 34, 35, 48-52, 63, 70, 75-76, 88, 90-92, 94, 95, 123, 135, 137, 160-61; *see also* Christopher R. Bartocci, Black Rifle II: The M16 Into The

The AR-15's versatility is revealed by the fact that it is widely used for hunting everything from rodents to deer and even wild boar—a few quick changes to barrel and receiver allow the weapon to handle ammunition ranging from its standard .223 Remington round—which was itself developed from a hunting cartridge, rather than a military round[39]—up to .308 and even .500 caliber big game cartridges.[40] The AR-15 also dominates target shooting competition, as indicated by the discussion of the Civilian Marksmanship Program and the national shooting matches above: "If you are not shooting an AR-15, you are not in the game."[41]

Finally, the AR-15 is widely used for self-defense, whether on a farm, a ranch or in one's home.[42] The uninformed notion that this rifle is not suitable for self-defense within the confines of a house would stun the tens of thousands of soldiers and Marines who have, in the last decade, used their military-issue M-16 rifles and M-4 carbines to defend themselves and their comrades in close-quarters fighting in the cities and towns of Iraq and Afghanistan. Osama bin Laden—were he still alive—would be equally surprised by this proposition, given that two fully

---

21ST CENTURY i-ii, xxv (2004). Indeed, civilian shooters of the semiautomatic AR-15 and the manufacturers who cater to them began enhancing and accessorizing the rifle long before the military did the same with its fully automatic versions. THE AMERICAN RIFLEMAN GUIDE TO BLACK RIFLES 49 (2006).

[39] *See* GARY PAUL JOHNSTON & THOMAS B. NELSON, THE WORLD'S ASSAULT RIFLES 19-20, 23, 1036 (2010).

[40] *See* Dick Metcalf, *The Big Boys*, in GUNS & AMMO 51 (Jan. 2013)*; see also* J. Guthrie, *The 300 Blackout Story*, in GUNS & AMMO, BOOK OF THE AR-15: 300 BLACKOUT EDITION 18 (Eric R. Poole ed., 2013).

[41] *See* THE AMERICAN RIFLEMAN GUIDE TO BLACK RIFLES 40 (2006).

[42] *See* J. Guthrie, *Versatile Defender: An Argument for Advanced AR Carbines in the Home*, in BOOK OF THE AR-15 134 (Eric R. Poole, ed. 2013) ("If a system is good enough for the U.S. Army's Delta and the U.S. Navy SEALs, surely it should be my weapon of choice, should I be a police officer or Mr. John Q. Public looking to defend my home."); Eric Poole, *Ready To Arm: It's Time To Rethink Home Security*, in GUNS & AMMO, BOOK OF THE AR-15 15-22 (Eric R. Poole, ed. 2013) (discussing virtues of the AR-15 platform as a home defense weapon); Mark Kayser, *AR-15 for Home & the Hunt*, in PERSONAL & HOME DEFENSE 28-29, 30-31 (2013) (advising use of AR-15 for self-defense in the home and recommending customizing with accessories).

automatic military variants of the semiautomatic AR-15, the M-4 carbine and the H&K 416 rifle, were used by Navy SEALs to kill him in an upstairs room of his house in Pakistan during a mission which called for extraordinary accuracy to avoid collateral injury to the many non-combatant women and children living in the compound.[43]  Plainly, the AR-15 works exceedingly well as a defensive firearm inside dwellings.

If that were not endorsement enough, the semiautomatic AR-15 is perhaps the most widely-issued police patrol rifle in the country.[44]

Thus, the semiautomatic rifle with pistol grips, adjustable stocks, and a large magazine capacity—as exemplified by the American AR-15—has to count as a "preferred firearm" and among the "most popular weapon[s] chosen by Americans" for lawful purposes ranging from hunting to target shooting to self-defense in the home. *Heller*, 554 U.S. at 628-29.  There are literally millions of these semiautomatic rifles in private hands in America, and therefore they cannot be marginalized as "highly unusual in society" or dismissed as "not typically possessed by law-abiding citizens for lawful purposes." *Id.* at 627, 625.

