UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

NEW YORK STATE RIFLE AND PISTOL
ASSOCIATION, INC., *et al.*

Plaintiffs,                                    13-cv-00291-WMS

-v.-

ANDREW M. CUOMO, Governor of the State of
New York, *et al.*

Defendants.

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT
OF STATE DEFENDANTS' CROSS-MOTION TO DISMISS
AND/OR FOR SUMMARY JUDGMENT AND IN OPPOSITION
TO PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT**

ERIC T. SCHNEIDERMAN
Attorney General of the State of New York
*Attorney for Defendants*
120 Broadway, 24th Floor
New York, New York 10271
(212) 416-8426
william.taylor@ag.ny.gov

WILLIAM J. TAYLOR, JR.
ANTHONY J. TOMARI
HELENA LYNCH
Assistant Attorneys General
    *Of Counsel*

**TABLE OF CONTENTS**

                                                                                                    **Page**

TABLE OF AUTHORITIES ................................................................................................ ii

PRELIMINARY STATEMENT ......................................................................................... 1

STATEMENT OF FACTS ................................................................................................. 3

ARGUMENT...................................................................................................................... 4

    I.  PLAINTIFFS' SECOND AMENDMENT CHALLENGES
       TO THE SAFE ACT FAIL AS A MATTER OF LAW ............................................. 4

       A.  The Scope of the Court's Second Amendment
          Inquiry Is Limited and Deferential ......................................................................... 4

       B.  The Record Plainly Supports New York's Legislative Judgment Here............... 10

       C.  Plaintiffs' Efforts to Avoid the Governing Second
          Amendment Legal Standards Are Without Merit................................................. 16

    II.  THE EXEMPTION FOR SHOOTING RANGES
        DOES NOT VIOLATE EQUAL PROTECTION ..................................................... 25

    III.  THE SAFE ACT IS NOT UNCONSTITUTIONALLY VAGUE ........................... 27

       A.  Plaintiffs Misstate the Applicable Vagueness Standard ..................................... 27

       B.  The *Morales* Test Would Not Apply Here In Any Event Because
         the Challenged SAFE Act Provisions Have a *Mens Rea* Element ...................... 28

       C.  Even if the *Morales* Standard Applied Here, Plaintiffs
         Could Not Satisfy It Because They Could Not Show that
         Vagueness "Permeates the Text" ........................................................................ 29

    IV.  PLAINTIFFS' CLAIMS IN COUNT FOUR ARE NOT JUSTICIABLE
        AND FAIL TO STATE A VIABLE CAUSE OF ACTION ................................. 31

       A.  Plaintiffs' Dormant Commerce Clause Claim Is Not Justiciable ...................... 31

       B.  Count Four Also Should Be Dismissed Because Plaintiffs Fail
         to State a Viable Claim on the Merits............................................................... 33

CONCLUSION................................................................................................................. 35

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Arnold's Wines, Inc.* v. *Boyle*, 571 F.3d 185 (2d Cir. 2009)............................................................33

*Arriaga* v. *Mukasey*, 521 F.3d 219 (2d Cir. 2008)............................................................29

*Baude* v. *Heath*, 538 F.3d 608 (7th Cir. 2008), *cert. denied*, 556 U.S. 1235 (2009)............... 33-34

*Benjamin* v. *Bailey*, CV 93-0063723 (Conn. Super. Ct. June 30, 1994),
    *aff'd*, 662 A.2d 1226 (Conn. 1995).......................................................11

*Benjamin* v. *Bailey,* 662 A.2d 1226 (Conn. 1995)....................................................11, 25

*Brown & Williamson Tobacco Corp.* v. *Pataki*, 320 F.3d 200 (2d Cir. 2003) ..............................33

*Carter* v. *United States*, 530 U.S. 255 (2000)...............................................29

*Cherry Hill Vineyard, LLC* v. *Baldacci*, 505 F.3d 28 (1st Cir. 2007) .............................................33

*Citizens for a Safer Community* v. *Rochester,* 164 Misc. 2d 822 (Sup. Ct. Monroe County
    1994) (Siragusa, J.) ..............................................26

*City of Chicago* v. *Morales*, 527 U.S. 41 (1999) ..................................................... 27-31

*City of Los Angeles* v. *Alameda Books, Inc.*, 535 U.S. 425 (2002) ........................................... 8-9

*Coal. of N.J. Sportsmen, Inc.* v. *Whitman*, 44 F.Supp.2d 666 (D.N.J. 1999), *aff'd*, 263
    F.3d 157 (3d Cir. 2001)................................................................26, 31

*Del-Rain Corp.* v. *United States*, 95-CV-938S, 1995 U.S. Dist. LEXIS 19619 (W.D.N.Y.
    Dec. 12, 1995)..........................................................32

*District of Columbia* v. *Heller*, 554 U.S. 570 (2008) ........................................... *passim*

*Enos* v. *Holder*, No. 2:10-CV-2911, 2011 U.S. Dist. LEXIS 73932 (E.D. Cal. July 8,
    2011) .......................................................24

*Ezell* v. *City of Chicago*, 651 F.3d 684 (7th Cir. 2011) ...............................................26

*Granholm* v. *Heald*, 544 U.S. 460 (2005)....................................................33

*Gun Owners Action League, Inc.* v. *Swift*, 284 F.3d 198 (1st Cir. 2002) ....................................26

*Heller* v. *District of Columbia*
    670 F.3d 1244 (D.C. Cir. 2011) ("*Heller II*").................................................. *passim*

*Kwong* v. *Bloomberg*, 876 F.Supp.2d 246 (S.D.N.Y. 2012), *aff'd*, 723 F.3d 160 (2d Cir. 2013), *petition for rehearing and rehearing en banc denied* (Sept. 20, 2013) ......................21

*Kachalsky* v. *Cnty. of Westchester*, 701 F.3d 81, 97 (2d Cir. 2012), *cert. denied*, 133 S. Ct. 1806 (2013) ................................................................ *passim*

*Kachalsky* v. *Cnty. of Westchester*, 817 F. Supp. 2d 235 (S.D.N.Y. 2011), *aff'd*, 701 F.3d 81 (2d Cir. 2012), *cert. denied*, 133 S. Ct. 1806 (2013) .........................................25

*Kolender* v. *Lawson*, 461 U.S. 352 (1983) .................................................................30

*Kuck* v. *Danaher*, 822 F. Supp. 2d 109 (D. Conn. 2011) .............................................28

*Kwong* v. *Bloomberg*, 723 F.3d 160 (2d Cir. 2013), *petition for rehearing and rehearing en banc denied* (Sept. 20, 2013)................................................................ *passim*

*L.A.M. Recovery, Inc.* v. *Dep't of Consumer Affairs*, 377 F. Supp. 2d 429 (S.D.N.Y. 2005), *aff'd*, 184 F. App'x 85 (2d Cir. 2006) ..........................................................32

*Lujan* v. *Defenders of Wildlife*, 504 U.S. 555 (1992) ...................................................23

*Nat'l Rifle Ass'n of Am., Inc.* v. *Bureau of Alcohol, Tobacco, Firearms & Explosives*, 700 F.3d 185 (5th Cir. 2012) ...........................................................................7

*Nat'l Rifle Ass'n of Am., Inc.* v. *McCraw*, 719 F.3d 388 (5th Cir. 2013) ................................21, 26

*Nordyke* v. *King*, 681 F.3d 1041 (9th Cir. 2012) (en banc), *cert. denied*, 133 S. Ct. 840 (2013) .......................................................................26

*NYC C.L.A.S.H., Inc.* v. *City of New York*, 315 F. Supp. 2d 461 (S.D.N.Y. 2004) .........................7

*Oltra, Inc.* v. *Pataki*, 273 F. Supp. 2d 265 (W.D.N.Y. 2003).................................................. 33-34

*People* v. *Ford*, 66 N.Y.2d 428 (1985).........................................................................29

*People* v. *Marino*, 212 A.D.2d 735 (2d Dep't 1995).........................................................29

*People* v. *Wood*, 58 A.D.3d 242 (1st Dep't 2008)..........................................................29

*Rhodes* v. *Tevens*, 07-CV-471S, 2012 U.S. Dist. LEXIS 30290 (W.D.N.Y. Mar. 7, 2012), *aff'd*, 2013 U.S. App. LEXIS 4701 (2d Cir. Mar. 8, 2013) ..............................................7

*Richmond Boro Gun Club, Inc.* v. *City of New York*, 97 F.3d 681 (2d Cir. 1996) ..................15, 29

*Richmond Boro Gun Club* v. *City of New York*, 896 F. Supp. 276 (E.D.N.Y. 1995), *aff'd*, 97 F.3d 681 (2d Cir. 1996)................................................................ 30-31

*Staples* v. *United States,* 511 U.S. 600 (1994)................................................................23

*State Ammunition Inc.* v. *Lindley*, No. 2:10-cv-01864, 2010 U.S. Dist. LEXIS 133491 (E.D. Cal. Dec. 2, 2010)................................................................................32

*Suleski* v. *Harlach*, 11-CV-376S, 2013 U.S. Dist. LEXIS 124922 (W.D.N.Y. Aug. 30, 2013) ...............................................................................................................7

*Summers* v. *Earth Island Inst.*, 555 U.S. 488 (2009) ...................................................24

*Teixeira* v. *Cnty. of Alameda*, No. 12-cv-03288-WHO, 2013 U.S. Dist. LEXIS 128435 (N.D. Cal. Sept. 9, 2013) ..........................................................................9

*Thomas* v. *City of New York*, 143 F.3d 31 (2d Cir. 1998) .............................................32

*United States* v. *Awan*, 384 F. App'x 9 (2d Cir. 2010)..................................................28

*United States* v. *Awan*, 459 F. Supp. 2d 167 (E.D.N.Y. 2006)......................................29

*United States* v. *Chester*, 628 F.3d 673 (4th Cir. 2010), *on remand*, 847 F. Supp. 2d 902 (S.D. W. Va. 2012), *aff'd*, 514 F. App'x 393 (4th Cir. 2013) ....................................8

*United States* v. *Chester*, 847 F. Supp. 2d 902 (S.D. W. Va. 2012), *aff'd*, 514 F. App'x 393 (4th Cir. 2013)...................................................................8

*United States* v. *Chester*, 514 F. App'x 393 (4th Cir. 2013) .......................................7-8

*United States* v. *Coppola*, 671 F.3d 220 (2d Cir. 2012), *cert. denied*, 133 S. Ct. 843 (2013) .................................................................28, 31

*United States* v. *Decastro*, 682 F.3d 160 (2d Cir. 2012), *cert. denied*, 133 S. Ct. 838 (2013) ...................................................................................................... *passim*

*United States* v. *Engstrum*, 609 F. Supp. 2d 1227 (D. Utah 2009)................................21

