# EXHIBIT
# 71

APPENDIX C

CV 93-0063723                    :    SUPERIOR COURT

DeFOREST H. BENJAMIN, JR.,   :    JUDICIAL DISTRICT OF
ET AL.                                :    LITCHFIELD

V.                                       :    AT LITCHFIELD

JOHN M. BAILEY, ET AL.       :    JUNE 30, 1994

## MEMORANDUM OF DECISION

The issue before the court is the constitutionality
of 1993 Connecticut Public Act No. 93-306, Connecticut's
"Assault Weapon Law."  On June 8, 1993, after lengthy
debate, the Connecticut legislature enacted P.A. 93-306
("the Act").[1]  The Act became effective on October 1,
1993 and prohibits the sale, transfer, and possession of
certain firearms and firearms parts collectively
described as "assault weapons."

Any person who lawfully possesses an "assault
weapon" prior to October 1, 1993 can keep the weapon by
obtaining a certificate of possession from the department
of public safety. P.A. 93-306, §4(a).  A person who
violates the possession element of the Act, except for a
first time offender who presents proof that he lawfully
possessed the weapon before October 31, 1993, is guilty

---

[1] Lieutenant Governor Eunice S. Groark provided the
tiebreaking vote after an 18-18 vote in the Senate.

1

of a Class D felony and shall be sentenced to a term of imprisonment of which one year may not be suspended or reduced. P.A. 93-306, §3(a). A person who violates the sale or transfer element of the Act is guilty of a class C felony and shall be sentenced to a term of imprisonment of which two years may not be suspended or reduced. P.A. 93-306 §2(a)(1). The Act further provides that a person who commits any class A, B, or C felony while armed with or threatening the use of an "assault weapon", shall be imprisoned for a term of eight years, which shall not be suspended or reduced. P.A. 93-306, §8. The Act specifies limited exceptions for certain individuals, such as police officers and members of the armed forces. P.A. 93-306, §3(b).

Sec. 1(a)(1) of the Act defines an "assault weapon." It states:

> As used in this act, "assault weapon" means: (1) Any selective-fire firearm capable of fully automatic, semiautomatic or burst fire at the option of the user or any of the following specified semiautomatic firearms: Algimec Agmi; Armalite AR-180; Australian Automatic Arms SAP Pistol; Auto-Ordnance Thompson type; Avtomat Kalashnikov AK-47 type; Barrett Light Fifty model 82A1; Beretta AR-70; Bushmaster Auto Rifle and Auto Pistol; Calico models M-900, M-950 and 100-P; Chartered Industries of Singapore SR-88; Colt AR-15 and Sporter; Daewoo K-1, K-2, Max-1 and Max-2; Encom MK-IV, MP-9 and MP-45; Fabrique Nationale FN/FAL, FN/LAR, or FN/FNC; FAMAS MAS 223; Feather

2

AT-9 and Mini-AT; Federal XC-900 and XC-450; Franchi SPAS-12 and LAW-12; Galil AR and ARM; Goncz High-Tech Carbine and High-Tech Long Pistol; Heckler & Koch HK-91, HK-93, HK-94 and SP-89; Holmes MP-83; MAC-10, MAC-11 and MAC-11 Carbine type; Intratec TEC-9 and Scorpion; Iver Johnson Enforcer model 3000; Ruger Mini-14/5F folding stock model only; Scarab Skorpion; SIG 57 AMT and 500 series; Spectre Auto Carbine and Auto Pistol; Springfield Armory BM59, SAR-48 and G-3; Sterling MK-6 and MK-7; Steyr AUG; Street Sweeper and Striker 12 revolving cylinder shotguns; USAS-12; UZI Carbine, Mini-Carbine and Pistol; Weaver Arms Nighthawk; Wilkinson "Linda" Pistol.

P.A 93-306 §1(a)(1).

The plaintiffs in the present action are Deforest Benjamin, a gun dealer and gunsmith in the town of Cornwall; Robert Suprenant, a citizen of Colebrook who wishes to purchase a Colt Sporter; Bertcelis Morales, a resident of Bridgeport and an owner of an Intratec TEC DC-9; Michelle and Bradford Palmer, residents of Manchester who allege that Michelle is the owner of a single Colt Sporter and pursuant to the Act, she can not shoot with her father; Bruce Kaufman, a resident of Windsor and the owner of a Colt AR-15; Frank D'Andrea, a firearms dealer in Stratford; and Navegar Inc., d/b/a Intratec, a Florida corporation which manufacturers the Intratec TEC-9 and Scorpion.

The defendants are John M. Bailey, the Chief State's Attorney of Connecticut; Frank Maco, the State's Attorney

3

for the Judicial District of Litchfield; and Nicholas Cioffi, the Commissioner of Public Safety for the State of Connecticut.

On October 12, 1993, the plaintiffs filed their initial complaint. Thereafter, the plaintiffs filed an amended complaint, and, eventually filed an amendment to their amended complaint.  In their amended complaint, which contains five counts, the plaintiffs seek a declaratory judgment that the Act is void under the Connecticut Constitution. The plaintiffs also seek to enjoin the enforcement of the Act pending the resolution of the case.

The plaintiffs allege in counts one and two that the Act violates their constitutional rights to equal protection and due process under the Connecticut Constitution.  Count three states that the Act is void for vagueness. In count four, the plaintiffs allege that the Act is unconstitutional because it attaints specific manufacturers who make particular weapons while not similarly affecting other manufacturers who make "similar, identical, or functionally identical" weapons. Count five states that the Act infringes on the plaintiffs' right to bear arms under Article First, §15

4

of the Connecticut Constitution.

