**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**
Buffalo Division

| | |
|---|---|
| NEW YORK STATE RIFLE AND PISTOL ASSOCIATION, INC., et al., )<br>)<br>        Plaintiffs. )<br>)<br>v. )<br>)<br>ANDREW M. CUOMO, et al., )<br>)<br>        Defendants. )<br>_____) | Case No.: 13-cv-00291-WMS |

***AMICUS CURIAE* BRIEF OF THE**
**NATIONAL SHOOTING SPORTS FOUNDATION, INC.**
**IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

---

John F. Renzulli, Esq.
Christopher Renzulli, Esq.
Scott C. Allan, Esq.
Edwin T. Brondo, Jr., Esq.
**RENZULLI LAW FIRM, LLP**
81 Main Street, Suite 508
White Plains, New York 10601
(914) 285-0700

Lawrence G. Keane, Esq.
**THE NATIONAL SHOOTING SPORTS FOUNDATION, INC.**
Flintlock Ridge Office Center
11 Mile Hill Road
Newtown, Connecticut 06470
(203) 426-1320

*Attorneys for Amicus Curiae*
*The National Shooting Sports Foundation, Inc.*

# **TABLE OF CONTENTS**

**PAGE(S)**

INTEREST OF *AMICUS CURIAE*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

SUMMARY OF ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .2

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .4

    I.      The Challenged Provisions are Subject to a Heightened Vagueness Standard Because They Impinge Fundamental Rights and Impose Strict Criminal Liability. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .4

    II.     The Challenged Provisions Are Unconstitutionally Vague. . . . . . . . . . . . . . . . . .5

    III.    The NY SAFE Act Chills Lawful Commerce in Arms. . . . . . . . . . . . . . . . . . . . 11

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

# TABLE OF AUTHORITIES

**FEDERAL CASES**                                                                                          **PAGE(S)**

*Armalite, Inc. v. Lambert*, 544 F.3d 644, (6th Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Bryan v. U.S.*, 524 U.S. 184 (1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .12

*Connally v. General Const. Co.*, 269 U.S. 385 (1926). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 5

*Dick's Sports Center, Inc. v. Alexander*, 2006 WL 799178 (E.D. Mich. 2006). . . . . . . . . . . . . 12

*District of Columbia v. Heller*, 554 U.S. 570 (2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  5

*Garner v. Lambert*, 344 Fed. Appx. 66 (6th Cir. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .12

*General Store, Inc. v. Van Loan*, 551 F.3d 1093 (9th Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . 12

*Hayes v. N.Y. Atty. Grievance Comm.*, 672 F.3d 158 (2d Cir. 2012) . . . . . . . . . . . . . . . . . . . . 5

*McDonald v. City of Chicago*, 130 S. Ct. 3020 (2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Shaffer v. Holder*, 2010 WL 1408829 (M.D. Tenn. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Vill. of Hoffman Estates v. Flipside*, 455 U.S. 489 (1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

**STATUTES, RULES & REGULATIONS**

N.Y. Gen. Bus. Law § 898. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .4, 11

N.Y. Penal Law § 265.00 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 6, 8, 9, 11

N.Y. Pen. Law § 265.02 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 6, 9

N.Y. Pen. Law § 265.10 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 6

N.Y. Pen. Law § 265.36. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 9

N.Y. Pen. Law § 265.37. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 9

*Amicus curiae* The National Shooting Sports Foundation, Inc. (the "NSSF"), respectfully submits this brief in support of the Plaintiffs' Motion for Summary Judgment currently pending before this Honorable Court.

