UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

NEW YORK STATE RIFLE AND PISTOL          )
ASSOCIATION, INC., et al.,               )
                                         )
                         Plaintiffs,     )     Case No.: 1:13-cv-00291-WMS
                                         )
          v.                             )
                                         )
ANDREW M. CUOMO, et al.,                 )
                                         )
                         Defendants.     )
_____)


**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

Table of Authorities ........................................................................... iii

I.    NEW YORK'S PROHIBITION ON'
      COMMONLY-POSSESSED FIREARMS
      VIOLATES THE SECOND AMENDMENT ................................1

      A.    Defendants Have Failed to Present
            Any Credible Evidence for Banning
            the Specific Features at Issue ...............................................1

            1.    Semiautomatics with
                  Detachable Magazines .............................................2

            2.    Pistol Grips and Thumbhole Stocks.........................3

            3.    Telescoping or Folding Stocks.................................4

            4.    Shotguns with Detachable Magazines ....................5

            5.    Shotguns with Thumbhole Stocks
                  or Forward Pistol Grips............................................5

            6.    Nexus with Criminal Misuse ...................................6

            7.    Lawful Purposes.......................................................6

      B.    The Prohibition on Common Firearms
            and Magazines in the Home is
            Categorically "Off the Table"...............................................8

      C.    Plaintiffs Have Standing to
            Challenge the Entire Ban ...................................................15

II.   THE ACT VIOLATES PLAINTIFFS'
      EQUAL PROTECTION RIGHTS.................................................16

III.  THE ACT IS UNCONSTITUTIONALLY VAGUE ...................17

      A.    The Second Circuit *En Banc* Approved
            Both the "Permeated with Vagueness" and
            "Vague in All Applications" Tests ....................................17

      B.    The Prohibitions Lack Adequate *Mens Rea*......................17

C.    Defendants Fail to Address the
Specific Vague Terms........................................................18

IV.    THE ACT VIOLATES THE COMMERCE CLAUSE.................20

A.    Plaintiffs' Dormant Commerce Clause
Claim is Justiciable ............................................................20

B.    Count Four States a Valid Claim for Relief.......................20

CONCLUSION.........................................................................................23

# TABLE OF AUTHORITIES

## Cases

*Abbott Laboratories v. Gardner*
387 U.S. 136 (1967)..................................................................................20

*American Library Assoc. v. Pataki*
969 F. Supp. 160 (S.D.N.Y. 1997)............................................................21

*Associated Indus. of Mo. v. Lehman*
511 U.S. 641 (1994)..................................................................................21

*Cincinnati v. Discovery Network, Inc.*
507 U.S. 410 ............................................................................................12

*City of Phila. v. New Jersey*
437 U.S. 617 (1978)..................................................................................21

*Colautti v. Franklin*
439 U.S. 379 (1979)..................................................................................18

*District of Columbia v. Heller*
554 U.S. 570 (2008)......................................1, 2, 6, 8, 9, 11, 12, 13, 14, 15

*Elec. Storage Battery Co. v. Shimadzu*
307 U.S. 5 (1939)......................................................................................19

*Ezell v. City of Chicago*
651 F.3d 684 (7th Cir. 2011) ....................................................................17

*Freedom Holdings Inc. v. Spitzer*
357 F.3d 205 (2d Cir. 2004).......................................................................21

*Granholm v. Heald*
544 U.S. 460 (2005)..............................................................................21, 22

*Healy v. Beer Inst.*
491 U.S. 324 (1989)..................................................................................21

*Heller v. District of Columbia*
670 F.3d 1244 (D.C. Cir. 2011) ...................................................3, 10, 11, 15

*Hetherton v. Sears, Roebuck & Co.*
652 F.2d 1152 (3d Cir. 1981)....................................................................16

*Kachalsky v. County of Winchester*
701 F.3d 81 (2d Cir. 2012)...........................................................................9

*Kwong v. Bloomberg*
723 F.3d 160 (2d Cir. 2013).........................................................12, 13, 14

*LJL 33rd Street Associates, LLC v. Pitcairn Properties, Inc.*
725 F.3d 184 (2d Cir. 2013)...........................................................................3

*Los Angeles v. Alameda Books, Inc.*
535 U.S. 425 (2002).................................................................................10

*McDonald v. City of Chicago*
130 S. Ct. 3020 (2010)........................................................... 7-8, 9, 10, 11

*National Rifle Ass'n of Am., Inc. v.*
*Bureau of Alcohol, Tobacco, Firearms & Explosives*
700 F.3d 185 (5th Cir. 2012) .......................................................................9

*New Albany DVD, LLC v. City of New Albany*
581 F.3d 556 (7th Cir. 2009) .....................................................................10

*People v. Ford*
66 N.Y.2d 428 (1985) ...............................................................................18

*People v. Marino*
212 A.D.2d 735 (2d Dep't 1995).................................................................18

*People v. Wood*
58 A.D.3d 242 (1st Dep't 2008) .................................................................18

*Peoples Rights Organization, Inc. v. City of Columbus*
152 F.3d 522 (6th Cir. 1998) .....................................................................18

*Robb v. Hungerbeeler*
370 F.3d 735 (8th Cir. 2004) .....................................................................10

*Schad v. Borough of Mt. Ephraim*
452 U.S. 61 (1981)....................................................................................17

*Springfield Armory, Inc. v. City of Columbus*
29 F.3d 250 (6th Cir. 1994) .......................................................................19

*Staples v. United States*
511 U.S. 600 (1994)................................................................................3, 8

*United States v. Chester*
628 F.3d 673 ..................................................................................................9

*United States v. DeCastro*
682 F.3d 160 (2d Cir. 2012)..........................................................................12

