UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

NEW YORK STATE RIFLE AND PISTOL ASSOCIATION, INC.;
WESTCHESTER COUNTY FIREARMS OWNERS ASSOCIATION, INC.;
SPORTSMEN'S ASSOCIATION FOR FIREARMS EDUCATION, INC.;
NEW YORK STATE AMATEUR TRAPSHOOTING ASSOCIATION, INC.;
BEDELL CUSTOM; BEIKIRCH AMMUNITION CORPORATION;
BLUELINE TACTICAL & POLICE SUPPLY, LLC;
BATAVIA MARINE & SPORTING SUPPLY; WILLIAM NOJAY,
THOMAS GALVIN, and ROGER HORVATH,

                Plaintiffs,

      v.                                              **DECISION AND ORDER**
                                                     13-CV-291S

ANDREW M. CUOMO, Governor of the State of
New York; ERIC T. SCHNEIDERMAN, Attorney
General of the State of New York; JOSEPH A.
D'AMICO, Superintendent of the New York State
Police; LAWRENCE FRIEDMAN, District
Attorney for Genesee County; and GERALD J.
GILL, Chief of Police for the Town of Lancaster,
New York,

                Defendants.

## TABLE OF CONTENTS

I.      INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

II.     BACKGROUND. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4

        A.      The SAFE Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4

                1.      Assault Weapons. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4

                2.      Magazines and Ammunition . . . . . . . . . . . . . . . . . . . . . . . . . . .  7

        B.      Procedural History. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  8

III.    DISCUSSION.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  9

        A.      Legal Standards . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  9

        B.      Standing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  10

        C.      The Second Amendment & Heller . . . . . . . . . . . . . . . . . . . . . . . . . . . .  11

        D.      Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  15

                1.      Common Use & Substantial Burden . . . . . . . . . . . . . . . . . . . . . .  19

                2.      Intermediate Scrutiny .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  23

        E.      Application of Intermediate Scrutiny to the SAFE Act . . . . . . . . . . . . . .  27

                1.      Assault Weapons . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  27

                2.      Large-capacity Magazines . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  33

                3.      Seven-round Limit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  34

        F.      Vagueness . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  37

                1.      The "conspicuously protruding" pistol grip. . . . . . . . . . . . . . . . . .  39

                2.      The threaded barrel . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  41

                3.      Magazine-capacity restrictions . . . . . . . . . . . . . . . . . . . . . . . . . .  41

                4.      The five-round shotgun limit . . . . . . . . . . . . . . . . . . . . . . . . . . . .  42

                5.      "Can be readily restored or converted". . . . . . . . . . . . . . . . . . . . .  42

6.    The "and if" clause of Penal Law § 265.36 . . . . . . . . . . . . . . . . .  43

7.    Muzzle "break" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  44

8.    "Version" of an automatic weapon. . . . . . . . . . . . . . . . . . . . . . . .  45

9.     Manufactured weight . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  46

10.   Commercial transfer . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  46

G.    Dormant Commerce Clause . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  46

IV.   CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  53

V.    ORDERS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  54

## I.   INTRODUCTION

On January 15, 2013, New York's Governor, Andrew M. Cuomo, signed into law the New York Secure Ammunition and Firearms Enforcement Act of 2013. Commonly known by its acronym, the SAFE Act makes broad and varied changes to firearm regulation in New York State. The Act amends or supplements various aspects of New York law, including, among others, the criminal procedure law, the correction law, the family court law, the executive law, the general business law, the judiciary law, the  mental hygiene law, and, of course, the penal law. According to its drafters, this network of new laws, which generally enhances regulation and increases penalties for the illegal possession of firearms, is designed to "protect New Yorkers by reducing the availability of assault weapons and deterring the criminal use of firearms while promoting a fair, consistent and efficient method of ensuring that sportsmen and other legal gun owners have full enjoyment of the guns to which they are entitled." (Senate, Assembly, and Gov. Memos in Supp., Bill No. S2230-2013.)

Plaintiffs, comprising various associations of gun owners and advocates, companies in the business of selling firearms, and individual gun-owning citizens of New York, challenge several aspects of the law. Principally, Plaintiffs maintain that certain restrictions codified in the SAFE Act, like those concerning large-capacity magazines and those regulating assault weapons, violate their right "to keep and bear arms" under the Second Amendment to the United States Constitution. They also assert that several aspects of the law are unconstitutionally vague and that certain provisions violate the Equal Protection and "dormant" Commerce Clauses of the United States Constitution.

Three motions are currently before this Court. Plaintiffs first filed a motion for a

1

preliminary injunction. That motion raised several — but not all — the challenges outlined above. In response to that motion, Defendants Andrew Cuomo, Eric Schneiderman, and Joseph D'Amico cross-moved to dismiss the case under Rules 12(b)(1), 12(b)(6), and 56 of the Federal Rules of Civil Procedure.[1] Then, Plaintiffs responded with their own motion for summary judgment. Because both sides have subsequently filed dispositive motions, this Court deems Plaintiffs' motion for a preliminary injunction moot.

In resolving the pending motions, this Court notes that whether regulating firearms is wise or warranted is not a judicial question; it is a political one. This Court's function is thus limited to resolving whether New York's elected representatives acted within the confines of the United States Constitution in passing the SAFE Act. Undertaking that task, and applying the governing legal standards, the majority of the challenged provisions withstand constitutional scrutiny.

As explained in more detail below, although so-called "assault weapons" and large-capacity magazines, as defined in the Safe Act, may — in some fashion — be "in common use," New York has presented considerable evidence that its regulation of these weapons is substantially related to the achievement of an important governmental interest. Accordingly, the Act does not violate the Second Amendment in this respect.

Further, because the SAFE Act's requirement that ammunition sales be conducted "face-to-face" does not unduly burden interstate commerce, it does not violate the dormant Commerce Clause.

---

[1] Defendant Gerald Gill also filed such a motion, in which he joins the motion filed by Cuomo, Schneiderman, and D'Amico. Although Defendant Lawrence Friedman did not appear in or defend this action, this failure does not affect the outcome of this case, and, for the sake of thoroughness, this Court will, *sua sponte*, apply the Decision and Order in equal measure to him. See Coach Leatherware Co. v. AnnTaylor, Inc., 933 F.2d 162, 167 (2d Cir.1991).

The Act, however, is not constitutionally flawless. For reasons articulated below, the seven-round limit is largely an arbitrary restriction that impermissibly infringes on the rights guaranteed by the Second Amendment. This Court therefore strikes down that portion of the Act. Finally, this Court must strike three provisions of the SAFE Act as unconstitutionally vague because an ordinary person must speculate as to what those provisions of the Act command or forbid.

## II.   BACKGROUND

### A.   The SAFE Act

In response to the tragic and incomprehensible shooting at Sandy Hook Elementary in Sandy Hook, Connecticut on December 14, 2012, the New York State Legislature and Governor Andrew Cuomo quickly enacted the New York Secure Ammunition and Firearms Enforcement Act of 2013. The 39-page Act makes broad changes to existing firearm regulation in New York State.

Section 17 of the Act, for instance, expands an existing requirement by adding a new article to the general business law that requires background checks for all gun sales — including private sales (except those made to immediate family members).

Section 48 of the Act amends the penal law to require counties within the state to re-certify gun licenses every five years. Previously, gun licenses never expired.

Section 49 establishes a statewide gun-license and record database.

Other provisions relate to firearm storage;  others still amend the mental hygiene law, strengthening provisions meant to curtail access to weapons.

But those provisions are not the subject of Plaintiffs' challenge here; their concerns principally involve the Act's two main provisions, which directly regulate firearms and ammunition.

### 1.   Assault Weapons

Before the SAFE Act was enacted, New York already regulated those weapons it considered to be "assault weapons." 2000 N.Y. Laws, ch. 189, § 10. In 2000, New York enacted a law regulating assault weapons in a manner modeled after the now-expired

federal assault weapons ban.[2]  That law, enacted in 1994 as the Public Safety and Recreational Firearms Use Protection Act, established a prohibition on semiautomatic weapons — that is, weapons designed to fire once each time the trigger is pulled — with two "military-style" features.  Pub. L. No. 103-322, tit. XI, subtit. A, 108 Stat. 1796, 1996-2010 (1994) (repealed by Pub. L. 103-322, § 110105(2), effective Sept. 13, 2004). Those features were defined in the statute, and weapons meeting the listed criteria were deemed "semiautomatic assault weapons" subject to stringent regulation. Id.  This model thus became known as the "two-feature" test, because, as the name suggests, the law outlawed semiautomatic weapons  that had two military-style features, and, in the case of rifles and pistols, had the capacity to accept a detachable magazine.  Before the SAFE Act, New York State regulated weapons under this rubric.

But the SAFE Act expands the reach of New York's regulation to include semiautomatic weapons that have only *one* feature "commonly associated with military weapons" and, in the case of rifles and pistols, have the ability to accept a detachable magazine.  Put simply, the SAFE Act institutes a "one-feature" test.

Those features are set out in Penal Law § 265.00, and, as they apply to rifles with detachable magazines, are as follows:

- a folding or telescoping stock;

- a pistol grip that protrudes conspicuously beneath the action of the weapon;

- a thumbhole stock;

- a second handgrip or a protruding grip that can be held by the non-trigger

---

[2]Other firearms regulations go back much further. As the Second Circuit has noted, New York's efforts in regulating the possession and use of firearms "predate the Constitution." Kachalsky v. Cnty. of Westchester, 701 F.3d 81, 84 (2d Cir. 2012). There were several laws on the books as early as 1785. Id.

hand;

- a bayonet mount;

- a flash suppressor, muzzle break, muzzle compensator, or threaded barrel designed to accommodate a flash suppressor, muzzle break, or muzzle compensator;

- a grenade launcher.[3,4]

Weapons meeting this criteria are defined as "assault weapons", and, subject to certain exemptions, the possession of such a weapon constitutes a "Class D" felony. N.Y. Penal Law §§ 265.02(7); 265.00(22)(g) (identifying exempt weapons).

Although colloquially referred to as a "ban," the SAFE Act does not prohibit all

---

[3] Most shotguns and pistols are unaffected by the SAFE Act. But the definition of "assault weapon" is not limited to rifles. The SAFE Act also sets forth similar features for semiautomatic shotguns and pistols. Semiautomatic shotguns meet the definition of assault weapons if they have one of the following features:

- a folding or telescoping stock,
- a thumbhole stock,
- a second handgrip or a protruding grip that can be held by the non-trigger hand,
- a fixed magazine capacity in excess of seven rounds, or
- an ability to accept a detachable magazine.

N.Y. Penal Law § 265.00(22)(b)(i)–(v).

Semiautomatic pistols meet the definition of assault weapons if they have the ability to accept a detachable magazine and are (1) "semiautomatic version[s] of an automatic rifle, shotgun, or firearm," or (2) have one of the following features:

- a folding or telescoping stock,
- a thumbhole stock,
- a second handgrip or a protruding grip that can be held by the non-trigger hand,
- the capacity to accept an ammunition magazine that attaches to the pistol outside of the pistol grip,
- a threaded barrel capable of accepting a barrel extender, flash suppressor, forward handgrip, or silencer
- a shroud that is attached to, or partially or completely encircles, the barrel and that permits the shooter to hold the firearm with the non-trigger hand without being burned, or
- a manufactured weight of fifty ounces or more when the pistol is unloaded.