The *Heller* Court drew support for the "common use" test from the historical prohibition on carrying "dangerous *and* unusual weapons." *Id.* at 627 (emphasis added).  That formulation, derived by the Court from Blackstone and early American legal scholars, is more properly read as a context-based restriction on the carrying and use of arms.  But even if read as a test for the arms that may be kept and borne, it would require both elements.  By itself, the fact that a particular gun is "dangerous" would not distinguish it from any other firearm in human history,

---

[43] *See* MARK OWEN & KEVIN MAURER, NO EASY DAY: THE FIRSTHAND ACCOUNT OF THE MISSION THAT KILLED OSAMA BIN LADEN 44-45, 203, 226, 232, 234-36 (2012).

[44] Michael Remez, *A Civilian Version of an M-16: Bushmaster Rifle a Common Choice*, HARTFORD COURANT (Oct. 25, 2002), http://articles.courant.com/2002-10-25/news/0210252068_1_bushmaster-firearms-john-allen-williams-distributor-in-washington-state; BARTOCCI, BLACK RIFLE II 126.

because it is in the very nature of firearms to be dangerous—that is their *raison d'être*. The second, cumulative element of the *Heller* Court's test—the requirement that a properly banned firearm be "unusual"—comports perfectly with the Court's repeated emphasis on protecting firearms that are "in common use," "typically possessed," and "preferred" by law-abiding Americans for lawful purposes. *Id.* at 624, 625, 628-29.

But none of the semiautomatic weapons outlawed by the Act fits this bill, nor can the New York legislature fill that gaping hole in its argument by tarring these popular, widely-used semiautomatic firearms as "assault weapons." That is a calculated bit of disinformation and a partisan term of opprobrium rather than an actual classification of firearms:

> Prior to 1989, the term "assault weapon" did not exist in the lexicon of firearms. It is a political term, developed by anti-gun publicists to expand the category of "assault rifles" so as to allow an attack on as many additional firearms as possible on the basis of undefined "evil" appearance.

*Stenberg v. Carhart*, 530 U.S. 914, 1001 n.16 (2000) (Thomas, J., dissenting) (internal quotation marks omitted).[45] Those who invented the term "assault weapon" to further their opposition to Second Amendment rights have been remarkably candid about their cynical and calculated effort to mislead the public (and legislators, too) into confusing semiautomatic civilian firearms with the fully automatic machine guns that equip the military:

> Assault weapons . . . are a new topic. The weapons' menacing looks, coupled with the public's confusion over fully automatic machine guns versus semiautomatic assault weapons—anything that looks like a machine gun is assumed to be a machine gun—can only increase the chance of public support for restrictions on these weapons . . . .

---

[45] There is a well-established firearms category known as the "assault rifle." This denotes a hand-held weapon capable of semiautomatic or *fully automatic* (selective) fire, fed from a detachable box magazine, which fires an intermediate rifle cartridge. But the phrase "semiautomatic assault weapon" is a nonsense word, a contradiction in terms. *See* JOHNSTON & NELSON, THE WORLD'S ASSAULT RIFLES i (emphasis added). *See also id.* at 1196 (Glossary of Terms); *see also* MAXIM POPENKER & ANTHONY G. WILLIAMS, ASSAULT RIFLE 9, 12, 212 (2004) (by definition all assault rifles can be fired in fully automatic mode).

Josh Sugarmann, *Assault Weapons and Accessories in America* (Violence Policy Center 1988),

http://www.vpc.org/studies/awaconc.htm (emphasis omitted).

Once the term "semiautomatic" is properly understood—one pull of the trigger fires one,

and only one, round of ammunition—there is nothing in the Act that distinguishes banned

semiautomatic "assault weapons" from permissible firearms on a *rational, functional* basis.