*United States* v. *Farhane*, 634 F.3d 127 (2d Cir. 2011), *cert. denied*, 133 S. Ct. 833 (2011) ................................................................... 27-28

*United States* v. *Marzzarella*, 614 F.3d 85 (3d Cir. 2010), *cert. denied*, 131 S. Ct. 958 (2011) ..................................................................17, 21

*United States* v. *Price*, 649 F.3d 857 (8th Cir. 2011) ..................................................23

*United States* v. *Rybicki*, 354 F.3d 124 (2d Cir. 2003) (en banc) ..................... 27-28, 30

*United States* v. *Weaver*, No. 2:09-cr-00222, 2012 U.S. Dist. LEXIS 29613 (S.D. W. Va. Mar. 7, 2012)............................................................................................28

*Wilson* v. *Cnty. of Cook*, 968 N.E.2d 641 (Ill. 2012)..................................................31

**STATUTES AND LEGISLATIVE MATERIALS**

Secure Ammunition and Firearms Enforcement Act, 2013 N.Y. Laws, ch. 1 (the "SAFE Act")......................................................................................................... *passim*

New York State Penal Law
§ 15.15................................................................................................................29
§ 265.02..............................................................................................................29
§ 265.20(a)(7-f)...................................................................................................25
art. 400 note .......................................................................................................29
§ 400.03(7)..........................................................................................................29

*What Should America Do About Gun Violence?: Hearing Before the S. Comm. on the Judiciary*, 113th Cong. (Jan. 30, 2013) (testimony of Baltimore County Police Department Chief James Johnson), *available at* http://www.senate.gov/isvp/?comm=judiciary&type=live&filename=judiciary013013 ........16


**MISCELLANEOUS**

Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytical Framework and a Research Agenda*, 56 UCLA L. Rev. 1443, 1456-59 (2009) ..................................................................................................................... 18-19

Brief for Appellants, *Heller* v. *District of Columbia*, 670 F.3d 1244 (D.C. Cir. 2011) ("*Heller II*"), *available at* 2010 U.S. D.C. Cir. Briefs LEXIS 18........................ 6-7, 17, 20, 22

Defendants Andrew M. Cuomo, Governor of the State of New York; Eric T. Schneiderman, Attorney General of the State of New York; and Joseph A. D'Amico, Superintendent of the New York State Police (collectively, the "State Defendants") respectfully submit this reply memorandum of law (i) in further support of their cross-motion, filed June 21, 2013, to dismiss the Amended Complaint in this action with prejudice and/or for summary judgment against Plaintiffs (ECF No. 64), and (ii) in opposition to Plaintiffs' cross-motion for summary judgment, filed August 19, 2013 (ECF No. 113).[1]

## PRELIMINARY STATEMENT

On January 15, 2013, in the wake of yet another series of mass shootings and violence caused by persons armed with assault weapons and other semiautomatic firearms equipped with large-capacity magazines, the State of New York enacted the Secure Ammunition and Firearms Enforcement Act, 2013 N.Y. Laws, ch. 1 (the "SAFE Act"). Among its many measures to combat the epidemic of gun violence, the SAFE Act, in particular, strengthened New York's existing bans on assault weapons and large-capacity magazines.

It is these provisions restricting this unusually dangerous and lethal weaponry -- which the voluminous and almost entirely uncontroverted record submitted by the State demonstrates clearly is the choice of deadly mass shooters, used disproportionately in violent crime and in particular in the murders of law enforcement officers, and not necessary or suitable for home

---

[1] Plaintiffs appear to have now abandoned their separate request for preliminary injunctive relief, filed April 15, 2013 (ECF No. 23), which goes almost entirely unmentioned in their August 19 filing. In any event, for the reasons already discussed in the State Defendants' moving brief ("State Defs.' Mem.") (ECF No. 77), such a request is plainly without merit here. (*See, e.g.*, State Defs.' Mem. at 15-16, 38 n.33, 78). As made clear in the State Defendants' cross-motion papers, and reiterated below, each of Plaintiffs' claims in this action should be dismissed by the Court, as a matter of law, with prejudice.

self-defense -- that Plaintiffs challenge in their Second Amendment claims. Their claims are wholly without merit.

As the State Defendants showed in their moving brief, Plaintiffs' Second Amendment challenges fail here under clear and binding precedent handed down since the Supreme Court's decision in *District of Columbia* v. *Heller*, 554 U.S. 570 (2008) -- and at every step of the governing framework for Second Amendment claims established by the Second Circuit. (*See* State Defs.' Mem. at 17-25). First, the bans do not even implicate Plaintiffs' constitutional rights because such weaponry is outside the ambit of Second Amendment protection. (*See id.* at 25-39). Furthermore, as Plaintiffs have conceded, they "*could* substitute alternative weapons" to effectuate self-defense in their homes, and so the bans do not substantially burden their rights. (*See id.* at 39-46). And, in any event, even if the bans imposed a substantial burden, because these provisions so clearly advance New York's public safety goals, they easily withstand constitutional scrutiny. (*See id.* at 46-56).

Plaintiffs have no real answer to any of this. Instead, they resort to misdirection and obfuscation. They mischaracterize the scope of this Court's review under the Second Amendment. They entirely disregard the relevant factual record before the Court. And they misstate and misapply the governing legal standards. But, as the State Defendants discuss below, none of these maneuvers can change the proper result here. Dismissal of Counts One and Two remains fully warranted. *See infra* Point I.

Plaintiffs' efforts to save their remaining claims -- on equal protection, vagueness, and Dormant Commerce Clause grounds -- fare no better. They all continue to fail for precisely the same reasons set forth in the State Defendants' moving brief. *See infra* Point II (equal protection); Point III (vagueness); Point IV (Dormant Commerce Clause).

Accordingly, Plaintiffs' motion for summary judgment (as well as their preliminary injunction motion to the extent it has not been abandoned) should be denied, the State Defendants' motion should be granted, and each of Plaintiffs' claims should be dismissed with prejudice.

### STATEMENT OF FACTS

For a complete recitation of the relevant facts on these cross-motions, we respectfully refer the Court to *(a)* the Declarations of Kevin Bruen, dated June 20, 2013 ("Bruen Decl."); Christopher S. Koper, dated June 21, 2013 ("Koper Decl"); Franklin Zimring, dated June 20, 2013 ("Zimring Decl."); Lucy P. Allen, dated June 21, 2013 ("Allen Decl."); Kathleen M. Rice, dated June 18, 2013 ("Rice Decl."); James M. Sheppard, dated June 21, 2013 (Sheppard Decl."); and William J. Taylor, Jr., dated June 21, 2013, as well as the exhibits thereto; *(b)* the State Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion for a Preliminary Injunction and in Support of State Defendants' Cross-Motion to Dismiss and/or for Summary Judgment, dated June 21, 2013; and *(c)* the State Defendants' Statement of Undisputed Material Facts in Support of State Defendants' Motion for Summary Judgment, dated June 21, 2013.[2] For further explication of these facts, we also respectfully refer the Court to the accompanying Reply Declaration of Christopher S. Koper, dated September 23, 2013 ("Koper Suppl. Decl."); and the State Defendants' Response to Plaintiffs' Local Civil Rule 56(a)(2) Counter-Statement, dated September 24, 2013, both of which are submitted herewith.

---

[2] All of these documents were filed on June 21, 2013 in support of the State Defendants' cross-motion to dismiss and/or for summary judgment and in opposition to Plaintiffs' motion for a preliminary injunction. Each is also hereby incorporated by reference into the State Defendants' present opposition to Plaintiffs' cross-motion for summary judgment. References to Exhibits ("Ex. __") herein are to those which accompanied State Defendants' cross-motion to dismiss and/or for summary judgment, with the exception of new Exhibit Nos. 71-74, attached to the accompanying Supplemental Declaration of William J. Taylor, Jr., dated September 24, 2013.

<u>**ARGUMENT**</u>

**I.**

**PLAINTIFFS' SECOND AMENDMENT CHALLENGES**
<u>**TO THE SAFE ACT FAIL AS A MATTER OF LAW**</u>

In an attempt to save their meritless Second Amendment claims, Plaintiffs misapprehend the proper scope of this Court's review, ignore the relevant factual record before the Court, and misstate and misapply the governing law. For all the reasons set forth in the State Defendants' moving brief (*see* State Defs.' Mem. at 17-56), as well as those discussed below, dismissal of Counts One and Two remains fully warranted.

**A.** **The Scope of the Court's Second Amendment**
<u>**Inquiry Is Limited and Deferential**</u>

Most fundamentally, Plaintiffs err in their summary judgment submission because they misapprehend the proper, and properly limited, scope of this Court's Second Amendment inquiry. Simply put, Plaintiffs presume that their own self-serving submissions and self-interested policy positions as to the wisdom of New York's bans of assault weapons and large-capacity magazines are what matters on these cross-motions -- and that the voluminous record submitted by the State in support of its legislative judgment is of no moment. Perhaps this is why, in making their summary judgment arguments, Plaintiffs have almost entirely ignored the State Defendants' six testimonial declarations and seventy exhibits, and relied instead exclusively on their own preferred views as to the purposes and uses of assault weapons and large-capacity magazines and their own bald assertions that New York law, or any law, addressing this dangerous weaponry "will . . . be ineffectual." (*See* Plaintiffs' Omnibus Memorandum of Law in Support of  Plaintiffs' Cross-Motion for Summary Judgment, in Reply to Defendants' Opposition to Preliminary Injunction, and in Opposition to Defendants' Motion

for Summary Judgment ("Pls.' Opp. Mem.") at 32; *see* Plaintiffs' Counter-Statement Pursuant to Local Rule 56(a)(2) (ECF No. 116) ("Pls.' L.R. 56(a)(2) Counterst.") ¶¶ 92-172).[3]

But Plaintiffs' approach is exactly backwards. Rather than discounting the State's legislative judgment and ignoring its supporting record submissions, the Court must make those the focus of its inquiry. Second Circuit law is clear on this point: Because of the "substantial deference" that must be given to "the predictive judgments of [the legislature]," particularly in the context of firearms regulation, the Court's role here, at most -- *i.e.*, even if it determines that Plaintiffs' Second Amendment rights have been "substantially burdened" and therefore assesses the challenged provisions under intermediate constitutional scrutiny -- "is only to 'assure that, in formulating its judgments, [New York] has drawn reasonable inferences based on substantial evidence." *Kachalsky* v. *Cnty. of Westchester*, 701 F.3d 81, 97 (2d Cir. 2012) (quoting *Turner Broad. Sys., Inc.* v. *FCC*, 520 U.S. 180, 195 (1997), and *Turner Broad. Sys., Inc.* v. *FCC*, 512 U.S. 622, 666 (1994)) (alterations in *Kachalsky*), *cert. denied*, 133 S. Ct. 1806 (2013); (*see* State Defs.' Mem. at 16, 49-50). And, in conducting this constitutional review, the Court should consider both the legislative record and available empirical data, including "studies and data" submitted by the State in support of its motion to uphold the challenged statutory provisions on summary judgment. *Kachalsky*, 701 F.3d at 97-99.