## I.

### FACTS

The court conducted an evidentiary hearing on divers days between January 20, 1994 and February 1, 1994. Thereafter, post-trial briefs were filed, and both counsel have made subsequent submissions with respect to recently decided case law, affecting the issues presented herein.  Final argument was heard on March 2, 1994.

The following plaintiffs testified.  Michelle Palmer, a petite woman, who explained that she preferred to shoot competitively with her father using the Colt Sporter, made no claim in her testimony that she used the firearm in self-defense.  Her claimed injury was that she was prevented by this statute from using her firearm of choice, one which was comfortable for a person of her body size, and one with which she could enter specific competitions.  The impact of the legislation did not extinguish her right to bear arms, but compromised it to the extent that she claimed injury.

Robert Suprenant testified that he desired to purchase a Colt Sporter.  On cross-examination, he was asked if that was the only gun he wanted to buy.

5

Bruce Kaufman used his Colt AR-15 to scare away an intruder in September of 1982. The intruder was never apprehended. Mr. Kaufman testified that he collected military style weapons, and had a collection valued at over One Hundred Thousand ($100,000.00) Dollars, which he and his father used in a gun dealing business. Mr. Kaufman's interest in the litigation was clearly as a dealer, and his claim that the AR-15 was necessary for the defense of his mother, his home, and himself, was incidental to his other real pursuit.

DeForest Benjamin makes his living as a gunsmith and dealer. He testified that the Act had adversely affected his business, although there was absolutely no proof of that absent his statement. He testified further that he often reconstructed firearms, and that he was unclear from the statutes, as to which alterations he would now be allowed to make. He testified that he was confused about his ability to use a folding stock on some of the weapons. For a gunsmith, he appeared to be confused over very simple gun parts. His confusion was not credible to the court.

Frank D'Andrea is a gun dealer, and has been so employed for over twenty years. He expressed confusion

6

over whether he was permitted under the statute to sell certain firearms. He understood that he could not sell the listed firearms, but others were so similar that he felt he might offend the statute if he did engage in a practice of selling those firearms. He indicated that thirty (30%) percent of his stock was in assault weapons. He testified that he did not recall an individual named Rubin Calazzo entering his store and buying several firearms, for cash, for an individual named Danny Melendez, who was later convicted in the Federal District Court for illegal sale of firearms. He testified that he sold ammunition at a discount if purchased in large quantities. He further testified that large capacity magazines were a very saleable commodity for gun dealers. Mr. D'Andrea's interest in this litigation clearly stemmed from his economic interest. The subject firearms, he conceded, could be sold outside the State of Connecticut.

**Ms. Morales** acquired an Intratec DC-9 from her husband just prior to the passage of the statute under review. She claimed that she possessed the firearm to protect herself, her family, and her home. She claimed that she heard an intruder at her front door in December,

7

and that she had the gun.  She also testified that she did not confront the intruder, or call out that she had a firearm.  She testified that she turned on the porch light, and the intruder fled.  She testified further that she had only tried shooting the banned weapon twice, at close range, and more importantly, that she had never possessed or fired any other weapon before.  The court finds her claim of a possessory interest in this banned weapon unworthy of belief.

Carl Miguel Garcia, president of Navegar, Inc., the manufacturer of the Intratec-9 and DC-9, and Scorpion, testified that to his knowledge, both New Jersey and California had passed laws banning the sale or transfer of his listed weapons.  Mr. Garcia complained that the statute had had a serious economic impact on his business, and that he and his company had received much negative press concerning the listed firearms.  He indicated that they functioned in many ways like unlisted pistols and revolvers, and in fact used a generic magazine, similar to those used in Glocks, the firearm of choice of many police departments around the country.

On cross-examination, Mr. Garcia admitted that his revenues had steadily increased over the past three

8

15a

years, despite the bans in some states.  He agreed that the promotional literature contained slogans such as "easily concealed" and "tough as your toughest customer." No police departments utilize these products because they do not contain safeties.  He agreed that the listed firearms were designed for maximum firepower, were inexpensive, and capable of rapid fire.  Mr. Garcia claimed that the weapon could not be concealed, but upon cross-examination, the Attorney General demonstrated that, with a large magazine, the weapon, could in fact be concealed.  Mr. Garcia denied that his listed firearms were the "gun of choice of drug dealers."

Mr. Robert Reese, president of Springfield Armory, Inc., testified that he founded his company after the government arsenal at Springfield, Illinois was shut down in 1969.  Mr. Reese acquired much of the machinery from the arsenal.  He adopted that name, and testified that he spent five (5) years acquiring the right to use the name for his company.  His story of developing his company, and the historical perspective of the World War II Garand was of interest to the court.  After World War II, the NATO forces contracted with the Italian company, Baretta, to overhaul the Garand, and it became known as the

9

Baretta Modification, 1959, or BM-59. In 1979, Mr. Reese negotiated with Baretta to acquire forty tons of surplus parts from which the private Springfield Armory built its BM-59. Mr. Reese and his company developed military weapons for civilian use and collection, and identified Plaintiffs' exhibits 45-58 as by-products of the United States M-1 Garand from the government Springfield Armory. He pointed to the similarities in the Baretta Garand M-1, the BM-59 Italia, to the banned Sringfield Armory BM-59.

On cross-examination, he testified that the BM-59 was a readily identifiable firearm, and that it was capable of firing .30 calibre "powerful" cartridges which could pierce five to six walls in a house. The firearm with that calibre cartridge could hit and kill a person distant from the shooter. The firearm was capable of firing four hundred (400) rounds of ammunition per minute, and a "good" shooter, could reload a magazine in ten (10) seconds.