## **INTERESTS OF *AMICUS CURIAE***

The NSSF is the trade association for the firearms, ammunition, hunting, and shooting sports industry. Formed in 1961, the NSSF is a Connecticut non-profit tax-exempt corporation with a membership of more than 9,000 federally licensed firearms manufacturers, distributors, and retailers (also known as "federal firearms licensees" or "FFLs"); sportsmen's organizations; shooting ranges; gun clubs; publishers; hunters and recreational target shooters. NSSF's membership includes almost 150 FFLs in the State of New York. The NSSF's mission is to promote, protect and preserve hunting and the shooting sports. The NSSF provides trusted leadership in addressing industry challenges; advances participation in and understanding of hunting and the shooting sports; reaffirms and strengthens its members' commitment to the safe and responsible use of their products; and promotes a political environment that is supportive of America's traditional hunting heritage and firearms freedoms. As a guardian of our nation's rich hunting and shooting traditions, the NSSF believes that lawful commerce in firearms and firearm-related products must be protected - and that, in particular, no law or regulation should unreasonably limit the lawful transfer of firearms to responsible, law-abiding adults who have individual constitutional rights guaranteed by the Second Amendment to the United States Constitution to purchase, own, possess and use such firearms and ammunition.

The NSSF's interest in this action derives principally from the fact that the NSSF's FFL manufacturer, distributor, and retailer members provide the lawful commerce in firearms that makes the exercise of Second Amendment rights possible. NSSF's members are the entities

from whom law-abiding New Yorkers seek to purchase firearms and ammunition and whom are expected to comply with the unconstitutionally vague provisions of the New York SAFE Act addressed more fully below. The NSSF submits this brief to expand upon the Plaintiffs' arguments challenging the vagueness of the New York SAFE Act and explain to this Court, the unconstitutional burden placed upon NSSF's members by the impermissibly vague provisions and practical effect of the New York SAFE Act.

## SUMMARY OF ARGUMENT

The Due Process Clause of the Fourteenth Amendment prohibits states from enacting statutes that are so vague that ordinary persons cannot readily determine whether their conduct might expose them to criminal penalties. That "the terms of a penal statute creating a new offense must be sufficiently explicit to inform those who are subject to it what conduct on their part will render them liable to its penalties is a well-recognized requirement…and a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essential of due process of law." *Connally v. General Const. Co.*, 269 U.S. 385, 391 (1926). In other words, the elements of a crime must be clearly expressed, and cannot be left to conjecture. *Id.* at 393.

Contrary to these well-settled requirements, the New York SAFE Act created and amended numerous penal laws that are replete with unconstitutionally vague provisions rendering it impossible for citizens of New York to determine what course of conduct will expose them to criminal penalties. Indeed, as noted by prior *amici*, New York State Sheriff's Association *et al.*, the provisions of the law are so vague that even the law enforcement officials charged with enforcing the laws are incapable of discerning what actions violate its provisions. If law enforcement officials cannot understand what constitutes violations of the provisions of

the New York SAFE Act, then it is equally, if not more, impossible for NSSF's members to comply with those provisions in the course of providing lawful commerce in firearms and ammunition to law-abiding New Yorkers.

Specifically, each of the following provisions (the "challenged provisions") contains unconstitutionally vague terms:

(1) N.Y. Penal Law §§ 265.00(22)(a) – (c), 265.02(7), 265.10(2), (3)—imposing criminal penalties for possession or manufacture of vague and poorly described firearms with a "detachable" magazine";

(2) N.Y. Penal Law §§ 265.00(23), 265.02(8), 265.36—imposing criminal penalties for possession of magazines "capable of holding more than 10 rounds of ammunition";

(3) N.Y. Penal Law §§ 265.36, 265.37—imposing criminal penalties for possession of magazines that can be "readily restored or converted" to hold more than 10 rounds of ammunition; and

(4) N.Y. Penal Law §§ 265.00(c)(viii), 265.02(7), 265.10(2), (3)—imposing criminal penalties for possession of semi-automatic "versions" of "automatic" firearms.