*United States v. Marzzarella*
614 F.3d 85 (3d Cir. 2010)............................................................................13

*United States v. Rybicki*
354 F.3d 124 (2d Cir. 2003)..........................................................................17

*United States v. Students Challenging*
*Regulatory Agency Procedures*
412 U.S. 669 (1973)................................................................................ 15-16

*West Lynn Creamery, Inc. v. Healy*
512 U.S. 186 (1994)......................................................................................21

*Woollard v. Gallagher*
712 F.3d 865 ..................................................................................................9


**Statutes**

18 U.S.C. §922 ..............................................................................................11

36 U.S.C. § 40722...........................................................................................7

National Firearms Act
48 Stat. 1236 (1934).......................................................................................2

N.Y. Penal Law § 265..........................................................................4, 6, 19


**Other Authorities**

*Guide to the New York Safe Act for*
*Members of the Division of State Police*
Office of Division Counsel (Sept. 2013) ......................................................19

House Report 99-495
99th Cong., 2d Sess., 17 (1986)..................................................................22

## I.    NEW YORK'S PROHIBITION ON COMMONLY-POSSESSED FIREARMS VIOLATES THE SECOND AMENDMENT

After all of the exhaustive briefing in this case, Defendants have failed to articulate why each of the specific features it lists in its definitions of "assault weapon" make a firearm any more dangerous than firearms without such features and are thus outside the scope of the Second Amendment.  Regardless of which feature causes a firearm to be prohibited, all such firearms are in common use by law-abiding persons for lawful purposes and are thus protected by the Second Amendment.  Defendants' denial of such common use conflicts with unassailable facts.

Moreover, this prohibition of firearms in the home is categorically precluded by the Second Amendment.  It is not subject to legislative or judicial interest-balancing. "The very enumeration of the right takes out of the hands of government . . . the power to decide on a case-by-case basis whether the right is really worth insisting upon." *District of Columbia v. Heller*, 554 U.S. 570, 634 (2008).

## A.    Defendants Have Failed to Present Any Credible Evidence for Banning the Specific Features at Issue

Defendants claim that "to prevail on summary judgment here, the evidence presented and relied upon by the State Defendants need not be undisputed."  NY Reply[1] 6.  Yet as to the specific features that make a firearm banned, Defendants either present *no evidence* in support of their assertions or, in most instances, *fail even to mention* the features banned.  Firearms may not be prohibited on the mere basis that the legislature decided to put them on a list under the term "assault weapons." Even if the Court were to

---

[1] "NY Reply" herein refers to Defendants' Reply Memorandum of Law filed at Dkt. No. 122.

decide that sufficient evidence exists to prohibit one feature, that would in no way validate the prohibition of other features just because they are on the same list.

Having presented no evidence for prohibiting the specific features, Defendants cannot prevail under any standard of review. The following discusses the salient features at issue.

*1. Semiautomatics With Detachable Magazines*

The threshold features rendering a rifle or shotgun an "assault weapon" are that it be semiautomatic with a detachable magazine, and for a shotgun, that it be semiautomatic. Additionally, the firearm must have one of a number of listed features to be deemed an "assault weapon." Defendants largely ignore the purpose of these features and instead seek to obscure the issue, however, by trying to suggest that semiautomatic firearms that are newly defined as "assault weapons" are essentially the same as machine guns. There is, however, no testing data in the record supporting the assertion that semiautomatics "fire almost as rapidly as automatics." NY Reply 6-7. Moreover, the fundamental legal difference between a firearm that shoots only one shot per trigger pull and one that shoots automatically as long as the trigger is held has been firmly entrenched since enactment of the National Firearms Act, 48 Stat. 1236 (1934), and probably well before that in New York law.

Defendants call "pure fabrication" the fact that the Supreme Court "drew the line" between firearms that shoot only once per trigger pull and fully automatic machine guns. NY Reply 22-23. Yet *Heller* invalidated a ban on handguns, most of which are semiautomatic pistols, and suggested that machine guns such as the M-16 are not protected by the Second Amendment. *District of Columbia v. Heller,* 554 U.S. 570, 624,

627 (2008).   The Court previously distinguished machine guns from firearms that "traditionally have been widely accepted as lawful possessions," such as semiautomatic AR-15 rifles.  *Staples v. United States*, 511 U.S. 600, 612 (1994).

At any rate, Defendants' assertions about the rate of fire of semiautomatic firearms are irrelevant, in that the State does not ban them for that reason alone.  The ultimate issue is whether it has presented sufficient evidence that the specific listed features are so horrifically-dangerous and uncommon that they have no Second Amendment protection.  In fact, those features are not inherently dangerous at all and are found on commonly-possessed firearms nationwide.  Other than bare assertions about two of those features, Defendants fail even to mention most of them in their opposition papers, much less to justify them.

2. *Pistol Grips and Thumbhole Stocks*

Defendants assert, but fail to offer *any* explanation as to why or how, a pistol grip facilitates spray firing from the hip.  NY Reply 6-7, 15.  The D.C. Circuit reached that conclusion based solely on an unsworn allegation of a Brady Center lobbyist at a committee hearing.  *Heller v. District of Columbia ("Heller II")*, 670 F.3d 1244, 1262-63 (D.C. Cir. 2011).  Of course, that testimony was not subject to cross examination in the litigation itself to establish his credentials and to evaluate the substance, and as such would not be admissible in a trial.[2]  And it is demonstrably false.  Holding one's hand at the hip level as if holding a flashlight replicates the comfortable feeling of holding a

---

[2] "[E]xpert valuations of this nature are the product of so many complex factors, and so many assumptions . . . as to make it particularly important that the opponent of the valuations be offered the opportunity to test their conclusions by cross-examination." *LJL 33rd Street Associates, LLC v. Pitcairn Properties, Inc*., 725 F.3d 184, 194 (2d Cir. 2013).

rifle with a straight stock, which has no pistol grip.  One must bend one's wrist upward in an uncomfortable manner to grasp a stock with a pistol grip at that level.  Anyone can replicate these movements in thin air and understand why a pistol grip does not assist firing from the hip.