Id. (c)(i)–(viii).

[4] Illustrations of the banned features are set forth in Appendix A, and are available at http://www.governor.ny.gov/assets/documents/RiflesBannedFeatures.pdf

possession of these firearms.  Current owners of these weapons can keep them, but they must register them. And while current owners are permitted to transfer and sell the weapons, transfers and sales must be made to firearm dealers or out-of-state buyers. Id. § 265.00(22)(h).

### 2.     Magazines and Ammunition

The SAFE Act also tightens regulation of magazines and ammunition. Section 38 of the Act amends Penal Law Section 265.00(23), making it unlawful to possess or sell magazines that have the capacity to hold more than 10 rounds of ammunition. Though this restriction was a part of the prior law, the SAFE Act eliminates the "grandfather" clause, which had exempted such "large-capacity" magazines that were manufactured before September 13, 1994 (the date of the federal law).   Now, all large-capacity magazines (defined as "a magazine, belt, drum, feed strip, or similar device, that [] has a capacity of, or that can be readily restored or converted to accept, more than ten rounds of ammunition"), regardless of their date of manufacture, are subject to regulation. Id. § 265.00(23). And, unlike the assault weapons described above, current owners cannot retain these large-capacity magazines in their current form. Owners of this type of magazine must sell it out of state, transfer it to an authorized in-state dealer or law enforcement, modify it, or discard it before January 15, 2014. Id. §§ 265.00(22)(h), 265.00(23).

Moreover, unless used at a firing range or during a shooting competition, 10-round magazines may not be fully loaded. Instead, the SAFE Act prohibits users from loading more than seven rounds of ammunition into "an ammunition feeding device." Id. § 265.37.

Possession of a large-capacity magazine is a "Class D" felony, and, depending on

the circumstances, penalties for possession of a magazine loaded with more than seven rounds of ammunition range from a "violation" to a "Class A" misdemeanor.[5] Id. § 265.37.

Restrictions on the sale of ammunition have been tightened as well. All ammunition dealers conducting business in New York must register with New York State or be otherwise licensed to sell ammuntion, and no sale can legally be completed without a state background check. The seller must also send a  record of the sale to the State Police. The Act also bans the sale of ammunition over the Internet, imposing a requirement that any ammunition transaction be conducted "face-to-face" and compelling the purchaser to present valid photo identification. Id. § 400.03 (effective Jan. 15, 2014).

## B.    Procedural History

On March 21, 2013, roughly three months after the SAFE Act was enacted into law, Plaintiffs filed a complaint in this Court alleging that the law violated several of their constitutional rights. (Docket No. 1.) On April 11, 2013, they filed an amended complaint (Docket No. 17), and shortly thereafter, a motion for a preliminary injunction (Docket No. 23), in which they sought to enjoin enforcement of several aspects of the law. Defendants Andrew Cuomo, Joseph D'Amico, and Eric Schneiderman then filed a motion to dismiss and a motion for summary judgment on June 21, 2013. (Docket No. 64.) Defendant Gerald Gill joined that motion the same day. (Docket No. 70.) Plaintiffs responded with their own motion for summary judgment on August 19, 2013. (Docket No. 113.) All briefing concluded on October 18, 2013.

In addition, this Court has permitted various *amici curiae*, supporting both sides of

---

[5]It is not a felony, however, to posses a large-capacity magazine if it was (1) possessed before the SAFE Act was enacted and (2) "was manufactured before September [13, 1994]." N.Y. Penal Law § 265.02(8).

the litigation, to file briefs advocating for their interests in the outcome of this case.

## III.  DISCUSSION

### A.    Legal Standards

The various motions pending before this Court implicate two Federal Rules of Civil Procedure: Rules 12(b)(1) and 56.[6]

Rule 12(b)(1) applies to Defendants' jurisdictional arguments. A motion under this rule "challenges the district court's authority to adjudicate a case, and, once challenged, the burden of establishing that the Court in fact retains such authority lies with the party who asserts jurisdiction." Loew v. U.S. Postal Serv., No. 03-CV-5244, 2007 WL 2782768, at *4  (E.D.N.Y. Feb. 9, 2007) (citing Arndt v. UBS AG, 342 F. Supp.2d 132, 136 (E.D.N.Y. 2004)). Dismissal of a case under Rule 12(b)(1) is proper "when the district court lacks the statutory or constitutional power to adjudicate it." Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000).

Both Plaintiffs and Defendants seek summary judgment. Under Rule 56, the plaintiff generally must produce evidence substantiating his claim, and the court can grant summary judgment only "if the movant shows that there is no genuine dispute as to any material fact." Fed. R. Civ. P. 56. A fact is "material" if it "might affect the outcome of the suit under governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986). A "genuine" dispute exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." Id. In determining

---

[6]Defendants also move to dismiss at least one aspect of this case under Rule 12(b)(6). In their original memorandum, Defendants sought to dismiss the four business plaintiffs' Second Amendment claims because, as they argue, the business plaintiffs do not have Second Amendment rights. But Defendants abandoned this argument in their reply memorandum, and, regardless, resolution of this contention would not affect the outcome of this case, as explained below. Accordingly, this Court need not recount the Rule 12(b)(6) standard here.

whether a genuine dispute regarding a material fact exists, the evidence and the inferences drawn from the evidence "must be viewed in the light most favorable to the party opposing the motion." Adickes v. S. H. Kress & Co., 398 U.S. 144, 158–59, 90 S. Ct.1598, 1609, 26 L. Ed. 2d 142 (1970) (internal quotations and citation omitted). When both parties move for summary judgment, "each party's motion must be examined on its own merits, and . . . all reasonable inferences must be drawn against the party whose motion is under consideration." Morales v. Quintal Entm't, Inc., 249 F.3d 115, 121 (2d Cir. 2001).

The function of the court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson, 477 U.S. at 249. Nonetheless, "disputed legal questions present nothing for trial and are appropriately resolved on a motion for summary judgment." Flair Broad. Corp. v. Powers, 733 F. Supp. 179, 184 (S.D.N.Y. 1990) (quoting Holland Indus. v. Adamar of New Jersey, Inc., 550 F. Supp. 646, 648 (S.D.N.Y. 1982)) (modifications omitted).

## B.    Standing

As in every case, this Court must  "satisfy itself that the case comports with the 'irreducible constitutional minimum' of Article III standing." Hedges v. Obama, 724 F.3d 170, 204 (2d Cir. 2013). Here, Plaintiffs Horvath and Galvin testify that they own rifles, pistols, and large-capacity magazines that the SAFE Act regulates. They further testify that, but for the Act, they would acquire weapons and ammunition-feeding devices that the Act renders illegal. As such, these plaintiffs clearly "face a credible threat of prosecution and should not be required to await and undergo a criminal prosecution as the sole means of seeking relief." See Holder v. Humanitarian Law Project, 561 U.S. 1, 130 S. Ct. 2705, 2717, 177 L. Ed. 2d 355 (2010). They have thus established Article III standing for the

10

purposes of their Second Amendment and vagueness claims. See id.; see also Ezell v. City of Chicago, 651 F.3d 684, 695 (7th Cir. 2011) (plaintiffs had standing to bring challenge under Second Amendment because "the very existence of a statute implies a threat to prosecute, so pre-enforcement challenges are proper"). Further, because at least one plaintiff has standing, "jurisdiction is secure and [this Court] can adjudicate the case whether the additional plaintiff[s] ha[ve] standing or not." Kachalsky v. Cnty. of Westchester, 701 F.3d 81, 84 n. 2 (2d Cir. 2012).

## C.    The Second Amendment & Heller

Plaintiffs contend that New York's restrictions on assault weapons and large-capacity magazines violate the Second Amendment.

That Amendment, adopted in 1791 as part of the Bill of Rights, provides that "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."

Before 2008, most courts to address the scope and import of the Second Amendment relied heavily on United States v. Miller, one of the few Supreme Court decisions to have expressly addressed the Amendment. 307 U.S. 174, 179, 59 S. Ct. 816, 83 L. Ed. 1206 (1939). Those courts concluded that the Second Amendment confers no individual right to firearm ownership, but extends only to use or possession of a firearm that has "some reasonable relationship to the preservation or efficiency of a well regulated militia." See id.; see also, e.g., United States v. Haney, 264 F.3d 1161, 1164–66 (10th Cir. 2001) ("We hold that a federal criminal gun-control law does not violate the Second Amendment unless it impairs the state's ability to maintain a well-regulated militia"); Gillespie v. Indianapolis, 185 F.3d 693, 710–11 (7th Cir. 1999); Stevens v. United States,

11

440 F.2d 144, 149 (6th Cir. 1971) ("There can be no serious claim to any express constitutional right of an individual to possess a firearm"); Burton v. Sills, 53 N.J. 86, 100, 248 A.2d 521 (1968) ("[Regulation . . . which does not impair the maintenance of the State's active, organized militia is not at all in violation of [] the terms or purposes of the [S]econd [A]mendment."). But see United States v. Emerson, 270 F.3d 203 (5th Cir. 2001) (rejecting both the "collective rights" model and the proposition that Miller mandates such an approach). In other words, the Second Amendment was read by an overwhelming majority of courts to offer no protection for the right of individuals to possess and use guns for private and civilian purposes.

But in 2008 that rationale was deemed flawed in the seminal Supreme Court case, District of Columbia v. Heller, where the Court addressed a District of Columbia law that essentially prohibited the possession of handguns. 554 U.S. 570, 128 S. Ct. 2783, 171 L. Ed. 2d 637 (2008).[7] In Heller, the first Supreme Court case since Miller to expressly address the Second Amendment, the Court noted that "[t]he Second Amendment is naturally divided into two parts: its prefatory clause and its operative clause." Id. at 577. It held that the prefatory clause of the Amendment — that which reads, "a well regulated militia, being necessary to the security of a free State" — "announces the purpose for which the right was codified" but does not restrict the right to own guns to the circumstances of militia service. Id. at 599. The Supreme Court explained that the Second Amendment codified a pre-existing *"individual* right to keep and bear arms." Id. at 592, 622 (emphasis added).

_____

[7]Indeed, the District Court for the District of Columbia, which first adjudicated the challenge to the D.C. law, dismissed the case because it found that the Second Amendment conferred no individual right to bear arms. See Parker v. District of Columbia., 311 F. Supp. 2d 103, 109 (D.D.C. 2004).

The Court did not, however, find that the prefatory clause was meaningless or decoupled from the operative clause of the provision. Indeed, "[l]ogic demands that there be a link between the stated purpose and the command." Id. at 577. Rather, the Heller Court found that because "the conception of the militia at the time of the Second Amendment's ratification was the body of all citizens . . . who would bring the sorts of lawful weapons that they possessed at home to militia duty," the prefatory clause informs and limits the right to those weapons in "common use at the time" — those weapons, that is, that a typical citizen would own and bring with him when called to service. The Court further found that this notion must be adapted and updated to include "all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." Id. at 582. And it went on to stress that the core component of the Amendment secures an individual right to own weapons for self defense, most notably in the home. Id. at 592–95.