Instead, the Act, like every other "assault weapons ban" enacted by Congress or by any State,

lists features that are either cosmetic, imaginary, or pointless—a proposition on which there is

agreement from both ends of the political spectrum.[46]

Paradoxically, the Act also outlaws features that *enhance the controllability and accuracy*

*of the weapon.* For example, a pistol grip makes it easier to hold and stabilize a rifle or shotgun

when fired from the shoulder and thereby promotes accuracy.[47] It also enables a homeowner to

keep his rifle or shotgun aimed at a burglar with one hand while he dials 911 with his other

hand.[48] Similarly, a vertical foregrip on a semiautomatic rifle such as the AR-15 improves

accuracy, provides stability and quick target acquisition, and aids in controlling recoil when the

weapon is fired.[49] An adjustable stock promotes accuracy by allowing the stock to be

---

[46] *Compare* Charles Krauthammer, Column, *Disarm the Citizenry*, The Washington Post (Apr. 5, 1996) ("Passing a law like the assault weapons ban is . . . purely symbolic"), *with* Editorial, The Washington Post (Sept. 1994) ("No one should have any illusions about what was accomplished (by the ban). Assault weapons play a part in only a small percentage of crime. The provision is mainly symbolic; its virtue will be if it turns out to be, as hoped, a stepping stone to broader gun control."). California's list of "assault weapons," which is the origin of the list of outlawed firearms in every state and federal ban enacted thereafter, "was derived by flipping through a picture book of guns and picking out those that looked the most menacing" to the legislative staff. Kopel, GUNS: WHO SHOULD HAVE THEM 176 & n.68.
[47] *See* BARTOCCI, BLACK RIFLE II 52; Kopel, GUNS: WHO SHOULD HAVE THEM 170-71.
[48] *See* Kopel, GUNS: WHO SHOULD HAVE THEM 171; *Heller*, 554 U.S. at 629.
[49] *See* BARTOCCI, BLACK RIFLE II 52, 101, 368; *see also* THE AMERICAN RIFLEMAN GUIDE TO BLACK RIFLES 52 (2006).

customized to fit the shooter's particular physique, thickness of clothing, and shooting position.[50] A threaded muzzle enables the user to affix a flash suppressor to reduce the blinding glare that occurs when a round is fired and that can temporarily blind the shooter, thereby making her more vulnerable to attack and rendering her subsequent shots less accurate.[51] Similarly, a muzzle brake—which can be affixed to a firearm with a threaded muzzle—reduces recoil and muzzle flip, thereby making the gun more accurate and controllable, especially for follow-up shots.[52] These are not indicia of "dangerous and unusual" weapons unfit for lawful civilian use. *Heller*, 554 U.S. at 627. On the contrary, these are features that enhance a gun's accuracy and controllability. Surely the State of New York has no rational, let alone legitimate, interest in making it more likely that a law-abiding citizen using a firearm for self-defense will miss her assailant and wound or kill a member of the family or an innocent passerby. To make it a felony to add features to one's rifle that make it more accurate and safer to use, for both the shooter and the public, is nothing short of perverse.

## IV. Banning So-Called "Assault Weapons" and "Large Capacity Magazines" Will Do Nothing To Reduce Violent Crime.

Even if the interest-balancing that *Heller* forbids were employed here, along the lines of the "tiers" or "levels" of judicial scrutiny that might be imported from Equal Protection Clause or First Amendment doctrine, and even if, contrary to *Heller*, intermediate scrutiny were the correct standard of review, the Act's ban on AWs and LCMs could not stand.

---

[50] *See* BARTOCCI, BLACK RIFLE II 52, 56, 76; Kopel, GUNS: WHO SHOULD HAVE THEM 172-73. *See also* THE AMERICAN RIFLEMAN GUIDE TO BLACK RIFLES 52 ("The ability to adjust the stock to a proper length can make the difference between a hit or miss.").

[51] *See* BARTOCCI, BLACK RIFLE II 49; Kopel, GUNS: WHO SHOULD HAVE THEM 172 (quoting a senior BATF official who stated that a flash suppressor "doesn't have a thing to do with increasing a gun's firepower.").