---

[3] Strikingly, while Plaintiffs attempt to rely on two of Dr. Christopher Koper's studies regarding the impact of the 1994 federal assault weapons ban (*See* Pls.' Opp. Mem. at 4-5, 15, 31; Pls.' L.R. 56(a)(2) Counterst. ¶¶ 24-38, 40-56, 59-61), they fail to even mention that Dr. Koper submitted a declaration in this case, in which he concludes, based on his studies, that New York's strengthened bans on assault weapons and large-capacity magazines are likely to advance the State's interests in protecting its populace from the dangers of mass shootings and gun violence. (Koper Decl. ¶¶ 4, 65). As discussed further below, *see infra* Point I (B),Dr. Koper has now submitted a supplemental declaration to rebut Plaintiffs' mischaracterization of his work. (Koper Suppl. Decl. ¶¶ 4-18).

In considering these materials, the Court's end is not "to determine in the first instance whether banning [assault weapons and large-capacity magazines] in particular would promote important law-enforcement objectives." *Heller* v. *District of Columbia*, 670 F.3d 1244, 1269 (D.C. Cir. 2011) ("*Heller II*"); *see Kachalsky*, 701 F.3d at 99. It is well settled that policy decisions like that are left solely to the legislature. *See Kachalsky*, 701 F.3d at 97, 99. The Court's role, even under intermediate scrutiny, is merely "to determine whether the [State] has presented evidence sufficient to 'establish the reasonable fit . . . require[d]' between the law at issue and an important or substantial governmental interest." *Heller II*, 670 F.3d at 1269 (quoting *Bd. of Trustees of State Univ. of N.Y.* v. *Fox*, 492 U.S. 469, 480 (1989)); *see Kachalsky*, 701 F.3d at 97-99.

And, to be clear, to prevail on summary judgment here, the evidence presented and relied upon by the State Defendants need not be undisputed. For example, the parties do not have to agree as to whether assault weapons fire almost as rapidly as automatics (*compare* State Defs.' Mem at 26, *with* Pls.' Opp. Mem. at 13-14), or whether pistol grips facilitate the rapid and continuous firing of ammunition from the hip (*compare* State Defs.' Mem. at 27, *with* Pls.' Opp. Mem. at 18). The plaintiffs in *Heller II*, in fact, also disputed these very points. *See* Brief for Appellants, *Heller II*, 670 F.3d 1244 (D.C. Cir. 2011), *available at* 2010 U.S. D.C. Cir. Briefs LEXIS 18, at *13-15; (*see* Pls.' Opp. Mem. at 25). Indeed, as here, the *Heller II* plaintiffs premised their summary judgment argument on the belief that their own "record affidavits showing that the particular 'assault weapons' at issue and particular magazines over ten rounds are in common use, are typically possessed by law-abiding citizens for lawful purposes, and are not 'dangerous and unusual,'" should control the Second Amendment question, and that evidentiary submissions by the District, including many of the exact same studies and reports

6

submitted and relied on by the State Defendants in this case, should simply be "disregarded." Brief for Appellants, *Heller II*, 2010 U.S. D.C. Cir. Briefs LEXIS 18, at *61-64.

But these sorts of evidentiary disagreements did not alter the result in *Heller II*. The D.C. Circuit still found that the District could rely on its own record submissions showing, among other things, that assault weapons "fire almost as rapidly as automatics" and that pistol grips "help stabilize the weapon during rapid fire and allow the shooter to spray-fire from the hip position." *Heller II*, 670 F.3d at 1262-63. And, based on this summary judgment record, it still upheld D.C.'s bans on assault weapons and large-capacity magazines under the Second Amendment. *Id.* at 1264. Other courts have likewise upheld firearms laws from Second Amendment attack at the summary judgment stage, even though the empirical data and other record evidence submitted in support of that legislation was challenged and disputed. *See, e.g., United States* v. *Chester*, 514 F. App'x 393, 395 (4th Cir. 2013); *Woollard* v. *Gallagher*, 712 F.3d 865, 881-82 (4th Cir. 2013); *Nat'l Rifle Ass'n of Am., Inc.* v. *Bureau of Alcohol, Tobacco, Firearms & Explosives*, 700 F.3d 185, 210-11 (5th Cir. 2012).[4] The same analysis, and same result, should apply here.[5]

---

[4] *See also, e.g.*, *NYC C.L.A.S.H., Inc.* v. *City of New York*, 315 F. Supp. 2d 461, 488 n. 23, 492-94 & n.32 (S.D.N.Y. 2004) (holding that studies, data, and reports supporting city and state smoking-ban legislation, though disputed, were admissible and material on summary judgment "not for the truth of what is contained in those materials," but to show the factual and empirical basis for the legislation, which the court upheld on a constitutional challenge).

[5] Plaintiffs' submissions, setting forth their own preferred policy views as to the purposes and uses of assault weapons and large-capacity magazines and the impact of New York's law restricting this weaponry, are not "material" for the purposes of Rule 56. Fed. R. Civ. P. 56(a); *see, e.g.*, *Suleski* v. *Harlach*, 11-CV-376S, 2013 U.S. Dist. LEXIS 124922, at *6 (W.D.N.Y. Aug. 30, 2013) ("A fact is 'material' only if it 'might affect the outcome of the suit under governing law.'"). As discussed in the State Defendants' accompanying Response to Plaintiffs' Statement of Undisputed Material Facts, they are also almost entirely comprised of pages upon pages of "conclusory statements, conjecture, and inadmissible evidence," *Rhodes* v. *Tevens*, 07-CV-471S, 2012 U.S. Dist. LEXIS 30290, at *17 (W.D.N.Y. Mar. 7, 2012), *aff'd*, 2013 U.S. App.

Contrary to Plaintiffs' position, the law is clear that legislative judgments based upon "conflicting evidence" are precisely what courts are required to uphold under intermediate scrutiny -- and, as the Second Circuit has stressed, nowhere is that more true than "[i]n the context of firearm regulation." *Kachalsky*, 701 F.3d at 97, 99. That, of course, does not mean that "mere assertions," *Heller II*, 670 F.3d at 1259, or bare "plausible *reasons*," *United States* v. *Chester*, 628 F.3d 673, 683 (4th Cir. 2010) (emphasis in original) (cited in Pls.' Opp. Mem. at 32), are enough to justify the legislature's predictive judgments.[6] But it does mean that where, as here, the State has submitted substantial evidence, including "studies and data" in support of the firearms legislation at issue, "the existence of studies and data challenging" that legislative judgment is not nearly enough to invalidate the statutory provision under the Second Amendment. *Kachalsky*, 701 F.3d at 99; *see, e.g.*, *Heller II*, 670 F.3d at 1262-64.

Plaintiffs' reliance on the Supreme Court's plurality opinion in *City of Los Angeles* v. *Alameda Books, Inc.*, 535 U.S. 425, 438-39 (2002), is misplaced. (*See* Pls.' Opp. Mem. at 31). The burden-shifting analysis adopted in *Alameda Books* has been limited to assessing the

---

LEXIS 4701 (2d Cir. Mar. 8, 2013), and thus are insufficient to defeat summary judgment in any case.

[6] Plaintiffs rely on the Fourth Circuit's 2010 decision in *Chester*, 628 F.3d at 683, in which the court remanded for further factual development where, unlike here, the government did not even attempt to submit into the record empirical or other evidence supporting the challenged federal statute, which banned gun possession by domestic violence misdemeanants. (*See* Pls.' Opp. Mem. at 32). But, notably, Plaintiffs fail to mention that, after the government submitted supporting empirical studies on remand, the district court held, applying intermediate scrutiny, that the law at issue did not violate the Second Amendment. 847 F. Supp. 2d 902, 906-12 (S.D. W. Va. 2012). The Fourth Circuit then affirmed on the subsequent appeal. 514 F. App'x 393, 395 (4th Cir. 2013). *Heller II* is similarly instructive in this regard. 670 F.3d at 1258-60 (holding that it could not determine whether certain of D.C.'s gun registration laws satisfied intermediate scrutiny, and remanding for the development of a more thorough factual record, where the record submitted by the District merely "asserts" that studies support the challenged legislation but "neither identifies the studies relied upon nor claims the studies showed the laws achieved their purpose," and where "the District fails to present any data or other evidence to substantiate its claim").

constitutionality under the First Amendment of municipal ordinances regulating the "secondary effects" of adult bookstores and similar businesses.  (*See id*).  No court -- including the D.C. Circuit in *Heller II*, which rejected this identical argument, *see* Brief for Appellants, *Heller II*, 2010 U.S. D.C. Cir. Briefs LEXIS 18, at *63-64 -- has ever applied it in the Second Amendment context.[7]  And, as the Second Circuit has emphasized, "[s]tate regulation under the Second Amendment has always been more robust than of other enumerated rights."  *Kachalsky*, 701 F.3d at 100.

In any event, *Alameda Books* strongly supports the State Defendants' position here. While noting that a municipality could not "get away with shoddy data or reasoning," the Supreme Court made clear that a municipality is not required to introduce evidence to prove that a challenged law is the only solution but may "rely upon evidence that is 'reasonably believed to be relevant' to the secondary effects that they seek to address."  535 U.S. at 438-39, 442.  Even in the First Amendment context, the *Alameda Books* Court stressed, the judicial role was a limited and deferential one.  *See id.* at 440 (citing *Turner Broad. Sys.*, 512 U.S. at 665-66, and "acknowledg[ing] that the Los Angeles City Council is in a better position than the Judiciary to gather and evaluate data on local problems").  The evidentiary record submitted by the State Defendants on their cross-motion -- which, as noted, far from "cast[ing] doubt on," *id.* at 438-39, in any way, Plaintiffs simply ignore -- easily satisfies such a standard.

In the end, the limited scope of this Court's review is clear.  As the Second Circuit held in *Kachalsky*, given "the general reticence to invalidate the acts of [our] elected leaders," firearms

---

[7] A federal district court in California recognized this just two weeks ago, when it rebuffed a similar argument by plaintiffs there that the "analysis used in First Amendment cases involving adult bookstores and movie theaters" was the appropriate analysis for their Second Amendment claims.  *Teixeira* v. *Cnty. of Alameda*, No. 12-cv-03288-WHO, 2013 U.S. Dist. LEXIS 128435, at *25-26 (N.D. Cal. Sept. 9, 2013) ("The Court is unaware of (nor do plaintiffs cite) any authority that applied this analysis in the Second Amendment context . . . .").

legislation of the sort at issue in this case should be struck down under the Second Amendment "only if 'the lack of constitutional authority to pass [the] act in question is clearly demonstrated.'" *Kachalsky*, 701 F.3d at 100-01 (quoting *Nat'l Fed'n of Indep. Bus.* v. *Sebelius*, 132 S. Ct. 2566, 2579 (2012)) (internal quotation marks omitted) (alterations in *Kachalsky*). On the relevant record in this case, Plaintiffs' Second Amendment claims do not come close to meeting that requirement. Accordingly, for the reasons set forth in the State Defendants' cross-motion papers, both Counts One and Two should be dismissed with prejudice.