Charles Fagg was qualified as an expert witness for the plaintiffs. In addition to identifying the banned firearms, he led the plaintiffs through a description of similar, and yet not banned firearms, that were distinguishable by brand name and slight design

10

differences. There seemed to be little controversy in this litigation that there are copies of the banned firearms, either by companies in foreign countries, or in this country, and that the industry markets firearms by changing numerical designation, name, and accessories. Mr. Reese testified that the industry had little control over the changes in designation of firearms, and that those changes appeared for each new marketing cycle. It appears that specific designation even within the industry may be an unattainable goal.

Mr. Fagg testified that flash suppressors had a legitimate civilian, and non-criminal purpose. Hunting at dawn or dusk made that a desired option for many hunters. He agreed that a flash suppressor also had the ability to mask the position of the shooter, and control recoil to a certain extent upon rapid fire at a target. He conceded that the civilian use of those options was limited, but that those options might well be more important to criminal use. On cross-examination, he was able to testify as to the maximum magazine that the listed firearms could hold, at least in most instances. In testimony that was a bit too coy, he testified that he did not know what an Algimec Agmi, the first on the list

11

of banned weapons, was.  It was clear later that this was
an Algimec AGM-1, so the statute contained a mere
typographical error.[2]  The little "mystery" that
surrounded that particular firearm, which no witness has
ever seen, was somewhat unnecessary for a court trial.

Mr. Fagg's testimony was technical and unemotional.
He described certain features of firearms for the record.
He compared the banned weapons with others not mentioned
in the statute, and responded to questions on cross-
examination in an equally professional manner.  As
earlier noted, there seemed to be little contest with
respect to his description of the firearms brought into
the court room, photographs of which remain as exhibits
for review.  It is clear that there are many firearms
which fit the general designation of "assault weapons",
and which are virtually identical to the banned weapons,
but which do not appear on the list.

Professor Kleck was called as an expert witness by
the plaintiffs.  His testimony centered on the self-
defense capabilities of semi-automatic weapons.  His
testimony was biased and did not help the inquiry of the

_____

[2] The court finds that the legislature should correct this
typographical error.

12

court with respect to the legal claims. His testimony focused on the public debate, which will continue on the airwaves, the town greens, and in the legislatures. This court is not permitted to substitute the judgment of the legislature, only to assess the claims of the parties. The decision of this court, and the decision on the appeal, will only be another step in the public dialogue concerning this issue. The statistics proposed were countered by the defendants, and the court was not swayed by either.

The defendants offered a videotape of various firearms being fired at the State Police range. Automatic fire, selective fire, semiautomatic fire, and bolt action fire were described. (Defendants' Ex. 14) During the testimony of Chief Thomas Sweeney of the Bridgeport Police Department, a video was offered (Defendants' Ex. 3) of street life in Bridgeport on November 27, 1993, at Hallock and Shelton Streets from 11:25 p.m. - 12:13 a.m. on November 28. The Green Top Posse had been raided and within a short time, was rearmed with assault-type weapons. The raid had secured two loaded AK-47s and a Colt Sporter with a flash suppressor, among other firearms. The Chief testified

13

that "straw purchasers" would acquire the guns legally and then transfer them illegally. The Chief testified further concerning gang hits near a school, on the first day of school, when a new middle school was being opened, when children going to school had to walk past a crime scene. At that crime scene, seventy-six (76) bullet casings were found near the body of Alexander Aponte, a suspected gang member.

Chief Sweeney pointed to the increase in seizure of assault weapons. In 1991, twenty-eight of the weapons seized as a result of police activity were assault weapons, and in 1992, that number increased to 49. While the evidence is clear that assault weapons do not make up the majority of weapon seizures, their numbers are increasing at a steady rate. He also described assaults on police officers, which included the use of an Intratec 22, one an M-11 type, and a crime scene which included Seven Hundred Sixty-two (762) spent rounds of 9 mm ammunition. That police officer was struck with a 9 mm round. Annette Richardson was killed, and it appeared from the investigation that she was not an intended victim. The Chief cited further examples of over penetration in dense population areas, which create a

14

grave risk to the citizenry. He claimed further that the possession of guns in the home for self-protection gave the homeowner a false sense of security and posed a risk to members of the household.

Col. Leonard Supenski is the Chief of the Technical Bureau of the Baltimore County Police Department. He is a gun owner and has competed with firearms as sport. He conducts training courses for police and citizens interested in self defense. He testified that he is familiar with the term "assault weapon" and opined that these lightweight military-style weapons were changed so that armies could move more effectively. He stated that the Kalishnikov, AK-47, originally made in the U.S.S.R. in 1947 by Kalishnikov, was the precursor of all of the military- style weapons on the list. His opinion was that there was not legitimate civilian use for these weapons, and that in a compressed urbanized society, they constituted a hazard to bystanders.

Col. Supenski testified about the report and recommendations of the Bureau of Alcohol, Tobacco, and Firearms ("BATF") (Defendants' Ex. 12) and provided the information contrary to Professor Kleck's testimony. He felt that the ordinarily intelligent citizen could access

15

documents necessary to sufficiently warn that citizen of which weapons were banned. He mentioned Shooting Digest and Gun World. The plaintiffs later offered into evidence, the manual published by the State of California to assist citizens in recognizing their banned firearms. (Plaintiffs' Ex. 67).