The vagueness of these provisions is particularly problematic for NSSF's members whose businesses and livelihoods are heavily related to the manufacture, distribution and/or sale of firearms, are already strictly regulated and depend upon absolute compliance.  For NSSF's members, an unintentional violation of the New York SAFE Act not only carries the criminal penalties applicable to the challenged provisions, but also has the potential to destroy their business and the financial support it provides to their families, their employees and their employees' families.  Given the potentially dire consequences of non-compliance faced by NSSF's members, the vagueness of the challenged provisions, as set forth more fully below,

presents an untenable situation in which the required absolute compliance is impossible. The situation is, therefore, unconstitutional under the Due Process Clause of the Fourteenth Amendment. Thus, the challenged provisions should be struck down by this Honorable Court.

Moreover, the New York SAFE Act's provisions imposing universal background checks, requiring the participation of NSSF's members in such background checks, and imposing various restrictions and limitations on such participation chill lawful commerce in firearms and impair the right to bear arms. N.Y. Gen. Bus. Law § 898. Indeed, under the New York SAFE Act, FFLs must perform services in connection with private sales which far exceed $10, but are prohibited from charging more than $10 for those services. The practical effect of the system created by the New York SAFE Act is that the services required for private sales/transfers will not be offered because it is cost prohibitive for FFLs, such as NSSF's members, to offer those services. The lack of those services, however, significantly reduces lawful commerce in firearms in violation of the Second Amendment by essentially extinguishing the private and re-sale markets.

## ARGUMENT

### I. THE CHALLENGED PROVISIONS ARE SUBJECT TO A HEIGHTENED VAGUENESS STANDARD BECAUSE THEY IMPINGE FUNDAMENTAL RIGHTS AND IMPOSE STRICT CRIMINAL LIABILITY

It is axiomatic that, under the Due Process Clause of the Fourteenth Amendment, laws must clearly set forth the conduct which they command or prohibit so that citizens of ordinary intelligence can know what conduct will constitute a violation. As such, laws which contain vague provisions which force citizens to guess or leave compliance with the law to conjecture, violate the Due Process Clause and are, therefore, unconstitutional. Where, as here, the laws at issue create crimes, "the crime, and the elements constituting it, must be so clearly expressed that

the ordinary person can intelligently choose, in advance, what course it is lawful for him to pursue." *Connally v. General Const. Co.*, 269 U.S. 385, 393 (1926).

In determining the appropriate level of review to be applied in vagueness analyses under the Due Process Clause of the Fourteenth Amendment, courts consider, among other things, whether the laws at issue impinge upon fundamental rights, and, in the case of statutes imposing criminal penalties, whether the statutes require a *mens rea*, or are strict liability offenses. Laws which impinge upon fundamental rights, regardless of whether they violate those rights, are subject to a heightened vagueness analysis. *See Vill. of Hoffman Estates v. Flipside*, 455 U.S. 489, 499 (1982); *see also Hayes v. N.Y. Atty. Grievance Comm. of the Eighth Judicial Dist.*, 672 F.3d 158, 168 (2d Cir. 2012). Similarly, laws imposing criminal penalties, especially those imposing strict liability, are also subject to the stricter vagueness analysis. *See Vill. of Hoffman Estates*, 455 U.S. at 498-99.

It is beyond dispute that the challenged provisions impose restrictions on the right to keep and bear arms, which the Supreme Court has recently clarified is a fundamental, individual right guaranteed by the Second Amendment. *See District of Columbia v. Heller*, 554 U.S. 570 (2008); *McDonald v. City of Chicago*, 130 S. Ct. 3020 (2010). For this reason, heightened vagueness review must be applied to the challenged provisions. Moreover, all of the challenged provisions also require heightened vagueness review because they impose criminal penalties in the form of strict liability for their violation.

## II. THE CHALLENGED PROVISIONS ARE UNCONSTITUTIONALLY VAGUE

Although the New York SAFE Act enacted and amended numerous statutes with vague provisions, only the challenged provisions are addressed in this brief because they present the most problematic scenarios for NSSF's members.