Moreover, shotguns fire multiple projectiles with a single pull of the trigger.  Rifles fire only a single projectile for each pull of the trigger.  Yet the ATF confirms in a study cited as authority by Defendants: "[P]istol grips for the trigger hand are prevalent on shotguns and are therefore generally recognized as particularly suitable for sporting purposes."  N.Y. Ex. 10, at 12.  Defendants nonetheless claim, without any basis, that pistol grips are not suitable for sporting purposes and are extraordinarily dangerous.

Nor have Defendants offered *any* explanation as to why they believe a "thumbhole stock" may be used for hip firing, which would be most uncomfortable.  Hip firing with an old-style straight stock would be far easier.  No evidence has been submitted to justify banning thumbhole stocks.

*3.  Telescoping or Folding Stocks*

With no discussion, Defendants claim that a rifle or shotgun with a telescoping or folding stock loses Second Amendment protection because it is concealable.  NY Reply 15.  They simply fail to respond to the fact that New York law elsewhere addresses concealability of long guns by restricting a shotgun or rifle with an overall length shorter than 26."  Penal Law § 265.00(3), § 265.01.  A rifle or shotgun with a telescoping or folding stock is banned by the Act even if it is three feet long in its shortest configuration, and yet a rifle with a straight stock could be as short as 26" and still be legal.  Lacking

any nexus with concealability, Defendants have offered no basis on which to prohibit rifles and shotguns with telescoping or folding stocks.[3]

### 4. Shotguns with Detachable Magazines

Defendants are conspicuously silent on why the law bans semiautomatic shotguns with detachable magazines.  The ATF report which Defendants endorse noted that shotguns have either tube magazines or detachable magazines, concluding: "In regard to sporting purposes, the working group found no appreciable difference between integral tube magazines and removable box magazines."  N.Y. Ex. 10, at 10.  No basis exists to ban such shotguns.

### 5. Shotguns with Thumbhole Stocks or Forward Pistol Grips

Defendants are also conspicuously silent on why the law bans semiautomatic shotguns with thumbhole stocks, or with a second handgrip or a protruding grip that can be held by the non-trigger hand. The ATF report on which Defendants rely found the latter to be a sporting feature because it "permits accuracy and maneuverability even for activities such as bird hunting or skeet shooting."  N.Y. Ex. 19, at 3.  Defendants again, however, claim with no explanation, that such firearms are not in their determination proper for sporting purposes.[4]

---

[3] New York's definition of a pistol as an "assault weapon" if it has a folding or telescoping stock is an enigma in that such features would make a pistol far *less* concealable than an ordinary pistol lacking such a stock altogether.

[4] Ironically, Defendants ignore that prior to the enactment of the Act, New York was known for hosting shooting competitions that regularly and legally used the same firearms that are now classified as "assault weapons," and which Defendants now claim are "unnecessary" for sporting purposes. *See* King Aff. (Dkt. No. 116-5) at ¶¶ 17-18; Plaintiffs' Omnibus Memorandum of Law (Dkt. No. 114) at page 19.

GOLDBERG SEGALLA LLP
11 Martine Ave., Ste. 750
White Plains, NY 10606

*6. Nexus With Criminal Misuse*

Defendants claim that "assault pistols are used disproportionately in crime, and that assault weapons have been disproportionately used in murder and other serious crimes." NY Reply 13. While "pistols" are used in crime disproportionately to rifles and shotguns, including those banned by New York, no evidence has been presented on "assault pistols." Pistols defined as "assault weapons" include, *e.g.*, those with a thumbhole stock, second handgrip, barrel shroud, and manufactured weight of fifty ounces or more. N.Y. Penal Law § 265.00(22)(c). Defendants have presented no evidence whatever correlating any of these features with crime.

*7. Lawful Purposes*

Defendants claim that the firearms and magazines banned "are not common, necessary, or even particularly suitable for self-defense purposes." NY Reply 14. Even aside from the fact that Defendants' argument that such firearms are somehow uncommon is contrary to all record evidence, it is for the American public, not a state legislature, to decide what is necessary and suitable for self-defense. The Second Amendment protects arms that are "overwhelmingly *chosen by American society* for that lawful purpose [self-defense]." *Heller*, 554 U.S. at 628 (emphasis added). It was not for the District of Columbia to say, as Defendants do here, that the firearms banned "are not common, necessary, or even particularly suitable for self-defense purposes." Nor need Plaintiffs demonstrate that they anticipate ever firing a certain number of rounds in self-defense, any more than the plaintiff in *Heller* needed to show anything more than that he had a constitutional right to keep and bear arms.

Defendants do not deny that the banned rifles are widely used in lawful target-shooting competitions.  NY Reply 15 n.13.  Whether ATF now considers such events "sporting" for purposes of its import criteria is irrelevant.  The Civilian Marksmanship Program in which the rifles are used was established by Congress to promote practice and safety.  36 U.S.C. § 40722(1) & (2).