The salient question for the Heller Court, then, was not what weapons were in common use during the revolutionary period, but what weapons are in common use today. Weapons that meet that test — that are "in common use at the time" — are protected, at least to some degree, by the Second Amendment. But other weapons, "not typically possessed by law-abiding citizens for lawful purposes" like self-defense, are not. Id. at 625.[8]

---

[8]Although the Bill of Rights, including the Second Amendment, originally applied only to the federal government, see Barron ex rel. Tiernan v. Mayor of Baltimore, 7 Pet. 243, 8 L. Ed. 672 (1833), most protections set out in the Bill of Rights have subsequently been held to apply to the States through the Fourteenth Amendment, which, among other things, prohibits States from depriving "any person of life, liberty, or property, without due process of law." The Second Amendment is no exception. The Heller Court did not address this question because the law at issue there applied in the District of Columbia. But two years after Heller, the Supreme Court affirmatively held that the right of an individual to "keep and bear arms," protected by the Second Amendment from infringement by the federal government, is

In Heller, the Court concluded that "the American people have considered the handgun to be the quintessential self-defense weapon" and that "handguns are the most popular weapon chosen by Americans for self-defense in the home." Id. at 629, 630. Therefore, the majority had no trouble finding that the District of Columbia's "complete prohibition of their use is invalid." Id. at 629.

The Supreme Court decided Heller in 2008. As many courts and commentators have noted, in many ways Heller raised more questions than it answered. See United States v. Masciandaro, 638 F.3d 458, 475 (4th Cir. 2011) (Wilkinson, J.) (ground opened by Heller is a "vast 'terra incognita'").  Indeed, the Heller Court candidly remarked that the decision was never meant "to clarify the entire field" of Second Amendment jurisprudence. Heller, 554 U.S. at 635.

 Among the questions left open by Heller is the standard courts should apply when evaluating the constitutionality of gun restrictions. Some restrictions are surely valid: the Court emphasized that, "[l]ike most rights, the right secured by the Second Amendment is not unlimited." Id. at 626. It even explicitly identified some "presumptively lawful regulatory measures" that were meant to be illustrative, "not exhaustive":

> [N]othing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.

Id. at 626–27 & n. 26.

But what other regulations, restrictions, and prohibitions are constitutionally sound?

---

incorporated by the Fourteenth Amendment and "is fully applicable to the States." McDonald v. City of Chicago, Ill., 130 S. Ct. 3020, 3026, 177 L. Ed. 2d 894 (2010).

And under what framework, or level of scrutiny, must they be analyzed?  <u>Heller</u> did not answer these questions. "Under any of the standards of scrutiny that we have applied to enumerated constitutional rights," wrote Justice Scalia for the majority, "this law would fail constitutional muster." <u>Id.</u> at 628–29. That task was left, for now, to the lower courts.

Since <u>Heller</u> was decided, the Second Circuit has had occasion to consider and interpret that decision. Although none of the cases addresses restrictions like those in the SAFE Act, they remain instructive in determining the appropriate standard of review.

**D.  Standard of Review**

First, some background. Throughout its jurisprudence, the Supreme Court has developed varying levels of scrutiny, which, depending on the circumstances, apply to statutes that affect constitutional rights. <u>See</u> <u>United States v. Carolene Prods. Co.</u>, 304 U.S. 144, 152 n. 4, 58 S. Ct. 778,  82 L. Ed. 1234 (1938) (introducing the levels-of-judicial-scrutiny concept). Some laws are subject to the most deferential standard: rational-basis review. <u>See</u> <u>Armour v. City of Indianapolis, Ind.</u>, 132 S. Ct. 2073, 2079, 182 L. Ed. 2d 998 (2012) (applying this standard for a classification that did not implicate a fundamental right, and concerned a local, economic, and commercial subject matter). Others, like content-neutral restrictions on speech, are subject to intermediate scrutiny. <u>Turner Broad. Sys., Inc. v. FCC</u>, 520 U.S. 180, 189, 117 S. Ct. 1174, 137 L. Ed. 2d 369 (1997) (requirement that cable television systems dedicate some of their channels to local broadcast television stations analyzed under intermediate scrutiny). And others still, like race-based classifications, are reviewed under the most rigorous standard: strict scrutiny. <u>See</u> <u>Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1</u>, 551 U.S. 701, 720, 127 S. Ct. 2738, 2751, 168 L. Ed. 2d 508 (2007) (school district relied on race to determine what public

schools children attended).[9]

In two recent decisions, United States v. Decastro and Kachalsky v. County of Westchester, the Second Circuit shed considerable light on the standard applicable to gun restrictions under the Second Amendment.  682 F.3d 160, 166 (2d Cir. 2012); 701 F.3d 81, 90 (2d Cir. 2012).

In Decastro, the court addressed the constitutionality of 18 U.S.C. § 922, which prohibits anyone other than a licensed importer, manufacturer, dealer or collector from transporting into his state of residence a firearm obtained outside that state. Analogizing the right to bear arms to other rights embodied in the Constitution, including the right to marry, the right to vote, and the right to free speech, the court held:

> [W]e do not read [Heller] to mandate that any marginal, incremental or even appreciable restraint on the right to keep and bear arms be subject to heightened scrutiny. Rather, heightened scrutiny is triggered only by those restrictions that (like the complete prohibition on handguns struck down in Heller) operate as a substantial burden on the ability of law-abiding citizens to possess and use a firearm for self-defense (or for other lawful purposes).

Decastro, 682 F.3d at 166 (parentheses in original).

Thus, in this Circuit, some form of heightened scrutiny (that is, intermediate or strict, or, possibly, something in between) is reserved for those "regulations that burden the Second Amendment right substantially." Id.  The Decastro court was clear that "[r]eserving heightened scrutiny for regulations that burden the Second Amendment right substantially is not inconsistent with the classification of that right as fundamental to our scheme of

---

[9]For a full explanation of each level of scrutiny, as least as they apply in the equal-protection context, see United States v. Windsor, 133 S. Ct. 2675, 2717, 186 L. Ed. 2d 808 (2013). Though it should also be noted that "the label 'intermediate scrutiny' carries different connotations depending on the area of law in which it is used." Ernst J. v. Stone, 452 F.3d 186, 200 n. 10 (2d Cir. 2006).

ordered liberty." Id. at 167. This approach accords with other circuits' reasoning in the wake of Heller. See Heller v. District of Columbia., 670 F.3d 1244, 1262 (D.C. Cir. 2011) ("Heller II")[10]; Ezell, 651 F.3d at 702; United States v. Marzzarella, 614 F.3d 85, 89 (3d Cir. 2010).

In Ezell, for example, the court found parallels to First Amendment jurisprudence, noting that "some categories of speech are unprotected as a matter of history and legal tradition. So too with the Second Amendment." 651 F.3d at 702. Thus, according to both the Ezell and Decastro courts, just as some forms of speech — obscenity, defamation, fraud — are outside the reach of the First Amendment, some forms of gun restrictions are outside the reach of the Second. Applying this standard, the Decastro court found that the prohibition on importing out-of-state firearms was among those restrictions that did not implicate the Second Amendment

The Second Circuit built on this foundation in Kachalsky, where it faced the following issue: "Does New York's handgun licensing scheme violate the Second Amendment by requiring an applicant to demonstrate 'proper cause' to obtain a license to carry a concealed handgun in public?" Kachalsky, 701 F.3d at 83. Drawing from its earlier ruling in Decastro, the court found that New York's licensing scheme — unlike the challenged law in Decastro — did impose a substantial burden on the plaintiffs' Second Amendment rights. It held, "New York's proper cause requirement places substantial limits on the ability of

---

[10]Some clarification of Heller II is warranted. After the Supreme Court ruled that the District of Columbia's ban on handguns was unconstitutional, the District adopted the Firearms Registration Amendment Act of 2008, D.C. Law 17–372, which required the registration of all firearms, and prohibited both the possession of "assault weapons" and magazines with a capacity of more than 10 rounds of ammunition. Joined by several other plaintiffs, Anthony Dick Heller, the same plaintiff from the earlier litigation, brought suit challenging the new law. Thus, this second round of litigation concerning D.C.'s firearm laws will be referred to in this Decision and Order as "Heller II."

law-abiding citizens to possess firearms for self-defense in public." Id. at 93.

The court's next holding is critical in determining the correct standard of review here. It found that the proper sequence of analysis required it to review the law under the familiar three-tiered scrutiny system. Specifically, it held:

> Although we have no occasion to decide what level of scrutiny should apply to laws that burden the "core" Second Amendment protection identified in Heller, we believe that applying less than strict scrutiny when the regulation does not burden the "core" protection of self-defense in the home makes eminent sense in this context and is in line with the approach taken by our sister circuits.

Id.

The court concluded that "because our tradition so clearly indicates a substantial role for state regulation of the carrying of firearms in public," and because the restriction did not burden a "core" right, intermediate scrutiny was appropriate. Id. at 96. The licensing requirement, which was substantially related to the achievement of an important governmental interest, survived under that standard.

Extrapolating from these holdings, this Court finds that it must engage in a three-part inquiry. First, it must determine whether any of the regulated weapons or magazines are commonly used for lawful purposes. If any are, it must next determine if any of the challenged provisions of the SAFE Act substantially burden a Second Amendment right. Finally, if any do, it must then decide what level of scrutiny to apply.

Contrary to the urging of some *amici*, the Second Circuit has eschewed any test under the so-called "history-and-tradition" model. Espoused most prominently by Judge Kavanaugh in dissent in Heller II, this model would test the constitutionality of certain gun laws by asking whether they were "rooted in history and tradition." 670 F.3d at 1284; see

<u>also</u> Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self–Defense: An Analytical Framework and a Research Agenda*, 56 UCLA L. Rev. 1443, 1463 (2009). But the Second Circuit categorically "disagree[s]" with this approach, stating unequivocally:

> <u>Heller</u> stands for the rather unremarkable proposition that where a state regulation is entirely inconsistent with the protections afforded by an enumerated right — as understood through that right's text, history, and tradition — it is an exercise in futility to apply means-end scrutiny. Moreover, the conclusion that the law would be unconstitutional "[u]nder any of the standards of scrutiny" applicable to other rights implies, if anything, that one of the conventional levels of scrutiny would be applicable to regulations alleged to infringe Second Amendment rights.

<u>Kachalsky</u>, 701 F.3d at 89 n. 9.

Accordingly, this Court will analyze the law under the rubric set forth in <u>Heller</u>, and as further developed by the Second Circuit.

### 1.      Common Use & Substantial Burden

Under <u>Heller</u>, the Second Amendment does not apply to weapons that are not "in common use at the time." Thus, inherent in the substantial-burden analysis is the question whether the SAFE Act affects weapons in common use.

Much of Plaintiffs' briefs are dedicated to the topic of the popularity and lawfulness of the firearms that New York defines as assault weapons. Both sides attempt to point to empirical evidence that suggests the weapons are — or are not — in common use for lawful purposes. And, in turn, much of that evidence deals with the archetypal AR-15.