[52] *See* BARTOCCI, BLACK RIFLE II 49-50; Kopel, GUNS: WHO SHOULD HAVE THEM 171-72, 175.

The State must mount a "pragmatic defense" of the challenged law. *Moore*, 702 F.3d at 939. The State must "marshal extensive empirical evidence" to justify the Act and "make a 'strong showing' that [this] gun ban [i]s vital to public safety." *Id.* at 939-40. *See also United States v. Skoien*, 614 F.3d 638, 641-42 (7th Cir. 2010) (en banc) (stating that "strong showing" is required). Indeed, the standard of proof required of the State is more demanding here than in either *Skoien* or *Moore* because: (1) this categorical ban on firearms reaches into the home, *Heller*, 554 U.S. at 628; and (2) unlike the criminal defendants who have raised Second Amendment defenses to criminal prosecution, the plaintiffs here are not criminals, but are instead " 'law-abiding , responsible citizens' whose Second Amendment rights are entitled to full solicitude under *Heller* . . . ." *Ezell v. City of Chicago*, 651 F.3d 684, 708 (7th Cir. 2011).

The State cannot meet this standard because all the empirical studies of federal or state AW or LCM bans—including the studies commissioned by the Justice Department's own National Institute of Justice—reveal that this kind of legislation has no discernible impact on firearms violence because criminal use of AWs and LCMs has always been extremely rare. Title XI of the Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103-322, 108 Stat. 1796 (1994) (the "1994 Federal Ban"), was in effect from 1994 through 2004. The first review of the Federal Ban, in 1997, explained that, "[a]ny effort to estimate how the ban affected the gun murder rate must confront a fundamental problem, that the maximum achievable preventive effect of the ban is almost certainly too small to detect statistically."[53] The "banned weapons and magazines were never involved in more than a modest fraction of all gun

---

[53] Jeffrey A. Roth & Christopher S. Koper, *Impact Evaluation of the Public Safety and Recreational Firearms Use Protection Act of 1994 (Final Report)* (Mar. 13, 1997) at 79 (*available at* www.urban.org/UploadedPDF/aw_final.pdf) ("Roth & Koper NIJ Rep. 1997").

murders,"[54] and therefore "[t]he evidence is not strong enough for us to conclude that there was any meaningful effect (*i.e.*, that the effect was different from zero.)"[55]

A follow-up report done for the Justice Department in 2004 concluded that 10 years of data on the Federal Ban made no difference: "we cannot clearly credit the ban with any of the nation's recent drop in gun violence.  And, indeed, there has been no discernible reduction in the lethality and injuriousness of gun violence, based on indicators like the percentage of gun crimes resulting in death or the share of gunfire incidents resulting in injury, as we might have expected had the ban reduced crimes with both AWs and LCMs."[56]  Studies of state-law bans on AWs and LCMs likewise found that such bans "have not reduced crime."[57]  The Justice Department report concluded that, "[s]hould it be renewed, the ban's effects on gun violence are likely to be small at best and perhaps too small for reliable measurement."[58]  Remarkably, the Justice Department

---

[54] *Id.* at 2.

[55] *Id.* at 6.  *See also id.* at 6 ("[We] found no statistical evidence of post-ban decreases in either the number of victims per gun homicide incident, the number of gunshot wounds per victim, or the proportion of gunshot victims with multiple wounds. Nor did we find assault weapons to be overrepresented in a sample of mass murders involving guns."); *id.* at 10 ("The limited data which do exist suggest that criminal gun attacks involve three or fewer shots on average. Further, there is no evidence comparing the fatality rate of attacks perpetrated with guns having large-capacity magazines to those involving guns without large-capacity magazines . . . ." (citations omitted)); *id.* at 11 ("[T]here have been no studies comparing the fatality rate of attacks with assault weapons to those committed with other firearms."); *id.* at 78 ("The ban on large-capacity magazines does not seem to have discouraged the use of these guns."); *id.* at 85-86, 88, 91 (both "victims per incident" and "the average number of gunshot wounds per victim" *actually increased* under the Ban—although not by a statistically significant margin).