### B.     The Record Plainly Supports New York's Legislative Judgment Here

New York enacted its strengthened bans on assault weapons and large-capacity magazines earlier this year in order to address, above all, a particular societal problem: the scourge of deadly mass shootings and the enhanced lethality of shootings committed with this unusual dangerous weaponry.

The State Defendants have submitted a substantial record in support of this legislative judgment, including supporting declarations from the criminologist who conducted the only published academic studies to have examined the efficacy of the federal government's ten-year ban on assault weapons and large-capacity magazines, as well as from two other highly qualified experts (*see* Koper Decl.; Zimring Decl.; Allen Decl.); additional supporting declarations from state and local law-enforcement officers in New York, including the Rochester Police Chief, the Nassau County District Attorney, and a representative from the State Police (*see* Sheppard Decl.; Rice Decl.; Bruen Decl.); and numerous other empirical studies, reports, and data demonstrating the compelling justifications for the New York's chosen gun-control measures.

In response, Plaintiffs ignore this record and have presented, in substance, nothing. Their papers contain no discussion of the State Defendants' six supporting declarations. Aside from

10

labeling studies authored by respected public-interest organizations and the federal government as "politically-charged statements" and "propaganda," (Plaintiffs' Response Pursuant to Local Rule 56(a)(2) (ECF No. 115) ("Pls.' L.R. 56(a)(2) Resp.") ¶¶ 13, 32-33; Pls.' Opp. Mem. at 15), Plaintiffs likewise barely acknowledge the bulk of the State Defendants' seventy exhibits. Instead, Plaintiffs offer nine nearly identical affidavits from their clients, each making essentially the same unsupported conclusory assertions, and none containing any specific factual allegations relevant to this action.[8]  And Plaintiffs also offer the declaration of Dr. Gary K. Roberts, D.D.S., who opines that AR-15s are in his opinion, "likely" the best weapon for civilian self-defense. Even ignoring the internal inconsistencies of Roberts's declaration, his opinion of what is or is not an appropriate self-defense weapon does not mean that New York State cannot decide otherwise.[9]  Plaintiffs also continue to rely on the declaration of Professor Gary Kleck, whose testimony was rejected by another court in a case involving a challenge to an assault weapons statute, because, the court found, his testimony was "biased," was "focused on the public debate," and "did not help the inquiry of the court with respect to the legal claims." *Benjamin* v. *Bailey*, CV 93-0063723, at 12-13 (Conn. Super. Ct. June 30, 1994) (Ex. 71).[10]

---

[8] Plaintiffs Nojay and Horvath submitted no affidavits with Plaintiffs' summary judgment motion, although Horvath did submit an affidavit with Plaintiffs' preliminary injunction which the State addressed in its moving brief.

[9]  Roberts's declaration is internally inconsistent.  He opines that handguns may be a poor choice for self-defense because they offer "poor incapacitation potential" and states that for self-defense, a weapon must use ammunition which can incapacitate and stop violent actions as quickly as possible. (Roberts Decl. at 8).  He then asserts that assault weapons may be the best weapons for self-defense, but, apparently trying to address the evidence showing that the use of assault weapons for self-defense may increase the risk of the shooting of bystanders, he also claims that the ammunition "most commonly used" in AR-15 firearms causes "unacceptably minimal wounds."  *(Id.* at 13).

[10] The trial court's decision was ultimately affirmed by the Connecticut Supreme Court.  662 A.2d 1226 (Conn. 1995).

Perhaps most strikingly, mass shootings, the very danger New York's assault weapon and large-capacity magazine bans were enacted to combat, are scarcely mentioned anywhere in Plaintiffs' papers. In their 50-page summary judgment brief, Plaintiffs reference mass shootings once, in a single, one-sentence footnote bereft of any analysis. (*See* Pls.' Opp. Mem. at 21 n.29). Plaintiffs' Local Rule 56(a)(2) Counter-Statement does little better, devoting less than one page to the subject (*see* Pls.' L.R. 56(a)(2) Counterst. ¶¶ 13-15), and, once again, entirely ignoring all of the supporting declarations, studies, and data submitted by the State Defendants -- on mass shootings, their relationship to assault weapons and large-capacity magazines, and the demonstrated positive impact of bans on such weapons.

With no answer for the State Defendants' record submissions, Plaintiffs try to change the subject. They don't discuss mass shootings or the increased lethality and victimization that results when assault weapons and large-capacity magazines are used in crime, but instead focus on gun crime generally, or on handgun use in crime.[11] (*See* Pls.' Opp. Mem. at 4-6, 15, 20-21, 31). But this selective, incomplete, and, in many instances, flatly incorrect approach cannot overcome the State's showing that the legislative determination that banning assault weapons and large-capacity magazines advances an important government interest. (*See* State Defs.' Mem. at 54).

---

[11] Citations to broader gun violence victimization rates do not come close to helping Plaintiffs in any event. Plaintiffs make the shocking argument that because the rate of gun homicides and other violent gun crimes has declined in recent years from the nation's highest rates in or around 1993, the United States has a "strikingly low" violent gun crime rate and new restrictions are unnecessary. (*See* Pls.' Opp. Mem. at 5). The Centers for Disease Control has reported, however, that between 2000 and 2010, 325, 449 Americans were killed with guns in non-suicide violence-related firearms deaths. (Ex. 72). And the magnitude of these numbers does not encompass the much larger numbers of those injured but not killed by guns or the horror of, in particular, the random gun violence associated with mass shootings like those at Sandy Hook elementary school and in Webster, New York in 2012.

Plaintiffs and their *amici* rely heavily on the work of Dr. Christopher Koper, citing extensively to selected portions of Dr. Koper's 1997 and 2004 studies regarding the impact of the 1994 federal assault weapons ban, in support of their arguments that the bans at issue here will have no effect on gun violence. (*See* Pls.' Opp. Mem. at 4-5, 15, 31; Pls.' L.R. 56(a)(2) Counterst. ¶¶ 24-38, 40-56, 59-61).[12] Nowhere, however, do Plaintiffs mention the declaration that Dr. Koper submitted in this case, in which he summarizes the key findings of his studies (not just in 1997 and 2004, but also his most recent 2013 report) and, based upon those findings and his nineteen years as a criminologist, provides his expert opinion as to the potential impact and efficacy of prohibitions on assault weapons and large-capacity magazines like those enacted in New York. (Koper Decl. ¶¶ 3-4, 58-65).

As Dr. Koper concludes -- but Plaintiffs, again, ignore completely -- New York's strengthened bans on assault weapons and large-capacity magazines are likely to advance the State's interests in protecting its populace from the dangers of mass shootings and gun violence. (*Id.* ¶¶ 4, 65). Dr. Koper has also now submitted a supplemental declaration, in which he reiterates his core findings and conclusions and specifically rebuts some of most egregious misuse of his work by Plaintiffs and their *amici*. (Koper Suppl. Decl. ¶¶ 4-25).

Specifically, Dr. Koper demonstrates that many of Plaintiffs' assertions are just flatly wrong. The evidence shows that assault pistols are used disproportionately in crime, and that assault weapons have been disproportionately used in murder and other serious crimes. (*Id.* ¶ 9). It also shows that assault weapons and guns with large-capacity magazines are used disproportionately in murders of police and mass public shootings. (*Id.*). And it reveals that

---

[12] Plaintiffs' latest *amicus*, the Pink Pistols, does the same in its August 30, 2013 *amicus curiae* brief. In fact, portions of the Pink Pistols' *amicus* brief are simply copied, almost word for word, into Plaintiffs' Statement of Undisputed Material Facts.

attacks with these weapons "result in more shots fired, more victims shot, more gunshots per victim, and more lethal injuries." (*Id.* ¶ 11).

Even more than this, Dr. Koper emphasizes, Plaintiffs and their *amici* simply "cherry pick" isolated statements from his studies and take them out of context. Thus, Dr. Koper states, while Plaintiffs and their *amici* do accurately quote from his reports for the most part, their selective, incomplete use of studies "do[es] not reflect the totality of [his] findings or the conclusions that [he] actually reached." (*Id.* ¶ 8).

Plaintiffs also have no answer to the State's showing that assault weapons and guns equipped with large-capacity magazines are not common, necessary, or even particularly suitable for self-defense purposes. (*See* State Defs.' Mem. at 25-39). Plaintiffs don't address the State Defendants' submissions on this point and, other than the Roberts declaration's opinion that an assault weapon may be suitable for home defense, present no evidence that civilians need such mass killing power for home defense, no evidence that any of them has ever used such weaponry in this manner and, indeed, no evidence whatsoever that the nearly twenty years of restrictions on assault-weapons and large-capacity magazines in New York have adversely affected individual self-defense.

Plaintiffs don't even attempt to address the State Defendants' evidence regarding the number of shots fired when using a gun in self-defense. (*See* State Defs.' Mem. at 37-39; Allen Decl. ¶¶ 12-15). As these analyses show, based on the NRA's own reports, the average number of shots fired when using a gun in self-defense is only about two, and, contrary to Plaintiffs' assertions, it is extremely rare (much less than 1% of the reports analyzed) for a person to fire more than seven shots in self-defense. (*See* State Defs.' Mem. at 37-39; Allen Decl. ¶¶ 12-15).

Plaintiffs also do not contest, indeed they concede, that there are hundreds of alternative

firearms available for self-defense purposes -- including, according to Plaintiffs, those that "function in essentially identical ways as the banned firearms." (Memorandum in Support of Plaintiffs' Motion for a Preliminary Injunction ("Pls.' Mem.") at 22-23; *see* Declaration of Gary Kleck, dated Apr. 15, 2013, at 6-8).[13]

And while Plaintiffs certainly assert that the features identified in the definition of an assault weapon under New York law do not make the weapons more dangerous (*see* Pls.' Opp. Mem. at 13-15), they don't address any of the evidence submitted by the State Defendants -- findings from courts, legislative bodies, law-enforcement officers, and other experts -- concluding precisely to the contrary. This evidence demonstrates, contrary to Plaintiffs' assertions, that, for example, protruding pistol grips and thumbhole stocks do aid a shooter in retaining control of a firearm while holding it at his or her hip, facilitating the rapid and continuous fire of ammunition without precise aiming. (*See* State Defs.' Mem. at 26-27 (citing evidence)). The Second Circuit, in fact, has expressly held as much. *Richmond Boro Gun Club, Inc.* v. *City of New York*, 97 F.3d 681, 685 (2d Cir. 1996) ("Although plaintiffs argue that any rifle can be shot with one hand and at hip level, that is hardly the point. This factor aims to identify those rifles whose pistol grips are designed to make such spray firing from the hip particularly easy."). The evidence also demonstrates that a folding or telescoping stock sacrifices accuracy for advantages such as concealability and mobility in close combat and, as the Second Circuit has noted, "is characteristic of military and not sporting weapons." *Id.* at

---

[13] Plaintiffs make much of the point that these banned assault weapons are apparently used in certain target-shooting competitions (though there are no allegations that they have ever been used in such matches by any of the Plaintiffs). (Pls.' Opp. Mem. at 18-19). But the ATF has declined thus far to find that the competitions Plaintiffs reference even constitute a recognized "sporting purpose" and, using a similar one-feature test as is the law in New York, does not permit assault weapons to be imported as sporting weapons. (Ex. 10 (2011 ATF Study) at 7-8; Ex. 19 (2012 ATF Study) at 2-3).