He testified concerning the BATF's tracing of firearms seized by law enforcement, and indicated that the Intratec Tec 9 was the leading gun seized, and the combination of the Tec 9, the Cobra MAC-11, the AK-47, and the Colt AR-15 comprised thirty-seven (37%) percent of all assault weapons seized. Among characterizations of individuals from whom such weapons were seized were drug dealers, disturbed individuals, street gangs, and hate groups. He reiterated Chief Sweeney that most of these weapons are purchased legally and then come onto a secondary market of unregulated sales by straw purchasers selling to criminals. He insisted that these weapons were a serious risk to police officers and to the public safety.

On cross examination, he conceded that a semi-automatic rifle or handgun could be used defensively. He added that the use would require considerable training.

16

23a

He conceded some discrepancies from his deposition testimony.

Major John Bardelli of the Connecticut State Police testified concerning the investigation of the murder of Trooper Russell Bagshaw by a burglar using the Wilkinson "Linda", a firearm on the list.  He testified that the public safety is affected adversely by the named weapons, in that they pose a danger to police officers.  He testified that urban undercover officers are encountering these weapons more and more.  The Colt AR-15 is issued to the Connecticut State Police SWAT team, but is not standard issue.  There is required special equipment and training for that team.

## II.

## DECLARATORY JUDGMENT

"The purpose of a declaratory judgment action... is to 'secure an adjudication of rights where there is a substantial question in dispute or a substantial uncertainty of legal relations between the parties.'" (Citation omitted.) **Wilson v. Kelley**, 224 Conn. 110, 115, 617 A.2d 433 (1992). The declaratory judgment procedure is peculiarly well adapted to the judicial determination

17

of controversies concerning constitutional rights and, as
in this case, the constitutionality of state legislative
action. **Horton v. Meskill**, 172 Conn. 615, 626, 376 A.2d
359 (1977). "The statute authorizing the Superior Court
to render declaratory judgments is as broad as it well
could be made." **Sigal v. Wise**, 114 Conn. 297, 301, 158 A.
891 (1932).

> The declaratory judgment procedure may be
> employed in a justiciable controversy where
> the interests are adverse, where there is an
> actual bona fide and substantial question or
> issue in dispute or substantial uncertainty of
> legal relations which requires settlement, and
> where all persons having an interest in the
> subject matter of the complaint are parties to
> the action or have reasonable notice thereof.

Practice Book §390.

The jurisdiction of the trial court over declaratory
judgment actions depends upon compliance with the notice
requirement of Practice Book §390. **Serrani v. Board of
Ethics**, 225 Conn. 305, 308, 622 A.2d 1009 (1993). Failure
to comply with the notice requirement of Practice Book
§390 **deprives** the trial court of subject matter
jurisdiction to render a declaratory judgment. See, e.g.
**Connecticut Ins. Guaranty Assn. v. Raymark Corporation**,
215 Conn. 224, 229, 575 A.2d 693 (1990). Accordingly, the
court finds that the plaintiffs have complied with the

18

procedural requirements of a declaratory judgment action. All persons having an interest in the subject matter of this action are now parties to the action or have reasonable notice thereof.

### III.

### STANDARD OF REVIEW

"Ordinarily, a trial court's analysis of a constitutional attack on an otherwise validly enacted statute begins with certain underlying principles of statutory construction." **State v. Leary**, 41 Conn. Sup. 525, 526-27, 590 A.2d 494 (1991, Mottolese, J.) One of the most fundamental of these is "that a strong presumption of constitutionality attaches to acts of a legislature." (Citations omitted.) **Peck v. Jacquemin**, 196 Conn. 53, 64, 491 A.2d 1043 (1985). To overcome this presumption, the party attacking a validly enacted statute bears the heavy burden of proving its unconstitutionality beyond a reasonable doubt and the court will indulge in every presumption in favor of the statute's constitutionality. **State v. Breton**, 212 Conn. 258, 269, 652 A.2d 1060 (1989). "In choosing between two constructions of a statute, one valid and one

19

constitutionally precarious, we will search for an
effective and constitutional construction that reasonably
accords with the legislature's underlying intent..."
(Citations omitted.) Id.

## IV.

### EQUAL PROTECTION AND THE RIGHT TO BEAR ARMS
### (COUNTS 1, 2 & 5)

The plaintiffs rely solely on state constitutional
grounds to invalidate the Act. The court is not bound by
federal precedents in interpreting our own state
constitutional provisions. **State v. Geisler**, 222 Conn.
672, 684, 610 A.2d 1225 (1992). "It is well established
that federal constitutional... law establishes a minimum
national standard for the exercise of individual rights
and does not inhibit state governments from affording
higher levels of protection for such rights..." (Internal
quotation marks and citations omitted.) **State v. Miller**,
227 Conn. 363, 377-87, 630 A.2d 1315 (1993). "[F]ederal
**decisional** law is not a lid on the protections guaranteed
**under our** state constitution." **Doe v. Maher**, 40 Conn.
Sup. 394, 419, 515 A.2d 134 (1986). Nevertheless, in the
interpretation of our state constitution, the court is

20

not precluded from consulting the case law under the federal constitution. **Daly v. Delponte**, 225 Conn. 499, 512-13, 624 A.2d 876 (1993).

Article I, §20 of the Connecticut Constitution is the modern equal protection clause. It provides: "No person shall be denied the equal protection of the law nor be subjected to segregation or discrimination in the exercise or enjoyment of his or her civil or political rights because of religion, race, color, ancestry, national origin, sex or physical or mental disability." Conn. Const. Art. I, §20.