### *The "Assault Weapons" Ban*

First, the new ban on and definition of "assault weapon" (N.Y. Penal Law §§ 265.00(22)(a) – (c), 265.02(7), 265.10(2), (3)) is problematic in numerous ways. For instance, the law generally prohibits manufacturing, selling, shipping and possessing "assault weapons." While the definition of an "assault weapon" would encompass the most popular modern sporting rifles, which are modeled after the original AR-15 rifle and "grandfathers" those rifles which were lawfully possessed on the effective date, the challenged provisions fail to provide any explanation of whether NSSF's members may continue to manufacture, sell, ship and possess lower receivers for use in repairing and customizing legally grandfathered modern sporting rifles without being subject to criminal penalties. Unlike the prior version of New York's assault weapons law, the New York SAFE Act does not reference receivers for "assault weapons," and not only could a lower receiver be used to replace a damaged one on a grandfathered "assault weapon" it could be used to manufacture a modern sporting rifle that does not have any of the features that the New York SAFE Act uses to define an "assault weapon." Because federal law defines a receiver as a firearm, however, FFLs are not willing to engage in conduct that may be legal because of the strict liability criminal provisions imposed by the New York SAFE Act and their uncertainty over the meaning of the provisions.

The challenged provisions banning "assault weapons" are unconstitutionally vague in that they fail to define what is meant by a "detachable" magazine which is a defining characteristic of "assault weapons." The lack of a definition for this critical term leaves NSSF's members to speculate with respect to whether the magazine of a particular firearm will be interpreted as being detachable, which could render it a prohibited "assault weapon," the manufacturing, shipping, sale or possession of which could subject them to criminal penalties.

A prime example of why this provision is unconstitutionally vague is the M1 Garand, the standard rifle issued by the U.S. during WWII, which is a semi-automatic rifle with a bayonet lug. Although surplus U.S. Government M1 Garands are sold to civilians through the Civilian Marksmanship Training Program,[1] if the M1 Garand is considered to have a detachable magazine, it would be considered an illegal "assault weapon" pursuant to the New York SAFE Act simply because of its bayonet lug. Although the M1 Garand is generally considered to have an affixed, non-detachable magazine, it is loaded using en bloc clips, which could be considered to constitute a "detachable magazine" by a law enforcement officer or prosecutor attempting to enforce this unconstitutionally vague provision. Unlike a stripper clip, which can be used to conveniently load separate cartridges into a magazine, an en bloc clip is loaded with cartridges and then it and the cartridges are loaded into the M1 Garand's magazine. Once the last round is fired, the en bloc clip is ejected. Given that an en bloc clip may easily be removed and replaced, it would be difficult to characterize it as not being detachable, but it is not properly characterized as a magazine. The vagueness and undefined nature of the "assault weapons" criteria fail to enumerate whether an M1 Garand rifle is, or is not, an "assault weapon," leaving NSSF's members to guess whether they are legal or not, and subject to criminal consequences if they guess wrongly that it is legal and the loss of the ability to earn a livelihood from the sale of a legal product if they wrongly guess that it is illegal. Such a situation is precisely the reason that

---

[1] The Civilian Marksmanship Program ("CMP") was originally created in 1903 and administered by the U.S. Army in order to provide civilians an opportunity to learn and practice marksmanship. In 1996, the Corporation for the Promotion of Rifle Practice and Firearms Safety, Inc., was created by Federal law (36 U.S.C. 0701-40733), and assumed responsibility for the CMP. As a U.S. government-chartered program, the CMP promotes firearms safety training and rifle practice for all qualified U.S. Citizens with special emphasis on youth programs. As a part of its operations, any U.S. citizen who is legally not prohibited from owning a firearm may purchase a military surplus rifle from the CMP, including the M1 Garand.

the Due Process Clause mandates that vague criminal statutes are unconstitutional and must not stand.