Moreover, Defendants outright ignore that the firearms with features that they seek to ban as supposedly providing advantages to criminals must, of necessity, provide the same advantages to law-abiding citizens seeking to use the firearms for self-defense.[5] Indeed, Defendants simply avoid addressing the reality that banning features that promote accuracy and safe use under the view that those features could be abused by criminals also means that law-abiding citizens are forced to use less accurate and less safe firearms for self-defense and sporting purposes.  While Defendants claim entitlement to enforce these prohibitions against those who would lawfully use firearms for self-defense, but they cannot do so where, as here, the firearms at issue are "commonly held." Additionally, Defendants' supposed policy decision is entitled to no deference in this Court. *See McDonald v. City of Chicago*, 130 S. Ct. 3020, 3050 (2010) (holding that resolving Second Amendment cases does not "require judges to assess the costs and

---

[5] As noted in the Amicus brief from the National Rifle Association, the now banned features "tend to improve the firearm's utility and safety for self-defense and other lawful purposes.  A pistol grip, for example, makes it easier to hold and stabilize a rifle or shotgun when fired from the shoulder and therefore promotes accuracy.  A thumbhole stock also promotes better control by the user.  A telescoping or folding stock . . . promotes accuracy by allowing the stock to be adjusted to fit the individual user's physique, thickness of clothing, and shooting position.  Features such as these are necessarily at least as useful for lawful self-defense as for criminal aggression." Dkt. No. 46 at page 10.

benefits of firearms restrictions and thus to make difficult empirical judgments in an area in which they lack expertise.").

**B.     The Prohibition on Common Firearms and Magazines
        in the Home is Categorically "Off the Table"**

The test for Second Amendment protection of various arms is whether they are "in common use" and "typically possessed by law-abiding citizens for lawful purposes . . . ." *District of Columbia* v. *Heller,* 554 U.S. 570, 624-25 (2008).  Where they are in common use and possessed for lawful purposes, citizens are entitled to own such firearms even if the government claims it has safety concerns because "[t]he very enumeration of the right takes out of the hands of government . . . the power to decide on a case-by-case basis whether the right is really worth insisting upon."  *Id.* at 634; *see also id.* at 636 ("the enshrinement of constitutional rights necessarily takes certain policy choices off the table."); *McDonald*, 130 S. Ct. at 3047 (emphasizing that *Heller* "expressly rejected the argument that the scope of the Second Amendment right should be determined by judicial interest balancing.").  In contrast, the government may only prohibit arms "that are highly unusual in society at large," which the Supreme Court has identified as including machine guns, sawed-off shotguns and artillery pieces   *Id.* at 625; *Staples v. United States*, 511 U.S. 600, 611-12 (1994).  As the Supreme Court has already held, "guns falling outside those categories traditionally have been widely accepted as lawful possessions. . . ." *Staples*, 511 U.S. at 612.

In applying the "common use" test, *Heller* struck down the District of Columbia's handgun ban, noting that it "amount[ed] to a prohibition of an entire class of 'arms' that is overwhelmingly chosen by American society for [the] lawful purpose [of self-defense]." *Id.* at 628.  The Court held that the common use test was met because

handguns were shown to be a preferred firearm for use in self-defense. *Id.* Here, the Act similarly fails because it improperly seeks to prohibit an entire commonly-held class of arms by expanding the scope of the term "assault weapons" to encompass them.

Defendants' contention that intermediate scrutiny applies in this case brazenly ignores *Heller*'s explicit and definitive rejection of the "interest-balancing" approach endorsed in the dissenting opinion by Justice Breyer—which is simply intermediate scrutiny by another name. *See Heller*, 554 U.S. at 634; *McDonald*, 130 S. Ct. at 3050 (plurality op.) ("while [Justice Breyer's] opinion in *Heller* recommended an interest-balancing test, the Court specifically rejected that suggestion"). And the cases cited by Defendants in support of applying intermediate scrutiny are readily distinguishable because they generally do not involve an outright ban on firearm possession for self defense in the home.[6]

Defendants would abolish judicial scrutiny in favor of slavish deference to whatever the legislature enacts. NY Reply 4-5. The cases cited in support, however, do not relate to a ban on a class of firearms and do not apply to firearm possession in the home, where "Second Amendment guarantees are at their zenith . . . ." *Kachalsky* v. *County of Westchester*, 701 F.3d 81, 88 (2d Cir. 2012).

While Defendants speculate regarding some safety concerns underlining the Act, Defendants cannot eliminate outright the constitutional rights of all law abiding citizens

---

[6] *United States* v. *Chester*, 628 F.3d at 683 (4th Cir. 2010), applied intermediate scrutiny because the defendant had been convicted of a misdemeanor crime of domestic violence. *See also Woollard* v. *Gallagher*, 712 F.3d 865, 881-82 (4th Cir. 2013) (carry permits); *National Rifle Ass'n of Am., Inc.* v. *Bureau of Alcohol, Tobacco, Firearms & Explosives*, 700 F.3d 185, 210-11 (5th Cir. 2012) (sale by licensed dealer of handguns to minors; possession not banned).

simply because some might abuse them. *See McDonald*, 130 S. Ct. at 3045 ("The right to keep and bear arms . . . is not the only constitutional right that has controversial public safety implications. . . . Municipal respondents cite no case in which we have refrained from holding that a provision of the Bill of Rights is binding on the States on the ground that the right at issue has disputed public safety implications."). Indeed, courts have already rejected the idea that the government may ban constitutionally protected activity because the existence of that activity could lead to abuses. *See, e.g.*, *New Albany DVD, LLC v. City of New Albany*, 581 F.3d 556, 560 (7th Cir. 2009) ("Just as there is no hecklers' veto over speech, there is no 'thieves' veto.' The police must protect the readers from the hecklers or thieves, rather than ease their workload by forbidding the speech."); *Robb v. Hungerbeeler*, 370 F.3d 735, 743 (8th Cir. 2004) (concluding state's desire to exclude controversial groups from its adopt a highway program was illegitimate because "[t]he first amendment knows no heckler's veto").