This weapon, first manufactured by ArmaLite (thus, "AR"), then sold to and popularized under Colt, is representative of the type of weapon the SAFE Act seeks to regulate. Though the mark "AR-15" is Colt's, many manufacturers make a similar firearm.

Generally, it is a semiautomatic rifle that has a detachable magazine, has a grip protruding roughly four inches below the action of the rifle, and is easily accessorized and adapted.[11] (See Overstreet Decl., ¶¶ 3–5; Docket No. 23-2); (National Shooting Sports Foundation survey, at 7, attached as Ex. B; Docket No. 23–3,4,5) (84% of owners of AR-15 type rifles have at least once accessory on their rifle).

It is also popular. According to Plaintiffs, since 1986 (when record-keeping began) "at least 3.97 million AR-15 type rifles have been manufactured in the United States for the commercial market." (Overstreet Decl., ¶ 5.) In 2011, AR-15s accounted for 7% of all firearms sold. (Id., ¶ 8.) Plaintiffs also assert that the AR-15 rifles are regularly used for self defense, hunting, and sporting competitions.

As the  Heller II court found, "in 2007 this one popular model accounted for 5.5 percent of all firearms, and 14.4 percent of all rifles, produced in the U.S. for the domestic market." 670 F.3d at 1261.  Although the Heller II court could not determine if this  type of weapon is used for lawful purposes, it "th[ought] it clear enough in the record that semi-automatic rifles . . . are indeed in 'common use.'" Id.

Defendants paint a different picture, contending that assault weapons "are a tiny percentage of the firearms available." (Def.'s Br., at 29; Docket No. 77.) According to the testimony of Professor Laurence Tribe before the United States Senate in February of 2013, Americans own roughly 310 million firearms and roughly 7 million assault weapons. (Tribe Testimony, at 24, attached as Ex. 28; Docket No. 78-3.) Using these rough numbers, assault weapons account for only about 2% of the guns owned in this country.

---

[11]An action is the mechanism on a firearm that loads, fires, and ejects a cartridge. Varieties include the lever action, pump action, bolt action, and semi-automatic.

But these statistics leave many questions unanswered. The Brady Center for the Prevention of Gun Violence, as *amicus curiae*, points out that the Heller Court did not specify what "time" it meant when it held that protected weapons are those that are "in common use at the time." There is no dispute that there has been a surge in the popularity of this type of firearm in the last decade. (Brady Center Br., at 8; Docket No. 121.[12])  The Brady Center argues that it is anomalous that a weapon could be unprotected under the Second Amendment one moment, then, subject only to the whims of the public, garner protection in the next moment. (Id., at 9.) It contends that this Court must look to a "historically representative period of time" and that there is no evidence that the weapons regulated by the SAFE Act were in common use for such a period. (Id.)

Regardless, ownership statistics alone are not enough. The firearm must also be possessed for lawful purposes, like self-defense. Heller, 554 U.S. at 625 ("Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes."). On this point, too, the parties are deeply divided. And, as the Heller II court noted, reliable empirical evidence on this point is elusive. 670 F.3d at 1261 ("[W]e cannot be certain whether these weapons are commonly used or are useful specifically for self-defense or hunting and therefore whether the prohibitions . . . meaningfully affect the right to keep and bear arms."). Although Defendants argue that the regulated weapons are not suitable for self-defense due to, among other things, their excessive firepower, there can be little dispute that tens of thousands of Americans own these guns and use them exclusively for lawful purposes such as hunting, target shooting,

---

[12]This brief was filed jointly by the Brady Center, The Police Foundation, and the Major Cities Chiefs Association.

and even self-defense. See Christopher S. Koper *et al.*, U. Penn. Jerry Lee Ctr. of Criminology, *An Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets and Gun Violence, 1994–2003* at 1 (2004) (around 1990, "there were an estimated 1 million privately owned [assault weapons] in the U.S."); see also Heller II, 670 F.3d at 1287–88 (Kavanagh J., dissenting) (A "brief perusal of the website of a popular American gun seller" underscores that "[s]emi-automatic rifles are commonly used for self-defense in the home, hunting, target shooting, and competitions"); (King Aff. ¶¶ 16–18; Docket No. 116.)

Despite the inherent ambiguities in making such a determination, for purposes of this Decision, this Court will assume that the weapons at issue are commonly used for lawful purposes. Further, because the SAFE Act renders acquisition of these weapons illegal under most circumstances, this Court finds that the restrictions at issue more than "minimally affect" Plaintiffs' ability to acquire and use the firearms, and they therefore impose a substantial burden on Plaintiffs' Second Amendment rights.

Large-capacity magazines are also popular, and Defendants concede they are in common use nationally. See Heller II, 670 F.3d at 331 ("There may well be some capacity above which magazines are not in common use but, if so, the record is devoid of evidence as to what that capacity is; in any event, that capacity surely is not ten."); Koper, *supra*, at 10 (as of 1994, roughly 20% of civilian owned handguns were equipped with large-capacity magazines); (Defs.' Br., at 36; Docket No. 77). Indeed, the "standard magazine" for an AR-15 holds 20 or 30 rounds. (Overstreet Decl., ¶ 4.) Given their popularity in the assumably law-abiding public, this Court is willing to proceed under the premise that these magazines are commonly owned for lawful purposes.

22

Further, this Court finds that a restraint on the amount of ammunition a citizen is permitted to load into his or her weapon — whether 10 rounds or seven — is also more than a "marginal, incremental or even appreciable restraint" on the right to keep and bear arms. See Kachalsky, 701 F.3d at 93 (New York's proper cause requirement for a concealed carry permit places a substantial burden on the Second Amendment right); see also Koper, *supra*, at 1 (A [large capacity-magazine] is arguably the most functionally important feature of most [assault weapons], many of which have magazines holding 30 or more rounds). Certainly, if the firearm itself implicates the Second Amendment, so too must the right to load that weapon with ammunition. Round restrictions, whether seven or 10, are therefore deserving of constitutional scrutiny. Thus, under Second Circuit precedent, this Court must next ask under what standard the restraints ought to be judged.

##### 2.     Intermediate Scrutiny

In Kachalsky, the Second Circuit applied intermediate scrutiny to restrictions on the possession of a gun outside the home, but noted that it did not have occasion to consider what standard would apply to restrictions inside the home, where "Second Amendment guarantees are at their zenith." 701 F.3d at 89. Although the SAFE Act unquestionably affects Plaintiffs' ownership rights in their home, for three reasons, this Court finds that intermediate scrutiny remains the appropriate standard under which to evaluate the law.

First, although addressing varied and divergent laws, courts throughout the country have nearly universally applied some form of intermediate scrutiny in the Second Amendment context. See, e.g., id.; Marzzarella, 614 F.3d at 96; United States v. Skoien, 614 F.3d 638, 641-42 (7th Cir. 2010); United States v. Walker, 709 F. Supp. 2d 460 (E.D. Va. 2010); see also United States v. Lahey, No. 10-CR-765 KMK, 2013 WL 4792852, at

*15 (S.D.N.Y. Aug. 8, 2013) ("The emerging consensus appears to be that intermediate scrutiny is generally the appropriate level of scrutiny for laws which substantially burden Second Amendment rights.").

Second, application of strict scrutiny would appear to be inconsistent with the Supreme Court's holdings in Heller and McDonald, where the Court recognized several "presumptively lawful regulatory measures." Heller, 554 U.S. at 626–27; McDonald, 130 S. Ct. at 3047 ("Incorporation does not imperil every law regulating firearms."). These types of restrictions are presumably justified because of the unique ability of firearms to upset and disrupt public order. The four dissenting justices in Heller point out that "the majority implicitly, and appropriately, rejects [a] suggestion [that strict scrutiny should apply] by broadly approving a set of laws — prohibitions on concealed weapons, forfeiture by criminals of the Second Amendment right, prohibitions on firearms in certain locales, and governmental regulation of commercial firearm sales — whose constitutionality under a strict scrutiny standard would be far from clear." Heller, 554 U.S. at 688 (Breyer, J.). The Western District of Pennsylvania later reiterated this sentiment, writing that "the Court's willingness to presume the validity of several types of gun regulations is arguably inconsistent with the adoption of a strict scrutiny standard of review." United States v. Marzzarella, 595 F. Supp. 2d 596, 604 (W.D. Pa. 2009). The district court in Heller II similarly noted that "a strict scrutiny standard of review would not square with" the majority's holding in Heller. Heller v. District of Columbia., 698 F. Supp. 2d 179, 187 (D.D.C. 2010). Accordingly, not only does this level of scrutiny lack precedent, but the Supreme Court's own holdings suggest that it is incongruous with extant, presumptively valid restrictions.

24

Last, this Court finds that First Amendment jurisprudence provides a useful guidepost in this arena.[13] As the Third Circuit has held, "[T]he right to free speech, an undeniably enumerated fundamental right, is susceptible to several standards of scrutiny, depending upon the type of law challenged and the type of speech at issue. . . . We see no reason why the Second Amendment would be any different." Marzzarella, 614 F.3d at 96 (internal citations omitted).

When considering restrictions that implicate the First Amendment, strict scrutiny is triggered only by content-based restrictions on speech in a public forum.  By contrast, content-neutral restrictions that affect only the time, place, and manner of speech trigger a form of intermediate scrutiny. See Hobbs v. Cnty. of Westchester, 397 F.3d 133, 149 (2d Cir. 2005); see also Madsen v. Women's Health Ctr., Inc., 512 U.S. 753, 791, 114 S. Ct. 2516, 2537, 129 L. Ed. 2d 593 (1994) (Scalia, J.) (concurring in part and dissenting in part) (intermediate scrutiny "applicable to so-called 'time, place, and manner regulations' of speech").

Like the Heller II court, which applied intermediate scrutiny to firearm restrictions similar to those at issue here, this Court finds that the burden here is akin to a time, place, and manner restriction. As described by the Heller II court, "[R]estrictions that impose severe burdens (because they don't leave open ample alternative channels) must be judged under strict scrutiny, but restrictions that impose only modest burdens (because

---

[13]The Second Circuit has expressed reservations about "import[ing] *substantive* First Amendment principles wholesale into Second Amendment jurisprudence." Kachalsky, 701 F.3d at 92 (emphasis in original). But that admonishment is not applicable here. This Court is not applying "substantive principles"; rather, as the Second Circuit has explicitly held, when deciding whether a law substantially burdens a Second Amendment right, or, in deciding what level of scrutiny to apply, "it is [] appropriate to consult principles from other areas of constitutional law, including the First Amendment." Decastro, 682 F.3d at 167–68 (citing Marzzarella, 614 F.3d at 89 & n.4).

they do leave open ample alternative channels) are judged under a mild form of intermediate scrutiny." 670 F.3d at 1262 (quoting Volokh, *supra*, at 1471) (parentheses in original). The court concluded that because "the prohibition of semiautomatic rifles and large-capacity magazines does not effectively disarm individuals or substantially affect their ability to defend themselves" — because, in other words, alternative channels for the possession of substitute firearms exist — the restrictions should be judged under intermediate scrutiny. Id.