[56] Koper NIJ Rep. 2004 at 96.

[57] Koper NIJ Rep. 2004 at 81 n.95.

[58] Koper NIJ Rep. 2004 at 3.  *See also id.* at 3 ("AWs were rarely used in gun crimes even before the ban.  LCMs are involved in a more substantial share of gun crimes, but it is not clear how often the outcomes of gun attacks depend on the ability of offenders to fire more than ten shots . . . without reloading."); *id.* at 92 n.109 ("It is now more difficult to credit the ban with any of the drop in gun murders in 1995 or anytime since."); *id.* at 92 ("neither medical nor criminological data sources have shown any post-ban reduction in the percentage of crime-related gunshot victims who die"); *id.* at 79 n.93 ("nearly a decade after the ban, LCM use has still not declined demonstrably below pre-ban levels.").

report conceded that criminals denied AWs and LCMs will simply substitute other firearms: "Because offenders can substitute non-banned guns and small magazines for banned AWs and LCMs, there is not a clear rationale for expecting the ban to reduce assaults and robberies with guns."[59]   And criminals are, by definition, not likely to be deterred by the ban in any event.

The failure of the Federal Ban on AWs and LCMs to have *any* discernible effect on gun violence has been confirmed by two government bodies—the National Research Council and the Centers for Disease Control—that conducted comprehensive reviews of all the published literature on firearms control and violence.  The NRC and CDC both concluded that there was insufficient evidence to conclude that bans on "assault weapons" or other particular firearms or firearms features had any beneficial effect on gun violence.[60]

Proponents of bans on so-called "assault weapons" and "large capacity magazines" often stress—but uniformly fail to document—that AWs and LCM pose a particular risk to law

---

[59] Koper NIJ Rep. 2004 at 81 n.95.  In a follow-up essay in 2013, the principal author of the two Justice Department studies reiterated that, "[b]ecause offenders can substitute non-banned guns and small magazines for banned AWs and LCMs, there was not a clear rationale for expecting the ban to reduce assaults and robberies with guns." Christopher S. Koper, *America's Experience with the Federal Assault Weapons Ban, 1994-2004*, in REDUCING GUN VIOLENCE IN AMERICA: INFORMING POLICY WITH EVIDENCE AND ANALYSIS 165 (Daniel W. Webster & Jon S. Vernick eds., 2013).  Although he noted that some stories by media journalists, *id.* at 170, forecast that the Federal Ban "may have modestly reduced gunshot victimization had it remained in place for a longer period," *id.* at 158, *see also id.* at 164-65, Koper himself once again concluded that "analyses showed no discernible reduction in the lethality or injuriousness of gun violence during the post-ban years." *Id.* at 165.

[60] *See* NATIONAL RESEARCH COUNCIL, FIREARMS AND VIOLENCE: A CRITICAL REVIEW 97 (Charles F. Wellford *et al.* eds., 2005) ("[G]iven the nature of the [1994 assault weapons ban], the maximum potential effect of the ban on gun violence outcomes would be very small and, if there were any observable effects, very difficult to disentangle from chance yearly variation and other state and local gun violence initiatives that took place simultaneously."); Centers for Disease Control, *Recommendations To Reduce Violence Through Early Childhood Home Visitation, Therapeutic Foster Care, and Firearms Laws*, 28 AM. J. PREV. MED. 6, 7 (2005) (With respect to "bans on specified firearms or ammunition," the CDC Task Force found that "[e]vidence was insufficient to determine the effectiveness of bans . . . for the prevention of violence."); *see also* Robert A. Hahn *et al.*, *Firearms Laws and the Reduction of Violence: A Systematic Review*, 28 AM. J. PREV. MED. 40, 49 (2005).

enforcement officers.  But professional, rank-and-file police officers (as distinguished from

elected or politically appointed law enforcement chiefs) oppose bans on so-called "assault

weapons."[61]  In his congressional testimony prior to the first AW ban enacted by Congress in