684-85; (*see* State Defs.' Mem. at 26-27 (citing evidence)).  And the list goes on.  (Bruen Decl. ¶¶ 13-26; *see* State Defs.' Mem. at 26-27 (citing evidence)).  In short, these features give assault weapons the "ability to cool down and handle round after round," increase the guns' "offensive capability," and "serve specific combat-functional ends."  *What Should America Do About Gun Violence?: Hearing Before the S. Comm. on the Judiciary*, 113th Cong. (Jan. 30, 2013) (testimony of Baltimore County Police Department Chief James Johnson), *available at* http://www.senate.gov/isvp/?comm=judiciary&type=live&filename=judiciary013013, at 3:19:15-3:21:55; H.R. Rep. 103-489, at 18-20 (1994) (Ex. 9).[14]

In sum, New York, like numerous other jurisdictions, has determined that "[s]ome weapons are so dangerous and some ammunition devices so lethal that we simply cannot afford to continue selling them in our state."  (Ex. 5 (Gov. Mem. in Support) at 6; Ex. 6 (Assembly Mem. in Support) at 5; Ex. 7 (Senate Mem. in Support) at 5).  Despite Plaintiffs' efforts to ignore it, the record here plainly supports that legislative judgment -- and provides no grounds whatsoever for Plaintiffs' Second Amendment claims.

### C. Plaintiffs' Efforts to Avoid the Governing Second Amendment Legal Standards Are Without Merit

Plaintiffs also flatly misstate or misapply the legal standards applicable to their Second Amendment challenge, advancing several flawed legal arguments in an effort to save their claims.  None have any merit.

*First*, and perhaps most puzzlingly, Plaintiffs point to *Heller II* and argue that both assault weapons and large-capacity magazines should be entitled to apparently absolute constitutional protection because Plaintiffs assert that they are in "common use" nationwide.

---

[14] And, of course, such evidentiary disagreements do not impact the constitutional analysis here. *See supra* Point I(A).

(*See* Pls.' Opp. Mem. at 2, 11-12, 16). In *Heller II*, the D.C. Circuit did find, based on the record there, that it was "clear enough" that assault weapons and large-capacity magazines are in "common use" nationwide. 670 F.3d at 1261. But the court did not resolve whether these weapons "are commonly used or are useful specifically for self-defense or hunting," as would be required for the District's bans to even affect the Second Amendment right. *Id.* The court held that it need not decide that issue, however, because even assuming the challenged laws "impinge[d] upon" the right, intermediate constitutional scrutiny would apply and the bans would survive. *Id.* at 1261-64. In short, *Heller II* strongly supports the State. (*See* State Defs.' Mem. at 22-23).[15]

*Second*, Plaintiffs also contend that New York's bans on assault weapons and large-capacity magazines are unconstitutional because they prohibit an entire "class of 'arms,'" like the handgun ban struck down in *Heller*. (Pls.' Opp. Mem. at 9, 27-28). This argument was also specifically raised, *see* Brief for Appellants, *Heller II*, 2010 U.S. D.C. Cir. Briefs LEXIS 18, at *65, and rejected in *Heller II*. 670 F.3d at 1268-69; *see also United States* v. *Marzzarella*, 614 F.3d 85, 101 (3d Cir. 2010) (upholding a ban on all firearms with obliterated serial numbers), *cert. denied*, 131 S. Ct. 958 (2011). It fares no better here.

Second Circuit case law is clear that the critical question under the Second Amendment is not the categorical one Plaintiffs propound (*i.e.*, whether assault weapons and/or large-capacity

---

[15] Indeed, as discussed in the State Defendants' moving brief, the grounds for dismissal are even stronger here. Unlike in *Heller II*, the record here shows that assault weapons and large-capacity magazines are *not* "commonly possessed," and certainly not "typically possessed by law-abiding citizens for lawful purposes" such as self-defense. (*See* State Defs.' Mem. at 29-34, 36-39). The Second Circuit also has established a slightly different, and more deferential, legal test, applying only rational basis review (rather than intermediate scrutiny, as in *Heller II*, 670 F.3d at 1261-62) where the bans at issue do not substantially burden the Second Amendment right. (*See* State Defs.' Mem. at 22 n.20). And, notably, the ban upheld in *Heller II* is even stricter than New York's, as it prohibits *all* assault weapons, even those possessed prior to the law's enactment. (*See id.* at 21 n.19).

magazines constitute "an entire class of 'arms'"), but rather one of "practical impact" -- *i.e.*, whether the restrictions at issue "operate as a substantial burden on the ability of law-abiding citizens to possess and use a firearm for self-defense (or other lawful purposes)." *United States* v. *Decastro*, 682 F.3d 160, 164-66 (2d Cir. 2012), *cert. denied*, 133 S. Ct. 838 (2013); *accord Kwong* v. *Bloomberg*, 723 F.3d 160,  167-68 (2d Cir. 2013), *petition for rehearing and rehearing en banc denied* (Sept. 20, 2013); *see* Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytical Framework and a Research Agenda*, 56 UCLA L. Rev. 1443, 1456-59 (2009) (explaining that "'entire medium' and 'entire class' formulations," including when used to describe the handgun ban in *Heller*, "should be seen as shorthand proxies for an inquiry into the functional magnitude of the restriction," meaning, in the Second Amendment context, whether it is "a material burden on the right to bear arms in self-defense"). The handgun ban in *Heller*, because it constituted a complete prohibition on "the most preferred firearm in the nation to 'keep' and use for protection of one's home and family," *Heller*, 554 U.S. at 629, unquestionably imposed such a "substantial burden" on the Second Amendment right.  *Decastro*, 682 F.3d at 165-66.  Given "the ample alternative means of acquiring firearms for self-defense," *id.* at 168, and, particularly given Plaintiffs' concession that they "*could* substitute alternative weapons*," including ones that "function in essentially identical ways" (Pls.' Mem. at 22-23), New York's prohibitions and restrictions on assault weapons and large-capacity magazines demonstrably do not constitute a substantial burden on the right.  (*See* State Defs.' Mem. at 39-46); *see also* Volokh, *supra*, at 1456-59, 1484-87, 89 (concluding that, unlike handgun bans, assault weapons bans, given the "many other handguns, rifles, and shotguns" still available, "don't substantially burden the right to keep and bear arms for self-defense," and

similarly concluding that a large-capacity magazine ban "would not materially interfere with self-defense").

Despite this settled law, Plaintiffs take the position that the availability of adequate alternatives for self-defense is irrelevant to the Second Amendment analysis, asserting that "newspapers may not be banned because many magazines are available" and that "*Heller* rejected the argument that handguns can be banned because long guns are available." (Pls.' Opp. Mem. at 24). But Plaintiffs miss the point. The reason handguns could not be banned in *Heller*, even though long guns remained available, was not due to some categorical rule, but because the Supreme Court found, for practical and functional reasons, long guns were not an adequate alternative for home self-defense purposes. *Heller*, 554 U.S. at 629 (noting the "many reasons" that "the American people have considered the handgun to be the quintessential self-defense weapon"); *see Decastro*, 682 F.3d at 165-66; Volokh, *supra*, at 1456-59.[16] Similarly, the First Amendment does not forbid bans on certain modes of speech, so long as "the challenged regulation 'leave[s] open ample alternative channels for communication of the information.'" *Decastro*, 682 F.3d at 167 (quoting *Clark* v. *Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 (1984)); *see also Heller II*, 670 F.3d at 1262; Volokh, *supra*, at 1454-59. Plaintiffs' efforts to argue that the Second Amendment prohibits a ban on any type or class of weapons under any circumstances is wholly without merit.

*Third*, Plaintiffs and their *amici* appear to take the extreme position that any application of means-end constitutional scrutiny is impermissible under the Second Amendment, as it would

---

[16] In fact, even Plaintiffs' proffered expert has concluded that "revolvers and semi-automatic pistols are together used almost 80% of the time in incidents of self-defense with a gun." *Heller II*, 670 F.3d at 1262 (citing Gary Kleck & Marc Gertz, *Armed Resistance to Crime: The Prevalence and Nature of Self-Defense with a Gun*, 86 J. Crim. L. & Criminology 150, 185 (1995)).

constitute the sort of "interest-balancing inquiry" rejected by the Supreme Court in *Heller*. (Pls.'

Opp. Mem. at 27-28; *see* NRA *Amicus* Brief at 3-5; New York State Sheriffs' Ass'n, *et al.*

*Amicus* Brief at 4).[17] By asserting this radical argument, Plaintiffs ask the Court to essentially

ignore post-*Heller* precedent, including binding Second Circuit law. The argument was

previously raised by plaintiffs, *see* Brief for Appellants, *Heller II*, 2010 U.S. D.C. Cir. Briefs

LEXIS 18, at \*19, 29-31, 34-35, and rejected by the D.C. Circuit in *Heller II* and, more

significantly, it has been expressly rejected by the Second Circuit as well. *Kachalsky*, 701 F.3d

at 89 n.9 (holding that the *Heller* Court's "conclusion that "the law would be unconstitutional

'[u]nder any of the standards of scrutiny' applicable to other rights implies, if anything, that one

of the conventional levels of scrutiny would be applicable to regulations alleged to infringe

Second Amendment rights"); *Decastro*, 682 F.3d at 166-67 & n.5 (applying rational basis review

to a law that did not "substantially burden" the Second Amendment); *Heller II*, 670 F.3d at 1264-

67 (holding that the intermediate scrutiny it applied to uphold D.C.'s bans on assault weapons

and large-capacity magazines "is clearly not the 'interest-balancing inquiry' proposed by Justice

Breyer and rejected by the Court in *Heller*"); (*see* State Defs.' Mem. at 46-48).