The equal protection clause provides for varying levels of judicial review to determine whether a state statute passes constitutional muster. **Daly v. DelPonte**, supra, 513. Our Supreme Court has held, in accordance with the federal framework of analysis that state action concerning social and economic regulation will survive an equal protection challenge if it satisfies a rational basis test. **Id.** citing **Laden v. Warden**, 169 Conn. 540, 542-43, 363 A.2d 1063 (1975). If, however, state action invidiously discriminates against a suspect class or affects a fundamental right, the action passes constitutional muster under the state constitution only

21

if it survives strict scrutiny. See Id., 542.

The plaintiffs allege in count one of their complaint that the Act must be declared unconstitutional because it lacks a rational basis. In count two, the plaintiffs allege that the Act should be "strictly scrutinized." The plaintiffs do not claim that the Act should be subject to a strict scrutiny test because it discriminates against a suspect class. Rather, the plaintiffs allege that the right to bear arms is a fundamental right and therefore legislation which affects that right should be subject to strict scrutiny.

## A. The Reasonableness Test

The Connecticut Constitution, Article first, §15 states: "[e]very citizen has a right to bear arms in defense of himself and the state." Conn. Const. Art. I, §15. All constitutional rights, however, are not absolute. For example, Conn. Const. Art. I, §3 guarantees the free exercise and enjoyment of religion. However, it is well recognized that this right is not absolute, religious conduct remains subject to regulation for the protection of society. Cantwell v. State of Connecticut, 310 U.S. 296, 303-04, 60 S.Ct. 900, 84 L.Ed 1213 (1940).

22

Further, the protection of speech found in the First Amendment and Conn. Const. Art. I §4, while fundamental, is not absolute. The First Amendment does not protect one who yells "fire" in a crowded theater, nor does it protect one who speaks "fighting words." **Chaplinsky v. New Hampshire**, 315 U.S. 568, 572, 62 S.Ct. 766, 86 L.Ed.2d 1031 (1942).

Another example can be found in Conn. Const. Art. I, § 8 which guarantees, in pertinent part, that in all criminal prosecutions, the accused shall have the right to be heard "... by himself and by counsel..." However, once a defendant is supplied with counsel, the core right is exhausted, and additional protections claimed under the Sixth Amendment can be severely circumscribed. **Wheat v. United States**, 486 U.S. 153, 159, 108 S.Ct. 1692, 100 L.Ed.2d 140 (1988). As a result, a defendant does not have a constitutional right to counsel of choice where other societal interests are compromised. **Id.**; **United States v. Vasquez**, 966 F.2d 254, 261 (7th Cir. 1992); **Johnson v. Warden**, 218 Conn. 773. 790-91, 591 A.2d 399 (1991).

On each occasion that the Connecticut courts have addressed the meaning of the "right to bear arms"

23

provision, they have indicated that the right is not absolute, but is a limited right, subject to the reasonable exercise of the state's police power. **State v. Bailey**, 209 Conn. 322, 346, 551 A.2d 1206 (1988); **State v. Banta**, 15 Conn. App. 161, 184, 544 A.2d 1226 (1988); **Rabbitt v. Leonard**, 36 Conn. Sup. 108, 116, 413 A.2d 489 (1979); **Johnsey v. Board of Firearms Permit Exam**, Superior Court, J.D. of New Haven, Docket # 299478 (1991, Schaller, J.) (It was not unreasonable for the Board of Firearm Permit Examiners to conclude that the appellant was an unsuitable person to be granted a pistol permit.).

In **Bailey**, the court held, inter alia, that the requirement that a person obtain a permit to carry a pistol places a reasonable restriction on a citizen's right to bear arms. The court, in pertinent part, stated, "It is beyond serious dispute that the legislature has the authority to place reasonable restrictions on a citizen's right to bear arms." **State v. Bailey**, supra, 346.

In **Banta**, the court denied the defendant's claim that a statute which prohibits a felon from possessing a firearm was unconstitutional under the state constitution. The court stated:

24

....our limited review of the record in this case convinces us that the defendant's claims are not truly of constitutional dimension. He claims that the state constitutional provision regarding the right to bear arms; Conn. Const., art. I, 15; confers on him an individual constitutional right to possess a pistol. Even if we assume without deciding that there is such an individual constitutional right, similar constitutional provisions in other states have been repeatedly interpreted to be subject to reasonable limitation....The defendant has not established that this prohibition applicable to convicted felons is unreasonable.

(Citations omitted.) **State v. Banta**, supra, 184.

In **Rabbit**, the plaintiff complained of the revocation of his pistol permit without prior notice and an opportunity to be heard. The court, Saden, J., stated that a Connecticut citizen has a fundamental right to bear arms in self defense. **Rabbit v. Leonard,** supra, 112. Nevertheless, the court applied a standard of reasonableness in finding that the state had the right to revoke the plaintiff's pistol permit. Id., 116.

Other jurisdictions with similar constitutional provisions guaranteeing the right to bear arms have consistently held that the right to bear arms is not an unlimited right and is subject to reasonable

25

regulation.[1]  See, e.g. **People v. Brown**, 253 Mich. 537, 235 N.W. 245, 246 (1931); **Carfield v. State**, 649 P.2d 865, 871-72 (Wyo. 1982); **People v. Blue**, 190 Colo. 95, 102-03, 544 P.2d 385 (1975); **Robertson, et al. v. City of Denver, et al.**, ___ Colo. ___ (May 2, 1994); **State v. Cartwright**, 246 Or. 120, 134-36, 418 P.2d 822 (1966); **State v. Smith**, 132 N.H. 756, 571 A.2d 279, 281 (1990); **State v. Kessler**, 289 Or. 359, 614 P.2d 94, 99 (1980).