Further adding to the unconstitutionally vague nature of the "assault weapons" ban is the inclusion of vague categories of firearms, most notably "a semiautomatic version of an automatic rifle, shotgun or firearm." N.Y. Penal Law §§ 265.00(c)(viii). Leaving aside the incredibly broad and undefined nature of the phrase "automatic rifle, shotgun or firearm," this provision of the "assault weapon" definition is rendered impossibly vague in that firearms apparently banned by the provision are "semi-automatic version[s]" of the automatic firearms. Exactly what constitutes a "semi-automatic version" of an "automatic firearm"? Does the same manufacturer have to make the same model in both automatic and semi-automatic versions for this provision to apply? If another manufacturer were to make an automatic version of a firearm, would all similar existing semi-automatic versions then become illegal "assault weapons"? The only way NSSF's members can answer this question is by speculating, something the Due Process Clause mandates they not be forced to do. Simply put, what level of similarity rises to "version"?

The unconstitutional vagueness of the "assault weapons" ban is further highlighted by the New York SAFE Act website (http://www.governor.ny.gov/nysafeact/gun-reform), which offers FAQs intended to clarify the confusion the challenged provisions have created. For instance, although the challenged provisions do not even mention "permanent modification" of firearms to render them not "assault weapons," the New York SAFE Act website suggests that owners of "assault weapons" may avoid the registration and prohibition aspects of the law by "permanently modifying" the firearm to eliminate the offending "assault weapon" characteristics. Even were this concept contained in the statute, the question of what constitutes "permanently modified" is quite obviously vague and subject to conjecture. For example, if a rifle is defined as an "assault

8

weapon" pursuant to the New York SAFE Act simply because it has a "a pistol grip that protrudes conspicuously beneath the action of the weapon" or a "thumbhole stock," would removing them and replacing them with an acceptable grip be sufficient to remove the rifle at issue from the definition of an "assault weapon"? What if the original pistol grip or thumbhole stock could simply be put back on the rifle, does that mean it would still be an "assault weapon"? If so, would any semi-automatic rifle with the ability to accept a detachable magazine potentially be considered an assault weapon if a prohibited pistol grip or thumbhole stock could be installed on it? Moreover, as the statute does not offer "permanent modification" as an option, the statute is impermissibly vague on the issue of whether NSSF's members may perform some action which renders a would-be "assault weapon" not an "assault weapon." This vagueness and confusion is precisely what the Due Process Clause of the Fourteenth Amendment prohibits.

### *Magazine Ban*

Equally problematic is the challenged provisions prohibiting magazines "capable of holding more than 10 rounds of ammunition" and magazines capable of being "readily restored or converted" to hold more than 10 rounds of ammunition. N.Y. Penal Law §§ 265.00(23), 265.02(8), 265.36, 265.37. The phrase "capable of holding more than 10 rounds" is impermissibly vague because there are firearms with built in feeding devices that are capable of holding more than one caliber of ammunition, such as lever action rifles with tubular magazines chambered for both .357 Mag. and .38 Spl. Ammunition. Ammunition in tubular magazines is stacked end to end, and the magazine capacity therefore depends on the length of the cartridge. Different cartridges have different lengths, such that when loaded with one caliber the feeding device holds less than 10 rounds, but when loaded with a different caliber it is capable of holding more than 10 rounds. The obvious, and impermissible, dilemma then, is how is such feeding

device to be characterized—as capable of holding more than 10 rounds or not? Is the determination made based on the ammunition being used in the rifle, or the shortest caliber of ammunition that could be used in the rifle? For NSSF's members attempting to make decisions about what they can legally manufacture, ship, sell and stock, such vagueness forces them to guess and potentially be subjected to criminal penalties. For this reason, the challenged provision clearly violates the Due Process Clause.

The challenged provisions also contemplate modifying magazines in order to reduce their capacity to 10 rounds or less, because the challenged provisions prohibit magazines which can be "readily restored or converted" to hold more than 10 rounds. The phrase "readily restored," however, is undefined in the statute leaving NSSF's members to wonder what is sufficient to modify a magazine that is capable of holding more than 10 rounds so that it is no longer capable of being "readily restored" to hold more than 10 rounds. Similarly, NSSF's members are apparently also expected to guess about what magazines are capable of being "readily converted" to hold more than 10 rounds. To be sure, the answer to that guess turns on, among other things, the question of "readily converted" by who? An engineer? A gunsmith? An individual who has never handled and has no experience with a firearm? Someone with access to normal household tools, or a full machine shop? If nothing else, these questions illustrate the unconstitutional vagueness of the challenged provisions, which warrant this Court striking them down. For example, many detachable pistol magazines have been modified to reduce their capacity to ten rounds or less by increasing the size of the baseplate or follower in the magazine body. The capacity of such a magazine could be further decreased or increased by changing the baseplate or follower. Would such a magazine be considered banned by the New York SAFE Act?