Furthermore, a legislature cannot "get away with shoddy data or reasoning" when impinging upon Constitutional rights. *Los Angeles v. Alameda Books, Inc.,* 535 U.S. 425, 438-39 (2002). Defendants protest that this line of reasoning has not been applied "in the Second Amendment context." NY Reply 8-9. Defendants cannot, however, reasonably argue that that "shoddy data or reasoning" should be acceptable in the current context.

Defendants would rely on intermediate scrutiny as set forth in *Heller II*, but they fail fully to explain that court's rendition of the test. NY Reply 6-7, citing *Heller v. District of Columbia,* 670 F.3d 1244 (D.C. Cir. 2011). That court articulated "a tight 'fit'" between the law and the governmental interest through "a means narrowly tailored to achieve the desired objective." *Heller II*, 670 F.3d at 1258 (citation omitted).

Unfortunately, that court failed to apply such a rigorous analysis to each feature defining an "assault weapon."

In addition, the D.C. Circuit conceded: "We think it clear enough in the record that semi-automatic rifles and magazines holding more than ten rounds are indeed in 'common use,' as the plaintiffs contend." *Heller II*, 670 F.3d at 1261. However, that court went off base by failing to consider evidence that the firearms were typically possessed by law-abiding citizens for lawful purposes, and instead conducted a "interest-balancing" analysis similar to that of Justice Breyer in his *Heller* dissent.

There is no question of fact before this Court that the subject firearms are commonly possessed by law-abiding citizens. Millions have been manufactured and lawfully purchased by Americans after passing the National Instant Criminal Background Check, *see* 18 U.S.C. § 922(t), as well as any state-required checks. Nor can it be denied that they are possessed for lawful purposes, including self-defense, target shooting, and hunting. Defendants may claim that in their opinion the firearms are no good for those purposes, but the test is the purposes for which the firearms are actually possessed. Surely Defendants are not claiming that the purposes for which Plaintiffs and millions of others possess or wish to possess the subject firearms and magazines are criminal or otherwise unlawful activities.

Defendants' attempt to paint the Second Amendment as entitled to less respect than the other amendments within the Bill of Rights is contrary to Supreme Court precedent. *See McDonald*, 130 S. Ct. at 3043, 3044 (rejecting the view "that the Second Amendment should be singled out for special—and specially unfavorable treatment" and refusing "to treat the right recognized in Heller as a second-class right, subject to an

entirely different body of rules than the other Bill of Rights guarantees . . . ."); *Heller*, 554 U.S. at 593, 634-35.  Just as newspapers cannot be banned simply because magazines are available, *Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 418 (1993), Defendants cannot ban firearms newly defined as "assault weapons" simply because other firearms are available.

While Defendants criticize Plaintiffs' citations to First Amendment case law, that is precisely what the Supreme Court did in *Heller*.  For instance, the Court noted that "[j]ust as the First Amendment protects modern forms of communications and the Fourth Amendment applies to modern forms of search, the Second Amendments extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Heller*, 554 U.S. at 582.  Additionally, *Heller* noted that the Second Amendment, like the First Amendment, prohibits the government from claiming that it can deprive law-abiding citizens of their Constitutional rights through interest balancing. *Id.* at 635.  Additionally, the Second Circuit has repeatedly recognized the propriety of construing Second Amendment rights in accordance with decisions construing the First Amendment. *See*, *e.g.*, *Kwong v. Bloomberg*, 723 F.3d 160, 165 (2d Cir. 2013) ("We agree that the Supreme Court's First Amendment fee jurisprudence provides the appropriate foundation for addressing plaintiffs' fee claims under the Second Amendment."); *United States v. DeCastro*, 682 F.3d 160, 167 (2d Cir. 2012) ("In deciding whether a law substantially burdens Second Amendment rights, it is therefore appropriate to consult principles from other areas of constitutional law, including the First Amendment (to which *Heller* adverted repeatedly).").  Indeed, even the sister circuit precedent advocated by Defendants recognized the propriety of looking

to First Amendment precedent.  *See*, *e.g.*, *United States v. Marzzarella*, 614 F.3d 85, 89 n.4 (3d Cir. 2010) ("Because *Heller* is the first Supreme Court case addressing the scope of the individual right to bear arms, we look to other constitutional areas for guidance in evaluating Second Amendment challenges.  We think the First Amendment is the natural choice.  *Heller* itself repeatedly invokes the First Amendment in establishing principles governing the Second Amendment.  We think this implies the structure of First Amendment doctrine should inform our analysis of the Second Amendment.").

In an effort to substitute their preferences for those of the American people, Defendants misunderstand the basis of *Heller,* stating: "The reason handguns could not be banned in *Heller*, even though long guns remained available, was not due to some categorical rule, but because the Supreme Court found, for practical and functional reasons, long guns were not an adequate alternative for home self-defense purposes." NY Reply 19.  But the Supreme Court did not seek to impose its own will and instead deferred to the choices "overwhelmingly chosen by American society," and to what "the American people have considered . . . to be the quintessential self-defense weapon . . . ." *Heller*, 554 U.S. at 628-29.

Additionally, Defendants continue to rely on opinions that do not apply to a ban on common firearms in the home.  NY Reply 18-21.  Defendants cite *Kwong* v. *Bloomberg*, 723 F.3d 160 (2d Cir. 2013), which upheld a fee to obtain a gun permit.  The court noted: "Because Admin. Code § 10–131(a)(2) does not ban the right to keep and bear arms but only imposes a burden on the right, we agree with the District Court that strict scrutiny is not appropriate here."  *Id*. at 168 n.16.  That is why, as Defendants note,

"the *Kwong* court declined to apply strict scrutiny," NY Reply 21, and is also why strict scrutiny applies to the outright gun ban here.