Calling the SAFE Act's restrictions "a ban on an entire class of firearms," Plaintiffs liken the SAFE Act to the ban struck down by the Supreme Court in Heller. But unlike the handgun ban, the SAFE Act applies only to a subset of firearms with characteristics New York State has determined to be particularly dangerous and unnecessary for self-defense; it does not totally disarm New York's citizens; and it does not meaningfully jeopardize their right to self-defense.  Current owners of the now-regulated weapons may lawfully possess them so long as they register the weapons with the State. They may also possess 10-round magazines, and, most places, they may load those magazines with up to seven rounds of ammunition. And, at certain designated areas, they may load the weapon with 10 rounds. Although the Act does make unlawful future purchases or sales of assault weapons, New Yorkers can still purchase, own, and sell all manner of semiautomatic weapons that lack the features outlawed by the SAFE Act. Indeed, Plaintiffs themselves concede that attributes of the banned weapons are "present in easily-substituted unbanned, counterpart firearms." (Pls.' Br. at 22; Docket No. 23-1.)

Accordingly, this Court finds that intermediate scrutiny is the most suitable standard under which to evaluate each challenged aspect of the law.

**E.      Application of Intermediate Scrutiny to the SAFE Act**

Under intermediate scrutiny, this Court must ask whether the challenged restrictions are "substantially related to the achievement of an important governmental interest." Kachalsky, 701 F.3d at 96. The Second Circuit recently observed and reaffirmed that "New York has substantial, indeed compelling, governmental interests in public safety and crime prevention." Id. at 97. There is no dispute that the SAFE Act is clearly intended to further this goal. (See Senate, Assembly, and Gov. Memos in Supp., *supra*.) Thus, the only remaining question is whether the challenged provisions are substantially related to the governmental interest in public safety and crime prevention. Starting with New York's definition of assault weapons, moving to the ban on large-capacity magazines, and concluding with the seven-round limit, this Court next undertakes that analysis.

**1.      Assault Weapons**

There is much debate, both in the community at large and in this litigation, whether the banned "military-style features" of semiautomatic weapons will be effective in reducing crime and violence.

Plaintiffs contend that many of the outlawed features do not make firearms more lethal; instead, according to Plaintiffs, several of the outlawed features simply make the firearm easier to use. For instance, they argue that a  telescoping stock, which allows the user to adjust the length of the stock, does not make a weapon more dangerous, but instead, like finding the right size shoe, simply allows the shooter to rest the weapon on his or her shoulder properly and comfortably. Another outlawed feature, the pistol grip, also increases comfort and stability. The same goes for the "thumbhole stock," which, as the name suggests, is a hole in the stock of the rifle for the user's thumb. It too increases

27

comfort, stability, and accuracy according to Plaintiffs.

But Plaintiffs later argue that the banned features increase the utility for self-defense — which is just another way of saying that the features increase their lethality. Plaintiffs make this explicit: "Where it is necessary for a crime victim to shoot the aggressor, and lethal or incapacitating injury will stop him, the lethality of the defender's firearm is a precondition to her ability end the criminal attack." (Pls.' Br. at 22; Docket No. 23-1.) The National Rifle Association of America, as *amicus curiae,* make a similar argument, describing how the banned features improve a firearm's usability.  (NRA Br. at 10; Docket No. 46.)

There thus can be no serious dispute that the very features that increase a weapon's utility for self-defense also increase its dangerousness to the public at large. See, e.g., McDonald, 130 S. Ct. at 3107 (Stevens, J., dissenting) ("Just as [firearms] can help homeowners defend their families and property from intruders, they can help thugs and insurrectionists murder innocent victims."). Pointing to the benefits of these features to those who might use them defensively, Plaintiffs argue that the SAFE Act ought to be struck down. But under intermediate scrutiny, this Court must give "substantial deference to the predictive judgments of the legislature." Kachalsky, 701 F.3d at 97. And "[i]n the context of firearm regulation, the legislature is 'far better equipped than the judiciary' to make sensitive policy judgments (within constitutional limits) concerning the dangers in carrying firearms and the manner to combat those risks." Id. (quoting Turner Broad., 512 U.S. at  665).

To be sure, this Court's deference is not without bounds. New York must rely on evidence that "fairly support[s]" its rationale in passing the law. City of Los Angeles v.

Alameda Books, Inc., 535 U.S. 425, 438, 122 S. Ct. 1728, 1736, 152 L. Ed. 2d 670 (2002). Here, New York has met that burden; substantial evidence supports its judgment that the banned features are unusually dangerous, commonly associated with military combat situations, and are commonly found on weapons used in mass shootings.

The recent mass shooting in Newtown, CT, which prompted the quick passage of this law, was no exception. The shooter armed himself with a .223-caliber Bushmaster Model XM15 rifle and a 30-round magazine. See Connecticut State Police Press Release, Jan. 18, 2013, available at   http://www.ct.gov/despp/cwp/view.asp?Q=517284 ("The shooter used the Bushmaster .223 to murder 20 children and six adults inside the school; he used a handgun to take his own life inside the school. No other weapons were used in this crime.").

Of course, this is only one incident. But it is nonetheless illustrative. Studies and data support New York's view that assault weapons are often used to devastating effect in mass shootings. (See Koper Decl., ¶¶ 11–14; Zimring Decl. ¶¶ 15–22; Docket Nos. 67, 68). For example, an exhaustive study of mass shootings in America, defined as the murder of four or more people in a single incident, found that there have been at least  62 mass shootings across the country since 1982.[14] Mark Follman, et al., A Guide to Mass Shootings  in  America, Mother  Jones,  updated  Feb.  27,  2013, http://www.motherjones.com/politics/2012/07/mass-shootings-map.   Frighteningly, "twenty-five of these mass shootings have occurred since 2006, and seven of them took place in 2012." Id. In the mass shooting with the most victims, at an Aurora, Colorado

---

[14]The study excluded crimes involving armed robbery or gang violence.

movie theater, police say the shooter used an AR-15 type weapon until its 100-round barrel magazine jammed. In all, the study found that assault weapons, high-capacity magazines, or both were used in over half of all mass shootings. Id.

The State points to other evidence as well. It suggests that it should come as no surprise that assault weapons produced carnage in Aurora and Newtown, as The Bureau of Alcohol Tobacco and Firearms found that these weapons "were designed for rapid fire, close quarter shooting at human beings" — or, as the report called it, "mass produced mayhem." (ATF, *Assault Weapons Profile,* at 19 (1994), attached as Ex. 40.) The Supreme Court has previously described the AR–15 as "the civilian version of the military's M–16 rifle." Staples v. United States, 511 U.S. 600, 603, 114 S. Ct. 1793, 128 L. Ed. 2d 608 (1994). Indeed, there is no dispute that the AR-15 type rifle derives from a weapon designed for fully-automatic military use on the battlefield. As Brain Siebel testified, the military features of semiautomatic assault weapons "serve specific, combat-functional ends" and are "designed to enhance the capacity to shoot multiple human targets rapidly." (Testimony of Brian J. Siebel, Brady Center to Prevent Gun Violence, at 1 (Oct. 1, 2008), attached as Ex. 29.) "The net effect of these military combat features is a capability for lethality — more wounds, more serious, in more victims — far beyond that of firearms in general, including other semiautomatic guns." H.R. Rep. 103-489, at 19-20 (1994) (chronicling five years of congressional hearings on semiautomatic assault weapons); (see Bruen Decl. ¶¶ 13-26; Docket No. 66.) The Chief of Police for the Rochester Police Department expresses similar sentiments, stating that assault weapons "are designed for one purpose — to efficiently kill numerous people." (Shepard Decl., ¶ 14; Docket No. 72.) In other words, evidence suggests that the banned features make a deadly weapon

30

deadlier.

And while there is not (and cannot be) a dispute that the outlawed features make semiautomatic weapons easier to use, New York identifies purposes of these features that are particularly unnecessary for lawful use. Of course, several of the banned features, like a grenade launcher, bayonet mount, or a silencer, require no explanation. Indeed, Plaintiffs do not explicitly argue that the Act's regulation of firearms with these features violates the Second Amendment. But for the contested features, like a pistol grip and thumbhole stock, New York points to evidence that these features aid shooters when "spray firing" from the hip. (Bruen Decl., ¶ 19); see Heller II, 670 F.3d at 1262–63 (quoting Siebel Testimony, *supra*). As the Second Circuit has held, "This factor aims to identify those rifles whose pistol grips are designed to make such spray firing from the hip particularly easy." Richmond Boro Gun Club, Inc. v. City of New York, 97 F.3d 681, 685 (2d Cir. 1996). Folding and  telescoping stocks aid concealability and portability. (See Bruen Decl., ¶ 18; 2011 ATF Study at 9, attached as Ex. 10); see also Richmond Boro, 97 F.3d at 684–85. A muzzle compensator reduces recoil and muzzle movement caused by rapid fire. (Bruen Decl., ¶ 20.)

And New York further points to evidence that AR-15 type rifles are "not generally recognized as particularly suitable for or readily adaptable to sporting purposes," nor used frequently for self-defense. See Dep't of Treasury*, Study on the Sporting Suitability of Modified Semi-automatic Assault Rifles*, 38 (1998); Gary Kleck & Marc Gertz, *Armed Resistance to Crime: The Prevalence and Nature of Self–Defense with a Gun*, 86 J. Crim. L. & Criminology 150, 185 (1995) (revolvers and semi-automatic pistols are together used almost 80% of the time in incidents of self-defense with a gun).

What's more, New York presents evidence that its regulations will be effective. Drawing from his comprehensive study of the 1994 federal ban (*supra*, at 21), Christopher Koper avows that the regulations will reduce the stock of "dangerous weaponry" in New York and are thus "likely to advance New York's interests in protecting its populace from the dangers of [] shootings." (Koper Decl., ¶ 65.) His analysis of the data "indicates that the criminal use of assault weapons declined after the federal assault weapons ban was enacted in 1994, independently of trends in gun crime." (Id.) Because New York's regulations are tighter than those in the federal ban, he believes, quite reasonably, that the affect will be greater. (Id., ¶ 60.)

For their part, Plaintiffs point to conflicting opinions and argue that criminals will retain their assault weapons while law-abiding citizens will be unable to acquire them. They also argue that the ban is irrational because there are numerous legal substitutes offering the same firepower. Further, there is no dispute that semiautomatic handguns are also often used in mass shootings. In fact, according to the Follman study, handguns were used in greater numbers than assault rifles.

But to survive intermediate scrutiny, the fit between the governmental objective and the challenged regulation need only be substantial, not perfect. And while these are legitimate considerations, "it is the legislature's job, not [this Court's], to weigh conflicting evidence and make policy judgments." Kachalsky, 701 F.3d at 99. New York, citing the undisputed potential for mass casualty that assault weapons present, is empowered to take action to reduce the quantity of such weapons in its state. See Nat'l Rifle Ass'n, 700 F.3d at 211 (quoting Buckley v. Valeo, 424 U.S. 1, 105, 96 S. Ct. 612, 46 L. Ed. 2d 659 (1976)) ("It is well-settled that 'a statute is not invalid under the Constitution because it

might have gone farther than it did, that a legislature need not strike at all evils at the same time, and that reform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind.'"). The ultimate merits of this judgment remain to be seen, but, considering especially that Plaintiffs themselves concede that the banned features increase the lethality of firearms — or as Brain Siebel has testified, that the military features of semiautomatic assault weapons are "designed to enhance the capacity to shoot multiple human targets rapidly" — this Court finds that New York has satisfied its burden to demonstrate a substantial link, based on reasonably relevant evidence, between the SAFE Act's regulation of assault weapons and the compelling interest of public safety that it seeks to advance.