1994, Joseph Constance, the Chief of Detectives and a twenty-five-year veteran of the Trenton

police, explained that New Jersey had had such a ban in place for years and that the "practical

value of such bans" is zero because their rationale is cosmetic.[62]  "Despite their intimidating

appearance, no auto-loading rifle is as dangerous as an old-fashioned double-barreled 12-gauge

shotgun."[63]  The so-called "assault weapons," Chief Constance testified, "were used in an

underwhelming .026 of 1 percent of crimes in New Jersey. . . .  That is really nothing. This

means that my officers are more likely to confront an escaped tiger from the zoo than they are to

confront one of these weapons."[64]

---

[61] *See* Kopel, GUNS: WHO SHOULD HAVE THEM 189 (discussing polls of police officers revealing that 75% of them oppose a ban on "assault weapons," with the figure rising to 85% when only street patrol officers are polled); Doug Wyllie, *PoliceOne's Gun Control Survey: 11 Key Lessons From Officers' Perspectives* (Apr. 8, 2013), http://www.policeone.com/Gun-Legislation-Law-Enforcement/articles/6183787-PoliceOnes-Gun-Control-Survey-11-key-lessons-from-officers-perspectives/ (reporting that the most comprehensive survey ever conducted of law enforcement officers (some 15,000 were polled) revealed that "95 percent say that a federal ban on manufacture and sale of ammunition magazines that hold more than 10 rounds would not reduce violent crime."); *id.* (91% say that a "ban on the manufacture and sale of some semiautomatics would have no effect on reducing violent crime" or "would actually have a negative effect on reducing violent crime"); *id.* (85% say that passage of the federal "assault weapons" ban proposed in 2013 "would have a zero or negative effect on their safety"); *id.* ("The overwhelming majority (almost 90 percent) of officers believe that casualties would be decreased if armed citizens were present at the onset of an active-shooter incident.").

[62] *Assault Weapons: A View from the Front Lines: Hearing on S. 639 and S. 653 Before the S. Comm. on the Judiciary*, 103d Cong. 83-84 (1993) (statement of Joseph Constance, Deputy Chief, Trenton, New Jersey Police Department).

[63] *Id.* at 83. *See* Kopel, GUNS: WHO SHOULD HAVE THEM 164 ("The Winchester Model 12 pump action shotgun (defined as a 'recreational' firearm by [assault weapons bans]) can fire six 00 buckshot shells, each shell containing twelve .33 caliber pellets, in three seconds. Each of the pellets is about the same size as the bullet fired by a[] [Russian] AKS (a semiautomatic look-alike of an AK-47 rifle).").

[64] *Assault Weapons*, 103d Cong. 85 (statement of Constance).

Finally, a criminal's choice of firearm is determined by what is available on the street for illegal purchase at the time he wants a gun.[65] An FBI study in 2006 found—unsurprisingly—that 97% of the firearms used to attack police officers "were obtained illegally."[66] Bans on AWs or LCMs "have no effect on the stemming of crime or the provision of public safety" because they only affect law-abiding citizens who buy their guns through legal channels.[67] As Chief Constance explained, New Jersey's AW ban was pointless because "rank-and-file officers in New Jersey knew to a certainty that criminals would continue to obtain guns illegally, no matter how strict our gun laws are. Our prediction of failure has been borne out. Simply put, ladies and gentlemen, criminals do not fill out forms."[68] Such laws "have no effect on the stemming of crime or the provision of public safety" because they affect only law-abiding citizens.[69]

The stubborn fact is that criminals are not deterred by firearms regulations; therefore the only people affected by bans such as the Act are law-abiding citizens who buy their firearms though properly licensed firearms merchants. Thus we are told that the gun-buying rights of law-abiding citizens may be restricted based not on fears about what *they* will do with the firearms they purchase, but on the violence that the State anticipates may come from others— that is, from criminals who may steal those firearms. But to ban firearms because criminals use them is to tell law-abiding citizens that their liberties depend not on their own conduct, but on the