    *Fourth*, Plaintiffs argue, as they did in their preliminary injunction papers, that because

New York's assault weapons and large-capacity magazines provisions affect firearm possession

in the home, *Kachalsky* mandates that they be subject to strict scrutiny. (*See* Pls.' Opp. Mem. at

29). But that is an incorrect reading of *Kachalsky* -- and, indeed, one that ignores not only the

---

[17] In the same way, Plaintiffs assert in their Local Rule 56(a)(2) Response that the relationship
between New York's laws restricting assault weapons and large-capacity magazines and the
State's interest in crime prevention and public safety is, under apparently all circumstances,
"irrelevant." (Pls.' L.R. 56(a)(2) Resp. ¶¶ 29, 31-36.) Such an assertion is, of course, rather
inconsistent with Plaintiffs' devoting the bulk of their summary judgment submission to
attempting to explain why the challenged New York gun-control measures will be "ineffectual"
as a policy matter. *See supra* Point I(A). In any event, as the State Defendants have
demonstrated, neither position has any merit.

*Kachalsky* decision itself, but the entire body of post-*Heller* case law in which strict scrutiny has simply not been applied, even as to laws reaching the "core" right of possession of firearms in the home  (*See* State Defs.' Mem. at 47-48).[18]

In *Kwong*, 723 F.3d at 167-69, the Second Circuit rejected the plaintiffs' argument that, because the challenged laws "burden[ed] the 'core' protection of self-defense in the home," *Kachalsky* mandated the application of something "higher" than intermediate scrutiny.  (Ex. 73 (Appellants' Fed. R. Civ. P. 28(j) Letter) at 1).  The *Kwong* court declined to apply strict scrutiny.  723 F.3d at 168 n.16.[19]  In fact, the Second Circuit indicated that, because there was no evidence that the residential handgun license fee at issue was "anything more than a 'marginal, incremental, or even appreciable restraint' on one's Second Amendment rights," rational basis review would likely be the appropriate standard (though the Second Circuit did not definitively resolve that question, as it found that the licensing scheme at issue easily survived intermediate scrutiny).  *Id.* at 19-26.[20]

---

[18] Plaintiffs assert the cases cited "do not involve bans on possession of guns by law-abiding citizens in the home." (Pls.' Opp. Mem. at 29).  This is not so.  *See, e.g.*, *Heller II*, 670 F.3d at 1261-64; *Marzzarella*, 614 F.3d at 96.  Indeed Plaintiffs cite no cases which have applied strict scrutiny in the Second Amendment context at all, and the State's search reveals one federal case, *United States* v. *Engstrum*, 609 F. Supp. 2d 1227, 1231-32 (D. Utah 2009), which has never been followed.  *See, e.g.*, *Nat'l Rifle Ass'n of Am., Inc.* v. *McCraw*, 719 F.3d 338, 348 (5th Cir. 2013) (stating that even if law burdened core right of self-defense in the home, strict scrutiny would not apply unless burden was severe).

[19] The Second Circuit noted in *Kwong* that strict scrutiny was not appropriate because the challenged provision "does not ban the right to keep and bear arms but only imposes a burden on the right."  *Id.*  As the Second Circuit's reliance on *Decastro*, its reference to its agreement with the district court's analysis on this point (which distinguished the burden in *Kwong* from the complete "ban on handguns" struck down in *Heller*, 876 F. Supp. 2d 246, 258-59 (S.D.N.Y. 2012)), and its citation to *Marzzarella* (which upheld a ban on all guns with obliterated serial numbers, 614 F.3d at 101) make clear, this is just another restatement of the same substantial burden test articulated in *Decastro*.

[20]  Even if the right to purchase an assault weapon or large-capacity magazine were a fundamental right under the Second Amendment (which it is not), Plaintiffs' contention that

21

*Fifth*, just as the plaintiffs did unsuccessfully in *Heller II*, *see* Brief for Appellants, *Heller II*, 2010 U.S. D.C. Cir. Briefs LEXIS 18, at *21-22, 62-63, 65, Plaintiffs here argue that *Heller* "drew the line" between semiautomatic and automatic firearms and that the only firearms that can constitute "dangerous and unusual" weapons, and thus fall wholly outside the scope of the Second Amendment, are "fully automatic machine guns." (Pls.' Opp. Mem. at 10). The assertion that there is a Second Amendment right to carry any weapon so long as it is not fully automatic finds no support in the Supreme Court's decision in *Heller,* which made clear that "the right secured by the Second Amendment is not unlimited" and "is not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." 554 U.S. at 623, 626; (*see* State Defs.' Mem. at 17-19). Further, in discussing an "important limitation" of the right, the Court stated that it "extends only to certain types of weapons" and that those weapons "most useful in military service," "not typically possessed by law-abiding citizens for lawful purposes," and "dangerous and unusual weapons'" may be entirely outside the scope of Second Amendment protection. 554 U.S. at 625-27(citing *United States* v. *Miller*, 307 U.S. 174, 175 (1939), and noting that the National Firearms Act's ban on shotguns with shortened barrels was "fairly supported by the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'"). Plaintiffs' contention that *Heller* "drew the line" between semiautomatics and automatics and protects the possession of all weapons except fully automatic machine guns is pure fabrication.

Unsurprisingly, no court has adopted Plaintiffs' approach. On the contrary, several post-*Heller* decisions have concluded precisely the opposite, that semiautomatic assault weapons are "dangerous and unusual" firearms outside the scope of the Second Amendment right. (*See* State

strict scrutiny must therefore apply (*see* Pls.' Opp. Mem. at 28) is also expressly precluded by binding Circuit precedent. *Decastro*, 682 F.3d at 166-67. (S*ee* State Defs.' Mem. at 48).

Defs.' Mem. at 28-29 (citing cases)).  And post-*Heller* cases have similarly found that large-capacity magazines may be prohibited as components of such dangerous and unusual weapons. (*See* State Defs.' Mem. at 34-35 (citing cases)).  Moreover, far from accepting the stark distinction between assault weapons and automatic firearms proffered here by Plaintiffs, the D.C. Circuit noted in *Heller II* that it was "difficult to draw meaningful distinctions between the AR-15 and the M-16" -- the automatic military firearms that "*Heller* suggests . . . may be banned [as] dangerous and unusual."  *Heller II*, 670 F.3d at 1263; *see Staples* v. *United States*, 511 U.S. 600, 603 (1994) ("Many M-16 parts are interchangeable with those in the AR-15 and can be used to convert the AR-15 into an automatic weapon."); (Brief of *Amici Curiae* Law Center to Prevent Gun Violence, *et al.*, (ECF No. 120) at 10-11 (explaining how an AR-15 can be converted into a fully automatic weapon "in a matter of ten seconds")); *see also United States* v. *Price*, 649 F.3d 857, 861 (8th Cir. 2011) (semiautomatic assault weapons with the capacity to accept large-capacity magazines "can 'unleash extraordinary firepower' . . . [and] have been referred to as 'mass produced mayhem'").[21]  As the State Defendants made clear in their moving brief, New York's laws restricting and prohibiting this dangerous weaponry do not even implicate, let alone burden, the Second Amendment right.

*Finally*, Plaintiffs' Second Amendment claims are, of course, limited by standing. Plaintiffs cannot simply bring some "generalized grievance" against New York's bans on assault weapons and large-capacity magazines, *Lujan* v. *Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992), but rather they may challenge New York's law only with respect to the particular assault weapons and magazines they possess and regarding which they have presented evidence.  *Heller*

---

[21] Indeed, just earlier this month, a firearms manufacturer based in Texas reported that it would soon be selling a "semiautomatic" rifle able, without any modification, to fire approximately 450 rounds per minute.  (Ex. 74).

*II*, 670 F.3d at 1249 n.* (limiting plaintiffs' challenge to D.C.'s ban in this manner). Here, that means that, at most, Plaintiffs may challenge New York's ban as to rifles -- as Galvin's and Horvath's AR-15s are the only type of assault weapon that any of the Plaintiffs here have specifically stated they possess. (Affidavit of Thomas Galvin, dated April 15, 2013, at 1; Affidavit of Roger Horvath Aff., dated April 15, 2013, at 1). With respect to the assault weapons and magazines that Plaintiffs claim they would now purchase if not for New York law, their conclusory and unsupported assertions are not nearly enough to confer a right to sue. *See, e.g.*, *Enos* v. *Holder*, No. 2:10-CV-2911, 2011 U.S. Dist. LEXIS 73932, at *12 (E.D. Cal. July 8, 2011); *see also, e.g.*, *Summers* v. *Earth Island Inst.*, 555 U.S. 488, 496 (2009) ("Such 'some day' intentions -- without any description of concrete plans, or indeed even any specification of *when* the some day will be -- do not support a finding of the 'actual or imminent' injury that our cases require.") (emphasis in original).[22]

*     *     *     *

As the State Defendants have demonstrated (*see* State Defs.' Mem. at 17-56), New York's bans on assault weapons and large-capacity magazines do not even implicate Plaintiffs' Second Amendment rights, certainly do not substantially burden those rights, and easily satisfy intermediate scrutiny in any event. Courts to consider such bans have, without exception,

---

[22] Plaintiffs' *amicus*, New York State Senator Kathy Marchione, argues that the registration provisions for those who lawfully owned assault weapons prior to the enactment of the SAFE Act also violate the Second Amendment. (Motion for leave at Docket No. 112; *amicus* brief not separately filed). But that is not so. The minimal requirements here plainly do not constitute a substantial burden. *See Kwong*, 723 F.3d at 167-69; (Bruen Decl. ¶ 27 n.8; Ex. 26 (Registration Form)); *see also Heller*, 554 U.S. at 683-84 ("Assuming that Heller is not disqualified from the exercise of Second Amendment rights, the District must permit him to register his handgun . . . "). *Heller II*, in which the D.C. Circuit held that basic registration requirements for handguns were "self-evidently de minimis," that such requirements for long guns "may also be de minimis," and remanded for further factual development as to long guns only because, unlike here, the record was "devoid of information" concerning the registration requirements for long guns, is of no aid to Plaintiffs on this argument. 670 F.3d at 325-26 & n. **.

24

upheld them against Second Amendment attack. No court has ever held to the contrary. And nothing in Plaintiffs' submission would support a different result here. Dismissal of Counts One and Two is fully warranted.

## II.

### THE EXEMPTION FOR SHOOTING RANGES
### DOES NOT VIOLATE EQUAL PROTECTION

The SAFE Act's exemption allowing magazines to be loaded with up to ten rounds at certain firing ranges and shooting competitions, *see* Penal Law § 265.20(a)(7-f), does not violate the Equal Protection Clause because it "does not treat similarly situated individuals differently." *Kachalsky* v. *Cnty. of Westchester*, 817 F. Supp. 2d 235, 273 (S.D.N.Y. 2011), *aff'd*, 701 F.3d 81 (2d Cir. 2012), *cert. denied*, 133 S. Ct. 1806 (2013). Plaintiffs seek to create an illusory classification of persons by making a false distinction between people who use firearms in their homes and people who use firearms at recreational shooting events. (Pls.' Opp. Mem. at 33-35). But no such distinction exists. As the court reasoned in *Benjamin* v. *Bailey*, equal protection concerns are not implicated where the gun regulations apply similarly to all people. 662 A.2d 1226, 1235 (Conn. 1995); *see also, e.g.*, *Kachalsky*, 817 F. Supp. 2d at 273. Pursuant to the SAFE Act, *all persons* may load ten rounds at exempt gun ranges and shooting events and *all persons* are otherwise limited to seven rounds. Here, Plaintiffs' equal protection claim fails because the law applies equally to all persons. (*See* State Defs.' Mem. at 57-58).