In the recently decided **Robertson** case, supra, the majority refused to categorize the Colorado right to bear arms as fundamental, but remained silent on that issue. They applied the reasonableness standard to the constitutional test of the Denver ordinance banning assault weapons. They cited the body of law that exists in Colorado where courts have applied the reasonableness standard to any statute which invoked the police power as a restriction on the right to bear arms, without a determination as to the nature of that right. **Robertson v. City of Denver,** supra, 13-14. They point out that Connecticut is one of two jurisdictions to refer to the right as fundamental, citing Rabbitt, supra. **Id.**, 12.

---

[1] These states have right to bear arms provisions which focus on a citizens right to bear arms for self defense and defense of the state.

26

That decision of our court was handed down in 1979, and consistently since that time, the Connecticut Supreme Court has applied the reasonableness standard to any legislation that has regulated the right to bear arms.

For all of the foregoing reasons, the court finds that Conn. Const. Art. I §15 explicitly grants citizens of Connecticut a right to bear arms. However, it does not grant an unlimited right to possess assault weapons. Therefore, the proper constitutional test is whether the Act is a reasonable exercise of the state's police power.

Police power generally means the power to govern and belongs to every sovereignty. <u>Snyder v. Newtown</u>, 147 Conn. 374, 389, 161 A.2d 770 (1960). "It is a universally accepted rule of constitutional law that the legislative department in the use of its police power is the judge, within reasonable limits, of what the public welfare requires." (Citations omitted.) <u>Cutlip v. Connecticut Motor Vehicles Commissioner</u>, 168 Conn. 94, 100, 357 A.2d 918 (1975).

> The court's function in examining the constitutional aspect of police legislation is to decide whether the purpose of the legislation is a legitimate one and whether the particular enactment is designed to accomplish that purpose in a fair and reasonable way. If an enactment meets this test, it satisfies the constitutional

27

requirement of due process and equal
protection of the laws.... Courts cannot
question the wisdom of police legislation and
must accord to the legislature a liberal
discretion, especially in matters involving
potentialities generally recognized as
dangerous.

**Pierce v. Albanese**, 144 Conn. 241, 249, 149 A.2d 606
(1957).

All of the facts that have been received on this
record were contained in the public debate in the
legislature concerning the appropriateness, as a
political matter, of regulating firearms in any way. The
legislature focused on the perceived public need to
control the use of large capacity, rapid fire automatic,
selective fire, and some semiautomatic firearms. The
evidence indicates an escalation in that use, and while
not the predominant number of firearms seized, the banned
weapons have appeared more frequently as a risk factor to
police officers on the street, and to innocent victims in
densely-populated areas.

The court finds that Public Act 93-306 is a
**reasonable exercise** of the State's police power. The
**court finds further** that the legislature designed the Act
to accomplish that purpose in a fair and reasonable
manner. Accordingly, it satisfies the constitutional
requirement of due process and equal protection.

28

35a

## V.

## VOID FOR VAGUENESS (COUNT 3)

In count three of their amended complaint, the plaintiffs assert that the Act is unconstitutionally vague in violation of Article I, §8 and §10 of the Connecticut Constitution. Specifically, the plaintiffs attack Section 1(a)(1) of the Act which defines an "assault weapon".

The void for vagueness doctrine, which is derived from the constitutional guarantee of due process, embodies two central precepts: the right to fair warning of the effect of a governing statute or regulation and the guarantee against standardless law enforcement. **State v. Schriver**, 207 Conn. 456, 460, 542 A.2d 686 (1988); **Smith v. Goguen**, 415 U.S. 566, 572-73, 94 S.Ct. 1242, 39 L.Ed. 2d 605 (1974); **State Management Assn. of Connecticut Inc. v. O'Neill**, 204 Conn. 746, 757, 529 A.2d 1276 (1987).

As a matter of the due process of law required by our federal and state constitutions, "a penal statute must be sufficiently definite to enable a person to know what conduct he must avoid." (Citations omitted.) **State v. Proto**, 203 Conn. 682, 696, 526 A.2d 1297 (1987).

29

Legislatures must set reasonably clear guidelines for law enforcement officials and triers of fact in order to prevent "arbitrary and discriminatory enforcement." **Smith v. Goguen**, supra, 572-73. A statute must afford a person of ordinary intelligence a reasonable opportunity to know what is permitted or prohibited. **McKinney v. Coventry**, 176 Conn. 613, 618, 410 A.2d 453 (1979). A statute which forbids the doing of an act in terms so vague that men of common intelligence must guess at its meaning and differ as to its application, violates the first essential of due process of law. **State v. Cavallo**, 200 Conn. 664, 667, 513 A.2d 646 (1986).

It is not necessary, however, that a statute list the precise conduct prohibited or required. **State v. Eason**, 192 Conn. 37, 47, 470 A.2d 688 (1984). It is recognized that the law may be general in nature; the constitution requires no more than "a reasonableness of certainty." **State v. White**, 204 Conn. 410, 415, 528 A.2d 811 (1987). "The test is whether the language conveys **sufficiently** definite warning as to the proscribed **conduct** when measured by common understanding and practice." (Citation omitted.) Id., 415-16. "A statute is not void for vagueness unless it clearly and

30

unequivocally is unconstitutional, making every presumption in favor of its validity." (Citation omitted.) **State Management Assn. of Connecticut, Inc. v. O'Neill**, supra, 758.