The provision making a semi-automatic shotgun an "assault weapon" if it has "a fixed magazine capacity in excess of seven rounds," NY Penal Law § 265.00(22)(b)(iv) is also unconstitutionally vague. Most shotguns have fixed magazine tubes underneath the barrel that hold the shells end to end, such that their capacity is determined by the length of the shells loaded in them. The three most common lengths of 12 gauge shotgun shells are 2 ¾", 3", and 3 ½". A shotgun with a 3 ½" chamber can fire any of these three shell lengths, and a shotgun with a 3" chamber can also fire 2 ¾" shells. The capacity of the fixed magazine tube on a shotgun is therefore variable. Because the New York SAFE Act does not define how the capacity of a fixed shotgun magazine is to be determined, but imposes strict liability and criminal penalties for its violation, it is unconstitutionally vague.

### III. THE NY SAFE ACT CHILLS LAWFUL COMMERCE IN ARMS

In addition to the impermissibly vague provisions of the New York SAFE Act, the new background check provisions (N.Y. Gen. Bus. Law § 898) are clearly designed to chill lawful commerce in arms and infringe the right to keep and bear arms as protected by the Second Amendment. Under the new provisions, all private sales and transfers of firearms require a background check to be performed on the purchaser. All such background checks must be performed through FFLs, such as NSSF's members. In order to perform these background checks, the New York SAFE Act requires NSSF's members to complete all of the same work and documentation that is required in connection with the sale of a new firearm, including completion of the federally required form 4473, and logging the firearm being transferred into and out of its federally required acquisition and disposition records. Notably, these acquisition and disposition records are subject to audit by the Bureau of Alcohol, Tobacco, Firearms and Explosives and FFLs are subject to strict and severe penalties for any errors or omissions in their

11

acquisition and disposition records. For instance, even a single minor error in these records can result in the revocation of an FFL's license if it is deemed "willful," and the bar for proving that an error was "willful" in the context of FFL licensing is fairly low. *See Bryan v. U.S.*, 524 U.S. 184 (1998) ("disregard of a known legal obligation . . . is certainly sufficient to establish a willful violation"); *General Store, Inc. v. Van Loan*, 551 F.3d 1093 (9th Cir. 2008) (simple indifference by a licensee that understands the requirements is enough to be "willful"); *Armalite, Inc. v. Lambert*, 544 F.3d 644 (6th Cir. 2008) (even if a minor error does not result in illegal possession of a firearm, illegal use of a firearm or even an inability of the firearm to be tracked, the error can still be "willful" and the FFL's license revoked); *Garner v. Lambert*, 344 Fed. Appx. 66 (6th Cir. 2009) ("keeping records is a technical exercise and errors, even typos, are unacceptable"); *Shaffer v. Holder*, No. 1:09-0030, 2010 WL 1408829 (M.D. Tenn. Mar. 30, 2010) (unintentional violations can be "willful"); *Dick's Sports Center, Inc. v. Alexander*, No. Civ. 204CV74482, 2006 WL 799178 (E.D. Mich. Mar. 29, 2006) (minor clerical errors can be treated as "willful" because "failure to comply with exacting book keeping regulations may hinder the ATF's ability to perform its mandated function").