Furthermore, Defendants misconstrue Plaintiffs' statement that there are unbanned firearms that "function in essentially identical ways" to banned firearms to suggest that Plaintiffs have not been burdened.  On a basic level all firearms function similarly insofar as they propel projectiles at a high rate of speed.  As noted in the accompanying Supplemental Declaration of Gary Kleck, attached as Exhibit A, Plaintiffs' statement was made in the limited context of referencing the fact that the Act does not ban all semiautomatic firearms that accept detachable magazines and, thus, criminals can continue to use firearms that are just as lethal as the firearms that the Act ban here.

The ban is the equivalent of reacting to a madman having intentionally driven a Toyota Corolla onto the sidewalk to strike pedestrians by banning Toyota Corollas. Under the Defendants' reasoning here other Corolla owners who suddenly found their vehicles unlawful could not complain of an injury because they could just go out and buy a Honda Civic since both cars "function in essentially identical ways" on some level.

Similar basic attributes between banned and unbanned firearms do not mean that the government can arbitrarily choose amongst firearms as to what is allowed to remain legal no more than the government could ban Toyota Corollas under the logic that citizens are uninjured because of the availability of other compact cars.  Indeed, *Heller* explicitly recognized that the government cannot claim that there is no injury from a prohibition on one type of firearm simply because citizens are legally entitled to possess alternative firearms. 554 U.S. at 629 ("[i]t [was] no answer to say . . . that it is

permissible to ban the possession of handguns so long as the possession of other firearms . . . is allowed.").

## C.    Plaintiffs Have Standing to Challenge the Entire Ban

Defendants suggest for the first time that Plaintiffs have standing to challenge the firearm ban only as to the AR-15 rifles that Galvin and Horvath possess.[7]  NY Reply 24. They assert that standing is not conferred by Plaintiffs' "conclusory and unsupported assertions" that they would purchase banned firearms and magazines but for the law.  *Id.* There is nothing conclusory about the assertions, however, since Plaintiffs Roger Horvath (Dkt. No. 23-7) and Thomas Galvin (Dkt. No. 23-8) both unequivocally state in their Declarations that they desire to acquire firearms with the currently banned features and that they would acquire large capacity magazines in short order but for the Act.   In addition, the First Amended Complaint is filled with allegations that Plaintiffs and members of the Plaintiff associations would "forthwith" obtain the banned firearms of all types and banned magazines but for the Act.[8]  *E.g.*, ¶s 55, 70-74.  It is noteworthy that in *Heller* itself, the plaintiff only wished to possess a handgun, and did not possess the handgun because it was unlawful.  *Heller,* 554 U.S. at 575-76.

The First Amended Complaint also articulates the Act's adverse economic impact on the business Plaintiffs from being unable to sell banned firearms and magazines.  *E.g.*, ¶¶ 56-69.  "An  identifiable trifle is enough for standing . . . ."  *United States v. Students*

---

[7] Galvin states in his declaration that he owns AR-15 rifles, as well as other pistols requiring now banned large capacity magazines, including a Browning high-power pistol and Smith and Wesson Model 59 pistol.

[8] *Heller II* limited the "assault weapon" challenge to AR-15 type rifles because, unlike here, the briefs did not "mention [other] such weapons in arguing the ban is unconstitutional."  *Heller II*, 670 F.3d at 1249 n.*.

*Challenging Regulatory Agency Procedures*, 412 U.S. 669, 689 n.14 (1973) (a stake of $5).   Accordingly, Plaintiffs have standing to challenge all of the Act's prohibitions on firearms and magazines.

## II.      THE ACT VIOLATES PLAINTIFFS' EQUAL PROTECTION RIGHTS

Defendants argue that Plaintiffs would make "a false distinction between people who use firearms in their homes and people who use firearms at recreational shooting events."  NY Reply 25.  But the Act does just that.  Defendants' further argument that "all persons" may load ten rounds at gun ranges and events but may only load seven rounds at home fails to ameliorate the discrimination – all laws that deny equal protection could be said to apply to all persons in some manner.  For instance, the law requiring that a handgun purchaser be identified by two freeholders violated equal protection even though it applied to "all persons."    *Hetherton v. Sears, Roebuck & Co.*, 652 F.2d 1152, 1157-60 (3rd Cir. 1981).

Basing the discrimination on the claim that gun ranges and competitions have a "controlled environment" which somehow "rationally further[s] the State's interests in public safety" has no merit.  NY Reply 26.  Firearms are not normally even discharged in homes, making possession of a firearm in the home inherently safer than actual use of a firearm at a range or competition.  Moreover, an unintended discharge has no nexus to how many rounds are loaded in a magazine.  An unintended discharge would entail only a single shot being fired, and it may pose a greater danger at a range or competition where numerous persons may be present.  In sum, the seven-round load limit has no rational basis and denies Plaintiffs the equal protection of the laws.

Additionally, Defendants' argument that Plaintiffs' constitutional rights can simply be eliminated in the home because they can be lawfully exercised at shooting ranges has no legal basis.   Defendants cite no precedent for this radical proposition. Indeed, when the City of Chicago raised a similar argument, it was soundly rejected:

> This reasoning assumes that the harm to a constitutional right is measured by the extent to which it can be exercised in another jurisdiction.  That's a profoundly mistaken assumption.  In the First Amendment context, the Supreme Court long ago made it clear that "one is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place."  The same principle applies here.

*Ezell v. City of Chicago*, 651 F.3d 684, 697 (7th Cir. 2011) (*citing Schad v. Borough of Mt. Ephraim*, 452 U.S. 61, 76-77 (1981)).  This Court should similarly reject Defendants' argument.