### 2.    Large-capacity Magazines

The same finding is true for the ban on large-capacity magazines. Indeed, the link between the SAFE Act's restrictions on large-capacity magazines and the state's interest in public safety is arguably even stronger here.

Koper testifies that it is "particularly" the large-capacity magazine ban that will prevent shootings and save lives. (Koper Decl., ¶ 65.) Indeed, large-capacity magazines are used regularly in mass shootings — they were used in more than half of the mass shootings since 1982. And, more troubling, their use is on the rise. In the past year, guns with large-capacity magazines were used in at least five of the six mass shootings. (Allen Decl.¶ 18; Docket No. 69.)

Evidence also suggests that, quite simply, more people die when a shooter has a large-capacity magazine. According to analysis conducted by NERA Economic Consulting, the average number of fatalities or injuries per mass shooting more than doubles when a

shooter uses a large-capacity magazine. (Id., ¶ 20.) Similarly, a 2013 study of mass shootings over the past four years using data collected by the FBI found that shooters who used assault weapons, high-capacity magazines, or both shot over twice as many people and killed 57% more people than shooters who did not use these weapons. (Mayors Against Illegal Guns, *Analysis of Recent Mass Shootings*, February 22, 2013, attached as Ex. 39.)

Just as with assault weapons, Plaintiffs find policy and judgment flaws in New York's decision to ban large-capacity magazines. Mass shooters, argues Gary Kleck in an affidavit submitted by Plaintiffs, often carry multiple firearms. (Kleck Decl., at 5; Docket No. 23–9.) So, according to Plaintiffs, any large-capacity-magazine ban would be ineffective, or worse, would only affect law-abiding citizens. But New York's evidence — far more comprehensive than Plaintiffs' — runs counter to this presumption, and again, "[i]n the context of firearm regulation, the legislature is 'far better equipped than the judiciary' to make sensitive public policy judgments (within constitutional limits) concerning the dangers in carrying firearms and the manner to combat those risks." Kachalsky, 701 F.3d at 97 (quoting Turner Broad. Sys., 512 U.S. at 665.) This Court's role is "to assure that, in formulating its judgments, New York has drawn reasonable inferences based on substantial evidence." Id. (internal citations omitted). Though by no means a panacea, in passing these provisions New York has made a public policy judgment that draws reasonable inferences from substantial evidence.  It thus survives intermediate scrutiny.

### 3.    Seven-round limit

The same cannot be said, however, about the seven-round limit. The SAFE Act adds New York Penal Law § 265.00(37), which makes it "unlawful for a person to

knowingly possess an ammunition feeding device where such device contains more than seven rounds of ammunition."[15] Unlike the restrictions on assault weapons and large-capacity magazines, the seven-round limit cannot survive intermediate scrutiny.

It stretches the bounds of this Court's deference to the predictive judgments of the legislature to suppose that those intent on doing harm (whom, of course, the Act is aimed to stop) will load their weapon with only the permitted seven rounds. In this sense, the provision is not "substantially related" to the important government interest in public safety and crime prevention.

Indeed, <u>Heller</u> found that the Second Amendment right is at its zenith in the home; in particular, the Court highlighted the right of a citizen to arm him or herself for self-defense. But this provision, much more so than with respect to the other provisions of the law, presents the  possibility of a disturbing perverse effect, pitting the criminal with a fully-loaded magazine against the law-abiding citizen limited to seven rounds.

Although Plaintiffs make this type of argument with respect to all aspects of the SAFE Act, the distinction here is plain. This Court has ruled that New York is entitled to regulate assault weapons and large-capacity magazines under the principal presumption that the law will reduce their prevalence and accessability in New York State, and thus,

---

[15]The seven-round limit does not apply at:

> an indoor or outdoor firing range located in or on premises owned  or occupied by a duly incorporated organization organized for conservation purposes or to foster proficiency in arms; at an indoor or outdoor firing range for the purpose of firing a rifle or shotgun; at a collegiate, olympic or target shooting competition under the auspices of or approved by the national rifle association;  or at an organized match sanctioned by the international handgun metallic silhouette association.

N.Y. Penal Law § 265.20(7-f).

inversely, increase public safety. (See Koper Decl., ¶ 64) (restrictions in Safe Act will "help prevent the spread of particularly dangerous weaponry"). The ban on the number of rounds a gun owner is permitted to load into his 10-round magazine, however, will obviously have no such effect because 10-round magazines remain legal. As described above, the seven -round limit thus carries a much stronger possibility of disproportionately affecting law-abiding citizens.

Defendants contend, pointing to a study conducted by the NRA, that the average citizen using his or her weapon in self-defense expends only two bullets. (Allen Decl.,¶¶ 12–15). Thus, New York argues, citizens do not truly need more than seven rounds, and the restriction minimizes the danger without hampering self-defense capabilities. But as an initial matter, New York fails to explain its decision to set the maximum at seven rounds, which appears to be a largely arbitrary number. And even if a person using a weapon in self-defense needs only a few rounds, and even if that is a rational reason for adopting the law, under intermediate scrutiny there must a "substantial relation" between the means and the end. The State's justification for the law need not be perfect, but it must be "exceedingly persuasive." Windsor v. United States, 699 F.3d 169, 185 (2d Cir. 2012) (quoting United States v. Virginia, 518 U.S. 515, 533, 116 S. Ct. 2264, 135 L .Ed. 2d 735 (1996)); see Lederman v. N.Y. City Dep't of Parks & Recreation, 731 F.3d 199, 202 (2d Cir. 2013). This peripheral rationale, which is possibly meant to protect bystanders when a firearm is being discharged lawfully, or victims of impromptu acts of violence, is largely unsupported by evidence before this Court. It thus fails the more demanding test and must

be stuck down.[16]

## F.    Vagueness

In addition to their Second Amendment arguments, Plaintiffs also contend that various aspects of the SAFE Act, mainly those describing the banned features, are unconstitutionally vague. They contend, in other words, that certain aspects of the law are void for vagueness.

The void-for-vagueness doctrine finds its roots in the Due Process Clause of the United States Constitution, as "[a]mong the most fundamental protections of due process is the principle that no one may be required at peril of life, liberty or property to speculate as to the meaning of statutes." Cunney v. Bd. of Trustees of Vill. of Grand View, N.Y., 660 F.3d 612, 620 (2d Cir. 2011) (internal modifications, quotation marks, and citations omitted). Simply, "[a]ll are entitled to be informed as to what the State commands or forbids." Id.

"As generally stated, the void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." United States v. Rybicki, 354 F.3d 124, 129 (2d Cir. 2003) (quoting Kolender v. Lawson, 461 U.S. 352, 357, 103 S. Ct. 1855, 75 L. Ed. 2d 903 (1983)).

The Supreme Court has cautioned, however, "that this doctrine does not require 'meticulous specificity' from every statute, as language is necessarily marked by a degree

---

[16]In light of this ruling, this Court need not address Plaintiffs' alternative argument that the seven-round limit violates the Equal Protection Clause.

of imprecision." Thibodeau v. Portuondo, 486 F.3d 61, 66 (2d Cir. 2007) (quoting Grayned v. City of Rockford, 408 U.S. 104, 110, 92 S. Ct. 2294, 33 L. Ed. 2d 222 (1972)).

Finally, depending on the type of law and conduct at issue, a statute may be challenged on vagueness grounds either "as applied" or "on its face." "Both types of vagueness challenges require the inquiry described above." Id. at 67 (internal citation omitted). Here, because the challenge is mounted "pre-enforcement," or before Plaintiffs have been charged with any crime under the law, it is correctly categorized as a "facial challenge." See Richmond Boro, 97 F.3d at 686 ("It would be premature to entertain [an as-applied] vagueness challenge . . . until a broader use of the ordinance is actually initiated"); see also Parker v. Levy, 417 U.S. 733, 759, 94 S. Ct. 2547, 41 L. Ed. 2d 439 (1974) ("[A] person to whom a statute may constitutionally be applied will not be heard to challenge that statute on the ground that it may conceivably be applied unconstitutionally to others, in other situations not before the Court."). But "[a] facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that *no set of circumstances exists under which the Act would be valid*." United States v. Salerno, 481 U.S. 739, 745, 107 S. Ct. 2095, 2100, 95 L. Ed. 2d 697 (1987) (emphasis added).

A three-member plurality of the Supreme Court, however, has also set forth a somewhat different test, finding  that when a criminal law with no *mens rea* requirement is the subject of the challenge and "[w]hen vagueness permeates the text of such a law, it is subject to facial attack." City of Chicago v. Morales, 527 U.S. 41, 119 S. Ct. 1849, 144 L.Ed. 2d 67 (1999) (Stevens, J.). The Second Circuit, highlighting the unsettled nature of this area of law, has declined to express a preference for either the "no-set-of-

circumstances" or "permeated-with-vagueness" standard. <u>Rybicki</u>, 354 F.3d at 132 n. 3 (*en banc*).

It is unclear whether the challenged provisions here lack a *mens rea* requirement to a degree that would trigger the latter test; but it is no matter, as this Court finds that the outcome is the same regardless of the standard applied.

Plaintiffs' vagueness challenge concerns the following 10 aspects of the SAFE Act:

- "conspicuously protruding" pistol grip

-  threaded barrel

- magazine-capacity restrictions

- five-round shotgun limit

- "can be readily restored or converted"

- the "and if" clause of N.Y. Penal Law § 265.36

- muzzle "break"

- "version" of automatic weapon

- manufactured weight

- commercial transfer

This Court will explain and address each in turn.

## 1.    The "conspicuously protruding" pistol grip

Penal Law § 265.00 regulates semiautomatic weapons that have a "pistol grip that protrudes conspicuously beneath the action of the weapon." Plaintiffs assert that an ordinary person would not know whether a pistol grip "conspicuously protrudes" beneath a weapon.

The Second Circuit, however, has already found that this provision is not

unconstitutionally vague, at least as analyzed under the "no-set-of-circumstances" test. In Richmond Boro Gun Club, the Second Circuit addressed a New York City law that criminalizes, in much the same way as the SAFE Act, possession or transfer of assault weapons. 97 F.3d 681. The law at issue there, Local Law 78, also employs a one-feature test and bans semiautomatic rifles and shotguns that have, among other features, a "pistol grip that protrudes conspicuously beneath the action of the weapon."

In that case, the plaintiff sued New York City, arguing that this provision and others were unconstitutionally vague. The Appeals Court found that "Plaintiff's facial vagueness challenge is plainly without merit" because, among other reasons, "it is obvious in this case that there exist numerous conceivably valid applications of Local Law 78." Id. at 684. Relying on evidence that is also present in this case (such as depictions of rifles with conspicuously protruding pistol grips), the circuit court found the plaintiff's argument regarding the "conspicuously protruding pistol grip" to be "disingenuous." Id. at 685.