---

[65] *See* Anthony J. Pinizzotto, Edward F. Davis and Charles E. Miller III, VIOLENT ENCOUNTERS: A STUDY OF FELONIOUS ASSAULTS ON OUR NATION'S LAW ENFORCEMENT OFFICERS 9, 43-45 (FBI Criminal Justice Information Services Division 2006). *See also id.* at 43-44 (interviewed criminals "stated that none of these laws or statutes deterred them" because all the guns they used were stolen, often from other criminals); *id.* at 45 ("availability was the overriding factor in weapons choice"); *id.* at 50 (no gang members "obtained their weapons legally," instead they "trade, swap, rent and barter guns" with other criminals, making it "just as easy to obtain an illegal firearm as it was to obtain drugs.").

[66] *See id.* at 50-51.

[67] *See Assault Weapons*, 103d Cong. 84 (statement of Constance).

[68] *See id.* at 84.

[69] *See id.*

conduct of the lawless, and that the law can vouchsafe the law-abiding only such rights as the

lawless will allow.  Surely this cannot be.  Just as "[t]he First Amendment knows no heckler's

veto," the Second Amendment cannot tolerate restrictions on law-abiding citizens' right to keep

and bear arms based on the threat to public safety posed not by those citizens but by criminals

who may obtain such firearms illegally. *Robb v. Hungerbeeler*, 370 F.3d 735, 743 (8th Cir.

2004) (holding that the risk of a violent and dangerous public reaction to speech is insufficient

rationale to infringe the rights of the speaker).

## V.   The Sad Truth Is that the Statute Challenged Here Would Not Have Prevented the Atrocity that Spawned It—the Horrifying Massacre at the Newtown School.

In the end, we must confront the unfortunate but stubborn fact that nothing that this Act

does would have changed anything at the Newtown school.  Limiting detachable magazines to a

capacity of ten rounds (and loaded with seven) would have made no difference:  Adam Lanza

used 30-round magazines, but he changed many of them out before they were exhausted and he

could just as easily and just as quickly have changed out 10-round magazines after firing seven

rounds from them.[70]  Or instead of reloading his AR-15, he could have employed either of the

two semiautomatic pistols that he was carrying, or even the shotgun that he also brought to the

school but left in his car.[71]  Deranged spree killers tend to arm themselves with multiple guns,

and Adam Lanza did that here.

Nor did the rate of fire of Lanza's semiautomatic AR-15 make a difference, because it

was the same as every other semiautomatic rifle—one pull of trigger and the gun fires one bullet.

Indeed, even if *all* semiautomatic rifles were outlawed, Lanza could still have used a 150-year-

---

[70] N.R. Kleinfield *et al.*, *Newton Killer's Obsessions, in Chilling Detail*, N.Y. TIMES, Mar. 28, 2013, at A1.

[71] *Id.*; *see* Kopel, GUNS WHO SHOULD HAVE THEM 164, for an explanation of the massive killing power that can be unleashed in three seconds by a regular shotgun.

old lever-action rifle such as the Volcanic, the Henry, or the Winchester—cowboy guns familiar

to us from a thousand movies and TV westerns. Lanza fired 154 shots in about five minutes;

that's 30 shots per minute.[72] That same rate of fire can be achieved with a Winchester lever-

action carbine from 1866,[73] or with a Volcanic lever-action rifle from the 1850s (which had a 30-

round magazine),[74] and that rate of fire might even be exceeded by a Henry Model 1860, which

was advertised as capable of 60 shots per minute.[75]

A bolt-action rifle from the First World War would also have fired as rapidly.[76] A person

practiced in using the bolt-action British Short Magazine Lee Enfield rifle ("SMLE"), with its

ten-round magazine can fire up to 37 aimed shots per minute.[77] Indeed, during the battle of

Mons on August 23, 1914, German infantry advancing on the British encountered such withering

fire that they were convinced they had been decimated by heavy Vickers machineguns firing at