To the extent that Plaintiffs attempt to argue that the ten-round exemption violates the Equal Protection Clause because it burdens a fundamental right, this argument also fails. Plaintiffs do not set forth the standard they think would be applicable to such a claim but, tellingly, they fail to cite *Kwong* v. *Bloomberg*, 723 F.3d 160 (2d Cir. 2013), the Second Circuit's most recent analysis of equal protection claims in the Second Amendment context.

25

Because the seven-round load limit does not violate the Second Amendment, as the State Defendants have clearly demonstrated, this provision would not be subject to heightened scrutiny at all but only to rational basis review under equal protection principles. *Id.* at 170 & n.19; *see also, e.g.*, *McCraw*, 719 F.3d at 350; *Nordyke* v. *King*, 681 F.3d 1041, 1043 n.2 (9th Cir. 2012) (en banc), *cert. denied*, 133 S. Ct. 840 (2013).[23] And Plaintiffs make no real attempt to overcome the State's showing that exemptions applicable to the "controlled environment" of a gun range or competition, which are longstanding in New York law, rationally further the State's interests in public safety while balancing the need for training and sport. (*See* State Defs.' Mem. at 59-60). Moreover, permitting more rounds at the controlled environment of a range, certainly does nothing to impermissibly burden Plaintiffs' Second Amendment right in the home. *See Kwong*, 723 F.3d at 170 n.19 (holding that lower fees for possession of guns in the home applicable outside of New York City does not violate the equal protection rights of New York City residents so long as fee charged in New York City is constitutional under the Second Amendment). Accordingly, and for the reasons set forth in the State Defendants' moving brief (*see* State Defs.' Mem. at 56-60), Plaintiffs' equal protection claim fails as a matter of law.

---

[23] Rather than setting forth a cogent equal protection argument, Plaintiffs rely upon inapposite cases or mischaracterize the import of cases. For example, *Citizens for a Safer Community* v. *Rochester* is entirely distinct because that case invalidated an ordinance that banned certain models of assault weapons but did not ban the identical weapons made by different manufacturers. 164 Misc. 2d 822, 826 (Sup. Ct. Monroe County 1994) (Siragusa, J.). The equal protection violation was caused by the potential unequal treatment of different persons who owned or sold the exact same weapon. That case has no application here. Plaintiffs' attempts to distinguish *Gun Owners Action League, Inc.* v. *Swift*, 284 F.3d 198, 212 (1st Cir. 2002), and *Coalition of New Jersey Sportsmen, Inc.* v. *Whitman*, 44 F.Supp.2d 666, 686 (D.N.J. 1999), *aff'd*, 263 F.3d 157 (3d Cir. 2001), are simply unavailing. Both cases clearly sustain under rational basis review laws which exempt shooters at gun ranges from certain restrictions applicable elsewhere. (*See* State Defs.' Mem. at 59-60). Plaintiffs also cite to *Ezell* v. *City of Chicago*, 651 F.3d 684 (7th Cir. 2011), but that case supports the reasonableness of the State's recognition of the importance of gun training, as Plaintiffs acknowledge. (Pls.' Opp. Mem. at 35).

**III.**

**THE SAFE ACT IS NOT UNCONSTITUTIONALLY VAGUE**

Plaintiffs' pre-enforcement, facial vagueness challenges to various provisions of the SAFE Act fail for all the reasons set forth in the State Defendants' moving brief. (*See* State Defs.' Mem. at 60-73). None of the arguments set forth in Plaintiffs' opposition -- which, for the most part, simply repeat the meritless arguments Plaintiffs raised in their preliminary injunction brief -- do anything to advance Plaintiffs' unsupportable position.

**A.      Plaintiffs Misstate the Applicable Vagueness Standard**

The applicable Second Circuit rule is clear. Because Plaintiffs' vagueness challenges are pre-enforcement and "do[] not reach conduct protected by the First Amendment," to prevail here, Plaintiffs must show that the challenged statutory provisions are "impermissibly vague in all of [their] applications." *United States* v. *Farhane*, 634 F.3d 127, 138-39 (2d Cir. 2011) (quoting *Vill. of Hoffman Estates* v. *Flipside, Hoffman Estates*, 455 U.S. 489, 497 (1982)) (internal quotation marks omitted), *cert. denied*, 133 S. Ct. 833 (2011). Unable to shoulder the heavy burden this standard places on them, Plaintiffs ask the Court, after having made no argument at all on this point in their preliminary injunction brief, to apply an incorrect standard to their vagueness claims. (*See* Pls.' Opp. Mem. at 36-37). In accordance with governing precedent, the Court should decline to do so.

Plaintiffs' contention here is that the *en banc* Second Circuit's decision in *United States* v. *Rybicki*, 354 F.3d 124 (2d Cir. 2003) adopted, as the standard of review for facial vagueness challenges outside the First Amendment context, the standard articulated by a plurality of the Supreme Court in *City of Chicago* v. *Morales*, 527 U.S. 41, 55 (1999), *i.e.*, that a statute is unconstitutionally vague if vagueness "permeates the text." (*See* Pls.' Opp. Mem. at 36-37). But

the Second Circuit expressly declined to adopt the *Morales* standard in *Rybicki*. 354 F.3d at 131

("The approach of the *Morales* plurality has not been adopted by the Supreme Court as a whole .

. . . We therefore are not required to apply it here."). And, since *Rybicki*, the Second Circuit has

consistently declined to allow facial vagueness challenges outside of the First Amendment

context, unless the statute is shown to be void in *all* applications. *See, e.g., United States* v.

*Coppola*, 671 F.3d 220, 235 (2d Cir. 2012), *cert. denied*, 133 S. Ct. 843 (2013); *Farhane*, 634

F.3d at 138-39; *United States* v. *Awan*, 384 F. App'x 9, 17 (2d Cir. 2010).[24]

Moreover, as the State Defendants noted in their moving brief (*see* State Defs.' Mem. at

63 n.52), those courts to consider the question since *Heller*, including a district court in the

Second Circuit, have expressly declined to apply the *Morales* test or any other heightened

vagueness standard in the Second Amendment context. *See, e.g.*, *Kuck* v. *Danaher*, 822 F. Supp.

2d 109, 131-32 (D. Conn. 2011) ("The Parties have not cited and this Court has not found any

decision that has applied the *Morales* plurality's standard in the context of a facial vagueness

challenge under the Second Amendment. In the absence of express guidance from the Supreme

Court and the Second Circuit's pronouncement in *Rybicki*, this Court concludes that the *Morales*

plurality approach is not applicable to the present circumstances.").[25] Tellingly, Plaintiffs make

no response whatsoever to this point.

> **B.** **The *Morales* Test Would Not Apply Here In Any Event Because the Challenged SAFE Act Provisions Have a *Mens Rea* Element**

Even where applicable, the *Morales* standard applies only to criminal statutes with no

*mens rea* requirement. *See Rybicki*, 354 F.3d at 131 (citing *Morales*, 527 U.S. at 55 (plurality)).

---

[24] Seemingly as a concession to this, Plaintiffs oddly ask that the Court apply *both* the applicable vague in all applications test and the *Morales* "permeates the text" test. (Pls.' Opp. Mem. at 37).

[25] *See also United States* v. *Weaver*, No. 2:09-cr-00222, 2012 U.S. Dist. LEXIS 29613, at *28-32 (S.D. W. Va. Mar. 7, 2012).

Here, as the State Defendants demonstrated in their moving brief, the New York criminal possession statutes at issue clearly contain such a *mens rea* element. (State Defs.' Mem. at 62 n.50); *see, e.g.*, *People* v. *Ford*, 66 N.Y.2d 428, 440 (1985); *People* v. *Wood*, 58 A.D.3d 242, 243-53 (1st Dep't 2008); Penal Law § 15.15(2).[26]

Nevertheless, Plaintiffs continue to argue that Penal Law § 265.02 has no *mens rea* requirement because one is not stated expressly in its text. This is just wrong. The New York Court of Appeals has specifically construed § 265.02 so as to include a *mens rea* element. *Ford*, 66 N.Y.2d at 440 ("Possession third [pursuant to Penal Law § 265.02] requires . . . that defendant's possession be knowing."); *accord, e.g.*, *People* v. *Marino*, 212 A.D.2d 735, 736 (2d Dep't 1995); *see also* Penal Law § 15.15(2). And New York's pattern Criminal Jury Instructions also include such a "knowingly" requirement for criminal possession of an assault weapon under § 265.02(7). (Ex. 75).[27]

### C. Even if the *Morales* Standard Applied Here, Plaintiffs Could Not Satisfy It Because They Could Not Show that Vagueness "Permeates the Text"

Even if the vagueness standard articulated by the *Morales* plurality were applied here, Plaintiffs would still have to show that "the law is 'permeated' with vagueness." *Rybicki*, 354 F.3d at 131 (citing *Morales*, 527 U.S. at 55 (plurality)). This means that Plaintiffs would need to

---

[26] The non-possession provision Plaintiffs challenge on vagueness grounds, Penal Law § 400.03(7), is not even a criminal statute, and would subject one, at most, to civil and/or administrative penalties. *See* Penal Law art. 400 note. Such laws "receive less exacting vagueness scrutiny." *Arriaga* v. *Mukasey*, 521 F.3d 219, 223 (2d Cir. 2008).