Where a penal statute implicates rights protected by the First Amendment, the statute's constitutionality is tested for vag: ess on its face. **State v. Pickering**, 180 Conn. 54, 58 n.3, 428 A.2d 322 (1980). However, in non-First Amendment contexts, "the constitutionality of a statutory provision being attacked as void for vagueness is determined by the statute's applicability to the particular facts at issue." Id., 57. This case does not involve the alleged infringement of First Amendment freedoms, therefore, the plaintiffs' vagueness challenge must be examined in the light of the facts of this case. Hence, the court is not free to speculate as to whether under hypothetical circumstances, the Act may be vague. **Springfield Armory, Inc. v. City of Columbus**, 805 F. Supp. 489, 497 (S.D. Ohio 1992).

The plaintiffs contend that the Act is unconstitutionally vague because it fails to define "assault weapon" in terms of any understandable categories except for the selective guns which are

31

38a

listed.  The plaintiffs allege further that the Act neglects to define "type" and "series," words which the Act uses to define assault weapons.

The definition of "assault weapons" in the statute is clear.  This court does not find credible, any claim that a person purchasing a firearm would be unaware of its firing capabilities.  This court finds that a person of ordinary intelligence is capable of understanding whether his or her firearm is a fully automatic, selective-fire, burst fire, or semi-automatic firearm. The definition of "assault weapon" is not vague.

The plaintiffs cite **State v. Defrancesco**, 34 Conn. App. 741, ___ A.2d ___ (1994), in support of their claim that the words "series" and "type" are not terms of art in the firearms industry, or at law, sufficient to allow the public to understand the prohibition in the statute.

Colt, in its promotional catalogue (Plaintiffs' Ex. 2) refers to certain combinations of firearms as a "group".  Springfield Armory refers to "series" or "models" for groupings of similar firearms (Plaintiffs' Ex. 3), while Eagle Arms prints an entire catalogue for the EA-15 series.

This marketing literature is found to be readily

32

39a

available to the general public, to those of ordinary intelligence, who would likely review catalogues prior to making a purchase. Clearly, gun dealers who have such literature and knowledge of the industry, know when a firearm is derived from another, with certain alterations that do not change the essential form of the firearm. Therefore, the court finds that the use of the word "series" in the statute is not vague.

The term "type" appears in none of the marketing or promotional literature that has been made an exhibit for the record. Furthermore, the definition does not appear in Black's Law Dictionary, but only in Webster's. It is not a word that lends itself to statutory construction, absent a review of the legislative history. When the court is unable to find the legislative intent from the language of the statute, the court must look to the legislative history for guidance. see **State v. Defrancesco**, supra, 750.

The legislative history discloses that the word "type" was used in conjunction with the AK-47 to include all copies of that firearm. **Senate Proceedings**, PP. 2988 (May 27, 1993, Jepson, S.). However, the legislative history is silent with respect to the use of the word

33

"type" as it pertains to the Auto Ordnance Thompson type. Despite the legislative history which addresses the use of the word "type" in conjunction with the AK-47, the court finds that the use of the word "type" in this statute is vague. That finding, however, is not dispositive of the constitutionality of the entire statute.

> Whenever a portion of a statute appears to be void for vagueness on its face, thereby threatening to produce a chilling effect on the remainder of the statute which might otherwise be valid, Connecticut courts, like the federal courts, have, whenever possible, applied a 'judicial gloss' to the statute to save it from infection and inevitable invalidation.

**State v. Leary**, 41 Conn. Sup. 525, 526-27, 590 A.2d 494 (1991, Mottolese, J.).

The court must now determine if the statute can be read consistently with its intent, if the vague word is deleted. The invalidity of one provision of the act does not necessarily result in the entire act being invalid. **Kellems v. Brown**, 163 Conn. 478, 495-96, 313 A.2d 53 (1972); citing **State v. Wheeler,** 25 Conn. 290, 299 (1856). The test is whether they are so mutually connected and dependent as to indicate a legislative intent that they should stand or fall together. **Kellems v. Brown**, supra, citing **Branch v. Lewerenz**, 75 Conn. 319,

34

41a

324, 52 A. 658 (1902). In this case, the court finds no
such dependence, and no mutual connection with respect to
the list of firearms, and with respect to the AK-47.
However, the use of the word "type" following Auto
Ordnance Thompson is connected, and that designation is
subject to being void for vagueness. Auto Ordnance
Corporation makes a variety of pistols and long guns
which are not further described in the statute.
(Plaintiffs' Ex. 1). Deleting the word "type" from the
description does not cure the problem with vagueness for
this listing. If the legislature sees fit, it has the
option to revise the statute to deal with which of the
Auto Ordnance firearms they feel are subject to the
statute. At this time, the court has no ability or
authority to substitute its judgment. The excision of
the word "type" where noted will not defeat the statute,
nor prevent its reasonable use as dictated by the
legislature. By narrowing the construction of the
statute, **by deleting** the vague term "type" and "Auto
**Ordnance Thompson** type", therein, the statute passes
constitutional muster.