The significant aspect of the New York SAFE Act is that it requires FFLs to perform the same tasks—prepare and submit appropriate forms, run background checks, and complete all required recordkeeping in their federally required and audited acquisition and disposition records—for firearms which they are neither purchasing nor selling. By requiring NSSF's members to do so, they not only incur the cost of the manpower required to complete all of these steps, but also incur a substantial additional cost in the form of additional risk and exposure with respect to possible revocation of their FFL for errors and omissions in the forms, background checks and acquisition and disposition records. As such, the provisions of the New York SAFE

Act which prohibit private party sales unless NSSF's members are involved in the "transaction," effectively requires NSSF's members to choose between an outright prohibition on lawful commerce in arms between private, law-abiding citizens of New York, and placing the FFL around which their livelihood is based at a substantially increased risk of revocation. Such a burden is far too high to place on NSSF's members, especially for a maximum charge of $10 per transaction.

Moreover, by requiring NSSF's members to be involved in these "transactions," significant questions are raised about whether they are then exposed to liability for personal injuries based on claims that: (1) they had some duty to inspect the firearm; (2) they physically damaged the firearm while it was in their possession; or (3) the firearm is defective. Practically speaking, NSSF's members' involvement in these "transactions" could expose them to liability anytime someone is injured by the firearm involved in the "transaction."[2] Given the additional cost and exposure, the reasonable value of the service NSSF's members are being asked to perform far exceeds the $10 cap imposed by the New York SAFE Act. That imposing a $10 maximum charge for such services is unreasonable is demonstrated by the fact that the State of Connecticut amended its newly passed private sales background check law to altogether eliminate the cap on the fee a dealer may charge for performing the services, which was originally set at $20, twice the cap imposed by the New York SAFE Act. In so amending the statute, the State of Connecticut recognized that the costs of the services FFLs are being asked to perform far exceeds $20 and cannot be reasonably set by statute.[3] Rather, the only way to ensure that requiring FFLs involvement in these "transactions" does not impose an unreasonable burden

---

[2] This potentially increased exposure also creates uncertainty about whether the insurance coverage held by NSSF's members applies to claims arising out of these transactions, and could result in higher insurance premiums.

[3] Setting a statutory cap on the fee which may be charged also fails to account for inflation.

on them is to allow natural market forces, such as the costs and risks associated with performing the services, the demand for the services and competition to set an appropriate price.

Although the New York SAFE Act (like the amended Connecticut statute) does not "force" NSSF's members to perform this service, if NSSF's members refuse to perform the service, the law-abiding citizens of New York will be legally prohibited from transferring their firearms. In other words, the New York SAFE Act asks NSSF's members to incur a substantial monetary loss and substantial additional risk and exposure in connection with each transaction in order to allow the law-abiding citizens of New York to sell their lawfully owned firearms to other law-abiding citizens. To no surprise, however, these pricing restrictions will result in these services being largely (if not completely) unavailable. Thus, as is plainly obvious, the system created by the New York SAFE Act amounts to a prohibition on private lawful commerce in firearms and was designed with one clearly unconstitutional purpose—to chill lawful commerce in arms and the lawful exercise of the Second Amendment right to keep and bear arms by the law-abiding citizens of the New York. For this additional reason, the New York SAFE Act is clearly unconstitutional and should be declared as much by this Court.

## CONCLUSION

For all of the reasons set forth herein, the New York SAFE Act is unconstitutional and should, therefore, be struck down by this Court.

Dated: White Plains, New York
    October 8, 2013        */s/ Scott C. Allan*
                                      John F. Renzulli, Esq.
                                      Christopher Renzulli, Esq.
                                      Scott C. Allan, Esq.
                                      Edwin T. Brondo, Jr., Esq.
                                      **RENZULLI LAW FIRM, LLP**
                                      81 Main Street, Suite 508
                                      White Plains, New York 10601
                                      (914) 285-0700

-and-

Lawrence G. Keane, Esq.
**THE NATIONAL SHOOTING SPORTS FOUNDATION, INC.**
11 Mile Hill Road
Newtown, Connecticut 06470
(203) 426-1320

*Attorneys for Amicus Curiae*
*The National Shooting Sports Foundation, Inc.*

15