### III.      THE ACT IS UNCONSTITUTIONALLY VAGUE

### A.      The Second Circuit *En Banc* Approved Both the "Permeated With Vagueness" and "Vague in All Applications" Tests

*United States v. Rybicki*, 354 F.3d 124, 131 (2d Cir.2003) (*en banc*), held that facial vagueness may be shown if "the law is 'permeated' with vagueness," not just that it must be vague in all applications.  Contrary to Defendants' out-of-context quotation, NY Reply 27-28, *Rybicki* said about *both* tests: "We therefore need not adopt, and do not mean to suggest our preference for, either."  *Id*. at 132.  The court thus considered the vagueness challenge under both tests, and this Court should do the same.

### B.      The Prohibitions Lack Adequate *Mens Rea*

Defendants cite precedents and pattern Criminal Jury Instructions using the term "knowingly," but ignore the actual holding that knowledge of the specific characteristics of the relevant banned weapons need not be proven.  NY Reply 29.  *People v. Wood*, 58

A.D.3d 242, 252-53 & n.5 (1st Dep't 2008), held that the state must prove that the defendant knew he possessed a knife, but need not prove that the knife "opens automatically by hand pressure applied to a button," which is the characteristic making it illegal.[9]  Here, the state would only need to prove that a person knew she possessed a gun, but need not prove that she knew it had the characteristics causing it to be defined as an "assault weapon."  That renders the Act "a trap for those who act in good faith." *Peoples Rights Organization, Inc. v. City of Columbus*, 152 F.3d 522, 534 (6th Cir. 1998) (quoting *Colautti v. Franklin*, 439 U.S. 379, 395 (1979)).

## C.    Defendants Fail to Address the Specific Vague Terms

Plaintiffs set forth in detail specific terms of the Act that are vague.  Plaintiffs' Omnibus Memo. 36-44.  Instead of responding, Defendants argue that the Act as a whole is not "permeated with vagueness" and thus implies that none of the specific provisions are vague, without mentioning them.  NY Reply 29-31.  Defendants therefore have abandoned any attempt to defend the specific provisions.

Defendants' Reply mentions only two provisions, addressing each in only one sentence.  First, Defendants quote Plaintiffs' statement that Penal Law § 265.36 is clear in making it unlawful "to knowingly possess a large capacity ammunition feeding device manufactured before" September 13, 1994.  NY Reply 30.  Yet it ignores the unintelligible remainder of the sentence: "and if such person lawfully possessed such large capacity feeding device before the effective date of the chapter of the laws of two thousand thirteen which added this section, that has a capacity of, or can be readily

---

[9] The other cases cited by New York say only that it must be proven that a defendant knew he possessed a gun, but raised no issue as to specific characteristics that made it unlawful.  *People* v. *Ford*, 66 N.Y.2d 428, 440 (1985); *People* v. *Marino*, 212 A.D.2d 735, 736 (2d Dep't 1995).

restored or converted to accept, more than ten rounds of ammunition."  The question arises: "and if" a person has such magazine, *then what*?  The sentence is incomplete.  The court may not "read into the law words which plainly are missing. We cannot thus rewrite the statute." *Elec. Storage Battery Co. v. Shimadzu*, 307 U.S. 5, 14 (1939).[10]  This clause is vague in all applications and must be stricken, leaving only the first part of § 265.36 intact.

Second, "assault weapon" is defined to include a semiautomatic pistol with a detachable magazine that is "a semiautomatic version of an automatic rifle, shotgun or firearm . . . ."  Penal Law § 265.00(22)(c)(8).  Defendants' only statement as to why "version" is not vague is that Plaintiffs said that "[t]he AR15 is the semi-automatic civilian sporting version of the select-fire M16 rifle and M4 carbine . . . ."  NY Reply 30. That single reference fails to save from vagueness a provision making it a felony to possess a pistol that is a "version" of potentially tens of thousands of the automatic rifles, shotguns, and firearms that have been designed, about which an average person knows nothing and which are unavailable for comparison because they are unlawful.  Nor does the Act provide any information about how similar a "version" must be or what factors to consider.  *See Springfield Armory, Inc. v. City of Columbus,* 29 F.3d 250, 253 (6th Cir. 1994) (holding "slight modifications" language is vague).

---

[10] The State Police claim to have done just that by rewriting § 265.36 to "only appl[y] to those who, before January 15th, 2013, lawfully possessed an ammunition feeding device having a capacity of more than 10 rounds."  Office of Division Counsel, *Guide to the New York Safe Act for Members of the Division of State Police*, (Sept. 2013), 7, available at http://www.waynecountyscope.org/news/ny-state-police-guide-to-enforcing-cuomos-law; *see also id.* at 13.

## IV.   THE ACT VIOLATES THE COMMERCE CLAUSE

**A.   Plaintiffs' Dormant Commerce Clause Claim Is Justiciable**

Defendants argue that it is only "speculative" that the Act's ammunition sales provisions will increase prices or have any other effect on Plaintiffs.  NY Reply 32.  Yet it does not deny that the Plaintiff New York State Amateur Trapshooting Association must take steps now, if it is to continue selling ammunition after the effective date, to register and establish a communications network with the State Police.  And to suggest that a ban on nationwide-competition for ammunition sales will not necessarily increase prices is to ignore reality.  It is noteworthy that Defendants fail to mention the leading precedent on pre-enforcement review, *Abbott Laboratories v. Gardner*, 387 U.S. 136, 149, 152 (1967), which held that purely legal issues are fit for judicial review when regulations already have impact.  Moreover, had Plaintiffs waited until the effective date to seek relief, Defendants would presumably argue that the delay indicated that no irreparable harm was at stake.  Plaintiffs are not held to such a catch-22 in seeking to vindicate their Constitutional rights.