Although the Second Circuit was proceeding under the assumption that Local Law 78 did not implicate a "fundamental right," Plaintiffs here have not identified any compelling reason to depart from this precedent.[17]

_____

[17]National Shooting Sports Foundation, Inc., as *amicus curiae*, argue that a more stringent test should apply because the right to firearm ownership is, as we now know, fundamental. As an initial matter, however, *amicus* does not specify what test it advocates. Moreover, to the extent *amicus* asks this Court to apply the "overbreadth doctrine," the Supreme Court has never recognized the doctrine outside the limited context of the First Amendment. Further, while the Court has recognized a "less strict" test in some situations, such a situation is not present here and this Court has not considered the law under this relaxed standard. See Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 498, 102 S. Ct. 1186, 71 L. Ed. 2d 362 (1982) (a "less strict" standard applies to economic regulation). Indeed, the "more stringent analysis" applies "when examining laws that impose criminal penalties." Thibodeau, 486 F.3d at 66; see also Arriaga v. Mukasey, 521 F.3d 219, 222–23 (2d Cir. 2008) ("The 'void for vagueness' doctrine is chiefly applied to criminal legislation. Laws with civil consequences receive less exacting vagueness scrutiny.").

Further, even under the "permeated-with-vagueness" standard, which was articulated after the Richmond Boro decision, this provision still survives. Under this standard "a law must at a minimum be 'vague in the vast majority of its applications' to be facially vague." United States v. Awan, 459 F. Supp. 2d 167, 180 (E.D.N.Y. 2006) (quoting Doctor John's, Inc. v. City of Roy, 465 F.3d 1150, 1152 (10th Cir. 2006)). That is not the case here — as the Richmond Boro court noted, there are a significant number of applications where this provision is not vague. 97 F.3d at 684–85. Accordingly, this provision will not be struck for vagueness.

### 2.    The threaded barrel

Penal Law § 265.00 also regulates semiautomatic weapons that have a "threaded barrel designed to accommodate a flash suppressor, muzzle break, or muzzle compensator." Plaintiffs assert that an ordinary person could not know whether a threaded barrel is "designed" to accommodate the outlawed attachments.

But like the pistol grip, the Second Circuit in Richmond Boro has already found that the phrase "threaded barrel designed to accommodate a flash suppressor" is not vague. Id. at 683. It rejected the plaintiff's argument with respect to the outlawed "threaded barrel" because "when the statute is applied to firearms advertised to include parts identified as bayonet mounts, flash suppressors, barrel shrouds, or grenade launchers," there is "certainly" no vagueness. Id.

Even if this were not binding precedent, this Court finds the term to be sufficiently clear. Accordingly, this provision will not be struck for vagueness.

### 3.    Magazine-capacity restrictions

Plaintiffs contend that the 10-round magazine restriction, found at N.Y. Penal Law

41

§ 265.00(23), is vague when applied to tubular magazines, because the capacity of such a magazine varies with the length of the cartridge.

This challenge must fail because, as is evident from Plaintiffs' argument, this provision is only possibly vague when applied to a specific use. When applied to non-tubular magazines, the restriction is not vague. (See Bruen Decl., ¶ 30.)  Plaintiffs do not argue otherwise. Because the provision is neither impermissibly vague in all its applications, nor permeated with vagueness, this challenge must fail.

### 4.    The five-round shotgun limit

Plaintiffs further argue that the language excluding "semiautomatic shotgun[s] that cannot hold more than five rounds of ammunition in a fixed or detachable magazine" from the definition of assault weapons is vague because shotgun shells come in various lengths. See § 265.00(22)(g)(iii).

But this challenge fails for the same reason: it is only possibly vague when applied to a specific use. When applied to a standard-length shell, the restriction is not vague. Thus, this language will also not be stricken for vagueness.

### 5.    "Can be readily restored or converted"

The SAFE Act not only criminalizes magazines that have the capacity to accept more than 10 rounds of ammunition, it also outlaws any magazine that "can be readily restored or converted to accept" more than 10 rounds of ammunition. N.Y. Penal Law §§ 265.00(23), 265.02(8), 265.36, 265.37. Plaintiffs contend that this language is impermissibly vague because it is unclear what is meant by "readily," which, they contend, is a purely subjective criterion.

This language has been in existence since the 1994 federal ban, and was adopted

by New York in its 2000 assault weapons ban. While that does not, in itself, render the language sufficiently clear, Plaintiffs have presented no evidence that there has been any confusion on this issue in the many years of its existence.

Although this Court is sympathetic to Plaintiffs' concerns, this provision reflects the limitations of our language more than poor draftsmanship.  In this sense, this Court agrees with the District of New Jersey, which, addressing similar language and relying in part on the Second Circuit's decision in Richmond Boro, held:

> Surely the Legislature, intent on reaching assault weapons which could be altered in minor ways or disassembled to avoid the purview of the other assault weapon definitions, did not have to specify in hours and minutes and with reference to specific tools and degrees of knowledge the parameters of what 'readily assembled' means. The precision in drafting which plaintiffs demand is neither constitutionally required nor perhaps even possible or advisable given the confines of language in which we all operate.

Coal. of N.J. Sportsmen, Inc. v. Whitman, 44 F. Supp. 2d 666, 681 (D.N.J. 1999).

Here, "[t]he words of this provision are marked by flexibility and reasonable breadth, rather than meticulous specificity, but [this Court] think[s] it is clear what the ordinance as a whole prohibits" — namely, magazines that can be easily restored to violate the law. Accordingly, this provision is not unconstitutionally vague. See Grayned v. City of Rockford, 408 U.S. 104, 110, 92 S. Ct. 2294, 2300, 33 L. Ed. 2d 222 (1972) (citations and quotations marks omitted).

**6.    The "and if" clause of Penal Law § 265.36**

New York Penal Law § 265.36 provides, in relevant part, that:

> It shall be unlawful for a person to knowingly possess a large capacity ammunition feeding device manufactured before September thirteenth, nineteen hundred ninety-four, **and if**

43

> such person lawfully possessed such large capacity feeding
> device before the effective date of the chapter of the laws of
> two thousand thirteen which added this section, that has a
> capacity of, or that can be readily restored or converted to
> accept, more than ten rounds of ammunition.

Plaintiffs concede that this Section "is clear in making it unlawful to knowingly possess a large capacity ammunition feeding device manufactured before September 13, 1994." (Pls.' Br. at 42; Docket No. 114). They contend only that the remainder of the paragraph should be stricken.

Plaintiffs correctly note that the clause beginning with "and if" is unintelligible. Although Defendants contend that this is simply a "grammatical error" and the meaning of the provision, when read as a whole, remains apparent despite the error, this Court cannot agree. The error is more substantial than a mere mistake in grammar. Rather, the "and if" clause is incomplete and entirely indecipherable; in short, it requires an ordinary person to "speculate as to" its meaning. See Cunney, 660 F.3d at 620. This clause must therefore be stricken as unconstitutionally vague. Id. The preceding clause, however, is not challenged, and will remain.[18]

### 7. Muzzle "break"

When properly attached to a firearm, a muzzle brake reduces recoil. The SAFE Act, however, regulates muzzle "breaks." See N.Y. Penal Law § 265.00(22)(a)(vi).  Although New York contends that this is a simple oversight in drafting, and that it intended to refer to muzzle "brakes," it has provided no evidence suggesting that this was the legislature's

---

[18]Section 265.36 contains two subsequent error-free paragraphs. Those are also unchallenged, and will remain.

intent. In any event, "[b]ecause construction of a criminal statute must be guided by the need for fair warning, it is rare that legislative history or statutory policies will support a construction of a statute broader than that clearly warranted by the text." Crandon v. United States, 494 U.S. 152, 160, 110 S. Ct. 997, 108 L. Ed. 2d 132 (1990). Indeed, "[l]egislatures and not courts should define criminal activity." McBoyle v. United States, 283 U.S. 25, 27, 51 S. Ct. 340, 75 L. Ed. 816 (1931) (Holmes, J.). This Court's job is to "presume that a legislature says in a statute what it means and means in a statute what it says there." Conn. Nat'l Bank v. Germain, 503 U.S. 249, 253–54, 112 S. Ct. 1146, 117 L. Ed. 2d 391 (1992). Of course here, the word "break" has its own meaning, distinct from its homophone "brake." And there is no dispute that there is no accepted meaning to the term "muzzle break." Both sides agree that it is, quite simply, meaningless. Consequently, an ordinary person cannot be "informed as to what the State commands or forbids." See Cunney, 660 F.3d at 620. All references to muzzle "break" must therefore be stricken.

### 8.   "Version" of an automatic weapon

New York Penal Law § 265.00(22)(c)(viii) regulates semiautomatic pistols that have an ability to accept a detachable magazine and that are "semiautomatic version[s] of an automatic rifle, shotgun or firearm."

This Court also finds this language  to be excessively vague, as  an ordinary person cannot know whether any single semiautomatic pistol is a "version" of an automatic one.

New York argues that some courts, referencing certain firearms, have called them "versions" of automatic weapons. See, e.g., Staples, 511 U.S. at 614 (referring to the AR-15 rifle as the civilian version of the M-16 automatic rifle). But that alone is insufficient to adequately inform an ordinary gun owner whether his or her specific weapon is a version

of an automatic weapon. The statute provides no criteria to inform this determination, and, aside from the largely irrelevant citations to case law, New York fails to point to any evidence whatsoever that would lend meaning to this term.  Thus, it not only fails to provide fair warning, but also "encourag[es] arbitrary and discriminatory enforcement." Section 265.00(22)(c)(viii) must therefore be stricken as unconstitutionally vague.

### 9.    Manufactured weight

New York Penal Law § 265.00(22)(c)(vii) regulates semiautomatic pistols that have an ability to accept a detachable magazine and that have a manufactured weight of fifty ounces or more when unloaded.  Plaintiffs claim that the term "manufactured weight" is vague. But this Court finds that the term has a plain and commonly-accepted meaning, and that this meaning provides sufficient notice to the ordinary person. This challenge is rejected.

### 10.   Commercial transfer

Plaintiffs also claim that the term "commercial transfer" is vague as used in N.Y. Penal Law § 400.03(7), which outlaws any commercial transfer of a firearm or ammunition unless a licensed dealer in firearms or a registered seller of ammunition acts an intermediary. Once again, however, this Court finds the term has an ordinary and commonly-accepted meaning. Accordingly, this Court will not strike it as vague.

## G.    Dormant Commerce Clause

Last, Plaintiffs argue that a portion of the SAFE Act violates the so-called "dormant" aspect of the Commerce Clause.

That portion, Section 50, effectively bans ammunition sales over the Internet and imposes a requirement that an ammunition transfer "must occur in person." Plaintiffs,

including those who allege that they would continue to buy ammunition online from out-of-state dealers if not for the law, contend that this violates the Commerce Clause, which provides that "Congress shall have Power . . . [t]o regulate Commerce with foreign Nations, and among the several States." U.S. Const. art. I, § 8, cl. 3. As the Second Circuit has astutely observed, "[i]t is well established that the affirmative implies the negative, and that the Commerce Clause establishes a 'dormant' constraint on the power of the states to enact legislation that interferes with or burdens interstate commerce." Arnold's Wines, Inc. v. Boyle, 571 F.3d 185, 188 (2d Cir. 2009). Thus, "[t]he negative or dormant implication of the Commerce Clause prohibits state taxation or regulation that discriminates against or unduly burdens interstate commerce and thereby impedes free private trade in the national marketplace." Gen. Motors Corp. v. Tracy, 519 U.S. 278, 287, 117 S. Ct. 811,136 L. Ed. 2d 761 (1997) (internal quotation marks, brackets, and citations omitted).