500 rounds a minute, when in fact the Germans had faced only determined English soldiers

quickly firing their bolt-action SMLE rifles.[78] Finally, Lanza could have accomplished his grim

atrocities without any rifle at all, but with a mere revolver that could rapidly be reloaded with the

use of such common and inexpensive devices as speed-loaders, full- or half-moon clips, or

---

[72] *See* Mary Ellen Clark & Noreen O'Donnell, *Newtown School Gunman Fired 154 Rounds in Less than 5 Minutes*, REUTERS U.S. ED. (Mar. 28, 2013), www.reuters.com/article/2013/03/28/us-usa-shooting-connecticut-idUSBRE92R0EM20130328.

[73] *See* GUN: A VISUAL HISTORY 174; MILITARY SMALL ARMS 147.

[74] *See* MILITARY SMALL ARMS 146.

[75] *See* K.D. KIRKLAND, AMERICA'S PREMIER GUNMAKERS: WINCHESTER 8 (2013). *See also* Kopel, GUNS: WHO SHOULD HAVE THEM 166 ("Even including time for reloading, a simple revolver or a bolt-action hunting rifle can easily fire [as] fast" as Patrick Purdy did in January 1989, when he shot 34 children at a schoolyard in California with a semiautomatic rifle).

[76] Adam Lanza apparently also possessed some type of "Enfield bolt-action rifle" at his home. *See* Clark, *Newtown School Gunman*, at 3.

[77] *See* WORLD ENCYCLOPEDIA OF RIFLES AND MACHINE GUNS 40.

[78] *Id.*

Quickstrips.[79]  Thus firearms technology that is more than a century old would have wrought the same destruction at Newtown as the modern rifle that Lanza used.  The monstrosity at Newtown was not the weapon, but the depraved individual who wielded it.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion for summary judgment should be granted.

Dated:  August 26, 2013

Respectfully submitted,

s/ Richard A. Grimm, III
Richard A. Grimm, III
Counsel for Pink Pistols
MAGAVERN MAGAVERN GRIMM LLP
1100 Rand Building
Buffalo, NY 14203
Tel:  (716) 856-3500
Fax:  (716) 856-3390
Email:  rgrimm@magavern.com

---

[79] *See* Joseph von Benedikt, *Double Down: Get Your DA Revolver Skills Up to Snuff with These Pro Tips*, in GUNS & AMMO, HANDGUNS (Aug./Sept. 2013) at 62-63.  Further evidence of the rapid reload ability of revolvers comes from THE PUBLIC INQUIRY INTO THE SHOOTINGS AT DUNBLANE PRIMARY SCHOOL ON 13 MARCH 1996, led by Lord Cullen.  *See* https://www.ssaa.org.au/research/1996/1996-10-16_public-inquiry-dunblane-lord-cullen.pdf.  On that day, a madman named Thomas Hamilton walked into a primary school in Scotland and, within four minutes, shot 30 teachers and children with a 9mm Browning semiautomatic pistol before killing himself with a single shot from one of the two revolvers that he was carrying.  *See id.* ¶ 1.3, 6.10(i).  Hamilton shot his victims with the 9 mm Browning semiautomatic that he kept reloading with twenty-round magazines (he fired 105 rounds in total).  *Id.* ¶ 3.39.  However, the Public Inquiry concluded that Hamilton could have inflicted the same bloodshed with either of his revolvers: "[W]ith a revolver it is possible to maintain a speed of firing which approaches that of the self-loading pistol.  Further, as I stated earlier, the use of a speedloader in conjunction with a revolver which had a cylinder which could be swung out would enable a whole set of cartridges to be removed and replaced very quickly." *Id.* ¶ 9.51.  The Inquiry further noted that use of a shotgun would have been more deadly, on the basis of evidence showing that one could, within the same span of time, discharge and reload a double-barreled shotgun 105 times—the same number of shots that Hamilton had fired—but with much more destruction from the approximately 675 to 1000 projectiles that would be fired if one were using buckshot.  *Id.* ¶ 9.53.