[27] Plaintiffs' newly constructed assertion that even if there is a *mens rea* requirement here it is not a good enough one is of no moment. (Ex. 75 ("A person KNOWINGLY possesses an assault weapon when that person is aware that he or she is in possession of such weapon.")); *see Wood*, 58 A.D.3d at 252 & n.4; *see also Carter* v. *United States*, 530 U.S. 255, 269 (2000) ("[t]he presumption in favor of scienter requires a court to read into a statute only that *mens rea* which is necessary to separate wrongful conduct from 'otherwise innocent conduct'"). Moreover, any dispute that a criminal defendant might have with respect to particulars of the *mens rea* requirements in his or her case are, of course, more properly left to state courts in the context of a criminal prosecution. *See, e.g.*, *Richmond Boro*, 97 F.3d at 686.

show, at a minimum, that the challenged law would be "vague in the vast majority of its applications." *United States* v. *Awan*, 459 F. Supp. 2d 167, 179-80 (E.D.N.Y. 2006) (quoting *Dr. John's, Inc.* v. *City of Roy*, 465 F.3d 1150, 1157 (10th Cir. 2006)); *see also Rybicki*, 354 F.3d at 144 (noting that where "the statute's clear prohibition applies to a wide swath of behavior" it is not facially unconstitutional under either *Salerno* or *Morales*). As the State Defendants demonstrated in their moving brief, Plaintiffs cannot come close to meeting such a standard here. (*See* State Defs.' Mem. at 63-73).[28]

Plaintiffs concede as much at several points in their opposition brief. For example, Plaintiffs acknowledge that "Penal Law § 265.36 is clear in making it unlawful 'to knowingly possess a large capacity ammunition feeding device manufactured before' September 13, 1994." (Pls.' Opp. Mem. at 42). And Plaintiffs similarly concede the clarity of the term "version" in their 56(a)(2) Counter-Statement, where they contend that it is undisputed that "[t]he AR15 is the semi-automatic civilian sporting version of the select-fire M16 rifle and M4 carbine used by the United States military and many law enforcement agencies." (Pls.' L.R. 56(a)(2) Counterst. ¶ 123).

In any event, Plaintiffs have made no new arguments to advance their unsupportable vagueness challenges. They ignore the fact that most of the terms they now challenge as vague have long existed in federal and State law without encouraging "arbitrary and discriminatory enforcement." *Kolender* v. *Lawson*, 461 U.S. 352, 357 (1983). They similarly ignore the fact that courts, including the Second Circuit, have rejected vagueness challenges to most of the terms Plaintiffs challenge here. *See, e.g., Richmond Boro Gun Club* v. *City of New York*, 896 F.

---

[28] Plaintiffs also have not shown, as *Morales* would also require, that any of the challenged provisions "infringe[] on a constitutional right," *Rybicki*, 354 F.3d at 131, as their Second Amendment and Dormant Commerce Clause challenges to certain of them also fail here.

Supp. 276, 289 (E.D.N.Y. 1995), *aff'd*, 97 F.3d 681, 684-86 (2d Cir. 1996); *Coal. of N.J.*

*Sportsmen, Inc.* v. *Whitman*, 44 F. Supp. 2d 666, 681 (D.N.J. 1999), *aff'd*, 263 F.3d 157 (3d Cir.

2001); *Wilson* v. *Cnty. of Cook*, 968 N.E.2d 641, 652 (Ill. 2012). Further, Plaintiffs persist in

ignoring the overriding standard applicable to all vagueness challenges, which "does not demand

meticulous specificity in the identification of proscribed conduct'" and "'requires only that the

statutory language conveys sufficiently definite warning as to the proscribed conduct when

measured by common understanding and practices." *Coppola*, 671 F.3d at 235 (internal

quotation marks omitted). Accordingly, as demonstrated in the State Defendants' moving brief,

Plaintiffs vagueness challenges fail, in their entirety, as a matter of law.

**IV.**

**PLAINTIFFS' CLAIMS IN COUNT FOUR
ARE NOT JUSTICIABLE AND FAIL
TO STATE A VIABLE CAUSE OF ACTION**

As set forth in the State's moving brief, Plaintiffs' Dormant Commerce Clause challenge

to the SAFE Act's ammunition sales provisions is not justiciable and, even if it were, clearly fails

on the merits.[29] (State Defs.' Mem. at 75-77). In their opposition, Plaintiffs attempt to salvage

the claim by speculating that when the provisions go into effect, they will increase the cost of the

ammunition one organizational plaintiff sells to its members. (Pls.' Opp. Mem. at 46). But these

speculative allegations, even if true, are insufficient to render the claim justiciable or viable.

A. **Plaintiffs' Dormant Commerce Clause Claim Is Not Justiciable**

The SAFE Act's ammunition sales provisions do not go into effect until, at the earliest,

January 15, 2014, and have not applied to Plaintiffs in any way; thus this claim is not ripe. (*See*

---

[29] Plaintiffs appear to have now abandoned whatever separate due process claim they may have
initially been asserting along with their Dormant Commerce Clause claim in Count Four of the
Amended Complaint (*see* Am. Cplt. ¶ 132), as it goes entirely unmentioned in their opposition
papers. Such a claim would plainly fail here in any event. (*See* State Defs.' Mem. at 73 n.57).

State Defs.' Mem. at 74). Although Plaintiff New York State Amateur Trapshooting Association, Inc. ("NYSATA") asserts that it "must plan well in advance" if it decides to operate as an ammunition dealer, and that both NYSATA and its members "must take care" if they order ammunition from out of state that might be delivered after the effective date (Pls. Opp. Mem. at 45-46), Plaintiffs do not offer any non-speculative evidence as to how the laws will impact them. As this Court has held, where a claim is dependent on "unknown factual contingencies" and "uncertain future events," there is no justiciable controversy and the claim must be dismissed as unripe. *Del-Rain Corp.* v. *United States*, 95-CV-938S, 1995 U.S. Dist. LEXIS 19619, at *7-11 (W.D.N.Y. Dec. 12, 1995); *see also Thomas* v. *City of New York*, 143 F.3d 31, 34 (2d Cir. 1998).[30]

In addition, even if this claim were ripe, none of the Plaintiffs in this action have standing to bring it. (*See* State Defs.' Mem. at 73-75 & nn.57-58, 77). Plaintiffs' opposition brief makes it clear that Count Four is being asserted only on behalf of "NYSATA and its members." (Pls.' Opp. Mem. at 46). However, NYSATA has no standing to sue on behalf of its members, as Plaintiffs concede (*see id.* at 49), nor are any individual NYSATA members parties to this action. And the injury asserted by NYSATA itself (*i.e.*, that the SAFE Act's recordkeeping provisions may make selling ammunition more expensive (*see* Am. Cplt. ¶ 135)) is simply not a cognizable one under the Dormant Commerce Clause. (*See* State Defs.' Mem. at 74-75 n.58).[31]

---

[30] *State Ammunition Inc.* v. *Lindley*, No. 2:10-cv-01864, 2010 U.S. Dist. LEXIS 133491 (E.D. Cal. Dec. 2, 2010), in which the court dismissed on ripeness grounds a nearly identical challenge to a California statute regulating ammunition sales, continues to be directly on point here as well, for the reasons set forth in the State's moving brief, notwithstanding Plaintiffs' strained efforts to try to avoid this factually indistinguishable decision. (*See* State Defs.' Mem. at 74).

[31] *See also, e.g.*, *L.A.M. Recovery, Inc.* v. *Dep't of Consumer Affairs*, 377 F. Supp. 2d 429, 438-39 (S.D.N.Y. 2005), *aff'd*, 184 F. App'x 85, 88 (2d Cir. 2006) (dismissing Dormant Commerce Clause claim on standing grounds because plaintiffs failed to allege an injury stemming from the application of the law in a manner discriminatory to out-of-state interests).

**B.      Count Four Also Should Be Dismissed Because
        <u>Plaintiffs Fail to State a Viable Claim on the Merits</u>**

Plaintiffs' Dormant Commerce Clause claim clearly fails on the merits because states may require face-to-face sales of consumer products so long as the in-person sales requirement applies equally to businesses within and outside of the state.  (*See* State Defs.' Mem. at 75-77).  As the State Defendants noted in their moving brief, the Second Circuit's decision in *Brown & Williamson Tobacco Corp.* v. *Pataki*, 320 F.3d 200 (2d Cir. 2003), which upheld under the Dormant Commerce Clause New York's face-to-face sale requirement for tobacco products almost identical to the provisions here, removes any doubt as to the constitutionality of the SAFE Act's ammunition provisions.  *Id.* at 219; *see also Arnold's Wines, Inc.* v. *Boyle*, 571 F.3d 185, 190 (2d Cir. 2009); *Oltra, Inc.* v. *Pataki*, 273 F. Supp. 2d 265, 273 (W.D.N.Y. 2003).[32]

Plaintiffs have no answer for *Brown & Williamson*.  They suggest that it has somehow been overruled by *Granholm* v. *Heald*, 544 U.S. 460 (2005), (*see* Pls.' Opp. Mem. at 48-49), yet the cases are entirely consistent, as the Seventh Circuit's and First Circuit's post-*Granholm* decisions upholding similar face-to-face sale requirements for wine make clear.  *See Baude* v. *Heath*, 538 F.3d 608, 612-15 (7th Cir. 2008), *cert. denied*, 556 U.S. 1235 (2009); *Cherry Hill Vineyard, LLC* v. *Baldacci*, 505 F.3d 28, 36-39 (1st Cir. 2007).  The SAFE Act prohibits *all* direct shipments of ammunition, by in-state and out-of-state sellers alike, which is precisely the sort of regulatory scheme the Supreme Court found to be "unquestionably legitimate" in *Granholm*.  544 U.S. at 481, 489, 493.

Plaintiffs argue that the background check could be done remotely (*see* Pls.' Opp. Mem. at 49), but that just ignores New York's considered determination that a face-to-face requirement

---

[32] Plaintiffs' assertion that *Arnold's Wines* "is not pertinent here" because it was concerned only with the Twenty-First Amendment, not the Dormant Commerce Clause (Pls.' Opp. Mem. at 49 n.49) is without merit.  *See Arnold's Wines*, 571 F.3d at 192 (holding that the New York laws at issue "do not run afoul of the Commerce Clause").

for ammunition sales is necessary "for effective confirmation of purchaser identity and corresponding background check." (Ex. 5 at 7; Ex. 6 at 6; Ex. 7 at 6). And Plaintiffs' speculative assertion that the SAFE Act's ammunition provisions must be unconstitutional because there may be ways to evade them is contrary to the law, the facts, and common sense. *See, e.g.*, *Baude*, 538 F.3d at 614 (rejecting similar evasion argument in upholding Indiana's face-to-face requirement for wine sales); *see also Oltra,* 273 F. Supp. 2d at 271.

Accordingly, for all these reasons, and those discussed in the State Defendants' moving brief, dismissal of Count Four, with prejudice, is fully warranted.

## CONCLUSION

For the foregoing reasons, and those set forth in their moving brief, the State Defendants respectfully request that the Court issue an order: (i) denying Plaintiffs' motions for summary judgment and for a preliminary injunction; (ii) granting judgment to State Defendants dismissing all of Plaintiffs' claims with prejudice; (iii) declaring that the challenged SAFE Act provisions are constitutional; and (iv) granting such other and further relief as the Court deems just, proper, and appropriate.

Dated: New York, New York
       September 24, 2013

ERIC T. SCHNEIDERMAN
Attorney General of the State of New York
*Attorney for State Defendants*
By:
/s/ *William J. Taylor, Jr.*
William J. Taylor, Jr.
Anthony J. Tomari
Helena Lynch
Assistant Attorneys General
120 Broadway, 24th Floor
New York, New York 10271
(212) 416-8426
william.taylor@ag.ny.gov