35

42a

## VI.

## BILL OF ATTAINDER (COUNT 4)

Article First, §13 of the Connecticut Constitution states: "No person shall be attainted of treason or felony by the legislature." Art. I §10 of the United States Constitution provides in pertinent part that "[n]o state shall... pass any Bill of Attainder." These Bill of Attainder provisions prohibit the state or federal legislatures from assuming judicial functions and conducting trials. **United States v. Brown**, 381 U.S. 437, 462, 85 S.Ct. 1707, 14 L.Ed.2d 484 (1965). The key features of a bill of attainder are that the challenged law "legislatively determines guilt and inflicts punishment upon an identifiable individual without provision of the protections of a judicial trial." **Nixon v. Administrator of General Services**, 433 U.S. 425, 468, 97 S.Ct. 2777, 2803, 53 L.Ed. 2d 867 (1977); see also **State v. Washburn**, 34 Conn. App. 557, 563, ___ A.2d ___ (1994).

**A plaintiff** challenging a legislative act on the ground that it is an unconstitutional bill of attainder must prove three elements: nonjudicial infliction of punishment; specificity as to the identity of individuals

36

affected; and lack of a judicial trial. **Springfield Armory, Inc. v. City of Columbus**, supra, 493; See 16A Am. Jur.2d Constitutional Law § 655 (1979). These elements must be established by the "clearest proof." (Citations omitted.) **Id.**

The plaintiffs allege that the manufacturers of guns named in the Act have been singled out for adverse treatment and legislatively condemned because of a relationship with an undesirable name. As a result, the plaintiffs claim that any manufacturer who makes and any citizen who owns or possesses a named gun have been attainted.

Specificity alone does not establish that the law is an unconstitutional bill of attainder. **Nixon v. Administrator of General Services**, supra, 470-72. The court in **Nixon** concluded that "the Act's specificity, the fact that it refers to [President Nixon] by name, does not automatically offend the Bill of Attainder Clause. **Id.**, 471-72. Similarly, the present Act's specificity in naming weapons made by Colt, Springfield Armory, Heckler and Koch, Intratech, and other gun manufacturers does not render the Act a bill of attainder. **Fresno Rifle and Pistol Club Inc. v. Van De Kamp**, 965 F.2d 723, 727-28

37

9th Circuit 1992.)

Furthermore, "[s]imply because a law places burdens on citizens does not make those burdens punishment." (Citation omitted.) **State v. Washburn**, supra, 563. Three tests have been identified as applicable to the determination whether the burden imposed by the legislature is punishment for bill of attainder purposes: the historical test; the functional test; and the motivational test. **Nixon v. Administrator of General Services**, supra, 473-84.

**A. The Historical Test**

The historical test requires the court to examine whether the burden imposed by the legislature falls within the category of punishments traditionally judged to be prohibited by the Bill of Attainder Clause. Id., 473-74. These are: the death sentence; imprisonment; banishment; confiscation of property; and barring individuals or groups from participating in specified employments or vocations. Id.

Plaintiffs' witnesses Benjamin, D'Andrea, and Carlos Garcia, the President of Intratech, offered testimony that their businesses have suffered as a result of

38

45a

passage of the Act. The plaintiffs, however, have not proven that the Act bars them from participating in their specified employments or livelihood. The Act does not prevent plaintiff Intratech from manufacturing or selling firearms in general. Nor does it prevent Intratech from manufacturing the banned "assault weapons" and selling them in places other than Connecticut. Moreover, the Act does not prohibit plaintiffs D'Andrea or Benjamin from selling or working on firearms and parts in the State of Connecticut other than those affected by the Act. For the foregoing reasons, the historical test for punishment has not been satisfied. See **Springfield Armory, Inc. v. City of Columbus**, supra, 494.

## B. The Functional Test

The functional test requires the court to analyze whether the challenged law, viewed in terms of the type and severity of burdens imposed, can be said to further nonpunitive purposes. **Nixon v. Administrator of General Services**, supra, 475-76. Where legitimate legislative purposes do not appear, it is reasonable to conclude that punishment was the purpose of the legislation. Id., 476. The plaintiff bears the burden of proving "that the

39

legislature's action constituted punishment and not merely the legitimate regulation of conduct." Id., n. 40.

The defendants assert that the Act was passed in light of legislative recognition that "assault weapons" are being used in street crime across Connecticut and that the proliferation of these guns is an intolerable threat to public safety. Defendants also argue that the Act will prevent tragedies such as the 1991 killing of State Police Trooper Russell Bagshaw.

The court finds that the Act was designed to serve a nonpunitive purpose, namely the protection of the citizens of Connecticut from the perceived danger posed by certain firearms. As stated previously, this is a reasonable exercise of the state's police power. Furthermore, in relation to the potential harm sought to be averted by the Act, the severity of the burden on the plaintiffs is slight. The functional test for punishment has not been satisfied. See **Springfield Armory, Inc. v. City of Columbus**, supra, 495.


**C. The Motivational Test**

The motivational test requires the court to determine whether the legislative history of the Act

40

47a

evinces an intent to punish. **Nixon v. Administrator of General Services**, supra, 478. In determining intent the court should also consider whether less burdensome alternatives were available. Id., 482.

The plaintiffs have not offered, nor has the court found, any evidence of a legislative intent to punish the plaintiffs. To the contrary, the motivation of the legislature is clearly focused on public safety. see **State v. Washburn**, supra, 564. The plaintiffs have failed to establish punishment under the motivational test.

The plaintiffs have failed to prove that the burden imposed by the Act fits within any of the categories of punishment prohibited by the federal or state bill of attainder clause. The Act is not an unconstitutional bill of attainder.

41

48a

## VI.

### CONCLUSION

The plaintiffs' action for a declaratory judgment that the Act is void under the Connecticut Constitution, is denied.  The court finds all issues in favor of the defendants subject to the narrowing construction of the statute contained herein.

The application for a temporary injunction is denied.

_____ J.
DRANGINIS

42

49a