**B.   Count Four States a Valid Claim for Relief**

There can be no question that the Act is protectionist.  It forces residents to purchase ammunition from New York retailers alone, effectively depriving all non-New York retailers of access to New York consumers.  The fact that Defendants claim the restriction was based on a supposed safety justification does not alter the analysis.  The Supreme Court's "Commerce Clause jurisprudence is not so rigid as to be controlled by

the form by which a State erects barriers to commerce." *West Lynn Creamery, Inc. v. Healy*, 512 U.S. 186, 201 (1994).[11]

Furthermore, the prohibitions of the dormant Commerce Clause extend beyond mere economic protectionism.  The Supreme Court has made clear that when a law "has the 'practical effect' of regulating commerce occurring wholly outside that State's borders [it] is invalid under the Commerce Clause."  *Healy v. Beer Inst.*, 491 U.S. 324, 332 (1989).  Regulations, like the one at issue here, that have "the practical effect of 'extraterritorial' control of commerce occurring entirely outside the boundaries of the" jurisdiction in question are "invalid per se."  *Freedom Holdings Inc. v. Spitzer*, 357 F.3d 205, 216 (2d Cir. 2004); *see also American Library Assoc. v. Pataki*, 969 F. Supp. 160, 174 (S.D.N.Y. 1997) ("the Commerce Clause precludes a state from enacting legislation that has the practical effect of exporting that state's domestic policies.").

The Act's creation of a monopoly for New York businesses to sell ammunition replicates the laws at issue in *Granholm v. Heald*, 544 U.S. 460, 466 (2005), "to allow in-state wineries to sell wine directly to consumers in that State but to prohibit out-of-state wineries from doing so . . . . It is evident that the object and design of the Michigan and New York statutes is to grant in-state wineries a competitive advantage over wineries located beyond the States' borders."

---

[11]  Moreover, the specific reason for a law's enactment does not impact the dormant Commerce Clause calculus.  *See Associated Indus. of Mo. v. Lohman*, 511 U.S. 641, 653 (1994) ("a court need not inquire into the purpose or motivation behind a law to determine that in actuality it impermissibly discriminates against interstate commerce."); *City of Phila. v. New Jersey*, 437 U.S. 617, 626 (1978) (describing "legislative purpose [as] not relevant to the constitutional issue to be decided in this case.").

Defendants argue that "states may require face-to-face sales of consumer products so long as the in-person sales requirement applies equally to businesses within and outside of the state."  NY Reply 33.  But that argument ignores the Second Circuit's recognition in *Granholm*, "that the physical presence requirement could create substantial dormant Commerce Clause problems if this licensing scheme regulated a commodity other than alcohol." 544 U.S. at 471 (quoting 358 F.3d 223, 238 (2d Cir. 2004)).[12] Additionally, the "clearest showing" is required "to justify discriminatory state regulation . . . ." *Id.* at 490.  Defendants have made *no showing* at all that ammunition sales from out-of-state businesses was a problem before the Act or that the Act's requirements – which are unprecedented in American legal history – would cure any problem.[13]

*Granholm* requires more:

> [T]he States provide little concrete evidence for the sweeping assertion that they cannot police direct shipments by out-of-state wineries. Our Commerce Clause cases demand more than mere speculation to support discrimination against out-of-state goods. The "burden is on the State to show that 'the discrimination is demonstrably justified,'" [citation omitted]. The Court has upheld state regulations that discriminate against interstate commerce only after finding, based on concrete record evidence, that a State's nondiscriminatory alternatives will prove unworkable.

*Id.* at 492-93.

Defendants rely on their "considered determination that a face-to-face requirement for ammunition sales is necessary 'for effective confirmation of purchaser identity and corresponding background check.'"  NY Reply 34.  Defendants, however,

---

[12] "The Twenty-first Amendment . . . empowers [a state] to require that all liquor sold for use in the State be purchased from a licensed in-state wholesaler . . . ."  544 U.S. at 489 (citation omitted).

[13] Congress repealed a more modest federal requirement after ATF verified that "recordkeeping requirements for ammunition have no substantial law enforcement value."  House Report 99-495, 99th Cong., 2d Sess., 17 (1986).

provide no evidence of a problem with persons purchasing ammunition from out-of-state sellers. The law will drive prices up for shotgun shells bought in large quantities by the trap-and-skeet shooters and their associations, but will have no effect on public safety. In sum, Defendants have submitted no evidence to justify their discrimination against out-of-state businesses, which thereby violates the Dormant Commerce Clause.

## **CONCLUSION**

For the foregoing reasons, the Court should grant the Plaintiffs' Motion for Summary Judgment, declare that the challenged portions of the SAFE Act are unconstitutional, and permanently enjoin Defendants from enforcing it. In the alternative, the Court should preliminarily enjoin enforcement of such provisions pending further proceedings.

Dated: October 9, 2013

Respectfully Submitted,


LAW OFFICE OF STEPHEN HALBROOK    GOLDBERG SEGALLA, LLP

By: /s/ Stephen P.Halbrook_____    By: /s/ Brian T. Stapleton_____
Stephen P. Halbrook, Esq.    Brian T. Stapleton, Esq.
*Pro Hac Vice*    Matthew S. Lerner. Esq.
3925 Chain Bridge Road, Suite 403    11 Martine Avenue, Suite 750
Fairfax, VA 22030    White Plains, New York 10606-1934
(703) 352-7276    (914) 798-5400
protell@aol.com    bstapleton@goldbergsegalla.com


    *Counsel for Plaintiffs*