Initially, Defendants contend that this Court should not address the merits of this challenge; they argue that because the provision at issue is not effective until January 15, 2014, Plaintiffs' Commerce Clause claim is not ripe and should be dismissed under Federal Rule of Civil Procedure 12(b)(1).[19]

The ripeness doctrine, "drawn both from Article III limitations on judicial power and

---

[19]Defendants do not seek dismissal on the related issue of standing, but this Court notes that Plaintiffs allege that they currently buy ammunition from out-of-state dealers. Under the Act, Plaintiffs will be foreclosed from doing so. As with the discussion regarding the possession of firearms and ammunition, this assertion is adequate to establish standing for this particular claim because Plaintiffs are forced to choose between refraining from making purchases that are not "face-to-face," or subjecting themselves to prosecution. See Humanitarian Law Project, 130 S. Ct. at 271; see also Gen. Motors Corp., 519 U.S. at 286 (customers of class that has allegedly been discriminated against in violation of dormant Commerce Clause have standing); Am. Booksellers Found. v. Dean, 342 F.3d 96, 101 (2d Cir 2003) (plaintiffs had standing to bring dormant Commerce Clause claim because "[i]n th[at] case, the choice that the statute present[ed] to plaintiffs — censor their communications or risk prosecution — plainly present[ed] a 'realistic danger' of 'direct injury'").

from prudential reasons for refusing to exercise jurisdiction," protects the government from "judicial interference until a [] . . . decision has been formalized and its effects felt in a concrete way by the challenging parties." Nat'l Park Hospitality Ass'n v. Dep't of Interior, 538 U.S. 803, 808, 123 S. Ct. 2026, 155 L. Ed. 2d 1017 (2003) (internal citations omitted); Abbott Labs. v. Gardner, 387 U.S. 136, 148-49, 87 S. Ct. 1507, 1515, 18 L. Ed. 2d 681 (1967), *overruled on other grounds*, Califano v. Sanders, 430 U.S. 99, 97 S .Ct. 980, 51 L .Ed .2d 192 (1977). New York does not identify whether it seeks dismissal on Article III or prudential grounds, but this Court finds that the facts demonstrate a "concrete dispute affecting cognizable current concerns of the parties" sufficient to satisfy constitutional ripeness. See N.Y. Civil Liberties Union v. Grandeau, 528 F.3d 122, 131 (2d Cir. 2008) (internal citation omitted). Indeed, pre-enforcement review of the validity of a statute or regulation is warranted "principally when an individual would, in the absence of court review, be faced with a choice between risking likely criminal prosecution entailing serious consequences, or forgoing potentially lawful behavior." Thomas v. City of New York, 143 F.3d 31, 35 (2d Cir. 1998). That is the case here.

Thus, the only issue is one of prudential ripeness. "A case held not to be prudentially ripe reflects a court's judgment that the case would 'be better decided later.'" Ehrenfeld v. Mahfouz, 489 F.3d 542, 546 (2d Cir. 2007). Challenges of this sort require courts to engage in a two-part inquiry, related to the Article III inquiry, that evaluates "both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." Abbott Labs., 387 U.S. at 149; Grandeau, 528 F.3d at 132.

The first step "is concerned with whether the issues sought to be adjudicated are contingent on future events or may never occur," while the second step asks "whether and

to what extent the parties will endure hardship if decision is withheld." <u>Grandeau</u>, 528 F.3d at 132, 134 (internal citations and quotation marks omitted).  In assessing the possibility of hardship, courts "ask whether the challenged action creates a direct and immediate dilemma for the parties." <u>Id.</u>

Here, this Court finds that both facets of the prudential-ripeness requirement are met. Plaintiffs raise a purely legal question, unconnected to "future events that may never occur." And Plaintiffs have sufficiently demonstrated that the impending effective date for the law imposes a direct and immediate dilemma, as Plaintiffs must prepare to comply with the law's new requirements. <u>See</u> <u>New York v. United States</u>, 505 U.S. 144, 175, 112 S. Ct. 2408, 120 L. Ed.2d 120 (1992) (issue ripe for review where plaintiff had to take action to avoid the consequences of a provision with an effective date several years off). Plaintiffs' claim of hardship is further buttressed by the fact that the law creates new obligations and subjects those failing to comply to civil and criminal liability. <u>C.f.</u> <u>Nat'l Park</u>, 538 U.S. at 809 (claim not ripe because regulation at issue did "not command anyone to do anything or to refrain from doing anything[,] . . .  subject anyone to any civil or criminal liability," nor create "legal rights or obligations") (modifications omitted).

Having determined that Plaintiffs' claim is ripe for review, the Court will move to the merits.

Under dormant Commerce Clause jurisprudence, a challenged provision is likewise analyzed under a two-prong test: First, this Court asks whether the ordinance "discriminates" against interstate commerce. If it does, this Court will apply the strictest scrutiny to the ordinance.  If it does not, this Court proceeds to "balance" the ordinance's "incidental" burdens on interstate commerce against its "putative local benefits." <u>See</u>

Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth., 476 U.S. 573, 579, 106 S. Ct. 2080, 90 L. Ed. 2d 552 (1986); Pike v. Bruce Church, Inc., 397 U.S. 137, 142, 90 S. Ct. 844, 25 L. Ed. 2d 174 (1970).

Undertaking that analysis, this Court finds that the face-to-face requirement does not run afoul of the dormant Commerce Clause. The Second Circuit addressed a remarkably  similar issue in Brown & Williamson Tobacco Corp. v. Pataki, 320 F.3d 200, 213 (2d Cir. 2003). There, the plaintiffs alleged that a New York law prohibiting cigarette sellers from shipping and transporting cigarettes directly to New York consumers violated the dormant Commerce Clause. The Second Circuit disagreed, holding that the statute imposed burdens on in-state and out-of-state dealers alike and that, contrary to the plaintiffs' argument and the district court's holding, it did not effectively forbid out-of-state dealers from selling cigarettes in New York state; instead, it eliminated *all* sales not made face-to-face, regardless of the seller's place of business.

The Brown court then went on to find that whatever additional costs the statute imposed were only "incidental effects on interstate commerce" and that the statute passed constitutional muster under the Pike balancing test. Id. at 216–17.

The same is true here. As in Brown, Section 50 of the SAFE Act applies restrictions evenhandedly between in-state and out-of-state arms and ammunition dealers. It does not create a "monopoly" for New York dealers, as Plaintiffs argue; instead (and again like Brown) it eliminates the direct sale of ammunition to New Yorkers no matter the seller's place of business.  As the Brown court found with regard to cigarettes, even assuming that the only way an out-of-state dealer could legally sell ammunition to New York consumers is to establish a brick-and-mortar outlet in New York, so too must in-state sellers. And,

50

even if it is costly and burdensome for out-of-state dealers "to establish brick-and-mortar outlets in New York, that is insufficient to establish a discriminatory effect." See Brown, 320 F.3d at 212; see also Exxon Corp. v. Governor of Maryland, 437 U.S. 117, 125, 98 S. Ct. 2207, 2214, 57 L. Ed. 2d 91 (1978) (even if a statute's burdens fall solely on interstate companies, this "does not lead, either logically or as a practical matter, to a conclusion that the State is discriminating against interstate commerce at the retail level").

Having determined that the statute regulates evenhandedly with only incidental effects on interstate commerce, this Court must uphold the law unless the burden imposed on interstate commerce is clearly excessive in relation to a legitimate local public interest. See Pike, 397 U.S. at 142; USA Recycling, Inc. v. Town of Babylon, 66 F.3d 1272, 1287 (2d Cir. 1995).

This provision is plainly intended to further a legitimate and important public interest: preventing those prohibited from purchasing ammunition from doing so online, especially in mass quantities, by requiring sellers to confirm the identity of a buyer through inspection of valid photo identification. (See Gov.'s Memo in Support, at 7.) If, like here, "a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities." Pike, 397 U.S. at 142. Although Plaintiffs argue that New York's goal can be achieved through other means (such as electronic background checks), Plaintiffs offer no evidence on this point, and have thus have failed to raise a triable issue of fact — as is their obligation — that the law "places a burden on interstate commerce that is 'clearly excessive in relation to the putative local benefits." See Town of Southold v. Town of E.

51

Hampton, 477 F.3d 38, 47 (2d Cir. 2007) (If the challenging party cannot show discrimination . . . it must demonstrate that the law "places a burden on interstate commerce that is 'clearly excessive in relation to the putative local benefits'"). Accordingly, Plaintiffs' motion on this ground is denied and Defendants' is granted.

## IV. CONCLUSION

"Our Constitution is designed to maximize individual freedoms within a framework of ordered liberty." Kolender v. Lawson, 461 U.S. 352, 357, 103 S. Ct. 1855, 1858, 75 L. Ed. 2d 903 (1983). In Heller and McDonald, the Supreme Court found that the right to "keep and bear arms," enshrined in the Second Amendment, was among those individual freedoms. But the Court also noted that the right was not unlimited. Drawing from post-Heller rulings that have begun to settle the vast *terra incognita* left by the Supreme Court, this Court finds that the challenged provisions of the SAFE Act — including the Act's definition and regulation of assault weapons and its ban on large-capacity magazines — further the state's important interest in public safety, and do not impermissibly infringe on Plaintiffs' Second Amendment rights. But, the seven-round limit fails the relevant test because the purported link between the ban and the State's interest is tenuous, strained, and unsupported in the record.

Further, three aspects of the law — the "and if" clause of N.Y. Penal Law § 265.36, the references to muzzle "breaks" in N.Y. Penal Law § 265.00(22)(a)(vi), and the regulation with respect to pistols that are "versions" of automatic weapons in N.Y. Penal Law § 265.00(22)(c)(viii) — must be stricken because they do not adequately inform an ordinary person as to what conduct is prohibited.

Finally, because the SAFE Act's requirement that all ammunition sales be conducted in-person does not unduly burden interstate commerce, it does not violate the Commerce Clause.

## V.  ORDERS

IT HEREBY IS ORDERED, that Plaintiffs' Motion for Summary Judgment (Docket No. 113) is GRANTED in part and DENIED in part.

FURTHER, that Plaintiffs' Motion for a Preliminary Injunction (Docket No. 23) is DENIED as moot.

FURTHER, that New York State Defendants' Motion for Summary Judgment and Motion to Dismiss (Docket No. 64) is GRANTED in part and DENIED in part.

FURTHER, that Gerald Gill's Motion for Summary Judgment and Motion to Dismiss (Docket No. 70) is GRANTED in part and DENIED in part.

FURTHER, the Clerk of the Court is directed to close this case.

SO ORDERED.

Dated:     December 31, 2013
           Buffalo, New York

/s/William M. Skretny
WILLIAM M. SKRETNY
Chief Judge
United States District Court